UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ATA AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:08-CV-0785-RLY-DML |
| | § | |
| | § | |
| FEDERAL EXPRESS CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING LAWRENCE D. MORRISS, JR.'S EXPERT OPINIONS AND REPORT**

Defendant, in support of its Motion *in limine* to Exclude Evidence and Argument Regarding Lawrence D. Morriss Jr.'s Expert Opinions and Report, submits the following memorandum of law:

## I. INTRODUCTION

ATA Airlines, Inc. (ATA) seeks approximately $66 million in lost profit damages as a consequence of Federal Express Corporation's ("FedEx") decision that ATA would not be included as part of the FedEx FY '09 Teaming Arrangement. ATA claims that these are the profits it would have earned from military charter flying for the period of April 3, 2008 (the date ATA ceased operations) through September 30, 2009 (the end of government fiscal year 2009).

Although ATA's military charter segment had been historically profitable, those profits were dropping in dramatic fashion in the years leading up to ATA's cessation of operations. Following an all-time high in FY '05 of $90 million in profit off of $406 million in revenue, ATA's profit dropped in FY '06 to $35 million on $324.6 million of revenue. By FY '07, its profits were only $2.1 million, based on $276.9 million in military charter revenue.

Moreover, assuming that ATA had continued to perform for the remainder of FY 2008 and been part of the FedEx Team in FY 2009, its military charter operation was facing a number of substantial headwinds.  These challenges to ATA's profitability include, but are not limited to: additional flying demands from team member Northwest Airlines, reducing the number of flight available to other passenger carriers; loss of narrowbody business due to the military's reclassification of ATA's 757-200 to short-range aircraft; one time costs associated with the shut down of ATA's failing scheduled service operation; and additional debt burden and other overhead expenses borne by military charter following the shut down of scheduled service.

Despite these considerable challenges and its immediate history of plunging profits, ATA is claiming in this matter that it would have suddenly swung to a $32.6 million annual profit based on a projection of only $286.5 million in revenue.  This profit calculation, when pro-rated over the claimed damages period (and eliminating by interest and depreciation) results in ATA's claimed lost profit figure of $66 million.

ATA seeks to support its lost profit claim through the expert opinions and report of Lawrence D. Morriss, Jr.  Morris did not, however, seek to determine what ATA's actual cost structure would have been for the remainder of FY '08 and FY '09 as a military-only operation. Instead, Mr. Morris decided to project ATA's costs for the damage period exclusively by employing a regression analysis.

As set forth in full detail, *infra*, Morriss' report and opinions regarding ATA's alleged lost profits should be excluded in their entirety because: (1) Morriss does not possess education, training, knowledge, or expertise sufficient to educate the jury about the complexities of conducting and interpreting a statistical regression analysis, or to employ one himself in a reliable manner; (2) in conducting his regression analysis, Morriss failed to utilize objective

2

controls, standards, and procedures relied upon by professional econometricians and statisticians, resulting in an analysis and lost profits calculation that is so unreliable it is devoid of probative value, provides no assistance to the trier of fact, and risks confusing the jury.

## II.  <u>FACTUAL BACKGROUND</u>

### A.   <u>Morriss' Report</u>

Morriss is a Certified Public Accountant specializing in valuations, financial analyses, insolvency and damage matters, with a certification in financial forensics and a Bachelor of Science in Business Administration earned from the University of Missouri in 1977.  *Morriss Report*, p. 3 (Exhibit A, attached).  He was engaged by ATA to "investigate, analyze and quantify the possible damages ATA may have suffered as a result of FedEx's January 22, 2008 early termination notice of the Fiscal 2007-2009 Agreement."  *Morriss Report*, p. 3.

In his report, Morriss explained his understanding of the facts, some of which are supported by independent verification and some of which were not.  Specifically, he stated that: (1) "FedEx notified ATA on January 22, 2008 that FedEx would not permit ATA to complete the final year of the Fiscal 2007-2009 Agreement"; (2) "According to ATA, FedEx's January 22, 2008 notice of termination was the compelling reason why ATA ceased operations and filed bankruptcy on April 2, 2008"; (3) "ATA, in order to preserve cash and not incur additional obligations without the cash flows that would have come from its military charter business after September 30, 2008, made the decision to cease its military charter business on April 3, 2008"; (4) "ATA ceased its military charter flying on April 3, 2008, but the Fiscal 2007-2009 Agreement with FedEx was effective through September 30, 2009"; (5) "ATA's shareholder/affiliate companies intended to fund any cash needs that ATA's military charter

3

service required due to typical cash flow cycles of the AMC [ . . .] military charter business." *Id.* at 5-6.

