EXHIBIT 1-A: Morris Report

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA INDIANAPOLIS DIVISION**

------------------------------------------------------------------------------- )
In re:                                                                           )
                                                                                 )
ATA AIRLINES, INC.                                                               )        Case No.1:08-CV-0785-
                                        Plaintiff,                               )        RLY-WGH
                                                                                 )
              v.                                                                  )
                                                                                 )
FEDERAL EXPRESS CORPORATION                                                      )        Expert Report of
                                                                                 )        Lawrence D. Morriss, Jr.
                                        Defendant.                               )
                                                                                 )
------------------------------------------------------------------------------- )

# TABLE OF CONTENTS

## TABLE OF CONTENTS

| Tab | Description | Page(s) | Report Page(s) Reference |
|---|---|---|---|
| 1 | **Report of Lawrence D. Morriss, Jr.** | 1 – 85 | |
| | **Signature Page** | 1 | |
| | **Executive Summary** | 2 – 6 | |
| | Statement of Assignment | 2 – 3 | |
| | Qualifications | 3 – 4 | |
| | Summary Opinions | 4 – 6 | |
| | **ATA Background** | 6 – 14 | |
| | Genesis | 7 | |
| | Military Charter Service | 8 – 9 | |
| | FedEx Relationship | 9 – 11 | |
| | AMC, FedEx Team and ATA Revenues | 11 – 14 | |
| | **Financial Analyses** | 14 – 51 | |
| | Shareholder/Affiliate Funding and Structure | 17 – 19 | |
| | Historical Analysis | 19 – 29 | |
| | Profitability and Cash Flow | 20 – 21 | |
| | Military Charter Operational Statistics | 21 – 27 | |
| | Passengers Enplaned | 22 | |
| | Departures | 22 | |
| | Block Hours | 22 | |
| | RPM | 22 – 23 | |
| | Average Stage Length | 23 | |
| | ASM | 23 | |
| | Load Factor | 23 | |
| | Revenue Statistics | 23 – 24 | |
| | Operating Revenue | 24 | |
| | RASM (in cents) | 24 | |
| | Yield (cents) | 24 | |
| | Expense Statistics | 25 – 26 | |
| | Operating Expense | 25 | |
| | CASM (in cents) | 25 – 26 | |
| | Net Contribution (Loss) | 26 – 27 | |
| | ATA's Aircraft Fleet and Air Frames | 28 – 29 | |
| | Industry Companies | 29 – 33 | |
| | Industry Comparison | 33 – 51 | |
| | Macro Ratio Analysis | 34 – 38 | |
| | Net Income to Sales | 35 | |
| | EBIT to Sales | 36 | |

i

## TABLE OF CONTENTS

| Tab | Description | Page(s) | Report Page(s) Reference |
|---|---|---|---|
| | EBITDA to Sales | 37 | |
| | EBITDAR | 38 | |
| | Micro Ratio Analysis | 38 – 42 | |
| | Net Income as a Percentage of Charter Passenger Revenue | 39 – 40 | |
| | EBIT as a Percentage of Charter Passenger Revenue | 40 – 41 | |
| | EBITDA as a Percentage of Charter Passenger Revenue | 41 – 42 | |
| | Macro Operational Statistic Analysis | 42 – 47 | |
| | RASM | 43 | |
| | CASM | 44 | |
| | Contribution | 45 | |
| | Average Stage Length | 46 | |
| | Yield | 47 | |
| | Micro Operational Statistic Analysis | 47 – 51 | |
| | Charter Passenger Revenues | 48 | |
| | Charter Passenger Revenue per Departure | 49 | |
| | Aircraft Miles per Departure | 50 | |
| | Charter Passenger Revenue per Mile | 51 | |
| | **Lost Profits Introduction** | 51 – 54 | |
| | **Damages** | 54 – 77 | |
| | Military Lost Profits | 55 – 70 | |
| | Projected Lost Revenues | 58 – 62 | |
| | Projected Expenses | 62 – 68 | |
| | Regression Analysis of Total Military Costs to Total Military Revenue | 65 – 68 | |
| | Projected EBITDA and Incremental Lost Cash | 68 – 70 | |
| | Incremental Lost Cash from April 3, 2008 through September 30, 2009 | 70 | |
| | DC-10 Losses | 71 – 77 | |
| | DC-10 Capitalized Costs | 73 | |
| | DC-10 Lease Costs | 73 – 75 | |
| | DC-10 Profits Earned Through Damage Date | 75 – 77 | |
| | Actual L-1011 Disposition Proceeds | 77 | |
| | **Summary Conclusions** | 77 – 85 | |
| 2 | Curriculum vitae of Lawrence D. Morriss, Jr. | 1 – 4 | 4 |
| 3 | Documents Considered List | 1 – 31 | 4 |

**TABLE OF CONTENTS**

| <u>Tab</u> | <u>Description</u> | <u>Page(s)</u> | **Report Page(s)** <u>Reference</u> |
|---|---|---|---|
| 4 | September 7, 2006 Letter Agreement between FedEx and ATA | 1 | 10 |
| 5 | DC-10 Original Costs as Stated in the Northwest Airlines Purchase Agreement | 1 – 2 | 10, 74 |
| 6 | McDonnell Douglas DC-10s | 1 | 11 |
| 7 | January 22, 2008 FedEx letter terminating ATA from the FedEx Teaming Arrangement for the USAF AMC CRAF Long Range Contract for FY09 | 1 | 11 |
| 8 | AMC Total Passenger Revenue by Carrier and Teams | 1 | 12 |
| 9 | Fed Ex AMC Passenger Revenue and FedEx Team Members' Share | 1 | 14 |
| 10 | ATA Airlines, Inc. Shareholder/Affiliates Capitalization December 31, 2007 | 1 | 17 – 18 |
| 11 | ATA Airlines, Inc. Schedule of January 2008 Intercompany Loans | 1 | 19 |
| 12 | ATA Airlines, Inc. Flight Profitability System Military Charter Years Ended December 31, 2005, 2006 and 2007 | 1 | 20 |
| 13 | ATA Airlines, Inc. Operational Statistics – Military Charter Years Ended December 31, 2002 through 2007 | 1 | 21 |
| 14 | ATA Airlines Fleet Schedule with Leases and Cycle Information | 1 | 28 |
| 15 | ATA Aircraft in use Military, Charter and Scheduled Service | 1 – 3 | 28 |
| 16 | List of Guideline Companies Considered, Included and Excluded | 1 – 7 | 29 |
| 17 | Macro Ratio Analysis 2003 through 2007 | 1 – 11 | 34 |
| 18 | Micro Comparison of DOT Yellow and Green Book Financial Information Years Ended December 31, 2003 - 2007 | 1 – 6 | 38 – 39 |
| 19 | Macro Industry Operational Statistics Trailing Twelve Months Ended December 31, 2002 through 2007 | 1 – 3 | 42 – 44, 46 – 47 |
| 20 | Regression Analysis Based on ATA's Military Charter Revenues To Costs | 1 | 66 |

iii

## TABLE OF CONTENTS

| <u>Tab</u> | <u>Description</u> | <u>Page(s)</u> | **Report Page(s)** <u>Reference</u> |
|---|---|---|---|
| 21 | Projected Interest and Depreciation and Amortization Weighted-Average Cost Percentages | 1 – 4 | 68 – 69 |
| 22 | DC-10 Capitalized Costs | 1 | 73 |
| 23 | Wells Fargo DC-10 Lease Information | 1 | 74 |

# TAB 1



666 Third Avenue, 21st Floor, New York, New York 10017
212.808.8330 ▪ www.mesirowfinancial.com

June 10, 2009

Attached is my report in connection with ATA Airlines, Inc. (ATA) versus Federal Express Corporation (FedEx), case number 1:08-CV-0785-RLY-WGH and pending in the United States District Court Southern District of Indiana Indianapolis Division (FedEx Litigation).

