UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| ATA AIRLINES, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-0785-RLY-DML |
| | ) | |
| FEDERAL EXPRESS CORP., | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the court is Federal Express Corp.'s ("FedEx") motion for summary

judgment[1] on Plaintiff's breach of contract claim (Count A).  For the reasons set forth

below, the motion is **DENIED**.

**I.      Facts**

  **A.      Background**

1.      The United States military does not have sufficient aircraft to meet its needs in

  transporting troops and cargo around the world.  It therefore relies on civilian

  aircraft to service those needs through the Civil Reserve Air Fleet ("CRAF").

  (Defendant's Ex. 1, Declaration of Gary Molinari ("Molinari Dec.") ¶ 4;

---

[1] At the time that FedEx filed the present motion, the court had not yet ruled on FedEx's
Motion for Partial Judgment on the Pleadings.  In that motion, FedEx moved to dismiss the non-
contractual claims asserted in Plaintiff's Complaint, specifically, Counts B-G.  On April 21,
2010, the court granted FedEx's motion.  Thus, the court's present Entry addresses only Count A
of Plaintiff's Complaint, Plaintiff's breach of contract claim.

Defendant's Ex. 2, Deposition of Charles Pollard ("Pollard Dep.") at 22).

2. Most airlines that participate in CRAF have voluntarily aligned themselves with other airlines and formed "teams" in order to bid on contracts which are issued by the United States Air Force's Air Mobility Command ("AMC").  (*See* Molinari Dec. ¶ 12; Pollard Dep. at 34-35).

3. The three primary teams that participate in CRAF are: the Alliance Team Arrangement, the Federal Express Team Arrangement, and the UPS Team Arrangement.  (*See* Pollard Dep. at 34; Molinari Dec. ¶ 16).

4. FedEx has been the leader of the FedEx Team since at least 1990.  (*See* Defendant's Ex. 3, Deposition of Gary Molinari ("Molinari Dep." at 112).

**B.    The Contracting Process**

5. The military has awarded one year contracts under CRAF since at least 1991.  (*See* Defendant's Ex. 4, Deposition of William Doherty ("Doherty Dep.") at 114-15; Molinari Dep. at 62, 93).

6. The government's contract year corresponds with the federal fiscal year, October 1 to September 30 of the next year.  (Doherty Dep. at 14).

7. There are three contracts that establish the FedEx Team from year to year. (Pollard Dep. at 73-74; Doherty Dep. at 117-20; Molinari Dep. at 101).  They are: (1) the Contractor Team Arrangement Agreement ("Arrangement Agreement"); (2) the Contractor Team Arrangement Operating Agreement ("Operating Agreement"); and (3) the Contractor Team Arrangement Fee Agreement ("Fee

Agreement").

8.      The Arrangement Agreement identifies the airlines participating on that year's

team, lists the aircraft being pledged, and establishes the commitments and

responsibilities of team members.  (*See* Molinari Dep. at 40-41, 101; Defendant's

Ex. 5, FY08 FedEx Arrangement Agreement ("FY08 Arrangement Agreement")).

The Arrangement Agreement is signed each year by all airlines forming that year's

team.  (*See* FY08 Arrangement Agreement; Doherty Dep. at 115-16).

9.      The Operating Agreement establishes the limits of the relationship among team

members and contains indemnification and insurance obligations.  (*See*

Defendant's Ex. 6, FY08 Operating Agreement ("FY08 Operating Agreement");

Doherty Dep. at 115-16, 118; Molinari Dep. at 228).

10.     The Fee Agreement establishes the commission, or fee, that the carrier must pay to

participate on the FedEx team and compensate the major airlines for their aircraft

commitments.  (*See* Defendant's Ex. 7, FY08 Fee Agreement (FY08 Fee

Agreement") § 5.A; Doherty Dep. at 42-43, 120-21; Molinari Dep. at 107-09,

228).  The commission is typically a fixed percentage of the revenue earned from

each mission.  (*See* FY08 Fee Agreement § 5.A).

