1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2             INDIANAPOLIS DIVISION

3

  ATA AIRLINES, INC.,      )
4                    )
                    ) CAUSE NO.
5       Plaintiff,     ) 1:08-cv-00785-RLY-DML
                    )
6       -vs-            )
                    ) Indianapolis, Indiana
7  FEDERAL EXPRESS CORPORATION,) October 12, 2010
                    ) 1:00 p.m.
8       Defendant.     ) VOLUME 2

9

10

11

12                   **BEFORE THE**
           **HONORABLE RICHARD L. YOUNG**
13

14        OFFICIAL REPORTER'S TRANSCRIPT OF

15             JURY TRIAL

16

17

18

19

20

21

22  Court Reporter:    Cathy Easley Jones, RPR, FCRR
                 Official Court Reporter
23                46 East Ohio Street, Room 291
                 Indianapolis, IN  46204

24

25     PROCEEDINGS TAKEN BY MACHINE SHORTHAND
        COMPUTER-AIDED TRANSCRIPTION

**A P P E A R A N C E S**

FOR THE PLAINTIFF:          Mr. Kenneth E. Broughton
                           Mr. Francisco Rivero
                           HAYNES AND BOONE
                           Suite 2100
                           Houston, TX  77010

                           Mr. Thomas E. Kurth
                           Mr. W. Alan Wright
                           HAYNES AND BOONE
                           901 Main Street
                           Suite 3100
                           Dallas, TX  75202

                           Mr. John David Hoover
                           Ms. Alice McKenzie Morical
                           HOOVER HULL
                           111 Monument Circle
                           Suite 4400
                           Indianapolis, IN  46204


FOR THE DEFENDANT:          Mr. Peter D. Blumberg
                           FEDERAL EXPRESS CORPORATION
                           3620 Hacks Cross Road
                           Building D, Third Floor
                           Memphis, TN  38125

                           Mr. Michael E. Gabel
                           FEDEX LEGAL DEPARTMENT
                           3620 Hacks Cross Road
                           Building B, 2nd Floor
                           Memphis, TN  38125

                           Ms. M. Kimberly Hodges
                           FEDEX LEGAL DEPARTMENT
                           3620 Hacks Cross Road
                           Building B-3
                           Memphis, TN  38125

I N D E X

PAGE

For Plaintiff:

DOUG YAKOLA
Direct Examination by Mr. Broughton ...........163

1                I N D E X   O F   E X H I B I T S

2                                              PAGE

3  For Plaintiff:

4  8 ..........................................184
   18 ........................................192
5  21 ........................................200

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          COURT CLERK:  All rise.

 2          THE COURT:  My understanding, is there is an issue?

 3          MR. KURTH:  Just the chairs, Your Honor.  We're

 4  good.  Crisis over.

 5          THE COURT:  Are we ready to have the jurors come in,

 6  or were there matters we needed to discuss?

 7          MR. BROUGHTON:  Both sides have matters we need to

 8  take up with the Court.

 9          THE COURT:  Who wants to go first?

10          MR. GABEL:  I will, Your Honor.  ATA had sent over a

11  copy of a proposed PowerPoint slides they planned to use in

12  their opening.  We had a number that involved proposed

13  exhibits that were on the exhibit list that we had objected

14  to, and obviously the Court has not had an opportunity to rule

15  on those objections.

16          We actually had a couple of our slides where we

17  brought it to the Court's attention pursuant to your local

18  rule that says if you want a pretrial ruling, you can ask for

19  one.  They have not done that on these.  There are still

20  potential exhibits that have a pending objection that the

21  Court has not ruled on, and we think it would be inappropriate

22  to show those to the jury before they've been admitted into

23  evidence or before the Court has had a chance to rule on the

24  objection.

25          In addition, I think they've agreed to remove most

1  of them, but the two remaining ones in addition to being

2  slides or potential exhibits we've objected to also deal with

3  their purchase of DC10s, which this court has already granted

4  a motion in limine on to exclude that.

5          The DC10s came in because they were alleging

6  reliance damages as if there had never been a contract, put

7  them back in the state that they were, and they are also

8  alleging a breach of contract damages, assuming we had

9  performed the contract, what we have earned.  And because it's

10 a double recovery, you had granted our motion in limine and

11 excluded the DC10 damages.

12         So these remaining two slides have two problems;

13 one, they're a potential exhibit that we've objected to that

14 the Court hasn't had a chance to rule on.  And two, they're

15 subject to the motion in limine that you've already granted.

16         THE COURT:  Thank you.  Mr. Broughton?

17         MR. BROUGHTON:  Your Honor, with respect to the two

18 slides that refer to DC10s, the Court's been very clear on the

19 issue of ATA seeking to recover damages for the DC10s, but the

20 Court has not issued a gag order on mentioning DC10s.  The two

21 exhibits at issue, one is the cover page of the sales contract

22 where we bought them.  I think it's very relevant to show that

23 ATA --

24         THE COURT:  Does somebody have a picture of that

25 slide?  Thank you.

1          MR. BROUGHTON:  Certainly, Your Honor.  Here are the

2  two.  This was a newspaper article that FedEx produced from

3  its own files about ATA having purchased the DC10s.

4          THE COURT:  And your desire to flash this on the

5  screen, and what comments would you make on the aircraft

6  purchase agreement in your opening statement -- are you going

7  to give it?

8          MR. BROUGHTON:  Yes, Your Honor, I am.

9          Basically that in the chronology of things, once

10 they made this agreement, ATA felt comfortable to go forward

11 and gear up for performing 30 years of flying with

12 wide-bodies.

13         THE COURT:  Then on the FedEx document titled FedEx

14 monitoring ATA purchase.

15         MR. BROUGHTON:  It's really the same thing.  It

16 wasn't unknown to FedEx that we were gearing ourselves up to

17 perform this contract that we're suing on.

18         THE COURT:  Thank you.  Mr. Gable?

19         MR. GABEL:  Your Honor, in addition to not being

20 admitted yet, both of those are irrelevant, particularly the

21 ATA monitoring their purchase simply because the only thing

22 that could possibly be designed to prove is that in some way

23 they relied on the existence of an alleged contract and

24 they're going toward those reliance damages that you've

25 already excluded as a double recovery.

1          The purchase really goes to the same thing.  What

2    date they purchased them goes to their theory that we wouldn't

3    have done this if we didn't have this three-year agreement in

4    place.  So they're going to emphasize the fact that their

5    final signature on a contract that may have taken them two

6    years to negotiate didn't happen until after the letter.

7    That's sort of the linchpin of the case.

8          THE COURT:  Okay.  Thank you.

9          MR. BROUGHTON:  Your Honor, my response to that

10   about the DC10s is that certainly that's a further -- I

11   believe that ATA purchasing, undertaking a purchase of that

12   magnitude is indicative of its intent and its belief that it

13   had a three-year commitment from FedEx.  That's just further

14   validation of it.

15         THE COURT:  All right.  The Court finds that the

16   purchase of the aircraft is part of the story here and adds

17   context to what the jurors will hear and the balance of the

18   evidence.  The Court overrules any objection.

19         MR. BROUGHTON:  Would you like me to take those

20   back?

21         THE COURT:  You can.

22         MR. BROUGHTON:  ATA also has a couple of objections

23   to the FedEx opening presentation.

24         THE COURT:  Okay.  Thank you.

25         MR. BROUGHTON:  With respect to Slide No. 8.

1          THE COURT:  Slide 8.  Okay, yes.

2          MR. BROUGHTON:  ATA renews its objection to these

3   quotes that are pulled out from Defendant's Exhibit 64.  This

4   is an excerpt from what is called the craft survey, and this

5   was a survey actually issued from a U.S. governmental agency

6   to every company that did AFC flying.  Of course, it's

7   undisputed that the Government itself only had annual

8   contracts.

9          One of these questions, the questions are not here

10  but one of these questions was to the people, do you like the

11  annual, or do you prefer to have multiyear contracts?  Well,

12  the way FedEx has pulled that out from this exhibit is it

13  really -- the craft survey is clearly talking about government

14  annual contracts.

15         The contract that ATA is suing on is a three-year

16  contract that the Government is not a party to.  It is purely

17  private parties that contracted between themselves on

18  interteam governance.  That's what this three-year split is,

19  and it is very misleading, confusing, and really irrelevant

20  that they are making it seem like ATA is talking about the

21  same contract that we're suing on when, in fact, this survey

22  is about -- is from the federal government.  It's not from

23  FedEx.  It's not from the FedEx team, and they're pulling this

24  out saying we are always working -- this is a quote from an

25  ATA employee.  We are always working from a state of flux and

1  uncertainty.

2          Right now we are guessing year to year, because we

3  do not know how Teaming Arrangements or business opportunities

4  will change.  For that reason, I believe under the rules, it

5  is very misleading and confusing and prejudicial.

6          THE COURT:  Mr. Blumberg, you wouldn't try to

7  mislead or confuse the jury, would you?

8          MR. BLUMBERG:  Never, Your Honor.  I believe I was

9  going to say I believe Mr. Doherty, who wrote the e-mail, is

10  going to take the stand, and what Mr. Broughton just described

11  goes to weight.  Mr. Doherty can explain what he meant.  We

12  raised this with the Court in our pretrial motion.

13          I would just add that, yes, he is saying we are

14  guessing year to year, but the very next phase is because we

15  do not know what Teaming Arrangements or how business

16  opportunities were changed.  FedEx's point and, in fact, one

17  of the core parts of this trial is that the military issues

18  military contracts annually --

19          THE COURT:  I've already ruled on 64, haven't I?

20          MR. BLUMBERG:  Yes.

21          THE COURT:  So this is all cross-examine,

22  Mr. Broughton.  What else?

23          MR. BROUGHTON:  Your Honor, ATA objects to Slide 17,

24  which is Defendant's Exhibit 192, which is from the expert

25  report of FedEx's damages expert, Howard Zandman.

 1                THE COURT:  Yes.

 2                MR. BROUGHTON:  Basically the revenues and financial

 3      status of ATA's overall business, including its scheduled

 4      service and commercial charter is not relevant.  There is one

 5      cause of action asserted by ATA in this lawsuit that's still

 6      pending, and that is the benefit of the bargain claim

 7      resulting from a breach of a single specific contract.  The

 8      only evidence that ATA plans to put on and the damages it is

 9      seeking are the damages that flow from Federal Express' breach

10      of that one contract.

11                Like I said, we are looking for the benefit of the

12      bargain.  This Slide 17 is much, much broader than that, and

13      its their expert's projections of ATA's overall financial

14      status, its overall business.  ATA has not pled this case as a

15      destruction of business.

16                It hasn't pled a cause of action for destruction of

17      business, and we believe that Exhibit 192, which is not yet in

18      evidence; and again, it's an expert's report is based on

19      insufficient facts and data, unreliable principles and

20      methods, principles and methods not reliably applied to the

21      specific facts of this case.  It is an improper summary.

22      ATA's overall financial condition is not relevant, that it's

23      prejudicial, confusing and speculative.

24                THE COURT:  Mr. Blumberg?

25                MR. BLUMBERG:  Your Honor, this was also one that

1 was presented to both ATA and the Court prior to trial.  It's

2 been -- ATA indicated that they were not going to raise an

3 objection during opening statement.  Mr. Kurth made that

4 representation.

5 　　　　As to relevance, we did a long motion.  We can sum

6 it up in a sentence.  Mr. Kurth told this jury panel that

7 FedEx caused ATA to go under, and I suspect that those words

8 will cross the lips of one of these attorneys during opening.

9 　　　　We are putting this on to show that FedEx didn't

10 cause ATA to go under, and with the case law we supplied the

11 Court earlier, that one of the elements that ATA has to prove

12 in an anticipatory repudiation is an ability to perform, and

13 this goes to ability to perform.

14 　　　　As to the accuracy and methodology, those go to

15 weight, we asked ATA tell us where the mistake is, let us

16 know.  That was several weeks, and we have not heard where the

17 mistake is.

18 　　　　THE COURT:  Mr. Broughton?

19 　　　　MR. BROUGHTON:  Your Honor, again, I think their

20 damage expert's summary of the overall financial condition is

21 totally irrelevant.

22 　　　　THE COURT:  Are there -- Mr. Broughton, are there

23 errors that you've covered in the summary?  Is the summary not

24 an accurate summary of the underlying documents?

25 　　　　MR. BROUGHTON:  We do not believe it is.  Mr. Kurth

1   actually has that witness, and if I could defer to him to

2   speak on ATA's behalf?

3          MR. KURTH:  Your Honor, yes.  There are beaucoup

4   problems with this summary in terms of how he came about --

5   their expert came about putting these numbers together.  He

6   couldn't have been using the records he references, because

7   they don't add up to these numbers.  That goes to -- and we'll

8   bring this up as to that aspect.  We'll bring it up now, but

9   I'll certainly bring it up if they try to show this as an

10  exhibit through their expert.  It's just wrong.

11         THE COURT:  Federal Express then presents this to

12  the jurors at its own risk then if it's not --

13         MR. KURTH:  They do, Your Honor.  We do want to

14  preserve an objection to it.  I think it was important we have

15  the Court understand that we have two very different

16  perspectives, ATA and FedEx with respect to what's the proper

17  focal point for this lawsuit.  They want to talk about ATA

18  airlines, the entire airline's scheduled service, civilian

19  charter.  We want to talk about military charter.

20         That conflict abides throughout.  I'm certainly not

21  waiving the objection because it will be a constant --

22  hopefully not irritant -- but we just have different glasses

23  on when we look at this thing, Your Honor.  They want to look

24  at the whole company and treat it as this whole company was

25  doomed, and we say that's not the issue.  The issue is whether

1  we had a benefit of bargain claim under this contract.  That's

2  the bid and the ask if you will, Your Honor.

3          THE COURT:  The opening statement, if this is not a

4  proper calculation and the summary is incorrect, and I'm sure

5  that will be brought out.  Of course, we all know it's risky

6  to present things to a jury in opening statements that can't

7  be proved.  Objection is overruled.

8          MR. BROUGHTON:  Your Honor, I had one more item I

9  wanted to bring up.  I don't know if you thought about your

10  limine on postJanuary?

11          FedEx filed a motion in limine that we're not

12  supposed to mention communications between FedEx and ATA after

13  FedEx sent the January 22, 2008 letter.  It was only in

14  limine, and I wanted to approach the bench now because I think

15  it's an important part of our story and an integral part of

16  ATA's mitigation.  They've pled a failure to mitigate.

17          I want to be able to say in my opening statement

18  that ATA urged Federal Express to reconsider the decision, and

19  FedEx refused to reconsider.  Nothing more beyond that.

20          THE COURT:  Mr. Blumberg?

21          MR. BLUMBERG:  Can I confer with my co-counsel for

22  one second?

23          THE COURT:  You may.

24      (A discussion was held off the record.)

25          MR. BLUMBERG:  Your Honor, we want the Court to

1    stand by its ruling.  If Mr. Broughton mentions it during

2    opening statements, then he's going to be committed to try to

3    prove up what he said to the jury.  We're going to open up all

4    those conversations, the depositions the Court has seen the

5    substance of.  We believe it is not appropriate to mention

6    that during opening statements, given the current ruling.

7               MR. BROUGHTON:  Your Honor, I don't see how that's

8    opening up all those other statements.  I'm only saying they

9    went there and asked them to reconsider.

10              THE COURT:  I'll allow it.  This is opening

11   statement.  I'll allow it.  Anything else?

12              MR. BROUGHTON:  Your Honor, Mr. Blumberg just

13   pointed out to me, I did not look at the clock.  If we both go

14   30 minutes, the jury would not be able to eat before 1:00

15   o'clock.

16              THE COURT:  You want to go back, Philip, and see how

17   the jurors are doing?  They can go to lunch now, or we can go

18   ahead and get them to lunch right around 1:00 o'clock.  Let's

19   just see how they're doing.

20              Mr. Gabel, will you be making the opening statement?

21              MR. GABEL:  Mr. Blumberg will be making the opening

22   statement, Your Honor.

23              THE COURT:  Mr. Blumberg will.

24              COURT CLERK:  They want to go now, Judge.

25              THE COURT:  They want to go to lunch now?

1          All right.  Bring them in, and we'll admonish them.

2          COURT CLERK:  All rise.

3     (Jury in.)

4          COURT CLERK:  You may be seated.

5          THE COURT:  Well, it's only noon and you want to go

6  to lunch already?  My goodness.  Well, we'll do that.  The

7  attorneys and I had to discuss a few things to get ready for

8  opening statements and took a few minutes longer, but we're

9  ready to go.

10          We will break for lunch at this time, and we'll

11  start up at 1:00 o'clock sharp.  Plenty of restaurants.  You

12  folks from Indy know that, but others may not be familiar with

13  downtown.  Philip will certainly have some names of places you

14  can go.

15          While you're outside of the courtroom, do not let

16  anyone talk to you about the case.  Do not read or listen to

17  news accounts.  We're in the courthouse here.  If you do get a

18  chance, you should wander around.  It is a beautiful,

19  magnificent structure.  It is a historic structure, and if you

20  get a chance to wander around a little bit, it might be worth

21  your while.

22          But also in the hallways, you'll see the attorneys

23  and the parties in the hallways when you're coming and going.

24  They've been instructed not to talk to you.  That's the best

25  rule that we can have to ensure no communication.

 1            So if they walk by you in the hallway and don't

 2  acknowledge you, they're not being rude.  They're all very

 3  nice people, but that's just the way we operate here in the

 4  courtroom.  We have court reporters here and young lawyers

 5  over here who are on my staff and make sure I don't get too

 6  far off the rails on things.  They will be helping me

 7  throughout the trial as well.

 8            So have a nice lunch.  We'll see you back here.  If

 9  you could come back a little bit before 1:00 so we could start

10  right at 1:00 o'clock, that would be very good.  Thank you

11  very much.

12            COURT CLERK:  All rise.

13      (Jury out.)

14            THE COURT:  Anything else we need to discuss,

15  Mr. Broughton?

16            MR. BROUGHTON:  I don't believe so, Your Honor.

17            THE COURT:  Anything else, Mr. Blumberg or

18  Mr. Gabel?

19            MR. BLUMBERG:  No, Your Honor.

20            THE COURT:  Have a nice lunch, and we'll see you

21  right at 1:00.

22      (Lunch recess.)

23      (Jury in.)

24            THE COURT:  Members of the jury, hope you had a nice

25  lunch.  It is a beautiful day out, get a little fresh air.

1  Ready to go here for an afternoon of opening statements and

2  evidence presentation.  Then, as I said earlier, we'll adjourn

3  somewhere around 5:00 o'clock today and then back again

4  tomorrow.

5          While you were outside the courtroom, did anyone

6  make any attempts to talk to you about the case?  Anyone

7  listen to any news accounts?

8          I'm going to have to have you stand again, and

9  please raise your right hand and take the oath of jurors.

10          (Jurors sworn)

11          THE COURT:  One of my preliminary instructions, if

12  you would just listen to these -- when I give you my final

13  instructions, you'll each have a copy of those to follow along

14  because they are a little more extensive and a little more

15  detailed.  But if you would just please listen to the

16  preliminary instructions.

17          Members of the jury, before you begin the trial, I

18  would like to tell you a little bit about what will occur

19  during the trial.  I want to briefly describe how the trial

20  will be conducted and explain what we, me as the Judge, and

21  the lawyers for both sides, will be doing.  At the end of the

22  trial, I will give you some more detailed instructions on how

23  you're to reach your decision, but now I simply want to

24  explain how the trial will proceed.

25          You've been selected as jurors to take an oath to

1   well and truly try this cause.  It may take six days for you

2   to hear all the evidence and the arguments of counsel.  During

3   the progress of the trial, there will be periods of time

4   during which you will be allowed to separate, such as recesses

5   for rest periods, lunch periods, and overnight.

6            During those periods of time you are outside the

7   courtroom and are permitted to separate, you must not talk

8   about this case among yourselves or with anyone else.  During

9   the trial, do not talk to any of the parties, their lawyers,

10  or any of the witnesses.

11           If any attempt is made by anyone to talk to you

12  concerning this case, you should report that fact to the Court

13  immediately.  There may be publicity in newspapers, radio, and

14  television concerning this trial.  You should not read or

15  listen to these accounts or do any research such as consulting

16  dictionaries, searching the Internet, or using other reference

17  materials.  And do not make any investigation about the case

18  on your own.

19           Instead, you should confine your attention to the

20  court proceeding, listen attentively to the evidence as it

21  comes from the witnesses, and render a verdict solely upon

22  what you see and hear in the court.  During the trial, you

23  must not consume any alcohol or drugs that would affect your

24  ability to hear the evidence fairly and impartially.

25           You should keep an open mind.  You should not form

1  or express an opinion during the trial and should reach no

2  conclusion in this case until you've heard all the evidence,

3  the arguments of counsel, and the final instructions as to the

4  law which will be given to you by the Court.

5         This lawsuit has been brought by the plaintiff, ATA

6  Airlines, Inc., against the defendant, Federal Express

7  Corporation.  I'll refer to that as FedEx, and I'll refer to

8  ATA Airlines as ATA.

9         The U.S. military does not have enough aircraft to

10  transport its passengers around the world, so it relies on

11  U.S. commercial airlines to help fly its missions.  The U.S.

12  Defense Department created the CRAF, which is the Civil

13  Reserve Air Fleet or CRAF, program so that the U.S. commercial

14  airline industry could supply aircraft to be readily available

15  to the military.

16         AMC, or the Air Mobility Command, is the military

17  branch in charge of military flying.  Since the early 1990s,

18  plaintiff, ATA Airlines, Inc., was a major participant in the

19  CRAF program.  Participation in the CRAF program entitles an

20  airline to bid on contracts the U.S. Government awards through

21  the AMC.  Carriers, such as ATA, several major passenger

22  carriers, defendant Federal Express Corporation, and other

23  airlines that participate in the CRAF program are awarded

24  points called Mobilization Value Points or MVPs.

25         The more MVPs a carrier has, the more charter

1  missions it may fly, which leads to more revenue.  Over the

2  years, airlines form teams so they could combine and share

3  their MVPs.  Airlines are not required to join a team.

4         Today there are three major military flying teams.

5  One, the Alliance Team; two, the FedEx team; and three, the

6  UPS team.  Bidding on the AMC contracts is undertaken by a

7  team representative.  FedEx is team leader of the FedEx team,

8  and ATA was a member of the FedEx team since the 1990s.  As

9  team leader of the FedEx team, it was FedEx who administered

10 the team.

11        ATA claims that it had a three-year contract with

12 FedEx under which it was entitled to 50 percent of the FedEx

13 team's international passenger flying for government fiscal

14 years 2007, 2008, and 2009.  ATA claims that FedEx breached

15 this contract when it notified ATA by letter dated January 22,

16 2008, that ATA would not be a member of the FedEx team for

17 fiscal year 2009.

18        ATA claims that being dropped from the FedEx team so

19 hampered its operations that it had no choice but to shut down

20 three months after FedEx sent the January 22, 2008, notice

21 letter.  ATA has sued FedEx for breach of contract seeking

22 monetary damages from FedEx for the breach.  FedEx denies

23 these claims.  FedEx asserts that its contracts with its team

24 members were -- or excuse me -- are annual contracts and that

25 ATA only had a contract with FedEx through the end of fiscal

1  year 2008.

