1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3
   ATA AIRLINES, INC.,            )
4                                 )
                                  ) CAUSE NO.
5          Plaintiff,             ) 1:08-cv-00785-RLY-DML
                                  )
6          -vs-                   )
                                  ) Indianapolis, Indiana
7   FEDERAL EXPRESS CORPORATION,) October 13, 2010
                                  ) 9:00 a.m.
8          Defendant.             ) VOLUME 3

9

10

11

12                    BEFORE THE
               HONORABLE RICHARD L. YOUNG
13

14          OFFICIAL REPORTER'S TRANSCRIPT OF

15                    JURY TRIAL

16

17

18

19

20

21

22  Court Reporter:    Cathy Easley Jones, RPR, FCRR
                       Official Court Reporter
23                     46 East Ohio Street, Room 291
                       Indianapolis, IN  46204
24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION

```
                                                          Vol. 3 -   253
 1                    A P P E A R A N C E S

 2

     FOR THE PLAINTIFF:        Mr. Kenneth E. Broughton
 3                             Mr. Francisco Rivero
                               HAYNES AND BOONE
 4                             Suite 2100
                               Houston, TX  77010
 5
                               Mr. Thomas E. Kurth
 6                             Mr. W. Alan Wright
                               HAYNES AND BOONE
 7                             901 Main Street
                               Suite 3100
 8                             Dallas, TX  75202

 9                             Mr. John David Hoover
                               Ms. Alice McKenzie Morical
10                             HOOVER HULL
                               111 Monument Circle
11                             Suite 4400
                               Indianapolis, IN  46204
12

13
     FOR THE DEFENDANT:        Mr. Peter D. Blumberg
14                             FEDERAL EXPRESS CORPORATION
                               3620 Hacks Cross Road
15                             Building D, Third Floor
                               Memphis, TN  38125
16
                               Mr. Michael E. Gabel
17                             FEDEX LEGAL DEPARTMENT
                               3620 Hacks Cross Road
18                             Building B, 2nd Floor
                               Memphis, TN  38125
19
                               Ms. M. Kimberly Hodges
20                             FEDEX LEGAL DEPARTMENT
                               3620 Hacks Cross Road
21                             Building B-3
                               Memphis, TN  38125
22

23

24

25
```

Vol. 3 -   254

I N D E X

PAGE

DOUG YAKOLA
Cross-examination by Mr. Blumberg ............257
Redirect examination by Mr. Broughton ........305

CHARLES W. POLLARD
Video Deposition ............................315

WILLIAM DOHERTY
Direct Examination by Mr. Broughton ..........320
Cross-examination by Mr. Gabel ...............359
Redirect examination by Mr. Broughton ........419
Recross-examination by Mr. Gabel .............426

Vol. 3 -  255

```
 1              I N D E X   O F   E X H I B I T S

 2                                            PAGE

 3    For Plaintiff:
```

```
 4    2 ...........................................257
      5 ...........................................337
 5    5 ...........................................430
      7 ...........................................328
 6    11 ..........................................335
      12 ..........................................257
 7    12 ..........................................337
      13 ..........................................257
 8    13 ..........................................337
      14 ..........................................338
 9    15 ..........................................430
      19 ..........................................257
10    36 ..........................................257
      40 ..........................................415
11    47 ..........................................355
      75 ..........................................430
12    93 ..........................................430
      97 ..........................................430
13    131 .........................................430
      173 .........................................260
14    257 .........................................314
      258 .........................................314
```

```
15
```

```
16    For Defendant:
```

```
17    8 ...........................................397
      12 ..........................................430
18    20 ..........................................373
      48 ..........................................414
19    51 ..........................................382
      51 ..........................................430
20    62 ..........................................394
      64 ..........................................390
21    76 ..........................................404
      77 ..........................................406
22    83 ..........................................430
      88 ..........................................402
23    89 ..........................................386
      94 ..........................................430
24    107 .........................................367
      124 .........................................430
25    160 .........................................430
      164 .........................................430
```

Vol. 3 -  256

1      *(In open court)*

2      *(Jury out.)*

3              THE COURT:  Good morning.  We have a matter you wish

4      to discuss prior to the jury being brought into the courtroom?

5              MR. BROUGHTON:  Yes, Your Honor.  I just --

6      Mr. Gordon had asked for a list of the exhibits that were

7      discussed yesterday, and I wanted to offer up the stipulated

8      exhibits that were discussed yesterday.

9              THE COURT:  All right.

10             MR. BROUGHTON:  The Plaintiffs offer Plaintiff's

11     Exhibit 2, Plaintiff's Exhibit 12, Plaintiff's Exhibit 13,

12     Plaintiff's Exhibit 19, Plaintiffs' Exhibit 36.  Those are all

13     previously stipulated.

14             THE COURT:  Hold on.

15             Jean, are you all right?  Is it not picking up?

16             THE COURT REPORTER:  I have no audio, but we'll be

17     able to handle it.

18             THE COURT:  Okay.  All right.

19             All right.  Anything else, Mr. Broughton?

20             MR. BROUGHTON:  No, Your Honor.

21             THE COURT:  Okay.  Mr. Blumberg, anything?

22             Okay.  Ready for the jury?

23             MR. BROUGHTON:  Those are admitted?

24             THE COURT:  I hear no objection.

25             Okay.  So they would be admitted.

Vol. 3 —  257

1      *(Plaintiff's Exhibits 2, 12, 13, 19, and 36 were received*

2 *in evidence.)*

3           THE COURT:  Mr. Yakola, you can come back up to the

4 witness stand.

5      (Jury in.)

6           THE COURT:  Good morning, members of the jury.

7 Welcome back to Day 2.

8           We're going to continue on with evidence in the

9 plaintiff's case in chief here today, and you remember

10 yesterday Mr. Yakola was on the witness stand.  And

11 Mr. Broughton asked him questions in direct examination and

12 finished that up right before we adjourned, and now

13 cross-examination by Mr. Blumberg of Mr. Yakola.

14           While you were outside the courtroom, did anyone

15 make any attempts to talk to you about the case?  Anyone read

16 or listen to any news accounts?  Anyone do any independent

17 research?

18           All right.  Very good.

19           Mr. Blumberg, cross-exam.

20                      **CROSS-EXAMINATION**

21 BY MR. BLUMBERG:

22 Q   Good morning, Mr. Yakola.

23 A   Good morning.

24           MR. BLUMBERG:  Robb, if you can put up Plaintiff's

25 Exhibit 13 -- Stipulated 13, which is No. 1302.  Thank you.

YAKOLA - CROSS/BLUMBERG

Vol. 3 -   258

1   BY MR. BLUMBERG:

2   Q   Mr. Yakola, this is the September 7th, 2006, letter you

3   were discussing yesterday.  Mr. Yakola, you weren't personally

4   involved in the discussions that led up to this agreement,

5   correct?  You never spoke with FedEx in working out this

6   split, correct?

7   A   That's correct.

8   Q   Okay.  And you never spoke with anyone at Omni about

9   working out the split, correct?

10  A   No, sir.

11  Q   Okay.  That was something that William Doherty handled?

12  A   Correct, sir.

13  Q   Okay.  And William Doherty was the head of military

14  charters around this time period, 2006?

15  A   Yes, that's correct.

16  Q   Now, ATA, as you testified yesterday, paid commissions as

17  part of its membership in the FedEx team, correct?

18  A   That's correct.

19  Q   Okay.  And the commission is -- that's a percent of the

20  revenue that ATA earns using the points of the larger

21  carriers?

22  A   Yes, that's correct.

23  Q   And I think you testified yesterday that was a substantial

24  sum of money in the millions of dollars?

25  A   That's what I recall saying, yes.

Vol. 3 –  259

1   Q   Okay.  In fact, you testified that when your commission

2   went from 7 percent to 3.5 percent, that was very exciting;

3   that made a financial difference to ATA?

4   A   It went to 4 1/2 percent, I think.

5   Q   Seven to 4.5 percent?

6   A   Yes.

7   Q   Okay.  The commissions, they were enough money to get the

8   attention of the company's CFO; it's something you used for

9   your financial models, correct?

10  A   Yes, that's correct.

11  Q   Okay.  This letter doesn't say anything about the

12  commission that ATA is going to pay as being part of the FedEx

13  team?

14  A   Not this letter, no.

15  Q   Okay.  Is there any letter that says what the commission

16  will be for the FedEx team?

17  A   There is the Fee Agreement.

18  Q   The Fee Agreement?

19  A   Right.

20  Q   ATA still had to negotiate commissions each year as part

21  of the FedEx team, correct?

22  A   That's correct, yes.

23  Q   Okay.  And that commission, along with the split, would

24  then go into the Fee Agreement, correct?

25  A   Yes.  The commission would be part of the Fee Agreement,

YAKOLA - CROSS/BLUMBERG

Vol. 3 -   260

1  yes.

2          MR. BLUMBERG:  Robb, can you call up Plaintiff's

3  Stipulated 173, which is No. 7501.

4          Your Honor, this is a stipulated exhibit.  I move

5  its admission.

6          THE COURT:  Show it admitted.

7     (Plaintiff's Exhibit 173 was received in evidence.)

8          MR. BLUMBERG:  Robb, if you could just blow up the

9  title and the first paragraph of that.

10 BY MR. BLUMBERG:

11 Q    Mr. Yakola, do you recognize this document?

12 A    Yes, I do.

13 Q    Okay.  This is the Fee Agreement we're speaking about,

14 correct?

15 A    That's correct.

16          MR. BLUMBERG:  Okay.  Robb, if you could go --

17 actually, keep that for one second.

18 BY MR. BLUMBERG:

19 Q    It says, "This agreement is made and entered this 27th day

20 of September, 2007, between Federal Express," and then it goes

21 on to say, "and ATA Airlines, Inc."  So this is ATA's Fee

22 Agreement, correct?

23 A    Correct.

24 Q    Okay.  And this is the Fee Agreement -- it's the 27th day

25 of September, 2007, so this would be the Fee Agreement for

PANOLA - CROSS/BLUMBERG

Vol. 3 -  261

1  fiscal year 2008?

2  A   Yes.  That would be my understanding.

3          MR. BLUMBERG:  Robb, if you could go two more pages

4  to the Section 5 that says "fee."  I guess that would be

5  7503 -- I'm sorry, 7502.

6  BY MR. BLUMBERG:

7  Q   And down there we have something called fee.  And it

8  says -- the fee in little paragraph 1, it has your commission

9  rate there of 4.5 percent, correct?

10 A   That's correct.

11         MR. BLUMBERG:  Okay.  Then go to the next page,

12 Robb.

13 BY MR. BLUMBERG:

14 Q   Okay.  Little paragraph 2 also has the commission there

15 for a different category of flying, 4.5 percent, correct?

16 A   Correct.

17 Q   Okay.  Now go to little paragraph 4.  And it states that

18 ATA is entitled to 50 percent of the team's -- and I'll

19 summarize, but wide-body and narrow-body award, 50 percent of

20 the narrow-body expansion, and 50 percent of the residual

21 wide-body expansion after NWA -- and that's Northwest,

22 correct?

23 A   That's correct.

24 Q   -- has operated up to 10 flights a month, correct?

25 A   Yes.

PANOLA - CROSS/BLUMBERG

Vol. 3 -   262

1  Q   Okay.  So the amount of business that ATA is going to

2  receive for that fiscal year is also in the Fee Agreement,

3  correct?

4  A   Yes.  The split that is part of the Fee Agreement is in

5  here, yes.

6  Q   It's also in the fee?

7  A   Yes.

8          MR. BLUMBERG:  Robb, if you could go back to

9  Plaintiff's 13, which is 1302.  That's the September 7th

10  letter.

11 BY MR. BLUMBERG:

12 Q   This letter says it will serve as an agreement for

13 distribution between ATA and Omni, correct?

14 A   That's correct.

15 Q   Okay.  It doesn't say anything about what other airlines

16 would be on the teams in those years, correct?

17 A   That's right.  It just says ATA and Omni.

18 Q   Just says ATA and Omni.

19         So at the time this letter is signed, no determination

20 has been made yet on what other airlines might be on the FedEx

21 team or how many points the team might have?

22 A   I don't really understand your question.  I'm sorry.

23 Q   It doesn't say anything in this letter that Northwest is

24 going to be on the team, correct?

25 A   No, it doesn't.

1  Q   Okay.  It doesn't say anything in this letter that

2  Continental's going to give its points, correct?

3  A   No, that's correct.

4        MR. BLUMBERG:  Robb, if you could go to the

5  signature where it says "agreed" -- actually, third paragraph

6  -- sorry -- third sentence where it says "please."  Blow that

7  area up.

8  BY MR. BLUMBERG:

9  Q   "Please indicate your concurrence by signing as indicated

10  below and returning to the undersigned."  And there's a

11  signature for ATA, correct?

12  A   Yes, there is.

13  Q   No signature for Omni on this letter, correct?

14  A   There is not.

15  Q   Now, I think you testified yesterday that in your

16  experience, it was not -- you said it wasn't unusual to have

17  agreements signed.  I think you called it counterparts where

18  one signs one and one signs the other?

19  A   That's correct.

20  Q   Okay.  Have you ever seen or been provided with a letter

21  with Mr. Molinari's signature and a signature block for Omni

22  and something that shows that Omni signed for this letter?

23  A   I've seen an Omni letter that was signed for a three-year

24  agreement, yes.

25  Q   Have you seen this letter -- well, let me ask you that.

1  That letter that you saw, did you see it during the time you

2  were employed at ATA?

3  A   No, I didn't.

4  Q   Okay.

5  A   I saw it afterwards.

6  Q   For this letter, have you ever seen the September 6th

7  letter?  Have you ever seen a version signed by Gary Molinari

8  and signed by a representative of Omni Air?

9  A   No.  I have never seen this particular letter with a

10 signature with Omni in it.

11 Q   Okay.  Now, you said yesterday again that -- you said,

12 Well, that happens all the time because sometimes people sign

13 by counterpart, correct?

14 A   That's one of the reasons, yes.

15 Q   Okay.  And I think we looked at the Arrangement Agreement

16 as an example.

17        MR. BLUMBERG:  Robb, if you could call up

18 Defendant's Stipulated 12, No. 60.

19 BY MR. BLUMBERG:

20 Q   Mr. Yakola, I'll represent to you that's the Operating

21 Agreement we looked at yesterday.

22        MR. BLUMBERG:  Now, Robb, if you could go to page

23 65.  Okay.  And, Robb, if you could blow up the miscellaneous

24 section, Section E.

25

Vol. 3 -  265

1  BY MR. BLUMBERG:

2  Q   This says, "This agreement may be executed in

3  counterparts, each of which shall be an original, but all of

4  which shall constitute one agreement," correct?

5  A   That's what it says, yes.

6        MR. BLUMBERG:  Okay.  Now go back to Plaintiff's

7  13 -- I'm sorry -- which is No. 1302.

8  BY MR. BLUMBERG:

9  Q   That language doesn't appear on this letter, does it?

10  A   No, it doesn't.

11  Q   Now, you had testified that you were getting this letter

12  based on some discussions you were having with a company

13  called Cerberus Capital about a loan; is that correct?

14  A   That's what caused me to ask for a copy of the contract,

15  yes.

16  Q   Okay.  When you first asked for a copy of this letter, you

17  asked for a fully-executed letter, correct?

18  A   I asked for the agreement between FedEx and ATA for the

19  three-year split.

20  Q   You asked your people at ATA, including Bill Doherty and

21  Sean Frick, to see if they could acquire a fully-executed

22  letter, correct, one with all signatures?

23  A   I don't recall specifically if I asked for the exact

24  fully-executed letter, but what I did say is, "I need a copy

25  of this three-year agreement."

YAKOLA - CROSS/BLUMBERG

Vol. 3 - 266

1        Maybe I don't understand your question.  I'm sorry.

2  Q   Let me see if I can walk you through this.

3  A   Yes.

4        MR. BLUMBERG:  Robb, if you can put up Plaintiff's

5  Stipulated 15, which is No. 1308.

6  BY MR. BLUMBERG:

7  Q   Mr. Yakola, you're sending -- this is an e-mail --

8        MR. BLUMBERG:  If you could actually go down, Robb,

9  let me go to the bottom of the chain first.  I'm sorry.  That

10 page, blow up the four points there.  Actually, if you could

11 blow up the whole e-mail, Robb, including the -- yeah, that

12 section.  Go down.  That should be good.  Thank you.

13 BY MR. BLUMBERG:

14 Q   On September 11th, 2006, you are sending an e-mail to Eric

15 Miller, and he's the individual at Cerberus, correct?

16 A   That's correct, yeah.

17 Q   And you're telling him everything is in progress.  And,

18 No. 1, you say, "Need to get Omni to sign the letter (have

19 FedEx signature)."  Have I read that accurately?

20 A   Yes, you have.

21 Q   Okay.  The letter that's being referred to, that's the

22 September 6, 2007, letter we're talking about?

23 A   That's the one, yes.

24 Q   Okay.  And then three days later Mr. Miller is asking you

25 the status of the Omni letter and opening B/S.  I take it that

Vol. 3 -  267

1  would be balance sheet, B/S?

2  A   Yes, hopefully.

3  Q   Hopefully.

4       And "Omni letter," was it your understanding that he's

5  referring to the letter there in No. 1?

6  A   Yes.

7  Q   Yes, that's the letter he's referring to, the Omni letter?

8  A   Yes.

9       MR. BLUMBERG:  Robb, if you could put up Defendant's

10  Stipulated 51, which is 265, and you'll have to turn that one

11  around, I guess.

12  BY MR. BLUMBERG:

13  Q   And this chain then continues.  You --

14       MR. BLUMBERG:  If you go up, actually, Robb, to the

15  top of that e-mail, right there, thank you.

16  BY MR. BLUMBERG:

17  Q   So he's asked you about the status of the Omni letter.

18  You forward it to Sean Frick with a question mark.  And I

19  think yesterday you told us who Mr. Frick was, but can you

20  identify Mr. Frick again for us?

21  A   He was my vice president of finance.

22  Q   Okay.  So Mr. Miller has posed a question about the status

23  of the Omni letter, and you forward that to Mr. Frick with a

24  question mark, correct?

25  A   Yes.

1  Q   Okay.  And Mr. Frick then asks Mr. Doherty, "Any luck on

2  the FedEx countersignature on the Fee Agreement or Omni

3  sideletter."  Do you have an understanding what "Omni

4  sideletter" is referring to?

5  A   Yes.  It's the name that we gave to the three-year

6  agreement.

7  Q   Okay.  And at the -- you also personally asked Mr. Doherty

8  to follow up with FedEx and find out if you could get a fully

9  executed letter, correct?

10  A   Yeah.  I asked where Omni's signature was on the letter.

11  I did.

12  Q   Okay.  And after all these discussions, you never got back

13  a copy with Omni's signature, correct?  You have a three-party

14  letter, and you never got one with all three signatures,

15  correct?

16  A   No.  We figured we didn't need it.  We realized we didn't

17  need it after looking for it.

18  Q   You decided you didn't need it?

19  A   That's right.

20  Q   Okay.  You decided you didn't need it, but you had asked

21  several -- you made several efforts to try and get one,

22  correct?

23  A   I did.  I had --

24  Q   You had Bill Doherty call?

25  A   Yes.  I made several efforts, and I made several efforts

1  because I had a letter.  I didn't expect to get one with two

2  signature blocks, one for ATA and one for Omni, but we did.

3  So I took that -- I took that letter and said rather than give

4  it to Cerberus with an empty signature block, I don't want to

5  have to explain the counter parties and all that.  Let me just

6  see if I can get the Omni signature for a few days.  And

7  that's what I waited for.

8       And when we didn't get it, when we asked FedEx and it

9  didn't come, I said, well, I don't really need it.  So I'm

10  going to go ahead and let it go forward as it is with my team

11  leader and ATA saying they had a 50/50 split.

12       MR. BLUMBERG:  Robb, can you put up -- with the

13  Court's indulgence.  Robb, if you could put up Plaintiff's

14  Exhibit 5, which is No. 46.

15       I'm sorry, Your Honor.

16       I'm sorry, Plaintiff's Exhibit 5, which is No. 1288.

17  BY MR. BLUMBERG:

18  Q   Mr. Yakola, this is the letter from January 17th, 2003,

19  that you testified about yesterday, correct?

20  A   Yes.

21  Q   And this one is signed by both, correct?

22  A   It is.

23  Q   Okay.  Now, you are the CFO of ATA --

24  A   I was, yes.

25  Q   -- at that time when you were trying to get the letter

Vol. 3 —  270

1  with all three signatures on it, correct?

2  A   That's correct.

3  Q   Okay.  And you had asked to try and get a letter with all

4  three signatures, correct?

5  A   Yes, I did.

6  Q   And you said you decided that you didn't need it, correct?

7  A   Yes.

8  Q   Okay.  But you were not interested or curious or wanted to

9  find out why, having asked several times for a letter from

10  Omni, why in the world you couldn't get one?  It didn't

11  matter –– to you it didn't matter?

12  A   I'm not sure how to explain it.  I asked for it for

13  convenience sake so I could show Cerberus that there was an

14  empty signature block.  I had a signature.  But I knew that I

15  didn't have to have that signature.  I had the one from FedEx,

16  and I had our signature.  So to me, that was the contract I

17  needed.  That's what I explained to Mr. Miller.  He accepted

18  it.

19          MR. BLUMBERG:  Objection, Your Honor, hearsay.

20          THE COURT:  Overruled.  Go ahead.

21  BY MR. BLUMBERG:

22  Q   Did Mr. Doherty report back to you –– strike that.

23          I want to turn –– you testified yesterday about the

24  SEC statement that was filed, correct?

25  A   Yes, correct.

1  Q   Okay.  You said there was a mistake in there, correct?

2  A   Yes, there was.  Yes.

3        MR. BLUMBERG:  Robb, if you could call up

4  Defendant's Exhibit 83 -- I'm sorry -- which is No. 7527.

5  BY MR. BLUMBERG:

6  Q   Okay.  This is the Form 10 we were talking about -- you

7  were talking about yesterday?

8  A   Yes.

9  Q   Okay.  And a Form 10 is a securities registration,

10  correct?

11  A   It is, yes.

12  Q   Okay.  And that's something that you're going to make

13  securities available to the public, and you have to identify

14  all your material risks and your material information on which

15  an investor would rely, correct?

16  A   Yes, exactly.

17  Q   Okay.  And as CFO, your group, your organization had

18  responsibility for putting this together, correct?

19  A   Yes.  We provided the information to put it together, yes.

20  Q   Okay.  I think you testified about this yesterday, but I

21  don't think we actually looked at the language in here.

22        Oh, let me just talk about the process for a second.

23  You put together the information, and who did it get sent to?

24  A   We were using a law firm at the time, Cravath, Swaine &

25  Moore; and so we pulled together all the information we had to

1   and gave it to them to -- actually, it's ready to put it

2   together.

3   Q   Okay.  So you gave all the information to Cravath, Swaine

4   & Moore.

5   A   Yeah.

6   Q   Cravath, Swaine & Moore is a New York law firm?

7   A   Yes.

8   Q   Okay.  I think an Am Law Top 100 Law Firm?

9   A   I wouldn't know.

10   Q   Okay.  But a good law firm?

11   A   Yes.

12        MR. BLUMBERG:  Okay.  Rob, if you could go to page

13   7536 in this document.  Okay.  If you could blow up the first

14   paragraph.

15   BY MR. BLUMBERG:

16   Q   In this paragraph you're describing your contracts with

17   the AMC, correct, that first sentence?

18   A   Yes.  That's correct.

19   Q   Okay.  And the very last sentence says --

20        MR. BLUMBERG:  If you could highlight that, the very

21   last sentence starting "for government."

22   BY MR. BLUMBERG:

23   Q   It says, "For government fiscal year 2007, we have

24   contracted with the FedEx team to fly 50 percent of the team's

25   passenger entitlement requirements and expect to contract for

Vol. 3 -   273

1  the same percentage for government fiscal year 2008," correct?

2  A   Yes.  That's correct.  That's what it says.

3       MR. BLUMBERG:  And, Robb, if you could go to 75 --

4  BY MR. BLUMBERG:

5  Q   And so what you're saying in this disclosure is that you

6  have a contract for FY07 and that you expect a contract for

7  the same percentage in 2008, correct?

8  A   The same conservative language used throughout the

9  document, yes.

10  Q   You're not saying that's a mistake, are you?

11  A   No.  That's not a mistake.

12       MR. BLUMBERG:  And then if you go to 7537, the first

13  full paragraph under "military charter service," the last

14  sentence.

15  BY MR. BLUMBERG:

16  Q   Actually, here you're describing the Teaming Arrangements

17  in this paragraph, correct?

18  A   That's correct.

19  Q   And here you say for government fiscal year 2007, the

20  FedEx team has 38 percent of the entitlement points, and ATA

21  has contracted with the FedEx team to fly 50 percent of the

22  team's passenger entitlement points, correct?

23  A   For 2007, yes.

24  Q   And at this time -- this was filed in April of 2007 -- so

25  we're in fiscal year 2007?

1  A   Yeah.  We filed a couple of Form 10s, but I'm assuming

2  that was the one you're saying.

3  Q   This doesn't say anything about the contract you had --

4  the alleged contract you have for '08 or '09, correct?

5  A   No.  This just talks about '07.

6  Q   This just talks about '07.

7           MR. BLUMBERG:  And if we go to --

8  BY MR. BLUMBERG:

9  Q   And neither of those are inaccurate statements, correct?

10 That was not a mistake from a PowerPoint or anything like

11 that, correct?

12 A   No.  The way the sentence is is an accurate statement,

13 correct.

14 Q   And anywhere in this SEC Form 10 -- take a step back,

15 Mr. Yakola.  You testified that this alleged contract was the

16 deal that kept you on the FedEx team for three years?

17 A   I don't understand your question.

18 Q   I'm sorry.  The September 6th letter.

19 A   Yes.

20 Q   You're saying that's the deal that kept you on the FedEx

21 team for three years?

22 A   That's the three-year contract, yes.

23 Q   And anywhere in the SEC Form 10, did you report that you

24 had a three-year contract to be on the FedEx team through

25 FY09?

1           MR. BROUGHTON:  Objection, foundation.  This is not

2  a document from ATA.