Morriss concluded that ATA was "deprived of profits it would have earned for the period of April 3, 2008 through September 30, 2009." *Id.* at 5. In calculating the amount of these profits, Morriss first estimated ATA's potential revenues through fiscal year 2009 based upon an internal ATA projection called "Project Thatcher." *Id.* at pp. 56-60. He did not, however, use ATA's own numbers to project expenses. Instead, he next employed a regression analysis to compare ATA's military revenue to total costs for the fiscal years ended September 30, 1998 through 2007. *Id.* at 65. Morriss' regression analysis consisted of a dependent variable - military costs - to be compared against only one independent variable - revenue. *Id.* Using the results of his regression analysis, Morriss then projected ATA's military costs through September 2009 and subtracted these projected costs from his projected revenue number. *Id.* at pp. 67-70. Based upon this calculation, Morriss projected an annual lost profit of $32,635,298, ultimately arriving at a total lost profit estimate of $65,998,411 for his assumed damage period of April 3, 2008 to September 30, 2009. *Id.* at p. 69.

**B.** **Dr. Adams' Report**

Dr. Adams holds a Ph.D. in Economics and is an Associate Professor of Management and Aronoff Professor of Family Business at Kennesaw State University in Kennesaw, GA. For the past eight years, Dr. Adams has also been an instructor for the National Association of Certified Valuation Analysts, teaching economics and statistics in its Certified Forensic Financial Analyst Program (CFFA) and has been recognized as an Instructor of Exceptional or Great Distinction in six of those eight years. *Adams Report*, p. 2 (Exhibit B-1, attached).

FedEx asked Dr. Adams to review Morriss' regression analysis and provide an expert opinion about whether the analysis was conducted in a reliable manner using methodology employed by econometricians, statisticians, and other professionals having significant training in regression. Dr. Adams' role, as a professional who regularly utilizes, teaches, consults, and writes about the use of regression analysis, was to review Morriss' methodology and provide an expert opinion regarding its reliability and adherence to standards and practices regularly employed by other professionals in the industry.

Dr. Adams reviewed the portion of Morriss' report containing the regression analysis and determined that Morriss had "made numerous errors in 1) his model specification, both theoretically and empirically; 2) the conclusion about lost profits drawn from his estimated model; and 3) his explanation of regression analysis." *Adams Report*, p. 4. In particular, Dr. Adams found that Morriss violated and/or misunderstood several important assumptions of regression and that he had failed to employ critical tests and analyses recognized in the field as crucial to assuring the reliability of a regression model.

Importantly, Dr. Adams' assessment indicated more than merely a disagreement with his results. Rather, Dr. Adams found that Morriss' errors led to "damage estimates that are not statistically valid at any conventional, or commonly accepted, level, . . . [and] indicate[d] a fundamental lack of understanding of regression analysis." *Id.*

### III. <u>LEGAL STANDARD</u>

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Before admitting expert testimony, *Daubert* requires that the district court function as a gatekeeper to ensure that expert testimony is both relevant and reliable. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "In other words, as a threshold matter 'a district court is required to determine: (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue.'" *Id.* (*quoting Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590 (7th Cir. 2000)).

To determine whether an expert's opinions are reliable, a court must first determine whether the expert is qualified in a relevant field and then examine the methodology the expert used in reaching his conclusions. *Smith*, 215 F.3d at 718. Thus, an expert's opinions must be substantiated; "providing only an ultimate conclusion with no analysis is meaningless." *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (internal quotation and citations omitted).

## IV.  ARGUMENT AND AUTHORITIES

### A.    Morris is Not Qualified to Offer Expert Testimony Regarding Regression Analysis.

Because "expert witnesses have the potential to 'be both powerful and quite misleading,'" the Court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc*., 259 F.3d 194, 199 (4th Cir. 2001) (*citing Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) and *Daubert*, 509 U.S. at 588, 595).   The reliability prong of Rule 702 of the Federal Rules of Evidence requires the court to initially

determine whether the expert is qualified in the relevant field. *Smith*, 215 F.3d at 718.  Rule 702 provides that an expert may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. In this case, Morriss fails on all counts to demonstrate expert qualifications sufficient to educate and assist the jury with regard to a regression analysis. Moreover, because his entire lost profits calculation is based upon his regression analysis and the inferences he drew from it, Morriss is also not qualified to educate the jury as to his ultimate projections of lost profits.

**1.     Morriss Lacks Sufficient Experience, Training, or Education to Provide an Expert Opinion Either Based Upon or Regarding a Statistical Regression Analysis.**

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir. 1990).  Morriss has a Bachelor of Science in Business Administration earned from the University of Missouri, is a Certified Public Accountant, a Certified Fraud Examiner, a Certified Valuation Analyst (a designation conferred by the National Association of Certified Valuation Analysts) and lists over 30 years experience in "accounting, tax insolvency, financial analysis, investigations, valuations and damages matters." *Morriss Report*, p. 3.  He states that he has "published articles and valuations and forensic investigation and taught professional education courses on 'Understanding Business Valuation Concepts' and 'Understanding Financial Statements.' *Id.* at p. 4.  He is no doubt qualified to provide expert opinions and testimony on many topics.  However, his expertise in the field of econometrics, and more particularly statistical regression analysis, is a very different story.