My report is intended for use in connection with the above-referenced case. My report, or portions thereof, may not be referred to or distributed to any other persons or entities, other than for the above-referenced matter, without my express written consent.  My report may not be referred to or quoted, in whole or in part, in any registration statement, prospectus, public filing, loan agreement or other agreement or documents without my prior written consent, which may require that I perform additional work. Additionally, I reserve the right to update this report if and when additional information becomes known or available.

My firm, Mesirow Financial Consulting, LLC (MFC) is being compensated for my time and the time of the MFC personnel I supervised and directed in the investigations and analyses leading to this report. The MFC professional hourly rates, for this matter, are as follows: Director, Managing Director and Senior Managing Director $670 - $710; Senior Vice-President $580 - $640; Vice President $470 - $540; Senior Associate $370 - $440; Associate $220 - $320 and Paraprofessional $90 - $190.

I am a Certified Public Accountant (**CPA**) specializing in, among other things, valuation and damage matters, and I am also a Certified Valuation Analyst (**CVA**), a Certified Fraud Examiner (**CFE**) and certified in financial forensics (**CFF**). I have more than thirty (**30**) years of accounting, tax, financial, forensic investigations, expert testimony, valuation, insolvency and damage analysis experience. My qualifications are further discussed in the Qualifications section in the Executive Summary of this report.

My report incorporates the information and conclusions herein, including tabs 2 through 23 and is divided into the following six parts:

| | |
|---|---|
| • Executive Summary | • Lost Profits Introduction |
| • ATA Background | • Damages |
| • Financial Analyses | • Summary Conclusions |

**Mesirow Financial Consulting, LLC**

Lawrence D. Morriss, Jr.
Senior Managing Director

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

# EXECUTIVE SUMMARY

Statement of Assignment

As of October 7, 2008, ATA Airlines, Inc. (Debtor and/or ATA) and its counsel, Haynes and Boone, LLP (Counsel) retained me to assist the Debtor and its counsel in the FedEx Litigation, which the Bankruptcy Court approved on November 5, 2008. On April 9, 2009, subsequent to the March 31, 2009 date that the Debtor's amended plan was confirmed, the trustee of the ATA Plan Trust engaged me to continue my work from my October 7, 2008 retention.

ATA and FedEx entered into at least two three-year agreements, which defined the passenger flying distribution among ATA and Omni Air International, Inc. (Omni) within the FedEx team.[1] The first agreement gave ATA the right to fly 62% of the defined passenger flying distribution for the three fiscal years beginning October 1, 2003 through September 30, 2006 (Fiscal 2004 – 2006 Agreement).[2] The next agreement provided ATA with the right to fly 50% of the defined passenger flying distribution for the three fiscal years beginning on October 1, 2006 and ending on September 30, 2009 (Fiscal 2007 – 2009 Agreement).[3]

FedEx and ATA slightly modified the Fiscal 2007 – 2009 Agreement to allow Northwest Airlines to fly up to 10 flights per month for the fiscal year ended September 30, 2008. In exchange for allowing Northwest Airlines to fly up to 10 flights per month, the commission ATA paid to FedEx was reduced from 7% to 4.5%. Additionally, according to the Air Mobility Command's (AMC) Commercial Operating INtegrated System (COINS) reports (AMC is further explained in the Military Charter Service section of this report and COINS reports are further explained in the AMC, FedEx Team and ATA Revenues section of this report), the flights, if any, that Northwest Airlines flew were immaterial to the overall number of FedEx team flights.

In connection with the Fiscal 2007 – 2009 Agreement, ATA replaced some of their older wide-body Lockheed L-1011 aircraft (L-1011s) with wide-body McDonnell Douglas DC-10 aircraft (DC-10s). ATA's L-1011s had been in service for several years and were becoming worn out or obsolete. Furthermore, parts for the L-1011s were scarce, and in order to fulfill its Fiscal 2007 – 2009 Agreement, ATA acquired the DC-10s in December 2006.  According to ATA management, ATA would not have acquired the DC-10s if it had known FedEx did not intend to

---

[1] Additionally, for each September 30 fiscal year, ATA, FedEx and other airline carriers that were part of the FedEx team entered into three separate annual agreements.
[2] January 17, 2003 agreement between FedEx, ATA and Omni Air International, Inc., bates number OMNI_006494.
[3] August 12, 2005 agreement between Mr. Doherty of ATA and Mr. Molinari of FedEx (bates number P-000090 - 000091) and September 7, 2006 agreement (bates number P-000092), which FedEx and Omni previously agreed to in August 2005 (bates number FEXFY06 1306 – 1307).

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

honor the Fiscal 2007 – 2009 Agreement.[4] Moreover, in December 2006, FedEx had knowledge concerning ATA's DC-10s.[5]

FedEx notified ATA on January 22, 2008 that FedEx would not permit ATA to complete the final year of the Fiscal 2007 – 2009 Agreement. According to ATA, FedEx's January 22, 2008 notice of termination was the compelling reason why ATA ceased operations and filed bankruptcy on April 2, 2008.[6]

My assignment was to investigate, analyze and quantify the possible damages ATA may have suffered as a result of FedEx's January 22, 2008 early termination notice of the Fiscal 2007 – 2009 Agreement.

## Qualifications

I am a Senior Managing Director with MFC, which I joined in August 2006. Prior to joining MFC, I was Principal-in-Charge of Litigation, Valuation & Investigative Services for XRoads Solutions Group (XRoads) for five years. Prior to XRoads I was a partner at PricewaterhouseCoopers LLP for more than 10 years with 24 years of total public accounting experience.

I earned a Bachelor of Science and Business Administration (BSBA) degree with an emphasis in accounting from the University of Missouri. I also earned Continuing Professional Education (CPE) from both the Darden School of Business at the University of Virginia and the Amos Tuck School of Business Administration at Dartmouth College.

I am a Certified Public Accountant (CPA) specializing in, among other things, valuations, financial analyses, insolvency and damage matters, and I am certified in financial forensics (CFF). I am a Certified Fraud Examiner (CFE) and a member of the Association of Certified Fraud Examiners. I am also a Certified Valuation Analyst (CVA), a member of the National Association of Certified Valuation Analysts, and I have performed numerous valuations and damage analyses in my career. I possess more than 30 years of experience in accounting, tax, insolvency, financial analysis, investigations, valuations and damage matters. I have testified and been qualified as an expert in numerous trials, depositions and evidentiary hearings.

My professional career of more than 30 years includes experience in the aviation industry. For example, some of my aviation experience includes work with Ozark Air, Sabre Air and Trans World Airlines as an auditor, consultant or expert.

---

[4] According to Subodh Karnik, ATA's former chief executive officer and president and Doug Yakola, ATA's former chief operating officer.
[5] December 6, 2006 email from Robert L. Rachor, Jr., Vice President, Planning and Performance Air Operations Division FedEx Express, to Gary Molinari of FedEx, Subject: ATA DC-10s fm NWA; bates number FEDEX_E_0024883.
[6] April 3, 2008 Declaration of Steven S. Turoff in Support of Debtor's First Day Motions and according to Subodh Karnik, ATA's former chief executive officer and president.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

ATA ceased its military charter flying on April 3, 2008, but the Fiscal 2007 - 2009 Agreement with FedEx was effective through September 30, 2009. Accordingly, ATA was deprived of the profits it would have earned for the period of April 3, 2008 through September 30, 2009.