11.     Unlike the Arrangement and Operating Agreements, Fee Agreements are only

between FedEx and the individual carrier.  (*See* Doherty Dep. at 120, 202-03).

Each operating airline negotiates its own commission level, and the airlines do not

know what others pay as commission.  (*See* Doherty Dep. at 120; Pollard Dep. at

38-39).

12.    Each of the Agreements have a "Term" provision, which generally provides that each Agreement has a one-year term which coincides with the government's fiscal year.  (*See* FY08 FedEx Arrangement Agreement § 2; FY08 Operating Agreement § 3; FY08 Fee Agreement § 6).

13.    The Fee Agreement also contains an "Entire Agreement" clause, which states that it, along with the Arrangement and Operating Agreements, "constitute the entire agreement and understanding of the parties on the subject matter hereof, and, as of the effective date hereof, supersedes all prior agreements, whether written or oral, between the parties on the subject matter hereof."  (*See id*. § 8).

### C.    Division of FedEx Team Passenger Business Among Carriers

14.    ATA and Omni Air International, Inc. ("Omni") performed most of the passenger missions for the FedEx Team.  (*See* Molinari Dep. at 48-49).

15.    On January 17, 2003, ATA, FedEx, and Omni entered into a letter agreement allocating the distribution of fixed, long-term expansion[2] and expansion passenger entitlement for the FY04-06 AMC Long Range International Contract within the FedEx Team (the "FY 04-06 Agreement").  The FY 04-06 Agreement reads:

>    It is mutually agreed by FedEx (FX), American Trans Air

---

[2]  CRAF offers two kinds of passenger business to civilian carriers.  The military offers the opportunity to operate an annually guaranteed volume of non-emergency military charter missions, called fixed business.  The military also awards missions on a monthly or shorter time frame based on need, called expansion business.

(ATA) and Omni Air International (OAI) that for the AMC contracts for the period FY '04-FY'06, the distribution of fixed, long term expansion and expansion passenger award shall be sixty-two percent (62%) for ATA and thirty-eight percent (38%) for OAI.

(Defendant's Ex. 8, January 17, 2003 Letter).

16.   With regard to this three-year agreement, William Doherty ("Doherty"), ATA's Director of Military and Governmental Affairs, testified that the FY 04-06 Agreement was advantageous to it for two reasons: (1) "Omni was growing faster than [ATA] was growing at the time," so it was a benefit to ATA to "lock [its share of business] in for three years"; and (2) from a business-planning perspective, "the more you can show your financiers capability[,] the better off you are."  (Doherty Dep. at 24-35).

17.   Omni's Managing Director, Charles Pollard ("Pollard"), also testified as to the intent behind the FY 04-06 Agreement as follows:

> . . . the benefit would be that we are making investments in equipment and people, taking a lot of business risk, and this entitlement gives us greater visibility, greater ability to plan what our revenue streams are likely to look like . . . I think it was a general sense on the part of Federal Express running the team and the carriers operating that, because it did require significant commitments for equipment and the like, that we needed a multiyear stability in that visibility.  So we were going to go out and acquire more DC-10s to be able to fly 38 percent . . . And that would be hard to do for just a one year scenario.

(Pollard Dep. at 69-70).

**D.      The Allocation of Passenger Business Following FY '06**

18.     While the FY 04-06 Agreement was still ongoing, ATA and Omni began

discussing with FedEx as Team Leader, the allocation of passenger business on the

FedEx Team for the next three fiscal years 2007-2009.  Written communications

from Omni to FedEx show Omni's efforts to convince FedEx to increase Omni's

allocation for the next three-year period.  (Plaintiff's Exs.[3] 16-20).

19.     Gary Molinari ("Molinari"), Managing Director of FedEx Charters, negotiated

with ATA and Omni separately.  (Molinari Dep. at 74).

20.     On August 9, 2005, ATA's Doherty wrote Molinari and argued for a compromise

allocation of 52% for ATA and 48% for Omni for FY07-09.  (Defendant's Ex. 9).