2          FedEx further denies that ATA is entitled to any

3  monetary damages because ATA went out of business on April 3,

4  2008, before the start of fiscal year 2009.  FedEx has also

5  made a counterclaim against ATA for breach of contract,

6  alleging that ATA breached its annual contract with FedEx when

7  it ceased operations in April 2008.

8          To prove a breach-of-contract claim, the party

9  claiming breach will have to prove by a preponderance of the

10  evidence, one, the existence of an enforceable contract; two,

11  nonperformance amounting to a breach of the contract; and,

12  three, damages caused by a breach of the contract.

13          ATA bears the burden of proving its claim by a

14  preponderance of the evidence.  Likewise, FedEx has a burden

15  of proving its counterclaim by a preponderance of the

16  evidence.  When I say a party has a burden to prove an issue

17  by the preponderance of the evidence, I mean that the party

18  must prove that party's contentions by a greater weight of the

19  evidence.  That is, a preponderance of the evidence means that

20  evidence, when considered and compared to that opposed to it,

21  has more convincing force and produces in your mind a belief

22  that the facts are more likely true than not true.

23          The greater number of witnesses testifying to a fact

24  on one side or a greater quantity of evidence introduced on

25  one side is not necessarily of the greater weight.  The

1  evidence given upon any fact that convinces you most strongly

2  of its truthfulness is of the greater weight.

3         You are the exclusive judges of the evidence, the

4  credibility of the witnesses and the weight to be given to the

5  testimony of each of them.  In considering the testimony of

6  any witness, you may take into account his or her ability or

7  opportunity to observe; the manner and conduct of the witness

8  while testifying; any interest, bias, or prejudice that

9  witness may have; any relationship with other witnesses or

10  interested parties; and the reasonableness of the testimony of

11  the witness considered in light of all the other evidence in

12  the case.

13         If there are conflicts in the evidence, it is your

14  duty to reconcile those conflicts, if you can, on the theory

15  that each witness has testified to the truth.  You should not

16  disregard the testimony of any witness without a reason and

17  without careful consideration.

18         If you find conflicting testimony that you cannot

19  reconcile, you must determine which of the witnesses you

20  believe and which of the witnesses you disbelieve.  In

21  weighing the testimony to determine what or whom you believe,

22  you should use your own knowledge, experience, and common

23  sense gained from day-to-day living.

24         At times during the trial a lawyer for one side or

25  the other may make an objection to a question that is asked by

1  another lawyer or to a particular answer that a witness gives.

2  This simply means the lawyer's requesting that I make a

3  decision on a particular rule of law.

4          Do not draw any conclusions from the fact that a

5  objection was made or from my rulings on those objections.

6  These only relate to the legal questions that I must determine

7  and should not influence your thinking.

8          If I sustain an objection to a question, the witness

9  may not answer.  Do not attempt to guess what the answer might

10  have been, had it been permitted to be given.  Similarly, if I

11  tell you not to consider a particular statement, you should

12  put that statement out of your mind, and you may not refer to

13  that statement in your later deliberations.

14          During the course of the trial I may ask a question

15  or two of a witness.  If I do, that does not indicate that I

16  have any opinion about the facts of the case or that I have

17  any opinion with respect to that witness' credibility.

18          ATA filed for bankruptcy protection under the

19  federal bankruptcy laws on April 3, 2008.  ATA's bankruptcy

20  case is still open.  The bankruptcy court has determined the

21  effect, if any, of a judgment in this case on ATA and its

22  creditors in the bankruptcy.  You should not speculate on the

23  law regarding bankruptcy.  The Court will instruct you on the

24  law in this case.

25          Direct evidence means evidence that directly proves

1   a fact without an inference and which in itself, if true,

2   conclusively establishes the fact.  Circumstantial evidence

3   means evidence that proves a fact from which an inference of

4   the existence of another fact may be drawn.

5           An inference is the deduction of fact that may

6   logically and reasonably be drawn from another fact or group

7   of facts.  It is not necessary that facts be proved by direct

8   evidence.  Both direct evidence and circumstantial evidence

9   are acceptable as means of proof.

10          As an example, direct evidence that it is raining is

11  testimony from a witness who says, "I was outside a minute ago

12  and I saw it raining."  Circumstantial evidence that it is

13  raining is the observance of someone entering the room

14  carrying a wet umbrella.  When attorneys for parties stipulate

15  or agree to the existence of a certain fact, you should accept

16  such stipulation or agreed fact as conclusively proved.

17          Testimony may be presented by way of transcript of

18  testimony or by videotape.  This evidence is to be considered

19  in the same light and subject to the same tests that are

20  applied to the testimony of other witnesses who appear live at

21  trial.

22          During the trial, certain exhibits may be offered

23  into evidence.  When the Court admits an exhibit as evidence,

24  each of you should carefully examine it without discussion at

25  the time it is submitted to you.  Certain trial exhibits may

1    contain notations such as "redacted" or "removed,"

2    "privileged" and "confidential," indicating that irrelevant or

3    confidential material has been redacted from the document.

4    You should not speculate on the context -- contents of the

5    redacted material or the reasons why it was redacted.

6            During the progress of the trial, certain questions

7    may be asked and certain exhibits may be offered which the

8    Court may rule are not admissible into evidence.  You must not

9    concern yourself with the reasons for these rulings since the

10   admissibility of evidence is strictly controlled by the rule

11   of law.

12           You must not consider an exhibit or testimony that

13   the Court orders stricken from the record.  In fact, such

14   matter is to be treated as though you'd never heard it.

15           Nothing that I say or do during the trial is

16   intended as any suggestion of what facts or verdict you should

17   find.  Each of you as jurors must determine the facts in the

18   verdict.  Any notes you take during this trial are only aids

19   to your memory.  The notes are not evidence.  If you do not

20   take notes, you should rely on your independent recollection

21   of the evidence and not be unduly influenced by the notes of

22   other jurors.  Notes are not entitled to any greater weight

23   than the recollection or impressions of each juror about the

24   testimony.

25           When you leave the courthouse during the trial, your

1   notes should be left in the jury room.  When you leave at

2   night, your notes will be secured and not read by anyone.  At

3   the end of the trial, your notes will be destroyed, and no one

4   will be allowed to read the notes before they are destroyed.

5           The trial of this case will proceed as follows:

6   First, the attorneys will have an opportunity to make opening

7   statements.  These statements are not evidence and should be

8   considered only as a preview of what the attorneys expect the

9   evidence will be.  Following opening statements, witnesses

10  will be called.  They will be placed under oath and questioned

11  by the attorneys.  Documents and other tangible exhibits may

12  also be received as evidence.

13          When the evidence is completed, the attorneys will

14  make final statements.  These final statements are not

15  evidence but are given to assist you in evaluating the

16  evidence.  The attorneys are also permitted to argue, to

17  characterize the evidence, and to attempt to persuade you to

18  reach a particular verdict.  You may accept or reject those

19  arguments as you see fit.

20          These preliminary instructions have been read to you

21  prior to the opening statements of counsel and prior to the

22  introduction of evidence so that you may understand the issues

23  presented for your decision in this action, the rules

24  regarding the burden of proof and credibility of witnesses and

25  the manner of weighing the evidence which you will hear in

1  this case.  You will receive further instructions after the

2  evidence has been concluded and the final arguments of

3  counsel.

4           Members of the jury, those are my preliminary

5  instructions to you.  Prior to opening statements, the parties

6  have requested that I read to you this joint stipulation

7  regarding overview of military flying.  The parties agree as

8  follows:

9           Comes now ATA Airlines and Federal Express

10  Corporation and file the following joint stipulation regarding

11  overview of military flying.

12           The U.S. military does not have enough aircraft to

13  transport troops and cargo around the world.  Under the Civil

14  Reserve Air Fleet program, which is also called CRAF, the

15  Government contracts with commercial airlines to move soldiers

16  and military equipment.  To participate in CRAF, commercial

17  airlines agree to make some of their aircraft available to the

18  Government in case of an emergency.  As an incentive for

19  pledging their aircraft and taking the risk of an emergency

20  callup, these airlines can operate a guaranteed volume of

21  regular, nonemergency military flying called fixed business.

22           In addition, the airlines can bid on military

23  missions that come up on a monthly or even shorter time frame,

24  which is called expansion business.

25           Airlines that participate in the CRAF program are

1 awarded points called mobilization value points or MVPs.

2 Points are awarded based on the size, type, and number of

3 aircraft that the airline pledges to the CRAF program. The

4 more MVPs a carrier has, the more fixed and expansion business

5 it is entitled to fly. The larger airlines such as Northwest,

6 United, Delta, and FedEx are awarded a large number of MVPs

7 because they are able to pledge a lot of aircraft to CRAF.

8 Typically, larger passenger airlines have not wanted to do

9 very much military flying. There are other smaller airlines

10 such as ATA, Omni Airlines, World Airlines, and Ryanair who

11 seek to do a lot of military flying but do not have that many

12 MVPs.

13        The military permits airlines to form teams or

14 Teaming Arrangements. Teams permit a group of airlines to

15 pool all of their points and bid the Government's contract as

16 a group. The smaller carriers, which are sometimes referred

17 to as operators, do most of the flying and earn revenue for

18 each mission flown.

19        These carriers pay a fixed percent of that revenue

20 to the team. This payment is called the fee or the

21 commission. These commissions are used to compensate the

22 larger carriers, also called points contributors, for their

23 MVP contribution to the team and for taking the risk that a

24 large number of planes could be called up during a military

25 emergency.

1           There are currently three major teams:  One, the

2    Alliance Team; two, the FedEx team; three, the UPS team, which

3    started in fiscal year 2006.  Each team is organized

4    separately and differently.  The team leader of the FedEx team

5    is FedEx.  As team leader, FedEx is responsible for putting

6    together the team, bidding the Government's contract for the

7    team, and handling administrative matters that relate to the

8    team.

9           FedEx does not award the actual missions.  It is up

10   to each team member to decide what missions it wants to bid

11   on, and the military awards the missions.

12          Each year the Government's air mobility command,

13   which runs the CRAF program, puts forth a request for proposal

14   that the airlines respond to through the team leader.  The

15   Government uses a fiscal year instead of an ordinary calendar

16   year.  The military's fiscal year starts October 1 and ends

17   September 30 of the following year.  For example, fiscal year

18   '08 began on October 1, 2007, and ended on September 30th,

19   2008.

20          There are three primary contracts used by the FedEx

21   team from year to year.  They are, one, the Contractor Team

22   Arrangement Agreement, the Arrangement Agreement; two, the

23   Contractor Team Arrangement Operating Agreement, the Operating

24   Agreement; and three, the Contractor Team Arrangement Fee

25   Agreement, which is the Fee Agreement.

1          The Arrangement Agreement identifies the airline

2    participating on that year's team, lists the aircraft being

3    pledged, and establishes the commitments and responsibilities

4    of the team members.  The Arrangement Agreement is signed each

5    year by all airlines forming that year's team.

6          The Operating Agreement establishes the limits of

7    the relationship among the team members and contains liability

8    and insurance obligations.

9          The Fee Agreement establishes the commission or fee

10   that the carrier must pay to participate on the FedEx team and

11   compensate the major airlines for their aircraft commitments.

12   The commission is typically a fixed percentage of the revenue

13   earned from each mission.

14         When the FedEx team has more than one airline

15   offering the same kind of service, such as passenger flying,

16   the Fee Agreement also includes that carrier's allocation or

17   split of the FedEx team's award.  Unlike the arrangement and

18   Operating Agreements which are signed by all team members

19   together, Fee Agreements are individual and private contracts

20   only between FedEx, as the team leader, and each individual

21   carrier on FedEx team.  Each operating airline negotiates its

22   own commission level with FedEx, and the airlines do not know

23   what others pay as commission to FedEx.

24         Also during this trial, you will hear references to

25   wide-body and narrow-body aircraft.  A narrow-body aircraft is

1  one that has two rows of seats and just one center aisle.  A

2  wide-body plane has a middle section of seats and two aisles.

3  This was submitted by attorneys for both parties.

4          So that is the overview of military flying that the

5  parties asked me to read to you prior to their opening

6  statements.

7          We are now ready for opening statements.

8          On behalf of ATA, Mr. Ken Broughton.

9          MR. BROUGHTON:  Thank you, Your Honor.

10                  OPENING STATEMENT FOR PLAINTIFF

11         MR. BROUGHTON:  May it please the Court, ladies and

12  gentlemen of the jury.  My name is Ken Broughton, and I'm

13  proud to be here representing ATA today.  I think you're in

14  for an interesting few days, and we will all do our best to

15  make it interesting.

16         We know this is certainly a sacrifice from your

17  daily routines, your jobs, your family commitments, and we

18  really appreciate your jury service.

19         I also wanted to recognize here Mr. Doug Yakola, who

20  was a long-time ATA employee and is here representing the

21  company.  It's also a particular pleasure to be trying this

22  case with my original mentor in the law business, Tom Kurth.

23  I first started working for him back in 1980.

24         Many of you knew ATA.  It was a local company.  You

25  knew its bright colors.  You saw its advertisements.  Perhaps

1  you got to go to Hawaii, knew people who got to go to Hawaii.

2  It was, from all I can tell, a very good company.

3          When you take a moment to think about it, you know,

4  it's a lot more than just a plane in the sky or just one you

5  see out at the airport.  It's mechanics, it's flight

6  attendants, it's pilots, it's the people who cater the food,

7  and a lot of others.  I think its lasting legacy is that it

8  did contribute to this community and to the lives of a lot of

9  people.

10          While ATA is no longer an operating airline, what's

11  left, actually, is this lawsuit and its claim against Federal

12  Express for breach of a contract.  You're going to hear a lot

13  about several different contracts, and the one that ATA is

14  suing on is unique.

15          You're going to hear about these annual agreements,

16  and the subject matter of these different contracts is very

17  important.  You need to focus on the subject matter of what

18  each of these individual contracts deals with because there is

19  no other contract that deals with the interteam administration

20  for a three-year period other than the one that ATA is suing

21  on.

22          In January of 2008, out of the blue, FedEx sent a

23  notice to ATA that it would no longer be on the FedEx team for

24  fiscal year FY09.  The evidence will show that this came as a

25  huge shock to the people at ATA because it had signed a

1  three-year contract covering fiscal year '07, fiscal year '08,

2  and fiscal year '09.  And out of the blue comes notice, "ATA,

3  you're not going to be on the team for fiscal year '09."  That

4  was halfway through fiscal year '08.

5         There was no reason stated, and at no time has FedEx

6  taken the position that ATA had been deficient in its

7  performance.  It had not issued any warning to ATA.  This,

8  again, was out of the blue.

9         We believe the evidence will show that FedEx was

10  king of the hill on the FedEx team.  Despite the fact that ATA

11  had been on that team for more than 15 years, and the

12  gentleman at ATA who was in charge of its military flying,

13  Bill Doherty, had dealt with Gary Molinari at FedEx for many,

14  many years, FedEx ruled the roost, and I think it was used to

15  ruling the roost and doing exactly what it wanted to do.

16  Consequently, because it made the rules, I think it felt like

17  it didn't necessarily have to play by the rules if those rules

18  turned out not to be convenient for Federal Express.  And I

19  believe that's what the evidence is going to show.

20         This wasn't the first three-year contract that FedEx

21  had entered, nor was it the last.  Yet you're going to hear

22  FedEx say in this courtroom that there was no such thing as

23  three-year agreements.  Well, I've got to say they entered

24  into at least four, three-year agreements that we know about.

25  And you're going to see those with your own eyes.  You're

1   going to hear several witnesses testify about those.

2          FedEx does not want to talk about this contract,

3   because it knows, it's very clear -- it's not some huge, long

4   contract drawn up by some lawyers.  It's very short, very to

5   the point, and very clear.  Each of you will be able to easily

6   read it and understand exactly what was agreed to.

7          And notice the words that were used, and also notice

8   who chose those words.  The agreement -- the three-year

9   contract that ATA is suing on was written by Gary Molinari,

10  head of the FedEx team.  He put it on a FedEx logo at the top.

11  He signed it and sent it to ATA, and this was, in fact, not

12  even the first time that ATA and FedEx had done that.

13         This was, in essence, a renewal contract.  There had

14  been virtually an identical contract for the preceding

15  three-year period that FedEx signed, ATA signed, and the

16  parties operated under that arrangement for FY04, FY05, FY06.

17         In this lawsuit, ATA is only suing for one thing.

18  It's suing to be made whole on that contract.  It's not suing

19  for the destruction of its business.  It's not suing because

20  later it filed bankruptcy.  It is going to put on evidence and

21  show each of you that it would have made a certain amount of

22  money from this very lucrative contract and that, halfway

23  through this contract, FedEx breached it.  Nothing more and

24  nothing less.

25         Most of you -- and you heard in the voir dire, part

1   of the jury selection process, that several people had flown

2   on ATA.  So many of you are familiar with what we just think

3   of as airlines, which they called scheduled service in the

4   airline industry.  Whether it was football game charters or

5   flying to Hawaii, most of y'all think of ATA with those kind

6   of planes and just you or me getting on there and going to

7   some destination.

8          But that was just one part of that business.  In

9   past years, that had been a much bigger part of ATA's

10  business.  But the events of 9/11 significantly changed the

11  airline industry.  It forced not only ATA into bankruptcy in

12  2004 but quite a few:  USAir, United Air, Air Canada, Aloha,

13  Northwest, and Delta all went into bankruptcy because prior to

14  9/11, flying had been much more significant.  People had

15  bought a lot of new planes, and the costs were very, very

16  high.

17         ATA was in bankruptcy from 2004 to very, very early

18  2006.  It is what was called a reorganization or a

19  restructure.  It proposed, and the bankruptcy court approved,

20  what is called a business plan.  In that business plan, ATA

21  streamlined itself, and it entered into a code share with

22  Southwest Airlines, which Southwest had never done that with

23  another airline.  And it came out of there with a

24  significantly increased focus on military flying.  And why did

25  it focus on military flying?  Because it's a very profitable

1  line of business, unlike on the commercial side where jet fuel

2  can go through the roof, as we've seen.  We've all seen it in

3  the newspapers.

4           Particularly in 2007 and 2008, jet fuel prices

5  doubled, tripled.  That doesn't really matter for military

6  flying, because it's a cost plus for the Government.  In other

7  words, the Government is going to pay the fliers back,

8  regardless of what the jet fuel price is.  That's not really

9  an issue.  So ATA's business plan emphasized military flying.

10          Why was military flying so important?  In the years

11 leading up to 2005, military spending in this country really

12 went through the roof, and ATA flew all over the world.  As

13 you can see from the points on there, military flying as well

14 as its charter flying and commercial flying was widespread,

15 but it focused on the military.  And if we look at that chart,

16 you will see from 2002 up to 2005, which was when ATA was

17 formulating its business plan, military spending went up

18 dramatically.

19          It's hard to see, but in that upper left-hand

20 corner, this is speaking in tens of millions, hundreds of

21 millions, a billion dollars.  Any time you're talking about

22 flying and aircraft and jet fuel, it's a very expensive

23 proposition.  Indeed, just as an example, each year CRAF --

24 and the judge mentioned that term -- awards the flights.  In

25 fiscal year '08 alone, just one year, just to the FedEx team,

 1   FedEx was awarded a $1 billion award to that team.  So we're

 2   talking very big dollars.

 3            Now, the Judge has explained quite a bit about

 4   giving you the overview that the parties agreed upon about how

 5   this works.  But for ease of convenience, the arrangement for

 6   military flying has turned out where the teams are free to

 7   organize themselves as they desire.  And you will hear that

 8   each team governs itself a little bit differently.

 9            The FedEx team has its own specific administration,

10   and FedEx has been the leader of that.  It is the team leader.

11   It controls the membership structure.  It decides who's going

12   to be on the team and who's not going to be on the team.

13            You've heard there are point sellers, which are

14   typically the large airlines that don't do any flying, and

15   then there are operating carriers or fliers like Omni, ATA,

16   and then, later, Northwest started doing some of that.  But at

17   the time this three-year contract -- well, at the time of the

18   previous three-year contract, '04 and '06, it was only Omni

19   and ATA.  On the contract that ATA is suing on, it started out

20   only being Omni and ATA.  So Northwest came later.

21            As you have heard, there is no one single contract

22   that governs this entire relationship.  Like many others in

23   business, there are several different contracts that bear on

24   the relationship between Federal Express and ATA.  And one of

25   them -- and it's the only one that deals with the three-year

 1  contract -- is why we are here, and that's what we're going to

 2  look at.

 3          As I mentioned, the contract we're suing on is

 4  really a renewal of the previous three-year contract.  If we

 5  can look at the first one, it was entered into on January 17th

 6  of 2003 between ATA, Omni, and FedEx.  They did this as an

 7  interteam administrative tool.

 8          As you can imagine and as we've discussed, military

 9  flying is quite expensive.  You can't go down and just buy a

10  plane at the drop of a hat.  They're very expensive.  The

11  negotiation process to buy one takes a long time.  The

12  training of pilots and crews for that plane and the mechanics

13  for that crew takes a long time for that plane, so it's a long

14  proposition.

15          So the evidence will show that ATA and Omni wanted

16  to be able to do some long-term planning.  They wanted to be

17  able to plan their fleets and look down the road a little bit.

18  So they decided to enter into a three-year split amongst

19  themselves.

20          Now, make no mistake about it, FedEx is the decider.

21  FedEx is the one who doles out the flying.  In this first

22  contract that was signed January 17 of 2003, the parties

23  decided, FedEx decided that it would assign 62 percent of the

24  passenger flying for the FedEx team to ATA.  At that time Omni

25  was fairly new on the scene, and FedEx assigned Omni

1   32 percent of the flying.  The parties abided by that

2   agreement for those three years.

3          Now, we start getting close to the expiration of

4   that contract, and what happens?  These parties decide to

5   start talking about, Okay, what are we going to do next?  And

6   you will see a series of e-mails and hear about negotiations

7   going on.  And these weren't three-party negotiations.  This

8   would be Omni talking with Gary Molinari at FedEx separately

9   and Bill Doherty from ATA talking to Gary Molinari separately.

10  And omni did not necessarily know what Mr. Molinari was

11  talking with ATA about and vice versa.  So mr. Molinari was

12  the holder of all knowledge here.

13         We expect that you will hear testimony by video from

14  Chuck Pollard, who is the president of Omni, and from Bill

15  Doherty, who was in charge of ATA's military flying; and they

16  will both tell you the reason they did this three-year

17  agreement was for long-term financial planning and long-term

18  fleet planning.  They needed to be able to look at -- to

19  manage these businesses a period longer than the one-year

20  contracts that the Government had.

21         And it will be undisputed that Government contracts

22  are one year.  But the contract here -- you don't see the

23  Government's name on there.  The Government is not a party to

24  this contract.  The Government didn't seek to regulate these

25  teams in that respect.  These teams were free-market

1    companies, and they are -- have the latitude to enter into any

2    agreement they want to amongst themselves.  And they decided,

3    Okay, so that we can plan our finances and plan our airplane

4    and fleets, we want to enter into this three-year agreement;

5    and that's what they did.

6              After several months of negotiating with

7    Mr. Molinari, on August 12th, 2005, Mr. Molinari sent an

8    e-mail to Bill Doherty at ATA, and he said that he had

9    decided -- and let me back up a minute.