3           MR. BLUMBERG:  I think the witness testified he had

4  personal knowledge and assisted in putting it together.

5           THE COURT:  Rephrase your question.

6  BY MR. BLUMBERG:

7  Q   This alleged three-year contract that you had on the FedEx

8  team for FY09, was that something that was material to ATA?

9  A   Of course, it was, yes.

10 Q   Mr. Yakola, I want to turn to -- you testified yesterday

11 about the ATA -- or ATA's parent's acquisition of World and

12 North American.  I want to ask you a few questions about that.

13          MR. BLUMBERG:  Robb, if you could put up stipulated

14 Exhibit 94 -- I'm sorry.  Number is 498.

15 BY MR. BLUMBERG:

16 Q   Mr. Yakola, I know you spent some time yesterday on

17 minutes of the board of directors of Global Aero Logistics.

18 These are minutes from the August 28, 2007 meeting.

19          MR. BLUMBERG:  Can we go to page, Robb, 505 of these

20 minutes?

21 BY MR. BLUMBERG:

22 Q   And following the acquisition, Mr. Yakola, this was the

23 resulting structure, correct?

24 A   That's correct.

25 Q   And ATA Airlines here, at that point it's on the FedEx

Vol. 3 -  276

1  team, correct?

2  A   Yes, it is.

3  Q   And North American here participated on the Alliance Team,

4  correct, and World Airways?

5  A   World Airways also participated on the Alliance Team,

6  right.

7  Q   I think you said that one of the responsibilities that you

8  had after the merger in moving into your new position was

9  dealing with synergies, correct?

10  A   Yes.

11  Q   Synergies.  That's, I guess, where they put the airlines

12  together, save overhead, and make them more profitable?

13  A   Bulk purchasing, that sort of thing.

14  Q   I want to ask you some questions about one of those

15  synergies.

16         MR. BLUMBERG:  I want to do Plaintiff's Exhibit 75,

17  which is 1820.  I think we had previously objected to this

18  exhibit, but we're going to withdraw our objection.

19         THE COURT:  All right.

20         MR. BLUMBERG:  If you could blow this up, Robb, the

21  top part.

22  BY MR. BLUMBERG:

23  Q   The top of this has an e-mail from an individual named

24  Andrew Wiseman.  Who is Mr. Wiseman?  It says

25  "imperialcapital.com."  Maybe that will be of some assistance

Vol. 3 —   277

 1  to you.

 2  A    Imperial was at one point helping us with some of the

 3  financing, and this was during the time when we were looking

 4  at the acquisition of World and North American as the parent.

 5  Q    Actually, if you look at the e-mail below, it looks like

 6  there's some documents being forwarded here, one called a

 7  Goldman Supplement, a Project Hugo Financial Model, but the

 8  third one is called Seabury Group, Review of GAL Merger

 9  Operating Economics.  You see where I'm looking there?

10  A    Yes, I do.

11  Q    I want to ask you some questions about that document.

12            MR. BLUMBERG:  Robb, if you could go to 1844.

13  BY MR. BLUMBERG:

14  Q    This review of GAL Merger Operating Economics, that's a

15  document that you were provided as part of this attachment?

16  A    Okay, yes.

17            MR. BROUGHTON:  May I ask a question, please?  Is

18  this an exhibit?

19            MR. BLUMBERG:  Yes.  That's the way you put it

20  together, Exhibit 75.

21            MR. BROUGHTON:  Okay.

22  BY MR. BLUMBERG:

23  Q    This is the cover page.  I just wanted to orient you.

24            MR. BLUMBERG:  Robb, if you could go to 1856.  Turn

25  that to the side.  And if you could blow up the first --

MANGLA - CROSS/BLUMBERG

1  BY MR. BLUMBERG:

2  Q    In the top it says "Synergy Item Description."  And these

3  are -- I wanted to ask you about this synergy.  It's called

4  Recapture of Omni Spill.

5        MR. BLUMBERG:  Robb, if you could blow up the

6  "description impact" section.

7  BY MR. BLUMBERG:

8  Q   It says here, "The larger heavy fleet at World" -- and I

9  assume "World" refers to World Airways?

10 A    Yes.

11 Q    And World Airways is on the Alliance Team?

12 A    Yes, it is.

13 Q    "Will allow it to earn an additional 27.5 million in AMC

14 revenues which it presently hands over to competitors, i.e.,

15 Omni, due to lack of aircraft availability.  The additional

16 revenue is expected to require an additional 1440 hours."

17       Have I read that correctly?

18 A    Yes, you have.

19 Q    And then below it shows some revenue numbers that could be

20 recaptured from Omni, correct?

21 A    Yes.

22 Q    And Omni is on the FedEx team, correct?

23 A    Correct.

24 Q    I think you also testified the way this --

25       MR. BLUMBERG:  Robb, you can take that down.

Vol. 3 -  279

1  BY MR. BLUMBERG:

2  Q   I think you testified that the way the structure was set

3  up, that ATA would never be sort of on both sides of the

4  transaction, never -- or that GAL wouldn't be working in such

5  a way to take business from one team, push it to another team,

6  that kind of thing?

7  A   Each airline was operating separately, yes.

8  Q   Do you know who Robert Binns is?

9  A   Yes, I do.

10 Q   Who is Mr. Binns?

11 A   He was the -- at the time, at the time of this or --

12 because he had several positions.

13 Q   Okay.

14     How about in late 2007, early 2008?

15 A   He was -- he worked for World Air Holdings as their Chief

16 Marketing Officer.

17 Q   Isn't it true that he also was -- once the GAL structure

18 went into place, that he was also the Chief Marketing Officer

19 for GAL?

20 A   Yes.  Then he became that for the parent company, yes.

21 Q   Once the acquisition took place in August of 2007, he

22 became Chief Marketing Officer for the parent GAL?

23 A   Correct.

24 Q   Do you know an individual named Dennis Kemery?  Does that

25 name ring any bells?

1  A   No.

2       MR. BLUMBERG:  Robb, if you could put up Stipulated

3  Defendant's 124, which is 769 -- I'm sorry -- 679.  And if you

4  could blow up the middle e-mail here.

5  BY MR. BLUMBERG:

6  Q   You do know who Mr. Binns is, correct?

7  A   Yes, I do.

8       MR. BLUMBERG:  Robb, if you could blow up the

9  sentence that says "on another issue."

10  BY MR. BLUMBERG:

11  Q   Mr. Binns said he's the Chief Marketing Officer for the

12  parent, correct?

13  A   Correct.

14  Q   He's e-mailing an individual named Dennis Kemery, and he's

15  saying, "On another issue, as FedEx is making an offer to

16  Delta to join their team" -- let me stop right there.

17       Did you have an understanding in or around this time

18  of what team Delta was on?

19  A   Delta was on the Alliance Team, yes.

20  Q   So it says, "As FedEx is making an offer to have Delta

21  join their team."  Mr. Binns goes ahead and says, "Why don't

22  we have Dennis reach out to NW?"  That's Northwest?

23  A   Northwest and Continental, yes.

24  Q   Northwest is on the FedEx team --

25  A   Yes, it is.

MANGLA  CROSS/BLUMBERG

Vol. 3 -  281

1  Q  -- at this point, and Continental gave its points to the

2  FedEx team?

3  A  Not completely -- I don't really recall.

4  Q  You don't recall?

5  A  Yeah.  I wouldn't be surprised.

6  Q  So here Mr. Binns is suggesting to an individual named

7  Dennis Kemery or suggesting to a group of individuals, why

8  don't we have Dennis reach out to Northwest and Continental to

9  see if there's interest, correct?

10  A  That's what he's saying, yeah.

11  Q  Okay.  Now, I want to talk about one or the other --

12        MR. BLUMBERG:  Robb, you can take that down.

13  BY MR. BLUMBERG:

14  Q  I want to talk about one of the other synergies involved

15  in the merger.  I think you gave some testimony yesterday

16  about ATA acquiring some DC10 aircraft?

17  A  Correct.

18  Q  Okay.  But, in fact, after the acquisition, the plan was

19  to send some of those planes over to World, correct?

20  A  Yeah, there were several plans; but that's eventually what

21  happened is some of those airplanes went over to World.

22  Q  And the thinking was could have been as many as five,

23  could have been as few as three; and you were debating how

24  many of these planes would be sent over to World?

25  A  Yes, we were, for a period of time, yes.

Vol. 3 -  282

1  Q   And World is on the Alliance Team?

2  A   Yes.

3  Q   Now, in your direct testimony yesterday, one of the things

4  that you discussed with ATA's attorney was in 2008 Northwest

5  coming in and doing some flying, correct, becoming a flier, as

6  opposed to just a points contributor?

7  A   Correct, yes.

8  Q   And you described how -- you said parties modify their

9  agreements all the time?

10  A   Yeah.  They're free to, yes.

11  Q   Okay.  And when Northwest came in and wanted to do some

12  flying, the document that was modified was the Fee Agreement,

13  correct?

14  A   That's correct, yes.

15  Q   Now, in January -- now turning to January 22nd, 2008, that

16  was the date that ATA was notified that it would not be part

17  of the bid for the FY09 contract, correct?

18  A   That's correct.

19          MR. BLUMBERG:  Okay.  Robb, if you could put up

20  Plaintiff's 2, which is No. 1282.

21  BY MR. BLUMBERG:

22  Q   This is the letter you -- this is the letter that was sent

23  to ATA, correct?

24  A   Yes, it is.

25  Q   Okay.  I don't know if in your testimony yesterday that

Vol. 3 -   283

1  this individual, Mr. Gary Ellmer, was discussed, but who's

2  Gary Ellmer?

3  A   Gary was the chief operating officer of ATA during this

4  period of time before I took over.

5  Q   Okay.  And so when you said you went back to ATA, you took

6  over for Gary Ellmer?

7  A   That's correct.

8  Q   Do you know what happened to Mr. Ellmer?

9  A   He left the company.  So he went back -- he's doing other

10  work now.

11  Q   Do you know why he left?

12  A   He was asked to leave, but I don't -- I'm not sure of all

13  the reasons why.  That was between him and the CEO.

14  Q   Okay.  At that time you were at Global?

15  A   That's correct.

16  Q   The letter --

17       MR. BLUMBERG:  Robb, if you could highlight the

18  first paragraph.

19  BY MR. BLUMBERG:

20  Q   This is where ATA is informed that it wouldn't be part of

21  the Contractor Teaming Arrangement for the FY09 long-range

22  contract, correct?

23  A   Yes.  That's what it says.

24  Q   The next sentence says, "Commitments and all activity for

25  FY08 will continue to proceed as contracted," correct?

Vol. 3 —   284

1   A   That's what it says.

2   Q   Okay.  Now, at the time that this letter was sent, ATA had

3   signed its Arrangement Agreement for FY08, correct?  For FY08.

4   A   The —— oh, the Arrangement Agreement, yes, yes.

5   Q   Yes.  It had signed its Operating Agreement for FY08?

6   A   That's correct.

7   Q   And it had signed the Fee Agreement for FY08?

8   A   That's correct.

9   Q   But at this time, January 22, 2008, it had not yet signed

10   an Arrangement Agreement for '09, correct?

11           MR. BROUGHTON:  Objection, foundation.

12           THE COURT:  Overruled.  If he knows.

13   A   I don't believe it had, no.

14   BY MR. BLUMBERG:

15   Q   Okay.  What about an Operating Agreement for FY09?

16   A   Not an Operating Agreement, no.

17   Q   Or a Fee Agreement for FY09?

18   A   No.

19   Q   Now, the next sentence says, "All commitments and activity

20   for FY08 will continue to proceed as contracted," correct?

21   A   That's what it says, yes.

22   Q   Okay.  And as I just asked you before, all those three

23   agreements for FY08 had all been signed by ATA and by FedEx,

24   correct:  The Arrangement Agreement, Operating Agreement, and

25   Fee Agreement?

MANGLA - CROSS / BLOMBERG

1  A   For FY08, yes.

2  Q   For FY08.

3       And you understood, based on this letter, that ATA was

4  still part of the FY08 team, correct?

5  A   Yes.

6  Q   Okay.  And ATA was entitled to keep flying through the end

7  of FY09?

8  A   Through the end of FY09, yes.

9  Q   I'm sorry.  Based on this letter that ATA was still

10 entitled to keep flying through the end of FY08?

11 A   No.  I agree with the first thing.  Through FY09 is when

12 we were entitled to fly to.

13 Q   I'm asking based on this letter.  It says, "Commitments

14 and all activity for FY08 will continue to proceed as

15 contracted."  I think you testified before the first paragraph

16 was telling you you weren't going to be part of the FY09 bid,

17 correct?

18 A   Yes, the letter says that.  It's different than what

19 you're asking me, which is we're entitled to fly through FY09.

20 Q   Let me rephrase my question.

21 A   Okay.

22 Q   I'm sorry if I put the wrong fiscal year.

23      But when you got this letter and it said, "Commitments

24 and all activity for FY08 will continue to proceed as

25 contracted," FedEx wasn't saying you can't fly tomorrow; you

Vol. 3 -  286

1  can't fly Tuesday; you can't fly in February of '08, correct?

2  A   That's correct.

3  Q   It was saying you can fly in February of '08, March of

4  '08, correct?

5  A   FedEx was saying that we could continue to fly for FY08,

6  that's correct.

7  Q   All the way through September 30th?

8  A   That's what this letter says.

9  Q   And after you got this letter, after ATA got this letter,

10  in fact, it did fly in January of 2008, correct?

11  A   Yes, it did.

12  Q   And it flew in February of 2008?

13  A   Yes, it did.

14  Q   Okay.  Now, even before -- as you testified in some detail

15  yesterday, even before ATA received this letter, the company

16  overall was losing money, correct?

17  A   Yeah.  When you included this scheduled service business,

18  yes, it was losing money.

19         MR. BLUMBERG:  Robb, if you could call up Stipulated

20  Plaintiff's 97 -- I'm sorry -- which is No. 2039.

21  BY MR. BLUMBERG:

22  Q   Mr. Yakola, let me ask you if you recognize this document.

23  A   It's the year-end income statement for ATA Airlines.

24  Q   Okay.  And as you can see under the income statement, it

25  says what the revenues are, the expenses are, gives you an

1  operating income --

2  A   With scheduled service and military combined, yes.

3  Q   Yes, this is for scheduled service.  So combined when you

4  take together military and scheduled service for -- and this

5  is calendar 2007, correct?

6  A   Yes, December 31, yes.

7  Q   For calendar 2007 ATA lost $97.2 million, according to

8  this balance sheet?

9  A   This income statement, yes.

10 Q   Okay.  And I think you described some of the factors that

11 were contributing to this, including the price of fuel --

12 A   Yes.

13 Q   -- was going up?

14 A   Yes.

15 Q   Overcapacity generally in the airline industry was an

16 issue?

17 A   Yes, it was.

18 Q   Okay.  And there were problems with the codeshare you had

19 entered into with Southwest?  That hadn't quite -- it wasn't

20 quite turning out to be as profitable as you'd anticipated

21 when you'd entered into it?

22 A   Yeah, I wouldn't characterize it as problems.  We were

23 pushing for more codesharing between us and Southwest, yes.

24 Q   Okay.  And so with the losses in scheduled service and the

25 military and overall losses, this was causing the cash balance

MANGLA - CROSS/BLUMBERG

Vol. 3 -  288

1  of ATA to go down, correct?

2  A   That's correct, yes.

3  Q   And this is before FedEx's notification about FY09 team

4  membership, correct?

5  A   That's correct, yes.

6  Q   Okay.  In fact, before FedEx's decision, ATA was receiving

7  money from the parent in order to keep its cash going,

8  correct?

9  A   Yes.  The parent was funding down to ATA, yes.

10  Q   Okay.  And in addition to the parent, some of the other

11  sister airlines, such as World, were also providing cash to

12  ATA?

13  A   Yes.  One of those transactions was one airline to the

14  other.

15  Q   Okay.  And, again, this was before -- this was all

16  occurring even before January 22nd, 2008, correct?

17  A   I'm not sure if the airline one happened before, but it

18  was all around that time, yeah.

19  Q   As far as the finances of ATA around that time period, I

20  actually want to ask you one --

21          MR. BLUMBERG:  I'm sorry.  Am I too fast for you?

22          THE COURT REPORTER:  Please slow down a little bit.

23          MR. BLUMBERG:  Sorry, and I'm sorry for you all,

24  too, if I'm --

25          I want to -- Robb, if you could turn to FedEx

1   Stipulated 164, which is page 1061.

2   BY MR. BLUMBERG:

3   Q   Okay.  We've spent a lot of time with board minutes from

4   Global Aero Logistics, and these are some minutes from the

5   February 5th, 2008, board meeting.

6          MR. BLUMBERG:  Robb, if you could go to 1063, and if

7   you could blow up that paragraph.  Thank you.

8   BY MR. BLUMBERG:

9   Q   There's a paragraph here called near-term work streams.

10          MR. BLUMBERG:  Robb, if you could blow up that

11   second paragraph -- I'm sorry -- the second sentence.

12   BY MR. BLUMBERG:

13   Q   It says, "Messrs. McDonald and Yakola are tasked with

14   restoring operational stability at ATA to minimize the loss of

15   revenue impact of being on AMC penalty."  Did I read that

16   correctly?

17   A   Yes, you did.

18   Q   Okay.  AMC penalty, let me talk about that for a moment.

19   Airlines like ATA are supposed to have a certain reliability

20   rate as far as doing their missions?

21   A   That's correct, 85 percent.

22   Q   85 percent.

23          And if you don't hit the 85 percent level, you go on

24   what's called -- you take an AMC penalty, correct?

25   A   We call it the penalty box.

MANOLA - CROSS/BLOMBERG

Vol. 3 -  290

1  Q   The penalty box.  That was my very next question.

2       And the consequence for being in the penalty box is a

3  2-percent reduction in the revenues you get back?

4  A   That's correct.

5  Q   Okay.  But no reduction on the cost side?

6  A   No.  That's correct.

7  Q   Okay.  And there's also the possibility of going into

8  something called the last use list?

9  A   Yes.

10  Q   Okay.  So around this time, February 2008, in addition to

11  the other factors that you testified about yesterday, ATA is

12  also facing a loss of revenue that's significant enough that

13  you and Mr. McDonald have been tasked with restoring

14  operational stability, correct?

15  A   Part of bringing the DC10s onto the fleet, there's typical

16  issues you have with them; and we were feeling those issues.

17  Q   So that was impacting -- that was another impact to your

18  revenues at this time?

19  A   Yes.

20  Q   Okay.  Another thing you testified about yesterday were

21  ATA's designs as far as scheduled service, the scheduled

22  service segment?

23  A   Yes.

24  Q   Okay.  And you talked about the possibility of shutting

25  down scheduled service?

YAKOLA - CROSS/BLUMBERG

Vol. 3 -  291

1    A    That was a possibility, yes.

2          MR. BLUMBERG:  Okay.  Robb, if you could call up

3    Plaintiff's 93, which is document 2025.  If you could blow up

4    that e-mail just a little bit for the jury.

5    BY MR. BLUMBERG:

6    Q    The shutdown of scheduled service, did that ever go by the

7    name Project Thatcher?

8    A    Yes, it did.

9    Q    Okay.  I can't recall if that name came across yesterday.

10   And so this e-mail here is a look at Project Thatcher from

11   December 18th of 2007, correct?

12   A    Yes, it is.

13   Q    Okay.  And that's before receipt of the FedEx letter

14   regarding the FY09 bid, correct?

15   A    That's correct.

16          MR. BLUMBERG:  Okay.  Robb, if you could turn to

17   2031.

18   BY MR. BLUMBERG:

19   Q    Mr. Yakola, I think I've heard it described this way; and

20   I can't recall if it was from you or someone else from ATA but

21   that shutting down a segment of a whole airline isn't like

22   shutting off a light switch.  There were costs associated with

23   doing a shutdown, correct?

24   A    Yes, there is.

25   Q    And prior to receipt of this letter, ATA had estimated

MANOLA   CROSS/BLOMBERG

Vol. 3 —   292

1  what those costs might be, correct?

2  A   Yes.   A shutdown was one of the contingency plans we had.

3  Q   Okay.   And here the costs were estimated anywhere

4  between —— I think that's 51 and $63 million, correct?

5  A   That was the —— yeah, the initial estimate for this, yes.

6  Q   And then, in addition, during the time it takes to get you

7  to when you can accomplish shutdown, ATA would continue to

8  lose cash, and that's that cash burn line.   I'm sorry.   The

9  next line.

10  A   Cash burn through shutdown, yeah, that line is —— it's not

11  just operating losses, but there's other costs that you're

12  going through if you have to shut down a piece of your

13  business.

14  Q   The cash that's going out the door, cash burn?

15  A   Correct.

16  Q   And so the estimated total here was 66 to $88 million,

17  correct?

18  A   That was the preliminary shutdown cost estimate, yes.

19  Q   And I think yesterday you testified that as a result of

20  the shutdown —— or when ATA closed up, that people lost their

21  jobs, correct, when ATA closed?

22  A   Yes.

23  Q   But if you're going to shut down scheduled service, that

24  was also going to result in job losses, correct?

25  A   That's correct.   The whole point of this slide is the

1  bottom bullet point, though, that says we needed to drive

2  towards a merger and acquisition solution.

3  Q    If you could get one?

4  A    Yeah, if we can get one.

5  Q    If you could get one.

6         And, in fact, the issues -- as you testified

7  yesterday, the issues that ATA was facing was affecting a lot

8  of the airline industry at that time.  Fuel, correct?  That

9  wasn't unique?

10 A    Fuel was affecting everybody.

11        MR. BLUMBERG:  Okay.  Robb, if you could take this

12 slide down.

13 BY MR. BLUMBERG:

14 Q    I also want to ask you a few questions about your

15 testimony yesterday.  You said that ATA, when it learned of

16 FedEx's decision, that it explored doing a Teaming Arrangement

17 with UPS, correct, joining the UPS team?

18 A    Yes.

19 Q    You did receive an offer from UPS, correct?

20 A    We received two offers from UPS.

21 Q    You received two offers?

22 A    The second offer was the one that didn't work, yeah.

23 Q    You received two different offers from UPS?

24 A    We received an original -- well, we were working on an

25 original offer.  Then all of a sudden it changed to an offer

YAKOLA - CROSS/BLUMBERG

Vol. 3 - 294

1  that didn't work.

2  Q   Well, how many offers, actual offers did you get from UPS?

3  Not discussions, how many offers did you get from UPS?

4  A   We got one offer from UPS, if you characterize it that

5  way, yeah.

6        MR. BLUMBERG:  Okay.  Robb, if you could put up, I

7  think, FedEx Stipulated 173, which is 1150.

8  BY MR. BLUMBERG:

9  Q   I think you may have reviewed some of these board minutes

10  yesterday with Mr. Broughton when you were talking about the

11  UPS offer.  I want to take you to a part of these board

12  minutes that may not have been discussed yesterday.

13        MR. BLUMBERG:  If you could go to 1156, and if you

14  could turn that.  Actually, Robb, if you could go back to that

15  earlier page first.  Thank you.  Robb, if you could blow up

16  the bottom paragraph there.

17        Okay.  Starting with Mr. Karnick, if you could

18  highlight all the way up where his bulletin -- one, two,

19  three.  Thank you.

20  BY MR. BLUMBERG:

21  Q   This paragraph, Mr. Yakola, says that, you know,

22  Mr. Karnick -- and this is Subodh Karnick, correct?

23  A   Subodh Karnick.

24  Q   I don't think we've talked about him today, not since

25  yesterday.  Can you just explain who Mr. Karnick is again?

Vol. 3 -   295

1   A   He is the CEO of the parent company, of Global Aero

2   Logistics.

3   Q   And so at this point in March of 2008, management is

4   looking at three scenarios concerning ATA.   The first is a

5   100-percent liquidation of ATA with or without a Project Surf

6   deal, and that's ATA shutting down, correct?

7   A   The Project Surf deal was we were in advance discussions

8   with Aloha to sell the scheduled service business.   So what

9   they're saying is as far as ATA was concerned, they would be

10   out of the scheduled service business, but it might be sold

11   with planes and employees and all that versus just simply shut

12   down.

13   Q   What happened to Aloha Airlines?

14   A   We eventually couldn't get to a deal with them because of

15   aircraft lessors.

16   Q   What happened to the airline itself?

17   A   They shut down --

18   Q   Around the same time?

19   A   -- around the same time, yes.

20   Q   The second is a wind-down of all of ATA's scheduled

21   service operations while maintaining the FY2009 AMC business

22   either on the UPS team or as an independent.   So under this

23   scenario, ATA flies on the FedEx team through 2008 -- through

24   FY2008, correct?

25   A   That's correct.

1  Q   You couldn't switch to the UPS team in the middle of a

2  contract year, correct?

3  A   That's correct.

4  Q   Okay.  And so you either join the UPS team in 2009 or fly

5  independent in 2009, correct?

6  A   Yeah, that was the Option No. 2, yes.

7  Q   Nothing requires an airline to be on a team, correct?

8  A   Other than the three-year agreement.

9  Q   No, I mean in general.  You don't have to join a team

10 to -- an airline in general doesn't have to be on a team to be

11 part of CRAF?

12 A   No.

13 Q   There are independents?

14 A   Yes.

15 Q   And then the third is 100-percent liquidation of ATA but

16 moving some of the aircraft to North American and World,

17 correct?

18 A   Yes.

19 Q   Okay.  There is the third team or the third team called

20 the Alliance Team, correct?

21 A   Yes.

22 Q   And that's the largest team, isn't it?

23 A   It is.

24 Q   Okay.  And the Alliance Team -- there's no Option 4 here.

25 There's nothing about joining the Alliance Team, correct?

1   A    That was looked at previously but wasn't an option by this

2   point.

3   Q    Well, the reason that it wasn't an option was because

4   ATA's parent already had two airlines on the Alliance Team,

5   and so you would be essentially eating from the same pie?

6   A    Well, the two airlines, they were flying their full

7   entitlement, so there was no room for a third flier on that

8   team unless there was going to be a lot more entitlement that

9   came.