7

Morriss has little formal training in statistics; he testified that he had undergraduate level "statistical classes" and "several cost accounting classes" as a college student in the late 1970's. Deposition of Lawrence D. Morriss, Jr. (*Morriss Dep.*) p. 166 (Ex. C).  He claims to have taken post-college courses in which regression analysis was the subject, but could not say how many or describe the courses or the instructors.  *Morriss Dep.* pp. 166-68.  He holds no certifications or degrees in statistics or regression and could not recall any course he has taken in which regression analysis was the specific focus of the course.  *Id.*  He has published no peer-reviewed articles on the subject, and could not name a single text or treatise he considers authoritative on the application of regression.[1]  *Id.* at 173; *Morriss Report*, Tab 2 (curriculum vitae). *See also Berlyn Inc v. Gazette Newspapers, Inc.* 73 Fed. Appx. 576; 2003 U.S. App. LEXIS 16814 at **14 n.3 (4th Cir. Aug. 18, 2003) (testimony of MBA excluded where he did not subscribe to and could not name economic journals, had published no articles, and was unfamiliar with basic terms employed by economists in antitrust analysis).

Morriss purports to have experience conducting regression analyses through his work in accounting and attendance at training courses in the use of Microsoft Excel's regression function. *Morriss Depo.* p. 167.  He does not, however, claim regression analysis to be among his specialties or skills, or list any specific matters in which he performed a regression analysis in the course of his work.  *Morriss Report*, p. 3-4, Tab 2.

It is important to note that Morriss' clear lack of significant experience in this area is not a matter of splitting hairs.  Regression analysis is a very complex concept in econometrics that

---

[1] Morriss was able to name two authorities, one each in econometrics and cost accounting, Jeff Wooldridge and Charles Horngren, respectively, who he suggests as being authoritative on certain specific issues relating to his regression.  However, he misstated both Wooldridge and Horngren's positions, as explained in greater detail, *infra.*

does not have universal application and that provides results requiring careful analysis, testing, and measurement to ensure reliability.  "The heart of expert testimony is the foundation. Whether a witness can parrot the results of a model does not mean that he is qualified to explain how the model works or to opine on the statistical validity or interpretation of the results." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) *citing Wilkins v. Univ. of Houston*, 662 F.2d 1156, 1157 (5th Cir. 1981) ("Since multiple regression analysis is subject to misuse, courts cannot be expected to accept at face value conclusions derived from such a model absent expert testimony concerning the validity of the model itself.")

One noted author on the subject, Patrick A. Gaughan, describes the problem in his treatise, *Measuring Commercial Damages*:

> Regression analysis can be a powerful tool in estimating relationships among variables and in creating projections. However, it has certain limitations and its usefulness will vary from case to case. ***It is very important that the user of this tool understands both its potential complexity and limitations.  As we noted in Chapter 5, too often, experts with little training in statistical analysis and econometrics sometimes blindly use the regression analysis features built into spreadsheet software packages without any appreciation of the complexity or the limitations of the techniques employed***.
>
> **        **        **
>
> Care must be exercised in reviewing the regression analysis that is included in many reports of economic damages. . . . ***Indeed, it is not uncommon for users to simply utilize the linear regression functions included in most spreadsheet packages without even being aware of the existence of other more sophisticated methods that could result in more accurate costs estimates.***

Patrick A. Gaughan, *Measuring Commercial Damages*, p. 176, 179-180 (John Wiley & Sons, 2000) (emphasis added) (attached hereto as Exhibit B-5).

Even taken as a whole, Morriss' education, experience, and training do not demonstrate the level of expertise in regression analysis necessary to provide sufficiently reliable testimony. *See Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992) (holding that witness with some general experience and education in the field lacked sufficient qualifications to qualify as expert in the area).  By way of comparison, Dr. Adams holds a Ph.D. in Economics, is an Associate Professor of Management and Aronoff Professor of Family Business at Kennesaw State University in Kennesaw, Georgia, has taught economics and statistics for the National Association of Certified Valuation Analysts, an organization to which Morriss belongs, and has published peer-reviewed articles in business and economic journals, several of which specifically discuss use of a multiple regression analysis in determining lost profits.  *Adams Report*, p. 2, ex. 1 (curriculum vitae).   *See also,* A. Frank Adams, III, Ph.D., "When a 'Simple Analysis' Won't Do: Applying Economic Principles in a Lost Profits Case," The Value Examiner, pp. 22-28, May/June 2003 (attached hereto as Exhibit B-6).  "A doctoral degree in a discipline that teaches theoretical or applied statistics, such as economics, history and psychology, usually signifies to other scientists that the proposed expert meets this preliminary test of the qualification process." Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 179, 200 (Federal Judicial Center 2000) (hereinafter "Federal Judicial Center Manual", relevant portions attached as Exhibit D).

## 2.   Morriss Does Not Demonstrate Sufficient Knowledge of Statistics and Regression.

Morriss has no formal background in statistics or econometrics, and his lack of knowledge on the subject and failure to grasp many of the key concepts are apparent from his deposition.  Dr. Adams reviewed Morriss' testimony and noted many areas in which Morriss

either completely misunderstood statistical concepts, or had testified contrary to principles set forth in the vast wealth of economics and statistics literature.