ATA's military lost profits are as follows:

| Period: | | Damage Amounts |
| --- | --- | --- |
| April 3, 2008 through September 30, 2008 | $ | 21,999,470 |
| October 1, 2008 through September 30, 2009 | $ | 43,998,941 |
| Total ATA military charter lost profits | $ | 65,998,411 |

The military lost profits of $65,998,411 is ATA's before tax incremental lost cash flow (as discussed in the Lost Profits Introduction section of this report) as measured through ATA's lost incremental earnings before interest, taxes, depreciation and amortization (EBITDA). The $65,998,411 military lost profits is based on the generally accepted hybrid lost profit method (also discussed in the Lost Profits Introduction section of this report).

Additionally, I estimated ATA's military costs based on a regression analysis of ATA's historical military charter revenues to its historical military charter expenses for the fiscal years ended 1998 through 2007.  In this case, I used all of ATA's military charter expenses because as of the date of this report I was unable to determine a reasonable accounting of fixed versus variable costs.  Since most of ATA's fixed costs, including nonrecurring DC-10 expenses (explained in the DC-10 Losses section of this report), were included in my regression formula, ATA's lost military profits are understated. In other words, if the fixed costs and the nonrecurring DC-10 expenses were removed from my regression analysis, my lost profits would be higher, but in order to be conservative I chose to use the lower military lost profits.

ATA's DC-10 losses totaling $27,842,748 are also due to FedEx's January 22, 2008 termination notice of the Fiscal 2007 – 2009 Agreement. ATA, in reliance on and in order to fulfill its obligations under the Fiscal 2007 – 2009 Agreement, acquired DC-10 aircraft to replace its older wide-body L-1011s.  According to ATA management, ATA would not have purchased these DC-10 aircraft if it had known that FedEx did not intend to honor the Fiscal 2007 – 2009 Agreement.[8] Moreover, in December 2006, FedEx had knowledge concerning ATA's DC-10s.[9]

---

[8] According to Subodh Karnik, ATA's former chief executive officer and president and Doug Yakola, ATA's former chief operating officer.
[9] December 6, 2006 email from Robert L. Rachor, Jr., Vice President, Planning and Performance Air Operations Division FedEx Express, to Gary Molinari of FedEx, Subject: ATA DC-10s fm NWA; bates number FEDEX_E_0024883.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

Accordingly, ATA's military charter business DC-10 losses are:

| | | | |
|---|---|---|---|
| I. | DC-10 Capitalized Costs | $ | 19,420,000 |
| II. | DC-10 Lease Costs | $ | 15,331,476 |
| III. | Less: DC-10 Profits Earned Through Damage Date | $ | (2,858,728) |
| IV. | Less: Actual L-1011 Disposition Proceeds | $ | (4,050,000) |
| V. | Total DC-10 Losses | $ | 27,842,748 |

Additionally, I investigated ATA's military charter service and determined ATA's military charter service, prior to April 2, 2008, was a strong going-concern business that was profitable and cash flowed. Moreover, ATA's shareholder/affiliate companies intended to fund any cash needs that ATA's military charter service required due to typical cash flow cycles of the AMC (AMC is further explained in the Military Charter Service section of this report ) military charter business.

## ATA BACKGROUND

ATA started in the airline business in 1973 and became a common-air-carrier in 1978. ATA's airline business included scheduled service, commercial charter, some cargo service and a significant military charter service. ATA provided military charter service since 1983 and was part of the FedEx AMC team since 1992.

Since 1992, ATA's military charter service with FedEx and the FedEx team was based on several different agreements. One agreement was FedEx's agreement with the U.S. government, awarded through AMC, to provide military charter services for fiscal year periods ending on September 30. Another agreement was the previously discussed ATA and FedEx three-year agreement defining the distribution of passenger flying within the FedEx team, with the latest agreement known as the Fiscal 2007 – 2009 Agreement.  In addition to the three-year agreements, ATA's military business relationship with FedEx was supplemented each year through three annual agreements, with each agreement ending on September 30 as well.

The Fiscal 2007 – 2009 Agreement gave ATA the right to fly 50% of FedEx's AMC defined international passenger business for the three years ending September 30, 2009.  This agreement was slightly modified by ATA and FedEx to allow Northwest Airlines to fly up to 10 flights per month for the fiscal year ended September 30, 2008.  In exchange for allowing Northwest Airlines to fly up to 10 flights per month, the commission ATA paid to FedEx was reduced from 7% to 4.5%. Additionally, according to AMC's COINS reports (as explained in the AMC, FedEx

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

this case, I used all of ATA's military charter expenses because I was unable to determine a reasonable accounting of fixed versus variable costs. Since most of ATA's fixed costs, including nonrecurring DC-10 expenses (explained in the DC-10 Losses section of this report) were included in my regression formula, ATA's lost military profits are understated. In other words, if the fixed and nonrecurring DC-10 costs were removed from my regression analysis, my lost profits would be higher; but in order to be conservative, I chose to use the lower military lost profits.

I was able to account for some of ATA's military charter fixed costs in order to compute EBITDA. I discovered ATA's method for allocating depreciation and amortization to its ownership expense if the FPS, so I was able to quantify depreciation and amortization. I was also able to determine how ATA allocated interest expense to overhead expense within its FPS.

ATA allocated all of its administrative and financing expenses to its various financial segments irrespective of whether that financial segment actually incurred such costs because it was the easiest method. This was the easiest method because ATA's financial statements were prepared on a combined basis, so segment allocations of administrative and financing expenses would not appear on the combined financial statements. In this case, the evidence showed that ATA's military charter service was a profitable and cash flowing business. Accordingly, I was able to determine the amount of allocated depreciation and amortization expense and interest expense that was included in ATA's military charter costs.

I also compared my computed net lost profits and lost incremental EBITDA to ATA's military charter service historical net lost profits and EBITDA. The historical comparison indicated that both of my computed net lost profits and lost incremental EBITDA were lower than ATA's military charter service historical amounts. This comparison provided me with additional assurance that my net lost profits and lost incremental EBTIDA computation was reasonable.

One of my first steps in determining ATA's military lost profits was to investigate ATA's projected military revenues for December 31, 2008, which was prepared prior to FedEx's January 22, 2008 notice. This military revenue projection gave me the best evidence of what ATA anticipated in conjunction with its on-going Fiscal 2007 – 2009 Agreement.

In investigating ATA's plans for the future, I studied ATA's board of directors meeting minutes. I discovered ATA had a board of directors meeting on January 22, 2008, which I understand from Counsel took place prior to FedEx's notification of the termination from the FedEx team. Included in the minutes from this January 22, 2008 board of directors meeting was a discussion related to the management-prepared projection called "Project Thatcher."[66]

Project Thatcher was a code name ATA used for an internal analysis of ATA's future business strategy. Included in Project Thatcher was ATA's consideration of what its various business segments would look like in 2008 based on, among other things, selling or liquidating its scheduled service and concentrating on its charter service business. Project Thatcher was

---

[66] See boards of directors' meeting minutes at P-003383 through P-003410.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

considered at the January 22, 2008 ATA board of directors meeting and apparently was subsequently discussed at a January 25, 2008 financial planning and analysis meeting. Included in Project Thatcher were rolling forecasts for each of ATA's business segments, which included fleet and profitability projections through December 31, 2008.