Molinari wrote to Doherty in response on August 12, 2005, stating:

> Thanks.  I appreciate your input, [sic] in order to close this
> issue out and so we can aggressively move forward to expand
> the team for FY07 and beyond I would propose we go to a
> 50/50 split.  I believe this is probably the most equitable
> position . . . I would like to proceed on this basis with a letter
> agreement for three years.  Please confirm.

(*Id*.).

21.     After receiving Molinari's email, Doherty telephoned Molinari and confirmed

ATA's acceptance of the "50/50 split" for FY07-09.  (Doherty Dep. at 49, 108-09;

Plaintiff's Ex. 2, Statement of William Doherty ¶ 7).

---

[3] All citations to email and fax communications are referenced solely by the exhibit
number.

6

22.     On August 18, 2005, Omni's Pollard sent a fax to Molinari, writing on the fax

cover page:

> I just returned from vacation to hear we've agreed to a 50/50
> split.  That should be fair all around.  Enclosed is a short
> agreement modeled after the one I sent you in June.  Please
> review and sign as soon as possible.  Call me with any
> questions.

(Plaintiff's Ex. 21).

23.     Pollard's fax transmission included a proposed "short letter agreement"

memorializing the agreed 50/50 split for FY07-09 for execution by Omni and

FedEx (the "Omni Letter Agreement").  (*Id*.).  The Omni Letter Agreement was

signed by Molinari on August 29, 2005, and reads, in relevant part:

> This letter agreement will serve to define the distribution of
> passenger business within the FedEx Contractor Teaming
> Arrangement (the "FedEx Team") for the FY07-09 years of
> the AMC Long Range International Contract (the "AMC
> Contract").
>
> It is agreed that FedEx will cause the FedEx Team to
> distribute 50% of its long range passenger entitlement (fixed
> buy and expansion, wide body and narrow body) to Omni Air
> International, Inc. ("Omni") for the FY07-09 years of the
> AMC Contract.  FedEx and Omni agree to implement this
> agreement by entering into contractor teaming arrangement
> documentation for FY07-09 substantially similar to the
> documentation in effect for the FY06 AMC Contract.

(*Id*.).

24.     Also on August 29, 2005, Molinari told Pollard with respect to the 50/50 split for

FY07-09:

7

> I am waiting to get with our [FedEx] legal to have them draft
> an agreement that all parties sign, in the interim if you want I
> could sign what you have prepared [Omni Letter Agreement]
> if that helps.

(Plaintiff's Exs. 9, Video deposition of Gary Molinari ("Molinari Video Dep.") at 70-71; Plaintiff's Ex. 10, Video Deposition of Charles Pollard ("Pollard Video Dep.") at 128; Plaintiff's Ex. 22).  Doherty testified that Molinari similarly advised him in August of 2005 that FedEx would send ATA an agreement memorializing the agreed three-year 50/50 split.  (Doherty Dep. at 52-53).

25.    The FY07 Fee Agreement, which ATA and Omni separately entered into in 2006 with FedEx, referred to the agreed-upon 50/50 split.  (Plaintiff's Ex. 23, FY07 Fee Agreement).

### E.    The September 7, 2006 Letter

26.    During the summer and fall of 2006, ATA was engaged in discussions with lenders for various financing projects, including financing for additional wide-body aircraft that ATA intended to use as a member of the FedEx Team.  (Doherty Dep. at 53; Plaintiff's Ex. 7, Video Deposition of Sean Frick ("Frick Video Dep.") at 20-21).  As part of the documentation that ATA would provide to potential lenders, Doherty asked Molinari to actually send the previously promised agreement memorializing the 50/50 split agreed to in the FY07-09 Agreement.  (Doherty Dep. at 53, 150-51).

27.    On September 7, 2006, Molinari prepared a letter agreement and emailed a signed

copy to Doherty and Pollard (the "ATA Letter Agreement").  (Defendant's Ex.

15).   Molinari's cover email message stated that the letter was "formalizing the

50/50 split for the pax biz."  (*Id*.).

28.     The ATA Letter Agreement reads, in relevant part:

The letter will serve as the agreement for the distribution between ATA and
Omni of both fixed and expansion for both wide and narrow body passenger
business in the AMC (Air Mobility Command) Long Range International
Contract for FY07-FY09.