10             Omni had added a lot of planes.  Specifically, it

11   had bought several DC10s, and it had gotten a lot bigger.  So

12   it wasn't content with flying 32 percent anymore.  So you will

13   see months of e-mails or testimony of Omni telling Gary

14   Molinari Omni deserves a much bigger share than this 62-38

15   split we had before.  In fact, Omni basically wanted to

16   reverse it.  Omni was lobbying to get 60 percent of the flying

17   and 40 percent for ATA.  And as you can expect, Bill Doherty

18   at ATA was lobbying Gary Molinari for as big a percentage as

19   ATA could get.

20             And at the end of the day on August 12th, Mr.

21   Molinari sent this e-mail, and he said, I've heard from both

22   sides.  I've decided it's going to be a 50-50 split.  Look at

23   the last sentence.  It says, "I would like to proceed on this

24   basis with a letter agreement for three years."

25             Now, apparently, as far as I can tell, FedEx is

1  going to take the position in his case that every time Gary

2  Molinari said, Let's do an agreement for three years, that he

3  had his fingers crossed behind his back because they would

4  have you believe that these contracts meant absolutely

5  nothing.

6          Let's take a look at them for ourselves.  If we look

7  at the one -- well, let me back up.  That was an e-mail from

8  Gary Molinari to Bill Doherty August 12th, 2005, and he says,

9  "I decided it's going to be a 50-50 split."  When you look at

10 that agreement, you see Chuck Pollard from Omni is not copied,

11 so we don't know how Mr. Molinari communicated that 50-50

12 split decision to Omni.  We don't know if it was by phone

13 call.  We don't know if it was by e-mail.

14         But we do know that he obviously, that Gary Molinari

15 obviously communicated that to Omni because on August 18th,

16 Chuck Pollard from Omni sent this fax to Gary Molinari:

17 "Gary, I just returned from vacation to hear we've agreed to a

18 50-50 split.  That should be fair all around."

19         The evidence will show the 50/50 split was with ATA.

20 No one else was in the picture at that point.  And the

21 evidence will also show that when Mr. Pollard said, "That

22 should be fair all around," he was talking about that should

23 be fair to Omni; that should be fair to ATA.

24         He also -- attached to the fax that he sent on

25 August 18th was a contract that Mr. Pollard had drafted.  And

1    the evidence will show Mr. Pollard was a lawyer, and he didn't

2    wait long to fire off this contract to FedEx.  And what does

3    it say?  It says, "FedEx will cause to be delivered to

4    Omni" -- as you've heard, that's exactly how the team worked.

5    "FedEx will cause to be delivered to Omni 50 percent of the

6    passenger flying for the years FY07, FY08 and FY09."

7            Well, Mr. Molinari didn't immediately respond to

8    that.  And so by August 29th -- that had been, what, 11 days

9    after Chuck Pollard had sent that to Mr. Molinari -- Chuck

10   Pollard e-mailed Mr. Molinari, and he's inquiring, When are

11   you going to sign that contract I sent you?  And as you can

12   see, Mr. Molinari didn't say, Contract?  There's no such thing

13   as a three-year agreement.  He said what?  I was waiting to

14   have the FedEx legal department draft a contract for all

15   parties to sign; but if you really need me to sign this now, I

16   will.  And so Mr. Molinari signed that on behalf of FedEx on

17   August 29th, 2005, sent it back to FedEx.

18           Now, Omni had not been directly dealing with ATA

19   through any of this.  So, of course, Omni didn't send this

20   contract to its team member, ATA.  Gary Molinari, for some

21   unknown reason, never sent this Omni three-year agreement to

22   ATA.  You'll see why that becomes important later.

23           All right.  So time goes by, and ATA was doing some

24   financial planning; and some of the people looking at the

25   company said, ATA, you've told us about this three-year

1  contract for '07 through '09 to do 50 percent of the flying.

2  Where is it?

3         So Bill Doherty called up Gary Molinari and said,

4  Could you please send that agreement that you promised several

5  months ago.  Immediately, Mr. Molinari sent the contract that

6  we're suing on here today.  On September 7th, 2006,

7  Mr. Molinari sent this three-year contract to ATA, and he sent

8  it to Omni.

9         His cover e-mail says, "Bill, Chuck, attached is a

10  letter for each of you to sign formalizing" -- that's not

11  ATA's word; that's FedEx's word -- "formalizing the 50/50

12  split."  Attached to it is the actual three-year agreement.

13  And if you look at the wording of that three-year agreement,

14  it says -- this was drafted by FedEx -- "it is agreed" -- the

15  first paragraph:  "This letter will serve as the agreement for

16  FY07 through FY09."  Second paragraph, "It is agreed that the

17  distribution," it goes on.

18         And look at the very last sentence.  "We look

19  forward to a continued successful relationship over this

20  period."  The only period being discussed in that letter is a

21  three-year period.  There is nothing here in this agreement

22  that says this is not binding; this is nothing; this is

23  wishful thinking.  You read this; it's a contract.

24         Not too long after this, ATA wanted to be sure it

25  had enough planes, it had the right kind of planes to do this

1  50 percent of this ever-increasing military flying.  So it

2  went out and bought seven DC10s and two spare frames, and

3  FedEx knew that they were buying these DC10s.  The parties

4  proceeded to operate under this three-year contract.

5          Now, you will hear that FedEx has a lot of excuses

6  for why its word is not its bond.  It's going to tell you, Oh,

7  don't look at what we signed.  Don't look at what we operated

8  under.  There's only annual contracts in this business.

9  That's it.  So we spent months negotiating this, and I

10 bothered to send this contract around, but it's meaningless.

11         You will hear FedEx argue that, Oh, you know what?

12 Maybe ATA was going to go out of business in the future, so I

13 don't really have to pay attention to this contract.  This

14 contract doesn't give FedEx that luxury to disregard its word.

15         You will hear FedEx say, Oh, Northwest Airlines

16 wanted to start doing some flying.  That's true.  It's

17 undisputed.  All right.  FedEx wanted to make Northwest happy.

18 Understood.  That's not an excuse to disregard the promise you

19 made.  You make a promise, and subsequent developments occur;

20 you renegotiate.  That's what you do.  You don't just cancel

21 it.  But FedEx chose to cancel it.

22         Once this lawsuit was filed and the parties started

23 producing literally tens of thousands of pages of documents,

24 FedEx found an e-mail from Mr. Doherty.  And you'll hear

25 Mr. Doherty say, I don't remember seeing it.  I have no idea

1   why I would have said that.  Mr. Doherty sent an e-mail to one

2   of his colleagues, said this period of time covered here --

3   and let me say this:  This was before the three-year contract

4   was signed.  It says, We've reached an agreement for a 50/50

5   split that runs through 2008.

6          You're never going to see any contract by FedEx or

7   anybody else that says we have a contract for two years.  All

8   right?  Mr. Doherty made a mistake.  He doesn't remember why

9   he would have ever said "2008."  All the evidence of any

10  contract that you will see signed by FedEx and signed by ATA

11  clearly says '07, '08, '09.

12         You will see emails where Mr. Molinari is engaged in

13  discussions where he refers to "our current three-year

14  agreement."

15         I think you will conclude that all the evidence

16  points to this absolutely was an agreement and that FedEx

17  comes up with a lot of reasons why it should be ignored.

18  Okay?

19         Mr. Doherty's reference to it being through 2008 got

20  subsequently put, by his colleague, into some PowerPoints; and

21  that PowerPoint got put into what's called a Form 10 filing

22  that kept referring to FY08, but you will see plenty of

23  evidence that people within the company, the financial

24  forecasting people, the people who worked for Mr. Yakola, were

25  working three years down the road, and they were actually

1  going by this three-year contract, not this mistaken e-mail.

2         Most of the excuse that FedEx is going to offer is

3  they don't want to talk about the fact that military flying

4  was profitable.  They want to ignore that.  They don't want to

5  talk about the fact that they signed an '04 through '06

6  three-year agreement.  They signed a three-year agreement with

7  Omni.  They signed a second three-year agreement with ATA.

8         After ATA was given notice that it would no longer

9  be on the team in FY09, FedEx entered into a new three-year

10 agreement with Omni for '09 through '11, 2011, giving it even

11 a higher percentage.  And they're here telling you today those

12 promises meant nothing; those signatures meant nothing; those

13 contracts meant nothing.

14        ATA, once it received the word, tried very hard to

15 get FedEx to reconsider.  In fact, it was such a shocking bit

16 of news to ATA that they didn't think it was serious.  They

17 thought FedEx was just doing some kind of a negotiating ploy

18 to cut some better deal.  But once they realized that they

19 were serious, they tried very hard to get FedEx to reconsider;

20 and you will see ten, 15 different alternatives that they

21 pursued to try to fill this void that was left because the

22 military flying was the core business of ATA.  And they didn't

23 have a very long window of opportunity to try to find a

24 replacement for this business, but you will see they tried

25 very, very hard and were unable to do so.

1          Ultimately, they went out of business.

2          ATA once it received the word tried very hard to get

3    FedEx to reconsider.  In fact, it was such a shocking bit of

4    news to ATA that they didn't think it was serious.  They

5    thought FedEx was just doing some kind of negotiating ploy to

6    cut some better deal.

7          But once they realized that they were serious, they

8    tried very hard to get FedEx to reconsider; and you will see

9    10, 15 different alternatives that they pursued to try to fill

10   this void that was left because the military flying was the

11   core business of ATA.  And they didn't have a very long window

12   of opportunity to try to find a replacement for this business,

13   but you will see they tried very, very hard and were unable to

14   do so.

15         Ultimately, they went out of business.  They're not

16   suing FedEx claiming that FedEx put them out of business.

17   They are suing to recover the benefit of the bargain of that

18   one contract.  You're going to see evidence of how much they

19   would have received in revenue and profits had they been able

20   to continue to do military flying until the end of FY09, and

21   that's the only think that ATA is suing upon.

22         ATA is seeking $65 million, which is a lot; but

23   everything's relative, isn't it?  When you look at the fact

24   that the FY08 FedEx team award was $1 billion, it puts it in

25   good perspective, given that ATA was supposed to receive

1  50 percent of all passenger flying that the FedEx team did.

2          We are seeking to do nothing more than to hold FedEx

3  to its word.  We're asking that FedEx be required to honor the

4  contract that it made.  We don't have to speculate on whether

5  ATA would have stayed in business.  We're only looking at a

6  contract that FedEx breached January 22 of 2008.

7          At that point, there was nothing more ATA could do

8  to stay on the team.  FedEx had breached it at that point in

9  time.  ATA stood ready and willing to continue that military

10  flying but ultimately became unable to do so without its core

11  business, and it had to shut down.

12          The final insult was that after ATA filed this

13  lawsuit, FedEx filed a counterclaim saying, well, you signed

14  an annual agreement, ATA, that you were going to fly until the

15  end of fiscal year '08.  And you went out of business in April

16  of '08, and you didn't finish the rest of that flying.

17          You know, it strikes me as kind of the situation

18  where FedEx shot us.  They shot ATA, and they're complaining

19  because ATA died too soon.  They're basically saying ATA, you

20  should have cloned a life another five months and then died.

21  That's what their counterclaim really is.

22          In closing, ATA is seeking nothing more than to

23  recover the benefit of the bargain of this one contract.  And

24  we very much appreciate your time.  We appreciate your

25  attention, and thank you again for your jury service.

1          THE COURT:  Thank you, Mr. Broughton.  On behalf of

2    Federal Express, Mr. Peter Blumberg.

3                         OPENING STATEMENT

4    BY MR. BLUMBERG:

5          Ladies and gentlemen of the jury, FedEx will prove

6    three things to you in this case:  First, that ATA did not

7    have a contract for FedEx team membership for fiscal year

8    2009.  The FedEx team contracts are annual contracts just like

9    the underlying military contracts.  They're year-to-year

10   contracts, and every airline is a free agent each year.

11         What ATA was doing is taking negotiations on one

12   term, one part of a larger contract, slapping a label on it,

13   saying it's a contract, and that FedEx breached that contract.

14   Just calling something a contract doesn't make it a contract.

15         Second, FedEx will prove that it was ATA that

16   breached the contract.  FedEx had signed ATA for all of fiscal

17   year '08, and ATA did not fulfill its obligations.

18         Finally, FedEx will show that even if ATA did have a

19   contract for the FY09 year, it would not have been able to

20   perform that contract because ATA because of losses in its

21   scheduled service operations, other financial problems, went

22   out of business in April 2008, six months before the start of

23   fiscal year 2009.

24         ATA was a company that had been losing money for

25   years in its scheduled service well before any decisions

1   involving military flying, and the reasons we're here today is

2   because ATA is looking for an excuse and is looking to collect

3   money that it never would have collected regardless.

4          I want to introduce you to -- I know you've seen and

5   met some of these people when you were doing voir dire.  This

6   is Michael Gabel, an attorney with FedEx -- I'm sorry, Kim

7   Hodges, an attorney with FedEx; Lisa Monahan, a paralegal; and

8   Bob Rachor, Senior Vice President of Air Business Operations.

9          MR. RACHOR:  Air Safety and Business Operations.

10          MR. BLUMBERG:  Air Safety and Business Operations.

11   I know all of you are familiar with FedEx.  It's the inventer

12   of the overnight delivery industry, has a large hub right here

13   in Indianapolis, Indiana.  About 100,000 packages move through

14   that hub every day, and it employs about 4,000 people.

15          Until this morning, you probably didn't know that

16   FedEx did a lot of military flying.  FedEx planes were used in

17   Desert Storm, FedEx planes were used in Desert Shield, and

18   FedEx planes fly nearly everywhere our troops are stationed.

19          FedEx has also been the team leader of one of the

20   military charter teams that participates as part of the CRAF

21   program.  There are two individuals who you will hear about

22   during this trial who had those responsibilities.

23          The first is an individual named Gary Molinari.

24   Gary Molinari was, for all the time we will be talking about

25   here in the next few days, the manager and director of the

1  FedEx charter program.  That includes the military charters

2  that we'll be talking about, but it also includes commercial

3  and private charters such as when FedEx returned -- the

4  National Zoo returned the pandas to China.  His boss is this

5  individual sitting here, Bob Rachor, who at the time was the

6  VP of that operation, is now Senior Vice President.

7       Mr. Rachor is familiar with the CRAF program not

8  only from his work at FedEx but also through 28 years of

9  military service with the U.S. Navy.  Now Mr. Molinari was the

10  individual who served as the administrator of the FedEx team.

11  As administrator, as you heard from Judge Young, Mr. Molinari

12  had a number of responsibilities, including bids for the FedEx

13  contracts, including the serving as the liaison to the

14  Government for matters involving the FedEx team.

15       One of these responsibilities and the responsibility

16  that is at issue here in this case is putting together the

17  FedEx team each year.  ATA claims that it had a three-year

18  deal to be on the FedEx team, that it had a deal to be on the

19  team for FY07, FY08, and FY09.  And that when FedEx made the

20  decision that ATA would not be on the team for FYO9, that

21  FedEx breached that contract.

22       When Judge Young was addressing you, he talked about

23  breach of contract cases, you know, typical kind of breach of

24  contract cases.  It is a contract, and someone is talking

25  about a clause or a phrase.  Well, this is somewhat unusual

1  breach of contract case, because what the parties seem to

2  dispute here is not really so much what a word means or what a

3  term means.  But really, what is the contract in this case?

4        What is the contract that puts an airline on the

5  FedEx team versus what is just one term of that contract?  ATA

6  has spent some time going over these letters.  I want to start

7  by going over with you the FedEx contracts.

8        The first is a document called the Arrangement

9  Agreement that Judge Young described very briefly.  The

10  Arrangement Agreement is the agreement that basically tells

11  the U.S. military who's on our team this year, who's going to

12  be part of the team.

13        The U.S. military contracts are always annual;

14  they've always been annual.  And as you'll hear, some of the

15  airlines, including ATA, have asked the military to move to

16  multi-year contracts, but the military has not been willing to

17  do that.  So each year FedEx puts together the team, and all

18  team members must sign the Arrangement Agreement, and that's

19  what goes to the military.  It tells the military who's on the

20  team and what planes are you pledging to the program.

21        The second agreement that must be signed each year

22  is one called the Operating Agreement.  This also -- every

23  airline that's going to participate on the FedEx team each

24  year must sign an Operating Agreement.  And the Operating

25  Agreement basically says, This is why we're getting together.

 1   This is what we're getting together to do.  It also has the

 2   insurance requirements, how much insurance you need to carry.

 3   It has something called an indemnification clause that says

 4   that if something should go wrong, what happens, and it makes

 5   each airline basically responsible for each other.

 6            The third agreement and one you'll probably hear a

 7   little more about during this trial is one called the Fee

 8   Agreement.  The Fee Agreement is also done every single year;

 9   but not every single airline does a Fee Agreement.  The Fee

10   Agreements are done only for those fliers/operators that are

11   basically paying to be part of a team.  They're the ones who

12   don't have as many points, and so what they do is they are

13   part of the FedEx team; they fly the missions, and they pay

14   over to the team so that the airlines that pledge their points

15   can be paid.

16            They see what it does is two things.  First of all,

17   it says how much you going to pay?  And it's usually a

18   percentage of revenues:  Three percent, four percent,

19   five percent, seven percent.  That might not sound like a lot

20   of money right now, two percent, three percent, seven percent,

21   but the amount of revenue that any one airline might earn

22   could be in the 100-million-dollar, 200-million-dollar range.

23   So these commissions are big money:  $10 million, $12 million,

24   $15 million.

25            So the Fee Agreement -- the commission is negotiated

1  each year, and the parties sign the Fee Agreement.  The

2  airline and FedEx sign the Fee Agreement.

3           Actually, Rob, if you could -- and I'm sorry.  I

4  introduced the table.  I neglected to introduce Rob Hudson

5  there in the back.  Rob is the technology master and will be

6  doing some of the show that you're going to see during this

7  trial.

8           If you could call up -- I'm terribly sorry --

9  Stipulated Defendant's 99, which is No. 580.

10          This is a Fee Agreement.  Rob, if you would go to

11  page 582, if you could blow up that top paragraph there,

12  No. 2.

13          This is the part of the Fee Agreement I was

14  describing a moment ago.  It says how much the airline is

15  going to pay to be on the team.  It has that clause.

16          The Fee Agreement has a second clause.

17          Rob, if you could go down to No. 4.

18          It has the split, how much of the business that the

19  airline is going to be flying for that year.  And here, the

20  Fee Agreement for ATA says it will have 50 percent of the

21  team's share of the wide-body and narrow-body business, 50

22  percent of the narrow-body expense, and 50 percent of the wide

23  body after Northwest has done ten flights a month.  So the Fee

24  Agreement has the amount that's paid and how much business.

25          The Fee Agreement has another clause in it that

1   you'll hear about called the entire agreement clause.  What it

2   says is this agreement, together with the Contractor Team

3   Arrangement and Operating Agreement constitute the entire

4   agreement and understanding of the parties and supersedes all

5   prior agreement.

6           And you'll hear from Gary Molinari and Bob Rachor

7   that what this means is once the parties go to contract for

8   the year and once they sign, this is the contract and this is

9   what governs.

10          Each of these agreements also has something in it

11  called a term clause.  The term clause basically says the term

12  of this agreement shall be for a period concurrent with the

13  contract awarded by AMC.  Military contracts are one year, and

14  each of these contracts are one year.  Each year all the

15  airlines have to -- if they're going to be part of the team --

16  sign up once again.  Military -- just like military flying is

17  year to year; membership on the FedEx team is year to year.

18          So about these letters and hearing about these

19  letters, how do the letters fit into this story?

20          Rob, if you can call up Plaintiff's 13, stipulated,

21  which is 1302.

22          What plaintiff is calling a contract, what plaintiff

23  on all those slides, contract, contract, contract, contract,

24  contract, what these letters are, is something between just

25  two of the airlines on just one term of the overall

1  military -- the overall FedEx contracts, just one term which

2  is just one of the three agreements that needs to be signed

3  each and every year.  Doesn't say how much these airlines are

4  going to pay.  Doesn't say who else is going to be on the team

5  each year, so no idea whether the team is going to be big

6  enough to support two carriers or small enough to support two

7  carriers.  Doesn't say how many planes are going to be

8  pledged.  It is simply something on just one term.

9       Now, how did these letters come about?  Well, it's

10 because Gary Molinari, who we'll meet, did a very good job

11 with the FedEx team.  And each year he was able to get enough

12 business to be able to support two passenger carriers.  And

13 for most of the time that we'll be talking about in this case,

14 those two passenger carriers were ATA and Omni.  And the

15 discussion was how the business would be split.

16      As you heard from Judge Young, FedEx at the end of

17 the road doesn't really control how the business is split.

18 The AMC awards the business.  And the first thing AMC does is

19 makes sure that that business gets flown, the commission gets

20 flown, regardless of any kind of splits.

21      Second, next you need to make sure that each team

22 gets its allotments, so the FedEx team gets what it's entitled

23 to, the Alliance Team gets what it's entitled to, and the UPS

24 team gets what it's entitled to.

25      Then and only then will the AMC look at internal

1  splits between what a team wants to do, and that's all this

2  letter is, just dealing with that one part of the overall

3  contract.

4          Now, for this one term, Mr. Molinari was willing to

5  work the term out over for what it would be for multiple years

6  so the parties wouldn't have to go back year to year and keep

7  figuring out what this split was.  But as he'll tell you, the

8  agreement on one term didn't bind these airlines to be part of

9  the FedEx team.  If they could get a better opportunity on

10 another team, they were free to go.  If the UPS team grew and

11 there was a better opportunity there, they were free to go.

12 If Gary Molinari had a bad year and lost one of the major

13 charter airlines, he wasn't going to force these two airlines

14 to stay on the FedEx team for no money.  As Gary Molinari will

15 tell you, these airlines were free agents each and every year

16 until they signed on the dotted line and signed the

17 arrangement, operating and Fee Agreements.

18         Now, there's another thing about this letter that

19 ATA didn't focus on much in the opening, but I want to point

20 out to you.  For this letter, the one that ATA is looking to

21 and saying, This gave us the right for FY07, '08 and 09, if

22 you look, there's a missing signature.  This is a three-party

23 letter that only two parties signed.  Omni did sign an earlier

24 letter, a letter that gave Omni 50 percent of the business but

25 didn't say anything about ATA.  When it came time to sign this

1   letter, Omni did not sign.

2          And you'll hear from Gary Molinari and he'll tell

3   you that he told ATA that Omni wouldn't sign and that even on

4   this one term, things would have to go year to year, even on

5   this one term.  And you'll also see that for fiscal year 2008,

6   the middle year of this alleged contract, ATA took a different

7   split, not 50/50.  And they'll give you reasons and it made

8   sense for finances and, you know, we thought we would make

9   better if we had a little less but did better on the

10  commission.  But the point is they never went to FedEx and

11  said Hey, you can't do this.  They never went to FedEx and

12  said, Well, we'll do this, but, remember, we've got that

13  letter; we want that amended.  None of that.

14          But, ultimately, all of that is really just about

15  the one term, what happened to that one term.

16          What we want you to focus on during this trial is

17  not what's put on top of a PowerPoint slide calling something

18  a contract.  This is a contract, saying it's a contract.

19  We're going to ask you to focus on what ATA was saying at the

20  time.

21          Rob, thanks.

22          In 2007, ATA's military charter director, Bill

23  Doherty, sent some comments to the military about the military

24  possibly moving to multi-year contracts.  Here's what Bill

25  Doherty said.  Here's what he told the military.  "We're

1    always working from a state of flux and uncertainty.  Right

2    now we're guessing year to year because we don't know what

3    Teaming Arrangements or how business opportunities will

4    change," guessing year to year.