10  Q    It's your testimony it wasn't just the problem that it

11  split the pie into smaller pieces?

12  A    Yes.  Because there was no entitlement, that's what you

13  would -- if you put a third flier with the same level of

14  flying, everyone would get a smaller piece of the pie.  That's

15  the effect of what would happen.

16          MR. BLUMBERG:  So now looking at these three

17  options, now, Robb, if you could turn to 1156 again.  Turn to

18  the first paragraph on the executive summary.

19  BY MR. BLUMBERG:

20  Q    It says, "The best solution on a free cash flow basis is

21  the World/North American standalone," correct?

22  A    Yes.

23  Q    Okay.  So the one that generates the most money is

24  shutting down ATA.  But the next paragraph given to the board

25  says, "However, other likely alternatives, ATA independent or

KARNICK   CROSS/BLUMBERG

Vol. 3 -   298

1   UPS team, do generate adequate cash flows."  That's what was

2   reported to the board on that day, correct?

3   A   What was the date of this one, again?

4   Q   I'm sorry.  March 5, 2008.

5   A   Yes.  At that time, March 15th, UPS was still an option

6   that was in discussion.

7   Q   Okay.  You only got one offer from the UPS team?

8   A   That's correct.

9   Q   And this is the one?

10   A   I don't know that we had gotten that offer at this point.

11   That was why I was asking about the date.

12          MR. BLUMBERG:  Okay.  Robb, if you can go back a

13   page -- actually, go back to the first page of this document.

14   Go to 1151, Paragraph 2, where it says, "ATA strategic

15   options."  If you can go to the third paragraph there.

16   BY MR. BLUMBERG:

17   Q   It says, "Mr. Karnick reported that UPS was willing to

18   accept ATA on its team for FY09 but with only a 40-percent

19   share."

20          So this is the offer we were talking about, correct?

21   A   Yes, yes, exactly.

22   Q   Do you know an individual named Jeff Sanborn?

23   A   Yes, I do.

24   Q   Who is Mr. Sanborn?

25   A   He was also working in marketing in the parent company in

1   Global Aero Logistics.

2           MR. BLUMBERG:  Okay.  Just a second.  I want to put

3   up an exhibit, but I want to make sure it's been stipulated

4   to.

5           Your Honor -- Robb, if you could put up Stipulated

6   160, which is 1501.  If you could just blow up the header,

7   thank you.

8   BY MR. BLUMBERG:

9   Q   This is an e-mail from Mr. Sanborn to Subodh Karnick, who

10  was, I think we established a second ago, was involved in

11  working with the UPS offer, correct?

12  A   Yes.

13  Q   Okay.  And if you go to the paragraph, Mr. Sanborn is

14  saying to Mr. Binns, "I've added a second worksheet to the UPS

15  analysis to estimate the amount of revenue that might move to

16  the Alliance Team, assuming a complete shutdown of ATA,"

17  correct -- I'm sorry -- "that might move to the Alliance Team,

18  assuming a complete shutdown of ATA."  Do you see where I'm

19  reading, the first sentence?

20  A   Yes.

21  Q   Okay.  He says, "Realizing under the scenario, the FedEx

22  team is entitled to 100 percent of ATA's planned 2008

23  revenues.  Any spill to other teams is dependent on the number

24  of additional aircraft committed to FedEx to carry ATA's

25  revenues"?

1   A    Yeah.  Probably better said in the next sentence, yeah.

2   Q    Okay.  So basically what Mr. Sanborn is saying here is,

3   Okay, if ATA is gone, there's business that may not get flown

4   at that point, correct?

5   A    Yes.  He is part of the parent company, and he's looking

6   at what's going to be the effect if ATA is gone.  That's

7   typical.

8   Q    So if ATA -- and he goes on to say that if ATA closes

9   down, some of its business could get spilled back to the

10  Alliance Team, correct?

11  A    That would be an effect.  If FedEx couldn't fly off --

12  with their remaining fliers fly off all their entitlement.

13  Q    Okay.  So part of the analysis of what to do with ATA is,

14  Well, if ATA goes down, at least some of that, the parent will

15  get back through spill?

16  A    Mr. Sanborn is pointing out something that's clear, that

17  if ATA, as a major flier in the FedEx team, doesn't fly and

18  FedEx can't fly all that, that it does get spilled to the

19  Alliance Team.

20  Q    Right.  So the parent still may get some of the business

21  back, even though ATA doesn't get --

22  A    If FedEx can't find Northwest or another flier to pick it

23  up, yes.

24          MR. BLUMBERG:  Okay.  Robb, if you could put up

25  Plaintiff's Stipulated 131 -- I'm sorry -- which is 2317.

YAKOLA - CROSS/BLUMBERG

Vol. 3 -  301

1  BY MR. BLUMBERG:

2  Q   Mr. Yakola, I want to turn to one more topic, which is

3  ATA's shutdown in 2008, the decision to close the airline.

4  A   Yes.

5  Q   Okay.  These are the March 30, 2008, board minutes,

6  correct?

7  A   Yes, they are.

8  Q   Okay.  I believe if you go to the first paragraph, you

9  were present at this board meeting?

10          MR. BLUMBERG:  Let's just blow up the first.

11          THE WITNESS:  I was.

12          MR. BLUMBERG:  Okay.  And, Rob, if you could go to

13  2320.  And if you go to the first full paragraph, which is

14  No. 8, "Shutdown plan:  Timing, passengers."

15          THE WITNESS:  Mr. Blumberg, I'm sorry.  I may have

16  misspoke.  Can you go back to the first page?  I may not have

17  been at this board meeting.

18  BY MR. BLUMBERG:

19  Q   Actually, I can go back, but, I think, based on this

20  paragraph, let me just ask you the question another way.  This

21  read that Mr. McDonald reported that based on discussions with

22  you --

23  A   Yeah.

24  Q   So let me talk about those discussions you had with

25  Mr. McDonald.

MANOLA   CROSS/BLOMBERG

Vol. 3 -   302

1    You reported to Mr. McDonald in sometime around

2   March 30, 2008, that ATA needed large cash infusions to stay

3   in business beyond the week, correct?

4   A   Given where we were after being kicked off the FedEx team,

5   yes.

6   Q   Well, at this time in March of -- I'm sorry -- March 30th

7   of 2008, you're still flying on the FedEx team at this point?

8   A   Yes.

9   Q   So you're still earning the revenue from the FedEx team?

10   The money is still coming in?

11   A   Yes.

12   Q   In fact, it takes, I think, some time, a week or 10 days

13   or so for the money for missions you flew in the past to

14   actually get to ATA's bank account, correct?

15   A   Yes, it's true.  Also, by March 30th, this time, we were

16   not accepting AMC missions because of the reality that this

17   contingency plan was going to happen.

18   Q   So if I understand your testimony correctly, as of

19   March 30th, 2008, you're saying that the military side of the

20   revenues had changed?

21   A   The -- there was about a 30 day -- within 30 days, we

22   would get paid by -- for the military flights we were doing.

23   So the cash we were receiving at that moment hadn't changed,

24   but the cash we were going to be receiving two weeks down the

25   road or three weeks down the road was going to change

Vol. 3 -   303

1  dramatically.

2  Q   But we're talking right now about what's going on at this

3  point in time.  At that point, you couldn't even maintain

4  operations for another week without large infusions of cash,

5  correct?

6  A   Yes.  I mean, my point was -- and this is obviously

7  paraphrased, but my point to Charlie, that I made to him, was

8  revenues are going to go down because of AMC, and costs are

9  obviously still up because of scheduled service.  So given our

10  cash situation, we weren't going to be able to maintain much

11  longer.

12  Q   But at this point in time, you're still part of the FedEx

13  team, and you're still earning the military revenues, but your

14  cash is continuing to go down, correct?

15  A   Yes, it is.

16  Q   Okay.  And prior to this time, in fact, ATA was receiving

17  cash from the parent and the other holding companies, correct?

18  A   Prior to this it had been, yes.

19  Q   And you actually asked the parent around this time to

20  continue to provide funds, correct?

21  A   Yes, I did.

22  Q   And the parent did not do so, correct?

23  A   That's correct.

24  Q   And, Mr. Yakola, you testified yesterday that as a result

25  of ATA's shutdown, you said no military personnel were

YAKOLA - CROSS/BLUMBERG

Vol. 3 -   304

1  stranded?

2  A    That's correct.  I said I did not strand any military

3  troops.

4  Q    Mr. Yakola, let me ask this another way.  Did every ATA

5  mission that it had signed up for, that it had bid and been

6  accepted, did all those fly?

7  A    Yes, they did.

8  Q    Okay.  Mr. Yakola, do you recall my taking your deposition

9  in -- on August 12, 2009?

10 A    Yes.

11 Q    I think we discussed previously before the jury came in it

12 was in a hotel in New Hampshire?

13 A    Yes.

14 Q    There was a court reporter present?

15 A    Yes.

16 Q    The court reporter swore you to take an oath?

17 A    Yes.

18 Q    And you answered all the questions truthfully?

19 A    Yes.

20 Q    And you had a chance to review your deposition transcript?

21 A    Yes.

22          MR. BLUMBERG:  Okay.  Robb, if you could do 208,

23 line 17 through 210, line 11.

24     *(A video was played in open court.)*

25          MR. BLUMBERG:  With the Court's indulgence.

YAKOLA - CROSS/BLOMBERG

Vol. 3 —  305

1          Pass the witness.

2          THE COURT:  All right.  Redirect, Mr. Broughton?

3          MR. BROUGHTON:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

5    BY MR. BROUGHTON:

6    Q   Mr. Yakola, with respect to this video that was just

7    shown, if I understood it correctly, you said there was a

8    handful of two or three flights that ended up not being flown

9    by ATA?

10   A   Yeah.  Mr. Blumberg said two or three.  I didn't disagree

11   with him.  There were fixed flights, fixed award flights that

12   went on throughout the rest of FY2008, and there were some

13   coming up a week or so down the road.

14   Q   Okay.  Had -- at any time prior to the bankruptcy, had you

15   given any word to FedEx that -- not mentioning the bankruptcy

16   or the shutdown, but had you given any word to FedEx that ATA

17   would not be flying those flights in the future, for whatever

18   reason?

19   A   As part of discussions around the FedEx kicking us off the

20   team, we said it was going to result in ATA's demise.

21   Q   Okay.  And did you give any notice -- did you decline any

22   flights in advance of the shutdown?  Did you give notice to

23   FedEx that some of these flights would not be flown by ATA,

24   that FedEx would need to get someone else on the team to fly

25   those?

1   A   What we did is before -- well before the shutdown, we

2   began to -- we didn't bid on future flights.  We stopped

3   bidding on those flights.

4   Q   Just explain to the jury, just so they're sure, what do

5   you mean by you didn't bid on those flights?

6   A   In order to fly and to fulfill your entitlement, the

7   military puts flights out; and they say, "We want to go from

8   here to there on this date and this time and pick up this many

9   troops."

10  Q   Let me stop you there.  What do you mean, they put flights

11  out?  I mean, does this happen every day, every week?

12  A   Yeah, it doesn't happen every day; but it does happen

13  quite often during the week.

14  Q   So let me stop you there.  Let's say it's February 1 of

15  2008, okay?

16  A   Yes.

17  Q   Before ATA went out of business.  Would ATA necessarily

18  know what military flights were going to come up in February?

19  A   No.

20  Q   Okay.  And why is that?

21  A   Well, because a lot of times you would -- flights would

22  come up that would be two days later or three days later.

23  Q   Let me stop you there.  I mean, the military is constantly

24  making different decisions on troop movements and what it

25  needs, right?

1   A   Correct.

2   Q   So maybe on February 4th all of a sudden ATA gets a fax or

3   an e-mail -- I'm not sure -- I believe it was e-mails from a

4   woman named Agnes Womble at CRAF and --

5           MR. BLUMBERG:  Objection, leading.

6           THE COURT:  Overruled.

7   Q   -- saying, "We have this flight.  Who wants to bid on it?"

8   Is that how it works?

9   A   Pretty much, yeah.

10  Q   Okay.  And ATA would have the opportunity to bid on it;

11  Omni would have the opportunity to bid on it.  And if nobody

12  on the FedEx team, then it would go to other teams?

13  A   It would spill over to another team, yes.

14  Q   Okay.  So was there a point in time before ATA's shutdown

15  that ATA just declined to accept those bids?

16  A   Yes, there was.

17  Q   And why did you decline?

18  A   Because I knew that a shutdown was a very real

19  possibility, and we didn't want to strand any troops.

20  Q   Okay.  Now, there were some what's called fixed -- I know

21  we've covered this before -- there's fixed and expansion?

22  A   Right.

23  Q   The expansion is kind of the more last-minute, unexpected,

24  you-can't-plan-in-advance-for flights, right?

25  A   That's correct.

1  Q    Okay.  And those, you started turning down?

2  A    Yes.

3  Q    Okay.  There were fixed flights that ATA bid on way in

4  advance because we have, you know, 100,000 troops in South

5  Korea, for instance, and we know there's always going to be --

6  there's no war going on now, thankfully.  We know there's

7  going to be definite flights of those troops going home for

8  leave or their families --

9         THE COURT:  Mr. Broughton, I've allowed a little bit

10 of leading so we can move this case along, but you're

11 testifying now.

12        MR. BROUGHTON:  Okay.  I apologize.

13 BY MR. BROUGHTON:

14 Q    Tell the jury what fixed flying is.

15 A    Fixed flying is, the military knows well in advance it

16 wants to fly every week from Dallas to Kuwait.  And so it's a

17 small percentage of the business, but it's a percentage you

18 can kind of plan on to say every Thursday I'm going to leave

19 Dallas.  I'm going to fly to Kuwait.  Saturday we're going to

20 come back.  Those flights are set way in advance all the way

21 throughout the year.

22 Q    And so back in '07 before -- months and months and months

23 before, those fixed flights had been set, right?

24 A    That's correct.

25 Q    Obviously, after the shutdown, ATA couldn't fly those

1  fixed flights that happened after it shut down?

2  A    Not those two or three.  We handed those back to the FedEx

3  team.

4  Q    Okay.  When you say you handed it back to the FedEx team,

5  what do you mean?

6  A    We notified FedEx just prior to our shutdown that we were

7  going to shut down, and we told them this flying would need to

8  be covered.  This was not flying that I had 200 troops, you

9  know, with their backpacks on, ready to get on a plane that

10 wasn't there.  This was flying that was going to be happening

11 in the future for which they were going to need an airplane

12 for because ATA had shut down.

13 Q    At the beginning of the cross-examination by FedEx, you

14 were asked -- or you said you decided you did not need Omni's

15 signature on the September 7 three-year contract.  Why did you

16 say that?

17 A    Because FedEx was our team leader.  They decided who got

18 the 50 -- who got which percentage of flying, and I had a

19 signed letter from Gary Molinari saying I had 50 percent of

20 the flying for three years.

21 Q    From your understanding, did Omni have any say-so on how

22 much flying FedEx assigned to ATA?

23 A    No, they did not.

24 Q    From your understanding, did ATA have the ability to tell

25 Omni, FedEx can't assign you what FedEx wants to assign?

1   A   No, they can't.

2   Q   On your cross-examination, you were asked by FedEx

3   counsel -- you were shown an ATA income statement for the, I

4   think, the end of the year for '07.  Do you recall that?

5   A   Yes.

6   Q   And what years was ATA paying off -- let me ask it this

7   way.

8        You testified yesterday that in December of '06, ATA

9   bought seven DC10s and two airframes to use for its military

10  flying?

11  A   That's correct.

12  Q   And when was ATA incurring the expenses for buying those

13  military flying planes?

14  A   All throughout 2007, putting them in condition for the

15  military to fly.

16  Q   And how would that impact costs to ATA during FY07?

17  A   It was expensed on the expense line, so it would increase

18  your costs a lot more, which is why you would show that larger

19  loss.

20  Q   You were also asked about the penalty box, and something

21  was said about a last use category.  Did ATA ever go into the

22  last use category?

23  A   Technically, yes.  When you're in the penalty box, you are

24  last use; but last use is dependent upon how much flying the

25  military needs.  If they're using all of the flying capability

1   of the fliers, then last use doesn't really have an impact.

2   Q   So did ATA end up losing any flights at all as a result of

3   last use?

4   A   I don't believe so, no.

5   Q   You were also asked about the UPS efforts to get on the

6   UPS team.  Do you recall that?

7   A   Yes.

8   Q   And why did ATA not accept this offer from UPS?

9   A   Because the UPS offer for 40 percent also included

10   commissions to be paid of $10 million; and when you compared

11   the $10 million against the amount of flying the UPS team was

12   offering, that 40 percent, the numbers didn't work.  It wasn't

13   going to be profitable or doable by ATA.

14   Q   And I believe yesterday you told us basically how big the

15   teams were compared to one another, the Alliance Team, the

16   FedEx team, the UPS team.  Remind us again, how big was --

17   what percentage of military flying did you understand the

18   FedEx team did?

19   A   10 percent.

20   Q   FedEx?

21   A   I'm sorry.  FedEx had over 50 percent.  Let me go back.

22   Q   Okay.

23   A   FedEx had 38 percent of this entitlement.

24   Q   Okay.

25   A   Alliance had over 50 percent.  UPS had 10 percent.

1  Q   Okay.

2  A   I know that wasn't your question.  I apologize.

3  Q   All right.  So the FedEx team, to the best of your

4  understanding, had about 38 percent of all the military

5  flying.  And ATA was doing 50 percent of the passenger flying

6  of that?

7  A   Correct.

8  Q   Okay.  So UPS was doing 10 percent of the flying; is that

9  right?

10  A   That's right.

11  Q   Total flying of the team.  So that's a much smaller team

12  than the FedEx team?

13  A   Yeah, much smaller.

14  Q   All right.  And you had been doing 50 percent of the FedEx

15  team?

16  A   50 percent of 38 percent.

17  Q   Yeah.  And the UPS offer was to do 40 percent of a team

18  that only had 10 percent?

19  A   Right.

20  Q   So why did that not make financial sense to ATA?

21  A   Well, it just was not going to be enough flying to offset

22  this commissions that ATA was going to have to pay to be on

23  the UPS team.

24  Q   If the UPS team had been a viable option for ATA to stay

25  open, would you have taken that offer?

Vol. 3 - 313

1  A    Absolutely.

2           MR. BROUGHTON:  Pass the witness.

3           THE COURT:  Thank you.

4           Recross, Mr. Blumberg?

5           MR. BLUMBERG:  No, Your Honor.

6           THE COURT:  Sir, thank you very much for your

7  testimony.  You may step down.

8       (Witness excused.)

9           THE COURT:  Members of the jury, why don't we take

10 our morning break at this time.  Let's take ten minutes or so.

11 Please go back to the jury room.  Do not discuss the case

12 among yourselves.

13          COURT CLERK:  All rise.

14      (Jury out.)

15          THE COURT:  Please be seated.

16          Mr. Broughton, how are we going to proceed with the

17 deposition of Mr. Pollard?

18          MR. BROUGHTON:  We're ready to do Mr. Pollard now,

19 and I called Mr. Doherty last night and again this morning;

20 and he assures me he will be here by noon today.  The

21 Pollard -- I was optimistic on how long Pollard is.

22          THE COURT:  How are you going to present that?  Is

23 it all by video?

24          MR. BROUGHTON:  All by video, and we're just playing

25 everybody's in the order it happened.  So it would be both

Vol. 3 —   314

1   sides of Pollard.

2           And one more housekeeping on these exhibits.  We had

3   the bench conference about the custodian-of-the-record

4   affidavits of Omni and Northwest.

5           THE COURT:  Yes.

6           MR. BROUGHTON:  And I think I need to actually offer

7   those up as exhibits.  I don't know that we did that.

8           THE COURT:  All right.  I can't recall if you did or

9   not.

10          MR. BROUGHTON:  I'm sure we did not; and I

11  apologize, Your Honor.

12          And the Omni custodian would be Plaintiff's 257, and

13  the Northwest custodian would be Plaintiff's 258.

14          THE COURT:  All right.  Show them admitted.

15      *(Plaintiff's Exhibits 257 and 258 were received in*

16  *evidence.)*

17          MR. BROUGHTON:  Thank you.

18          THE COURT:  Let's take 10 minutes.

19      (A recess was taken.)

20  (Jury in.)

21          THE COURT:  All right.  Mr. Broughton, call your

22  next witness.

23          MR. BROUGHTON:  ATA calls by deposition, by video,

24  Chuck Pollard, the president of Omni.  And we are playing

25  those portions of Mr. Pollard's deposition that were

Vol. 3 -   315

1   designated both by ATA and by FedEx.

2           THE COURT:  All right.  Members of the jury, you

3   remember I told you earlier, discussed what a deposition is.

4   A deposition is a statement made by a witness given outside of

5   court under oath with both attorneys -- or both parties

6   represented by counsel.

7           Depositions are used in almost every trial in some

8   form or fashion because of unavailability of witnesses to come

9   to the actual trial or other issues that prevent in-court

10  testimony.  So you're to consider the testimony of Mr. Pollard

11  by video deposition just as if he was sitting on this witness

12  stand.  Okay?

13          All right.  Ready to proceed.

14          (The video deposition of Charles W. Pollard was

15  played in open court.)

16          THE COURT:  Mr. Broughton, how much longer is the

17  video?

18          MR. BROUGHTON:  About 20 minutes.

19          THE COURT:  It's 12:30, and I want to make sure the

20  jurors get lunch and get some fresh air.  You folks all need

21  some lunch too.  So I don't want to extend it too long.

22          So why don't we break here for lunch, and we'll come

23  back; and we'll finish up the cross-examination of

24  Mr. Pollard.  And then we'll continue on with evidence then

25  for the rest of the afternoon.

1          So have a nice lunch.  If you could come back and be

2     ready to go at 1:30.  Please do not discuss the case among

3     yourselves.  Do not let anyone talk to you about the case.

4     Have a nice lunch.  We'll see you in a bit.

5               COURT CLERK:  All rise.

6          (Jury out.)

7               THE COURT:  All right.  Anything we need to discuss

8     prior to your lunch break, Mr. Broughton?

9               MR. BROUGHTON:  Not that I'm aware of, Your Honor.

10              THE COURT:  Mr. Blumberg?

11              MR. BLUMBERG:  No, Your Honor.

12              THE COURT:  All right.  I'll see you at 1:30.

13         (A luncheon recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3 —  317

1          A F T E R N O O N   S E S S I O N

2          THE COURT:  Mr. Broughton, ready for the jury?

3          MR. BROUGHTON:  Yes, Your Honor.

4       (*Beginning of bench conference.*)

5          MR. GABEL:  I wanted to make an offer of proof of a

6    piece of the deposition testimony that ultimately got excluded

7    from what was played to the jury.  The Court's orders

8    initially appeared inconsistent.  In Docket No. 206 you had

9    sustained FedEx's objection on the basis of Federal Rule of

10   Evidence 106 that the answer was incomplete and the entire

11   answer —

12          THE COURT:  It was nonresponsive or something,

13   wasn't it?

14          MR. GABEL:  First you had sustained our objection

15   that we needed a complete answer under 106.  In a separate

16   document, Court Docket 205, you sustained ATA's objection that

17   the answer was nonresponsive.  It's FedEx's position that the

18   answer is relevant and is responsive and that it completes the

19   thought of Omni's Mr. Pollard as to what his thinking was and

20   whether or not he would assent to a three-party letter that is

21   the basis of their case.

22          We think it's a fundamental piece of evidence.  And

23   even if the Court is not going to play it for the jury, I

24   would like for it to be in the record.

25          THE COURT:  Where are you at here?

Vol. 3 –  318

1           MR. GABEL:  Starting at line 7 --

2           THE COURT:  The green?

3           MR. GABEL:  Green and blue.

4           THE COURT:  Anything further on this?

5           MR. BROUGHTON:  It's clearly nonresponsive.

6           THE COURT:  You're just making an offer of proof,

7    right?

8           MR. GABEL:  Making an offer of proof.

9           THE COURT:  You want to go ahead and make it right

10   here?

11          MR. GABEL:  Sure.  The question is:

12          "Okay, in not signing the September 7, 2006,

13   three-party agreement, was Omni taking the position that it

14   was entitled to more than 50 percent of FedEx passenger

15   entitlement for FY07 through FY09?"

16          The answer is:

17          "I don't think we were taking that position.  I do

18   think that over the time frame the announcements coming out of

19   ATA were becoming increasingly concerning.  The financial

20   difficulties were mounting.  The losses of scheduled service

21   were pretty scary to us as a partner on this team, and we

22   couldn't help but think about how long ATA would be able to

23   continue to perform its role."

24          THE COURT:  Mr. Broughton, any further?

25          MR. BROUGHTON:  No, sir.

Vol. 3 - 319

1    THE COURT:  Okay.  All right.  The Court previously

2 had found that this was a nonresponsive answer.  The ruling

3 will stand, and we'll show your offer of proof.

4    MR. GABEL:  Thank you, Your Honor.

5    *(End of bench conference.)*

6    *(Jury in.)*

7    THE COURT:  Hope you had a nice lunch.  Another

8 beautiful day.

9    We're going to continue on with the

10 cross-examination of Mr. Pollard in the video deposition.

11    *(The continuation of the video deposition of*

12 *Mr. Pollard was played in open court.)*

13    THE COURT:  All right.  That's the end of the

14 deposition.

15    Call your next witness, Mr. Broughton.

16    MR. BROUGHTON:  Your Honor, at this time I would go

17 ahead and offer -- I believe the court reporter would like a

18 copy of that as Plaintiff's Exhibit 259, the transcript from

19 this.

20    THE COURT:  All right.  Give that to Philip, please.

21    MR. BROUGHTON:  ATA calls Mr. Bill Doherty.

22    THE COURT:  All right.

23    MR. BROUGHTON:  I believe he's waiting in the

24 witness room next door.