For example, Morris was questioned in his deposition as to whether he had utilized a Ramsey RESET test or other objective test to ascertain if his regression model had a specification error.   As explained in greater detail, *infra*, it is standard practice among econometricians and statisticians to objectively test a regression model to ensure it is properly specified.  Morriss' response was simply, "[n]o, it would be inappropriate to do so."  *Morriss Depo*. pp. 153-154.  Morriss then went on to state that he did not need to perform an objective test because he "looked" at a plot of his data and could "see" that the data were linear, which is an entirely subjective measure.  *Id.*  As Dr. Adams explained:

> It's clearly an indication that Mr. Morriss has never had an econometrics class where he paid attention, because if he had, then he would have been exposed to at least the issue of specification error.  And so if he's been exposed to that, whether he's chosen the Ramsey Reset test or the Hausman test or some objective test for specification error, it would be hard to state that it would be inappropriate to do so.   . . . I know of no econometrics text that exists that says that [linearity] is a valid test for specification error.

*Deposition of A. Frank Adams.*, p. 110 (Exhibit E, attached). Morriss was also asked whether linearity tests for specification errors.  His response was, "[t]hat's what specification is, it's linearity." *Morriss Depo*. p. 293.  However,

> [l]inearity does not test for specification error.  I challenge Mr. Morriss to cite any authoritative source that says if you construct a model and use ordinary least squares regression to estimate the parameters, that linearity is a test for specification error.  I just believe he has a gross lack of understanding of what regression analysis is.

*Adams Depo.*, pp. 130-131.   Dr. Adams cited many other examples of Morriss' lack of fundamental understanding of regression methodology and also remarked upon the complete absence of citation to authority in Morriss' report with regard to his regression analysis, stating:

> And so I've got an opinion and I generally cite a source.  And Mr. Morriss has opinions and you have no idea where they're coming from.  It's – what was amazing about this report is you look through the entire report, and I did read through it briefly, and Mr. Morriss and his staff has done a beautiful job of referencing on virtually every single page in it, but when you get to that – those pages of regression analysis, there's nothing.   There are no references, there are no citations, there's no authority, there's absolutely nothing for what he's done.

*Adams Depo.*, p. 128. *See Morriss Report*, pp. 65-68.  Even from a lay perspective, the fact that Morriss dedicates only three pages of his eighty-five page report to the explanation of his regression analysis and its resulting calculation of ATA's military costs suggests a dubious depth and quality of "analysis."

As explained above, in order for Morriss to provide expert testimony with regard to his regression analysis and its impact on his calculation of ATA's lost profits, he must possess qualifications of a sufficient degree to convince the Court that his testimony will be both reliable and of assistance to the jury.  He does not.  Had Morriss elected to project damages through some other method about which he did have expertise, his ability to educate the jury might not be in question.  In fact, Morriss initially attempted to do a business valuation measure of damages. ATA's counsel, however, instructed him to use his lost profits model.  Morriss explained:

> I presented the valuation, the damage model, what was the value on January 22, 2008 versus what we had at the very end of time, and we had a meeting with counsel, and counsel and I discussed – and they thought that the lost profits model was the better fit for this particular case.

12

Q.  Did you concur that the lost profit model was better fit for the case?

A.  Well, the way it was explained to me, it was a legal issue, and because I'm not a lawyer, it's, you know, it's something that I would have to agree with based upon since they're the lawyers in the case.

*Morriss Depo.* pp. 17-18.  Therefore, instead of using a business valuation analysis to project damages, Morriss allowed ATA's counsel to dictate that he use a lost profits analysis, which included the regression analysis, a methodology about which he has very little demonstrated knowledge and even less experience and training.

It is this Court's role as a gatekeeper to guard against submission of expert opinions which are not reliable and cannot assist the jury.  This role is of particular importance when the testimony offered involves a subject as complicated as regression analysis because jurors are less likely to readily grasp its complexities.  If this Court were to permit Morriss to testify about the projected military costs which are necessary to his calculation of lost profits, the jury would have to rely solely upon his assertions regarding the reliability of his own analysis (and Dr. Adams' criticisms of it) because they are unlikely to be able to fairly weigh his credibility on this issue.

FedEx certainly does not suggest that a jury can never judge credibility of an expert witness on a complex topic.  However, the court's gatekeeping role as described in *Daubert* and its progeny compels it to ensure that expert evidence at least meets basic standards of reliability.  Morriss does not possess the qualifications and demonstrated knowledge of statistical regression analysis necessary for him to assure this Court that his testimony can be relied upon by the jury.

Because Morriss' lost profits calculation cannot be completed without a reliable estimate of ATA's projected costs, his entire opinion regarding ATA's claimed lost profits lacks validity.  Therefore, any arguments or evidence regarding Morriss' expert opinions on lost profits should

13

be excluded on the basis of his lack of qualifications.  *See Lamela v. City of New York*, 560 F. Supp. 2d 214, 224 (E.D.N.Y. 2008) ("If an expert lacks the requisite qualifications, any analysis of the reliability of their methods by the court is superfluous.")