I discovered that Project Thatcher projected military revenues of approximately $339 million for the year ending in December 2008. I analyzed the $339 million for reasonableness by comparing ATA's military charter projected RASM percentage increase to ATA's military charter actual annual RASM percentage changes from 2003 through 2007. I discovered the increase projected from the prior year in ATA's military charter projected RASM was 1.3%[67] and that its actual weighted-average RASM percentage increase for 2003 through 2007 was 6.4%. In other words, the percentage of projected RASM increase was reasonable, and conservative, when compared to ATA's military charter actual history.

Next, I investigated some of ATA's military charter projected revenue capacity issues contained in Project Thatcher. I compared the projected ASM to departures, enplaned passengers to departures, block hours to departures, departures to aircraft in service and ASM to aircraft in service by each plane type to ATA's historical capacity statistics for the years 2004 through 2007. This analysis revealed that the Project Thatcher projections were reasonable when compared to ATA's military charter historical capacity statistics. My analysis also indicated that the newly acquired DC-10s were projected to be more efficient than in 2007, which was reasonable when considering the DC-10 conversion issues in 2007 that would not be present in the future.

I also performed a reasonableness test of the projected $339 million by comparing it to an estimate of what ATA's military charter revenue in 2008 would be if based on ATA's historical share of the FedEx team's AMC revenues for the years 2003 through 2007. My test resulted in domestic revenue of $22.8 million and international revenue of $286.5 million for a total of $309.3 million. The $309.3 million was within 10% of the Project Thatcher revenue of $339 million, which meant the $339 million was reasonable. In order to be conservative, however, I used my lower international revenue of $286.5 million[68] in the lost profits calculation since the Fiscal 2007 – 2009 Agreement only related to international revenues.

Next, I analyzed ATA's projected military charter expenses contained in Project Thatcher. I compared ATA's military charter actual expenses for the years 1998 through 2007 and the month of January 2008 with the Project Thatcher projected expenses. This comparison showed that there were a few expenses that needed additional analysis, such as fuel, crew, maintenance and overhead.

---

[67] Project Thatcher projected a RASM of 11.87¢ and ATA's 2007 military charter segment's RASM in 2007 was 11.72¢, an increase of 1.3%.
[68] One of the reasons I chose the $286.5 million was because in 2007 ATA's military charter service actual revenue was $287.6 million, which was about the same as my 2008 revenue estimate. Although 2007 was an anomaly for ATA's military profitability due to the DC-10 costs, I thought the $286.5 million was the best and most conservative revenue estimate for ATA's military charter service in 2008, based on my testing.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

Fuel costs were an industry wide issue,[69] but a significant portion of crew, maintenance and overhead costs were related to the DC-10 conversion costs. At the time of this report I could not reasonably quantify these one-time or nonrecurring DC-10 costs,[70] so I decided to test the costs using a regression analysis, which proved to be more reasonable.

In my regression analysis, ATA's military charter total costs for 1998 through 2007 were regressed with ATA's military charter total revenues for 1998 through 2007. The regression outcome resulted in a cost estimate with a very high statistical score. In other words, the regression formula was the best estimate of what ATA's military costs would have been in 2008, which included the nonrecurring DC-10 and fixed costs.

Next, I determined the projected incremental lost profit or EBITDA based on the projected revenues and expenses. I was able to determine how interest, depreciation and amortization expenses were allocated within ATA's military charter expenses, which were embedded in the projected expenses. I chose EBITDA because that is a proxy for the incremental cash ATA's military charter business would have received from the remaining term of the Fiscal 2007 – 2009 Agreement with FedEx.

Usually in lost profits analyses, fixed and semi-variable costs are not included in the lost profits computations. However, I was unable to determine the fixed or semi-variable expense components included in overhead in this case. Accordingly, my lost profits or EBITDA is conservative and understated since the fixed costs and the nonrecurring DC-10 costs were embedded in my regression analysis. In other words, my incremental lost cash flow would have been higher if I could have isolated the nonrecurring DC-10 and fixed costs.

Additional conclusions and how I arrived at ATA's military lost profits are amplified in the following sections:

- Projected Lost Revenues
- Projected Expenses
- Projected EBITDA and Incremental Lost Cash

**Projected Lost Revenues**

Just before FedEx's termination notice on January 22, 2008, ATA forecasted total 2008 military charter revenue of $339,288,621,[71] which was included in the Project Thatcher analysis,

---

[69] Fuel costs were less of an issue for ATA's military charter business since its fuel costs were reimbursed through the AMC contracts.
[70] I am continuing to investigate this issue and if additional documents are discovered that are responsive to this issue I intend to update my lost profits analysis.
[71] "Charter/Military Sales 2008 Budget" at P-006827 and agreed to Project Thatcher projected revenues at P-023002.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

previously discussed.  Project Thatcher assumed, among other things, that ATA would dispose of its scheduled service segment and concentrate on its military charter segment.

Included in Project Thatcher were detailed support schedules,[72] however, they included all charter revenue forecasted in one "charter" category. In order to determine which portion of this forecasted charter revenue was applicable to the military charter segment, I compared the Project Thatcher forecasts (forecasts of the fleet plan, ASMs, departures, onboard passengers, enplaned passengers, block hours and RPMs) to the support documents.

I discovered the forecasts included in Project Thatcher compared the Project Thatcher statistics to the forecasted statistics contained in ATA's 2008 budget prior to its determination that it would dispose of its scheduled service segment (2008 Op Plan 2).  The 2008 Op Plan 2 included detailed revenue projections by the individual charter segments; therefore, by comparing the forecasted statistical performance between Project Thatcher and 2008 Op Plan 2, I could determine what changes took place in the revenue projections.

The Project Thatcher and 2008 Op Plan 2 comparison analysis showed there were no changes in the forecast of the military charter segment.  Therefore, it was reasonable for me to assume that the forecasted revenue for the military charter in Project Thatcher was the same as the 2008 Op Plan 2 military charter budget of $ 339,288,621.

To analyze the reasonableness of the Project Thatcher's forecasted military activity, I investigated revenue and capacity statistics based upon ATA's anticipated fleet plan statistics in Project Thatcher and compared them to ATA's historical performance.

I first analyzed the projected RASM, as shown below.

| | 2007 Historical: | | | | As Projected in Project Thatcher: | | | |
| | Total Revenue (in 000s) | Total ASMs (000s) | RASM | | Total Revenue (000s) | Total ASMs (000s) | RASM | Difference |
|---|---|---|---|---|---|---|---|---|
| Military: | | | | | | | | |
| 757-200s | $ 22,003 | 176,268 | 12.48¢ | | $ 28,559 | $ 214,321 | 13.33¢ | 0.8¢ |
| 757-300s | $ 77,024 | 667,060 | 11.55¢ | | $ 84,732 | $ 748,085 | 11.33¢ | -0.2¢ |
| 737-800s | $ 5,526 | 42,256 | 13.08¢ | | $ 5,588 | $ 44,903 | 12.45¢ | -0.6¢ |
| DC-10s | $ 33,178 | 278,832 | 11.90¢ | | $ 181,766 | $ 1,523,494 | 11.93¢ | 0.0¢ |
| L-1011s | $ 149,882 | 1,289,449 | 11.62¢ | | $ 38,643 | $ 326,601 | 11.83¢ | 0.2¢ |
| Total Military | $ 287,612 | 2,453,865 | 11.72¢ | | $ 339,289 | 2,857,404 | 11.87¢ | 0.2¢ |