It is agreed that the distribution for the above passenger segments will be
fifty-fifty (50%-50%) respectively for both wide and narrow body and for
both fixed and expansion.

(*Id*.).

29.     Doherty signed the ATA Letter Agreement for ATA and returned it to Molinari.

(Defendant's Ex. 16; Doherty Dep. at 152).  Pollard did not sign the document.

(Pollard Dep. at 140).

30.     In an April 13, 2007 email, Molinari informed Pollard that FedEx had "not been

successful in getting ATA to back off the current agreement of 50/50 split for both

w/b and n/b AMC fixed and expansion passenger distribution" and that ATA was

"insistent that they have also made fleet decisions based on the above split . . . ."

Molinari suggested that FedEx and Omni "start to review FY09 and beyond in

June or July as we will be able to establish a new split effective with FY09."

(Plaintiff's Ex. 24).

### F.    ATA's Purchase of DC-10-30 Aircraft

31.    Relying on FedEx's oral and written representations regarding ATA's agreed
continued future participation on the FedEx Team, ATA pursued substantial
capital investments to enable it to fulfill its obligations under the FY07-09
Agreement.  (Plaintiff's Ex. 11, Video Deposition of Doug Yakola ("Yakola Video
Dep.") at 56-57; Doherty Dep. at 65-67; Doherty Dep. Exs, 11, 12a, 12b; Frick
Video Dep. at 69-71).

32.    In December 2006, ATA expanded its fleet of wide-body aircraft, and paid NWA
several millions of dollars for DC-10-30 aircraft ("DC-10s").  (Plaintiff's Ex. 1,
Affidavit of Sean Frick at 2).

33.    ATA also incurred millions of dollars for the commissioning of these DC-10s, the
training of pilots and associated personnel, expenses associated with securing the
necessary FAA certifications and other expenses related to the purchase.
(Plaintiff's Ex. 6, Video Tape Deposition of Gary Ellmer at 80, 81, 86; Yakola
Video Dep. at 46-50).

### G.    ATA's FY08 Fee Agreement

34.    In late 2006, Northwest Airlines ("NWA") advised Molinari that it wanted to start
flying wide body expansion missions, a type of mission flown by both ATA and
Omni.  (*See* Molinari Dep. at 147-48).

35.    In response to NWA's request, FedEx sought to negotiate with ATA to allow
NWA to fly up to 10 flights per month (out of ATA's 50%) in exchange for FedEx

10

reducing the commission that ATA had to pay FedEx from 7% to 4.5% for FY08. (Molinari Dep. at 146-47).

36.    FedEx reached an agreement with ATA that for FY08, NWA would be entitled to up to ten wide body expansion missions per month.  (*See id*. at 147-48).  This is reflected in the FY08 Fee Agreement, dated September 27, 2007, provided that ATA would be entitled to 50% of the FedEx Team's fixed award, 50% of the FedEx Team's narrow body expansion award, and "50% of the residual wide body expansion after NWA has operated up to ten flights per month."  (*See* FY08 Fee Agreement § 5.A.iv).

### H.    FedEx Negotiates an Agreement for FY09-11 with Omni

37.    Throughout 2007, unbeknownst to ATA, many communications ensued between Omni and FedEx to change the allocation of passenger flying on the FedEx Team. The plan was to eliminate ATA, and replace it with NWA (at a much smaller percentage) and allocate a much larger percentage to Omni.  (Molinari Video Dep. at 183; Plaintiff's Ex. 3, Omni Custodian of Records Affidavit at 989, 2091, 010754-56).

38.    Under this new three-year agreement for FY09-11, Omni would receive 100% of the narrow body passenger fixed body entitlement, 100% of the wide body passenger fixed body entitlement, and 70% of the wide body passenger expansion entitlement for FY09-11 with nothing for ATA.  (Pollard Video Dep. at 189).

39.    Ultimately, FedEx signed an agreement for FY09-11 with Omni.  (Molinari Video

Dep. at 63; Pollard Video Dep. at 124).