5           ATA's parent had responsibilities with the

6    Securities and Exchange Commission to give truthful

7    disclosures, and you'll hear several quotes from the SEC, but

8    here's one:  "However, our revenue and net income from the AMC

9    are derived from one-year contracts that the AMC is not

10   obligated to renew."  And when someone at ATA's parent company

11   asked a quick question about the contract status, the

12   individual who took over for Bill Doherty, an individual named

13   Wil Lilly, here's what he said:  ATA is only contracted with

14   Fed Ex for FY08.  Wil -- that's Wil Lilly -- said, that FY09

15   should get underway in the next couple of months.  So again,

16   we want you to focus on what ATA was saying at the time as far

17   as whether they had a contract with FedEx versus an agreement

18   on just one term of a contract.

19          Now, ATA was on the FedEx team for a large number of

20   years.  They had been on since at least the mid 1990s.  And

21   for FY2007 they signed their Arrangement Agreement.  They

22   signed their Operating Agreement.  An agreement on commission

23   was reached, and so the fee agreement was signed, and ATA was

24   on the FedEx team.  And in 2008 they signed on to the

25   Arrangement Agreement, the Operating Agreement; an agreement

1  on commission was reached, and they signed off on the Fee

2  Agreement and they flew as part of the team.

3          But when it came time for the FY09 team and Gary

4  Molinari was starting to consider what the composition of the

5  team would look like for 2009, two things had changed, things

6  that, frankly, at the time probably not ATA and not FedEx

7  could have foreseen but things that are not in the picture

8  back in 2005 and 2006.

9          The first involved Northwest.  Northwest Airlines

10 had for a long time been part of the FedEx team but as just a

11 points contributor, just pledged its points.  But starting

12 around 2006, as we're all familiar, the economy started

13 softening, and Northwest had some planes that it couldn't use

14 anymore; it just didn't have the business.  So it decided that

15 it wanted to do some military flying.

16         And as ATA's CEO, Subodh Karnick, who we'll see on

17 tape, said in some board minutes this was a watershed event

18 that all the carriers have worried about for years:  What

19 happens if the points contributors want to start flying their

20 points?  And that's what happened here.

21         Now, for one year, Gary Molinari was able to get

22 Northwest to back down a little bit to just ten flights a

23 month, up to ten nights a month.  Doesn't sound like a lot,

24 but each wide-body flight, the military pays about had a

25 million dollars, so we're talking about $60 million of the

1 pie.

2            And Mr. Molinari was able to look at that Omni would

3 fly, ATA would fly, and Northwest would fly that up to ten

4 flights a month.  But then the next year, Northwest came back

5 and said, We want double that; we want to double our flying.

6 And Northwest made it very clear:  UPS is going to give that

7 to us, and if you don't do it, we're going to leave.

8            Northwest had about 25 percent of the FedEx team's

9 points, and if they left, that situation about maybe not

10 having enough points for two carriers could have come to pass.

11 Gary Molinari needed to keep the team together so that all the

12 fliers, the cargo and the passenger ones, would be able to

13 fly.

14            The second involved ATA.  Before August 2007, this

15 was the structure of ATA.  Here's the operating airline.  It

16 had a holding company above it, and the holding company was

17 called ATA Holdings.  And it was owned by a private equity

18 fund called MatlinPatterson, and you're going to hear from a

19 MatlinPatterson witness, I believe, at this trial.  And ATA

20 flew as part of the FedEx team.

21            In 2007 the parent company, MatlinPatterson, did an

22 acquisition.  You have ATA, and then they bought two other

23 airlines called North American and World Airways.  I'm sure

24 before this morning, most of you hadn't heard of these two

25 airlines, but they also do military charter flying.

1          Here's the issue:  While ATA is part of the FedEx

2    team, these two teams are part of the Alliance Team.  Gary

3    Molinari and some of FedEx's other airlines on the team were

4    worried about a conflict of interest.  See, if the FedEx team

5    goes and makes an offer to one of the major carriers in the

6    Alliance Team and says, Hey, We'll pay you more; We want to

7    grow our team; Come over, that's no longer so good for the

8    parent.  And they were worried that there would be

9    interference, that there would be conflict of interest, that

10   ATA might tell the parent what was going on and they would do

11   something to stop it, or that the parent at least would be --

12   the Alliance Team owned by the same company would be trying to

13   attract the airlines on the FedEx team.  And as you'll see,

14   this was more than just an idle concern or speculation.  You

15   will see some internal ATA e-mails that suggest this might

16   have been an issue.

17          You will also hear that sometime in 2007, just --

18   some folks from ATA came to Memphis and said, Hey, we've got

19   an idea; why don't we do a little cargo flying.  The problem

20   is, ATA doesn't have any cargo planes; those are hollowed-out

21   planes.  So this was another thing that had changed, another

22   factor.

23          For these two reasons, FedEx made the decision that

24   ATA would not be on the team for FY09, and at that time the

25   military bid hadn't even been issued.  ATA had not signed an

1  Operating Agreement, an Arrangement Agreement, or a Fee

2  Agreement for that year.

3         So in 2009 Gary Molinari calls ATA and tells them

4  the following.  This was in January of 2008.  The bid hadn't

5  gone out.  There was time to find another teaming arrangement,

6  and there were still eight months left on the FY08 year, that

7  they were not going to be on the team for FY09 but went on to

8  say commitments and all activity for FY08 will proceed as

9  contracted.  So there's no doubt about this.  FedEx was very

10  clear:  Won't be on the FY09 team, but we want you, we invite

11  you, we expect you to fly all the business in FY08.  FedEx

12  tells ATA here that it won't be part of the FY09 team, but

13  they can fly as much business, earn as much money, earn as

14  much profit as they want for all the rest of that year.

15         You're going to hear from ATA's damages expert,

16  who's going to say for the balance of FY08, if ATA had flown,

17  he's going to say they would have made millions and millions

18  and millions of dollars.  They would have been profitable.

19  Money to be made.

20         But ATA shut down here.  On April 2nd, 2008, ATA

21  closed down, the whole airline.  So the question would be if,

22  as ATA is saying, they stood to make $22 million between

23  April 2008 and the end of the year and they were on the team,

24  eligible to fly, no barrier to flying that business, why would

25  they not fly it?

 1              And here's the reason:  Even before FedEx's

 2    decision, ATA was running out of cash.  December 4th, 2007,

 3    ATA CFO saying, "I'm worried about cash at ATA; it's ugly."

 4    December 14, 2007, ten days later, ATA's CFO is again saying,

 5    "We are very critical with cash at ATA."  December 28th, 2007,

 6    before FedEx's -- before any word about FY09, "Is plan B a

 7    shutdown and cut-our-losses scenario?"

 8              The fact is that even before FedEx's decision, ATA

 9    was losing money and running out of cash.  And even before

10    FedEx's decision, ATA was having to draw cash from its parents

11    and other sources just to stay in business.

12              And the evidence will show and you'll hear from a

13    the damages expert, Howard Zandman, that this company was

14    going to run out of cash, one way or another.  What ATA is

15    looking for here is an excuse for what would have happened

16    regardless.

17              Here's a snapshot of what had gone on for ATA in the

18    prior years:  Losses of $86 million, losses in the 10s of

19    millions of dollars year and year after year.  And it's for

20    this reason that FedEx says that even if there had been a

21    contract for FY09 -- and there wasn't -- but even if there had

22    been, ATA would not have been ready or willing or ready or

23    able to perform that contract.

24              Finally, I want to touch on Mr. Broughton's

25    statement that ATA says they're coming to you and they're

1  asking you for $65 million.  Some of that money is the FY08

2  money for $22 million.  I want to talk about ATA's military

3  profits for a second.

4          There was a time that ATA did make a lot of money in

5  military flying; but as time was going on, the amount was

6  going down and going down.  In the year, the last year, the

7  full year that they flew -- and this was all before any

8  notification about FY09, ATA only made $2.1 million on

9  military flying.  Through this lawsuit ATA is simply trying to

10 get a recovery that they never would have gotten even if they

11 had been part of the FY09 team.

12         Ladies and gentlemen, at the conclusion of all the

13 evidence I'm going to come back and summarize what you've

14 heard, and I'm going to go over the three things I said at the

15 beginning that FedEx said it would prove.

16         That ATA didn't have a contract to be on the team

17 for FY09, and that these letters that they're waving around

18 are not contracts, they're simply one term of a contract.  And

19 second, that ATA did have a contract for FY09 -- for FY08, and

20 ATA didn't perform that contract.

21         And finally, that even if ATA did have a contract

22 for FY09, it wouldn't have been able to perform that because

23 the company was running out of money, and it ran out of money

24 six months before the start of FY09.  Thank you very much.

25         THE COURT:  Thank you, Mr. Blumberg.

1          Ladies and gentlemen, we're now ready to begin the

2    evidence.  You may call your first witness.

3          MR. BROUGHTON:  Your Honor, if we may approach on a

4    quick housekeeping matter?

5          THE COURT:  You may.

6     (Beginning of bench conference.)

7          MR. BROUGHTON:  I want to see what the Court's

8    preference was on this.  I'll just put it this way.  ATA

9    stipulated to a lot more documents than FedEx did.  We filed

10   months ago the custodian of records affidavits.  FedEx

11   objected.  We put them on our exhibit list.  FedEx objected

12   saying we amassed several unrelated e-mails.  Obviously the

13   custodian of records' affidavit is a collection of different

14   documents for a period of time.

15         He said break them up to individual ones and add

16   them to your list, and then we can address the objections

17   individually.  Obviously, part of our -- we did that.  It did

18   not result in any stipulations of admissibility, I don't

19   believe.

20         So I think it would cause everything to move along

21   faster if I just go ahead and offer these custodian of

22   records' affidavits from Northwest and from Omni, because I do

23   believe they absolutely prove up a lot of documents that we're

24   going to be going through, business records, records that

25   prove up every single time for 50 different documents.

1          MR. BLUMBERG:  There are a couple problems.  The

2    custodian of the affidavits, the problem is that while they

3    have signed on them as being business records, that they --

4    well, let me take a step back.  The individual documents, many

5    of those in there are just e-mails going back and forth.  They

6    are not the kind of business records that are contemplated by

7    the hearsay objection.

8          You can't just slam a custodian -- it has to be a

9    report, a memorandum, the kind of document contemplated by the

10   rule.  Our objection was many of these are just e-mails going

11   back and forth, and that doesn't get rid of the hearsay

12   problem.  That's why we wanted to address them one by one, but

13   many of them can't be admitted.

14         MR. BROUGHTON:  Your Honor, I disagree.  I don't

15   think that's the law.  In this day and age, people are

16   communicating business communication by e-mail.  That's people

17   with knowledge of the information transmitting information in

18   the course of business.  It's regular for the business to keep

19   that, and it's regular for the business to maintain those

20   sorts of records.

21         We don't have e-mails of people asking about the

22   weather or telling jokes.  Obviously all of these are

23   discussing business.  So I wanted to start off because

24   Mr. Yakola's testimony includes -- some of them include about

25   Northwest documents and Omni documents, and I'm just trying to

1    move this along faster.  Otherwise this is going to be a very

2    protracted, you know, 200 exhibits.

3              MR. BLUMBERG:  Your Honor, it wouldn't have been

4    protracted if we followed the procedures that the Court had.

5    I mean, coming to the sidebar before the first witness and

6    saying now I want all these in is --

7              THE COURT:  This is not good.  Let's go ahead and

8    start your witness.  You make your objections as you can, and

9    then I may have to look at some of these tonight or something.

10             MR. BROUGHTON:  I'm happy to leave them with you.

11             THE COURT:  That will be fine.  Okay.

12        (A bench conference was held off the record.)

13             THE COURT:  Call your first witness.

14             MR. BROUGHTON:  ATA calls Mr. Doug Yakola,

15   Mr. Yakola.

16            DOUG YAKOLA, PLAINTIFF'S WITNESS, SWORN

17                   DIRECT EXAMINATION

18   BY MR. BROUGHTON:

19   Q   Mr. Yakola, would you please tell the jury your name.

20   A   Doug Yakola.

21   Q   Where do you currently live, Mr. Yakola?

22   A   I live in York, Maine.

23   Q   How long have you lived in York, Maine?

24   A   About two years, a little over two years.

25   Q   Where did you live before that?

Vol. 2 - 164

YAKOLA - DIRECT/BROUGHTON

1  A   In Zionsville, Indiana.

2  Q   How long did you live here in Indiana?

3  A   A little over five years.

4  Q   Tell us a little bit about yourself.  Let the jury know

5  who you are.

6  A   Yeah.  I have -- I am the father of three.  I have been in

7  the airline-related business -- airline-related line of

8  business for 25 years now, going on.  I don't like to talk

9  about that too much.  Quite a bit.  I've been involved in

10  various assignments:  Operations, finance, kind of all

11  different things.

12  Q   And for how many years did you work at ATA?

13  A   I worked at ATA for a little over five years.

14  Q   Approximately when was your last day of employment?

15  A   It was in the middle of January of 2009.

16  Q   And why did you leave ATA at that point?

17  A   Well, there wasn't a business anymore.  It was shut down.

18  There was nothing left to do there.

19  Q   How are you currently employed?

20  A   I am self-employed.  I am a consultant.

21  Q   What kind of consulting work do you do?

22  A   Mainly around restructuring, helping companies that are in

23  trouble, either operational or financial.

24  Q   What do you mean, helping companies that are in trouble?

25  A   Helping them come up with a business plan that might work;

YAKOLA — DIRECT/BROUGHTON

1  helping them –– if they have to go through a bankruptcy

2  proceeding, I am familiar with that from the ATA case.  So I

3  help them with that as well.

4  Q   We heard in opening the mention of a company called

5  MatlinPatterson.  Have you ever done any consulting for

6  MatlinPatterson?

7  A   Yes.  I did some consulting work and do some consulting

8  work for MatlinPatterson after my time at ATA.

9  Q   How many different companies have you done consulting work

10  since you left ATA?

11  A   Oh, boy, about six.

12  Q   Just very briefly tell the jury what your educational

13  background is.

14  A   Sure.  I have an undergraduate degree in business from the

15  University of Central Florida in Orlando and a graduate

16  degree, an MBA from Northwestern up in Chicago.

17  Q   And tell us about your employment background since you got

18  out of school.

19  A   Yes.  After I graduated my undergrad, I went to work for

20  Northwest Airlines.  I worked for Northwest Airlines for 18

21  years, various assignments in what's called corporate

22  auditing.  I did fraud investigation there for a number of

23  years.  That was kind of fun.  I went on to more operational

24  assignments where I was in charge of all of the baggage

25  handling, the system processes for Northwest and various other

YAKOLA - DIRECT/BROUGHTON

1  assignments.

2      Ultimately, I became the director of customer service

3  in Detroit where I managed all of the customer service

4  employees, about 700 employees in Detroit in that big hub of

5  Northwest there, the new airport, if any of you have been

6  through there.

7  Q   And did you stay at managing the Detroit hub until you

8  left Northwest?

9  A   That's correct.  I left Northwest in late October of 2003,

10 and that's the job I had at the time I was managing the

11 Detroit hub.

12 Q   Where did you go in late October of 2003?

13 A   I went to ATA Airlines.  I became their Vice President of

14 Station Operations and Cargo, which meant I was in charge of

15 all of ATA's stations, all the places that they flew for

16 passengers and cargo.

17 Q   Where did you office when you started in October of 2003?

18 A   In Indianapolis.

19 Q   Tell us very generally about the business of ATA at the

20 time you started in 2003.

21 A   Sure.  ATA, as much as it was, even in its later years, it

22 was a scheduled service carrier, as you probably all know from

23 Indianapolis, a low-fare carrier flying out of Indianapolis

24 and Chicago that flew 737s and 757s to a lot of leisure

25 destinations.  That was a big part of its business when I

YAKOLA - DIRECT/BROUGHTON

1  started in 2003.

2  　　　　Not a small but a smaller part of the business was

3  what we called military and commercial charter.  ATA had been

4  flying military charters since well before the FedEx team,

5  since 1983.  We had been flying military charters flying

6  military troops all over the world and also commercial

7  charters like football charters, football teams, that sort of

8  thing.  But a big part of this business at that time in 2003

9  was the schedule service business.

10  　　　　MR. BROUGHTON:  If you would, Mr. Brockwell, put

11  Federal Express Exhibit No. 27 up on the screen.  I'm sorry,

12  Federal Express, not plaintiff's.

13  BY MR. BROUGHTON:

14  Q    Mr. Yakola, I direct your attention to this document

15  entitled ATA Airlines Business Update For Air Mobility Command

16  dated December of 2005; do you see that?

17  A    Yes.

18  Q    Just to give us a little background, it was mentioned in

19  opening that ATA had filed bankruptcy in 2004; is that right?

20  A    That's correct.

21  Q    Tell us what led to ATA filing bankruptcy in 2004.

22  A    You know, the events as they always do start kind of well

23  before the actual filing, and back in 1998, 1999, the

24  management and ownership of ATA decided to try to get a big

25  step into the kind of new, low-cost carrier business as you

YAKOLA - DIRECT/BROUGHTON

1  know, Jet Blue today or Southwest Airlines.

2       One of the ways it did that was it flew a lot of --

3  back in the late '90s, 2000, 727-200 airplanes, older L1011

4  airplanes, what we call refleeted.  So it got rid of all its

5  old airplanes and got all brand new airplanes:  Big 737-800s,

6  757s, much more modern airplanes.  Those airplanes came on in

7  2000, into the early parts of 2000 -- of 2000, into 2001.

8       Then the watershed event that everyone talks about, of

9  course, you have September 11th of 2001 that occurred and sent

10 the entire industry into a big tailspin.  But ATA had signed

11 contracts with different lessors for these airplanes and was

12 responsible for a lot of lease cost on the airplanes.  So it

13 needed to restructure itself during that time so it could come

14 out as a much more focused carrier, given the new reality of

15 the airline industry after September 11th.

16 Q  So going back to the cover sheet here, this was in

17 December of 2005.  So was this towards the beginning or

18 towards the end of ATA's bankruptcy?

19 A   It was towards the end of ATA's bankruptcy.  It went in in

20 October of '04 and came out about three months after this

21 document.

22       MR. BROUGHTON:  Okay.  And if we could turn,

23 Mr. Brockwell, to the second page of FedEx Exhibit 27.

24 BY MR. BROUGHTON:

25 Q   This gives just a brief synopsis of the ATA background,

1  indicates it started back in 1973 and relates some of the

2  information that you just told us.  And if we could go to page

3  3, please, this gives a listing here, and I wanted to pause on

4  a few of these names because the jurors have heard of some of

5  them.  The second name up there is Subodh Karnick, and very

6  briefly tell us who Mr. Karnick is.

7  A   Subodh was an executive that we hired from Delta Airlines

8  who had a significant marketing background, and he eventually

9  became the CEO of ATA Airlines.

10 Q   Okay.  A few names under Mr. Karnick's name is your name,

11 right?

12 A   That's me.

13 Q   Okay.  And we go a little bit down and see the name of

14 Sean Frick.  Tell the jury who Sean Frick is.

15 A   Sean Frick, at the time -- this was the chief

16 restructuring officer was well involved in that first

17 bankruptcy of ATA, eventually became vice president of finance

18 and worked for me.

19 Q   Okay.  Let's pause a little bit on his title.  Chief

20 restructuring officer.  What does that mean?  Tell us.

21 Explain what "restructuring officer" means.

22 A   When any company is going through a bankruptcy process,

23 it's like a second job, right?  It is -- there is a lot of

24 work to do to administer that company through that bankruptcy

25 process.  So chief restructuring officer is someone who

YAKOLA - DIRECT/BROUGHTON

1  focuses on that effort and also focuses on helping develop the

2  business plan, what's called the plan of reorganization for

3  the bankruptcy court.  And that's what Sean was doing in that

4  first bankruptcy.

5  Q   And we also see just below Mr. Frick, Bill Doherty.  And

6  who was Bill Doherty?

7  A   Bill Doherty was our man in charge of military and the

8  military contracts.  He had been with ATA for many, many

9  years, always in the military side of the business.

10 Q   The last name on the list, Jack Schultz, please tell us

11 who Jack Schultz is.

12 A   Jack was a financial analyst, but his specialty was the

13 military business.  You know, we always thought separately

14 about the military business and the scheduled service

15 business.  And Jack was the person that we relied upon for

16 financial and -- you know, analysis about the military

17 business itself.

18            MR. BROUGHTON:  Page 4, please.

19 BY MR. BROUGHTON:

20 Q   This is entitled "restructuring timeline."  And you've

21 told us that it filed for Chapter 11 reorganization in October

22 of 2004; is that right?

23 A   That's correct.

24 Q   And tell us a bit here -- when you get here to the middle,

25 it mentions a codeshare with Southwest.  Tell us about that,

Vol. 2 -  171

YAKOLA - DIRECT/BROUGHTON

1  if you would.

2  A   One of the things that came out of that reorganization was

3  a codeshare contract or codeshare agreement with Southwest

4  Airlines.  You probably know what codeshares are because it's

5  such a common term now.  But it's two airlines that agree to

6  sell space on the other airline as if it was their own code.

7  So you could go on to Southwest's website, and you could book

8  a Southwest flight but actually would be flown by ATA Airlines

9  and vice versa.  You could go on an ATA website and book one

10  that was actually on Southwest.

11         As part of restructuring the scheduled service

12  business, we came up with -- got an agreement with Southwest

13  for this codeshare agreement where we would work and partner

14  with Southwest in order to grow both of our businesses.

15  Q   Did ATA consider that to be a good thing?

16  A   It was an excellent thing.  Southwest is a big carrier.

17  Q   We go to the next entry, June of '05, and it says ATA

18  retained an investment banker to raise exit capital.  Do you

19  see that?

20  A   Yes, I do.

21  Q   Tell us, what is exit capital?

22  A   When a company is going through a bankruptcy process,

23  there's a lot of fees, expenses, and prior obligations that it

24  has to pay before it can be freed from that bankruptcy

25  process, and not just in doing its normal course of business,

Vol. 2 - 172

YAKOLA - DIRECT/BROUGHTON

1  but perhaps it's generated some debts that it has to pay

2  before it would be allowed out.  To do that, there has to be

3  money that the company has to be able to pay those

4  obligations.  And so what we were trying to do is to -- that's

5  what exit capital is.  It's the money you need to exit

6  bankruptcy, basically.

7  Q   And the last entry there says "November of '05, ATA

8  announces an agreement with MatlinPatterson to provide exit

9  financing and with Southwest for an enhanced codeshare.  Do

10 you see that?

11 A   I do.

12 Q   And tell the jury who MatlinPatterson is.

13 A   MatlinPatterson is what we call a private equity firm.

14 There are many firms like them, and what they do is they

15 provide capital or they provide money to companies in order to

16 help those companies to grow.  MatlinPatterson is what's

17 called a distressed investment firm, so they look for

18 opportunities like ATA, who is in bankruptcy at the time, and

19 to invest in those opportunities so it can have an ownership

20 stake in a company that's going to grow and prosper.

21         MR. BROUGHTON:  Mr. Brockwell, if we could turn to

22 page 7, please.

23 BY MR. BROUGHTON:

24 Q   This is entitled "next steps in ATA emergence."  Do you

25 see that?