25    THE COURT:  Okay.  Okay.

1  **DIRECT EXAMINATION**

2  **WILLIAM G. DOHERTY, PLAINTIFF'S WITNESS, SWORN**

3  **DIRECT EXAMINATION**

4  BY MR. BROUGHTON:

5  Q    Good afternoon, Mr. Doherty.

6  A    Good afternoon.

7  Q    Would you please tell the jury your name.

8  A    My name is William G. Doherty.

9  Q    And where do you live, Mr. Doherty?

10 A    I live up in Carmel, Indiana.

11 Q    How long have you lived in Carmel?

12 A    For 23 years.

13 Q    Okay.  Tell us a little bit about yourself.

14 A    Okay.  I spent 20 years in the Air Force after college.  I

15 then went from the Air Force to ATA, where I spent 20 years

16 there.  And then since then, I have been consulting.  That's

17 my job history.  Myself, I have a wife and two kids, and

18 that's all.

19 Q    Okay.  Thank you.

20      And tell us a little bit about your 20 years in the

21 Air Force.

22 A    While I was in the Air Force, I worked in the air

23 transportation business, primarily.  However, I also worked

24 other modes of transportation.  My entire career for -- except

25 for the first three years I was an admin.  After that I went

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  321

1  into the transportation career field.  In addition to working

2  air transportation, worked virtually every mode of

3  transportation there is.

4  Q    During your time in the Air Force, did you have any

5  involvement with -- I know it's gone through some name

6  changes, but AMC or CRAF?

7  A    Yes, I did.  I worked for AMC.  At the time I was there,

8  it was called Military Air Command.  Now it's called the Air

9  Mobility Command.  They're the same organization.

10         I was very active in the CRAF program, the Civil

11  Reserve Air Fleet program in the military and then afterwards

12  with ATA working it from the civilian side.

13  Q    Okay.  Tell us, if you would, what year did you go to work

14  at ATA?

15  A    I went to work in 1988 at ATA.

16  Q    And you had been in the Air Force right up until that

17  time?

18  A    I retired in '87.

19  Q    And just tell us about kind of your -- what your duties

20  were when you started at ATA.

21  A    When I started at ATA, I was working initially the

22  international traffic rights, the permissions to land in

23  various countries or overfly various countries.  That's where

24  I started out working with.  I then worked my way bidding on

25  domestic military business, and when Mr. Hutchinson, my

Vol. 3 — 322

1  predecessor, left the company, I took over the full

2  international and all military responsibilities.

3  Q   Tell us about ATA back during the Desert Storm/Desert

4  Shield?  Was ATA doing much military flying then?

5  A   ATA was very active during Desert Shield/Desert Storm.  As

6  a matter of fact, on the passenger side as a pure passenger

7  carrier, ATA flew more flights than any other carrier into the

8  desert, in and out of the desert during that time frame.  So

9  we were very active.

10  Q   And do you recall about when ATA became a member of the

11  FedEx team?

12  A   It was right about '92, '93 originally.  I think it was

13  '92.  I can't remember exactly, but prior to that, we were not

14  a member.  Teaming Arrangements had started about 1990, but my

15  predecessor was involved, didn't think that Teaming

16  Arrangements were a good thing.  When I came in, I disagreed

17  with him, so we changed that and became a member of FedEx

18  team.  That's when we became a member of FedEx.

19  Q   Okay.  And was Mr. Gary Molinari there in '91 or '92 when

20  ATA went on the FedEx team?

21  A   Yes.  I believe he was.  I worked with both Gary Molinari

22  and Fred Fink.  One of them -- I'm not sure which one of them

23  came from Flying Tigers when the two merged, and I'm not

24  exactly sure the date that that merger took place.  I dealt

25  with the two of those initially up front.

1  Q   Was there a point in time when you were just dealing with

2  Mr. Molinari?

3  A   Yes.  Most of the time, I was dealing with Mr. Molinari as

4  the sole contact in FedEx.

5  Q   Okay.  And was that starting in the early '90s all the way

6  up until the time you left ATA in 2007?

7  A   That's correct.

8  Q   How often would you communicate with Mr. Molinari?

9  A   Well, that would actually depend upon time of the year.

10  During contract negotiation times was more often than it was

11  during the regular portion of the year.  We didn't have a lot

12  of disputes within the team as far as what needed to be done;

13  but once we were trying to form teams, we would deal with

14  Gary.  And he would try to keep us posted in who he's trying

15  to bring onto the team, and we would be after him to try to

16  increase the size of the team so we can increase the pool of

17  the money that was coming into the team.

18  Q   And --

19  A   Okay.

20  Q   I'm sorry.  Go ahead.

21  A   There were other times we dealt with him when we had other

22  negotiations and AMC was bringing up proposals to contract

23  changes, et cetera.  Then he would mediate for us.

24  Q   Would you typically talk with him on the phone or by

25  e-mail, or what would be your typical method of communication?

1 A   Normally, we would discuss things on the phone.  That was

2 my primary way of communicating back and forth.  A lot of it

3 was a lot of theory, how can we do this and what would be

4 better.

5 Q   We've heard some discussion about something called the

6 penalty box.  Does that term have any meaning to you?

7 A   It was a term.  It's not an official term.  It's a term

8 that we assigned to it basically.

9        A team -- a team or a carrier can be put into the

10 penalty box for -- which we called, which would mean we were

11 being penalized for the amount of work we could do or whether

12 we could get additional business or we might get penalized on

13 the amount of the -- we might get a reduction in the amount of

14 payment from the military.

15        This occurred when our performance was not proper.  If

16 we weren't performing up to a certain level required by the

17 contract, there was a penalty for not meeting those standards.

18 Q   Okay, thanks.

19        MR. BROUGHTON:  Your Honor, may I approach the

20 witness?

21        THE COURT:  You may.

22 BY MR. BROUGHTON:

23 Q   Mr. Doherty, I want to hand you Plaintiff's Exhibit 257

24 and ask you to briefly take a look at Bates No. Omni 722 and

25 ask you if Omni was ever in the penalty box, to your

Vol. 3 -  325

1  recollection.

2  A   Yes, I'm sure they were.  I'm sure every carrier at some

3  point in time was; yes, I would say based on that.

4          MR. BROUGHTON:  If we could go to Plaintiff's

5  Exhibit 5, please.  Actually, before we put that up --

6  BY MR. BROUGHTON:

7  Q   Would you know what commission rates FedEx -- the FedEx

8  team was paying to Continental Airlines?

9  A   No.

10  Q   Why wouldn't you know that?

11  A   Those financial considerations were run by the team lead,

12  which was FedEx.  The team lead did not share those with the

13  other members.  They may have told us we needed to increase

14  what we're paying, but they wouldn't tell us a number.

15          They may tell us what they're trying to do as far as

16  bringing someone on, but that they need this -- some level of

17  increased incentive to do that.  And they would then try and

18  tell us what our new commission level would be to get there,

19  but they wouldn't tell us what they were actually paying to

20  Continental or any other member of the team.

21  Q   Did you know what commission rate Omni was paying to

22  FedEx?

23  A   No, I do not.  Same reason.

24  Q   Other than what ATA was paying to FedEx, did you know

25  anybody else's commission rate?

1  A   No.

2  Q   You couldn't have shared that information with anybody if

3  you wanted to?

4  A   We were not supposed to share any of that information.  It

5  was -- and I wouldn't do it anyway because it could be a

6  better deal than somebody else is getting; and I wouldn't want

7  to create a problem with the team.  So no.

8  Q   You didn't know what the rate was anyway?

9  A   I knew what my rate was, and that was it.

10        MR. BROUGHTON:  Now, would you please put up

11 Plaintiff's Exhibit 5?

12 BY MR. BROUGHTON:

13 Q   Can you see that on the screen?

14 A   I can see it.

15 Q   This is January 17, 2003; is it not?

16 A   Yes, it is.

17 Q   And the jury has seen this several times, but you signed

18 this three-year agreement for FY04 through FY06; is that

19 right?

20 A   That's correct.

21 Q   What was ATA's motivation in wanting to enter into a

22 three-year agreement?

23 A   There were a number of reasons you would want to do that.

24 First of all, it gives you some stability that when you're

25 dealing with bankers and other investors, et cetera, it gives

1  you something to show them that shows you are in this

2  agreement for a period of time and you can predict to them and

3  show them the level of compensation or level of revenue that

4  was out there.  So you can show them some sort of business

5  plan and what kind of revenue you intend to make from that and

6  that it was a stable business plan.  That was one reason.

7           Another reason is that you -- at the time the reason

8  we were willing to do a three-year -- at the time Omni was

9  growing, and we were shrinking.  And we wanted to make sure we

10 held onto our position within the team.

11 Q   Okay.  Leading up to this '04 through '06 agreement, were

12 you negotiating directly with ATA, or were you talking to

13 Mr. Molinari to negotiate this three-year agreement?

14 A   I was talking directly to Mr. Molinari.  Did you mean

15 Omni?

16 Q   I'm sorry if I misspoke.

17 A   I did not talk to Omni, no; but I did speak directly to

18 Mr. Molinari.  He negotiated between the two -- the two team

19 members to come up with an agreed-upon level of split for the

20 business.

21 Q   And did you have any further discussions with Mr. Molinari

22 once this '04 through '06 agreement was about to expire?

23 A   Well, we discussed how we were going to proceed beyond

24 this time frame, yes.

25           MR. BROUGHTON:  Would you please put up Plaintiff's

1    Exhibit 7?

2    BY MR. BROUGHTON:

3    Q    Mr. Doherty, would you take a moment and look at that,

4    please?

5    A    All right.

6    Q    All right.  This Plaintiff's Exhibit 7 is actually --

7             MR. BROUGHTON:  Before we go any further, I would

8    like to go ahead and offer Plaintiff's Exhibit 7.  I believe

9    it's stipulated.

10            MR. BLUMBERG:  No objection.

11            THE COURT:  Seven admitted.

12       *(Plaintiff's Exhibit 7 was received in evidence.)*

13   BY MR. BROUGHTON:

14   Q    This is actually two e-mails, correct?

15   A    That's correct.

16   Q    The bottom, which is the longer e-mail, is from you to

17   Mr. Molinari dated Tuesday, August 9, 2005; is that right?

18   A    Yes.

19   Q    The subject line says, "PAX split within the team."  Is

20   that right?

21   A    Right.

22   Q    It's a bit of a long e-mail.  You start off saying, "The

23   current passenger split is ATA, 62 percent, and Omni,

24   38 percent.  Looking forward to the FY07 contract and beyond,

25   some assumptions need to be made."

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  329

1          MR. BROUGHTON:  Mr. Brockwell, if we could go down

2   towards the end of this e-mail on the second page.

3   BY MR. BROUGHTON:

4   Q   Actually, I'm looking at -- where is the split you

5   proposed?  Top of the second page where it says "52 percent"?

6   A   Okay.

7   Q   It says, "If we split the difference, we would come to a

8   split that would look like this:  ATA, 52 percent, and Omni,

9   48 percent.  This represents a significant move in position

10  within the team for both carriers.  We would be willing to

11  split at this compromised level.  The length of this agreement

12  could be for the three years that Omni has proposed or it

13  could be for a shorter period of time.  We are open to

14  suggestions on this issue."  Do you see that?

15  A   I do.

16         MR. BROUGHTON:  Mr. Brockwell, if we could go to the

17  very top of the first page on Plaintiff's Exhibit 7.

18  BY MR. BROUGHTON:

19  Q   In response to your August 9 e-mail, did Mr. Molinari send

20  you this August 12 e-mail?

21  A   Yes.

22  Q   The subject line says "Re: PAX split within the team."

23  That was responding to yours?

24  A   Right.

25  Q   All right.  And he says "Bill, thanks, I appreciate your

1  input.  In order to close this issue out and so we can

2  aggressively move forward to expand the team for FY07 and

3  beyond, I would propose we go to a 50/50 split.  I believe

4  this is probably the most equitable position without trying to

5  assess the probability of ATA adding 767 and coming out of

6  bankruptcy as well as Omni getting clear of the 60/40

7  restriction.  I would like to proceed on this basis with a

8  letter agreement for three years.  Please confirm.  Gary."

9        Do you recall receiving this e-mail?

10  A  I do.

11  Q  After that, did you confirm to Mr. Molinari?

12  A  I did.  I called him back that same day and told him that

13  we would be agreeable to do it.  We preferred the proposal

14  that we had out there, but we understand his situation because

15  both of us were proposing things that we didn't know were

16  going to happen.

17  Q  And after this call -- before we move on, during this

18  call, was there any discussion of whether or not FedEx would

19  be sending any sort of a written agreement about this 50/50

20  three-year split?

21  A  Mr. Molinari said that he would be getting with his legal

22  department and sending something out to both us and to Omni

23  that outlined the agreement, much like we had the previous

24  agreement.

25  Q  Now, I note in this particular e-mail exchange it is only

1 between you and Mr. Molinari; is that right?

2 A   That's correct.

3 Q   It doesn't show Omni being copied or participating in this

4 particular e-mail?

5 A   That's correct.

6 Q   Do you know if Mr. Molinari ever communicated this 50/50

7 split to Omni?

8 A   I do not know -- personally I know afterwards, after the

9 fact that they were communicated, but no --

10          MR. GABEL:   Objection, Your Honor.

11          THE COURT:   Sustained.

12 BY MR. BROUGHTON:

13 Q   Did Mr. Molinari ever tell you that Omni agreed to a 50/50

14 split?

15 A   Mr. Molinari told me that the agreement would be there and

16 we would have -- that the agreement was approved and would be

17 sending me something from legal validating it.

18 Q   At any time did Mr. Molinari or anyone at FedEx send to

19 ATA a copy of an August 18th, 2005, three-year agreement for

20 a -- for 50 percent to go to Omni for the years FY07 through

21 FY09?

22 A   Yes.  It was sent sometime in September of '07.

23 Q   Okay.  Let me back up.  We'll look at that September 7,

24 2006 agreement in a moment.  Prior to that, did FedEx ever

25 send a copy to you of any agreement that it signed only with

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -   332

1   Omni giving Omni 50 percent?

2   A    No.

3           MR. BROUGHTON:  If you would put Plaintiff's

4   Exhibit 12 up.  If you could zoom in on that, please.

5   BY MR. BROUGHTON:

6   Q    Let me know once you've had a chance to read that,

7   Mr. Doherty, please.

8   A    Okay.

9   Q    Do you recall receiving this September 7, 2006, e-mail

10  from Mr. Molinari?

11  A    Yes.

12  Q    And in it he says, "Attached is a letter for each of you

13  to sign formalizing the 50/50 split for the PAX bids."  Do you

14  see that?

15  A    Yes.

16  Q    And if we could please -- well, before we do it, what did

17  you understand this attachment to be formalizing the 50/50

18  split?

19  A    This was the agreement that we said we had verbally to

20  split the business between us and Omni on a 50/50 basis for

21  all business, passenger business to the team.

22          MR. BROUGHTON:  And if we could go to the

23  attachment, please, Mr. Brockwell.

24  BY MR. BROUGHTON:

25  Q    This is what you received; is that right?

Vol. 3 - 333

1    A    Yes, it is.

2    Q    And it had already been signed by Mr. Molinari?

3    A    Correct.

4              MR. BROUGHTON:  Can we please go to Plaintiff's

5    Exhibit 13.

6    BY MR. BROUGHTON:

7    Q    And is Plaintiff's Exhibit 13 your signature?

8    A    Right.

9    Q    And once you received -- or what did you do once you

10   signed this?  Did you send it back to Mr. Molinari?

11   A    Yes, I did.

12   Q    And did you ever see one of these signed by Omni?

13   A    No, I did not.

14   Q    Did anyone ever tell you that Omni refused to sign it?

15   A    No.

16   Q    Did Mr. Molinari ever tell you that Omni refused to sign

17   and there was no September 7, 2006, agreement?

18   A    No.  He never said anything like that.

19   Q    Once you received this and signed it, did you circulate it

20   to anyone at ATA?

21   A    I did.

22   Q    Do you recall who you gave it to?

23   A    Well, I probably sent it to Mr. Schultz, who was the

24   accounting person within our area.  He probably sent it to

25   Mr. Yakola and forwarded on to there.  Mr. Frick probably got

1  a copy, and my supervisor, Mr. -- well, what was the date?

2  I'm not sure at that time if Mr. Ellmer was on board or not.

3  If he was, he would have gotten it.  If not, Mr. Karnick would

4  have gotten a copy.

5          MR. BROUGHTON:  Let me -- all right.  If you could

6  put Plaintiff's Exhibit 11 up, please.  If you could zoom in

7  on that a bit.

8  BY MR. BROUGHTON:

9  Q   Mr. Doherty, this is an e-mail from you to Gary Molinari;

10  is that right?

11  A   That's correct.

12  Q   Dated January 3rd, 2006?

13  A   Yes.

14  Q   And it says, "We plan to be there on the 9th of January.

15  We will let you know the time as we finalize reservations."

16  Can you tell us where "there" was?

17  A   At FedEx headquarters.

18  Q   It goes on to say, "Again, the purpose is to bring you up

19  to date on where ATA stands in our bankruptcy proceedings and

20  to provide assurance of our continued support to the team and

21  AMC.  We would also like to have a discussion with your fleet

22  planners."  Do you see that?

23  A   Yes.

24  Q   And why were you requesting for Mr. --

25          MR. GABEL:  Your Honor, I'm going to object on the

1  basis of motion of limine, and this is also not in evidence.

2         MR. BROUGHTON:  I certainly offer Plaintiff's

3  Exhibit 11.

4         THE COURT:  Any objection to 11?

5         MR. GABEL:  Relevance, fleet planning.

6         MR. BROUGHTON:  I believe it's a continuum.  It is

7  four months after Mr. Doherty signed the September 7, 2006;

8  and he was going there to talk about purchasing airplanes to

9  fly off that 50 percent for three years.

10         THE COURT:  Overruled.  I'll allow it.

11         MR. BROUGHTON:  Is Plaintiff's Exhibit 11 admitted?

12         THE COURT:  Admitted.

13     *(Plaintiff's Exhibit 11 was received in evidence.)*

14  BY MR. BROUGHTON:

15  Q   And so why did you want to talk with FedEx about ATA's

16  fleet planning?

17  A   Well, we were in the process of trying to procure 767

18  aircraft to replace our L1011 airplanes, which were getting

19  old; and we needed to replace them if we were going to be able

20  to continue to fly the business.

21         We were also coming to the realization that we may

22  have to do some other airplane in the interim until we could

23  find them.  We wanted to talk to their fleet planners because

24  they, being much larger than us, had access to a lot of other

25  aircraft brokers that they could possibly recommend us to go

1   to.  They also had at the time, we thought, DC10s that were

2   waiting to be converted from passenger to cargo aircraft and

3   waiting for a slot.  We thought maybe we could propose to them

4   the possibility of us using those aircraft in our fleet until

5   they were -- came up in the line to go in for modification.

6   That was the purpose of the deal with the fleet planning.  We

7   were looking for a way to replace the L1011s, whether we were

8   going to get some other airplane or a 767 or use a temporary

9   stopgap measure with FedEx airplanes.

10  Q    Do you know if FedEx owned a lot of DC10s?

11  A    I don't know if they owned them or they leased them, but

12  they had access to a lot of DC10s.

13           MR. BROUGHTON:  And, Mr. Brockwell, if we could

14  scroll up to the top of Plaintiff's Exhibit 11.

15  BY MR. BROUGHTON:

16  Q    Mr. Doherty, we see Gary Molinari's name at the top here.

17  He was sending it to someone named Philip Blum.  Do you know

18  who Philip Blum is?

19  A    I have met him.  I don't know him that well.

20  Q    All right.  And he worked at FedEx?

21  A    I believe he did, yes.

22  Q    Okay.  And it's CC'd to Mr. Bob Rachor, who happens to be

23  seated here behind me.  Have you ever met Mr. Rachor?

24  A    I don't know if he was at that meeting or not.  If he was

25  at that meeting and I met him there, that would be the first

Vol. 3 -  337

1  time I recall meeting him.

2         MR. BROUGHTON:  Okay.  Your Honor, at this point --

3  ATA would like to offer Plaintiff's Exhibit 5, 12, and 13,

4  which have all been stipulated to.

5         MR. BROUGHTON:  Your Honor, at this point -- ATA

6  would like to offer Plaintiff's Exhibit 5, 12, and 13, which

7  have all been stipulated to.

8         MR. GABEL:  No objection.

9         THE COURT:  Five, 12 and 13 admitted.

10     *(Plaintiff's Exhibit 5, 12, and 13 were received in*

11  *evidence.)*

12  BY MR. BROUGHTON:

13  Q   So this meeting in Memphis January 4, '06 -- I may have

14  said the wrong year a moment ago.  This was about three or

15  four months after your August 12 e-mail -- August 12, 2005,

16  e-mail with Mr. Molinari about the 50/50 split; is that right?

17  A   Yes.  I believe that was right.

18  Q   And then the September -- obviously the September 6

19  agreement is after January 4, and I realize I misspoke the

20  year.

21         Mr. Doherty, we move forward from September 7, '06;

22  and around that same time, did you also sign a FY07 Fee

23  Agreement with Federal Express?

24  A   I would have, yes.

25         MR. BROUGHTON:  And if you could please put PX14 on

Vol. 3 -   338

1   the screen.

2          ATA offers Plaintiff's Exhibit 14, which is a

3   stipulated document.  It may be already admitted.  I'm not

4   sure.

5          MR. GABEL:  No objection.

6          THE COURT:  14 admitted.

7       *(Plaintiff's Exhibit 14 was received in evidence.)*

8          MR. BROUGHTON:  And if we could go to the signature

9   page, please.  Zoom in on the -- yes.

10  BY MR. BROUGHTON:

11  Q   Mr. Doherty, if you will, take a look a moment at the

12  signatures and the dates underneath them.  Let me know when

13  you've had a chance to look.

14  A   Okay.

15  Q   So tell us, would this have been -- this Fee Agreement

16  have been a document sent to you by Mr. Molinari?

17  A   That's correct.

18  Q   Okay.

19          And I notice that the date for Mr. Molinari is typed

20  in, September 18, 2006.  Do you see that?

21  A   I do.

22  Q   And your date for you signing it is handwritten; is that

23  right?

24  A   Correct.

25  Q   And if we go to the first page -- zoom in on the first

Vol. 3 -  339

1    line -- it says, "This agreement is made and entered into as

2    of the 18th day of September, 2006"; is that right?

3    A    Right.

4    Q    But you signed it, actually, almost a month before its

5    effective date; is that right?

6    A    Correct.

7              MR. BROUGHTON:  If we could go back to the signature

8    page.

9    BY MR. BROUGHTON:

10   Q    Do you recall, did this come to you signed or unsigned, or

11   do you remember one way or the other?

12   A    From Mr. Molinari?

13   Q    From Mr. Molinari.

14   A    It was not signed.

15   Q    So you signed it on August 22nd, 2006?

16   A    Yes.

17   Q    Do you know when he signed it?

18   A    No.  I don't know when -- I don't know the day he signed

19   it, only could assume.  But based on what the date is on the

20   document, I believe the 18th of September would have been the

21   day that the process had to be done, but I don't know.

22   Q    So you don't know if even though it's typed "September 18"

23   under his signature, you don't know if he signed it before

24   then or not?

25   A    I do not.

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  340

1  Q   Now, if we think about our calendar in our mind, in

2  between you signing this on August 22nd and the typed date

3  under Mr. Molinari's signature, September 18, 2006,

4  Mr. Molinari sent you the September 7, 2006, three-year

5  contract; is that right?

6  A   I'm sorry.  Could you repeat the question?

7  Q   You signed this August 22nd --

8            THE COURT:  Excuse me?

9            MR. GABEL:  Objection, leading.

10            THE COURT:  Rephrase.

11  BY MR. BROUGHTON:

12  Q   What date did you sign the Fee Agreement?

13  A   This is the Fee Agreement, the 22nd of August.

14  Q   And what is the date of the three-year agreement that we

15  just looked at that Mr. Molinari sent you --

16  A   That was 7 September.

17  Q   So about two weeks after you signed the September 7, 2006,

18  contract?

19            MR. GABEL:  Objection, leading.

20  BY MR. BROUGHTON:

21  Q   How many weeks after you signed this Fee Agreement did you

22  sign the September 7, 2006 --

23  A   The 22nd of August, whatever that would be, about 15, 16

24  days.

25  Q   Let's look above here to the paragraph just above your

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  341

1  signature.  It says "entire agreement;" does it not?

2  A   Yes, it does.

3  Q   We read along, "This agreement, together with the

4  Contractor Team Arrangement Agreement and the Operating

5  Agreement, constitute the entire agreement and understanding

6  of the parties on the subject matter hereof, and as of the

7  effective date hereof, supersedes all prior agreements,

8  whether written or oral, between the parties hereto concerning

9  the subject matter hereof.  This agreement may be modified

10  only by further written agreement signed by the parties

11  hereto."

12       Do you see that?

13  A   I do.

14  Q   What number of years was being discussed in this FY07 Fee

15  Agreement, what period of time?

16  A   Just the one fiscal year.  Fiscal year -- I think it was

17  '07.

18  Q   So the subject matter --

19  A   Would have been fiscal year '07... I'm sorry.

20  Q   So the subject matter in the Fee Agreement was one year?

21  A   That's correct.

22  Q   How many years was the September 7, 2006, agreement?

23  A   That was for three years.

24  Q   So the subject matter of the period of the September 7 was

25  how many years?

Vol. 3 -  342

1  A    That was three years for the September 7.

2  Q    So does the subject matter of the Fee Agreement seem

3  different to you than the subject matter of the three-year

4  agreement?

5  A    Well, the Fee Agreement is dealing with the contract --

6  AMC required a one-year contract.  They require a one-year

7  contract.

8             MR. GABEL:  Objection, nonresponsive.

9             THE COURT:  Rephrase your question.

10            MR. BROUGHTON:  It's been so long ago, I forgot.

11            THE COURT:  Subject matter of the --

12            MR. BROUGHTON:  Thank you, Your Honor.

13  BY MR. BROUGHTON:

14  Q    Mr. Doherty, when you signed the September 7, 2006,

15  three-year agreement -- let me ask you this.

16            When you signed this FY07 Fee Agreement on August the

17  22nd of 2006, that was after Mr. Molinari sent you his

18  August 12th, 2005, e-mail about the 50/50 split; is that

19  right?