    **B.**    **Morriss Failed to Adhere to Recognized Industry Standards in Performing His Regression Analysis.**

Morriss explains in his report that he employed a regression analysis in an attempt to forecast military charter costs for the lost profits period.  *Morriss Report*, p. 65.  Specifically, Morriss claims that, through a regression analysis, he was able to compare and quantify ATA's relationship of military revenue to military costs and use the resulting inference to calculate projected costs from his projection of revenue to a reasonable degree of certainty.  *Id.* at p. 65. However, as explained below, Morriss' regression is both theoretically and empirically unreliable and fails to follow generally accepted standards and practices of professional econometricians and statisticians.  In fact, Morriss' regression is so unreliable that it cannot add anything to the judicial process and would assuredly confuse and prejudice the jurors.

    **1. Explanation of Regression Analysis.**

A regression analysis is a statistical tool that utilizes "a variable to be explained – called the dependent variable – and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable . . . . also called independent variables." *Federal Judicial Center Manual*, p. 181.  Simply put, the point of a regression analysis is to compare the variables and determine whether the relationship between them is statistically meaningful. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. Ky. 2002) (*citing Engineering Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County*, 122 F.3d 895, 917 (11th Cir. 1997)).

14

Conducting a reliable regression analysis begins with properly specifying the model to be used. This is a critical step and "[i]t is essential that a valid statistical method be applied to assist with the analysis in each legal proceeding." *Federal Judicial Center Manual,* p. 191. Specification of the regression model involves several initial steps including: (1) choosing the correct independent and dependent variables; and (2) specifying the proper functional form. *Id.,* pp. 185-191. In this case, Morriss chose military revenues as his independent variable and military costs as his dependent variable, asserting that "when revenues change costs change, as most people know . . . ."[2] Morriss' choice of functional form was a linear equation to which he applied a linear regression model, also known as least squares regression.[3]

Once the variables and form of the model are selected, it is necessary to test the model to ensure it meets the general assumptions of a regression analysis. In order for the results of a regression model to be considered reliable, it must adhere to several critical assumptions. The first assumption, and the one most at issue in the present motion, is that *the model is properly specified*, i.e., that no variables have been omitted, that no irrelevant variables have been included, and that the functional form of the model is correct. *See Federal Judicial Center Manual*, p. 213, n.69.[4]

---

[2] Dr. Adams explains in his report that this relationship is directly contrary to economic theory because, in fact, costs cause revenues. As Dr. Adams explains, "[t]his reversed causality can create problems with the theoretical disturbance of the model which can in turn render the statistical tests and confidence intervals employed by Mr. Morriss to be potentially inappropriate." *Adams Report*, p. 4.

[3] A linear regression model is "[a] regression model in which the effect of a change in each of the explanatory variables on the dependant variable is the same, no matter what the values of the explanatory variables." *Federal Judical Center Manual,* p. 224.

[4] *See id.* at p. 213, n.69. ("The necessary assumptions of the regression model include (a) the model is specified correctly; (b) errors associated with each observation are drawn randomly

*If* the model has not failed any of the assumptions, the results of the model are then analyzed. The regression results take the form of several measurements, including the coefficient of determination ($R^2$), t-statistic, and p-value, none of which are at issue in the present motion. $R^2$ measures "goodness of fit," and shows the percentage of variability in the dependent variable that is explained by the independent variable(s).  For example, Morriss claimed his regression resulted in an $R^2$ of 95%, suggesting that 5% of the variability in costs is explained by something other than revenues and that his results were therefore valid.  However, as explained in more detail below, because he failed to properly specify his regression model – or even to test for a specification error -- the measurements resulting from it are meaningless.

> [O]ne important assumption is that the true model is known.  *In other words, when the statistician has correctly specified the true model and estimated it appropriately, statistical significance can be meaningful.  But if the model is misspecified, meaning important variables are omitted, or the functional form is incorrect, then the estimates are biased and inconsistent and statistical significance is meaningless, even though computer output might indicate statistical significance. Thus, the cavalier statements frequently made about the meaning of statistical significance are only true if the specification of the model is known to a certainty*.

Mark Klock, *Finding Random Coincidences While Searching for the Holy Writ of Truth: Specification Searches in Law and Public Policy or Cum Hoc Ergo Propter Hoc?*, 2001 Wis. L. Rev. 1007 (2001) (emphasis added). *See also Federal Judicial Center Manual* at 217, 217 n.77. ("As a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose

---

from the same probability distribution and are independent of each other; (c) errors associated with each observation are independent of the corresponding observations for each of the explanatory variables in the model; and (d) no explanatory variable is correlated perfectly with a combination of other variables.")

one model over another.  Alternative procedures and tests are available. . . . .These include F-tests and specification error tests.").