As shown above, ATA's military charter RASM was forecasted to increase by 0.2¢, which was a 1.3% increase from 2007. I determined the 1.3% increase was reasonable by investigating ATA's military charter RASM percentage change for the years ended December 31, 2003 through 2007 and discovered the weighted-average RASM increase was 6.4%, as follows:

---

[72] ATA Airlines, Inc. 2008 Thatcher Analysis Scenario 1 at P-022945 through P-023027.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

Percentage Change in RASM

| Line | Item | Military Charter | | | | | Weighted Average % Change |
|---|---|---|---|---|---|---|---|
| | | 2007% | 2006% | 2005% | 2004% | 2003% | |
| 1 | % Increase (Decrease) in revenue per available seat miles (RASM) | 1.8% | 6.4% | 11.4% | 12.4% | 2.1% | 6.4% |

After determining that the RASM as projected for the military charter segment was reasonable, I then analyzed the military segment's operating statistics as projected in Project Thatcher and compared them to how ATA had performed historically since 2004, as shown below:

| | For the Year Ended December 31 | | | | Military Statistics As Forecasted in Project Thatcher for 2008 |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | |
| **Military Service** | | | | | |
| *ASM (000) / Departures* | | | | | |
| B737-800 | 190.1 | 230.5 | 119.2 | 127.8 | 132.2 |
| B757-200 | 375.9 | 379.3 | 304.4 | 297.4 | 298.3 |
| B757-300 | 433.3 | 429.1 | 413.9 | 415.8 | 400.0 |
| DC-10-30 | | | | 645.0 | 670.8 |
| L-1011 | 689.4 | 752.8 | 722.8 | 751.3 | 774.8 |
| *Enplaned Passengers / Departures* | | | | | |
| B737-800 (160-175 seats) | 56.1 | 41.5 | 49.5 | 51.7 | 55.6 |
| B757-200 (185-200 seats) | 37.5 | 31.4 | 45.9 | 47.4 | 62.2 |
| B757-300 (232-247 seats) | 41.2 | 34.9 | 37.5 | 38.7 | 44.8 |
| DC-10-30 (318 seats) | | | | 74.8 | 92.2 |
| L-1011 (283 seats) | 62.7 | 71.3 | 70.5 | 66.2 | 82.4 |
| *Block Hours / Departures* | | | | | |
| B737-800 | 2.7 | 3.5 | 2.0 | 2.1 | 2.1 |
| B757-200 | 4.4 | 4.5 | 3.7 | 3.6 | 3.6 |
| B757-300 | 4.1 | 4.1 | 3.9 | 3.9 | 3.8 |
| DC-10-30 | | | | 4.7 | 4.8 |
| L-1011 | 5.0 | 5.5 | 5.4 | 5.7 | 5.8 |
| **Charter Service (Military & Other)** | | | | | |
| *Departures / Aircraft in Service* | | | | | |
| B737-800 | 338.3 | 98.1 | 340.0 | 139.4 | 130.1 |
| B757-200 | 82.7 | 79.5 | 44.7 | 50.6 | 77.1 |
| B757-300 | 81.5 | 81.1 | 58.2 | 77.6 | 79.0 |
| DC-10-30 | | | | 38.4 | 46.0 |
| L-1011 | 63.2 | 54.3 | 46.9 | 49.4 | 41.7 |
| *ASM (000) / Aircraft in Service* | | | | | |
| B737-800 | 75,615 | 20,011 | 41,350 | 18,171.2 | 17,209.3 |
| B757-200 | 29,790 | 28,611 | 13,013 | 16,046.6 | 22,986.0 |
| B757-300 | 34,404 | 34,472 | 23,759 | 31,415.1 | 31,594.6 |
| DC-10-30 | | | | 28,144.5 | 30,829.2 |
| L-1011 | 43,184 | 40,807 | 33,892 | 36,748.6 | 32,286.5 |

As shown above, only a few of the performance statistics forecasted for the military segment indicate that ATA must achieve a higher statistic than they had achieved historically, and most of them relate to the fleet of DC-10s. As explained in the DC-10 Losses section of this report, ATA put the first DC-10 into service in June of 2007 and the fourth into service in December of 2007.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

efficient use of the crew's time, resulting in higher crew expenses as a percentage of the corresponding revenue.

This increase in maintenance costs and less efficient use of crew time continued into 2007 and these issues were exacerbated by the introduction of the DC-10 fleet.  ATA initially planned to replace four L-1011s in service during 2006 by September of 2007, and have seven DC-10s in service by December 2007,[76] with the anticipation of expanding its widebody capacity for its Fiscal 2007 – 2009 Agreement.  However, ATA ran into issues related to putting the DC-10s into service during 2007, including maintenance issues and a shortage of trained crew to fly them.  As a result of these issues, ATA was only able to introduce its fourth DC-10 into service in December 2007 and was still flying three L-1011s through 2007.  Therefore, ATA was still incurring the increased maintenance and inefficient crew time associated with the L-1011s, but it also incurred higher maintenance to get the DC-10s into service and even less efficient crew time related to training and down-time.

Due to these events, I considered the decrease in ATA's military profitability in 2007 was an anomaly.  A large portion of decreased profitability of 2007 was related to one time expenses that would not continue in the future.  It is reasonable to assume that once the DC-10 fleet was fully in service, relieving the need for the L-1011s, ATA's military segment maintenance and crew expense would have been more closely aligned with its historical expense percentage prior to fiscal year 2007.

However, since I could not quantify the nonrecurring expenses related to the DC-10 and L-1011 issues, I took the conservative approach of estimating costs using a regression analysis.  In other words, my lost profits analysis incorporated the nonrecurring DC-10 costs since those costs were embedded in my regression analysis.

<u>Regression Analysis of Total Military Costs to Total Military Revenue</u>

In order to determine ATA's military costs for the Lost Profits Period, I performed a regression analysis comparing ATA's annual military revenue to total costs for the fiscal years ended September 30, 1998 through 2007.

A regression analysis compares the relationship of one independent variable to another dependent variable for the purpose of using the results of this analysis as a predictor of future dependent variables. In this regression analysis, the independent variable, or "X" variable, was the military revenues while the dependent variable, or "Y" variable, was the military costs.

The following schedule depicts the total revenues and costs for the fiscal years ended September 30 from the FPS reports that I used in the regression analysis.

---

[76] ATA management presentation, "ATA has need for widebody aircraft", Monthly Cash Flow-Year 2 (P-005249).

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

The measurement of the p-value or Significance F is based on the confidence level one selected before performing the regression. In this case I selected a 95% confidence level which means I have to have a p-value less than (1- .95) .05. In this case my p-value was .00001322, which is less than .05 and means that there is a statistically significant relationship between military revenues and military costs.  Stated in other words, the p-value explains how much of the data is explained by chance rather than by the relationship of the variables, which means in this case that greater than 99.999% of the data is explained by the relationship of total costs to total revenue. In other words, the Null Hypothesis in this case is false and my regression results are statistically significant.