40.     On January 22, 2008, Molinari called ATA's Chief Operating Officer, Gary

        Ellmer, and informed him that ATA would not be a member of the FedEx Team

        for FY09.  (Molinari Dep. at 241-42; Defendant's Ex. 20).

41.     On April 2, 2008, ATA ceased operations and filed for bankruptcy.  (Complaint ¶

        18).

**II.     Summary Judgment Standard**

        Disposition of a case on summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed.R.Civ.P.56(c).  The record and all

reasonable inferences therefrom must be viewed in the light most favorable to the non-

moving party.  *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264

(7th Cir. 1996).

        The moving party bears the burden of demonstrating the absence of a triable issue.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden may be met by

demonstrating "that there is an absence of evidence to support the non-moving party's

case."  *Id.* at 325.  If the moving party meets its burden, the adverse party "may not rest

upon the mere allegations or denials of the adverse party's pleading," but must present

specific facts to show that there is a genuine issue of material fact.  Fed.R.Civ.P. 56(e);

*see also National Soffit*, 98 F.3d at 265 (citing *Hughes v. Joliet Correctional Ctr.*, 931

12

F.2d 425, 428 (7th Cir. 1991)).

## III.    Discussion

### A.    The Omni and ATA Letter Agreements

The first issue the court must address is whether the parties had a binding and enforceable contract to split the passenger business in the AMC Long Range International Contract between Omni and ATA on a 50/50 basis for the FY07-09 AMC contract years. The parties agree that Tennessee law applies to ATA's breach of contract claim.

A plaintiff who alleges a breach of contract must prove "'(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract.'" *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006) (quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.*, 1998 WL 960287. at *3 (Tenn.Ct.App. Feb. 6, 1998)).  An enforceable contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Doe v. HCA Health Serv. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (internal quotations and citations omitted).  "A contract 'must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties.'" *Id.* (quoting *Higgins v. Oil, Chem., & Atomic Workers Int'l Union, Local # 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and

13

for giving an appropriate remedy.").  In determining whether or not to construe an

instrument as a binding contract,

> [t]he primary test as to the actual character of a contract is the intention of
> the parties, to be gathered from the whole scope and effect of the language
> used, and mere verbal formulas, if inconsistent with the real intention, are to
> be disregarded.  It does not matter by what name the parties chose to
> designate it.  But the existence of a contract, the meeting of the minds, the
> intention to assume an obligation, and the understanding are to be
> determined in case of doubt not alone from the words used, but also the
> situation, acts, and the conduct of the parties, and the attendant
> circumstances.

*McMahan v. McMahan*, 2005 WL 3287475, at *5 (Tenn. Ct. App. 2005) (quoting 17

AM.JUR.2d *Contracts* § 4 (1991)).

In determining whether the parties have mutually assented to the terms of a

contract, courts apply an objective standard based upon the parties' manifestations.

*Staubach Retail Servs. Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn.

2005) (citing *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866

(Tenn. Ct. App. 2002)).  A written contract need not be signed by all parties so long as the

parties evince an intent to be bound by the contract.  *Tenn. Div. of United Daughters of

the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98, 116 (Tenn. Ct. App. 2005).

Moreover, a binding and enforceable contract may be embodied in more than one written

instrument.  *See McCall v. Towne Square, Inc.*, 503 S.W.2d 180, 182 (Tenn. 1973); *Oman

Const. Co. v. Tenn. Cent. Ry. Co.*, 370 S.W.2d 563, 570-71 (Tenn. 1963).

In the present case, the facts construed most favorably to ATA support the

inference that FedEx, Omni, and ATA agreed to split the passenger business in the AMC

14

Long Range International Contract on a 50/50 basis for the FY07-09 years.  The evidence

in support of this inference is found in the Omni Letter Agreement, signed by both

Omni's Pollard and FedEx's Molinari in August 2005, by ATA's oral acceptance of the

split in August 2005, and by the ATA Letter Agreement signed by ATA's Doherty and

Molinari in September 2007.  (Plaintiff's Ex. 21; Defendant's Exs. 15-16).  These letters

and ATA's oral promise to Molinari all address the same terms – that FedEx, Omni, and

ATA agreed that Omni and ATA would split the passenger business on a 50/50 basis for

the FY07-09 AMC contract years.