Vol. 2 - 173

YAKOLA - DIRECT/BROUGHTON

1  A   I do.

2  Q   In December 2005 it says it seeks approval for MPDIP loan.

3  Please tell us what that means.

4  A   A DIP loan -- MP, of course, is MatlinPatterson.  A DIP is

5  called debtor in possession.  It is the term given to the

6  company when the company is in bankruptcy.  The company owes

7  debts.  It is the debtor, but it's still in possession of the

8  company.  So this is a loan that MatlinPatterson is giving to

9  the company while it remains in bankruptcy court.

10 Q   And at the bottom of that page, it says February '08,

11 emerged from bankruptcy.  Did that, indeed, happen in

12 February?

13 A   It did, yes, February 28th.

14 Q   Okay.  And at that point in time after ATA emerged from

15 bankruptcy, who owned the majority of ATA's stock?

16 A   At the time it emerged, MatlinPatterson became the

17 majority owner of the company.

18         MR. BROUGHTON:  Okay.  And if we could turn to slide

19 9, please -- or I'm sorry -- page 9.

20 BY MR. BROUGHTON:

21 Q   It's kind of small.  I apologize.  At the top it says

22 "maintain commitment to AMC charter business."  Do you see

23 that?

24 A   I do.

25 Q   I know there's a lot of initials to keep up with in this

YAKOLA - DIRECT/BROUGHTON

1  case, and we've heard "CRAF."  What is your understanding of

2  "AMC"?

3  A   AMC is the air mobility command, or that is the military;

4  that is the Government.

5  Q   Okay.  So in your mind, AMC and CRAF, can they be used

6  interchangeably?

7  A   Yes.

8  Q   Okay.  So the first bullet point in ATA's new business

9  plan to emerge from bankruptcy is to maintain commitment to

10  AMC charter business, right?

11  A   That's correct.

12  Q   During the bankruptcy, did ATA continue to do the military

13  flying?

14  A   It did.  Yes, it focused on that flying quite a bit.

15  Q   Did your position or duties change once ATA got out of

16  bankruptcy in February of '05?

17  A   Yes, they did.

18  Q   And please tell us about that.

19  A   First, it was in February of '06.

20  Q   I'm sorry.  February of '06.

21  A   I'm the one bad with dates.

22      I went from the senior VP of customers and ground

23  operations, kind of an operational role, to become's the chief

24  financial officer of the company.

25  Q   And tell us what a chief financial officer does.

YAKOLA - DIRECT/BROUGHTON

1   A   It is responsible for all the books and records of the

2   company, cash -- managing the cash of the company.  We get

3   involved in, you know, major purchases of fleet fuel, which is

4   always a major purchase for an airline, that sort of thing.

5   Q   All right.  Now, we've already heard a good bit about how

6   the military flying works.  We've heard that ATA was a member

7   of the FedEx team; is that right?

8   A   That's correct.

9   Q   And there -- was a member.  And we've heard about two

10  other teams, the Alliance Team and the UPS team; is that

11  right?

12  A   That's correct.

13  Q   I believe in opening, FedEx said that the UPS team only

14  came into existence in 2006.  Does that sound about right to

15  you?

16  A   Yes, it does.

17  Q   Okay.  And going into 2007 and 2008, give the jury an idea

18  of how these three teams compared in size to each other.

19  A   Generally, FedEx was the -- I'm sorry.  Alliance was the

20  largest team.  I believe it held more than 50 percent of all

21  the military business.

22       FedEx was a little bit smaller but, really, about the

23  same size as the Alliance Team.  Then UPS was a fairly small

24  player.  I think they had ten percent or less of the business

25  during that time.

YAKOLA - DIRECT/BROUGHTON

1  Q   Do you know how long ATA had been on the FedEx team?

2  A   It was a founding the member of the team.  That was since

3  1991, I think.

4  Q   And do you know what other members of the FedEx team did

5  passenger flying back in 2005, 2006?

6  A   Yes.  The other passenger flier was Omni Air

7  International.

8          MR. BROUGHTON:  Mr. Brockwell, if you could put

9  Plaintiff's Exhibit 5 up for the jury, please.

10  BY MR. BROUGHTON:

11  Q   Mr. Yakola, Plaintiff's Exhibit 5 is dated January 17,

12  2003, is it not?

13  A   Yes.

14  Q   He's enlarged it for you.  Whose logo is at the top of

15  that?

16  A   Federal Express.

17  Q   Okay.  And if you would, read through -- it's very short.

18  Read through that and -- for us.  It's a little hard for me to

19  read from that far.

20  A   It says, "This letter agreement" --

21          MR. BLUMBERG:  Objection, Your Honor.  Personal

22  knowledge of the witness.

23          THE COURT:  Foundation?

24          MR. BROUGHTON:  The document is stipulated into

25  evidence, and Mr. Yakola is appearing here as the corporate

Vol. 2 – 177

YAKOLA – DIRECT/BROUGHTON

1   representative of ATA.

2          MR. BLUMBERG:  The fact he's a corporate

3   representative doesn't get around the fact he wasn't at ATA

4   time of this letter.

5          THE COURT:  What's the date of the letter?

6          MR. BROUGHTON:  January 17, 2003.

7          THE COURT:  I'm going to need a little more

8   foundation.

9   BY MR. BROUGHTON:

10  Q   Mr. Yakola, you said that you became the chief financial

11  officer of ATA in February of '06; is that right?

12  A   That's correct.

13  Q   And at that time, tell us your duties as they related to

14  forecasting, doing financial forecasting and budgeting for the

15  flying that ATA was performing.

16  A   We would have -- through Jack Schultz, who I mentioned

17  before worked for me on the analysis, we would take the

18  expected amount of flying that we would do for FedEx based on

19  the share of flying or percent that we would have and what

20  type of flying we thought that was and come up with forecasts

21  of revenue and expenses in order to determine, you know, what

22  our profit and loss might look like this year.

23  Q   Okay.  Well, Plaintiff's Exhibit 5 relates to the amount

24  of military flying that ATA was doing in FY04, FY05, and FY06.

25  Was that relevant to your job duties as the chief financial

YAKOLA - DIRECT/BROUGHTON

1  officer of ATA in February of '06 when you became CFO, and

2  would that be one of the documents you would be looking at to

3  do your forecasting and budgeting?

4  A    Absolutely.

5          THE COURT:  Overruled.  Go ahead.

6  BY MR. BROUGHTON:

7  Q    And as we look at this, Mr. Yakola, Plaintiff's Exhibit 5

8  says, "This letter agreement will serve to define the

9  distribution of fixed, long-term" -- it goes on -- "expansion

10 passenger entitlement for the FY04 through FY06 AMC long-range

11 international contract with the FedEx contractor teaming

12 arrangement."  Do you see that?

13 A    I do, yes.

14 Q    And if we go on down, it lists some percentages there; is

15 that right?

16 A    That's correct.

17 Q    And what were those percentages listed?

18 A    ATA was 62 percent of that business, and Omni was

19 38 percent.

20 Q    And in round numbers, do you recall, what was the amount

21 of revenue being generated to ATA back in the FY06 time frame

22 for military flying?

23 A    The amount of revenue on an annual basis was $400 million,

24 rounded.

25          MR. BROUGHTON:  Okay.  If we could put Plaintiff's

YAKOLA - DIRECT/BROUGHTON

 1  Exhibit 8 up, please.

 2          MR. BLUMBERG:  Your Honor, this is Plaintiff's 8?

 3          MR. BROUGHTON:  Yes.

 4          MR. BLUMBERG:  I don't think it's in evidence.  Can

 5  we approach the bench on that, please?

 6      (Beginning of bench conference.)

 7          MR. BROUGHTON:  We had a lot of duplicates.  That's

 8  December of '05.  Deleted duplicate of Plaintiff's Exhibit 8.

 9          MR. BLUMBERG:  We deleted it because we didn't want

10  it.  We didn't believe it would be used at trial.  We didn't

11  delete it as a duplicate.

12          MR. BROUGHTON:  It was your 26.

13          MR. BLUMBERG:  Yes, but we removed it.

14          MR. BROUGHTON:  Okay.  I didn't realize that.

15      (End of bench conference.)

16          MR. BROUGHTON:  Your Honor, Plaintiff's Exhibit 8 is

17  included in the Omni custodian of records affidavit.  It was

18  timely filed with the court.  The custodian of the records for

19  Omni Airlines was Trisha Frank, signed that under oath and

20  attached documents produced from the files of Omni, and I

21  believe she testified that those were documents made at or

22  near the time by or from information transmitted by a person

23  with knowledge, that the documents were kept in the regular

24  business of Omni, and that they were maintained in the regular

25  business of Omni; and consequently, ATA offers Plaintiff's

Vol. 2 -  180

YAKOLA - DIRECT/BROUGHTON

1  Exhibit 8.

2       MR. BLUMBERG:  Your Honor, the document is hearsay

3  within hearsay.  In that document that individual is reporting

4  something that he got from another source.  So even though --

5  the business records doesn't cure that part of it.

6       MR. BROUGHTON:  Your Honor, the document reflects

7  with respect to a person with knowledge and the accuracy of

8  the underlying document.  It was a summary of the publicly

9  filed bankruptcy plan of ATA in 2005 and includes comments

10  from Omni on it regarding Omni's business as it pertains to

11  ATA and the split -- the 50/50 split business between the team

12  members.

13       THE COURT:  Ladies and gentlemen, let's take our

14  afternoon break at this time.  I need to talk to the attorneys

15  about a few things.  Please go back to the jury room.  Do not

16  discuss the case among yourselves.

17       COURT CLERK:  All rise.

18       THE COURT:  Please be seated.

19    (Jury out.).

20       THE COURT:  I guess my problem is ten minutes ago I

21  was presented with two packets here of purported business

22  records and affidavits.  And now I'm expected to rule on these

23  off the cuff on the bench when there's been objections posed

24  previously?  I'm wondering, here, Mr. Broughton, about why

25  wasn't this brought to my attention a little earlier?

YAKOLA - DIRECT/BROUGHTON

1    MR. BROUGHTON:  Your Honor, I apologize.  We took

2 from the comments at the pretrial -- I mean FedEx only

3 tendered up a very small number, and somehow Mr. Wright and I

4 interpreted from -- we came away from that hearing thinking it

5 was the Court's desire to hear more testimony about these

6 objections and make rulings in the course of the trial.  So I

7 sincerely apologize.

8    THE COURT:  Mr. Blumberg, your objections on these

9 are what, now?

10    I mean, I guess I have no problem -- we have an

11 affidavit here from the custodian of the records from Omni and

12 Northwest; of course, under 803(6), the business record

13 exception on the hearsay.  The affidavit appears to cover what

14 the objection -- what your objection goes to.  These are,

15 according to the affidavit, the business records of the

16 corporation.  So what's your objection?

17    MR. BLUMBERG:  Well, the 803(6) objection is for

18 business records that are -- have those systematic

19 trustworthiness, you know, memoranda, reports, things that are

20 done --

21    THE COURT:  In the normal course of business, right.

22    MR. BLUMBERG:  What we have here is taking just

23 e-mails that go back and forth, just communications that don't

24 have those systematic and -- so it doesn't satisfy the first

25 prong.  The rest would be satisfied, but it doesn't make them

YAKOLA — DIRECT/BROUGHTON

1    the kind of memorandum, report, record that's contemplated by

2    the rule.  What's occurring here is –– that means that any

3    business, any corporate entity could get around the entire

4    hearsay rule by just saying, We'll take all our documents;

5    we'll slap a custodial affidavit on them and turn them all

6    into business records.  They actually have to be the kind of

7    records contemplated by the rule, not every e-mail going back

8    and forth –– it's not records generated during business.  It's

9    a certain kind of record.

10          Second, this particular document does have a hearsay

11   within hearsay problem because this individual has read some

12   ATA filings, and he's reporting to his other people within

13   Omni about things he's read.  So even if it would qualify as a

14   business record, this particular document has the hearsay

15   within hearsay problem.

16          MR. BROUGHTON:  Your Honor, I think the case law has

17   certainly evolved on these issues of e-mails, and that is the

18   way people conduct business today.  There's plenty of reported

19   cases that allow e-mails to be properly attached to

20   custodian-of-the-records affidavits.  There's nothing about

21   this document that smacks of unreliability.

22          In Direct TV, Inc., versus Murray, 307 F.Sup.2d

23   764, District Court, South Carolina, 2004, the Court found

24   that e-mails between two companies were admissible based on

25   business records affidavits establishing the reliability of

YAKOLA — DIRECT/BROUGHTON

1   the e-mails.  These custodian-of-records affidavits were

2   electronically filed with the court quite a long time ago.

3   There's comments on there from Mr. Rob Coretz.

4          THE COURT:  What's the Bates number on this exhibit?

5          MR. BROUGHTON:  It is Omni 001223.

6          THE COURT:  Well, as I said earlier, I believe the

7   affidavit covers the requirements set forth in the rule.  And

8   it is true that e-mail is certainly a part of our day-to-day

9   operations.

10         The only thing I can say is that these affidavits

11  say that these documents are kept in the regular course of

12  Omni's business and regular practice of Omni to make and

13  maintain these documents.  So I have to say that the affidavit

14  follows the rule and if the custodian says that these records

15  are part of their day-to-day business and they're kept in the

16  normal course, it appears to me to satisfy the rule.  So I'll

17  overrule the objection.  Let's take 10 minutes.

18         COURT CLERK:  All rise.

19     (A recess was taken.)

20     *(Jury in.)*

21         THE COURT:  All right, Mr. Broughton.

22         You may be seated.

23         MR. BROUGHTON:  Plaintiffs offer Exhibit 8.

24         THE COURT:  Show it admitted.

25

Vol. 2 - 184

YAKOLA - DIRECT/BROUGHTON

1    *(Plaintiff's Exhibit 8 was received in evidence.)*

2    BY MR. BROUGHTON:

3    Q   Mr. Yakola, I direct your attention -- and again, the date

4    of this is December 2005, correct?

5    A   That's correct.

6    Q   Tell the jury your involvement with ATA bankruptcy as of

7    December of 2005.

8    A   At the time I was Senior Vice President of Customer and

9    Ground Operations; but I became, in 2005, much more heavily

10   involved in the business plan and the creation of the plan

11   that ATA would engage in after bankruptcy.

12   Q   And I believe you told us two months after December, you

13   became the CFO; is that right?

14   A   That's correct.

15   Q   I direct your attention to the second bullet point there.

16   It says total military revenue is projected to increase from

17   395 million in 2005 to 438 million in 2006; do you see that?

18   A   I do.

19   Q   I believe you told us earlier you thought it was about

20   400 million for 2006.  Is that consistent?

21   A   I was close.

22   Q   If you look at the last bullet point on that first page,

23   it says, "From the plan:  The military charter business has

24   historically been profitable for ATA and is a key component of

25   the new business plan.  Under the new business plan, ATA will

YAKOLA — DIRECT/BROUGHTON

1 continue to sell downtime on its military and scheduled

2 service aircraft to tour operators on an ad hoc basis."  Is

3 that consistent with your understanding of ATA's business

4 plan?

5 A   Yes.  A key piece of the business plan that we had coming

6 out of this bankruptcy, was we were going to put a much bigger

7 focus on the military charter business.  We recognized its

8 long profitability.  We recognized how important it was, and

9 we wanted to make sure that we focus on it like that.

10 Q   If we could turn to the second page of Plaintiff's

11 Exhibit 8.  We didn't mention this, but at the top of the

12 first page, it says it is from Rob Coretz to Chuck Pollard.

13 The jury's heard who Chuck Pollard is.  If we look at the top,

14 and Rob Coretz, it says he is president and CEO of Omni; is

15 that right?

16 A   That's correct.

17          MR. BROUGHTON:  And if we turn to the second page?

18 Mr. Brockwell, if you can zoom in on what's in bold there

19 two-thirds of the way down.

20 BY MR. BROUGHTON:

21 Q   It says, "Rob, when does the 50/50 slit come into effect?"

22          Do you see that?

23 A   Yes.

24 Q   Mr. Yakola, was there a point in time at ATA that you

25 heard about a 50/50 split of the passenger flying on the FedEx

YAKOLA - DIRECT/BROUGHTON

1  team?

2  A   Yes.

3  Q   Do you recall about when that was?

4  A   It was in late 2005.

5  Q   And why do you remember that?

6  A   Because it was a key component of our business plan going

7  forward.

8       The amount of the FedEx charter team business that we

9  would get, the split would allow me to then go forward in my

10 role as CFO and do my business planning for my revenue for

11 what the expenses would be, fleet planning and going forward.

12 It was a key item.

13 Q  So you take over as CFO in early 2006.  Tell the jury some

14 of the major projects that you would have been working on

15 there in 2006.

16 A   Once we came out, there were a few things we needed to do

17 right away.  One was called zero-based budgeting, which is

18 simply a term for -- I came up with a new budget for the

19 company, postbankruptcy now that the it's back out on its own

20 again.  Zero base means we went through every department and

21 started from the beginning.

22      What do you need to operate?  So we had expenses based

23 on not what people spent the year before or year before, but

24 what they needed to spend going forward.  That was one key

25 thing.

YAKOLA - DIRECT/BROUGHTON

1        A second key thing is we had what's called an ATSB

2   loan.  The ATSB was the airline transportation stabilization

3   board.  It was a board put together after September 11th to

4   stabilize the airlines, and it gave loans to several airlines,

5   one of which was ATA.

6   Q   Let me interject, is the ATSB, is it your understanding

7   ATSB is a Government agency?

8   A   Yes.  It's a Government agency.

9   Q   Go ahead.

10  A   We had a loan from this ATSB, this government agency to

11  operate, and we needed to refinance that loan.  The ATSB

12  wanted to finish its work, and I think ATA was one of the last

13  loans they had.  So they asked us what we call refinance or

14  have someone else take on that loan.  So we worked that a lot

15  in coming out right away in 2006.

16       The third thing we began to do is address our aircraft

17  fleet needs, and that was, you know, looking at different

18  types of airplanes and what types of airplanes we could fly to

19  use -- specifically as it was wide-body airplanes, these

20  two-aisle airplanes, to fly the military business.  So those

21  three things were major projects.

22  Q   Okay.

23       Now, with respect to -- you mentioned this ATSB loan

24  that you were trying to refinance.  What efforts were -- let

25  me ask you this.  Was anyone at ATA assisting you on trying to

Vol. 2 -  188

YAKOLA - DIRECT/BROUGHTON

1  find lenders to refinance the ATSB loan?

2  A   Yes.  MatlinPatterson, who was our owner, was with me day

3  to day on helping assist on this loan.  In addition, we had an

4  investment banker, which is -- it's a firm we hired called

5  Jefferies that would help us bring people to the table that

6  would want to listen to our story and for which would then

7  eventually loan us money.

8  Q   Was there any of the people reporting to you at ATA

9  assisting you on this ATSB refinance project?

10  A   Yes.  Sean Frick, a name I mentioned before and Jack

11  Schultz both did a lot of work with me on this refinancing.

12  Q   Do you recall off the top of your head some of the

13  potential lenders that you were talking to here in 2006?

14  A   There were -- we talked to a lot of lenders.  A couple

15  that we went a long ways with was a company called Cerberus

16  Capital Management and another company called Silver Point.

17  Both were very large organizations that would loan money in

18  this type of manner.

19  Q   What sort of information do you recall providing to these

20  potential lenders?

21  A   Well, a lot.  We provided our business plans for, you

22  know, different periods of time:  Three years, five years, ten

23  years out.

24       We provided a lot of information as related to what

25  type of business we were or what did we fly?  What did the

Vol. 2 - 189

YAKOLA - DIRECT/BROUGHTON

1  schedule service business look like?  What was fuel going to

2  forecast to do, that sort of thing.

3  Q   Let me direct your attention to Plaintiff's Exhibit 12,

4  and Plaintiff's Exhibit 12, I believe, has been stipulated to.

5       MR. BROUGHTON:  And if you can enlarge that for us,

6  Mr. Brockwell.

7  BY MR. BROUGHTON:

8  Q   Plaintiff's Exhibit 12 is from Gary Molinari dated

9  September 7, 2006; is that correct, Mr. Yakola?

10 A   That's correct.

11 Q   It says, "Bill/Chuck, attached is a letter for each of you

12 to sign formalizing the 50/50 split for the -- "

13      MR. BLUMBERG:  602, foundation.  May we approach for

14 a moment?

15      *(A bench conference was held on the record.)*

16      MR. BLUMBERG:  I don't want to keep getting up.  You

17 can't use the witness as a narrator for documents that the he

18 has never seen.  You need to establish a foundation this is a

19 document he has seen before, that he is familiar with, and

20 that he has personal knowledge of.  He is just using him as a

21 narrator.

22      MR. BROUGHTON:  Your Honor, he is the corporate rep

23 of the company.  He is the only guy left standing at that

24 company.  I believe under the rules, he is also, if I need to

25 put that on every time, he is the custodian of records of that

YAKOLA - DIRECT/BROUGHTON

1  company.  This is a business record of FedEx.  It's a party

2  admission by FedEx.

3           It's a document stipulated to.  I'm just using it to

4  put in context, and the attachment is the letter, the contract

5  we're suing on.

6           THE COURT:  There seems to be some dispute as to

7  what this witness' status is.  You say he's a corporate

8  representative; you say he is not.

9           MR. BLUMBERG:  He's the person under 615 who is

10  sitting at the table.  He's not a 30(b)(6) or any kind of -- I

11  know when we deposed him, he was deposed as a Rule 26 witness.

12  There's never been any designation.  Whether or not he's the

13  custodian of records, first of all, that is not who they

14  designated as the custodian of records.  That also doesn't

15  change the fact that you need to have personal knowledge of

16  what you're testifying to.  You can't just be, like I just

17  said, like a sock puppet so ATA can get through the story.

18           THE COURT:  Yes, I'll sustain the objection.

19  BY MR. BROUGHTON:

20  Q   Mr. Yakola, if you can turn to page 2 of Plaintiff's

21  Exhibit 12, please.

22           MR. BROUGHTON:  If you could enlarge that for us.

23  BY MR. BROUGHTON:

24  Q   Mr. Yakola, have you ever seen Plaintiff's Exhibit 12,

25  which is the September 7, 2006, addressed to Bill Doherty and

YAKOLA — DIRECT/BROUGHTON

1 Chuck Pollard from Gary Molinari?

2 A   Yes.

3 Q   Okay.  And when do you think you first saw this document?

4 A   In late -- it would have been almost right away, so right

5 around September 7th of 2006 after it was first given to us.

6 Q   Okay.  And why would you have seen this document?

7 A   Because I asked for it.

8 Q   And why did you ask for it?

9 A   Because we were in extended negotiations with Cerberus and

10 Silver Point, the two firms I had mentioned about refinancing

11 the debt; and we had been telling them all throughout this

12 process, which had lasted months, that we had a three-year

13 agreement with FedEx to split for 50 percent of the passenger

14 business.  And they were going through all their final ticks

15 of what they needed before they made an offer to us for the

16 debt, and they said, Can we see the contract that memorializes

17 that 50/50 split?

18 Q   Did you ultimately send the September 7 -- or someone

19 under your direction ultimately send this September 7, 2006,

20 agreement to these third parties?