20  A    August 12 what year?

21  Q    The e-mail we looked at a moment ago.

22  A    The 7 September or the --

23  Q    I'm sorry.  Mr. Molinari's e-mail back in August of '05.

24  A    Okay.

25            MR. BROUGHTON:  Would you flash --

Vol. 3 -  343

1          THE WITNESS:  That's outlining the 50/50, correct?

2          MR. BROUGHTON:  Yes.

3    BY MR. BROUGHTON:

4    Q   Yes, all right.  Let's just put it up there.  That's

5    Plaintiff's Exhibit 7.  All right.  We looked at that a few

6    moments ago, right?

7    A   Okay.

8    Q   Okay.  So that's August 12 of 2005.  We move forward to

9    August 22nd, 2006, when you signed the FY07 Fee Agreement,

10   right?

11   A   Okay.

12   Q   Was -- what was your intention when you signed the

13   August 22nd Fee Agreement as it pertained to the 50/50 split?

14   A   Okay.  The Fee Agreement is an agreement that's

15   attached -- that is a one-year agreement that tells us -- that

16   is tied to the AMC one-year contract.  All the Contracting

17   Team Arrangement Agreements, the three parts of it, were all

18   tied to a specific one-year AMC contract.  That was what that

19   fee was based on the makeup of the team for that fiscal year.

20        If we had added people, we may have had to increase

21   the fee level.  If we lost people, they may have decreased the

22   fee level.  Those were things that worked out on an annual

23   basis.

24        The other agreement that we talked about on splitting

25   the 50/50 was a three-year agreement, and that was an

1   agreement that was how we would proceed -- how we would --

2   that we would do business together for three years at a level

3   of division between us and Omni, who were the only fliers

4   within the -- on the passenger side of the business within the

5   team.  So there were two different documents and concepts.

6   The Teaming Arrangement is a one-year deal tied to the AMC's

7   one-year contract.  It specifically has somewhere in the

8   agreement there the contract number every year; and that is

9   what goes to AMC minus the Fee Agreement to let them know that

10  we are a serious team, that teams can change and structure

11  year to year because the contract is year to year.

12          Outside of the Teaming Arrangements, carriers can have

13  agreements all they want.  They can agree to split business.

14  I mean, we had other teams that had people that had committed

15  to the team for three years.  That's outside of the Teaming

16  Arrangement.  AMC is not concerned with that.

17          So there are two different concepts in what we're

18  dealing with.  We're dealing with a Teaming Arrangement that

19  is something tied to the AMC contract, and we're dealing with

20  a letter of agreement that we had -- like we had -- that we

21  signed in '03 for the '04 to '06 agreement that deals with

22  what the members of the team, the passenger fliers on that

23  team, had agreed to do internally and be with the team and how

24  we would split this and how we would stay with the team for

25  that period of time.  Other carriers have had the same

DOHERTY - DIRECT/BROUGHTON

Vol. 3 - 345

1   arrangements with their teams.

2   Q   At any time did Mr. Molinari ever tell you he did not

3   consider the '04 through '06 three-year contract to be valid?

4   A   No.

5   Q   At any time did he ever tell you he did not consider the

6   '07 through '09 to be valid?

7            MR. GABEL:  Objection, leading.

8            THE COURT:  Sustained.

9   BY MR. BROUGHTON:

10  Q   Did Mr. Molinari ever give any indication to you whether

11  or not FedEx felt bound by the '07 through '09 three-year

12  agreement?

13  A   Well, we had the agreement.  I mean, there was no further

14  discussion as far as whether or not he felt it was valid or

15  not.  We both signed the agreement.  He indicated that Omni

16  was in agreement with it, as well.  So, I mean, there was no

17  need for further other -- other discussion on it.

18  Q   Let's go forward about a year.  Did there come a point in

19  time where Mr. Molinari mentioned anything about Northwest

20  Airlines wanting to fly -- to start to fly?

21  A   Yes, he did.

22  Q   And tell the jury about that, if you would.

23  A   Surely.  Northwest was a member of our team.  They were a

24  nonflier.  So, basically, the team paid Northwest money for

25  their points, and then we got the benefit of their points for

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  346

1   the division of AMC business.

2        That division applied to all types of business,

3   whether it was narrow-body cargo, wide-body cargo, narrow-body

4   passengers, or wide-body passengers.  So there were four

5   categories within that.

6        With Northwest now wanting to fly, what they wanted to

7   do was they wanted to fly 10 missions a month because they had

8   some excess availability, and they approached Gary Molinari on

9   that subject.  So he sent a letter out to us explaining that

10  Northwest wanted to be a part.  They wanted to -- I think it

11  was a letter; maybe he did it on the phone.  I can't remember

12  if it was written or not, quite frankly.  But what he

13  explained was they wanted to fly 10 trips.

14       We resisted that at first.  Mr. Molinari then advised

15  us that FedEx might walk from the team -- I mean, Northwest

16  might walk from the team if we did not allow them to do some

17  level of flying.  This would have been an untenable situation

18  for all carriers as members of the team because they would

19  have taken, on the passenger side, roughly, you know -- ATA

20  ourselves would have lost about -- close to $100 million worth

21  of revenue -- of entitlement to revenue in a year, which was

22  basically a hit, 25-percent reduction in the amount of

23  business we would be entitled to.

24       The tradeoff was that we gave -- we as a team gave

25  Northwest about $60 million worth of flying.  The loss I had

1  would have been similar -- would have also been lost by Omni.

2  They would have lost 100 million.  We would have lost

3  100 million.  The other cargo carriers, they would have all

4  lost entitlement.  How much, I don't have those figures.  So

5  overall, the team would have taken a very significant hit in

6  revenue if Northwest had walked from the team.

7       So Gary Molinari was definitely going to push to keep

8  them as a member.  He had the ultimate decision as to who --

9  what we actually wound up doing.  So we came to the conclusion

10 that one way or the other, Northwest had to stay on the team.

11      How that was going to happen, we had further

12 discussions on.  But that's what was going on at the time.

13 Q   Okay.  Did there come a point in time where ATA reached

14 some agreement with FedEx about the amount of flying that

15 Northwest would do for the FedEx team?

16 A   Well, we went back to them with a proposal that they -- if

17 they fly -- I mean, one of the reasons that we were paying so

18 much in commission -- our commission level a couple years

19 earlier had gone up a couple of percentage points due to the

20 fact that we were bringing Northwest onto the team and we were

21 going to be paying for their points.

22      So I brought that up to Mr. Molinari to explain -- to

23 say, Hey, if they're going to start flying some business, we

24 need some -- the commission level needs to go down.  Something

25 needs to be -- we need some sort of tradeoff to be able to do

1   this.

2        And so an agreement came up that they would take

3   10 percent of the business, the basic agreement -- they would

4   take not 10 percent; 10 flights a month.  We would get -- for

5   a reduction of the commission level, 10 flights would come

6   off, and then the residual, what was left after that, would

7   still be split 50/50 between us and Omni.

8   Q   And so what was the -- before this Northwest flying, what

9   was ATA paying to FedEx for a commission annually?

10  A   We were paying 7 percent.

11  Q   Okay.  And after the Northwest started flying, what did

12  the commission rate change to?

13  A   I left shortly after they got there, but that was -- or

14  shortly after that, they started flying.  I left, but that was

15  dropped to 4 1/2 percent.

16  Q   You were the one who reached that agreement with

17  Mr. Molinari; is that right?

18  A   That's correct.

19  Q   And did you have an opinion of whether or not Northwest

20  Airlines would actually fly up to 10 flights a month?

21  A   I did not believe they would because they did not have --

22  they did not have the structure at that point in time to do

23  that.  They did not have the discipline to do that.  They were

24  a scheduled service carrier.  Their primary role was to fly

25  scheduled service, and that took precedence over any charter.

1    They had never performed that level -- well, they hadn't

2    performed any military flying, really, for a long period of

3    time, other than the fact that when they were dragged into it

4    when the CRAF was activated.

5    Q    Mr. Doherty, we've heard reference that Omni and ATA had

6    been the fliers for the FedEx team for many years running; is

7    that right?

8    A    That's correct.

9    Q    Now, these -- we've heard about fliers, and we've heard

10   about points sellers, right?  And up to this point in time,

11   Northwest -- before FY08, was Northwest a points seller?

12            MR. GABEL:  Objection, leading.

13            THE COURT:  Sustained.

14   BY MR. BROUGHTON:

15   Q    Prior to FY08, was Northwest a points seller or a flier?

16   A    They were a points seller.

17   Q    Okay.  And what was Continental?

18   A    Continental had done a number of different deals.  They

19   had been basically strictly a point seller.  At one point in

20   time they did not join a team and they just sold their points.

21   One time they joined a team.  So at the time -- at other

22   points in time, they really were not really big fliers.  They

23   were sellers.

24   Q    Okay.  And tell the jury, if you would -- we've heard

25   about these three different teams.  Tell us about the concept

Vol. 3 -  350

1  that -- about the point sellers and was it common or uncommon

2  for the point sellers to be switching teams from year to year?

3  A   We encouraged Gary -- and I'm sure the other teams were

4  doing it as well -- to try to solicit other points sellers to

5  the team every year.  And sometimes we did and sometimes we

6  actually lost.  One year we lost members in the team --

7  sellers to the Alliance Team.

8        These were -- you know, the points sellers were trying

9  to get as much money as they could.  And I don't blame them;

10  that's what they're in business to do.  So some of them -- so

11  they would go with whoever provided the best deal at the time.

12  So they moved back and forth.

13  Q   To your knowledge, did FedEx are have any three-year

14  agreements with any points sellers?

15  A   Yes.

16        MR. GABEL:  Objection.  Basis of knowledge.

17        THE COURT:  Foundation.

18  BY MR. BROUGHTON:

19  Q   Do you know whether or not FedEx had any three-year

20  agreements with any points sellers?

21  A   FedEx?

22  Q   FedEx.

23  A   I do not know if they had three-year agreements with

24  points sellers.

25  Q   Okay.  Do you know if any of the teams had multiyear

1   agreements with points sellers?

2         MR. GABEL:  Same objection.  Personal knowledge.

3         THE COURT:  If he knows.

4         THE WITNESS:  I do know that United did.  I worked

5   for United after I left ATA, and they were still in part of

6   that three-year agreement they had with the Alliance Team.  I

7   was consulting with them.

8   BY MR. BROUGHTON:

9   Q   While you were at ATA, do you recall whether or not you

10  were ever contacted by anyone from the UPS team?

11  A   Yes.

12  Q   What do you recall about that?

13  A   Mr. Greg Treitz, he contacted me multiple years to try to

14  get ATA to join the UPS team.  UPS was a very small team.

15  They had no major players in it other than themselves.  They

16  did not at the time contribute that many airplanes to the team

17  themselves.  So they were very small, and they had a very

18  small entitlement; and they were trying to grow that.  So they

19  needed and they had -- Ryanair was the only passenger flier at

20  the time.  And they had -- I can't remember what aircraft they

21  had, but they were narrow-body aircraft.  So they wanted

22  somebody with wide-body aircraft because their entitlement for

23  wide-body was being totally wasted and wasn't being flown by

24  anybody.  So they did approach us.

25         MR. BROUGHTON:  Okay.  Could you please put Federal

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  352

1  Express 39 up.  Mr. Brockwell, if you could figure out how to

2  make this a little bigger.

3          I'll tell you what, let's start at the end so that

4  everybody can read it.  Otherwise, it will be impossible.

5  BY MR. BROUGHTON:

6  Q   All right.  Mr. Doherty, this e-mail starts on Wednesday,

7  June 21st, 2006; is that right?

8  A   Correct.

9  Q   And it's from Sean Frick, and it says "Quick diligence

10 questions."  You see that?

11 A   Yes.

12 Q   And it says, "When was the FedEx team contract last

13 renewed, and how many years is it good for?"  Do you see that?

14 A   Yes, I do.

15 Q   If we could go next up the chain, you said, "The teaming

16 agreement is renewed annually, and it runs for the term of the

17 next AMC contract.  It is usually agreed to in March or April

18 of each year.  This year it was in April for FY2007."  Is that

19 what you told him?

20 A   Yes.

21 Q   All right.  Let's go up to the next one, please.

22 Mr. Frick writes back and says, "I thought we had a three-year

23 deal.  Don't we know that our percent versus Omni is shrinking

24 over the next couple of years?"  And if we could look at that

25 response.

1  A    Okay.

2  Q    And your response was, "This is a two-year side agreement

3  with Omni and FedEx in anticipation of everyone's continued

4  presence on the team."  Do you see that?

5  A    I do.

6  Q    Okay.  Do you have any idea why you typed "two" there?

7  A    I do not.

8  Q    Do you remember even sending this e-mail?

9  A    I don't remember sending it, but, obviously, I did.

10 Q    Okay.  Did you ever negotiate a two-year agreement with

11 FedEx?

12 A    No.

13 Q    Did FedEx ever send you a two-year agreement?

14 A    No.

15 Q    That's June of '06.  Three months later in September of

16 '06, if we could look at Plaintiff's Exhibit 12, after this

17 June '06 e-mail, did you receive this September 7, 2006,

18 contract?

19 A    Yes.

20 Q    And for what period of time was it?

21 A    For a three-year period starting '07 through '09.

22          MR. BROUGHTON:  If we could look at Plaintiff's

23 Exhibit 47, please.  If you could enlarge that top part.

24 BY MR. BROUGHTON:

25 Q    Mr. Doherty, this is an e-mail from you to Andrew Gigax in

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -   354

1   August of 2007; is that right?

2   A   Correct.

3   Q   Tell the jury who Andrew Gigax is.

4   A   He was a financial analyst that worked for Jack Schultz.

5   Q   The subject says 50/50 split; do you see that?

6   A   Correct.

7   Q   The date, August 3, 2007, that's almost a year after the

8   September 7, 2006 three-year contract; is that right?

9   A   Right.

10   Q   And if we could look at these attachments, please?  The

11   first attachment, do you recognize that?

12   A   Yes.

13   Q   That's that August 12 --

14   A   That's the --

15   Q   Tell us what that is.

16   A   That's the letter from Gary Molinari explaining that the

17   50/50 split with us -- between us and Omni and that he would

18   send a -- we would proceed with a letter of agreement for

19   three years.

20   Q   And let's look at the second attachment, please?

21        MR. GABEL:  Objection, Your Honor.  We've objected

22   to that as an incomplete exhibit.

23        THE COURT:  I can't hear you.

24        MR. GABEL:  We've objected to that.  It's an

25   incomplete exhibit.  It's not a fully-executed copy.

1        MR. BROUGHTON:  This attachment?

2        MR. GABEL:  I believe that's subject to the

3    objection as well as on the basis of hearsay and relevance.

4        THE COURT:  What's your purpose here, just to

5    show --

6        MR. BROUGHTON:  The purpose is to show -- not for

7    the truth of the matter asserted but just show he sent these

8    two items to Andrew Gigax.

9        THE COURT:  Overruled.

10       MR. GABEL:  What's the relevance of sending it to

11   Andrew Gigax?

12       MR. BROUGHTON:  He said he was a financial analyst.

13       MR. GABEL:  And --

14       THE COURT:  Overruled.

15       MR. BROUGHTON:  Plaintiffs offer Exhibit 47.

16       THE COURT:  Show it admitted.

17    (Plaintiff's Exhibit 47 was received in evidence.)

18   BY MR. BROUGHTON:

19   Q   Mr. Doherty, do you recall why you would be sending to

20   Andrew Gigax about a year later a copy of Mr. Molinari's 50/50

21   split e-mail and the three-year contract?

22   A   The exact reason I don't know, but at the time there was a

23   lot of --

24       MR. GABEL:  Objection.  Lack of knowledge beyond the

25   first part of the answer.  Nonresponsive.

1    THE COURT:  Rephrase.

2  BY MR. BROUGHTON:

3  Q    You did send these to Mr. Gigax; is that right?

4  A    I did.

5  Q    He is a financial analyst at ATA?

6  A    Yes.

7  Q    Mr. Doherty, did there come a time when the 757-300

8  aircraft were reclassified by AMC?

9  A    Yes.

10  Q    Tell us about that, if you would.

11  A    Well, it was proposed -- there was a proposal came out of

12  AMC to reclassify all 757 aircraft as short-range aircraft

13  instead of long-range aircraft.

14  Q    Let me stop you right there.  What difference would that

15  make if it was long range versus short range?

16  A    The short range was a different category of flying within

17  the international contract.  It was -- basically the

18  difference, the short-range aircraft is defined as something

19  that could fly nonstop at 1500 nautical miles with 75 percent

20  of its payload versus a long range is 3500 nautical miles

21  nonstop with 75 percent of its payload.

22         So in other words, it was for a shorter period --

23  distance.  The 757s never really met the 3500 nautical mile

24  category the way it was redefined as -- in the contract.  So

25  it was never enforced.  They flew under the long-range

1  contract, and AMC had decided that year to enforce it and to

2  expand it a little bit.  They put the 75 percent aspect into

3  it.

4        So what they did was they came down and the initial

5  look from their point of view was that none of the 757s met

6  the long-range category.  They would have then gone into the

7  short range; which again, is a different segment of business

8  within the contract.  It's actually a segment within the

9  Teaming Arrangement that was not covered.  I was -- because

10 there was nobody else within our team that flew at that time

11 short-range airplanes except us.  So we actually paid no

12 commission on the short-range business.

13       It was also a segment that didn't do a lot of

14 business.  It would have affected the business distribution

15 for everybody because we had 757s and Omni had 757s.  So that

16 would have had a big change within the structure of the

17 business being flown.

18 Q   And the change would be, if I understood you, that you

19 didn't have to pay a commission on short range?

20 A   Well, that would have been a change within -- based on the

21 team.  That wouldn't have been a change -- the overall change.

22 The overall change would have limited the business that

23 eventually went into that category because AMC would have

24 tried to keep their -- they're flying on long-range airplanes.

25 They wanted to be able to fly nonstop.

DOHERTY - DIRECT/BROUGHTON

Vol. 3 - 358

1      It doesn't mean that they wouldn't have flown

2  short-range aircraft to the desert, but it does mean that they

3  would have flown behind any long-range aircraft as far as what

4  they would have taken as suitable airplanes to fly the troops.

5  So it would have had an effect on the dollar for anybody that

6  had those airplanes.

7      Now, there were two categories of 757s.  The 757-200

8  they eventually found a way to keep them into long-range

9  flying.  The 757-300 did not -- could not get to that 3500

10  nautical mile milestone no matter how they tried to manipulate

11  the numbers.  So consequently, that airplane was going to be a

12  short-range aircraft, and only two carriers in the United

13  States had 757-300s, ATA and Continental.

14  Q   So did that have any -- did that make any difference to

15  you being in charge of ATA's flying at that time?  Was this

16  for FY08 or do you recall?

17  A   That would have been for the FY08 contract that they were

18  looking at.

19  Q   And did this make any difference to you?

20  A   It had a potential loss of overall long-range flying

21  because the 757s did not meet their -- it had a potential

22  gain -- 757-300, because we wouldn't have had to pay

23  commission.  So, I mean, there was a loss and a gain in that

24  process.

25      MR. BROUGHTON:  I'll pass the witness.

DOHERTY - DIRECT/BROUGHTON

Vol. 3 -  359

1      THE COURT:  Thank you.

2      Cross-examination, Mr. Gabel.

3                  **CROSS-EXAMINATION**

4      MR. GABEL:  Thank you, Your Honor.

5  BY MR. GABEL:

6  Q   Good afternoon, Mr. Doherty.  My name is Mike Gabel.  I

7  don't believe we've met before.  Now, you told Mr. Broughton

8  that you were the -- part of your -- you kind of went through

9  your career history.  And one thing you told him was that you

10 were sort of in charge of ATA's military operations; is that

11 correct?

12 A   That's correct.

13 Q   So you were the person who was the dealmaker so to speak,

14 right?

15 A   Yes.

16 Q   You were given authority and power by ATA to sign deals on

17 behalf of ATA that would contractually bind ATA to what you

18 signed, correct?

19 A   That's right.

20 Q   And you negotiated those deals and you signed those deals,

21 and if it had your John Hancock on it, ATA was expected to

22 follow that deal, correct?

23 A   That's correct.

24     MR. GABEL:  Robb, if you don't mind, if you would

25 put up 005979.  And for the jury's reference and for the

DOHERTY - CROSS/GABEL

Vol. 3 — 360

1   Court's reference when they're deliberating, this is

2   Plaintiff's Exhibit 173.

3   BY MR. GABEL:

4   Q   This is the 2008 Fee Agreement I believe Mr. Broughton

5   asked you about; do you recall that?

6   A   Okay.

7            MR. GABEL:  Robb, if you will, go over to page

8   005983 of that document.

9            MR. GABEL:  Down at the signature block, if you can

10  blow that up.

11  BY MR. GABEL:

12  Q   Is that your signature on that document, Mr. Doherty?

13  A   Yes, it is.

14  Q   Again, you were authorized by ATA to negotiate, and what

15  you signed bound ATA; is that correct?

16  A   I was authorized to negotiate on behalf of ATA and what I

17  signed, yes.

18  Q   And you signed this?

19  A   Yes, I did.

20  Q   And you signed it in the general vicinity of October 2007,

21  correct?

22  A   Yes.

23            MR. GABEL:  If you will, Robb, if you can pan up on

24  that page to the paragraph just above that.

25

1  BY MR. GABEL:

2  Q   This paragraph says -- and I believe Mr. Broughton read it

3  but, "This agreement, together with the Contractor Team

4  Arrangement Agreement and the Operating Agreement, constitute

5  the entire agreement and understanding of the parties on the

6  subject matter hereof and, as of the effective date hereof,

7  supersedes all prior agreements, whether written or oral,

8  between the parties hereto concerning the subject matter

9  hereof.  This agreement may be modified only by further

10 written agreement signed by the parties hereto."

11       Was that paragraph in there at the time that you

12 signed on behalf of ATA?

13 A   Yes, it was.

14 Q   You see it mentions two different times the subject matter

15 hereof.

16       MR. GABEL:  Robb, if you would go over to page 3 of

17 the agreement.  I believe that's 5981.  If you will, blow up

18 Paragraph IV there on page 3 of Plaintiff's Exhibit 173.

19 BY MR. GABEL:

20 Q   Was at least a portion -- well, Paragraph No. IV discusses

21 the allocation or entitlement that ATA was going to get as far

22 as its percent of flying as part of its subject, correct?

23 A   That's correct.

24 Q   And it also -- it also provides that Northwest will get 10

25 flights per month, correct?

DOHERTY - CROSS/CABLI

Vol. 3 -  362

1  A    It says that, yes.

2  Q    Now, that three-party letter from back in 2006 that Omni

3  never signed -- you recall that letter?  We've been discussing

4  it a good bit.

5  A    Okay.

6  Q    That letter said nothing about Northwest flying, did it?

7  A    No.

8  Q    Now, when Mr. Broughton was questioning you, I believe you

9  said that you asked Gary for reduction in the commission or

10  the fee that Northwest paid to FedEx partially because

11  Northwest was going to fly, correct?

12  A    What -- I didn't ask for a reduction in the fee to be paid

13  to Northwest.  I asked for a reduction in the commission that

14  ATA would be paying.

15  Q    Maybe I misstated the sentence.

16        Prior to Northwest flying these 10 flights a month,

17  ATA was paying 7 percent commission to FedEx, correct?

18  A    That's correct.

19  Q    And after Northwest started flying, ATA was paying 4-1/2

20  percent, correct?

21  A    That's what was negotiated.

22  Q    You said the reason that was negotiated is you had

23  originally gone up to 7 percent to recruit Northwest to the

24  team, correct?

25  A    Right.

DOHERTY - CROSS/CABELL

Vol. 3 -   363

1  Q   And they had been recruited back in 2002, correct?

2  A   I can't state the year, but yes, sometime back in that

3  time frame.

4  Q   Far before any three-party letters we're talking about

5  that cover 2007, 2008, and 2009, correct?

6  A   Right.

7  Q   Now, so you went to Gary and you said, "I want to reduce

8  the fee because part of the deal in this fee was we were

9  recruiting Northwest as a nonflier." But what you did not say

10 to Gary was, "Hey, they can't fly because we've got this

11 three-party letter from 2006." You didn't say that, did you?

12 A   We discussed the letter. We discussed the split. The

13 implication that I got would be that the 10 flights would be

14 taken off the top, and then the split would continue after

15 that.

16 Q   So your testimony today to this jury is that you did

17 discuss the three-party 2006 letter, the one with just your

18 signature and FedEx's signature, not Omni's signature, with

19 Gary Molinari. And so, you raised that as a reason that

20 Northwest couldn't do the flying?

21 A   That was part of the rationale, yes.

22 Q   Okay. Would you say that your memory today is more clear

23 or less clear about these events than it was a year ago?

24 A   About the same. I don't know. Why?

25 Q   Okay. Do you remember you gave a deposition back in June

Vol. 3 -   364

1   of 2009?

2   A   Yes.

3   Q   And you were under oath to -- you were sworn to tell the

4   truth there, just like you were today to this jury, right?

5   A   Right.

6   Q   And Mr. Broughton was there, and Mr. Blumberg was there, I

7   believe, correct?

8   A   Okay.

9   Q   That was here in downtown Indianapolis, right?

10  A   Yes.

11  Q   And you were asked questions, and you gave answers,

12  correct?

13  A   Yes.

14  Q   And your answers were under oath, correct?

15  A   That's right.

16        MR. GABEL:  Robb, if you will, go to the deposition

17  of Mr. Doherty at page 206, lines 4 through 8.

18  BY MR. GABEL:

19  Q   Let me ask if this was your testimony a year ago.

20     (A video was played in open court.)

21  Q   Was that your testimony a year ago?

22  A   Yes.

23        MR. GABEL:  Now, going back to Plaintiff's

24  Exhibit 173, the third page of that document, 5981, Robb.

25

Vol. 3 - 365

1  BY MR. GABEL:

2  Q   Paragraph IV on that page, the paragraph that discusses

3  the split -- the subject of this is the split that you will be

4  getting as well as the Northwest flying.  Nothing in this

5  paragraph IV said anything about a three-party letter that the

6  parties may have signed a year before, did it?  There's no

7  reference --

8  A   There's no reference to it, no.

9  Q   Okay.  Now, we've heard some testimony about another

10 three-party letter that everybody did sign --

11 A   Yes.

12 Q   -- back in 2003?

13        And that letter addressed 2004, 2005, and 2006,

14 correct?