### 2.  Morriss Failed to Consider the Impact of Other Variables

A regression analysis is often referred to as either a "simple" or "multiple" regression analysis, the distinction being that "[a] simple regression equation has only one independent variable [while] a multiple regression equation has several independent variables." *Federal Judicial Center Manual*, p. 144.

Multiple regression analyses, when conducted according to recognized econometric and statistical standards, are generally recognized by courts as reliable and "can be a source of valuable scientific testimony in litigation."  *Id.* at 191.  However, simple regression analyses – those with only one independent variable – have not been viewed with confidence in legal proceedings.  In fact, courts have excluded expert witness testimony on the basis of the expert's reliance on a simple regression analysis because it fails to consider other significant variables that might impact the dependent variable.  "[A] reliable regression analysis requires the expert to consider more than a single factor. Standard and reliable methodology requires a 'multiple' regression analysis, which determines the effect of two or more explanatory variables on a variable to be explained, called the dependent variable." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 666-667 (S.D.N.Y. 2007) *citing Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000) (statistical analysis excluded for failure to conduct a multiple regression analysis).  *See also Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1210 (N.D. Cal. 2009) ("It should also be noted that those cases that do hold experts' econometrics analyses inadmissible are limited to cases in which the expert had blatant failures

in methodology -- e.g., they ran only simple regressions rather than complex regressions, or totally omitted to include supply and demand factors as part of the methodology.")

"Multiple regression analysis is a generally accepted method in the science of statistics. In this sense, as a technique it meets the Daubert standards. However, it can be seriously misapplied, providing results which are not helpful to the trier of fact." *Iams Co. v. Nutro Prods*., 2004 U.S. Dist. LEXIS 31141, 14-15 (S.D. Ohio June 30, 2004).  Although it is not essential, or even possible, to account for all possible variables, "failure to consider a major explanatory variable that is correlated with the variable of interest [dependent variable] in a regression model may cause an explanatory variable to be credited with an effect that actually is caused by the omitted variable . . . [which] may lead to inferences made from regression analyses that do not assist the trier of fact." *Federal Judicial Center Manual,* p. 188.

In this case, Morriss performed a simple linear regression analysis – using only military charter revenues as an independent variable and military charter costs as the dependent variable – and refused to consider the impact of any other variables upon ATA's historical military charter costs. *Morriss Report*, p. 65.  Morriss claimed in his deposition that there was simply no need to consider other variables, stating:

> . . . it's a plausible economic issue that when revenues change, costs change, as most people know, and it's a fundamental tenent [sic] of cost accounting, and that the units that we were talking about would have been too cumbersome to project what aircraft, what seat, how many miles, all that kind of stuff, but I have one thing that already encompasses that, and that's my revenue.  So all I need to be able to do is be able to say, okay, is there linear, is there linearity between them, meaning that when revenues change, cost [sic] change, plot says, yup, okay, now I can do a regression and let's see what the tests – the significant tests say about the regression.

18

*Morriss Dep*. pp. 135-136.

In other words, rather than measuring the actual variables impacting costs, such as type of aircraft, seat miles, number of flights awarded, etc., Morris used revenue to proxy these units based upon his assertion that the other units would be "too cumbersome" to project.  However, in doing so, Morriss failed to adhere to the standards generally accepted by econometricians when he refused to at least consider – and reject if necessary – the possibility that variables other than revenue explain changes in costs.  *See Adams Decl*. ¶ 6; *Adams Report*, p. 5, n.4; *infra*, n. 8. Instead, he used his own subjective judgment to hypothesize that the relationship of all other potential variables to costs could be accurately measured by using revenue as a proxy.

However, this hypothesis is contrary to economic theory, which holds that revenue numbers are generally a function of price multiplied by quantity, as explained by Dr. Adams. Under traditional economic theory, price and quantity are two independently moving variables. For example, if the price of an item stays the same, but more are sold, revenue increases. Similarly, if the same number of items is sold but the price decreases, revenue decreases. Therefore, using revenue as an overall proxy for all of these variables is likely to credit revenue with an effect on costs actually caused by some other factor.  *See Adams Depo*. pp. 142-143.

The problem here is that Morriss *never considered* whether other variables would impact his model in a manner that would alter his inferences regarding the relationship of revenues to costs and *never explained* why other variables were irrelevant in this case.  This is a serious departure from recognized standards utilized by professionals trained in the use of statistical analyses and results in an analysis that Morriss cannot claim to be reliable with any certainty. *See Federal Judicial Center Manual,* p.188.

FedEx's objection to Morriss' failure to consider other variables -- whether he ultimately used them in his analysis or not – is not merely academic.  As explained by the case law above, if another variable should have been considered but was omitted, the entire analysis cannot be trusted to be reliable.  *See Iams Co. v. Nutro Prods.*, 2004 U.S. Dist. LEXIS 31141 at **17-18 (S.D. Ohio June 30, 2004) (citing Paul C. Giannelli and Edward J. Imwinkelried, *Scientific Evidence 3rd*, 719-20 (1999) ("[T]he model's omission of any obviously influential variable ***or the absence of a major assumption of regression analysis*** often results in the inadmissibility of the evidence.")) (emphasis added).  Morriss should have made efforts - and demonstrated those efforts - to verify that his chosen variables were the only ones he needed to consider in his analysis.  His cavalier claim that only these variables are "economically plausible" is simply not sufficient.  *See Federal Judicial Center Manual*, p. 203 ("The expert should report investigations that were made into errors associated with the choice of variables and assumptions underlying the regression model.")  Moreover, as explained below, Morriss increases the gap between his method of analysis and the methods commonly applied by econometricians by failing to conduct any objective tests to ensure his model could be verified.