After I determined that ATA's military revenue was a reasonable benchmark to predict total military costs, I utilized the regression results to calculate the costs that correlated to the previously discussed forecasted military revenue of $286,478,392.  The regression formula showed that the y-intercept (cost) was $30,502,004 ($B_0$) and the variable x-intercept (revenue) was 0.779608851 ($B_1$).  Using this formula, I was able to determine, with statistical validity, that the total military costs would have been $253,843,094.[77]

Subtracting the military costs of $253,843,094 from the projected revenues of $286,478,393 indicated ATA's military charter lost net profits would have been $32,635,298, as depicted below:

| | | | | |
|---|---|---|---:|---:|
| I. | **Total Annual Forecasted ATA AMC Revenue** | | | $  286,478,392 |
| II. | Total Annual Forecasted Expense: | | | |
| | $B_0$ Value Based on Regression Analysis | | $        30,502,004 | |
| | $B_1$ Value Based on Regression Analysis | 0.779608851 | | |
| | *Multiplied by* : Total Forecasted Revenue | $   286,478,392 | | |
| | Add: $B_1$ Value | | $      223,341,090 | |
| | **Equals: Total Annual Forecasted Expense** | | | $   (253,843,094) |
| III. | **Forecasted Annual Net Profit** | | | $       32,635,298 |

As previously discussed, ATA's military charter profitability for 2007 was an anomaly, but ATA's military charter lost net profits of $32,635,298 is about what ATA actually experienced for the year ended September 30, 2006. The year ended September 30, 2006 was a better comparison period since that period was free of the DC-10 cost issues, which distorted ATA's

---

[77]  The $253,843,094 incorporates the higher FedEx commission of 7% instead of the lower commission of 4.5%. As previously discussed, FedEx and ATA slightly modified the Fiscal 2007 – 2009 Agreement to allow Northwest Airlines to fly up to 10 flights per month for the fiscal year ended September 30, 2008. In exchange for allowing Northwest Airlines to fly up to 10 flights per month, the commission ATA paid to FedEx was reduced from 7% to 4.5%.  Since the regressed military expenses in the lost profits analysis incorporated the actual expenses for the years ended 1999 through 2007 the higher FedEx commission of 7% is included in the regression computed expense total of $253,843,094.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

military charter profitability in late 2006 through the year ended December 31, 2007. In 2006 ATA's actual military charter net profits were $35,810,085, which provided me with additional assurance that the $32,635,298 was reasonable.

**Projected EBITDA and Incremental Lost Cash**

In order to convert ATA's military charter lost net profit into incremental lost cash before financing costs,[78] I determined ATA's military charter EBITDA for the Lost Profits Period. Since interest, depreciation and amortization were embedded in ATA's military charter estimated costs, I needed to identify each of these items.

Interest expense in ATA's FPS reports was included in the overhead expense line item and was allocated to each segment based on that segment's number of departures. In 2005 and 2006, total interest expense was identified in ATA's annual financial statements. Therefore, for the years 2005 and 2006, I calculated the military charter departures as a percentage of total departures and applied that percentage to the total interest expense identified on ATA's annual financial statements. For 2007, total charter interest expense was included on ATA's segmented income statement, which included military charter. Therefore, for 2007, I determined the percentage of military departures to total charter departures and applied that percentage to the total charter interest expense. I then determined the weighted-average of ATA's military charter interest to revenue for 2005, 2006 and 2007, which was 1.3 percent[79] (*TAB 21*).

Depreciation and amortization were included in ownership costs in ATA's FPS reports and were allocated to each segment based on the number of planes in service. Depreciation and amortization were identified in total on ATA's annual financial statements in 2005 and 2006. During these two years, however, I did not have the number of military charter planes in service separately reported. Instead, I had the total number of scheduled service and total number of charter planes in service, which allowed me to determine military charter depreciation and amortization.

First I determined the amount of scheduled service depreciation and amortization for 2005 and 2006. I did this by determining the percentage of scheduled service planes in service to total planes in service for 2005 and 2006, and applied those percentages to the total depreciation and amortization for 2005 and 2006. This analysis isolated scheduled services total deprecation and amortization. I then removed scheduled services deprecation and amortization for 2005 and 2006 from the total depreciation and amortization, which left a balance for charter services. I then determined the percentage of military charter revenues for 2005 and 2006 to total charter

---

[78] ATA's military charter service generally cash flowed from its operations, and external financing was a non factor.
[79] The FPS reports did not separately disclose interest expense as it was a component of the "overhead" expense. However, according to P-20385 to P-20435, an ATA-prepared memo explaining how expenses are allocated to the various segments within the FPS system, most overhead expenses, including interest expense, are allocated to the respective business segments based on the number of departures. Therefore, I estimated each year's interest expense (years ended December 31, 2005 through 2007) based on each segment's total number of departures divided by the total number of departures, which resulted in interest expense as a percentage of revenue of 0.1%, 1.0% and 1.8% for the military segment for the years ended December 31, 2005 through 2007, respectively.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

revenues for 2005 and 2006 and applied those percentages to the depreciation and amortization balance for charter services, indicating the amount of depreciation and amortization expense that was allocable to the military charter segment.

For 2007, I had information on the number of military charter planes in service to the total charter planes in service so I applied that ratio to the total charter depreciation and amortization in the FPS. I then determined the weighted-average of ATA's military charter depreciation and amortization to revenues for 2005, 2006 and 2007, which was 2.7 percent (**TAB 21**).

Based on this information I was able to determine that ATA's military charter annual projected EBITDA was $43,998,941, as indicated in the chart below:

| | | | |
|---|---|---|---|
| I. | **Forecasted Annual Net Profit** | | $ 32,635,298 |
| | Forecasted Interest Expense | | |
| | Historical Weighted-Average Interest Expense as a Percentage of Revenues | 1.3% | |
| | Total Forecasted Revenue | $ 286,478,392 | |
| II. | **Forecasted Annual Interest Expense** | | $ 3,580,980 |
| | Forecasted Annual Depreciation and Amortization Expense | | |
| | Historical Weighted-Average Depreciation and Amortization Expense as a Percentage of Revenues | 2.7% | |
| | Total Forecasted Revenue | $ 286,478,392 | |
| III. | **Forecasted Annual Depreciation and Amortization Expense** | | $ 7,782,663 |
| IV. | **Incremental annual lost cash - Before Interest, Taxes, Depreciation and Amortization (EBITDA)** | | $ 43,998,941 |

As previously discussed, ATA's military charter EBITDA for 2007 was an anomaly, but ATA's military charter EBITDA of $43,998,941 is lower than what ATA actually experienced for the year ended September 30, 2006. Again, the year ended September 30, 2006 was a better comparison period since that period was free of the DC-10 cost issues, which distorted ATA's military charter EBITDA in late 2006[80] through the year ended December 31, 2007. Using the same allocation formula as indicated in the above chart, ATA's actual military charter EBITDA for 2006 was $49,343,833,[81] which provided me with additional assurance that the $43,998,941 was reasonable.[82]

---

[80] Even though the last part of 2006 was distorted due to nonrecurring L-1011 and DC-10 issues, ATA's military charter service EBITDA for the year-ended December 31, 2006 was $30,092,363.

[81] Adding interest expense of $4,398,468 (Revenue of $338,343,721 x 1.3%) and depreciation and amortization of $9,135,280 (Revenue of $338,343,721 x 2.7%) to the net profit of $35,810,085 equals EBITDA of $49,343,833.