      The fact that the parties did not sign one single document is of no moment, as the

parties' course of conduct and understandings support the inference that they intended to

be bound.  For example, in the cover email message which contained the ATA Letter

Agreement, Molinari stated that the letter was "formalizing the 50/50 split for the pax

biz."  (Defendant's Ex. 15).  Molinari did not say he was proposing such a split; Molinari

stated that he was "formalizing the 50/50 split."  In addition, the FY07 Fee Agreement

reflects the 50/50 split: "ATA shall be entitled to fifty percent (50%) of the Contractor

Team's prorata share of the wide body and narrow body fixed and expansion services."

(FY07 Fee Agreement, § 5.A.(iv)).  Tellingly, Molinari informed Pollard in April 2007

that the parties would have to negotiate for a new split effective FY09, as he "could not

get ATA to back off the current agreement of 50/50 split for both w/b and n/b AMC fixed

and expansion passenger distribution."  (Plaintiff's Ex. 24).  Moreover, the parties entered

into a similar arrangement for FY04-06, notwithstanding the fact that the parties also

were bound by three other annual contracts: the Arrangement Agreement, the Operating Agreement, and the Fee Agreement (which, as discussed below, contained an integration clause) for FY04, FY05 and FY06.

The fact that the parties' agreement did not have a commission rate does not necessarily render the agreement unenforceable, as argued by FedEx. Based upon the parties' prior Fee Agreements and course of conduct, Tennessee law provides that the court may supply a reasonable commission rate. *See German v. Ford*, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009) ("When a parties' bargain is sufficiently definite to be a contract, but they have not agreed with respect to a term that is necessary to a determination of their rights and duties, a term which is reasonable may be supplied by the court.") (citing RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981)); *Pylant v. Spivey*, 174 S.W.3d 143, 155 (Tenn. Ct. App. 2003) ("[W]here a term is missing from a contract, a reasonable one will be implied."); *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993) ("It has long been held in this jurisdiction that contract terms may be implied in appropriate cases."); *McClain v. Kimbrough Const. Co., Inc.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990) ("[C]ontracting parties are not always precise and frequently leave material provisions out of their contracts. In these situations, the courts impose obligations on contracting parties that are reasonably necessary for the orderly performance of the contract."). Here, it is undisputed that the Fee Agreements between FedEx and ATA covering FY03, FY04, FY05, and FY06 all reflect a 7% commission payable by ATA to FedEx. (*See* Plaintiff's Exs. 12-15).

16

One final issue must be addressed.  FedEx contends that because the FY08 Fee Agreement between FedEx and ATA negotiated a slightly different percentage of flying for ATA for FY08 – ATA was entitled to 50% of the narrow body expansion, and 50% of the residual wide body expansion after NWA has operated up to 10 flights per month – this fact disproves the existence of the parties' agreement as expressed in the ATA Letter Agreement.  The court does not agree. The evidence reflects that NWA advised FedEx that it wanted to start doing some passenger flying for the FedEx Team.  In recognition of the fact that ATA was entitled to 50% of the passenger flying for FY08, FedEx negotiated with ATA, which resulted in ATA giving a portion of its 50% share to NWA in exchange for FedEx lowering the commission rate that ATA would pay FedEx from 7% to 4.5%. Parties are free to alter, amend or modify their agreements without nullifying the existence of the agreement, as long as there is a mutuality of assent and a meeting of the minds. *Frank Rudy Heirs Assoc. v. Moore & Assoc., Inc.*, 919 S.W.2d 609, 612 (Tenn. Ct. App. 1995).

For all of the reasons set forth above, the court finds a material issue of fact as to whether the parties had a binding and enforceable agreement to split the passenger business for the AMC Long Range International Contract on a 50/50 basis for the FY07-09 years (hereinafter the "FY07-09 Agreement").