21 A   Yes, I did.

22 Q   Okay.  And who did you have send that?

23 A   Meagan Austgen.

24 Q   Who was Meagan Austgen?

25 A   Meagan was a financial analyst who reported up through me.

Vol. 2 - 192

YAKOLA - DIRECT/BROUGHTON

 1          MR. BROUGHTON:  Mr. Blumberg, we would like to offer

 2     Plaintiff's Exhibit 18.

 3          MR. BLUMBERG:  No objection.

 4          THE COURT:  18 admitted.

 5      (Plaintiff's Exhibit 18 was received in evidence.)

 6          MR. BROUGHTON:  If you could enlarge that for us,

 7     please.

 8     BY MR. BROUGHTON:

 9     Q   And what was Meagan Austgen's title?

10     A   Financial analyst.

11     Q   Okay.  Did she report to you?

12     A   No.  She reported to Ian Wadsworth, who reported to me.

13     Q   Okay.  And who is Eric Miller?

14     A   Eric is a senior member at Cerberus Capital, the firm that

15     was going to give us the debt refinancing.

16     Q   And the date of this e-mail is what?

17     A   September 20th of 2006.

18     Q   And it says, "Attached is the Omni sideletter agreement

19     signed by ATA and FedEx."  Do you see that?

20     A   Yes.

21     Q   What is your understanding of what the Omni sideletter

22     agreement is referring to?

23     A   It's referring to the contract between FedEx and ATA that

24     gave ATA 50 percent of the passenger business flying and Omni

25     50 percent of the passenger business flying for '07, '08, and

Vol. 2 -  193

YAKOLA - DIRECT/BROUGHTON

 1  '09.

 2  Q   Has anyone ever told you there was a two-year agreement

 3  between FedEx and ATA to do a 50/50 split?

 4  A   No.

 5  Q   Have you ever seen a two-year agreement?

 6  A   No.

 7  Q   Did you do any budget forecasting or analysis based on a

 8  two-year agreement?

 9  A   No, I didn't.

10         MR. BROUGHTON:  Now, if we can put Plaintiff's

11  Exhibit 13 up there on the screen, Mr. Brockwell.

12  BY MR. BROUGHTON:

13  Q   Mr. Yakola, have you ever seen a copy signed by Omni?

14  A   No, I haven't.

15  Q   Okay.  Have you looked for a copy signed by Omni?

16  A   We asked for a copy signed by Omni, yes.

17  Q   And who was asked to provide a copy signed by Omni?

18  A   Federal Express.

19  Q   And did Federal Express ever send a copy signed by Omni,

20  to your knowledge?

21  A   No, they did not.

22  Q   Okay.  What ended up -- did you end up caring that Omni

23  did not sign that particular document?

24  A   No.

25  Q   Did anyone ever tell you that Omni had refused to sign it?

YAKOLA - DIRECT/BROUGHTON

1  A    No.

2  Q    Okay.  Look at the last sentence of the September 7, 2006,

3  agreement.  It says, "We look forward to a continued

4  successful relationship over this period."  Do you see that?

5  A    Yes, I do.

6  Q    What period of time did you understand that to relate to?

7  A    2007, 2008, and 2009, the fiscal years of the Government.

8  Q    Okay.  And when you reviewed this document, did you see

9  any language that appeared to you to give you any concern that

10 this was anything less than a commitment from Federal Express?

11 A    No.  It says it would serve as the agreement.

12 Q    Now, with respect to the fact that there's no signature

13 there on the Omni signature block, have you been involved in

14 transactions involving multiple parties in multiple locations?

15 A    Yes, I have.

16 Q    How many agreements do you think you've signed with

17 multiple parties who were located all over the country or all

18 over the world?

19 A    Dozens.

20 Q    Did everybody get together in a room and all see each

21 other sign?

22 A    No.

23 Q    How has that worked, from your experience?

24 A    You get a copy of a contract.  You sign for your company.

25 You scan or fax that contract back to the original party, and

1  they go around and get their other signatures.

2  Q   Do you always end up receiving a copy of everybody's

3  signature?

4  A   No.

5        MR. BROUGHTON:  Mr. Brockwell, could you put Federal

6  Express Exhibit 12 up on the screen.

7  BY MR. BROUGHTON:

8  Q   Mr. Yakola, this is entitled "Contractor Team Arrangement

9  Operating Agreement"; is that right?

10 A   That's correct.

11 Q   It's dated March 9th, 2005?

12 A   That's correct.

13 Q   And it's between Federal Express and ATA; is that right?

14 A   Yes.

15        MR. BROUGHTON:  Mr. Brockwell, if you could go to

16 the signature page of Federal Express 12.

17 BY MR. BROUGHTON:

18 Q   Whose signature do you see there, Mr. Yakola?

19 A   Gary Molinari's signature.

20 Q   Okay.  Next to it is "Gemini"; is that right?

21 A   Yes, that's correct.

22        MR. BROUGHTON:  If you can show the Gemini signature

23 block.

24 BY MR. BROUGHTON:

25 Q   Do you see any signature under Gemini?

                        YAKOLA - DIRECT/BROUGHTON


 1  A   No, I don't.

 2          MR. BROUGHTON:  Let's go to the next page, Mr.

 3  Brockwell.

 4  BY MR. BROUGHTON:

 5  Q   Whose signature do you see there?

 6  A   That's Bill Doherty's signature.

 7  Q   Okay.  Any other signatures under those other folks there

 8  on that page?

 9  A   No, sir.

10  Q   Okay.  Can you draw any conclusion from looking at that

11  whether all those people ended up signing or not?

12  A   No, sir.  The ATA and FedEx signature are on this

13  contract, so that's what we're to be concerned with.

14  Q   Okay.  Let's look at Federal Express 36.  This is called a

15  Contractor Team Arrangement Operating Agreement, right?

16  A   Yes.

17  Q   April 3rd, 2006, between ATA and Federal Express.  Do you

18  see that?

19  A   Yes, I do.

20          MR. BROUGHTON:  Mr. Brockwell, could we go to the

21  signature blocks on this.

22  BY MR. BROUGHTON:

23  Q   Are there several signatures there that don't appear,

24  Mr. Yakola?

25  A   Yes, there are.

YAKOLA - DIRECT/BROUGHTON

1  Q   Do you draw the conclusion from that that all those people

2  refused and that there was no contract?

3  A   No, I don't.

4  Q   Do you know who the party was that was sending out these

5  agreements for all the team members to sign?

6  A   Yes, I do.  It was Gary Molinari from FedEx.

7  Q   Do you know if he, in turn, bothered to send everybody's

8  signature to everybody else?

9  A   No.  We didn't -- we rarely saw a fully signed, executed

10 agreement.  I can't recall a time when we had one.

11 Q   Okay.  So did the fact that no Omni signature appeared on

12 that September 7, 2006, agreement give you any pause or cause

13 for concern?

14 A   No.

15 Q   Okay.  Did Eric Miller ever say, Hey, where's the Omni

16 signature?"

17         MR. BLUMBERG:  Objection, hearsay.

18 A   Yes, he did.

19         THE COURT:  That's a yes or no.  Go ahead.

20 A   Yes.

21 BY MR. BROUGHTON:

22 Q   Did you tell Mr. Miller anything about the Omni signature?

23 A   Yes, I did.  I told him that we had an agreement with

24 FedEx that ATA would receive 50 percent of the flying for

25 those three years, and that was what we were concerned about.

YAKOLA - DIRECT/BROUGHTON

1  That was our contract.  And what Omni had or whether they

2  signed it or not wasn't a concern for us.

3  Q   Was it your understanding that Omni had any say-so

4  whatsoever over whether or not FedEx could cause to be

5  delivered to ATA 50 percent of the passenger flying for the

6  team?

7  A   No, FedEx was the team leader.  FedEx was the leader of

8  the team.  They decided who got each percentage of the

9  business.  Omni didn't decide; ATA didn't decide.  It was

10 FedEx.

11        MR. BROUGHTON:  Let's also turn, if you can, Mr.

12 Brockwell to Plaintiff's Exhibit 19, which has been

13 stipulated.

14 BY MR. BROUGHTON:

15 Q   Mr. Yakola, the date of this e-mail is September 29th,

16 2006; is that right?

17 A   That's correct.

18 Q   And you were copied with it?

19 A   Yes.

20 Q   And Bill Doherty was copied wit?

21 A   That's correct.

22 Q   Who is John Dennison?  Sean Frick sent this to John

23 Dennison.

24 A   John was the CEO and president of ATA at that time.

25 Q   And it says, "John, attached is a sideletter Doug

1  referenced in his e-mail.  We can discuss at 1:00 p.m."  And

2  it references an attachment on the sideletter; is that right?

3  A    That's correct.

4  Q    If we can go to the second page, it's attaching the

5  September 7, 2006, letter; is that right?

6  A    That's correct.

7  Q    So was there any doubt in your mind as of September 29,

8  2006, that ATA had a contract for three years with FedEx?

9  A    No.  I don't know why there would be.

10  Q    You mentioned earlier that one of the projects on your

11  plate in 2006 was looking at possibly adding some aircraft at

12  ATA; is that right?

13  A    That's correct.

14  Q    Very briefly tell the jury about that.  What was going on

15  there in summer/fall of '06?

16  A    We had, as I said, just come out of bankruptcy, and we

17  were coming off of the previous three-year contract with FedEx

18  for flying, which we had received 62 percent; and we were

19  going on to a new contract where we were going to be flying

20  50 percent of the business.  And we had lost some business,

21  the 62 to the 50 percent, and we were very focused to make

22  sure that we were not going to lose any more split in any

23  future years.  And we needed to make sure that we had the

24  wide-body airplanes available to fly everything that we were

25  entitled to based on the agreement with FedEx.

YAKOLA - DIRECT/BROUGHTON

1  Q   And did ATA end up signing a contract with Northwest

2  Airlines to purchase some DC10s?

3  A   That's correct.  We looked at different types of

4  airplanes, different number of airplanes.  Eventually, we

5  found seven operating DC10s that Northwest was selling as part

6  of its bankruptcy that -- plus two other airframes, airplanes

7  without engines, basically -- that we purchased later on that

8  year.

9  Q   Okay.  And who signed that December 2006 contract between

10 ATA and Northwest?

11 A   I did.

12         MR. BROUGHTON:  Plaintiff offers Exhibit 21,

13 Plaintiff's Exhibit 21.

14         MR. BLUMBERG:  I'll object on the basis of the

15 motion in limine.

16         THE COURT:  Overruled.  It's admitted.

17     (Plaintiff's Exhibit 21 was received in evidence.)

18         MR. BROUGHTON:  Mr. Brockwell, could you please put

19 Plaintiff's Exhibit 21 up for us.

20 BY MR. BROUGHTON:

21 Q   Mr. Yakola, this is a thick document, and you've told us

22 in essence that ATA bought seven DC10s with two airframes.

23 Why would you want airframes?

24 A   For two reasons.  One for parts; you could take them off

25 the airplanes and use them for the other seven.  And the other

1  was it was option value.  So if there was even more military

2  flying to be had, then we could always go get engines and put

3  them on these two and fly up to nine airplanes.

4  Q   Had ATA been considering buying wide-bodies for some

5  period of time prior to December of '06?

6  A   Yes.  ATA had been looking at different wide-body

7  airplanes throughout its first bankruptcy process.

8  Q   And what were you waiting on in terms of actually buying

9  some airplanes?

10  A   Well, two things.  One, we had to find the right deal for

11  ATA, and, you know, we needed to find the right number of

12  airplanes that we could bring in at a cost that was

13  appropriate for ATA, given its business.

14          And No. 2, we wanted to make sure that we had the

15  business going forward, that the business that we could rely

16  on and count on was going to be there so I could forecast out

17  what the revenues were in terms of was it a good purchase for

18  the company.

19  Q   Mr. Yakola, what type of flying was ATA going to use these

20  DC10s for?

21  A   Military.  Some commercial charter carrying football teams

22  and such, but 95 percent would be flying military troops

23  around the world.

24  Q   Tell us, are DC10s good for scheduled service?

25  A   No, they weren't.  In fact, Northwest was getting out of

YAKOLA - DIRECT/BROUGHTON

1  them because they wanted to take them out of scheduled service

2  in the scheduled passenger service business.

3  Q   Let's turn, if you will, to Federal Express Exhibit 44.

4        MR. BROUGHTON:  Mr. Brockwell, if you could enlarge

5  that?

6  BY MR. BROUGHTON:

7  Q   Mr. Yakola, this is from Jack Schultz to you, March 14th

8  of 2007; is that right?

9  A   That's correct.

10 Q   It says, "The attachment is an August 7, 2006 military

11 briefing package, final PowerPoint;" is that right?

12 A   That's correct.

13 Q   Below that I guess is the older e-mail, correct?

14 A   Yes.

15 Q   The bottom half of the page, and that's from Ms. Meagan

16 Austgen, who you told us who she was earlier, right?

17 A   That's correct.

18 Q   Her e-mail is actually dated August 7, 2006, right?

19 A   Yes.

20 Q   Okay.

21      If we go to the second page entitled "ATA Military

22 Charter Briefing Package, August of '06."  At this time you

23 were CFO; is that right?

24 A   That's correct.

25 Q   Did people under your supervision prepare this briefing

 1  package?

 2  A   They did, yes.

 3  Q   And what was the purpose of it?

 4  A   The military business is -- it's a complex business from,

 5  you know, hearing about MVP points and how everything is

 6  awarded and all that.  So we were looking for a presentation

 7  where we could show people who didn't know anything about the

 8  military business what it was all about and how ATA benefited

 9  from the business.

10  Q   And why in March of '07 were you receiving a PowerPoint

11  from almost a year before -- well, six months before?

12  A   Because we -- we needed it because we were going to give

13  it to another external party who needed to know more

14  information about the military.

15  Q   And who was that external party?

16  A   That was JPMorgan.

17  Q   What was going on in March of '07 where you needed to

18  provide information on ATA's military flying to JPMorgan?

19  A   ATA's parent, the holding company, was looking at a

20  transaction where it would buy North American and World

21  Airways, two other airlines, and JPMorgan was looking to

22  provide the funding for that purchase.

23  Q   Did this relate at all to that SEC form that FedEx showed

24  us in opening?

25  A   Yes.  The SEC form, this Form 10, had to do with ATA

YAKOLA - DIRECT/BROUGHTON

1  having to file publicly -- or file public information.  And so

2  as part of its coming out of bankruptcy and as part of working

3  possibly with purchasing other airlines, we had to file this

4  information with the SEC.

5  Q   Okay.

6      And were you involved in any way in the preparation or

7  gathering of information for this SEC Form 10?

8  A   Yes.  With the gathering of the information, yes, I was.

9  Q   Who were you gathering information for?

10 A   I'm sorry?  From or for?

11 Q   For.

12 A   I was gathering information for lawyers that we had hired

13 that were preparing this very thick SEC form.

14     MR. BROUGHTON:  And if we would, Mr. Brockwell, turn

15 to the next page, page 2.

16 BY MR. BROUGHTON:

17 Q   And if you would, look at the third -- I'm sorry, the

18 second bullet point.  Do you see that?

19 A   I do.

20 Q   That bullet point says, "50 percent share of FedEx

21 passenger traffic locked in through 2008."  Do you see that?

22 A   I do.

23 Q   Do you believe that statement is accurate?

24 A   No, it's not.

25 Q   Why didn't you notice it back at the time it was put in

1  this PowerPoint?

2  A   Because we take -- we take these presentations that were

3  created six months ago; and once created, we put them in a

4  file.  And if we need them, we pull them back out and say

5  here, use this information to prepare this new form we had to

6  file.

7  Q   And if we go back -- you don't need to go back, but as we

8  recall, this was prepared August 7 of 2006, right?

9  A   That's correct.

10 Q   This is one month before the September 7, 2006 three-year

11 agreement; is that right?

12 A   Yes, it is.

13 Q   Obviously, you hadn't seen the September 7, 2006 agreement

14 at the time this was prepared in August of '06; is that right?

15 A   That's correct.

16 Q   Is this one of the documents that you gave to your

17 attorneys who then, in turn, prepared the SEC form?

18 A   Yes, it is.

19 Q   And if we could, turn to FedEx 93.  Mr. Yakola, is this

20 one of the Form 10s that you were talking about?

21 A   Yes, it is.

22 Q   The one that's in evidence is just selected pages, and

23 we've stipulated to this document.  So we're not complaining

24 that all the pages weren't there.  It was not put in because

25 it was so thick, but I want to hand you the entire Form 10 of

YAKOLA - DIRECT/BROUGHTON

 1  Exhibit -- which is the same as Exhibit 93.  Will you confirm

 2  that from the front?

 3  A    Yes.

 4  Q    Did that same information from that PowerPoint referencing

 5  '08 end up in that Form 10?

 6  A    Yes.  It did, yes.

 7  Q    And should you have noticed it when you looked through

 8  that inch-thick Form 10?

 9  A    Yes, I should have.

10  Q    Did that mean to you there was no three-year contract?

11  A    No, it did not.

12           MR. BROUGHTON:  If we could, Mr. Brockwell, turn to

13  page 4 of Federal Express Exhibit 44.

14  BY MR. BROUGHTON:

15  Q    And very briefly, Mr. Yakola, I'm showing this just to

16  give the jury an idea of the different military operations

17  that ATA had flown in; do you see that?

18  A    Yes, I do.

19  Q    Do you know who was the biggest passenger flier for the

20  military in Desert Storm and Desert Shield?

21  A    ATA was the biggest passenger flier.

22  Q    And ATA continued to do the military flying up until it

23  went out of business?

24  A    That's correct.  From 1983 on, we've been doing nonstop

25  flying for the military.

1  Q    Is that something you were proud about?

2  A    Yeah.  I was.

3  Q    When ATA had to shut down, what was one of the priorities

4  for you with respect to military flying?

5  A    I made a promise that I would not strand any military

6  troops.  We took troops back and forth from the theater for

7  their two weeks they would get every six months.  They would

8  be in war, and then we would have the responsibility of

9  bringing them home so they could see their families for two

10 weeks.  That was a huge responsibility that we all took pretty

11 seriously.

12          MR. BROUGHTON:  If we could, Mr. Brockwell, turn to

13 Exhibit -- I mean the same exhibit, page 7.

14 BY MR. BROUGHTON:

15 Q    Mr. Yakola, this is entitled "AMC international spending

16 has been high;" do you see that?

17 A    Yes, I do.

18 Q    Why was that relevant to your position as CFO?

19 A    The military spending on -- directly translated to

20 military flying, which directly translated to how much the

21 FedEx team would get, that $1 billion that you were talking

22 about before.  So when we would look at high levels of flying,

23 we would know that as a 50 percent flier on the FedEx team, we

24 could figure out in our financial forecasts how much of that

25 ATA would get going forward.

YAKOLA - DIRECT/BROUGHTON                    Vol. 2 -  208

1         MR. BROUGHTON:  Page 8, please, Mr. Brockwell.

2   BY MR. BROUGHTON:

3   Q   This is captioned "DOD projects spending increases going

4   forward."  Is DOD Department of Defense?

5   A   That's correct.

6   Q   In the left-hand column where it has 300, 400, 500, what

7   denominations is that in?

8   A   It is billion.  With a B I think they say.

9   Q   What did this chart indicate, and why was it important to

10  you as CFO of ATA?

11  A   A spending level of between 4 and 500 billion indicates a

12  lot of military activity, and a lot of military activity flows

13  down to ATA.

14        MR. BROUGHTON:  Plaintiff offers Defendant's

15  Exhibit 44.

16        MR. BLUMBERG:  Have we done that one already?

17        MR. BROUGHTON:  Is it in?

18        MR. BLUMBERG:  What number is this?

19        THE COURT:  Yes.  It's already in.

20        MR. BROUGHTON:  I thought it was, but I couldn't

21  tell for sure.

22        Mr. Brockwell, if you could put up Federal Express

23  Exhibit 94, please.

24  BY MR. BROUGHTON:

25  Q   And Mr. Yakola, could you please identify Federal Express

                                                            Vol. 2 -  209
                        YAKOLA - DIRECT/BROUGHTON

 1  94?

 2  A    It is minutes from a Board of Directors' meeting, and

 3  Global Aero Logistics is the new name for ATA Holdings.

 4  Q    Let's back up a minute.  That was mentioned in openings by

 5  FedEx, but I believe previously ATA had been owned by a

 6  company called ATA Holdings; is that right?

 7  A    That's correct.

 8  Q    When did it change its name to Global Aero Logistics?

 9  A    After we started looking at -- we, as the holding company,

10  the parent, we began looking at the purchase of North American

11  and World Airways.  We decided to rename the parent company to

12  separate it from ATA because we didn't want to confuse people

13  that ATA Airlines owned other airlines.  It was really a

14  parent company that owned it.

15  Q    Just to be clear, did ATA, World, and North American

16  remain as separate companies?

17  A    Completely separate, yes.

18  Q    They just had a common parent?

19  A    That's correct.

20  Q    When did this take place?

21  A    The renaming?

22  Q    When did World and North American actually -- when were

23  they actually acquired by Global Aero Logistics?

24  A    In late August of 2007.

25  Q    And was it your regular practice to attend board meetings

YAKOLA - DIRECT/BROUGHTON

1  of Global Aero Logistics?

2  A   Yes, I was.

3  Q   Why was that?

4  A   Well, I was the Chief Financial Officer of the company.

5  Q   And we heard -- let me ask you this.  Did your title

6  change at any point in time from CFO to some other position as

7  we get into 2007, late 2007?

8  A   Yes, it did.

9  Q   What did it change to?

10  A   I became the Chief Integration Officer.  I love that

11  title.

12  Q   What did you do?

13  A   Since the parent had bought these three airlines, one of

14  the things we had identified is that three airlines can have a

15  lot of power in doing things like purchasing things together

16  like maintenance parts and other sort of things we call

17  synergies.  They can work together and then get lower prices

18  for each one of the airlines if they work together as it

19  relates to cost.

20  Q   Buying in bulk?

21  A   Exactly, yes.  We can all buy like toilet paper in bulk.

22  So that amount that we had identified through a whole bunch of

23  projects was $100 million that by buying in bulk, we can save

24  all three companies $100 million in total.

25          So someone had to be focused on getting that hundred

YAKOLA - DIRECT/BROUGHTON

1  million dollars.  That was an important part of the success of

2  this acquisition.  So at the time I looked at it as a great

3  opportunity to go out there and find all these savings.

4  Q   Okay.  Now, I believe in opening, we heard from Federal

5  Express that something -- something to the effect that

6  Mr. Molinari was concerned that this was some sort of a

7  conflict of interest; did you hear that?

8  A   Yes.

9  Q   Do you have an understanding in your mind what that term

10 conflict of interest means?

11 A   I do, yes.

12 Q   What does it mean to you?

13 A   It means that we cannot -- I guess I look at it as we're

14 on both sides of a transaction, right?  So we can't make a

15 decision cleanly for one side or the other without hurting the

16 other side.

17 Q   And from your experience, once ATA, World, and North

18 American came under the same ownership of a holding company,

19 did that happen where you were on both sides of the same

20 transaction?

21 A   No, I didn't.

22 Q   Were any steps taken to prevent such a thing from

23 happening?

24 A   Yes.  The management was set up specifically so that each

25 airline would operate by itself and with its own team.

YAKOLA - DIRECT/BROUGHTON

1  Q    And with respect to -- something in opening was mentioned

2  about ATA making a proposal to Mr. Molinari about something

3  called contour cargo; is that right?