15 A   Correct.

16 Q   And those Fee Agreements in each of those years did

17 reference the letter that all three parties had signed; is

18 that correct?

19 A   Yes.

20 Q   Okay.  So when we look at the Fee Agreements for 2004,

21 2005, and 2006, when we look over at that page where it

22 discusses what commission ATA would pay to FedEx, that will

23 also have a paragraph that says -- that refers back to the

24 2003 letter that all three parties signed, correct?

25 A   Yes.

Vol. 3 -   366

1   Q   And back to this 2008 Fee Agreement, it did not make a

2   reference to the three-party letter that only two parties

3   signed, correct?

4   A   No, it did not.

5   Q   And you didn't raise that issue with Gary Molinari when he

6   sent you this Fee Agreement and ask him to add a reference to

7   that 2006 three-party letter that only two parties had signed,

8   did you?

9   A   No, I didn't.

10  Q   You didn't review this Fee Agreement with ATA's lawyer

11  before you signed it, did you?  The 2008 Fee Agreement.

12  A   The 2008, no.

13  Q   ATA had an in-house lawyer, correct?

14  A   Yes, we did.

15  Q   And from time to time, you had reviewed various contracts

16  that you were signing on behalf of the company with that

17  lawyer, correct?

18  A   Yes.

19  Q   But you didn't review this one with the lawyer.  You just

20  signed it, correct?  Or prior to signing it --

21  A   No, I did not review it every year with the lawyer because

22  it was you basically word for word.

23          MR. GABEL:  Robb, if you will, please go to page 598

24  and pull that up.  For the jury's reference and the Court's

25  reference, this will be Defendant's Exhibit 107.  Go to just

DOHERTY - CROSS/GABEL

Vol. 3 -  367

1  the top, the send and receive information there, Robb.

2  BY MR. GABEL:

3  Q   At the top, this appears to be an e-mail from Jack Schultz

4  to you dated October 1st, 2007.

5  A   Okay.

6  Q   Do you have any reason to doubt that you received an

7  e-mail from Jack Schultz on October the 1st, 2007?

8  A   Well, basically, I probably received it.  I don't know if

9  I read it.  I would have to see the body.

10          MR. GABEL:  Your Honor, I believe this is

11  stipulated, but we'll offer Defendant's Exhibit 107.

12          THE COURT:  Show it admitted.

13      (Defendant's Exhibit 107 was received in evidence.)

14          MR. GABEL:  Now, if you'll show me the whole e-mail,

15  Robb.  Just pan in on the message to Mr. Gordon, basically

16  down to "Jack."

17          THE WITNESS:  Okay.

18          MR. GABEL:  First, if you can go to the middle

19  paragraph of this, if you can highlight the middle paragraph

20  or blow it up, Robb.

21  BY MR. GABEL:

22  Q   Well, who is Jack Schultz?  Who is the guy sending you

23  this e-mail?

24  A   Jack Schultz is the -- was the financial director that

25  worked for the financial officer, Mr. Yakola; and I -- and he

Vol. 3 -  368

1  worked within the military department.

2  Q   So he's a finance guy who worked with Mr. Yakola, the CFO

3  of the company?

4  A   Yeah.

5  Q   And this is an e-mail from somebody who does financial

6  analysis with the CFO, correct?

7  A   Correct.

8  Q   And you got it -- I think we looked at the date --

9  October 1st, 2007, which is within a week, give or take, of

10 when you signed that 2008 Fee Agreement, correct?

11 A   Okay.  Yes.

12 Q   Now, Jack Schultz, here it is October of 2007.  You'll

13 agree with me that October of 2007 is over a year after you

14 had gotten that three-party letter that only two parties

15 signed, correct?

16 A   Yes.

17 Q   So you've now been doing business for a year, and Jack

18 Schultz says, "Also, there's a letter that conveys an

19 agreement between ATA and Omni to share the revenues 50/50.

20 The only version I've seen has not been signed by Omni.  Do

21 you have a signed copy of that letter?"

22     Well, as of this date when the financial assistant to

23 the CFO was asking you for a signed copy of that letter a year

24 and a half after the letter had come out, you still didn't

25 have one signed by Omni, did you?

DOHERTY - CROSS / GABEL

Vol. 3 -  369

1    A    No, I did not.

2              MR. GABEL:   Okay.  Now, going to the bottom

3    paragraph, the bottom sentence just before the signature,

4    Robb.

5    BY MR. GABEL:

6    Q    Mr. Schultz goes on to say, "Also, Subodh has requested

7    that we NOT," all caps, not, "sign the Contractor Team

8    Arrangement Fee Agreement until he approves.  Thanks."

9              Who is Subodh?

10   A    Subodh was the head of the parent company for ATA.

11   Q    So the parent company was requesting that you not sign --

12   and that Contractor Team Arrangement Fee Agreement, they tend

13   to repeat the name of all these contracts to the last word,

14   but this would be what is commonly known as the Fee Agreement,

15   correct?

16   A    Correct.

17   Q    And according to Jack Schultz, Subodh Karnick was

18   requesting that you not sign that until he approved.  Is that

19   what this e-mail told you?

20   A    Yes.

21   Q    Now, on direct I think Mr. Broughton was asking you some

22   questions about your background, and you indicated that you

23   retired from ATA; is that correct?

24   A    Yes.

25   Q    Well, that retirement occurred within a month of you

DOHERTY - CROSS/GABEL

Vol. 3 -   370

1  signing this Fee Agreement, didn't it?

2  A   That's about right.

3  Q   And your retirement was not voluntary, was it?

4  A   No.

5  Q   You were asked to leave ATA, weren't you?

6  A   Yes.

7         MR. GABEL:  Robb, if we can go back to the 2008 Fee

8  Agreement, Plaintiff's Exhibit 173, at page 3 with the fee

9  language on it.  That will be 5981, I believe.  If you will,

10  blow up the top paragraph, the II on that page.

11  BY MR. GABEL:

12  Q   Now, we had discussed earlier that this Fee Agreement that

13  you signed less than a month before you were asked to leave

14  ATA had reduced the amount that you paid to FedEx from

15  7 percent to 4 1/2 percent, and that sounds almost like sales

16  tax.  It doesn't sound like a lot of money.  So can you

17  quantify for the jury what 7 percent of your revenue would be

18  over the course of a year?

19  A   Our revenue was $400 million, so 7 percent of that is

20  roughly $28 million.

21  Q   So what commission was charged by FedEx would be something

22  that was important and significant and material to ATA,

23  correct?

24  A   Yes.

25  Q   It could totally change the deal one way or the other,

Vol. 3 -   371

1  depending on what that commission was, correct?

2  A   Not necessarily.  I mean, when you say "change the deal,"

3  I mean, if you leave the team, you get nothing.

4  Q   Good point.

5  A   If you stay with the team -- I mean, so --

6  Q   So if FedEx raised a commission to a point that wasn't

7  tenable or acceptable, you were free to leave the team, right?

8  A   We were free to leave the team.

9  Q   Well, let's talk about the numbers.

10         MR. BROUGHTON:  Excuse me.  I don't think he was

11  through with his answer.

12         MR. GABEL:  He fully responded.

13         THE COURT:  Mr. Doherty, do you have anything else

14  to say?

15         THE WITNESS:  I was going to say except for the fact

16  that we had an agreement to be with them for three years.

17  BY MR. GABEL:

18  Q   And you're referring to that 2006 letter with only two

19  signatures?

20  A   That's correct.

21  Q   Are you aware of any other contract that referenced FY09

22  or any other document that referenced FY09 other than that --

23  any other document signed by you and FedEx that referenced

24  FY09 other than that three-party letter with only two

25  signatures?

DOHERTY - CROSS/CABELL

Vol. 3 -  372

1   A    Not that I'm aware of at this point in time.

2   Q    Do you know about what the typical profit percentage was

3   for military flying for ATA?

4   A    It ranged, but based on the amount of expense we had --

5   when we were short aircraft and we were nursing aircraft

6   through maintenance, it was probably less, but probably

7   roughly around 10 percent.

8   Q    If FedEx had come back and said, You know what?  Our costs

9   have gone up, and we want to charge you 12-percent commission

10  next year, this would have turned into a money loser for ATA,

11  correct?

12  A    Well, the 10 percent was after the commission level, which

13  was already 7 percent, so it would have to go up a lot higher

14  than that.

15  Q    Okay.  If FedEx had come back and said, Next year your

16  commission would be 18 percent, this would be a money loser

17  for ATA, correct?

18  A    It would be.

19  Q    And nothing in that three-party letter that only two

20  parties signed said anything about what the commission would

21  be, did it?

22  A    No.

23  Q    There was nothing in that three-party letter that only two

24  parties signed that limited what that commission could be, was

25  there?

DOHERTY - CROSS/GABEL

Vol. 3 -   373

1   A   No, because they were two different agreements.

2          MR. GABEL:  Robb, if you could, go to page 01291.

3   Actually, go to page 00078, just 78 without the zeros.

4          And for the Court's reference and for the jury's

5   reference, this is Defendant's Exhibit No. 20.

6          Zoom in on the to/from information there, if you

7   could, Robb.

8   BY MR. GABEL:

9   Q   This is an e-mail from you, Mr. Doherty, to Gary Molinari

10  dated August 9th, 2005.

11  A   Okay.

12  Q   I believe you were asked about some of these

13  communications by Mr. Broughton.  Do you recall engaging in

14  these e-mail communications with Mr. Molinari in August 2005?

15  A   Yes.

16          MR. GABEL:  We'll offer Defendant's Exhibit No. 20,

17  Your Honor.

18          THE COURT:  20 admitted.

19      (Defendant's Exhibit 20 was received in evidence.)

20          MR. GABEL:  Robb, if you would, go down to the last

21  paragraph of this document.

22  BY MR. GABEL:

23  Q   In the last paragraph of this e-mail -- now, just to give

24  everyone some context, August of 2005, that's when a series of

25  e-mails were flying back between you and FedEx and FedEx and

DOHERTY - CROSS/CABELL

Vol. 3 -   374

1   Omni talking about split of business in future years, correct?

2   A   Correct.

3   Q   And during the course of these e-mails, you sent this

4   e-mail to Gary Molinari, correct?

5   A   Yes.

6   Q   And the closing paragraph of your e-mail said, "We would

7   be willing to split at this compromise level.  The length of

8   this agreement could be for the three years that Omni has

9   proposed, or it could be for a shorter period of time.  We're

10  open to suggestions on this issue"; is that correct?

11  A   That's right.

12  Q   Now, at the time that you, as the chief negotiator on

13  behalf of ATA, was communicating to FedEx that you were open

14  to whatever length of agreement we might come up with, ATA was

15  already in the market shopping for newer wide-body jets,

16  correct?

17  A   Correct.

18  Q   As a matter of fact, if you look up at the fourth

19  paragraph of this e-mail -- if you'll go up to the fourth

20  paragraph of Defendant's 20, Robb -- and the second sentence

21  of that, you even told Gary Molinari "ATA is adding as many

22  narrow-body aircraft as possible to augment our wide-body

23  fleet.  So at the same time ATA is not reducing any wide-body

24  aircraft, we expected that the net effect of our current fleet

25  program will actually add at least one wide-body and possibly

Vol. 3 -   375

1   two.  They would be fully committed to the generation of

2   military business."  So the remainder of that really talks

3   about the wide-body airplanes, things like 767s and DC10s,

4   correct?

5   A   Yes.

6   Q   And so ATA was actively out there shopping for these

7   larger wide-body airplanes at the time you sent this e-mail in

8   August of 2005 saying ATA was willing to agree to a shorter

9   agreement, correct?

10  A   Yes.

11        MR. GABEL:  Robb, if you will, go to 01291, which is

12  Plaintiff's Exhibit 7.

13  BY MR. GABEL:

14  Q   Mr. Doherty, on your direct exam you were asked about Gary

15  Molinari's response to this e-mail.

16        MR. GABEL:  And, Robb, if you will, highlight the

17  top e-mail there; in particular, the bottom sentence that

18  says, "I would like to proceed on this basis with a letter

19  agreement for three years."

20  BY MR. GABEL:

21  Q   Now, a letter agreement for three years, you understood

22  that that was not an e-mail or a phone call, that what Gary

23  Molinari was talking about, based on prior experience, was a

24  letter, a letter that had three different signatures on it,

25  correct?

DOHERTY - CROSS/CABELL

Vol. 3 -  376

1   A   That's what he was proposing to put out, yes.

2   Q   So whatever y'all were negotiating he was going to reduce

3   to a letter with three signatures, correct?

4   A   Yes.

5   Q   Okay.  And he told you about this in August of 2005; is

6   that correct?

7   A   Right.

8   Q   Now, you didn't actually see a proposed three-party letter

9   agreement until September of 2006, correct?

10  A   That's right.

11  Q   So 12 1/2 months went by between this e-mail saying, "Hey,

12  I'm going to put together a letter agreement," and when you

13  actually saw that three-party letter, correct?

14  A   That's right.

15  Q   And during that intervening 12 1/2 months, ATA never took

16  the initiative to say, well, I don't know what Gary's doing,

17  or I don't know what's taking so long, and, frankly, I don't

18  care what Omni's doing.  I want to sew up my 50 percent and

19  send an agreement for just two parties to FedEx that says

20  regardless of what you end up doing with the other 50 percent

21  in the next future years, ATA gets 50 percent for the next

22  three years.  You never sent that kind of letter to Gary, did

23  you?

24  A   No, we did not.

25  Q   And you didn't know whether or not, during that 12 1/2

1   months, Omni had sent a letter that said, "Regardless of what

2   happens with the other 50 percent or whether we might want to

3   bid on 60, 70, 80 percent in the next couple of years, we want

4   to at least assure our 50 percent.  So here's Omni.  Here's

5   FedEx.  We're agreeing that no matter what happens with that

6   other 50 percent -- and, as a matter of fact, we kind of like

7   it being fair game -- we want to guarantee Omni's 50 percent."

8   You didn't know at that time whether Omni did that, did you?

9   A   I had no idea what Omni was doing.

10  Q   Now, you had talked about when Gary sent you this and

11  said, "Please confirm."  You told Mr. Broughton you called him

12  back that day, correct?

13  A   I believe it was that day.  It sure would have been right

14  around when I got the communications.

15  Q   And if my notes are correct, you said that Gary said that

16  he would be getting with his legal department to send you an

17  agreement that both ATA and Omni would sign, correct?

18  A   I don't know if he said "both."  He said that he would

19  send us an agreement from his legal department.  I don't know

20  that he specified the word "both."

21  Q   If my notes reflected in your direct examination 20

22  minutes ago, you said the word "both," would you have any

23  reason to argue with that?

24  A   No.  If I said it, I said it.  I don't know that he --

25  Q   It's possible you said it 20 minutes ago --

DOHERTY - CROSS/GABEL

Vol. 3 -   378

1   A    What his exact words were, I don't have a total recall of

2   his exact words at the time.

3   Q    But you always understood there would be something for

4   both of you to sign coming from Molinari based on what you had

5   seen before?

6   A    That's right.

7            MR. GABEL:  Robb, if you will, go to page 153, which

8   is Defendant's Exhibit 39 for the juror notebooks that you

9   will deliberate with or for the Court's record.

10  BY MR. BROUGHTON:

11  Q    Defendant's Exhibit 39 is an e-mail that you were asked

12  about by Mr. Broughton involving you and Sean Frick having an

13  e-mail exchange about your understanding of the deal with

14  FedEx.  You'll recall Mr. Broughton was asking you about this

15  bottom e-mail where -- well, who is Sean Frick first?  Who are

16  we talking to here?

17  A    He was -- I believe at the time he was the VP of

18  Restructuring or he was, he was -- had a number of different

19  titles over the time.  He was either VP of Restructuring.  He

20  was in charge of the -- getting the new equipment and

21  financing into them.

22  Q    So he was either restructuring the company coming out of

23  bankruptcy or he was buying airplanes?

24  A    I'm not sure what his title was exactly.

25  Q    But under either scenario, he's the type of person you

Vol. 3 -  379

1  would go to give accurate information to, correct?

2  A   That's correct.

3  Q   You were the lead negotiator, the lead dealmaker, the guy

4  that knew the most about ATA's military business, correct?

5  A   Yes.

6  Q   Sean Frick asked you in June of 2006, which is after

7  you've had all these e-mails --

8        THE COURT REPORTER:  I'm sorry, Mr. Gabel.  Could I

9  ask you to slow down, please?

10        MR. GABEL:  It doesn't happen to me very often.

11        THE WITNESS:  Not all of them, the September 6 is --

12  BY MR. GABEL:

13  Q   But those 2005 e-mails, that whole exchange had happened

14  when Sean Frick was asking you this question, correct?

15  A   Yes.

16  Q   Mr. Broughton showed you --

17        MR. GABEL:  Actually go up a little bit, Robb -- or

18  go back to the main page.  Actually, go back -- this is the

19  second page of Exhibit 39.  Page 1 of that e-mail -- or e-mail

20  chain would be -- you got it, 152.

21  BY MR. GABEL:

22  Q   Mr. Broughton showed you --

23        MR. GABEL:  First blow up the bottom two e-mails.

24  BY MR. GABEL:

25  Q   Mr. Broughton a few minutes ago showed you these two

Vol. 3 - 380

1  e-mails.  This is Sean Frick saying, Hey, I thought we had a

2  three-year deal.  Don't we know our percent versus Omni is

3  shrinking in the next couple years?  And he showed you a

4  response that was a two-year side agreement with Omni and

5  FedEx that anticipated the continued presence on the team; and

6  he asked you if you had any idea why you had typed "two" there

7  instead of "three."  Do you recall that line of questioning?

8  A   I do.

9  Q   But this was more than just a typo, wasn't it?

10  A   I don't know.  Again, I don't recall the message itself.

11  I don't know why I would say two years because everything we

12  had talked about with FedEx before and after that had been

13  talking about three years.  The reason I put two years down, I

14  don't know.

15  Q   Just so the jury gets a complete picture, I want to show

16  them the next e-mail in the chain that Mr. Broughton didn't

17  show them.  Just above that -- the next two e-mails there.  He

18  says, "When did we sign that?"  And you responded, "That was

19  agreed to in October of last year to cover FY07 and 2008

20  contracts, Bill."

21       My question to you is how many years did you identify

22  when you say FY2007 and FY2008?

23  A   That's two years, but that's -- that again goes --

24  Q   In October of last year at the time of June of 2006, that

25  would have been October of 2005 would be the month you're

DOHERTY - CROSS/GABEL

Vol. 3 -  381

1  referring to?

2  A   Yes.

3       MR. GABEL:   Robb, if you will, pull up Document

4  1300.  This is Plaintiff's Exhibit 12 for the Court and for

5  the jury.

6  BY MR. GABEL:

7  Q   This is the cover e-mail of that three-party letter you

8  eventually did get from Gary Molinari, 12-and-a-half months

9  after those August e-mails.  And in his cover letter that was

10 to Bill and Chuck, and you understand "Bill" was you, correct?

11 A   Yes.

12 Q   "Chuck" referred to Charles Pollard of Omni, correct?

13 A   Yes.

14 Q   Gary told you when he sent you this that he expected each

15 of you to sign this document, correct?

16 A   Right.  It was formalizing the 50/50 split that we had

17 agreed to.

18 Q   But you never got a copy that had been signed by Omni, did

19 you?

20 A   No, I did not.

21 Q   Let's go to -- Robb, let's go to Document 265.  For the

22 Court and for the jurors keeping score at home, this is

23 Defendant's Exhibit 51.  Go to the --

24       MR. GABEL:   Well, first blow up the bottom -- well,

25 first blow up the top header information there.

DOHERTY - CROSS/GABEL

Vol. 3 - 382

BY MR. GABEL:

1

2  Q   The top of this indicates this is an e-mail from Sean

3  Frick to you in September, and it's a little bit illegible.

4  But I believe it's September of 2006.  Did you get this e-mail

5  from Sean Frick during that time?

6  A   Yes.

7          MR. GABEL:  Your Honor, I think this one may already

8  be in, but I offer Defendant's Exhibit 51.

9          THE COURT:  Show it admitted.

10     (Defendant's Exhibit 51 was received in evidence.)

11  BY MR. GABEL:

12  Q   All right, let's go to the e-mail chain.  This attached a

13  bottom e-mail chain that didn't include you, correct?  If you

14  look down at the bottom, what started all this off was from

15  Doug Yakola to Eric Miller.  Doug Yakola was the Chief

16  Financial Officer, correct?

17  A   Yes.

18  Q   Pretty high up the chain, correct?

19  A   Um-hum.

20  Q   He had told Eric Miller everything is in progress, and

21  Paragraph No. 1, "Need to get Omni to sign the letter.  Have

22  FedEx signature."  This was as of September 11, 2006, correct?

23  A   Yes.

24  Q   Then apparently above that, Eric had followed up with him

25  three days later asking for the status of the Omni letter,

Vol. 3 - 383

1   correct?

2   A   Yes.

3   Q   And then Doug had forwarded that to Sean Frick with a

4   question mark; and then just above that, Sean forwarded to you

5   saying, "Any luck on FedEx countersignature on the Fee

6   Agreement or the Omni sideletter," correct?

7   A   Yes.

8   Q   And that's where you find the two different agreements in

9   Sean's question, correct?

10  A   In Sean's question?  Yes.

11  Q   He's asking for one, a copy of the Fee Agreement that

12  FedEx had signed; and two, what he refers to as Omni

13  sideletter was what you understood was this three-party 2006

14  letter with only two signatures, correct?

15  A   Yes.

16  Q   So you now have -- all right.  You now have the Chief

17  Financial Officer of Global, the parent company, Doug Yakola;

18  and Sean Frick, a Vice President, both forwarding down the

19  chain an e-mail to you saying someone would like to see Omni's

20  signature on this agreement, correct?

21  A   Right.

22  Q   And so naturally with those higher-ups saying we want

23  Omni's signature, you would have picked up the phone and

24  called Gary Molinari and said, "I need Omni's signature,"

25  correct?

DOHERTY - CROSS/GABEL

Vol. 3 - 384

1  A   Yes.

2  Q   Because at this time you had never seen one with Omni's

3  signature, had you?

4  A   I had not seen one with Omni's signature.

5  Q   And correct me if I'm wrong; but on your direct

6  examination, you testified to this jury that Gary never told

7  you that Omni would not sign.

8  A   That's right.

9  Q   In fact, when you followed up with Gary and asked him for

10 Omni's signature, he did tell you Omni would not sign, didn't

11 he?

12 A   No, he did not.

13 Q   He may have told you Omni wouldn't sign, didn't he?

14 A   No, he did not.  He never told me that Omni would not sign

15 the letter.

16 Q   And your memory today in October of 2010 is crystal clear

17 on that?

18 A   Yes.

19 Q   Even more clear than it would have been a year ago in June

20 of 2009?

21 A   I don't know if it's more clear or the same, but he never

22 said that Omni would not sign the letter.

23 Q   Well, like I discussed earlier, over a year ago here in

24 downtown Indianapolis, you gave a sworn deposition --

25 A   Yes.

DOHERTY - CROSS/GABEL

Vol. 3 -  385

1  Q  -- where you were sworn to tell the truth just like you're

2  telling these folks the truth today, didn't you?

3  A  Yes.

4  Q  You were asked questions and you gave answers that were

5  honest answers, correct?

6  A  Yes.

7       MR. GABEL:  Robb, if you will, play Mr. Doherty's

8  deposition at pages 167, line 6 through 169 line 1.

9       (The deposition of Mr. Doherty, page 167, line 6

10  through 169, line 1, were played in open court.)

11       MR. BROUGHTON:  Your Honor, I would just object.

12  That was not impeachment at all.

13       THE COURT:  I agree with that.

14       MR. GABEL:  I disagree, Your Honor.  I'm sorry.

15       THE COURT:  I just agreed with Mr. Broughton.

16  That's not impeachment.  It's not anywhere close to

17  impeachment.  Now move on with your next question.

18       MR. GABEL:  Thank you, Your Honor.

19       If you can -- Robb, pull up page 480.  For the

20  record, this is Defendant's Exhibit 89.

21  BY MR. GABEL:

22  Q  Mr. Doherty, this appears to be an e-mail from you to Gary

23  Ellmer dated June 15, 2007.  Would you have sent that e-mail?

24  A  Yes.

25  Q  If you will, flip over to the attached page of that, page

DOHERTY - CROSS/GABEL

Vol. 3 -   386

1    2 of that is Defendant's Exhibit 89.  And --

2              MR. GABEL:  Well, Your Honor, I would offer

3    Defendant's Exhibit 89.

4              THE COURT:  Any objection?

5              MR. BROUGHTON:  I object as hearsay.

6              THE COURT:  Any response?

7              MR. GABEL:  Your Honor, this is an e-mail from

8    Mr. Doherty.  It would be an admission of a party opponent.

9    He was a representative of ATA.

10             MR. BROUGHTON:  I believe it's been offered for the

11   truth of the matter asserted.  It's an out-of-court statement.

12             THE COURT:  Made by a party opponent.

13             MR. BROUGHTON:  I believe FedEx has consistently

14   objected to e-mails from Gary Molinari in the past.

15             THE COURT:  Overruled.  It's admitted.

16        (Defendant's Exhibit 89 was received in evidence.).

17   BY MR. GABEL:

18   Q    Who was Gary Ellmer?

19   A    Gary Ellmer was the Senior VP of Operations, and I

20   reported to him.  He was my boss.

21   Q    You would want to convey accurate information to him,

22   correct?

23   A    Yes.

24   Q    And on the front page, we saw that this e-mail was sent in

25   June of 2007, correct?

DOHERTY - CROSS/GABEL

Vol. 3 -   387

1  A   Okay, yes.

2  Q   If you want to look to --

3  A   No, that's fine.

4  Q   In June of 2007, by that time, you would have been in

5  possession of this three-party letter the two parties signed,

6  correct, the 2006 letter?