### 3.  Morriss Failed to Perform Any Objective Testing to Verify that His Model Was Properly Specified.

Even more damaging than Morriss' failure to at least consider the impact of other potential variables on ATA's costs was his failure to ensure that the basic assumptions of a regression model had been met.  As explained above, every regression model must adhere to several critical assumptions.  The first is that the model is properly specified.  A model is improperly specified if it has omitted relevant variables, included irrelevant variables, or has an incorrect functional form.  Econometricians employing a regression analysis routinely perform

objective tests to ensure proper specification as a matter of standard practice.  *See also infra n.5; id.* at 217, 217 n.77 ("As a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose one model over another.  Alternative procedures and tests are available. . . . .These include F-tests and specification error tests.")

Morriss asserts that he tested his model for specification error by "looking at" a plot of his data and, because he could "see that there's a linear pattern" he could be assured that his model was properly specified.  *See Morriss Depo.* p.135; p. 287 ("I mean, you can tell whether something is linear or not by sight."); p. 293 ("Q. So does linearity test for specification error? A. That's what specification is, it's linearity.").  Morriss' method of measuring linearity by "eyeballing" is wholly subjective and means that he is solely relying upon his own judgment to determine whether his model is properly specified.  The more critical point is that linearity is NOT a test for specification error.  Linearity of the variables only indicates that there is linear relationship between the variables, which is not an indication of proper specification and, indeed, is not even one of the standard assumptions of a regression model.  Linearity provides little information with regard to whether there is a specification error or if any other assumptions of regression analysis have been violated.  *See Adams Decl.* ¶¶ 13-14 (Exhibit C, attached).

In contrast, a specification error test measures whether the variables and functional form chosen for the model are correctly specified.  An *objective* specification error test ensures that the result is not solely dependent upon the intuition of the individual expert and can be replicated by other professionals.  "An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result. . . . [The expert's] method, 'expert intuition,' is neither normal among social scientists nor testable--and conclusions that are

21

not falsifiable aren't worth much to either science or the judiciary." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) *citing McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

One such objective test commonly used among econometricians is the Ramsey RESET (Regression Equation Specification Error) test. The RESET test is an "F-test" which is generally conducted after the variables and form of a regression model are constructed to test for specification errors in the model. *See Federal Judicial Center Manual*, p. 217, n. 77 (advising courts to consider the results of an F-test or specification error test). The purpose of the RESET test is not to determine exactly what variable has been omitted or the specific problem with a model's functional form. Rather, the RESET test merely measures whether a specification error exists. If the test reveals the existence of a specification error, the analyst must then look further to ascertain exactly what the problem is. *Adams Report*, p. 4-5.

Objective F-tests, such as the RESET test, are critical to the process of conducting a regression analysis because "[f]ailure to develop the proper theory, failure to choose the appropriate variables, or failure to choose the correct form of the model can bias substantially the statistical results …." *Federal Judicial Center Manual,* p. 186. Use of the Ramsey RESET test to test for specification error in a regression analysis is a standard practice that an econometrician would use in his scientific work, outside of the context of litigation. [5]   It is, in fact, a test that

---

[5] "Econometric specification errors such as omitted variables, endogenous explanatory variables, errors in measurement, and an incorrect functional form can each cause least-squares estimates to be biased, inconsistent, and inefficient. The Regression Specification Error Test ("RESET test") is a rather general test of specification error, and is capable of detecting all of the specification problems listed above, but the test is particularly sensitive to omitted variables and incorrect functional form." 2003 U. Ill. J.L. Tech. & Pol'y 475, 496. *See also*, Hill, Griffith and Lim, *Principles of Econometrics* (3rd ed., 2008) (using RESET to test for omitted variables) (Ex. B-2);

students of economics and statistics are commonly taught to use to ensure proper specification of their model.  *See Adams Decl.,* ¶¶ 7-11.  However, even if Morriss did not agree that the application of the Ramsey RESET test was appropriate in his regression analysis, his failure to apply ***any*** objective test to ensure that the basic assumptions of a regression model had been met is inexcusable and falls far short of "employ[ing] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

As with FedEx's other criticisms of Morriss' methodology, Morriss' failure to employ ***any*** objective specification error test is more than just an academic disagreement.  Rather, the procedural failure alone means Morriss did not verify the reliability of his results in a manner that would satisfy the "intellectual rigor" of an expert econometrician.  As a result, he cannot provide testimony regarding his lost profits calculation with any assurance of reliability sufficient to meet the requirements of *Daubert* and its progeny.  Moreover, although Morriss is of the opinion that his model is "good enough," because it has an $R^2$ of 95%, the difference in the ultimate lost profits calculation resulting from a model constructed in a manner which provides a higher degree of confidence is no small matter.  *See Morriss Depo*. p. 142 (". . .improving on [an $R^2$ of] 95 is almost silly and ridiculous").