[82] As previously discussed, I discovered a Bain & Company draft analysis of ATA dated March 22, 2006, which was titled ATA Update; bates number P-031399 through P-031577. Bain & Company was apparently retained to assist ATA's management with certain financial planning and the March 22, 2006 draft ATA Update contained some projected information concerning ATA's military charter services. The projected military charter services

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

Incremental Lost Cash from April 3, 2008 through September 30, 2009

In order to determine the incremental lost cash for the Lost Profits Period, I annualized the $43,998,941 EBITDA.  As previously discussed, EBITDA is ATA's proxy for cash lost for the 18 month period from April 3, 2008 through September 30, 2009, indicated as follows:

| | | | |
|---|---|---|---|
| I. | **Incremental annual lost cash - Before Interest, Taxes, Depreciation and Amortization (EBITDA)** | $ | 43,998,941 |
| | Annualized: | | |
| | Divided by 12 Months | | 12 |
| | EBITDA per Month | $ | 3,666,578 |
| | Multiplied by 18 Months | | 18 |
| II. | **Military Lost Profits April 2008 Through September 2009 (Incremental lost cash)** | $ | 65,998,411 |

Accordingly, ATA's military charter incremental lost cash (also known as lost profits) for April 3, 2008 through September 30, 2009 totaled $65,998,411[83] as follows:

| Period: | Damage Amounts | |
|---|---|---|
| April 3, 2008 through September 30, 2008 | $ | 21,999,470 |
| October 1, 2008 through September 30, 2009 | $ | 43,998,941 |
| Total ATA military charter lost profits | $ | 65,998,411 |

The $65,998,411 is understated because, as of the date of this report, I was unable to quantify ATA's military charter fixed costs and the nonrecurring DC-10 costs embedded in ATA's expenses, as previously discussed. In order to be conservative, I accepted the $65,998,411, but I intend to continue investigating this matter and I may modify my results if and when additional information becomes available.

---

information was stale information (since it was dated March 22, 2006), however, it projected that ATA's implied reasonable military charter revenue EBIT (earnings before interest and taxes) for 2008 would range from 14.8% of revenue to 16.8% of projected revenue; bates number P-031415. The March 22, 2006 draft also indicated that ATA's downside or worst case projected EBIT for 2008 may be no less than 5.4% of projected revenue, bates number P-031419. The EBIT in ATA's lost profits computation is $36,216,278 ($43,998,941 less depreciation and amortization of $7,782,663), which is 12.6% of the $286.5 million of lost military charter revenue. Once again  I am not relying on the results of the Bain & Company March 22, 2006 draft, but they are a further indication of the reasonableness of ATA's 2008 lost military charter incremental profits of $43,998,941.

[83] The date of this report is June 10, 2009, which means any lost profits after June 10, 2009 may be present valued to June 10, 2009 since it is still in the future. However, I have not present valued the future lost profits past June 10, 2009 since the actual determinative date will be the date of trial and I understand trial date will be after September 30, 2009. Moreover, I have not included prejudgment interest in the total amount of lost profits, which may be applicable in this case and would start on April 3, 2008 and run through the date of trial.

ATA Airlines, Inc., v. Federal Express Corporation
Case Number 1:08-CV-0785-RLY-WGH, Pending in the
United States District Court Southern District of Indiana
Indianapolis Division

I have published articles on valuations and forensic investigation and taught professional education courses on "Understanding Business Valuation Concepts" and "Understanding Financial Statements." My curriculum vita, which includes a listing of my prior four years of testimony, is included in **TAB 2** of this report.

A list of the documents, not listed in this report, that I have considered in connection with this matter are contained in **TAB 3** to this report.[7]

## Summary Opinions

The following is an abbreviated description of the fuller expert opinions I reached in this matter, which are described in further detail in the ATA Background, Financial Analyses, Lost Profits Introduction and Damages sections of this report. This summary is not intended, of course, to be a substitute for a review of the larger issues addressed in this report.

My investigation and analyses of ATA revealed that ATA's damages, related to FedEx's January 22, 2008 early termination notice of the Fiscal 2007 – 2009 Agreement, and computed with reasonable certainty, are as follows:

|  | ATA Damages | |
|---|---|---|
|  | Military Lost Profits | DC-10 Losses |
| Damage Amount | $     65,998,411 | $     27,842,748 |

FedEx notified ATA on January 22, 2008 that FedEx would not permit ATA to complete the final year of the Fiscal 2007 – 2009 Agreement. According to ATA, FedEx's January 22, 2008 notice of termination was the compelling reason why ATA ceased operations and filed bankruptcy on April 2, 2008. ATA's military lost profits of $65,998,411 are the profits ATA would have received for the period from April 3, 2008 through September 30, 2009 if FedEx honored the Fiscal 2007 – 2009 Agreement.

ATA, in order to preserve cash and not incur additional obligations without the cash flows that would have come from its military charter business after September 30, 2008, made the decision to cease its military charter business on April 3, 2008.

---

[7]Additionally, over the course of my assignment I had discussions with former or current ATA or ATA affiliate company employees, such as Subodh Karnik (president and chief executive officer), Doug Yakola (senior vice president and chief operating officer), Jack Schultz (director of charter finance), Heath Garrett, Bill Garrett, Rob Binns and Wisty Malone (vice president controller/treasurer). Most of my discussions with current or former ATA or ATA affiliate company employees were to gain an understanding of ATA events or ATA information, such as where such information could be retrieved. Any statements of current or former ATA or ATA affiliate company employees that I may have relied upon in forming my conclusions are so indicated in this report.

TAB 2





**LAWRENCE D. MORRISS, JR., CFE, CFF, CVA, CPA**

Senior Managing Director
**Mesirow Financial Consulting, LLC**

666 Third Avenue at the
Chrysler Center, 21st Floor
New York, NY 10017
direct  212-808-8353
fax      212-682-5015
LDmorriss@mesirowfinancial.com

**Education:**

**University of Missouri**, BSBA, Accounting
**University of Virginia**, Darden School of Business CPE
**Dartmouth College**, Amos Tuck School of Business Administration CPE

**Experience Highlights:**

Mr. Morriss, senior managing director, serves as the head of the Litigation & Investigative Services practice. He is a former PricewaterhouseCoopers, LLP partner, a **CPA**, a certified fraud examiner (**CFE**), certified in financial forensics (**CFF**) and a certified valuation analyst (**CVA**) with over 30 years of experience.

Mr. Morriss has been an arbitrator and **testified** as an **expert** in several matters over the years. Some of his expert assignments included intercompany issues, substantive consolidation, franchise/dealership disputes, insolvency, fraudulent conveyances and preferences, business interruption matters, construction disputes, trademark issues, securities/finance disputes, embezzlement/fraudulent reporting cases, business valuations, breach of contract, officers' and directors' standard of care, lost profits and damage issues and post merger and acquisition matters.

Mr. Morriss has performed several forensic **investigations**, such as:

· Business fraud in merger and acquisition transactions
· Internal control investigations
· Financial statement fraud
· Embezzlement investigations

Some closely-held **valuation** engagements Mr. Morriss has performed include:
· Manufacturing                                        · Health Care
· Securities, Mortgages and Derivatives     · Telecommunications
· Information technology                             · Coal Mines

Some of Mr. Morriss' industry experience includes:
· Automotive          · Food                             · Mining
· Aviation              · Franchise                      · Retail
· Banking               · Hotel/Leisure               · Securities/Mortgages, Derivatives
· Construction        · Information technology   · Satellite Services
· Energy                 · Insurance                     · Telecommunications
· Entertainment      · Manufacturing              · Transportation

Some of Mr. Morriss' financial experience is in the 1933 and 1934 Securities Acts financial reporting, generally accepted accounting principles (**GAAP**) and generally accepted auditing standards (**GAAS**).

**Other Information:**

Mr. Morriss is a member of the American Institute of Certified Public Accountants, The Missouri Society of Certified Public Accountants and past member of The National Commission on Fraudulent Financial Reporting (**Treadway Commission**). He is also a member of the National Association of **Certified Valuation Analysts** and the Association of **Certified Fraud Examiners**. He has developed and presented continuing professional education courses on "Introduction to SEC Reporting" and "Public Company Reporting, Including the Foreign Corrupt Practices Act." He has developed and presented CLE seminars on "Understanding Financial Statements" and "Understanding Business Valuation Concepts." Mr. Morriss holds permits to practice with the **New York**, Missouri, Kansas, **Illinois**, Michigan and **California** Boards of Accountancy.