**B.      The Agreement in Light of the FY08 Fee Agreement**

The next issue that the court must resolve is the relationship between the FY07-09 Agreement and the integration clause of the FY08 Fee Agreement. The integration clause

17

of the FY08 Fee Agreement reads:

8.    ENTIRE AGREEMENT

This Agreement, together with the Contractor Team
Arrangement Agreement and the Operating Agreement,
constitute the entire agreement and understanding of the
parties on the subject matter hereof, and, as of the effective
date hereof, supersedes all prior agreements, whether written
or oral, between the parties hereto concerning the subject
matter hereof.  This Agreement may be modified only by
further written agreement signed by the parties hereto.

(*Id.* § 8).

Under Tennessee law, the primary and overriding purpose in contract

interpretation is to ascertain and give effect to the parties' mutual intent at the time the

contract was written.  *See Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78

S.W.3d 885, 890 (Tenn. 2002) ("The central tenet of contract construction is that the

intent of the contracting parties at the time of executing the agreement should govern.");

*Public Employees Benefit Servs. Corp. v. Parminter*, 60 S.W.3d 833, 836-37 (Tenn. 2001)

(same).  In construing the contract, the words expressing the parties' intentions should be

given their plain and ordinary meaning.  *Fisher v. Revell*, 2009 WL 3103796, at *2 (Tenn.

Ct. App. 2009) (citing *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct.

App. 1983)).  If the language of a written contract is unambiguous, the determination of

the parties' intent is a question of law for the court.  *Starks v. White*, 2009 WL 1684624,

at *2 (Tenn. Ct. App. 2009) (citing *Warren v. Metro. Gov't of Nashville & Davidson Co.*,

955 S.W.2d 618, 623 (Tenn. Ct. App. 1987)).

18

The plain language of the FY08 Fee Agreement's integration clause provides that the FY08 Fee Agreement "supersedes all prior agreements, whether written or oral, between the parties hereto *concerning the subject matter hereof*."  (FY08 Fee Agreement § 8 (emphasis added)).  The "subject matter" of the FY08 Fee Agreement is an undefined term subject to two reasonable interpretations.  One reasonable interpretation is that the subject matter of the FY08 Fee Agreement covers the subject matter of the FY07-09 Agreement – that being, the distribution of passenger business.  (*Id*. § 5.A.(iv)).  A second equally reasonable interpretation is that the subject matter of the FY08 Fee Agreement covers the commission to be paid to ATA as a result of its participation in the FedEx Team for FY08.  Accordingly, the court finds there exists a material issue of fact as to whether the integration clause of the FY08 Fee Agreement supersedes the parties' FY07-09 Agreement.  FedEx's Motion for Summary Judgment must therefore be **DENIED**.

## IV.    Conclusion

For the reasons set forth above, the court must **DENY** FedEx's Motion for Summary Judgment (Docket # 90).


**SO ORDERED** this  24th  day of June 2010.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

19

Electronic Copies to:

Peter D. Blumberg
FEDERAL EXPRESS CORPORATION
peter.blumberg@fedex.com

Kenneth E. Broughton
HAYNES AND BOONE, LLP
kenneth.broughton@haynesboone.com

Michael E. Gabel
FEDEX LEGAL DEPARTMENT
megabel@fedex.com

M. Kimberly  Hodges
FEDEX LEGAL DEPARTMENT
kim.hodges@fedex.com

John David Hoover
HOOVER HULL LLP
jdhoover@hooverhull.com

Don R. Hostetler
HOOVER HULL LLP
dhostetler@hooverhull.com

Thomas E. Kurth
HAYNES AND BOONE, LLP
thomas.kurth@haynesboone.com

Alice McKenzie Morical
HOOVER HULL LLP
amorical@hooverhull.com

George E. Purdy
BOSE MCKINNEY & EVANS, LLP
gpurdy@boselaw.com

Robert R. Ross
FEDERAL EXPRESS CORPORATION
rrross@fedex.com

W. Alan Wright
HAYNES AND BOONE, LLP
alan.wright@haynesboone.com