4  A    That's correct.

5  Q    Tell us what contour cargo is.

6  A    Contour cargo is -- cargo is built on pallets, on metal

7  sheets that go on an airplane.  Contour cargo is built

8  specifically for a DC10 airplane where it's not built in a

9  complete square.  It's built with kind of a -- I don't know

10 what the shape would be called, but it's cut off.  One of the

11 corners is cut off so it fits in the round belly of the

12 airplane.  So it's cargo specifically designed for DC10s and I

13 think MD11s.

14        So it was a specific type of business that the

15 military either desired or wanted at various points in time.

16 Q    Okay.

17        Now, I don't believe anybody's touched on this, but

18 what does the term COINS Report mean to you.  For the court

19 reporter, that's C-O-I-N-S?

20 A    COINS Report is an acronym that allows us to see the

21 military demand in the future.  So we could look at what the

22 military was forecasting as to be a demand for passenger or

23 cargo flying.

24 Q    So is the COINS Report, to your understanding, actually a

25 report produced by the military?

1  A    That's correct, yes.

2  Q    Am I correct that it not only includes forecasts of the

3  future, but it also reports what flying has been done by which

4  airline and what team and was it cargo or passenger and which

5  kind of planes did it?

6  A    That's correct.  It gives you information what happened in

7  the past as well as forecast for the future.

8  Q    Can an airline look at these COINS Reports -- the historic

9  reports and figure out, okay, the FedEx team flew this much

10  contour cargo, and the Alliance Team flew this much contour

11  cargo, and the UPS team flew the rest?

12  A    Yes.

13  Q    And from your experience, is that what people do?  They

14  look and see who's flying what kind of business?

15  A    Yes.  Everyone wants to know what their competitors are

16  doing.

17  Q    Now in looking at a lot of these documents, and I think

18  it's another term that perhaps hasn't come up yet about

19  military flying.  What does the term entitlement mean to you

20  in the context of military flying?

21  A    Entitlement is what based on the points that you have put

22  together for the team, how much of the military flying you are

23  entitled to.  So if you have a bunch of big carriers who have

24  put together points, these mobilization value points, MVPs,

25  then that will allow you entitlement that you can fly a

YAKOLA — DIRECT/BROUGHTON

1 certain percentage of the business.

2 Q   And let's just assume that the entitlement for FY07 had

3 been 60 percent of the contour flying was supposed to go to

4 FedEx, and 40 percent was supposed to go to the Alliance Team.

5 Let's make that assumption.

6 A   Okay.

7 Q   Could you look at the COINS Report and see if FedEx tea,

8 had actually flown off its 60 percent entitlement?

9 A   Yes.  You could look at a pass and see and compare what

10 they actually flew, what percentage was flown versus another

11 team.

12 Q   Do you know whether ATA made a proposal to FedEx regarding

13 contour cargo flying?

14 A   Yes, it did.

15 Q   What's your understanding as to why ATA made such a

16 proposal?

17 A   ATA, the –– ATA airlines looked at the COINS Reports.

18 They saw that a lot of this contour cargo flying was going to

19 another team, the Alliance Team.  So it was seeking to capture

20 some of that revenue for the FedEx team.

21 Q   And this was after Global became the parent company of

22 both World, North American, and ATA?

23 A   That's correct, after the acquisitions were complete.

24 Q   So if I understood you correctly, ATA was trying to get

25 more business for the FedEx team?

YAKOLA - DIRECT/BROUGHTON

1  A   That's correct.

2  Q   At the expense of the Alliance Team?

3  A   Well, if it had been successful, it would have taken

4  business from the Alliance Team, that it was flying what we

5  call spill.  It would have taken that business because of its

6  entitlement, correct.  It would have hurt the Alliance Team,

7  yes.

8  Q   And World and North American were on the Alliance Team?

9  A   That's correct.

10           MR. BROUGHTON:  Mr. Brockwell, if you could put up

11  Federal Express 100.

12  BY MR. BROUGHTON:

13  Q   Mr. Yakola, you are copied on this e-mail dated

14  September 27, 2007; is that right?

15  A   That's correct.

16  Q   And I was from Bill Doherty; is that right?

17  A   That's right.

18  Q   I think you told us he was basically in charge of the

19  military flying at ATA?

20  A   That's correct.

21  Q   It says "FedEx commissions."  I know there's been an

22  instruction on it, but briefly remind us, how does this

23  commission work with respect to -- as between ATA and FedEx?

24  A   When FedEx brings in all these, what we call point

25  contributors -- the way I look at it is there's two types of

1  companies in the -- there are point contributors, airlines

2  that have a lot of points but don't want to fly and what I

3  call fliers, which are self-explanatory.  They don't have a

4  lot of points because they're a small airline but they fly.

5          So the way that FedEx gets these points contributors

6  to stay on the FedEx team and not be on the UPS team or

7  Alliance Team is to offer them commissions of the flying that

8  they do -- a commission off the military revenue so that they

9  get money for staying on the team.  That's how you get

10 Northwest Airlines to stay on the team.

11         The commissions are paid by the fliers because the

12 fliers get the revenue from the military.  So we get the

13 revenue, and that commission is taken out and then paid to

14 those points contributors.

15 Q   So if we go back to Federal Express 100 here, Bill Doherty

16 says, "Have received the new Fee Agreement today from FedEx

17 for the FY2008 contract.  They have agreed to reduce our

18 commission level on all wide-body and narrow-body awards from

19 the current 7 percent to 4.5 percent."  Do you see that?

20 A   Yes, I do.

21 Q   Was that a good thing or a bad thing for ATA?

22 A   Just looking at this e-mail, it's a great thing for ATA.

23 I mean, it's a huge commission cut.

24 Q   Are we talking about thousands of dollars or millions?

25 A   Millions.

YAKOLA - DIRECT/BROUGHTON

1  Q   So this would be millions of dollars in savings to ATA?

2  A   Yes, yes.

3  Q   Did you find out why this change from almost cut in

4  half -- why this occurred?

5  A   Yes.  Later on, subsequent to this e-mail, we found out

6  that Northwest Airlines, who was generally only a points

7  contributor -- they didn't actually fly.  They wanted to

8  actually begin to fly.  So they wanted to take commissions

9  that would have normally been split 50 percent Omni and

10 50 percent ATA.

11 Q   And how does that relate to the fact that ATA's commission

12 rate was cut almost in half?

13 A   Since there would be less revenue -- well, let me put it

14 this way.  Since revenue that normally would have come to ATA

15 and then been paid out is actually going directly to

16 Northwest, they wouldn't get paid commissions on flying that

17 ATA didn't do.

18 Q   Let me back up a second.  We've looked at the September 7,

19 2006 agreement; is that right?

20 A   Correct.

21 Q   And it said there was going to be three years of flying,

22 50/50 split between Omni and ATA?

23 A   That's correct.

24 Q   No mention of Northwest Airlines, correct?

25 A   That's correct.

                                                    Vol. 2 -   218
                          YAKOLA - DIRECT/BROUGHTON

1  Q   FY07 goes by, and there was a 50/50 split between ATA and

2  Omni, right?

3  A   Correct.

4            MR. BLUMBERG:  Objection, leading.

5            THE COURT:  Sustained.

6  BY MR. BROUGHTON:

7  Q   What happened in FY08?  Did that exact 50/50 percent

8  change in any way?

9  A   No -- well, it did, yes.  Northwest had told FedEx that it

10  wanted to fly more, and so it wanted to actually fly trips,

11  not just be a points contributor.

12  Q   And how does that relate to the commission being lowered

13  that ATA had to pay FedEx from 7 percent to 4.5 percent?

14  A   We had a three-year agreement with Federal Express to fly

15  50 percent of the flying.  Now that 50 percent was going to be

16  reduced by up to 10 flights per month by Northwest Airlines.

17  So we had an agreement with FedEx.  They said you're going to

18  get 50 percent of all the flying.  And now what we had found

19  was that Northwest was going to take up to 10 of those flights

20  a month.

21            So in consideration for that, FedEx lowered our

22  commission from 7 percent to 4 1/2 percent to make up for the

23  fact that 10 of those flights were now going to be flown by

24  Northwest.

25  Q   Is it your understanding that parties are free to amend an

1  existing contract?

2  A   Yes, of course.

3  Q   Is that what FedEx and ATA did here?

4  A   Yes.  We had a major points contributor, something along

5  the lines of 25 percent, I believe, of the points on the FedEx

6  team was with Northwest Airlines.  We needed to make sure as a

7  team member, that we made them happy.  If they wanted to fly,

8  we looked and said look, we need to figure out a way to make

9  that work to work within the team.  So we agreed to amend that

10 contract for that year.

11         MR. BROUGHTON:  Let's look at Federal Express 113,

12 please.

13 BY MR. BROUGHTON:

14 Q   Federal Express 113 is the October 25, 2007, Global board

15 minutes; is that right?

16 A   That's correct, October 23.

17 Q   I'm sorry, October 23, 2007.  And did you attend this

18 meeting?

19 A   I did.

20 Q   And if we turn to page 3 of these board minutes?

21         MR. BROUGHTON:  Mr. Brockwell, if you can zero in on

22 the Roman Numeral IV integration.

23 BY MR. BROUGHTON:

24 Q   What are you doing here?  What kind of report did you

25 give, Mr. Yakola, at the October board meeting?

1  A   I'm giving a report to the board in my new role as Chief

2  Integration Officer on how I'm doing identifying and

3  implementing the synergies that would come from the

4  acquisition.

5  Q   Do you recall what fuel prices were doing in the fall of

6  2007?

7  A   Going up.

8  Q   And were jet fuel prices going up dramatically in 2007?

9  A   They were.  They were going up both dramatically and

10 consistently.

11 Q   And did these rising fuel prices have any impact on ATA's

12 military flying?

13 A   No, it did not.

14 Q   And why not?

15 A   Because the military would -- they would set a fuel price

16 at the beginning of the year, and then if you had to pay more

17 than that, they would reimburse you for whatever the

18 difference was between that.  Or conversely, if you paid less

19 than that, you would have to reimburse the military if you

20 paid less.  So fuel was zeroed out, I guess is the best way to

21 put it.

22 Q   How about with ATA's scheduled service?  Did this spike in

23 jet fuel prices cause any problems?

24 A   They caused a lot of problems.  Unlike the military, you

25 have a rising fuel, you can't immediately raise ticket prices

YAKOLA - DIRECT/BROUGHTON

 1  for everyone that was flying on that flight based on that rise

 2  in fuel.  So we had to what I call, eat a lot of that fuel

 3  cost increase.

 4  Q   What did that do to ATA's cash at that time?

 5  A   Well, it reduced it, obviously.  We were getting revenue

 6  for seats that we had sold weeks and sometimes months back

 7  when fuel was a certain price.  Now, the cost was a lot more

 8  than what we had forecasted.

 9         MR. BROUGHTON:  Okay.  If we could turn to Federal

10  Express 130, which are the November '07 board minutes.

11         And if you could turn, Mr. Brockwell, to -- does the

12  Bates number work for you?  Okay, G000117.

13  BY MR. BROUGHTON:

14  Q   This is entitled GAL's revenue sources; do you see that?

15  A   I do.

16  Q   The top bullet point is AMC.  It says, "70 percent of AMC

17  passenger revenues;" do you see that?

18  A   I do.

19  Q   It goes down here and talks about charter and schedule

20  service and charter passenger; is that right?

21  A   Correct.

22  Q   Had the jet fuel prices gotten any better by November of

23  '07?

24  A   No, they had gotten worse.

25  Q   Was that continuing to have an impact on ATA's schedule

YAKOLA - DIRECT/BROUGHTON

1  service?

2  A   It was, yes.

3  Q   What was that impact?

4  A   Again, we were paying more for fuel than we had

5  forecasted, and fuel was one of the largest costs that the ATA

6  schedule service had.  So it was having an impact on cash.

7  Q   And was ATA coming up with any plans to address this

8  schedule service issue here in late '07?

9  A   Yes, it was.

10  Q   What was that?

11  A   We were looking at -- we started from the bottom up and

12  looked at all the routes that ATA was flying and said given

13  this new fuel price, this new fuel environment, what routes

14  are -- will still be profitable for us?  What routes can we

15  keep, and which ones can we eliminate?  And not just single

16  flights but maybe entire markets.

17       I think, you know, people in this room who live in

18  Indianapolis, they probably lived through some of that as ATA

19  got out of certain markets.  We didn't fly to them anymore

20  like St. Petersburg, Florida.

21  Q   Let's turn to FedEx 134.  These are the December '07 board

22  minutes.

23       MR. BROUGHTON:  Mr. Brockwell, if you can go to the

24  top of the page where it lists the attendees.

25

YAKOLA - DIRECT/BROUGHTON                Vol. 2 -  223

1  BY MR. BROUGHTON:

2  Q   Do you see your name there, Mr. Yakola?  I think you're

3  seven lines down on the right?

4  A   There it is.

5  Q   So you were at that meeting?

6  A   Yes, I was.

7  Q   If we go just below that, it says, "The following

8  individuals were also invited to participate:  Nick Amigone of

9  MatlinPatterson."  You see that?

10  A   I do.

11  Q   We've heard who MatlinPatterson is.  Up above your name,

12  were any of the board members associated with MatlinPatterson?

13  A   Yes, they were.

14  Q   Which ones?

15  A   Mark Chodock, Peter Schoels, and Lawrence Teitelbaum.

16  Q   Why were they on the board of GAL?

17  A   MP was very involved in Global Aero Logistics.  They were

18  on the board because they wanted to participate in the

19  decisions of the company.

20        MR. BROUGHTON:  And if we could go to page 2,

21  please, Mr. Brockwell?

22  BY MR. BROUGHTON:

23  Q   That bottom paragraph, Roman Numeral V, entitled

24  integration.  Had you identified some specific dollar amount

25  synergies at this point in time, Mr. Yakola?

YAKOLA - DIRECT/BROUGHTON

1  A    Yes, we had.  By December, we had identified actually

2  quite a bit of the synergies.

3  Q    And how much were you thinking that was going to save

4  these companies in money?

5  A    It's not part of the board minutes.  My recollection is by

6  this time, we were north of $40 million.

7  Q    And was there any discussion here in December of ATA

8  getting rid of its scheduled service altogether?

9  A    Yes, there was.

10 Q    Tell us about that, please.

11 A    Well, you know, we had already been going through all this

12 route analysis to see what we could keep, but fuel was going

13 up at an astronomical rate.  I think this was the time when we

14 all started paying 3 and $4 a gallon for gas, you know, for

15 our cars.  That was impacting jet fuel as well.

16       And it was getting to the point where even our most

17 profitable routes that ATA had on scheduled service were not

18 profitable because of this spike that we had in jet fuel.

19 Everyone thought it was going to stop at a certain level.  It

20 would stop at $50 a barrel, it would stop at $60 a barrel, and

21 it didn't.  It kept marching up.

22       So we kept redoing our analysis to say okay, we can

23 cut this or cut that and try to make this work.  Finally, we

24 started looking at, look, it might just be that given fuel

25 prices where they are, if this is the new reality of where

YAKOLA - DIRECT/BROUGHTON

1  fuel is going to be, that we can't be in this business.  That

2  we need to focus on our foundation on the business of

3  military, and we shouldn't be in the scheduled service

4  business.

5  Q   Was this problem peculiar to ATA at this time?

6  A   No.  Every airline was bleeding during this time.

7  Q   Let's go to Federal Express 148.  And these are the

8  January 22, 2008 board minutes; are they not?

9  A   They are.

10  Q   In the opening we saw a letter from FedEx.  It was also

11  January 22nd of 2008.  Do you recall that?

12  A   Yes.

13  Q   What did that letter say?

14  A   It said that ATA was being kicked off the FedEx team,

15  basically.

16  Q   Now, had ATA received that information as of the time of

17  this board meeting?

18  A   No.  It came that evening after this board meeting was

19  over.

20  Q   Okay.  And you were at this January 22nd board meeting; is

21  that right?

22  A   That's correct.

23          MR. BROUGHTON:  If you would turn to page 4, please,

24  and that's GAL 249.

25          If you -- Mr. Brockwell, if you could enlarge first

1  this one that says "C, Gemini air cargo."

2  BY MR. BROUGHTON:

3  Q   Mr. Yakola, who is Gemini Air Cargo?

4  A   Gemini was another company that primarily flew freight,

5  cargo and freight.

6  Q   Okay.  And why is the Gemini Air Cargo being mentioned in

7  the Global board minutes?

8  A   Because MatlinPatterson was looking to expand Global Aero

9  Logistics with more fliers, and Gemini was attractive to them

10  because it had airplanes, DC10s and what's called an MD11,

11  which is a modern version of a DC10 which was similar to what

12  ATA had and what World Airways had.

13  Q   Okay.  If you look at this second sentence, it says,

14  "While MatlinPatterson is prohibited by its fund covenants

15  from providing the company with any additional cash at this

16  time, the board, after discussion, instructed management to

17  continue with the due diligence review process."  Do you see

18  that?

19  A   Yes, I do.

20  Q   Do you know what that means?

21  A   Yes.  It has its own rules for how much it invests in --

22  how much it puts into specific investments.  And at various

23  points in time, they need to get higher and higher levels of

24  authority to continue to invest in the company.  And so the

25  fund covenants -- "covenants" just means, basically, the rules

YAKOLA - DIRECT/BROUGHTON

1  say that without additional authority, right, they can't

2  invest anything further.

3       But that doesn't mean that they won't.  It just means

4  they go out and get additional authority.

5  Q   Okay.  And so here, Global is looking at acquiring Gemini

6  Air Cargo; is that right?

7  A   That's correct.

8  Q   And it was planning on using funds from MatlinPatterson to

9  do so?

10 A   That's correct.

11 Q   Okay.  And it was going to be from a different fund or get

12 a way around the covenants?

13 A   There's many different sources that MatlinPatterson can

14 call upon to do something like this.  It's a $9 billion fund.

15 Q   Okay.  MatlinPatterson is 9 billion?

16 A   They have raised $9 billion, so there's money, I guess, is

17 what I'm saying.

18       MR. BROUGHTON:  Okay.  Mr. Brockwell, if we can go

19 to the bottom of that same page 4, the E, and if we can focus

20 in on the last half of this -- well, let's just look at it.

21 BY MR. BROUGHTON:

22 Q   Is that discussing the fuel price situation there,

23 Mr. Yakola, beginning with the top sentence?

24 A   Yes, exactly.  It's talking about the differences in fuel

25 price.

YAKOLA - DIRECT/BROUGHTON

1  Q   They've gone from $50 to $95 a barrel?

2  A   Yes.  And, further, you know, talking about the

3  catastrophic impact on costs, which is what I've been talking

4  about.

5  Q   Okay.  And if we go on, it says, "The company's

6  considering either selling off ATA's scheduled service

7  business; failing that, liquidating it entirely.  ATA's

8  scheduled service components include 11 aircraft, related

9  crews, administrative and logistical support and the west

10 codeshare; is that right?

11 A   That's correct, yes.

12 Q   You're not talking about military flying at this point?

13 A   No, no.

14 Q   Okay.  No discussion of ATA stopping the military flying?

15 A   No, there never was.

16 Q   Okay.  And it's reported here that JPMorgan had received

17 interest from several airlines, including Aloha, Hawaiian, and

18 Continental to acquire all or part of ATA's schedule service

19 business and that JPMorgan was the optimistic that it would

20 receive one or more first-round bids.  Do you see that?

21 A   Yes, I do.

22 Q   Was this good news?

23 A   Absolutely.  I mean, it was part of the plan that we had

24 going forward to make sure that ATA would stop losing cash.

25

YAKOLA – DIRECT/BROUGHTON                    Vol. 2 –  229

1        MR. BROUGHTON:  Mr. Brockwell, if we could go to

2   Plaintiff's Exhibit 2, please.

3   BY MR. BROUGHTON:

4   Q   This is the letter that was referenced in opening or shown

5   in opening, and you just mentioned it a few moments ago; is

6   that right?

7   A   That's correct.

8   Q   Okay.  And in this letter, what did FedEx tell ATA?

9   A   That it was not going to be a member of the team for

10  fiscal year 2009.

11  Q   Well, if, as FedEx says, there wasn't any agreement for

12  '09, why would they be sending this to you in January of '08

13  saying, You're not going to be on the team in '09?

14  A   I have no idea.  We were in complete shock to get a letter

15  like this.

16  Q   And as FedEx counsel pointed out, it goes on to say you're

17  supposed to continue the rest of FY08; is that right?

18  A   Yes.  That's what it says.

19  Q   Okay.  Now, when you say ATA was in shock, why?

20  A   ATA had been flying military for decades, and we were a

21  founding member of the team.  It -- it just never -- it never

22  even would occur to us that FedEx would cancel our contract,

23  for two reasons:  Number one is because we did have a contract

24  through fiscal year '09; but, as importantly, we had been part

25  of the military troop flying from the very beginning of this.

YAKOLA - DIRECT/BROUGHTON

1  And all of a sudden to find out that, you know, FedEx decided

2  that we weren't going to be -- I keep using the word "shock,"

3  but that's the word that came to mind.

4  Q   Okay.  And so what did ATA do in response to having

5  received this letter?

6  A   Well, I mean, we called immediately to find out, you know,

7  what was going on here, what was -- you know, why was FedEx --

8  why did they send this letter to us, you know, and did they

9  have an issue with the way we were flying?  Did they have an

10 issue with our operation.  We were ensured --

11 Q   Let me just stop you right there.

12 A   Oh, I'm sorry.

13 Q   Does that letter mention any reason at all?

14 A   No, which is why we were burning up the phone lines to

15 find out what was going on.

16 Q   Okay.  And without going into the substance of any of

17 those communications at this point in time, did ATA ask FedEx

18 to reconsider?

19         MR. BLUMBERG:  Objection.  Motion in limine on this.

20         THE COURT:  Sustained.

21         MR. BROUGHTON:  Can we approach the bench?

22         THE COURT:  You may.

23     (Beginning of bench conference.)

24         MR. BROUGHTON:  I apologize.  I thought that was the

25 same ruling in opening.  I'm not going any further than we

                    YAKOLA - DIRECT/BROUGHTON              Vol. 2 -  231

 1  asked them to reconsider.

 2            THE COURT:  No further?

 3            MR. BROUGHTON:  No further.

 4            THE COURT:  Okay.  (That was a bench conference.

 5       (End of bench conference.)

 6  BY MR. BROUGHTON:

 7  Q   Mr. Yakola, did ATA ask FedEx to reconsider the decision

 8  set forth in this January 22nd letter?

 9  A   Multiple times.

10  Q   Okay.  What else, other than asking FedEx to reconsider,

11  did ATA do as a result of having received this notice?

12  A   I think it's important to understand that ATA's core

13  business was just wiped out.  All right?  The profitable

14  military business was gone, and it was going to be gone in six

15  months.  You know, we had to figure out a way to either make

16  sure that that didn't occur somehow by talking to FedEx or

17  look for other things that we could do with the airplanes.

18            One of the things that we started doing after we

19  realized that FedEx may not reconsider and change its mind was

20  that we approached --

21            MR. BLUMBERG:  I'm going to object, have it struck.

22  We're beyond our motion now.

23            THE COURT:  All right.  Sustained.

24  BY MR. BROUGHTON:

25  Q   Other than asking FedEx to reconsider --

YAKOLA - DIRECT/BROUGHTON                    Vol. 2 -  232

1        MR. BLUMBERG:  Objection, Your Honor.

2        THE COURT:  You know, let's move on.

3   BY MR. BROUGHTON:

4   Q   What other alternatives was ATA considering at that point

5   in time?