7  A   Yes.

8          MR. GABEL:  If you will, let's go down, Robb to the

9  third indented bullet point that starts going forward, that

10  area.

11  BY MR. GABEL:

12  Q   Now, in this memo did you tell Gary Ellmer that going

13  forward -- and going forward, I guess, the time point we're

14  referencing at the time you sent this is June of 2007,

15  correct?

16  A   Going forward is any time forward of where we were, yes.

17  Q   Okay.  And during June of 2007, you were already in fiscal

18  year 2007, correct?

19  A   This was just talking about fiscal year -- the change was

20  going to take place in fiscal year '08.

21          MR. GABEL:  Your Honor, I move to strike as

22  nonresponsive.

23          THE COURT:  All right.  Show it stricken.

24  BY MR. GABEL:

25  Q   My question is:  June of 2007, the time that you're

DOHERTY - CROSS/GABEL

Vol. 3 -  388

1  sending this e-mail, that is within the Government, the

2  military's fiscal year 2007, correct?

3  A   Yes.

4  Q   Because that year had run from October of '06 and was

5  going to run to September of '07, correct?

6  A   Correct.

7  Q   So you're still in FY07 at the time you send this,

8  correct?

9  A   Okay.  Yes.

10  Q   And you had signed a Fee Agreement for FY07 with FedEx,

11  correct?

12  A   Yes.

13  Q   And that Fee Agreement for FY07 had said you got

14  50 percent of the business, correct?

15  A   Right.

16  Q   So you tell Gary Molinari that currently the split is

17  50/50, but you also tell him that going forward --

18          THE COURT:  Wait, this isn't something to Molinari,

19  is it?

20          MR. GABEL:  I'm sorry.  Did I say "Molinari"?

21          THE COURT:  Yes.

22  BY MR. GABEL:

23  Q   You told Gary Ellmer --

24          MR. GABEL:  I'm sorry, Your Honor.

25

DOHERTY - CROSS/GABEL

Vol. 3 -  389

BY MR. GABEL:

1

2   Q   You told the C-something-O of ATA, Gary Ellmer -- OO, EO?

3   A   Senior VP of operations.

4   Q   Senior VP of operations, Gary Ellmer, at ATA, that it was

5   50/50, but going forward it could change, correct?

6   A   Yes.

7   Q   And you didn't say anything in this document --

8           MR. GABEL:  And, Robb, if you want to show him the

9   whole document.

10  BY MR. GABEL:

11  Q   -- about a three-party letter that only two people had

12  signed that would preclude things from changing, did you?

13  A   No.

14          MR. GABEL:  Robb, if you would pull up page 378,

15  which for the Court's record is Defendant's Exhibit 64.

16  BY MR. GABEL:

17  Q   And at the top, this appears to be an e-mail from Bill

18  Doherty to Susan Lee with a copy to Wil Lilly sent February of

19  2007.

20          MR. GABEL:  And, Your Honor, I would like --

21  BY MR. GABEL:

22  Q   Well, did you send this e-mail, Mr. Doherty?

23  A   It's been a long time, but yes.

24          MR. GABEL:  Okay.  Your Honor, I would like to offer

25  Defendant's Exhibit 64.

1          MR. BROUGHTON:  Objection.  It's irrelevant.  This

2    is from the Government, CRAF; and he is responding not to

3    FedEx but to CRAF.  Furthermore, the questions aren't stated.

4    So only showing the answers is an incomplete document.  And

5    without that, it's misleading and confusing.

6          MR. GABEL:  Your Honor, I believe you ruled on this

7    exhibit in a pretrial order and admitted it, allowed it to be

8    referenced in opening; and that was based in part on the fact

9    it's not complete because FedEx got it from ATA.  So it's not

10   our fault if they didn't give us the entire attachment.  And

11   it is relevant because it goes to Mr. Doherty's state of mind

12   and his understanding of what kind of deal he did have or did

13   not have that he's conveying to a third party during the time

14   that they're alleging he thinks he has a three-year deal.

15          THE COURT:  Overruled.

16          MR. GABEL:  Thank you.

17       *(Defendant's Exhibit 64 was received in evidence.)*

18   BY MR. GABEL:

19   Q   Mr. Doherty, if --

20          MR. GABEL:  Robb, can you put back up

21   Defendant's 64, 378.  If you will, go to the first paragraph

22   of Defendant's 64 and expand that, Robb.

23   BY MR. GABEL:

24   Q   In your communication to the military, to CRAF, you would

25   want it to be honest and forthright and open, correct?

1  A   Yes.

2  Q   And did you say in your e-mail to CRAF in the fourth line

3  down -- well, let's just read the whole sentence.  The second

4  sentence, "ATA strongly supports a longer-term contract.  This

5  would put some stability in our business expectations.  The

6  current process no sooner gets done and we have to start

7  working the next year's contract with no feel for what our

8  expectations should be.  We are always working from a state of

9  flux and uncertainty.  The longer-term contract gives us some

10  basis for fleet planning, fleet upgrades, investor confidence

11  in our business plans -- and investor confidence in our

12  business plans.  Right now we are guessing year to year

13  because we don't know what Teaming Arrangements or how

14  business opportunities will change."

15       Did you send that e-mail to CRAF?

16  A   Yes, I did, in response to their reply -- their questions.

17  Q   Looking back at --

18       MR. GABEL:  Robb, if you could, go back to 00152.

19  BY MR. GABEL:

20  Q   Which is the e-mail exchange between you and Mr. Frick

21  where he was asking you about whether we had a two-year

22  agreement or three-year agreement.

23       MR. GABEL:  Robb, if you will, blow up that second

24  full e-mail from the bottom.

25

Vol. 3 - 392

1  BY MR. GABEL:

2  Q   Now, one thing you had told Mr. Frick was that whatever

3  agreement you had with Omni and FedEx was in anticipation of

4  everyone's continued presence on the team, correct?

5  A   Yes.

6  Q   And I believe on direct you testified to Mr. Broughton

7  that people came and people went, correct?

8  A   That's right.

9  Q   And UPS called you up, and they talked to you about

10  joining their team, correct?

11  A   They did.

12  Q   Mr. Treitz from UPS called you?

13  A   Yes.

14  Q   And he called you on multiple occasions, didn't he?

15  A   Right.

16          MR. GABEL:  Robb, if you will, go to 374, which is

17  Defendant's 62.  If you will blow up the top information about

18  the date.

19  BY MR. BROUGHTON:

20  Q   This appears to be an e-mail from Greg Treitz at UPS to

21  Bill Doherty dated January 10th, 2007.  Do you have any reason

22  to doubt that you received an e-mail from that --

23  A   I received that.

24  Q   You received that?

25  A   Yes, I did.

Vol. 3 -  393

1  Q   And this would have been in reference to your discussions

2  with Mr. Treitz about ATA joining the UPS team?

3  A   That's correct.

4          MR. BROUGHTON:  May I object?  It's clearly a

5  hearsay document from a third party.

6          MR. GABEL:  Your Honor, I would like to offer into

7  evidence Defendant's Exhibit 62.  In response to the

8  anticipated hearsay objection, I'd like to say this is not

9  offered for the truth of the matter asserted.  We don't

10 particularly care whether Mr. Treitz at UPS was being honest

11 or whether he was with his fingers crossed behind his back

12 saying we would like --

13         THE COURT:  If it's not being offered for the truth,

14 then it's not hearsay.  So what other basis would you have,

15 Mr. Broughton?

16         MR. BROUGHTON:  I assume he is offering it for the

17 truth.

18         THE COURT:  Well, he just told me he's not.  I'm

19 assuming he's offering it -- the only basis it would come in

20 is did he receive it.  So then there has to be some relevance

21 established.

22         What's the relevance?

23         MR. GABEL:  And the relevance is Mr. Doherty had

24 conversations with Mr. Treitz, multiple conversations during

25 this time period when he's allegedly bound by a three-year

Vol. 3 -  394

1  contract --

2        THE COURT:  Well, there's been testimony and

3  evidence all through this trial about conversations with UPS,

4  so that's going to be no surprise to anybody.

5        MR. GABEL:  But the timing and the fact that there

6  were multiple ones in which he never says, "Sorry, I can't

7  join your team.  I've got a three-year deal."  That's the

8  relevance.

9        MR. BROUGHTON:  No, Your Honor.  I believe it is

10  irrelevant.

11        THE COURT:  All right.  Ladies and gentlemen, this

12  document is not being offered for the truth of what's in it.

13  It's just being offered for the fact to show what people

14  actually did on a certain time and day.

15        MR. GABEL:  Thank you, Your Honor.

16    (Defendant's Exhibit 62 was received in evidence.)

17  BY MR. GABEL:

18  Q   If you would, look down at --

19        MR. GABEL:  Robb, blow up the third paragraph of

20  this e-mail.

21  BY MR. GABEL:

22  Q   Mr. Treitz was UPS's head of military, correct?

23  A   That's correct.

24  Q   And this is January of 2007 he's e-mailing you, correct?

25  A   Yes.

DOHERTY - CROSS/GABEL

Vol. 3 -  395

1  Q   And as of January of 2007, you've already received this

2  three-party letter that only two people signed back in 2006,

3  correct?

4  A   That's correct.

5  Q   So you've got the letter with two signatures on it,

6  correct?

7  A   Yes.

8  Q   And Mr. Treitz said to you, starting with the second

9  sentence, "From our discussion, this is where I believe ATA

10  would desire to be."

11      Did Mr. Treitz have a discussion from which he could

12  discern where ATA would desire to be with you?

13  A   He made me -- he said he would propose -- he thought that

14  ATA would be a good fit into his Teaming Arrangement because

15  he didn't have a wide-body carrier.

16  Q   And you did not tell him, Well, you're wasting your time

17  even having this discussion with me because I can't join the

18  UPS team; I'm committed through '09.  You didn't tell him

19  that, did you?

20  A   No.  The terms of our agreement with FedEx were supposed

21  to be kept to ourselves, so I did not, no.

22  Q   And when you say the terms of your agreement were supposed

23  to be kept to yourself, that was -- which agreement are you

24  talking about?

25  A   With FedEx, our Teaming Arrangement and the other

DOHERTY - CROSS/GABEL

Vol. 3 -   396

1   agreements.  Those were agreements between us.  What

2   Mr. Treitz was offering was information.  At some point in

3   time I might want to join the UPS team.  I mean, maybe in '10.

4   Q   Okay.

5   A   So gathering information on my part is all I'm doing.

6   Q   So you're just gathering information for future years out

7   there when you're no longer bound to the FedEx team, correct?

8   A   Correct.

9        MR. GABEL:  Okay.  Robb, if you would, go to the

10  first paragraph of this e-mail and blow that up.

11  BY MR. GABEL:

12  Q   And did Mr. Treitz say to you in the first sentence of his

13  e-mail to you, "Per our brief discussion, I would like to

14  summarize the structure of the UPS contracting team and how

15  ATA Airlines would provide a good fit for the FY08 CRAF

16  contract."  Is that what he told you?

17  A   That's what he said in the letter.

18  Q   Okay.

19  A   Yes.

20  Q   Now, you told on direct Mr. Broughton that Gary Molinari

21  kept you apprised -- well, one of his duties was to try to

22  grow the team, correct?

23  A   That's correct.

24  Q   And so one way he would try to grow the team is he would

25  go out and he would try to recruit other carriers from other

1   teams, correct?

2   A   Yes.

3   Q   So if there's a big flying airline that has essentially

4   signed its planes up for the draft that's currently on the

5   Alliance Team, they would be a potential target for Gary

6   Molinari to try to recruit them to the FedEx team so the FedEx

7   team would get a bigger pie, correct?

8   A   Right.

9   Q   And Gary Molinari, you would talk to him from time to

10  time, and he would apprise you that he was making efforts to

11  recruit those types of airlines, correct.

12  A   Yes.

13          MR. GABEL:  Robb, if you will, pull up Defendant's

14  Exhibit -- well, page 49.  This is Defendant's Exhibit 8.

15  BY MR. GABEL:

16  Q   Did you receive this e-mail from Gary Molinari dated

17  January 26th, 2005?

18  A   Yes.

19          MR. GABEL:  Your Honor, I would like to offer

20  Defendant's Exhibit 8.

21          THE COURT:  Any objection?

22          MR. BROUGHTON:  No objection.

23          THE COURT:  Eight admitted.

24      (Defendant's Exhibit 8 was received in evidence.)

25

Vol. 3 - 398

1  BY MR. GABEL:

2  Q    And in this e-mail, Gary Molinari says, "We're getting

3  close to finalizing an arrangement with UAL to add them to the

4  team for FY06."  What was UAL?  What does that represent to

5  you?

6  A    United Airlines.

7  Q    Okay.  They're a big airline everybody knows about that

8  they've flown?

9  A    Right.

10  Q    And they have a lot of airplanes, right?

11  A    Yes, they do.

12  Q    And they signed a good number of those airplanes up for

13  the military draft, so to speak, so that they're entitled to a

14  lot of CRAF points, right?

15  A    Right.

16  Q    Do you recall what team United was a member of?

17  A    They were a member of the Alliance team.

18  Q    So Gary Molinari, obviously, hasn't finalized the

19  agreement at the time that he's letting you know that he's

20  negotiating with a member of the Alliance Team, correct?

21  A    Correct.

22  Q    And he goes on to say -- well, he gives you a number of

23  pretty detailed financial numbers for what it would mean to

24  the team to bring Alliance on, correct?

25  A    Yes.

1    Q    And this would be typical of the type information that

2    Gary would share with members of the team while he's out

3    trying to recruit airlines from other teams, right?

4    A    Yes.

5    Q    Now, in the spring of 2007, ATA's corporate structure

6    underwent a change, didn't it?

7    A    2007, yes.

8    Q    They acquired some other -- or their parent company

9    acquired some other airlines, right?

10   A    Yes.

11   Q    And the other airlines that they acquired included World

12   Airlines and North American Airlines, right?

13   A    Yes.

14   Q    And so now you had all three airlines under the same

15   corporate umbrella.  So ultimately, your boss is the same as

16   the guy at World's boss, the same as the guy at North

17   American's boss?

18          THE COURT REPORTER:  I'm sorry.  Could you repeat

19   your question?

20          MR. GABEL:  Probably a bad question.

21   BY MR. GABEL:

22   Q    After this acquisition went through in 2007, you

23   ultimately -- in the corporate scheme of things, World rolled

24   up to the same person that ATA rolled up to and that North

25   American rolled up to, right?

DOHERTY - CROSS/GABEL

Vol. 3 —   400

1   A   Yes.

2   Q   Now, World and North American were actually flying

3   airlines on the Alliance Team, right?

4   A   Yes.

5   Q   So they had a substantial interest in military business

6   that was generated by the membership of other airlines on the

7   Alliance team, like United, correct?

8   A   Yes.  Yeah, they would.

9   Q   And you knew when this corporate structure went through

10  that there was likely to be some concern on the part of Gary

11  Molinari that there might be some conflict of interest having

12  members of the Alliance Team under the same umbrella as a

13  member of the FedEx team, didn't you?

14  A   That's why we went down to talk to them to give them

15  assurances that we would be okay and operate separately.

16  Q   And one reason you knew he would be concerned was because

17  he shared information like he did in Exhibit 8 about his

18  efforts to recruit other members, correct?

19  A   That could have been a concern of his, yes.

20  Q   Now, there were times in ATA's history where, regardless

21  of what the team's theoretical split of business was, ATA did

22  not fly that percentage of the FedEx team's business because

23  of operational problems or lack of aircraft, weren't there?

24  A   Yes.

25  Q   So, historically, ATA may have been entitled to 62 percent

DOHERTY - CROSS/GABEL

Vol. 3 -   401

1   of the business in theory among the team and in a letter; but

2   if they couldn't fly the mission when the military put out the

3   mission, then it went to some other player, right?

4   A   If our aircraft were fully utilized, that's correct.

5   Q   So in order for ATA to fully fly and maximize what it

6   could get from military flying, it needed a capable, a

7   functional, a large aircraft fleet, right?

8   A   Yes.

9   Q   Now, one brand of the wide-body airplanes that ATA used

10  for this military flying was something called an L1011; is

11  that right?

12  A   That's right.

13  Q   And ATA had a number of these L1011s, right?

14  A   Yes.

15  Q   And they're big, wide-body planes; but they're also very

16  old, correct?

17  A   Right.

18  Q   They're very expensive to maintain, and they break down a

19  lot, right?

20  A   They're very expensive to maintain, and they broke down no

21  more than a DC10; but they broke down, yes.

22  Q   But when they did break down, parts were hard to find

23  because there weren't that many in operation anymore, right?

24  A   The supportability was less than the DC10, yes.

25  Q   And at some point you learned that ATA had acquired some

DOHERTY - CROSS/GABEL

Vol. 3 -   402

1   DC10s that were going to help it retire its L1011s and put not

2   a new plane but a newer plane in its place for military

3   flying, right?

4   A   Right.

5   Q   And also potentially its fleet for military flying, right?

6   A   Yes.

7   Q   And more DC10s was a good thing for ATA's military flying,

8   right?

9   A   That's right.

10  Q   Okay.  Now, after this acquisition of these other two

11  airlines on the Alliance Team, let me see if you got --

12          MR. GABEL:  Well, I tell you what.  Robb, put up

13  page 479.  This is Defendant's Exhibit 88.  And I think this

14  was stipulated, Your Honor.

15          I'll offer Defendant's Exhibit 88.  Maybe it's not.

16          MR. BROUGHTON:  No objection.

17          THE COURT:  88 admitted.

18      (Defendant's Exhibit 88 was received in evidence.)

19  BY MR. GABEL:

20  Q   Okay.  June of 2007, that was after the acquisition of

21  these airlines on the Alliance Team was announced, correct?

22  A   Yes.

23  Q   And did you e-mail Jack Schultz at that point saying, "Are

24  we talking about pushing some of our planned DC10s to World?"

25  Did you send that e-mail?

DOHERTY - CROSS/CABEL

Vol. 3 - 403

1  A   I did.

2  Q   And had you, in fact, heard rumors that instead of using

3  DC10s for its own flying, its own military business, ATA was

4  going to transfer some of these newer DC10s it was buying to

5  an airlines on the Alliance Team?

6  A   I had heard a rumor that some of the airplanes were being

7  considered to be transferred, yes.

8  Q   Well, some people say a rumor is just a premature fact.

9  Did you ultimately find out that they were, in fact,

10 transferring some of these DC10s that had been intended to

11 replace the old L1011s to an airline that flew for the

12 Alliance Team?

13 A   Eventually, but I had the assurance at the time they were

14 going to do that they were going to maintain additional L1011s

15 longer, send them for the D checks so ATA would not have lost

16 any numbers of aircraft.

17 Q   So they're telling you, "We're going to take these newer,

18 cheaper-to-operate airlines and give them to somebody on the

19 Alliance Team; but as a tradeoff we're going to keep the

20 older, more-expensive-to-maintain planes flying longer, spend

21 the money to keep them flying longer"?

22 A   The DC10 and the L1011 are the same age, basically.  The

23 L1011-500, which is the ones we were talking about at the

24 time, are actually newer than the DC10s that we picked up.

25 But they were, again, not as supportable because there were

DOHERTY - CROSS/GABEL

Vol. 3 -   404

1  not as many people around the world that had them.  We had

2  most of the parts here in Indianapolis.

3  Q   Well, you as an employee of ATA and head of ATA's

4  business, not a puppet master at Global, you did not think

5  that was a good move for ATA, did you?

6           MR. BROUGHTON:  Objection.  I have to object to the

7  sidebar comment.

8           THE COURT:  Sustained.

9  BY MR. GABEL:

10 Q   You did not think that was a good move from ATA's

11 perspective, did you?

12 A   From my perspective as a military -- running the military,

13 no.  I did not have the full picture, overall picture.

14 Q   Now, we've talked a lot about the Fee Agreements, and the

15 Fee Agreements of the three contracts that you would sign to

16 be on the FedEx team, the Fee Agreements were the only ones

17 that were just between you and FedEx, correct?

18 A   That's correct.

19 Q   These other contracts, several folks signed them.  One of

20 them -- and, again, they have a long name but one of them was

21 known as the -- for short, was called the Arrangement

22 Agreement, correct?

23 A   Okay.

24          MR. GABEL:  Robb, if you will, pull up page 424.

25 This is, for the Court, Defendant's Exhibit 76.  I'll offer

DOHERTY - CROSS/GABEL

Vol. 3 -  405

1  the that into evidence now.  It's the Arrangement Agreement

2  for FY08.

3          MR. BROUGHTON:  No objection.

4          THE COURT:  Show it admitted.

5      *(Defendant's Exhibit 76 was received in evidence.)*

6  BY MR. GABEL:

7  Q   Mr. Doherty, does this appear to be what in shorthand we

8  refer to as the Arrangement Agreement?

9  A   Right.

10  Q   And that was the agreement that said, "We will be a member

11  of the team this year, and here are the planes we will sign

12  up" and those type of things; and that was actually sent to

13  the military, correct?

14  A   Yes.

15          MR. BROUGHTON:  All right.  Robb, if you will, go

16  over to page 2 of that document.  Highlight paragraph 2 at the

17  top of that document, please.

18  BY MR. GABEL:

19  Q   Like a lot of legalese, this takes a long time to say a

20  simple concept; but did you understand that the term of the

21  Arrangement Agreement was one year?

22  A   Yes.

23  Q   So when this says "concurrent with the current contract

24  awarded by AMC," you understood that to be the same as the

25  AMC's fiscal year, correct?

DOHERTY - CROSS/GABEL

1   A   Yes.  Yes.

2   Q   And --

3   A   As a matter of fact, that's the solicitation number that

4   they're referring to that deals with their contract.

5   Q   And the second of these three contracts that you would

6   sign to be on the team was shorthand termed an Operating

7   Agreement, correct?

8   A   Yes.

9           MR. BROUGHTON:  Robb, if you will, pull up page 431.

10  Go ahead and blow up the first few sentences.  This is

11  Exhibit 77 for the Court.

12  BY MR. GABEL:

13  Q   Does Exhibit 77 appear to be the, for shorthand, Operating

14  Agreement that you would have entered into for fiscal year

15  2008 with the FedEx team?

16  A   Yes.

17          MR. GABEL:  I'll offer Defendant's 77, Your Honor.

18          MR. BROUGHTON:  No objection.

19          THE COURT:  77 admitted.

20      (Defendant's Exhibit 77 was received in evidence.)

21          MR. GABEL:  Robb, if you would, go over to page 2 of

22  this document, which is 432.  Blow up the first paragraph.

23  BY MR. GABEL:

24  Q   Now, you understand that the term of the Arrangement

25  Agreement was the same as the term of the other agreement --

DOHERTY - CROSS/GABEL

Vol. 3 -   407

1   the term of the Operating Agreement was the same as the term

2   of the Arrangement Agreement, correct?  It refers to the

3   Arrangement Agreement as its term?

4   A    All right.

5   Q    You understood this also was a one-year document, correct?

6   A    Yes.

7   Q    Robb, if you will go down to Paragraph B at the bottom of

8   that.  Paragraph B of this operating agreement said,

9   "Notwithstanding any other provision of this agreement, FedEx

10  is authorized to unilaterally arrange for substitute service.

11  If any party to the Contractor Team Arrangement fails to

12  perform under the AMC contract.  If any team member is unable

13  to perform its obligations under the AMC contract and FedEx

14  arranges substitute service at a rate above the AMC rate, then

15  the differential (subservice rate minus the AMC rate) will be

16  absolved by the remaining team members on a pro rata basis

17  based on mobilization value.

18          Provided, however, No. 1, such arrangement for

19  substitute service shall not relieve the nonperforming team

20  member of its obligations and responsibilities under this

21  agreement; and No. 2, upon such nonperformance, the performing

22  team members shall be entitled to pursue all remedies

23  available at law or pursuant to this agreement against such

24  nonperforming party."

25          Was all of that legalese in there when you signed this

DOHERTY - CROSS/GABEL

Vol. 3 -   408

1  on behalf of ATA?

2  A   Yes.

3  Q   Did you understand that to mean that if ATA didn't perform

4  its obligations as a member of the FedEx team, that the FedEx

5  team could arrange alternate flights to get that done and then

6  come after ATA for what it cost them to do that?

7  A   Yes.

8          MR. GABEL:  Now, Robb, if you would, go over to page

9  436 of this document.  Highlight Paragraph E.

10 BY MR. GABEL:

11 Q   Paragraph E just before where the signatures began in this

12 contract says, "This agreement may be executed in

13 counterparts, each of which shall be an original but all of

14 which shall constitute one agreement."

15      Do you recall that language being in there when you

16 signed this --

17 A   I don't recall that, but I'm sure it was.

18 Q   Did you understand that language to mean FedEx could send

19 one to one airline and one to the other airline, and if they

20 both sent back a signature, that would make it okay?

21 A   Yes.

22 Q   Similar language to that does not appear in that

23 three-party letter that only two people signed back in 2006,

24 does it?

25 A   I don't recall it in there, so I don't believe it was in

DOHERTY - CROSS/GABEL

Vol. 3 - 409

1   there, no.

2           THE COURT:  Mr. Gabel, we need to take an afternoon

3   break.  I was just reminded by Cathy that we haven't taken

4   one.  Certainly the court reporters, considering they have one

5   of the tougher jobs in the court to do, need a break.  I'm

6   sure the jurors would like one as well.  You guys need to

7   speak up because sometimes I just forget.

8           So we'll take 10 minutes, and please do not discuss

9   the case among yourselves.  Thank you.

10          COURT CLERK:  All rise.

11      (Jury out.)

12      (Recess taken.)

13      (Jury in.)

14      (A bench conference was held on the record.)

15          MR. GABEL:  I just wanted to apologize for my tone

16  or my demeanor when you agreed with his criticism.  I wanted

17  to apologize.

18          THE COURT:  No problem.

19      (End of bench conference.)

20          THE COURT:  All right, Mr. Gabel, continue your

21  cross-examination.