For example, although Dr. Adams was not engaged to provide an opinion of the "correct" model for projecting ATA's military costs, as part of his analysis, he conducted the objective

---

Peter Kennedy, A Guide to Econometrics, 4th Ed.  (1998) (Ex. B-3); Damodar Gujarati *Basic Econometrics p. 510-11, 521-23*  (3rd ed. 1995) (explaining that RESET may be used to test for omitted variables and incorrect functional form) (Ex. B-4); *Adams Depo. at* 42-38 and exhibits 2 and 3 thereto (Ex. E).

Ramsey RESET test that Morriss failed to do.  Dr. Adams found that "at the highest conventional level of statistical confidence, the 99% level, Mr. Morriss's model is misspecified." *Adams Report*, p. 5.  This means that there is only a 1% chance that Morriss' model was properly specified.  Morriss, therefore, has a fundamental problem with his model and Dr. Adams believes that the error in specification is most likely due to omitted variables. *Id.  See also Federal Judicial Center Manual*, p. 189 ("Bias caused by the omission of an important variable that is related to the included variables of interest can be a serious problem.").  To test his theory that Morriss omitted a variable, Dr. Adams applied a "trend variable" to Morriss' model. *Id.*  A trend variable is a generic variable that can be applied in a regression model as a proxy to represent some other omitted variable which is not currently known. *Adams Report*, p. 5 & n.5 (Ex. B-1).[6]

The result of including the trend variable in Morriss' model was that the projected costs were $292 million (as opposed to Morriss' projection of $253.8 million) with a confidence level of 98.7% (as opposed to Morriss' confidence level of 95%).  Ultimately this change in the cost forecast projects to a $5.5 million ***loss*** for ATA over Morriss' damage period, using Morriss' same projected revenues, as opposed to Morriss' calculation of $32.6 million ***profit***. *Id.* at pp. 5-6.  Neither FedEx nor Dr. Adams intend to suggest that Dr. Adams' revision of Morriss' model necessarily resulted in the "correct" model; Dr. Adams only tested Morriss' model and made attempts to improve it in a manner that passed objective specification error tests.  However, it is important to consider the lost profits calculations resulting from Dr. Adams' improvements on Morriss' model because they illustrate how critical ensuring reliability of the regression model is.

---

[6] "In time series data it is common practice to introduce the trend variable to represent the influence of other variables which cannot be precisely pinpointed."  Gujarati, D.N., p. 407 (1999).

Because Morriss' model did not pass objective specification error tests, and because he failed to consider – or even explain his failure to consider – whether other variables should be included in his regression model, Morriss cannot provide the Court with any assurance that his regression methodology or the results and inferences he made from it have sufficient reliability to be admissible.   Therefore, even if he were qualified to provide testimony and opinions regarding his regression analysis and the resulting lost profits calculation, he cannot meet the reliability standards of *Daubert*. "A 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in Daubert.'" *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

## V.  CONCLUSION

Based upon the foregoing, the testimony, report, and other evidence or argument concerning the expert opinions of Lawrence D. Morriss, Jr. about ATA's claims for lost profits should be excluded from the trial in this case.

Respectfully submitted,

**FEDERAL EXPRESS CORPORATION**

By:   /s/ M. Kimberly Hodges
Peter D. Blumberg (admitted *pro hac vice)*
M. Kimberly Hodges (admitted *pro hac vice*)
FEDERAL EXPRESS CORPORATION
3620 Hacks Cross Road
Building B, Second Floor
Memphis, Tennessee   38125
(901) 434-8219 t
(901) 434-9279 f
kim.hodges@fedex.com

and

George E. Purdy
Carina M. de la Torre
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, Indiana   46204
317.684.5000 t
317.684.5173 f
gpurdy@boselaw.com
cdelatorre@boselaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing *Defendant's Memorandum in Support of Motion in Limine to Exclude Evidence and Argument Regarding Expert Opinions and Report of Lawrence D. Morriss, Jr.* was served this 17th day of February, 2010 on the attorneys of record for all parties by operation of the Court's Electronic Filing System as follows:

Thomas E. Kurth
Kenneth E. Broughton
W. Alan Wright
Francisco Rivero
HAYNES AND BOONE, LLP
1221 McKinney, #2100
Houston, Texas   77010-2007

John David Hoover
Alice M. Morical
Don R. Hostetler
HOOVER HULL LLP
111 Monument Circle, #4400
P.O. Box 44989
Indianapolis, Indiana   46244-0989

Attorneys for Plaintiff ATA Airlines, Inc.

/s/ M. Kimberly Hodges
M. Kimberly Hodges