© 2009 Mesirow Financial Holdings, Inc. All rights reserved.

**LAWRENCE D. MORRISS, JR.**
**PRIOR FOUR YEARS TESTIMONY**

| Line | Case name | Attorney client | Attorney's client | Attorney's firm |
|---|---|---|---|---|
| 1 | In re: Enron Creditors Recovery Corp., et al. v. Citigroup Inc., et al. case number 03-09266 (AJG) in United States Bankruptcy Court Southern District of New York | Julia Traver Manson and Stephen J. Shimishak | Citigroup Inc. | Paul, Weiss, Rifkind, Wharton & Garison LLP (New York) |
| 2 | The Jean Coutu Group (PJC) Inc. versus Wells Fargo Bank, N.A., as Trustee, et al. case number 06-CV-14301 (JGK) in the United States District Court Southern District of New York | Rick B. Antonoff and Leo T. Crowley | Wells Fargo Bank, N.A. as Trustee | Pillsbury Winthrop Shaw Pittman LLP (New York) |
| 3 | The Litigation Trust of MDIP Inc. (Formerly known as Mosler Inc.) versus Michel Rapoport, et al. case number 03-CV-779-GMS | Robert E. Zimet and Eric Davis | Michel Rapoport, et al. | Skadden, Arps, Slate, Meagher & Flom LLP (New York) |
| 4 | PSINet Consulting Solutions Holdings, Inc. et. al, case number 01-14916 (REG) in the United States Bankruptcy Court, Southern District of New York | Peter Goodman and Gerry Bracht | PSINet Consulting Solutions Holdings, Inc., et al. | Andrews & Kurth LLP (New York) |
| 5 | WorldCom, Inc. et al., (Debtors), Jointly Administered Chapter 11 Case Number 02-13533 (AJG) | Edward S. Weisfelner | Ad Hoc MCI Trade Claims Committee | Brown Rudnick Berlack Israels LLP (New York) |
| 6 | National Rural Telecommunications Cooperative, et al. v. DIRECTV, Inc., Hughes Communications Galaxy, Inc. et al | Michael Baumann | DIRECTV, Inc and Hughes Communications Galaxy, Inc. | Kirkland & Ellis (Los Angeles) |
| 7 | Diesel Cast France v. Caterpillar Overseas S.A. | Jean-Yves Garaud (Paris, France) and Charles Gustafson (Geneva, Switzerland) | Caterpillar Overseas S.A. | Cleary Gottlieb, Steen & Hamilton (Paris, France) |
| 8 | R.M. Taylor, Incorporated v. General Motors Corporation | William F. Frey | General Motors Corporation | Honigman Miller Schwartz and Cohn (Detroit) |
| 9 | Battenfeld of America Holding Company, Inc., et al. v. Baird Kurtz & Dobson | Randall E. Hendricks and Ulrich Hallemeier (Germany) | Battenfeld of America Holding Company, Inc., et al. | Rouse Hendricks German & May (Kansas City) Battenfeld Service (Troisdorf, Germany) |
| 10 | Comac Partners, L.P. , et al. v. Anchor Glass Container Corporation, et al. | Alex Chackes and Alan Goudis | Anchor Glass Container Corporation, et al. | Shearman & Sterling (New York) |

**LAWRENCE D. MORRISS, JR.**
**PRIOR FOUR YEARS TESTIMONY**

| Line | Case name | Attorney client | Attorney's client | Attorney's firm |
|------|-----------|-----------------|-------------------|-----------------|
| 11 | Sithon Maritime v. Mercury Marine | Alex Marconi | Mercury Marine | Snell & Wilmer (Phoenix and Thessalonica, Greece) |
| 12 | National Grocery v. Schnucks Markets, Inc. | Ed Goldenhersh | Schnucks Markets, Inc | Greensfelder Hemker (St. Louis) |
| 13 | Biomat v. Springwater Enterprises, Inc. | Lawrence Berkowitz | Springwater Enterprises, Inc. | Berkowitz, Feldmiller, Stanton (Kansas City) |
| 14 | Selmon v. Selmon | Elizabeth Drill Nay/Douglas C. McKenna | Mr. Don Selmon and Telecommunications Resources, Inc. | Lewis, Rice & Fingersh (Kansas City) |
| 15 | Scott Christian v. The Peruvian Connection, Ltd. | Elizabeth Drill Nay/Douglas C. McKenna | The Peruvian Connection, Ltd. | Lewis, Rice & Fingersh (Kansas City) |
| 16 | James, et al. v. Commonwealth Energy Corporation | Randy Smith | Commonwealth Energy Corporation | Rus Miliband Smith PC (Newport Beach, California) |
| 17 | PulseCard, Inc. v. Discover Card Services, Inc., et al. | Randall E. Hendricks | Discover Card Services, Inc., et al. | Rouse Hendricks German & May (Kansas City) |
| 18 | HHC/Precision, Inc. vs. OmniQuip Textron International, Inc. and Harbour Group Industries, Inc. | Joseph Hendirx | OmniQuip Textron International, Inc. | Sutton & Murphy (Mission Viejo, California) |
| 19 | Westport Community Secondary Schools, Inc. v. The School District of Kansas City 333 d/b/a Kansas City 33 School District, et al. | James Wyrsch | Westport Community Secondary Schools, Inc. | Wyrsch Hobbs & Mirakian, P.C. (Kansas City) |
| 20 | Excel Laminates, Inc. vs. Lear Corporation | Richard Wilhelm | Lear Corporation | Dickinson Wright (Detroit) |

**LAWRENCE D. MORRISS, JR.**
**PUBLICATIONS AND SPEECHES**

| Line | Publication or Venue | Date | Title | Type | |
|------|----------------------|------|-------|---------|--------|
| | | | | Article | Speech |
| 1 | New York Law Journal | May 24, 2004 | Asset Valuation - Fundamental Factors In Putting a Price Tag On an Equity Interest | X | |
| 2 | New York Law Journal | June 28, 2004 | Litigation: Non-Verbal Signals Key in Detecting Witness Prevarication | X | |
| 3 | Institutional Investor Events | February 15, 2005 | Corporate Governance and Fraud Challenges Faced in a Turnaround or Distressed Situation | | X |

# TAB 20

MFC, LLC

ATA Airlines, Inc.
Regression Analysis Based on ATA's Military Charter Revenues to Costs

| Regression Statistics | |
|---|---|
| Multiple R | 0.976388705 |
| R Square | 0.953334904 |
| Adjusted R Square | 0.947501767 |
| Standard Error | 17930975.48 |
| Observations | 10 |

ANOVA

| | df | SS | MS | F | Significance F |
|---|---|---|---|---|---|
| Regression | 1 | 5.25474E+16 | 5.25474E+16 | 163.434342 | 1.3216E-06 |
| Residual | 8 | 2.57216E+15 | 3.2152E+14 | | |
| Total | 9 | 5.51195E+16 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | 305020004.23 | 155150598.8 | 1.965961113 | 0.084872164 | -5275787.79 | 662279796.26 | -5275787.79 | 662279796.26 |
| Total Military Revenue (X) | 0.779608851 | 0.060982483 | 12.78414416 | 0.000001322 | 0.638982993 | 0.920234708 | 0.638982993 | 0.920234708 |

Page 1 of 1