6   A   Joining the UPS team.

7   Q   Okay.  Tell us about that.

8   A   UPS, as I mentioned before, was a much smaller team; it

9   only had about ten percent of the business.  But we approached

10  them to see if we could possibly join their team and bring in

11  the future other points contributors over so that we could

12  grow that team.  It was nowhere near the flying that -- or the

13  entitlement that the FedEx team had.  It was a much smaller

14  pie, but it was something.  So we approached the UPS team.

15  Q   Okay.  Let's look at Federal Express Exhibit 164.

16       These are February 5, 2008, board minutes, are they

17  not?

18  A   They are.

19       MR. BROUGHTON:  And, Mr. Brockwell, if we could

20  enlarge the very last bullet point there.

21  BY MR. BROUGHTON:

22  Q   What does that say, Mr. Yakola?

23  A   It's that -- it's my appointment to come back home to ATA.

24  Q   Okay.  So you left the chief integration officer title

25  behind, right?

1   A    Yes.

2   Q    And why is that?

3   A    Because at this point, that was not the most important

4   thing that we had going on at Global Aero Logistics.  We had

5   an airline who we were in the midst of restructuring the

6   scheduled service business, possibly selling it off, and we

7   were facing the real possibility that we wouldn't have a

8   military business.

9        So they asked me to come back and take over ATA

10  Airlines and stabilize it because all kinds of rumors were

11  floating around and everything going on and come out and

12  assist in that process to see if we could figure out a way to

13  pull ATA out of the fire it had been put in and put it back on

14  stable ground.

15       MR. BROUGHTON:  Okay.  If we could turn to page 2,

16  please, the very bottom of the page, the last paragraph.  If

17  you can enlarge the last three lines, last paragraph.

18  BY MR. BROUGHTON:

19  Q    And that says -- what does that say, Mr. Yakola?

20  A    It says that we agreed that we had to make a decision very

21  quickly on whether to either sell ATA's scheduled service

22  business or just to shut it down and liquidate it.

23       MR. BROUGHTON:  Okay.  Let's go to Federal Express

24  167.

25

YAKOLA – DIRECT/BROUGHTON                  Vol. 2 – 234

1   BY MR. BROUGHTON:

2   Q   This is February 12 board minutes, correct?

3   A   That's correct.

4   Q   Now, we looked at several before, and it seemed like the

5   board was meeting once a month; is that right?

6   A   That's correct.

7   Q   Did that change at this point in time?

8   A   Yes.  It went to almost weekly.

9   Q   And why is that?

10  A   We were trying to figure out a solution for the military

11  business for ATA and continue to work on a solution for the

12  scheduled service business.  These are major events going on

13  at ATA.

14         MR. BROUGHTON:  Okay.  And if we turn, Mr.

15  Brockwell, to page 2 -- well, let me give you the Bates

16  number.  GAL -- or G000293.  That's it.  Beat me to it.

17  BY MR. BROUGHTON:

18  Q   Mr. Yakola, let's look at that third bullet point,

19  "propose ATA scheduled service."  Please tell the jury about

20  that.

21  A   This was analysis called Project Giants, but it was an

22  analysis what would happen if we just simply -- if we

23  eliminated scheduled service, shut it down, and then just went

24  forward as a military carrier.  And so what this was, was the

25  cost of shutting down scheduled service.

YAKOLA - DIRECT/BROUGHTON

1          And each one -- I can go through each one of these

2   costs, if you want me to.

3   Q   No.  That's okay for now.

4          MR. BROUGHTON:  Let's go to the next page, Mr.

5   Brockwell, page 3.

6   BY MR. BROUGHTON:

7   Q   And the title of this is "AMC teaming update," right?

8   A   That's correct.

9   Q   And the first bullet point is what?

10          MR. BLUMBERG:  Objection, Your Honor.  The first

11   sentence should be redacted, given the Court's ruling.

12          MR. BROUGHTON:  Can we approach the bench?  This is

13   talking about a third party TransCom, not communications

14   between --

15          THE COURT:  Approach the bench.

16     (Beginning of bench conference.)

17          THE COURT:  Why are you throwing TransCom in there

18   for now?  Where is that coming from?

19          MR. BROUGHTON:  They wanted to go to the U.S.

20   military and try to get them to mediate this dispute.  And all

21   this is, is showing efforts to mitigate.  There's no

22   bad-mouthing here.  This is their exhibit.  FedEx put it in.

23          MR. BLUMBERG:  We've already determined that their

24   trying to get back on the FedEx team is not mitigation.  That

25   sentence shouldn't be going in.  We can redact it very

YAKOLA - DIRECT/BROUGHTON

 1  quickly.  They've got the technology right there to run it

 2  right through.

 3          MR. BROUGHTON:  I understand that was a limine, and

 4  we provided plenty of Tennessee cases going back to the

 5  breaching party saying, We'll give you a better deal, is

 6  mitigation.  And I didn't think the Court had ruled on that.

 7  I thought the focus of yours was that they couldn't say that

 8  FedEx said, We'll see you at the courthouse, or whatever they

 9  said.

10          MR. BLUMBERG:  The ruling was all the efforts --

11          MR. BROUGHTON:  That's a limine.  Now that the

12  testimony has come in, you've pled failure to mitigate as an

13  affirmative defense.  And under Tennessee law, which, I

14  believe, is what controls here -- and again, I'm not going

15  into that.

16          THE COURT:  I don't want juror confusion here, all

17  of a sudden bringing in another company, TransCom.  You've got

18  evidence in of mitigation.  And that's your document, too,

19  right?

20          MR. BLUMBERG:  That is a FedEx exhibit.

21          MR. BROUGHTON:  It's another name for CRAF.  They

22  kept changing acronyms, and people continued to call it

23  TransCom.  It's U.S. Transportation Command.  There's not

24  going to be any more about it other than to show we're still

25  working on this; we're trying to make something happen.

YAKOLA – DIRECT/BROUGHTON                Vol. 2 –  237

1          THE COURT:  Go ahead.

2      (End of bench conference).

3   BY MR. BROUGHTON:

4   Q   Mr. Yakola, what's the reference to "possibly mediated by

5   TransCom"?

6   A   TransCom is another name for the military arm, the

7   Government arm that awards business.  And AMC, I think we've

8   called it, TransCom, they're one and the same.

9   Q   CRAF, also?

10  A   CRAF, as well, yeah.

11  Q   Okay.  And below that it says what about UPS?

12  A   "UPS team membership, with or without Ryan as a partner."

13  Q   Explain that to us.

14  A   So one of the reasons the UPS team was small was it didn't

15  have a big flier.  So even if it got a big points contributor,

16  it didn't have someone that could fly the business.  Ryan was

17  another airline called Ryanair, and they were trying to get

18  into the military business a lot more with these wide-body

19  airplanes.

20          So Ryan had worked with UPS a long time, and if they

21  were going to be a partner of UPS, that would have been less

22  flying for ATA.  But if they weren't going to be a partner,

23  then ATA could bring a lot of flying to the UPS team.

24  Q   Okay.  And we looked down here at the very last bullet

25  point at the bottom of the page, "resolutions within next two

YAKOLA - DIRECT/BROUGHTON

1  weeks."  Do you see that?

2  A   Yes.

3  Q   Explain that entry to us, "implications of not having."

4  A   Well, that's the dynamite, right?  So, you know, within

5  the next two weeks, we need to really understand what happens

6  if we don't have a FedEx option; they're not going to let us

7  on the team for FY09, if UPS doesn't work out, what are we

8  going to do if we didn't have any military business?  I think

9  it says "quite severe on ATA," and that's an understatement.

10          MR. BROUGHTON:  Okay.  Let's go to Federal Express

11  171.

12  BY MR. BROUGHTON:

13  Q   This is February 22.  So this is ten days later, right?

14  A   Yes.

15          MR. BROUGHTON:  If we can go to the second page of

16  this exhibit, please.

17  BY MR. BROUGHTON:

18  Q   Is ATA still pursuing there UPS as a possible alternative?

19          MR. BROUGHTON:  If you can enlarge that for him a

20  bit, please.

21  A   Yes.

22  Q   And if you look at the II update on Project Surf, do you

23  see that?

24  A   Yes.

25  Q   Tell us quickly, what was Project Surf?

YAKOLA - DIRECT/BROUGHTON

1  A   Surf was the selling of the scheduled service business.

2  That was the name of that project.  And we had gotten into

3  very extensive discussions with Aloha Airlines where they were

4  going to buy the scheduled service business of ATA.

5          MR. BROUGHTON:  If we can turn to Federal Express

6  Exhibit 173, please, which is the March 4th board minutes.

7  And if we could go to the second page of that, please, Mr.

8  Brockwell.

9  BY MR. BROUGHTON:

10 Q   The first paragraph, Mr. Yakola, says, "Mr. Karnick

11 reviewed the potential positive and negative aspects

12 associated with each of the three possible ATA scenarios and

13 explained the summary numbers on revenue and free cash flow."

14 Do you see the that?

15 A   I do.

16 Q   Then the next paragraph says, "Messrs. McDonald and Yakola

17 both advised that ATA faces huge operational risks in trying

18 to wind down ATA in an orderly foundation (in whole or in

19 part)."

20 A   That's correct.

21 Q   Explain what you meant when you said this to the board.

22 A   At this point we were looking, obviously, one of the

23 options was to simply shut down the scheduled service business

24 or shut down the entire business.  And an airline is a very

25 complex beast.  It's not like serving hamburgers at

YAKOLA - DIRECT/BROUGHTON

1  McDonald's.  You're putting multi-ton airplanes up in the sky

2  with highly trained people, and a lot of things have to come

3  together to make that work.

4        So when -- if you're thinking about a long time to

5  shut down an airline, obviously, things become public; people

6  get to know things.  And we were looking at the prospect of a

7  public knowledge of ATA shutting down and then trying to run a

8  business for a while.  It's just not possible to do that.

9        So that's what Charlie McDonald and I both talked

10 extensively about together and came to that conclusion and

11 gave it to the board.

12 Q   When employees hear that their core business is gone, are

13 they going to start looking for jobs elsewhere?

14 A   Yeah.  When -- when you tell someone that you're going to

15 go out of business and you're going to do it, you know, six

16 months down the road, people are going to do what's natural,

17 what is common sense.  They're going to start looking for

18 another job, as they should.  I don't blame them.  But when

19 they start looking for another job, they find one and they

20 leave, that's a hole that I have to fill.  If that hole is a

21 pilot who's flying a DC10 on the military, I don't necessarily

22 have another pilot to fill that hole, and all of a sudden I'm

23 stranding military troops in Afghanistan.

24       You know, vendors, people that you do business with

25 every day that you pay money to, who say, Hey, wait a second,

YAKOLA - DIRECT/BROUGHTON

1  Doug; you're going to go out of business; I'm not going to run

2  credit terms for you anymore; I'm not going to do all this

3  work for you and then have you walk away and not pay me. So --

4  Q   Let me stop you there.  When you say you're not going to

5  do credit terms, what are you talking about?

6  A   In other words, an airline caterer would cater the planes

7  for a month.  They would give us a bill at the end of that

8  month to pay.  We would pay that after they had already given

9  the service.  That's what I mean by "credit terms."  All of a

10 sudden they're going to turn around and say, Wait, you're

11 going out of business.  I'm either not going to do any

12 business with you because I don't want to be caught with you

13 owing me money or I want all the money in advance.

14        I mean, that's the reality.  I don't blame these

15 people for doing that, but that's why it's so difficult to do

16 this kind of what we call orderly wind-down.

17            MR. BROUGHTON:  Okay.  Mr. Brockwell, if we can

18 go -- still in 173, if we can go to page 12 of the PowerPoint

19 that's attached.

20 BY MR. BROUGHTON:

21 Q   Mr. Yakola, March 4th, you guys are still working on the

22 UPS option; is that right?

23 A   That's right.

24 Q   What does that first entry say?

25 A   It says, "UPS proceeded well until their likely knowledge

YAKOLA - DIRECT/BROUGHTON

1  of ATA's FedEx situation.  Then they had a take-it-or-leave-it

2  attitude."

3  Q   What did you mean by that?

4  A   Well, we didn't tell anyone -- we didn't tell UPS that we

5  had been kicked off the FedEx team.  We went to them and said,

6  Hey, we want to come fly with you, and we were trying to

7  negotiate a contract with them where it made sense for ATA to

8  fly military.

9        UPS was looking at their flier, Ryanair, and trying to

10  do a negotiation with them, as well.  When they found out that

11  ATA was not --

12           MR. BLUMBERG:  Objection, speculation.

13           THE COURT:  Sustained.

14  BY MR. BROUGHTON:

15  Q   At some point in time, did UPS' negotiation strategy

16  change towards ATA?

17  A   The fact is they took a contract that was workable, that

18  we were working on that was workable for us off the table,

19  right, completely ripped it up and gave us a new one that was

20  completely unworkable.  That was the fact.

21  Q   Is that what you mean by "take it or leave it"?

22  A   Exactly.  They gave us hours to accept.

23  Q   And when you say it was unworkable, what do you mean?

24  A   Well, it was such a small piece of -- well, two reasons:

25  Number one, it was a very small piece of the pie.  There

Vol. 2 - 243
YAKOLA - DIRECT/BROUGHTON

1   wasn't a lot of flying.  Number two is we had to sign up for

2   $10 million in commissions.  We had to sign up to pay

3   $10 million to the UPS team without knowing how much flying we

4   were going to get.

5            MR. BROUGHTON:  Let's turn to FedEx Exhibit 178,

6   which is the March 11th.  So this is seven days later.  This

7   is the next week.  If we could go to the second page, please.

8   Mr. Brockwell, if we could go under II down to -- let's go to

9   that second paragraph, "Mr. Garrett reported."  Enlarge that

10  and the third and the fourth paragraph, please.

11  BY MR. BROUGHTON:

12  Q   So here Mr. Garrett's giving a report about the cash burn;

13  is that right?

14  A   That's correct.

15  Q   We goes to -- it says, "All ATA payroll payments are

16  current," right?

17  A   That's correct.

18  Q   Then we go down there, and Mr. McDonald, who's that?

19  We've seen his name, but I don't think you've told us who

20  Mr. McDonald was.

21  A   Charlie was the chief airline officer, but he was at the

22  holding company, the parent company, and he was responsible

23  for each airline and their operations.

24  Q   Okay.

25  A   I'm sorry.  I worked for Charlie in my role as chief

 1  operating officer of ATA.

 2  Q   Okay.  And he's talking about selling off spare parts; is

 3  that right?

 4  A   We were looking for everything, yes.

 5  Q   Okay.  Then you report that "ATA employees expect the

 6  shutdown of scheduled service but are generally unaware of the

 7  FedEx team issue.  He also stated that no official retention

 8  package had yet been offered to any key employees.  He stated

 9  that the first week in April, following spring break for most

10  passengers, might be the best time to shut down the remaining

11  ATA scheduled service operations to maximize revenue."

12           Do you see that?

13  A   I do.

14  Q   So according to this, most people still didn't know about

15  not on the team for FY09; is that right?

16  A   That's correct.

17  Q   Okay.  And then it references a retention package.  What

18  do you mean by that?

19  A   A retention package is something that you offer to key

20  employees that even when your future is unclear or in danger,

21  you want them to stay with you; you want to retain them.  So

22  you offer them extra money and bonuses to stay, despite what

23  they might be hearing and what their own self-interests might

24  dictate.

25           MR. BROUGHTON:  Let's go to Federal Express 180.

1   These are the March 25 board minutes.

2   BY MR. BROUGHTON:

3   Q    If we look at the last paragraph on page 1, it references

4   ATA's chief restructuring officer, Steve Turoff and Douglas

5   Yakola, COO.  Do you see that?

6   A    Yes, I do.

7   Q    Okay.  And had ATA at this point hired a chief

8   restructuring officer?

9   A    It did.

10  Q    And why was that?

11  A    It was facing imminent bankruptcy.

12  Q    And you go on to talk about minimizing the number of

13  stranded passengers.  Do you see that?

14  A    Yes.

15  Q    Let's go to the top of page 2.  The very top line says,

16  "ATA's shutdown plan includes paying wages to all ATA

17  employees through April 2nd and returning all aircraft to the

18  continental United States."  Do you see that?

19  A    Yes, I do.

20  Q    And the last sentence says, "No military personnel will be

21  stranded"?

22  A    Absolutely not.

23  Q    And how did you know to ensure that was the case?

24  A    We stopped accepting missions to fly after April 2nd.  We

25  stopped doing that three weeks prior when we thought that we

                   YAKOLA – DIRECT/BROUGHTON

 1  might just have to do this so that we weren't actually -- you

 2  know, halfway through our mission with someone when we had to

 3  let go.

 4          MR. BROUGHTON:  Your Honor, it's 5:20, and I think

 5  we're nowhere near finished with him and as well as the cross.

 6  So I don't know if the Court wanted to take a break or --

 7          THE COURT:  Why don't we go for another 10 or 15

 8  minutes?

 9          MR. BROUGHTON:  All right.  Let's next turn to FedEx

10  183.

11  BY MR. BROUGHTON:

12  Q   And this is the March 30, 2008 board minutes; is that

13  right.

14  A   That's correct.

15          MR. BROUGHTON:  And if we could go to the second

16  page, Mr. Brockwell.

17  BY MR. BROUGHTON:

18  Q   At the bottom it says Mr. Chodock -- and I believe you

19  indicated he's with MatlinPatterson; is that right?

20  A   That's correct.

21  Q   "Reported that MatlinPatterson and JPMorgan continue their

22  discussions regarding obtaining a waiver from JPMorgan for

23  existing and imminent defaults and are restructuring the loan

24  facility to include monthly covenants," and goes on.

25          "A prohibition on any future company, loans, or cash

 1  advances to ATA in a 20 to 30 million dollar line of credit

 2  provided by MatlinPatterson to Global should the company's

 3  cash reserves dip below 25 million."

 4        Put take in plain English for us, if you would.

 5  A   Sure.  What Mark is -- Mark Chodock is reporting here is

 6  that JPMorgan basically gave the company money to buy -- to

 7  have the acquisition -- they had a lot of debt with Global

 8  Aero Logistics.

 9        So they were in a position to -- kind of at the same

10  level as MatlinPatterson's owners to talk about what was going

11  to happen with the company.  So there was lots of negotiations

12  that went on where JPMorgan could have said, you know what?  I

13  don't like what's going on here.  I want out.  I'm going to

14  walk away from the loan.  You owe it all to me right now and

15  default someone on the loan.  But instead, they talked about

16  obtaining a waiver so they wouldn't default on the loan, and

17  that was getting close to being done here.

18        Second of all, as part of that, MatlinPatterson was

19  going to put in more cash into Global if the cash reserves

20  dipped below a certain amount.  So, you know, despite the loan

21  covenants that we talked about earlier, MatlinPatterson was

22  prepared to put in more money to keep all this going, and

23  JPMorgan was prepared to waive legal rights they had in order

24  to keep all this going as well.

25        MR. BROUGHTON:  Now let's go to Federal Express 185,

YAKOLA - DIRECT/BROUGHTON

1  which is the April 2 board minutes.

2  BY MR. BROUGHTON:

3  Q   Mr. Yakola, was it your goal to keep ATA open?

4  A   Yeah, it was, Ken.

5  Q   Why?

6  A   I had 2800 employees I was responsible for, people who had

7  worked for ATA since its inception in the 1950s.  You know,

8  people who counted on ATA not just as employee but other

9  vendors as well.  We had a big responsibility.  Everyone

10  worked hard right up until that last day to make this happen,

11  and so I wanted to do it for them.  I also was -- you know, we

12  were very proud of our military flying.  We were very proud of

13  what we did.

14       We had flight attendants who would fight with each

15  other, not really, but to fly the military trips over the

16  scheduled service trips, because, you know, it was something

17  that we were very proud of as an organization and wanted to

18  continue to do.

19       We were going to shut down a legacy, a company that

20  was part of Indiana and part of the U.S. for many, many years.

21  You don't do that lightly.  So it was one of the most

22  difficult things I've ever had to do.

23  Q   Did you feel like you did everything you could to keep the

24  company open at that point?

25  A   Right up until the last day, yes.  And we flew right up

                        YAKOLA - DIRECT/BROUGHTON


 1  until the last day.

 2              MR. BROUGHTON:  I'll pass the witness.

 3              THE COURT:  All right.  Thank you.

 4         Ladies and gentlemen, we've gone a long time today.

 5  I think we'll break at this time.  It's a natural break before

 6  cross-examination by Federal Express.  We'll start fresh in

 7  the morning with cross-examination.  I did want to see if we

 8  could finish this direct, so I kept you a little late tonight.

 9         Plus we had a little extra down time today that I'm

10  trying to make up so I can keep my promise to you to get you

11  out of here early next week.

12         While you're outside the courtroom, again, do not

13  read or listen to any news accounts.  Do not do any

14  independent research on your own, no Internet research on

15  issues that might be related or pertinent here, and do not let

16  anyone talk to you about the case.  With that, have a good

17  evening.

18         Have they discussed what time?

19         COURT CLERK:  Not yet.

20         THE COURT:  Go back in the jury room.  Philip will

21  take you back there.  Discuss what time you would like to

22  begin in the morning, and we'll let the attorneys know and

23  then we'll go from there.

24         COURT CLERK:  All rise.

25     (Jury out.)

1             THE COURT:  Please be seated.

2             Okay, we'll have cross-examination in the morning.

3    Beginning then -- we have the deposition then of Mr. Pollard?

4             MR. BROUGHTON:  Yes, Your Honor.  The Court ruled on

5    the various objections.  I haven't retimed it.  I'm assuming

6    it's around an hour.  I think before the objections were ruled

7    on, it was an hour and 15 minutes.  So probably cut 15 out of

8    it.

9             THE COURT:  That's good.  Then who after that?

10            MR. BROUGHTON:  Bill Doherty has been subpoenaed.

11   He has had a death in the family, but I've told him that he's

12   required to be here.

13            THE COURT:  If he does not appear, then who would

14   you have?  Are you planning on calling him out of order then

15   if he has to attend a funeral?

16            MR. BROUGHTON:  Certainly I could.  We have him on

17   video deposition as well.  I believe the next one would be

18   Mr. Rachor called as an adverse witness.

19            THE COURT:  Okay.  Very good.

20            COURT CLERK:  9:00 o'clock.

21            THE COURT:  So if you could be here at least 8:45 so

22   we can take care of any questions you might have or any

23   matters you wish to address so we can start promptly at 9:00

24   o'clock.

25            Mr. Blumberg, anything you wish to add?

1           MR. BLUMBERG:  No, Your Honor.

2           THE COURT:  Thank you very much.

3           Have a good evening.  I'll see you in the morning.

4           *(The proceedings were adjourned at 5:21 p.m.)*

1      <u>CERTIFICATE OF COURT REPORTER</u>

2

3   I, Cathy Jones, hereby certify that the foregoing is a

4 true and correct transcript from reported proceedings in the

5 above-entitled matter.

6

7

8  /s/ Cathy Jones      October 12, 2010

  _____

9  CATHY JONES, RPR, FCRR

  Official Court Reporter

10 Southern District of Indiana

  Indianapolis Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25