22  BY MR. GABEL:

23  Q   Mr. Doherty, I believe in your direct examination by

24  Mr. Broughton, I believe you were discussing the value of

25  these 10 flights a month that Northwest got under the 2008 Fee

1  Agreement.  If my notes were correct, you mentioned the idea

2  of $500,000 per flight; is that correct?

3  A    No.

4  Q    You didn't?

5  A    I didn't.

6  Q    60 million, is that a number?

7  A    60 million is the figure that I used, yes.

8  Q    That was an annual number, the annual value of 10 flights

9  a month by Northwest flying the size planes that they flew

10 would be $60 million in revenue?

11 A    Roughly.  Roughly, yes.

12 Q    That would be your estimation?

13 A    Right.

14 Q    So once Northwest started flying $60 million in revenue

15 per year of the FedEx team's long-range business, ATA was no

16 longer getting 50 percent of the FedEx team's long-range

17 business, was it?

18         MR. BROUGHTON:  Objection.  Assumes facts not in

19 evidence.  Misstates testimony.

20         THE COURT:  The jurors will determine what the

21 evidence is, the testimony is.

22         THE WITNESS:  They would be getting 50 percent of

23 what was left was what the agreement said, 50 percent of the

24 residual.  So yes, we wouldn't be getting 50 percent of the

25 total, but neither would Omni under that scenario.

DOHERTY - CROSS/GABEL

Vol. 3 -   411

BY MR. GABEL:

Q   You were getting something less than 50 percent after

Northwest is flying $60 million a year, correct?

A   Correct.

Q   And you signed a contract that acknowledged that fact,

correct?

A   I signed a contract that said we would be getting, again,

50 percent of the residual.  But obviously it's not going to

be 50 percent of the total.

Q   And you were aware before you were separated from ATA that

there was at least some possibility that Omni was not getting

that same deal.  So that --

A   No, I was not.

Q   You were not aware of that before you left --

A   It was mentioned that -- Mr. Subodh had mentioned that he

had heard that.  That was the only inclination of anything

different than -- that it was.

Q   Just to refresh your memory --

        MR. GABEL:  Robb, go into Document 598.

BY MR. GABEL:

Q   And again, this was Exhibit 107 we talked about earlier

today, that e-mail dated October 1, 2007 from Jack Schultz to

you.  And the first paragraph said, "I think Subodh may have

been informally feeling out Chuck Pollard on the new teaming

agreement; and he's concerned that they may have been given

Vol. 3 -   412

1  the same deal as we have.  I think Chuck may have indicated

2  that FedEx asked for something like that, but they pushed

3  back."

4         So you did get that e-mail.  You were aware other than

5  that conversation by the head of GAL with Omni's head of

6  military flying, correct?  You were informed of that?

7  A   I got this message, yes.

8  Q   Now, earlier we were talking about the value of the

9  commissions that you would pay to be a member of the FedEx

10  team.  I think you had estimated that it would be in the

11  millions, 28 million per year potentially, correct?

12  A   Right.

13  Q   And so cutting that from 7 percent to 4 1/2 percent, that

14  was a significant accomplishment.  At least that part of the

15  news was good news for ATA, correct?

16  A   That's correct.

17  Q   And you reported that good news within internal chains

18  within ATA, did you not?

19  A   Yes, I did.

20  Q   I'll show you what's been marked as --

21         MR. GABEL:  Well, Robb, page 1650, please.

22  BY MR. GABEL:

23  Q   I'll show you what's been marked as Plaintiff's

24  Exhibit 48.

25         MR. GABEL:  Robb, just blow up the second paragraph,

DOHERTY - CROSS/GABEL

Vol. 3 -   413

1   the second bullet point.  Well, first just blow up just the

2   top part.

3   BY MR. GABEL:

4   Q   Would you have sent this e-mail, Plaintiff's Exhibit 48,

5   on September 28, 2007?

6   A   Yes.

7   Q   And what does the subject mean, WAR-charter sales?

8   A   Every week all the departments sent a WAR Report, a

9   situation report is basically what it was of what took place,

10   special events that took place within the company in the past

11   seven days to update senior management of what was going on.

12   So this was a response -- this was my report for that week.

13   Q   And you would report really good things that had happened

14   within your department, correct?

15   A   You would report bad things as well.

16          MR. GABEL:  Let's look at the text of that e-mail

17   please, Robb.  Let's look at the whole thing just so we've got

18   it.

19   BY MR. GABEL:

20   Q   You reported that the 2008 AMC contract had been awarded,

21   correct?

22   A   That's right.

23   Q   You talked about the award.  Then in Bullet Point 2 --

24          MR. GABEL:  If you will just focus on that Bullet

25   Point 2 there.

Vol. 3 -   414

1   BY MR. GABEL:

2   Q   You said, "Successfully negotiated a reduction in the

3   FedEx commission level for FY2008 AMC contract.  Starting 01

4   October 2007, the new commission level for wide-body and

5   narrow-body for both fixed and expansion buying will be

6   4.5 percent."

7   A   Right.

8   Q   There is still no commission on short-range flying.  You

9   reported that as good news within ATA, correct?

10  A   Yes.

11         MR. BROUGHTON:  Your Honor, if he's going to ask him

12  to testify from the document, I would ask him to offer it.

13         MR. GABEL:  I'm sorry.  Your Honor, I'd like to

14  offer Plaintiff's Exhibit 48.

15         MR. BROUGHTON:  No objection.

16         THE COURT:  Show it admitted.

17     (Defendant's Exhibit 48 was received in evidence.).

18  BY MR. GABEL:

19  Q   But on the flip side of that coin, there was also some bad

20  news for ATA in that Northwest was now going to be eating $60

21  million of the FedEx pie each year, correct?

22  A   Of the FedEx pie, yes.

23  Q   And there's no mention of Northwest flying on this e-mail,

24  is there?

25  A   No.

DOHERTY - CROSS/GABEL

Vol. 3 -  415

1          MR. GABEL:  Let's move on to Document 1634, please,

2    Robb, Plaintiff's Exhibit 40.  Let's focus on the bottom

3    e-mail there.

4    BY MR. GABEL:

5    Q   The bottom e-mail is from you to Subodh Karnick and Gary

6    Ellmer and Sean Frick and Jack Schultz and Doug Yakola dated

7    September 27, 2007.  Did you send that e-mail?

8    A   Yes.

9          MR. GABEL:  And, Your Honor, if it hasn't been

10   offered, I offer Plaintiff's Exhibit 40.

11          MR. BROUGHTON:  No objection.

12          THE COURT:  Show it admitted.

13     *(Plaintiff's Exhibit 40 was received in evidence.)*

14   BY MR. GABEL:

15   Q   Here once again you're sharing some very good news about

16   ATA's business with pretty much the powers that be,

17   Mr. Karnick, Mr. Ellmer, Mr. Frick, Mr. Schultz, and

18   Mr. Yakola, correct?

19   A   That's correct.

20   Q   You're telling them that you got the new Fee Agreement

21   from FedEx for the FY2008 contract, and they agreed to reduce

22   our commission level on all wide-body and narrow-body awards

23   from the current 7 percent to 4.5 percent.  The short-range

24   award continues to have no commissions.  This new rate will be

25   effective 1 October, 2007.  That is what you told them, right?

Vol. 3 -  416

1  A    That's correct.

2  Q    But again, the flip side of that coin is that Northwest is

3  now flying $60 million of the FedEx team pie was nowhere in

4  that e-mail, was it?

5  A    No.

6  Q    And apparently Mr. Karnick thought that somebody giving

7  you a few million dollars sounded too good to be true.  So

8  on -- well, later that same day at -- if my military time is

9  correct, at 7:30 at night, 7:29 at night; is that correct?

10 A    That's 3:25 in the afternoon.

11 Q    5:29 in the afternoon.  Three?

12 A    1500 is three o'clock.

13 Q    What time is 19:29:32?

14 A    Okay.  I'm looking at the top one.  19 would be --

15         THE COURT:  Seven o'clock.

16         THE WITNESS:  Seven o'clock, yeah.

17 BY MR. GABEL:

18 Q    Seven o'clock that night, Mr. Karnick says, "Huh?  Why?"

19 And you responded to Mr. Karnick at the top of that document.

20         MR. GABEL:  Robb, if you can go to the top response

21 e-mail.

22 BY MR. GABEL:

23 Q    And Mr. Karnick again, he was the head of all of global,

24 the parent company, correct?

25 A    Yes.

DOHERTY - CROSS/GABEL

Vol. 3 -   417

1  Q   And you responded to him four o'clock in the morning the

2  next day with your reasons for why you were saving this 2 1/2

3  percent in commissions, correct?

4  A   Right.  Yes.

5  Q   And you told Mr. Karnick, "Earlier this year I approached

6  Gary at FedEx about reducing the rate giving him all the

7  reasons why the current rate was too high.  I have been

8  discussing this with him every year for the last four years.

9  This year our discussion centered around the fact that NWA has

10 been doing a bit of actual flying.  I reminded Gary that the

11 reason our rate went from 4 to 7 was to get NWA's points and

12 that they would not be flying.  Gary said that he would

13 review.  Has said that before.

14        "Shortly after the announcement that GAL was planning

15 on buying World, Gary mentioned they might consider some

16 reduction, was not definitive.  Kept discussing with him.

17 Earlier this week he said that he would be making an

18 adjustment, no amount mentioned.  Today received Fee

19 Agreement, unable to discuss with him.  He is only in half

20 days as he had triple bypass surgery a few days ago.  Will

21 talk to him more tomorrow."

22        That was your response to Mr. Karnick from his e-mail

23 of "Huh?  Why?"

24 A   Yes.

25 Q   Nowhere in that explanation did you say that "I went to

DOHERTY - CROSS/GABEL

Vol. 3 -   418

1   Gary and said, 'Well, you're cutting into our three-year deal

2   from that three-party letter back in 2006.'"  Nowhere does it

3   say that, does it?

4   A    No.

5   Q    And nowhere does it say anything about amending things or

6   amending that three-year deal, does it?

7   A    No.  We're not talking about the three-year deal.  We're

8   talking about the commission level here.

9   Q    Did that satisfy Mr. Karnick?

10  A    He wanted more --

11           MR. BROUGHTON:  Objection, calls for speculation.

12           THE COURT:  Sustained.

13           MR. GABEL:  Robb, if you will, go to page 597.

14  BY MR. GABEL:

15  Q    Did you get the top e-mail on -- this is Plaintiff's -- I

16  mean, Defendant's Exhibit 106, an e-mail dated September 28th,

17  2007.  Appears to be from Subodh Karnick to Bill Doherty.  Did

18  you get this e-mail on -- at 1:59 a.m. on September 28th,

19  2007?

20  A    Yes, I did.

21  Q    Did Mr. Karnick, after your earlier response talking about

22  all your negotiations with Mr. Molinari say, "I'm serious.

23  Why did this happen?"

24  A    Yes.

25  Q    Did you glean from that that Mr. Karnick may not be

DOHERTY - CROSS/GABEL

Vol. 3 -   419

1  satisfied with your original response that made no mention of

2  losing $60 million of the Northwest pie?

3  A   I gleaned from that that he was -- that he wanted more

4  information.

5  Q   And your employment with ATA ended less than a month after

6  this, correct?

7  A   That's correct.

8         MR. GABEL:  I'll pass the witness.

9         THE COURT:  Redirect exam, Mr. Broughton?

10         MR. BROUGHTON:  Thank you, Your Honor.

11                  **REDIRECT EXAMINATION**

12  BY MR. BROUGHTON:

13  Q   Mr. Doherty, we've heard several questions about

14  $60 million going to Northwest Airlines.  Did you hear that?

15  A   Yes.

16  Q   The provision you were looking at said Northwest could fly

17  up to 10 flights a month, did it not?

18  A   Yes.

19  Q   Did you know whether Northwest actually flew up to 10

20  flights per month?

21  A   In that time frame, no, they did not.

22  Q   Do you know if indeed it was $60 million?

23  A   No, I do not.

24  Q   If they didn't fly up to 10 flights, would that impact

25  that $60 million number?

Vol. 3 -   420

1    A    It would reduce that number.

2              MR. BROUGHTON:  If you would put FedEx 39 up,

3    please.  If it comes up later, we'll go on.  I think the jury

4    remembers it.

5    BY MR. BROUGHTON:

6    Q    You were asked again about your June 2006 e-mail to Sean

7    Frick where you said it was a two-year agreement?

8    A    Yes.

9    Q    That was June of '06, right?

10   A    Yes.

11   Q    July, August, September -- three months later, you get a

12   September 7, 2006 agreement signed by Mr. Molinari; is that

13   right?

14   A    That's correct.

15   Q    Does it matter what you said in June of '06 that it was

16   two-year if you ended up signing a three-year?

17             MR. GABEL:  Objection, calls for speculation.

18             THE COURT:  Sustained.  Rephrase.

19   BY MR. BROUGHTON:

20   Q    Was there ever a two-year agreement?

21   A    There was no two-year agreement.  The only thing we had

22   ever discussed, you know, to begin with was a three-year

23   agreement which Gary had recommended.  And then the only other

24   discussion was -- and then September of '07 -- or '06, rather,

25   Gary sent the letter -- again, outlining a three-year

Vol. 3 -  421

1   agreement.  There was never any two-year agreement.

2   Q   So after you sent this e-mail, did you sign an agreement

3   for three years?

4   A   Yes.

5   Q   You were asked about a CRAF survey which was shown up

6   there and is FedEx Exhibit 64.

7           MR. BROUGHTON:  Would you please put that up?  If we

8   could go to the very top, Mr. Brockwell, please.

9   BY MR. BROUGHTON:

10  Q   All right.

11          This is from you to a lady named Susan J. Lee; is that

12  right?

13  A   That's correct.

14  Q   Who is she with?

15  A   I -- she was at AMC.  She was part of the contracting team

16  at AMC.

17  Q   Why did you end up sending -- the subject line says

18  "Survey For Future of CRAF Program"; is that right?

19  A   That's correct.

20  Q   Now, the actual questions that you are responding to are

21  not on here, are they?

22  A   No.

23  Q   And you were asked specifically about annual agreements

24  versus multiyear agreements.

25  A   Right.  The whole survey was put out to see how we could

BOHANNON - DIRECT/BROGDON

Vol. 3 - 422

1  improve the CRAF program.  It had nothing to do with Teaming

2  Arrangements or how things were at this point in time.  It was

3  a general survey to discuss how we would -- how AMC and

4  TransCom should be looking at trying to redesign the CRAF

5  program to make it better going forward and what -- they

6  wanted carriers' input as to how to make it better.  So the

7  questions that were on the survey were geared that way, and

8  these were the opinions that ATA put forth.

9  Q    When Ms. Lee was asking you the question in this survey,

10 was she asking you about your opinion on one-year agreements?

11 A    She did.  I mean, she's not talking to just me.  She's

12 talking to all 30-some odd carriers.  She sent that out to all

13 30 carriers.

14 Q    You were also asked some questions about an e-mail you

15 received from a man at UPS; do you recall that?

16 A    Yes, Mr. Treitz.

17 Q    Did Mr. Treitz at UPS contact you on more than one

18 occasion?

19 A    Yes, he did.

20 Q    Did he -- over what period of time did Mr. Treitz --

21 A    Every year when we look at trying to put teams together,

22 he would give a call to put a feel out to see if he could

23 attract somebody.  It was never a -- an appealing thing for us

24 to do because we would not benefit anything really from it at

25 that point in time.

DOHERTY - REDIRECT/BROGGNTON

Vol. 3 -   423

1       He said if we could get a -- if we would join, he

2   could probably attract a major carrier.  Well, the way we

3   looked at it is if he would probably really have a major

4   carrier before we would join.

5       So I'm willing to listen to him.  I was willing to

6   listen to him.  I know Mr. Treitz.  We talk quite often

7   about -- at various meetings that we've been to.  It would be

8   a good thing if you could ever put it together, but, you know,

9   it wasn't.  We're willing to listen.  Again, sometime down the

10  road it might be something we need to look at, but at that

11  point in time, it wasn't.

12  Q   You were also asked about Defendant's Exhibit 77, which

13  was one of those annual agreements.  And you were particularly

14  shown that provision that said that agreement could be signed

15  in multiple counterparts.  Do you recall that?

16  A   Yes.  I recall the question.

17  Q   You recall the question.  And you recall being asked

18  whether the September 7, 2006 agreement contained a provision

19  saying it could be signed in multiple counterparts?

20  A   I think that's right.

21  Q   Right.

22  A   It was '06.

23  Q   How many agreements do you think you signed when you were

24  at ATA?

25  A   With FedEx, probably about -- as far as a Teaming

DOHERTY - REDIRECT/BROUGHTON

Vol. 3 -   424

1  Arrangement Agreement, there was three each year for 17, 18

2  years that I was doing that work.  And then the multiple

3  sideletters -- the two sideletters we had.

4  Q   Okay.  And how about other agreements with other third

5  parties?

6           MR. GABEL:  Objection, relevance.

7  BY MR. BROUGHTON:

8  Q   Were you ever required to go to some distant city and

9  actually sign an agreement?

10 A   Yes.

11 Q   Okay.  Tell us about those.

12 A   I went to Prague to sign an agreement with Czechoslovakian

13 Airlines.

14          MR. GABEL:  Objection, relevance.

15          THE COURT:  Where are we going here?

16          MR. BROUGHTON:  I apologize, Your Honor.

17 BY MR. BROUGHTON:

18 Q   My question is:  Was it typical in your experience,

19 whether or not there was a provision that said this can be

20 signed in counterparts, just to sign and fax it or sign and

21 e-mail it or sign and stick it in the mail?

22          MR. GABEL:  Same objection to the relevance of what

23 he may have had with some other party who's not involved in

24 the alleged agreement that is the basis of this lawsuit.

25          MR. BROUGHTON:  I think it's relevant to show

REDIRECT/BROUGHTON

Vol. 3 - 425

1   typical, common business practice.

2            THE COURT:  All right.  Overruled.  Go ahead.

3            THE WITNESS:  I've never seen that before.

4            MR. GABEL:  I withdraw my objection.

5   BY MR. BROUGHTON:

6   Q   You've never seen what before?

7   A   I've never seen that phrase before.  I was obviously

8   there.  That was part of the legal review that I had when I've

9   had those documents reviewed.  It was the same year after

10  year, so I usually --

11  Q   Okay.  And my question is:  When you were signing

12  contracts, would it be typical of you to sign a contract and

13  fax it or sign a contract and stick it in the mail to return

14  it to other parties --

15  A   Yes.

16  Q   -- whether or not there was such a provision?

17  A   Yes.

18  Q   You were asked on cross-examination about having a copy of

19  the September 7, 2006, which Omni did not sign, right?  We

20  kept hearing the phrase "the three-party agreement that only

21  had two signatures," right?

22  A   Yes.

23  Q   Were you at all concerned that you didn't have a copy with

24  Omni's signature?

25  A   I was not.

Vol. 3 -  426

1  Q    And why were you not?

2  A    Because I had the feeling when I talked with Gary that --

3  Molinari that we had the agreement, the three-year agreement.

4  I never got the indication from him that there was no

5  three-year agreement.  He never told me that.  There was no --

6  Q    And when Mr. Molinari sent you that September 7, 2006,

7  contract with his name signed to it, did you have any doubt

8  that he meant what he signed his name to?

9  A    No, I did not.

10          MR. BROUGHTON:  I'll pass the witness.

11          THE COURT:  Recross exam, Mr. Gabel.

12                   **RECROSS-EXAMINATION**

13  BY MR. GABEL:

14  Q    Mr. Doherty, earlier we had had some discussion about the

15  chief financial officer and the vice president both asking you

16  to go find out about Omni's signature and about you making

17  some phone calls to Gary Molinari about that, correct?

18  A    Right.

19  Q    If in those phone calls Gary may have or, regardless of

20  what your memory is, did tell you that Omni had not signed,

21  and that meant you didn't have a three-year agreement for the

22  area of the company that you oversaw, that would have been

23  some bad news you had to take and report back to your

24  superiors, wouldn't it?

25          MR. BROUGHTON:  Compound question, and calls for

DOHERTY - RECROSS/GABEL

Vol. 3 -   427

1  speculation.

2          THE COURT:  If you could rephrase that.  That was --

3  BY MR. GABEL:

4  Q   If Gary Molinari had told you that Omni didn't sign and,

5  as a result, you don't have a three-year deal but will proceed

6  year to year; and you had to report that back to your

7  superiors, you would have been reporting bad news to them,

8  correct?

9  A   Yes.

10          MR. GABEL:  No further questions.

11          THE COURT:  Redirect?

12          MR. BROUGHTON:  No, Your Honor.

13          THE COURT:  All right.  Mr. Doherty, thank you very

14  much for your testimony.  You may step down.

15     (Witness excused.)

16          THE COURT:  All right.  Members of the jury, it's a

17  little after five.  We'll get you out of here close to normal

18  time tonight.

19          Again, while you're outside the courtroom, do not

20  read or listen to any news accounts.  Do not let anyone talk

21  to you about the case.  Do not do any independent research.

22          And we'll start again at nine o'clock tomorrow

23  morning.  Thank you very much.  Have a good evening.  Be safe,

24  and we'll see you tomorrow.

25          COURT CLERK:  All rise.

Vol. 3 —   428

1      *(Jury out.)*

2             THE COURT:  Please be seated.

3             All right.  Mr. Broughton, where are we at in your

4      case?

5             MR. BROUGHTON:  We will be calling Mr. Rachor next

6      as an adverse witness and then Mr. Molinari as an adverse

7      witness and then Bill Garrett, then Mark Patterson, then Larry

8      Morriss, the damages expert.  I don't think I've left anybody

9      out.

10            THE COURT:  Is that about it then?

11            Okay.  All right.  In terms of scheduling, of

12     course, we'll work all tomorrow.  On Friday morning I have an

13     obligation.  As chief judge, it's my privilege to swear in all

14     the new lawyers who just passed the bar examination; and

15     that's a big ceremony, as we all know, and that's Friday

16     morning at ten o'clock.  So I'm going to be out for just a few

17     hours.  So we'll –– we could start early and then have the

18     jurors sit around, or we could just come in and not take a

19     lunch break and have everybody start at noon.

20            I'll try to work with your schedules in terms of

21     getting people in here.  We can start early in the morning,

22     knock off about 9:30.  I can run over there, do that, come

23     back.  We can start again.  Or we can just take the morning,

24     not a lunch, and start at noon and go till 5:00; and I would

25     think we would be able to finish your case.  I think that was

Vol. 3 –  429

1   your plan, wasn't it, Mr. Broughton, to finish this week?

2           MR. BROUGHTON:  Your Honor, I think it's going to be

3   really hard to do that.  I think a big difference is that --

4   and I don't know what FedEx's plans is in terms of putting on

5   its counterclaim.  I'm assuming they're going to go ahead and

6   do their direct with their witnesses because I'm really

7   calling -- other than their damages expert, I'm calling, I

8   believe, all of their witnesses in my case.

9           THE COURT:  Okay.

10          MR. BROUGHTON:  So it seems like their actual case

11  is going to be a lot shorter.

12          THE COURT:  Mr. Blumberg.

13          MR. BLUMBERG:  Your Honor, I think that's correct.

14  I mean, at the pace we're going, I think we'd be able to start

15  at noon on Friday because ultimately it looks like, when we

16  get to FedEx's case, we may only have our damages witnesses.

17          THE COURT:  Right, right.  And, also, when you call

18  Mr. Molinari and the others, if you wish me to explain to the

19  jurors that you'll be doing some of your direct exam with this

20  witness, just so we don't have to call them back in your case,

21  I will be happy to do that; but you need to remind me.

22          MR. BLUMBERG:  I think from FedEx's point of view,

23  we would like you to do that.  We had submitted in one of our

24  preliminary jury instructions some proposed language.  I can

25  either try to find that or Mr. Gordon may have it.

Vol. 3 —  430

1          THE COURT:  Sure.  But that would be -- I always

2   find that's helpful to the jurors that they understand that

3   you're both in your case in chief on the same witness.

4          Okay.  So anything else we need to talk about,

5   Mr. Broughton?

6          MR. BROUGHTON:  None that I'm aware of.

7          THE COURT:  Mr. Blumberg?

8          MR. BLUMBERG:  The only other piece I have is there

9   were some exhibits during Mr. Yakola's -- during his

10  examination I want to make sure you have admitted.

11         THE COURT:  All right.

12         MR. BLUMBERG:  Your Honor, I believe every single

13  one of these was stipulated except for one where there was an

14  objection that we had made that we withdrew.

15         THE COURT:  Okay.

16         MR. BLUMBERG:  And that's Defendant's 12,

17  Defendant's 51 --

18         MR. BROUGHTON:  Could you go a little bit slower?

19         MR. BLUMBERG:  Yes.  Only because they were all

20  stipulated.  Defendant's 83, Defendant's 94, Defendant's 124,

21  Defendant's 160, and Defendant's 164.

22         We also had Plaintiff's 5, 15, 75 -- and that was

23  the one that the objection was withdrawn -- 93, 97, and 131.

24         THE COURT:  All right.

25         MR. BROUGHTON:  No objections.

Vol. 3 -  431

1          THE COURT:  All right.  Show them admitted.

2      *(Defendant's Exhibits 12, 51, 83, 94, 124, 160 and 164*

3  *were received in evidence.)*

4      *(Plaintiff's Exhibits 5, 15, 75, 93, 97 and 131 was*

5  *received in evidence.)*

6          THE COURT:  I assume both sides have somebody

7  keeping track of what's going in and what's been offered and

8  what's actually gone in.  And, of course, before we close the

9  record, I'll have both of you get with Philip to make sure his

10  list is consistent with your list, as well; and then if

11  there's others that have not got in, I'll allow you to get a

12  chance to get those in before we close the record.

13          Okay.  Thank you.  We'll see you tomorrow, 8:45.

14          COURT CLERK:  All rise.

15      *(The proceedings were adjourned at 5:09 p.m.)*

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF COURT REPORTER</u>

2

3      I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6

7

8    /s/ Cathy Jones                    October 13, 2010
    _____
9    CATHY JONES, RPR, FCRR
     Official Court Reporter
10   Southern District of Indiana
     Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25