1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
2                   INDIANAPOLIS DIVISION

3

    ATA AIRLINES, INC.,        )
4                        )
                        ) CAUSE NO.
5        Plaintiff,       ) 1:08-cv-00785-RLY-DML
                        )
6        -vs-              )
                        ) Indianapolis, Indiana
7    FEDERAL EXPRESS CORPORATION,) October 14, 2010
                        ) 9:00 a.m.
8        Defendant.       ) VOLUME 4

9

10

11

12                    **BEFORE THE**
              **HONORABLE RICHARD L. YOUNG**
13

14          OFFICIAL REPORTER'S TRANSCRIPT OF

15                JURY TRIAL

16

17

18

19

20

21

22  Court Reporter:    Cathy Easley Jones, RPR, FCRR
                     Official Court Reporter
23                   46 East Ohio Street, Room 291
                   Indianapolis, IN  46204
24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
           COMPUTER-AIDED TRANSCRIPTION

# A P P E A R A N C E S

FOR THE PLAINTIFF:                Mr. Kenneth E. Broughton
                                  Mr. Francisco Rivero
                                  HAYNES AND BOONE
                                  Suite 2100
                                  Houston, TX   77010

                                  Mr. Thomas E. Kurth
                                  Mr. W. Alan Wright
                                  HAYNES AND BOONE
                                  901 Main Street
                                  Suite 3100
                                  Dallas, TX   75202

                                  Mr. John David Hoover
                                  Ms. Alice McKenzie Morical
                                  HOOVER HULL
                                  111 Monument Circle
                                  Suite 4400
                                  Indianapolis, IN   46204


FOR THE DEFENDANT:                Mr. Peter D. Blumberg
                                  FEDERAL EXPRESS CORPORATION
                                  3620 Hacks Cross Road
                                  Building D, Third Floor
                                  Memphis, TN   38125

                                  Mr. Michael E. Gabel
                                  FEDEX LEGAL DEPARTMENT
                                  3620 Hacks Cross Road
                                  Building B, 2nd Floor
                                  Memphis, TN   38125

                                  Ms. M. Kimberly Hodges
                                  FEDEX LEGAL DEPARTMENT
                                  3620 Hacks Cross Road
                                  Building B-3
                                  Memphis, TN   38125

434

I N D E X

PAGE

ROBERT L. RACHOR, JR.
Direct Examination by Mr. Broughton ...........438
Cross-examination by Mr. Blumberg ............468
Redirect examination by Mr. Broughton .........513

GARY MOLINARI
Direct Examination by Mr. Kurth ..............523
Cross-examination by Mr. Gabel ...............580
Redirect examination by Mr. Kurth ............667
Recross-examination by Mr. Gabel .............689
Further Redirect examination by Mr. Kurth .....689

ROBERT RACHOR – OFFER OF PROOF
Examination by Mr. Broughton ..................693

435

1               I N D E X   O F   E X H I B I T S

2                                               PAGE

3    For Plaintiff:

4    3 ..............................................458
     9 ..............................................438
5    10 .............................................438
     14 .............................................680
6    24 .............................................565
     27 .............................................561
7    64 .............................................543
     168 ............................................680
8    169 ............................................680
     170 ............................................680

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X   O F   E X H I B I T S

2                                                        PAGE

3    For Defendant:

4    15 .........................................607
     20 .........................................610
5    24 .........................................648
     61 .........................................638
6    67 .........................................622
     74 .........................................504
7    74 .........................................628
     79 .........................................506
8    81 .........................................509
     81 .........................................634
9    123 ........................................640
     145 ........................................642
10   187 ........................................657
     188 ........................................659

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

437

1   (In open court.)

2       *(Jury in.)*

3           THE COURT:  Good morning.  Welcome back to day three

4   of our trial.  We're going to continue today with testimony

5   and evidence presented in the plaintiff's case in chief, and

6   we also may call some witnesses today who would be a witness

7   called by either side.  And sometimes it's a time saver not

8   only to the Court and to the jurors but also to the witness

9   that instead of calling them in one case and having certain

10  questions asked and then calling them back a couple days later

11  on the other side in their case, we just have the witness

12  answer questions on direct examination and cross-examination

13  at the same time.

14          So when those witnesses appear, I'll let you know in

15  advance that each side is calling that witness at a particular

16  time.

17          While you were outside the courtroom, did anyone

18  make any attempts to talk to you about this case?  Anyone read

19  or listen to any news accounts?  Do any independent research?

20          All right.  Mr. Broughton, call your next witness.

21          MR. BROUGHTON:  Yes, Your Honor, as a quick

22  preliminary matter from the deposition of Mr. Pollard

23  yesterday, Plaintiffs would like to offer Plaintiff's

24  Exhibit 9 and 10 into evidence; and 10 has already been

25  stipulated.

438

 1              THE COURT:  Plaintiffs 9 and 10.

 2              MR. BROUGHTON:  Nine, the attachment was stipulated

 3   to, but the fax cover sheet was not.

 4              MR. BLUMBERG:  We will withdraw our objection, Your

 5   Honor.

 6              THE COURT:  Nine and 10 admitted.

 7       *(Plaintiff's Exhibit 9 and 10 were received in evidence.)*

 8              THE COURT:  Call your next witness.

 9              MR. BROUGHTON:  Plaintiff calls Mr. Robert Rachor as

10   an adverse witness.

11              THE COURT:  All right.

12          **ROBERT L. RACHOR, JR., PLAINTIFF'S WITNESS, SWORN**

13                    **<u>DIRECT EXAMINATION</u>**

14              THE COURT:  Members of the jury, you just heard

15   Mr. Broughton say we'll call Mr. Rachor as an adverse witness.

16   That's not a derogatory term or anything of that sort.  It's

17   just that under the rules when you call your own witness in a

18   case in direct examination, you've heard objections to leading

19   questions.  You can't ask a leading question; in other words,

20   you can't testify yourself from the lectern.

21              The witnesses are supposed to be the ones

22   testifying, and you can't ask a question that would suggest an

23   answer.  But in cross-examination you can do that.  You've

24   seen that happen throughout this trial so far.  But when we

25   have what's called an adverse witness, that would be a witness

1  that would be for someone who more than likely would be called

2  for the other side, the other party, one of the other parties

3  in the litigation.

4          Then the rules do allow for some leading and

5  cross-examine type examination on the part of the attorney

6  presenting the witness in its own case in chief.  So the rules

7  just juggle just a little bit here.

8          As I mentioned to you just a few minutes ago,

9  Mr. Rachor would more than likely be a witness that would be

10  called by each side.  All right.

11  BY MR. BROUGHTON:

12  Q   Mr. Rachor, good morning.

13  A   Good morning.

14  Q   Would you please tell the jury your name.

15  A   My name is Robert L. Rachor, Jr.

16  Q   Where do you live, Mr. Rachor?

17  A   In Collierville, Tennessee.

18  Q   How long have you worked at Federal Express?

19  A   Over 13 years now.

20  Q   What is your title there now?

21  A   My current title is Senior Vice President of Air Safety

22  and Business Operations.

23  Q   If you would, tell us what your titles have been through

24  the 13 years you've been at Federal Express.

25  A   I was hired as a Managing Director, Planning and Analysis

1  and promoted to Vice President, Planning and Business

2  Operations.  Then Vice President, Safety and Airworthiness,

3  then Vice President Planning and Performance, and now Senior

4  Vice President of Air Safety and Business Operations.

5  Q    During that time, has military flying by FedEx or FedEx's

6  administration of the FedEx team been under your supervision?

7  A    Not from day one but for a considerable period of that

8  time.

9  Q    Is it currently?

10  A    Yes, sir.

11  Q    And for how long have you been involved in the military

12  flying and the FedEx team?

13  A    Actually to a certain extent while I was in the military

14  while I was at the United States transportation command as the

15  Director of Planning and -- Planning and Analysis and

16  Financial Management.  Then once I came to FedEx, of course,

17  I've been intimately involved in the CRAF and the charter

18  business.

19  Q    And you've been sitting here throughout the whole trial,

20  correct?

21  A    Yes, sir.

22  Q    And you heard the opening statement from your counsel?

23  A    Yes, sir.

24  Q    And you've heard the testimony of all the witnesses?

25  A    Yes, sir.

RACHOR - DIRECT/BROUGHTON                    441

1  Q   And you watched and heard the video of Mr. Chuck Pollard

2  from Omni?

3  A   I did.

4  Q   In early 2008, Mr. Jim Parker of FedEx was your immediate

5  superior; is that right?

6  A   That's correct.

7  Q   And is he still your superior today?

8  A   He is.  He is the Executive Vice President of Air

9  Operations.

10  Q   How long has Jim Parker been your superior?

11  A   Since the day I walked -- well, actually no.  He hired me.

12  He was my -- I reported to him for a period of time, and then

13  as manage -- as a Managing Director.  And then as Vice

14  President, I reported to a gentleman by the name of Don

15  Barber, who was the Senior Vice President of Air Operations

16  for a period of time, about six years.

17  Q   Since then, it's been back to Jim Parker?

18  A   Yes, sir.

19       In late 2005, Jim Parker promoted to the Senior Vice

20  President of the Air Operations; and I reported to him.

21  Q   And during about the last 10 years that Gary Molinari was

22  at Federal Express, you were his direct report; is that right?

23  A   That's correct.

24  Q   And he did not directly report to anyone other than you?

25  A   Not for that period of time, no.

1  Q   And it's true that you delegated the responsibility for

2  running the FedEx charter segment of FedEx's business to

3  Mr. Molinari; isn't that right?

4  A   That was his job, yes, sir.

5  Q   And you expected Gary Molinari to run FedEx's military

6  flying business, didn't you?

7  A   Yes, sir -- well, under my guidance as the managing

8  director, he was to implement the -- run the charter program

9  as a whole, which included the military flying but included a

10 significant amount of other flying as well.

11 Q   And as managing director of charter operations, it was

12 Gary Molinari who determined how the flying would be split

13 between the fliers on the FedEx team; isn't that right?

14 A   Yes, although he would advise me how he planned to do

15 that.  So I would agree with that or not agree with that.

16 Q   Did you ever disagree with it?

17 A   No, because in the end, it was an agreement between the

18 two passenger carriers.  You know, we had a fairly balanced

19 team that had a -- the only thing that really had to be worked

20 out from a participation point of view was the split between

21 the two carriers.  So it was a better conversation about that.

22 Q   But it was Mr. Molinari who would make that decision, and

23 you would ratify it or not ratify it?

24 A   Yes.  As a Managing Director, Gary would make that

25 decision.

1   Q   Mr. Rachor, you believe that when you sign a contract, you

2   are indicating your acceptance of that contract, don't you?

3   A   Yes, sir.

4           MR. BLUMBERG:  Objection.

5   BY MR. BROUGHTON:

6   Q   Do you believe a person's word is their bond?

7   A   Should be.

8   Q   FedEx has a large in-house legal department; does it not?

9   A   Yes, sir.

10  Q   And you know sitting here today that Gary Molinari entered

11  into some contracts on behalf of FedEx without the prior

12  approval of the FedEx legal department, don't you?

13  A   No, sir, I do not.

14  Q   You do not know that?

15          MR. BROUGHTON:  Let's look at Plaintiff's Exhibit 4.

16          MR. BLUMBERG:  Objection.  Your Honor, the document

17  has not been stipulated.  It should not go up on the ELMO.

18  Can our objections be heard?

19          THE COURT:  Sure.  Approach the bench, please.

20      (Beginning of bench conference.)

21          MR. BROUGHTON:  This is a party admission.  It's to

22  Mr. Rachor from Gary Molinari's replacement, David Lang.

23          MR. BLUMBERG:  The document's prejudicial value

24  outweighs the probative.  This is a document from June of

25  2008.  It is after the lawsuit was filed, and it was during

RACHOR - DIRECT/BROUGHTON                    444

1  the collection of -- it was part of the efforts to collect

2  documents as part of the lawsuit.  It's not a real time

3  statement on what the contract is or what the belief is.

4       We've just been sued, and he was trying to collect

5  information.  It would have to be a document from the time.

6       THE COURT:  What's the purpose here?

7       MR. BROUGHTON:  If you look at this, are there any

8  other contracts out there that legal did not see?  Did Gary

9  have any contracts out there beyond -- in other words, he's

10  asking did he have any multiyear contracts.  Are there any

11  other contracts that legal did not see?  The clear implication

12  is he's seen, also, contracts that weren't approved by the

13  FedEx --

14       THE COURT REPORTER:  I'm sorry, speak more into the

15  mic.

16       MR. BROUGHTON:  Oh, I'm so sorry.

17       This guy says, "We are looking through our files to

18  determine if there are any letters that confirm longer-term

19  commitments than what are in the Fee Agreements."  And that's

20  exactly what we're suing on here, and that's what all those

21  other three-year contracts are.

22       MR. BLUMBERG:  The date of the document is after the

23  filing of the lawsuit.  We raised this as an objection.

24       THE COURT:  Yes, I'll sustain the objection.

25       *(End of bench conference.)*

RACHOR - DIRECT/BROUGHTON                    445

1          MR. BROUGHTON:  Mr. Brockwell, if you could put

2   Plaintiff's Exhibit 5 up on the screen.

3   BY MR. BROUGHTON:

4   Q   Mr. Rachor, have you seen this three-year agreement for

5   FY04 through FY06 before?

6   A   During preparation for the trial, yes.

7   Q   You had never seen it before this lawsuit was filed; is

8   that right?

9   A   Not to my knowledge, no.

10  Q   In fact, you never saw this three-year agreement until

11  your deposition was taken on August 29th of last year; isn't

12  that right?

13  A   I believe you're correct, yes.

14  Q   You didn't know that Gary Molinari had signed this

15  three-year agreement, did you?

16  A   No, sir, I did not, no.

17          MR. BROUGHTON:  Would you put Plaintiff's Exhibit 7

18  up?

19  BY MR. BROUGHTON:

20  Q   Mr. Rachor, at the top of Plaintiff's Exhibit 7, there is

21  an August 12 e-mail from Gary Molinari to Bill Doherty; do you

22  see that?

23  A   Yes.

24  Q   Subject is "PAX split within the team."  Do you see that?

25  A   Yes.

RACHOR - DIRECT/BROUGHTON                          446

1   Q   If you would please look at that first sentence, end of

2   the first sentence.  Mr. Molinari says, "I would propose we go

3   to a 50/50 split."  Do you see that?

4   A   Yes.

5   Q   If you go to the last sentence before "please confirm," it

6   says, "I would like to proceed on this basis with a letter

7   agreement for three years."

8        Now, you never saw this 50/50 split proposal from

9   Mr. Molinari, did you?

10  A   Not that I recall, no, sir.

11  Q   Speaking of three-year agreements --

12       MR. BROUGHTON:  Would you please put PX9 up.

13  BY MR. BROUGHTON:

14  Q   If you would take a look at this fax cover sheet,

15  Mr. Rachor, it says "to" -- the typed portion says "to Gary

16  Molinari from Chuck Pollard"; is that right?

17  A   Yes, sir.

18  Q   And I believe you told us you heard the deposition of

19  Mr. Pollard yesterday, right?

20  A   I did.

21  Q   And you saw him testify that he had said, I just returned

22  from vacation, and here we've agreed to a 50/50 split, right?

23       MR. BLUMBERG:  Objection, Your Honor, foundation.

24  May we approach again?

25       THE COURT:  You may.

1        (*Beginning of bench conference.*)

2              MR. BLUMBERG:  Your Honor, it seems like what's

3   going on here is we're just going through the witness and

4   showing him a bunch of documents he's never seen before and

5   confirming he's never seen before and delivering a closing

6   argument.  We've brought Gary Molinari here all the way from

7   California.  He's prepared to testify.  I think this is a

8   waste of the jury's time and not really relevant to the issues

9   in the case.

10              MR. BROUGHTON:  Your Honor, it's not a waste of the

11   jury's time because he sent to me -- Mr. Rachor sent an e-mail

12   shortly after the January termination letter amongst

13   Mr. Molinari, him, and his boss, Jim Parker, saying -- telling

14   Mr. Parker that if -- well, with respect to this dispute,

15   saying ATA claims that there was a three-year agreement, but

16   it wasn't valid because Omni did not agree to a 50/50 split.

17   And I think I can show the jury he was wrong.  Omni has

18   testified.  Omni has produced documents that they did agree to

19   a 50/50 split.  So his conclusion that the three-year

20   agreement was not an agreement based on the fact that Omni

21   didn't agree to it was correct, and the reason he believed

22   Omni didn't agree to it is because Gary Molinari never showed

23   him this document that we're talking that Omni had agreed to

24   the split.

25              THE COURT:  I'll let you present your case, but I

1   don't want you showing him documents that he's never seen

2   before and asking him to testify about what's in that

3   document.

4          MR. BROUGHTON:  But in this particular case if his

5   subordinate would have shown him this agreement, he would have

6   known it existed.  He would have known it existed, and he

7   would not have drawn the conclusion --

8          THE COURT:  Okay.  Go ahead.

9      (End of bench conference.)

10         MR. BROUGHTON:  Please put that up, Mr. Brockwell.

11  BY MR. BROUGHTON:

12  Q   Mr. Rachor, you've seen Mr. Pollard's statement, and

13  you've heard his testimony that he said Omni agreed to a 50/50

14  split, right?

15  A   I've seen this.  To be honest, I was doing a little bit of

16  preparation over there, so I didn't hear all of Mr. Pollard's

17  testimony.

18  Q   Okay.  You see his next sentence, "That should be fair all

19  around," correct?

20  A   Yes.

21         MR. BROUGHTON:  Okay.  Mr. Brockwell, let's go to

22  the attachment, please.

23  BY MR. BROUGHTON:

24  Q   You've now seen this August 18, 2005, three-year agreement

25  signed by Mr. Molinari and Omni, have you not, covering '07

RACHOR - DIRECT/BROUGHTON                    449

1  through '09?

2  A    Yes, I've seen this.

3  Q    That was never shown to you prior to this lawsuit being

4  filed, was it?

5  A    You know, I don't know.  I certainly wasn't aware of it --

6  I became aware of it sometime during trial preparation.  The

7  exact time, I don't know.

8  Q    Certainly before ATA got the January 22nd, 2008, notice

9  letter, you had never seen this three-year agreement with

10 Omni; is that right?

11 A    Correct.

12 Q    In February of 2008 after FedEx had sent the January 22nd

13 notice letter, you told your boss, Jim Parker, that ATA may

14 bring up an agreement to split the flying between ATA and Omni

15 for FY07 through '09, didn't you?

16 A    Can you repeat the question again?

17 Q    Certainly.

18        In February of 2008, which is after FedEx sent ATA the

19 January 22nd notice letter that it would not be on the team in

20 '09, you told your boss, Jim Parker, that ATA may bring up an

21 agreement to split the flying between ATA and Omni for FY07

22 through '09, didn't you?

23 A    It's probably an e-mail.  Could I see that?  I don't know

24 the exact words I would have used with Mr. Parker at the time.

25 Q    Sure.

RACHOR - DIRECT/BROUGHTON                    450

1          MR. BROUGHTON:  May I approach the witness, Your

2     Honor?

3          THE COURT:  You may.

4     BY MR. BROUGHTON:

5     Q   It's this top e-mail, Mr. Rachor.

6          My question is in February of '08, did you tell your

7     boss that ATA may bring up an agreement to split the flying

8     between ATA and Omni for FY07 through FY09?

9     A   Yes, I did.

10    Q   And that was on February 19th, was it not?

11    A   If that's what the e-mail says, yes.  I didn't know what

12    they were going to bring up when they called, if they called.

13    Q   But you wanted to let Mr. Parker know if they brought up

14    that three-year agreement, here was your position on it; isn't

15    that right?

16    A   I was prepping him for the phone call.

17    Q   Okay.  And -- and I can hand this back to you if you want.

18    In fact -- well, if you'll just hold on to this, please.

19    A   Certainly.

20    Q   You say, "They may bring up an issue about an earlier

21    agreement to split the flying between them and Omni for FY07

22    through '09.  But the parties (except maybe them) did not sign

23    it, and there was not concurrence with the way the business

24    was split."  You see that?

25    A   Yes.  I saw that, yes.

RACHOR – DIRECT/BROUGHTON                         451

1   Q   "Not concurrence."  You've seen the Omni three-year

2   agreement where Mr. Pollard said, "We've agreed to a 50/50

3   split.  That should be fair all around," didn't you?

4   A   I saw that a couple years after this.

5   Q   Well, don't you wish Mr. Molinari would have told you that

6   before you wrote this e-mail?

7   A   What I was thinking at the time, I don't know if I would

8   wish that or not.  It's kind of hard to go from here to there

9   at that point.

10  Q   Well, you're telling your boss, Mr. Parker, who

11  apparently -- is he the No. 2 guy at FedEx?

12  A   At the time he was one of about 16, I believe -- please

13  don't quote me on 16 -- Senior Vice Presidents.

14  Q   You're warning him that if --

15  A   No, sir, I'm not.  I'm just --

16  Q   Well, you're advising him?

17  A   I'm just telling him there's a phone call coming and

18  here's what it might be about.

19  Q   So if ATA brings up this three-year agreement, don't worry

20  about it because Omni did not concur with it.  And now you

21  know that's wrong, isn't it?

22  A   I said no such thing as "don't worry about it," sir.

23  Q   Let's look at it again.  "They may bring up an earlier

24  agreement to split the flying between them and Omni for FY07

25  through '09, but the parties, except maybe them, did not sign

RACHOR - DIRECT/BROUGHTON                              452

1    it" -- and let's start right there at the "except maybe them."

2           Did you think ATA was the only one who signed that

3    September 7, 2006 three-year agreement?

4    A   No, I thought it required the signature of ATA and Omni.

5    ATA had signed but Omni had not.

6    Q   But Gary Molinari signed it, right?

7    A   Yes, he did.

8    Q   So ATA signed it, and Gary Molinari signed it?

9    A   That is correct.

10   Q   And now you know that a year beforehand, Omni had signed

11   agreeing to the other 50 percent, hadn't they?

12          MR. BLUMBERG:  Objection.  Mischaracterizes the

13   evidence.

14          THE COURT:  Overruled.

15          THE WITNESS:  They had not signed the agreement

16   which I had seen.

17   BY MR. BROUGHTON:

18   Q   Right.  But now you know they had signed another agreement

19   with FedEx agreeing to the other 50 percent that FedEx wasn't

20   giving to ATA.

21   A   I thought you said that was an '05 letter.

22          MR. BROUGHTON:  Could you put PX9 up there, please?

23          THE WITNESS:  I can't see with my glasses.

24          MR. BROUGHTON:  Could you please enlarge that for

25   him?

RACHOR - DIRECT/BROUGHTON                    453

1            THE WITNESS:  No.  The date, please.

2    BY MR. BROUGHTON:

3    Q   If you look up at the top, it says "August 18th."

4    A   2005.

5    Q   2005.

6    A   So you had me in 2000 -- I'm confused.  You had me in 2008

7    writing to Mr. Parker about a letter, and you're asking me

8    about a letter from 2005.

9    Q   Well --

10   A   I don't think that --

11   Q   The point is in 2008 when you talked to your boss -- you

12   were under the impression you told your boss that Omni did not

13   concur with 50 percent of the flying for FY07 through FY09,

14   right?

15   A   What I had at the time, if I recall, between the time we

16   notified ATA was I got visibility of the letter that was

17   signed -- the two-party letter that was signed -- however many

18   we're referring to, the two-party letter that was signed by

19   two people or two parties.  So I saw that letter; and

20   therefore, was trying to prepare my boss for the call that I

21   knew was coming.

22   Q   And now you realize that the third party had actually

23   signed an agreement for the same exact subject matter covering

24   the same sort of flying for the same three-year period in a

25   separate document.  You realize that now?

1          MR. BLUMBERG:  Objection.  Mischaracterizes the

2  evidence.

3          THE COURT:  The jurors will determine what the

4  evidence is.  Go ahead.

5          THE WITNESS:  Well, there is another letter from

6  Omni, yes.  That's correct.

7  BY MR. BROUGHTON:

8  Q   And they agreed that it would be 50 percent for them from

9  '07 through '09?

10 A   Yes.

11         THE COURT:  Hold on a second.

12         (Cell phone ringing.)

13         THE COURT:  Let's have a time out.  You're lucky

14 you're sitting on that side of the bar.  We're ready?  Okay.

15         THE WITNESS:  I don't think that helped either.  I

16 think they balked at that.

17 BY MR. BROUGHTON:

18 Q   Did you not hear Mr. Pollard's testimony?

19 A   I told you I was preparing for this, sir.

20 Q   So you're still telling this jury Omni did not agree to

21 50 percent for '07 through '09?

22 A   That letter says what it says.

23 Q   Would you have told your boss that Omni didn't agree with

24 50 percent when you sent this to him in February of '08 if

25 you -- if Mr. Molinari had bothered to show you that letter?

1  A   I would try to get my boss fully prepared for the phone

2  call if I could.

3              MR. BROUGHTON:  Object as nonresponsive.

4              THE COURT:  Sustained.

5  BY MR. BROUGHTON:

6  Q   Mr. Rachor, would you have told Jim Parker that this

7  agreement signed by ATA and FedEx was, in essence, of no

8  importance because Omni did not concur with the way the

9  business was split had Mr. Molinari shown you that Omni

10 letter?

11 A   If I knew about -- to -- I'll answer your question

12 directly.  If I had known about the Omni letter and I prepared

13 my boss for the phone call, then I would have given him as

14 much information I had at the time, yes.

15             MR. BROUGHTON:  Still object as nonresponsive.

16             THE COURT:  I think that's about all you're going to

17 get.

18 BY MR. BROUGHTON:

19 Q   So at this time, turns out you were wrong for your reason

20 in what you reported to Mr. Parker, right?  Omni did agree?

21 A   I don't know that to be true at the time.  They may have

22 written this letter, but they certainly were planning on

23 working the split differently than --

24             MR. BROUGHTON:  Object as nonresponsive.

25             THE COURT:  Rephrase your question.

RACHOR - DIRECT/BROUGHTON                    456

1   BY MR. BROUGHTON:

2   Q    Mr. Rachor, you know Gary Molinari never sent that Omni

3   three-year agreement to ATA, did he?

4   A    I don't know if he did or not, sir.

5   Q    You didn't tell your boss that the ATA three-year

6   agreement wasn't valid because FedEx only does annual

7   contracts, did you?

8   A    At the time, no.

9   Q    You didn't tell your boss that that three-year ATA

10  agreement wasn't valid because of that entire agreement

11  boilerplate clause in the Fee Agreement, did you?

12  A    I reviewed the Fee Agreement.  When the letter came up, I

13  reviewed the Fee Agreement, and the Fee Agreement --

14          MR. BROUGHTON:  Objection, nonresponsive.

15          THE WITNESS:  Ask the question again.  I'm just

16  trying to --

17  BY MR. BROUGHTON:

18  Q    You didn't tell your boss that the three-year agreement

19  with ATA wasn't valid because of some boilerplate entire

20  agreement clause in a Fee Agreement, did you?

21  A    I didn't tell him it was valid or invalid.  I told him two

22  things, that it wasn't signed by all the parties; and then

23  secondly, that Omni -- or excuse me -- that ATA had signed up

24  to something different than what the Letter Agreement had

25  originally had in it.

RACHOR – DIRECT/BROUGHTON                    457

1   Q    Now, you had never seen the September 7, 2006, Letter

2   Agreement before 2008, had you?

3   A    The September 7 --

4            MR. BROUGHTON:  Please put PX12 -- put PX13 up, if

5   you would.  If you would enlarge that for him, please.

6            THE WITNESS:  I recognize the letter.

7   BY MR. BROUGHTON:

8   Q    That first sentence says, "This will serve as the

9   agreement," right, goes on?

10  A    Yes.

11  Q    Second paragraph says, "It is agreed," goes on, right?

12  A    Yes.

13  Q    And the last sentence says, "We look forward to a

14  continued successful relationship over this period," does it

15  not?

16  A    That's what it says.

17  Q    And the period being discussed is '07 through '09?

18  A    Yes, it is.

19  Q    And you had never seen this three-year agreement until

20  February of 2000, right?

21  A    2000?

22  Q    I'm sorry, 2008.

23  A    It could have be late January, early -- right around that

24  time, yes.

25  Q    And you wouldn't have seen that agreement because that's

1  not something you would have been involved in prior to that

2  time, right?

3  A    That's correct.

4  Q    That was Gary's area of responsibility?

5  A    As the Managing Director of Aircraft Charters, yes, sir.

6        MR. BROUGHTON:  If we can put PX3 up, please.

7  BY MR. BROUGHTON:

8  Q   If you could take a look at that, please.  This is an

9  e-mail from Gary Molinari to you dated February 22, 2008,

10 correct?

11       MR. BROUGHTON:  You could enlarge that for him,

12 please?

13       THE WITNESS:  Yes.

14       MR. BROUGHTON:  Plaintiff offers Plaintiff's

15 Exhibit 3.

16       MR. BLUMBERG:  No objection.

17       THE COURT:  Three admitted.

18    *(Plaintiff's Exhibit 3 was received in evidence.)*

19       MR. BROUGHTON:  Mr. Brockwell, if you could enlarge

20 that, the first full paragraph.

21 BY MR. BROUGHTON:

22 Q   This is from you to Gary Molinari; is that right?

23 A   Correct.

24 Q   Do you recall this e-mail?

25 A   I do.

RACHOR - DIRECT/BROUGHTON                    459

1   Q   And you say to Mr. Molinari, "Do you concur with the

2   following?"  Concur means agree, right?

3   A   Yes.  Yes, sir.

4         THE COURT REPORTER:  I'm sorry, sir.  Could you repeat

5   your answer?

6         THE WITNESS:  Yes, I concurred.  I said -- go ahead.

7   BY MR. BROUGHTON:

8   Q   Concur means to agree, right?

9   A   In this case, yes.

10  Q   And it says, "Regarding the 2006 agreement for FY07 to '09

11  that ATA refers to:  The letter was from Gary (and therefore

12  signed) proposing the split of NB and WB PAX business."

13  That's narrow-body and wide-body, right?

14  A   Yes, sir.

15  Q   It has a spot for signatures of each airline.  In the

16  letter, each airline was asked to concur.  Omni did not sign,

17  as they thought they should have a larger percentage over the

18  three-year period.  Instead, we operated under the original

19  one-year agreements that gave ATA the 50/50 split but only for

20  that year.

21        We'll continue on with the rest of it shortly.

22        MR. BROUGHTON:  And if we can scroll down -- let's

23  see.  No, scroll up to the top.  I'm sorry.

24  BY MR. BROUGHTON:

25  Q   Mr. Molinari responded, "I concur with your summary to

RACHOR - DIRECT/BROUGHTON                    460

1   him," right?

2   A   Yes.  That's the response, correct.

3   Q   Mr. Molinari had never told you the whole story, had he?

4   A   Had not told me the whole story?

5   Q   He had led you to believe that Omni didn't agree with the

6   50/50 split?

7          MR. BLUMBERG:  Objection, speculation.

8          THE COURT:  Overruled.

9          THE WITNESS:  I'm trying to remember exactly.

10  BY MR. BROUGHTON:

11  Q   Well, you had just told us a couple minutes ago that you

12  left all of that to Mr. Molinari.  You wouldn't have been

13  involved in these things?

14  A   What I knew about the Fee Agreements -- well, whatever I

15  knew about the Fee Agreements, I gleaned from Gary personally.

16  Before I wrote this e-mail to Mr. Parker -- well, this is in

17  preparation for an e-mail to Mr. Parker.

18  Q   Right.

19  A   I can't remember whether I'd seen the letter at that time

20  or not.  So -- ask your question again so I get it right.  I'm

21  sorry.

22  Q   The point of you sending your little summary to

23  Mr. Molinari is you wanted to be sure he concurred with that,

24  right?

25  A   That's right, yes.

RACHOR – DIRECT/BROUGHTON                461

1   Q    And the basis for what you had said in your summary was

2   information you had gotten purely from what Mr. Molinari had

3   told you before, right?

4   A    Yes.

5   Q    But it turns out he wasn't telling you the whole story,

6   right?  He led you to believe that Omni didn't agree with the

7   50 percent?

8   A    That's what I said right here.  I don't believe at the

9   time they did, did they?

10  Q    The jury's –– we've looked at the Omni agreement.  You're

11  not disputing that they signed it, right?

12  A    I'm not disputing that there's a letter they signed in

13  2005 with respect to a 50/50 split.  No, sir, I'm not.

14  Q    Now, military flying has been very profitable for Federal

15  Express, right?

16  A    Not as much as we like, but military flying is profitable

17  flying by design.

18  Q    Why do you say it's profitable flying by design?

19  A    Well, the military wants to attract carriers to the CRAF.

20  So when they reimburse you, they reimburse you for your costs.

21  So it becomes profitable flying in that regard.

22  Q    And the FedEx team, for instance, for 2008 or FY08 alone

23  was awarded about a billion–dollar contract, right?

24  A    Yes, sir.

25          MR. BROUGHTON:  If we could put Plaintiff's

1    Exhibit 2 up.  If you could enlarge it, please.

2    BY MR. BROUGHTON:

3    Q    Do you recall this January 22nd letter?

4    A    Yes, sir.

5    Q    You didn't participate in drafting this letter, did you?

6    A    Did not.

7    Q    You did not review the letter before Mr. Molinari sent it

8    out, did you?

9    A    I knew that it was going and what it was going to say.

10   Q    But you had not reviewed it?

11   A    Personally, no.

12   Q    And you don't know if the FedEx legal department reviewed

13   it before it went out, do you?

14   A    No, I don't.

15   Q    You did not participate in the phone call to ATA

16   referenced in that January 22nd letter, did you?

17   A    I did not.

18   Q    It was Mr. Molinari who made the decision to exclude ATA

19   from the team for FY09, wasn't it?

20   A    No, sir.

21   Q    He did not make that decision?

22   A    He recommended to me that we approach the team that way,

23   and I approved that.

24   Q    Okay.  And that letter doesn't state any reasons why ATA

25   was being ousted from the team in FY09, does it?

RACHOR – DIRECT/BROUGHTON                    463

1  A   No, sir.

2  Q   You said at the outset of your testimony that prior to

3  going to FedEx, you were involved in the CRAF program; is that

4  right?

5  A   I was the director of program analysis and financial

6  management at the U.S. Transportation Command, which oversaw

7  the budget for the Air Mobility Command and others.

8  Q   Since that time, do you go -- you do go and attend -- and

9  you have to describe it better than I can, but they have

10 annual meetings or, perhaps, more-than-annual meetings of

11 military fliers that meet with CRAF or AMC or U.S. TransCom,

12 whatever those various acronyms are; is that right?

13 A   Yes.

14 Q   Okay.  And do you go every year?

15 A   No, it depends.  The relationship with -- of course,

16 you're dealing contractually with the Air Mobility Command.

17 So there are rules on how you interface with the

18 transportation command.  So the way it works under Government

19 Sunshine Laws is that the National Defense Transportation

20 Association sponsors conferences and stuff so that people are

21 able to converse and talk about the contract and make inputs

22 in general terms to the Air Mobility Command and the U.S.

23 Transportation Command.

24       The commander of the U.S. Transportation Command will

25 also occasionally hold conferences above the working level, so

1  to speak, so he may have a what's called Transportation

2  Advisory Board.  I would occasionally attend that, or

3  Mr. Parker would attend those.  I preferred Mr. Parker to go,

4  as a more senior representative than I.  And -- or a CEO

5  conference, and within our company, Mr. Parker -- Mr. Parker

6  should attend; and if he could not for some reason, then I

7  would attend the CEO conference.

8  Q    Okay.  Have you attended -- are the CEO conferences the

9  only ones you've ever been to in the last two, three years?

10  A    Let's see.  There was a CEO conference in January I went

11  to, and I've been to a Transportation Advisory Board; but I

12  don't think any others.

13  Q    Okay.  And you've attended some of these meetings in the

14  last two years, have you not?

15  A    Yes.

16  Q    Okay.  When was the last one you went to?

17  A    Attended a meeting in January of this past year.

18  Q    January of '09?

19  A    January of '10, this year.

20  Q    We're still in '10.

21  A    Yes.

22  Q    I was concerned there for a minute.

23  A    A while ago.  January.

24  Q    Okay.  But you're aware that CRAF is issuing new rules

25  which make substantial changes in the way mobilization points

1  are going to be awarded to the teams?

2  A   That's correct.  It's changing a good bit.

3  Q   It's radically changing the way the teams operate, isn't

4  it?

5  A   Yes.

6  Q   Okay.  And you're aware that these new rules are going to

7  give mobilization points --

8          MR. BLUMBERG:  Objection, relevance as to what's

9  going on now.

10          THE COURT:  I assume you have some relevance here.

11          MR. BROUGHTON:  I believe I do, Your Honor.

12          THE COURT:  Okay.  We'll see.

13  BY MR. BROUGHTON:

14  Q   It's going to give more mobilization points to carriers

15  like ATA was that actually flew the troops, as opposed to

16  giving more points to big airlines that had a lot of planes

17  but didn't use them for the troops; isn't that right?

18  A   We used our planes for the troops, sir, quite a bit.  We

19  carried one-third of the cargo into the Desert Shield/Desert

20  Storm war ourselves, one-third of all the commercial cargo

21  that moved in that war.

22  Q   I'm sorry.  My question wasn't clear.

23          These new rules are going to give more mobilization

24  points to the carriers -- to the actual fliers compared to

25  points sellers; isn't that right?

RACHOR - DIRECT/BROUGHTON                         466

1   A   Yes.

2   Q   All right.  And you're aware that one of the reasons that

3   these rule changes are going into effect is so the big

4   carriers like Northwest couldn't shove companies like ATA out

5   of the way; isn't that right?

6           MR. BLUMBERG:  Objection.  I think we've

7   demonstrated there's no relevance to this.

8           THE COURT:  Overruled.

9           THE WITNESS:  I'm sorry, Your Honor.  I couldn't

10  hear your ruling.

11          THE COURT:  Overruled.

12  BY MR. BROUGHTON:

13  Q   You know that one of the major reasons for these changes

14  is so big carriers like Northwest could not push -- throw

15  their mobilization points around and push companies like ATA

16  out of business; isn't that right?

17  A   No, sir.

18          MR. BROUGHTON:  Your Honor, can we approach the

19  bench, please?

20          THE COURT:  You may.

21      (*Beginning of bench conference.*)

22          MR. BROUGHTON:  This is in limine about discussions.

23  I did want to get into the fact that he was on the call

24  with -- a telephone call, which is not the meeting that I

25  believe Mr. Blumberg had expressed concern about.  This was a

1  subsequent phone call.  Let me back up.  ATA got the letter.

2  ATA asked for a meeting.  Karnick and Ellmer went to Memphis

3  and met with Mr. Molinari.  He told them he would -- was

4  doubtful but he would take it under consideration.

5          Subsequently, a phone call was set up, which is the

6  one he testified he was preparing his boss for where Karnick

7  called and said, "Will you reconsider"; and they said, "No."

8  I'm not getting into any, "We've got a building full of

9  lawyers" or "We're going to sue you" or any of that stuff.  I

10  just want him to confirm that ATA made a call.  He was on it,

11  and ATA asked them to reconsider.

12          MR. BLUMBERG:  That's the exact subject of the

13  motion in limine.  We've explained there were two instances,

14  that first they met with Gary Molinari, and then they

15  elevated.  So this is the exact same thing.  And, actually, as

16  Mr. Broughton was examining him about that e-mail, I was

17  actually going to compliment him that he was respecting the

18  motion in limine, but this goes beyond that.  He's established

19  what's going on in those calls without getting into that part.

20          MR. BROUGHTON:  We believe urging them to reconsider

21  is showing that we were trying very hard to do everything we

22  could.  And it is mitigation to say, "Will you please

23  reconsider?"

24          THE COURT:  Well, you're not going to argue or it's

25  not part of your mitigation to say that they didn't go that

1   step to ask them --

2           MR. BLUMBERG:  We certainly didn't say that in

3   opening, and we're not going to say that in closing.  We're

4   not going to accuse them of --

5           THE COURT:  Okay.

6           MR. BROUGHTON:  I'm sorry.

7           I will want to make an offer of proof with this

8   witness at some point.

9           THE COURT:  Okay.  We can do that at a break.

10          MR. BROUGHTON:  Okay.

11   *(End of bench conference.)*

12          MR. BROUGHTON:  I will pass the witness.

13          THE COURT:  Cross-examination, Mr. Blumberg, and

14   direct examination.

15                      **CROSS EXAMINATION**

16   BY MR. BLUMBERG:

17   Q   Good morning, Mr. Rachor.  How are you?

18   A   Good morning.

19   Q   I know that Mr. Broughton introduced you very briefly.  I

20   know the jury's been looking at you for a little while.  I

21   just want to get them to know you a little better.  During the

22   opening there was a reference to your military service.  Can

23   you describe briefly your time with the military?

24   A   Well, I spent 20 years in the military, most of it

25   aviation.  I was a pilot, and I flew patrol aircraft, P3s.  We

1   spent a lot of time looking for Russian submarines during the

2   Cold War.

3          While you're not in flying operations, you're usually

4   ashore.  While I was ashore, I started developing skill sets

5   in the area that I'm working at now.  I served in the Pentagon

6   any number of times -- a number of times -- twice, which is

7   bad enough.  But I served in the Pentagon as the -- first as

8   the Manager of the Aviation Warfare Program.  I put all the

9   air warfare assets together in the Navy.

10          Then as the Assistant Director of the Navy, the budget

11   within the Pentagon.  That led to after I -- well, I commanded

12   a squadron of patrol aircraft.  Then I was very fortunate to

13   get a major command and command a base, after which having had

14   some Pentagon tours, I went out with what's called a joint

15   tour with the Air Force and the Army with the U.S.

16   Transportation Command, as I mentioned, the Director of

17   Program Analysis and Financial Management.

18   Q   When you came to FedEx, you described a number of

19   positions.  I just want to focus on the one you held during

20   the 2006 to 2008 time frame, and that was the Vice President

21   of Planning and Performance.  Can you just give an overview of

22   everything that you were responsible for in that VP position.

23   A   I'll try not to go too long.  I had four directors working

24   for me at the time from 2006 to 2008.  I had the Managing

25   Director of Fleet Planning and Business Operations.  So he

*RACHOR — CROSS/MR. BLUMBERG*                    470

1   would -- they would do all the long-term fleet planning about

2   how we integrate the aircraft that we're buying into our fleet

3   and how we do our maintenance and things of that nature.  The

4   Business Operations group would do some business cases.

5           I had a Managing Director of Planning and Analysis.

6   That group, unfortunately, had to do all the admin work for

7   the airlines.  That's the 10 percent of the job you always

8   hate.  They also did performance, which from our perspective,

9   was how to build a better airline.

10          So you have the continual improvement, continued

11  improvement in our flight processes and --

12          THE COURT REPORTER:  I'm sorry.  I need you to slow

13  down, please.

14          THE WITNESS:  I'm sorry.  I talk fast.  I'm sorry.

15          THE COURT REPORTER:  That's okay.  "Which from our

16  perspective, was how to build a better airline."

17          THE WITNESS:  How to build a better airline.  I had

18  industrial engineers, and I had process people and metrics

19  people who work in that particular group.  The Vice

20  President -- the Managing Director of Strategic Projects had

21  an interesting job.

22          Strangely for the airline, because of our strength

23  in engineering, we do a number of things other airlines just

24  don't do.  We're developing heads-up displays for the aircraft

25  which are those nice things you see the fighter pilots look

1    through.  We put counter missile systems, missile defense

2    systems on airplanes and just kind of an unusual type of

3    activity but an interesting one, certainly, to be associated

4    with.

5            Then the Managing Director of Aircraft Charters,

6    which was a business unit unto itself.

7    Q    How many individuals in the charters area -- how many

8    individuals were in that overall?

9    A    It would vary, but I would say about 20, 22.

10   Q    Broadly, we've been talking a lot about military charters,

11   but what does FedEx's overall charter department cover?

12   A    Well, one of the reasons we have charters is it provides

13   us a couple of large assets that we can move in and out of the

14   system as necessary.  Charters runs essentially an

15   around-the-world mission.  Currently because of the war in

16   Afghanistan, we fly missions into Baghlan.  That gets us into

17   the, into the Asian Theater.

18           Then we have to find our way home somehow by getting

19   some other business in some fashion.  Sometimes we'll go pick

20   up with our FedEx rate.  Sometimes we'll work out of Hong Kong

21   or Guangzhou, for example.  Or we'll go up the back way and

22   we'll go up through Dubai and Frankfurt and that way will

23   reposition the aircraft back.  So it's a fairly complex

24   business that operates two sides of the equation.

25   Q    And the charter department also does some of the special

1  charters like moving whales, seals, pandas, those kind of

2  charters?

3  A   Yes.  We do a good bit of horses.  We did the World

4  Equestrian Games recently.  My career passed before my eyes.

5  We had 440 extremely expensive horses we brought in for the

6  World Equestrian Games.  We've done the Olympics with horses.

7  We've done whales from different aquariums.  We do a lot of

8  really interesting, interesting things.

9  Q   Okay.  And during, let's say, the 2005 to 2008 time

10 period, who was in charge of charters?

11 A   Mr. Molinari.

12 Q   Okay.  So he had everything you've just described, the

13 freight forwarding and the animal charters and military

14 charters.  That was all under Mr. Molinari's tent?

15 A   Yes, correct.

16 Q   Okay.  How long was Mr. Molinari with FedEx?

17 A   The Tiger merger occurred in 1989, so he came over with

18 the Tiger merger in the charters department.

19 Q   And that's Flying Tigers.  That was the --

20 A   That was Flying Tigers, the airline that the company

21 acquired in 1989.

22 Q   When did Mr. Molinari leave FedEx?

23 A   He -- it was kind of funny.  He retired in, I think,

24 June 1st, 2008, or somewhere thereabouts.  But he had a --

25 Gary had always kept his house in California, and he had the

*RACHOR – CROSS/MR. BLUMBERG*                    473

1   same renter in the house the entire time.  About two years

2   prior to 2008, he kicked his renter out.  We all went, "Well,

3   that's it for Gary."  So he was getting ready to retire at

4   that point, so we knew that he was leaving fairly soon at that

5   point or sometime after that.

6   Q   Okay.  I think in talking about military charters, FedEx

7   has participated in the Civil Reserve Air Fleet program we've

8   been hearing about during this trial?

9   A   Yes.  Since we acquired Tigers and they still had the CRAF

10  prior to Desert Shield/Desert Storm, we participate in that on

11  an annual basis.

12  Q   Okay.  And does FedEx actually fly missions as part of

13  this?

14  A   We do.  I know there's a lot of technical things here, but

15  we're both a points seller and a flier.  In fact, we like to

16  fly more than they will fly us.

17  Q   Have FedEx –– we talked about the call-up in emergency.

18  Have FedEx planes actually ever been called up in case of

19  emergency?

20  A   Yeah.  As I mentioned earlier, during Desert Shield/Desert

21  Storm, FedEx flew about one-third of the cargo that went into

22  the theater for that.  During Operation Iraqi Freedom, they

23  did a –– the Air Mobility Command doesn't like to call up the

24  CRAF if they don't have so because it puts a lot of rules in

25  place.  So what they did is they came to the team and said, We

RACHOR – CROSS/MR. BLUMBERG                474

1  need you to fly at higher levels; Can you do that?  The team

2  was able to do that.  That's how we operated for the initial

3  portion of Operation Iraqi Freedom.

4  Q   I want to turn to the division of roles between you and

5  Mr. Molinari as far as CRAF.  What were the areas that you

6  handled or had oversight on?

7  A   Well, as Mr. Broughton had asked me, I did a lot of work

8  with our senior relations with the military.  Either I had

9  prepared the person who was going or I went myself, things of

10 that nature.  I worked -- I did the business plan, of course.

11 That's a very important piece in the business, to lay out the

12 plan for the year.  I monitored the plan during the year, and

13 I really served as an integrating role with charters and the

14 rest of the company because there was a continual demand on

15 charter aircraft from the company to fly this mission, to fly

16 that mission, support our company, and we had to kind of work

17 with those --

18            THE COURT REPORTER:  I'm sorry, sir.

19            THE WITNESS:  I'm sorry.

20            THE COURT REPORTER:  I need you to slow down.

21            THE WITNESS:  It's hard for me.

22            There was demand from the company about what we were

23 going to do with the charter assets.  So I would fight those

24 battles internally within the company, and they were not

25 infrequent.  So when I'd lost our support trailers, we went to

*RACHOR - CROSS/MR. BLUMBERG*                    475

1  our long-range planning committees, things of that nature.  I

2  would do studies or lead a study.  For example, we just bought

3  new triple 7 freighters and whether or not we would dedicate

4  those to the CRAF.  There had to be a lot of study work that

5  had to go into that.  So I would direct that study and review

6  it and supervise it and get the results up to the chairman, et

7  cetera.  So I stayed pretty busy at that level with charters.

8  Q   And you referred to the chairman.  Who is the chairman?

9  A   Mr. Fred Smith.

10 Q   Okay.  Now, as far as the CRAF program military charters,

11 what things were in Mr. Molinari's tent?

12 A   Well, as the managing director, he ran that particular

13 business.  He was responsible for putting the team together,

14 for managing the team, for doing the negotiations, for

15 executing the contract when the contract was initiated for the

16 year and all the associated matters of that.  He also had a

17 sales team, so on the other side of the business we were

18 looking for people who wanted to move whales or horses or

19 whatever it may be because it was a round-trip type issue, so

20 he was very active with sales.

21      And we had our own -- every airline has a global

22 operations control center.  We had our own control center for

23 charters where we monitored the charter flights and made sure

24 everything was going -- there's a lot of -- charters operates

25 in a different environment, somewhat, than the rest of the

1  system does.  You want to move -- FedEx moves packages.  So

2  charters moves, you know, a whole plane charter.  So FedEx

3  doesn't turn down customers.  We just accept all packages.

4  Charters has customers, and we move things for individual

5  customers.  So there's an awful lot of things that aren't

6  built into the system that we have to do.

7       If you're going to fly into -- well, I mean, for

8  example, during the earthquake in Haiti, we had to get into

9  Haiti.  So then came the charters to get us in there because

10 we had the capability to try to figure out -- the rest of the

11 system doesn't know how to do this, where we do -- how to get

12 into Haiti to deliver aid into Haiti, for example.  So we were

13 able to work contacts and things of that nature.  So there's

14 always a lot of, you know, how do you get it offloaded?  Is

15 there a live battery offloader in Haiti?  If there's not, what

16 kind of aircraft do you have to fly in?  What is there?  All

17 that type of stuff has to be worked out.

18      The system already has that all in place.  So that

19 keeps -- when charters has to do those types of activities, it

20 keeps them very, very busy.

21 Q   Let me ask you about a few specific things that the jury

22 has already heard about.  As far as responding to the

23 Government solicitation, putting together the bid, is that

24 something that you handled or something Mr. Molinari handled?

25 A   Mr. Molinari handled that.

1  Q   Okay.  And if there were increase of calls from the

2  military about matters relating to the team, is that something

3  that was in your area or Mr. Molinari's area?

4  A   Mr. Molinari's area.

5  Q   Okay.  Putting together the team each year, the team that

6  would bid the contract, was that your area or Mr. Molinari's

7  area?

8  A   Mr. Molinari's area.

9  Q   Okay.  And working out the commissions that the flier

10 operators would pay, is that your area or was that

11 Mr. Molinari's area?

12 A   Mr. Molinari's area.

13 Q   Okay.  But did you have any discussions or conversations

14 with him about commissions or that part of it?

15 A   Yeah.  We would have a discussion.  I would sit down with

16 Gary and say, "Okay, how do you plan to line up the team this

17 year?  What are the Fee Agreements going to look like?  What

18 percentage are you asking from each carrier?  Why are you

19 doing that that way," et cetera.  I would be familiar with the

20 plan; and then once the plan was put together, I would

21 approve -- I'd approve or agree with it, essentially.

22 Q   What about as far as, you know, within the team dividing

23 up the business when we had more than one carrier doing the

24 same kind of business?  Was that your area or Mr. Molinari's

25 area?

RACHOR – CROSS/MR. BLUMBERG                    478

1   A    That was Gary's area.

2   Q    The jury's also heard a fair amount about the teaming

3   contracts, the Arrangement Agreement, the Fee Agreement, the

4   Operating Agreement.  Mr. Rachor, I don't want to spend a lot

5   of times on this with you; but there were a couple questions,

6   a couple things I wanted to go over.  The Arrangement

7   Agreement --

8   A    Which one?

9   Q    The Arrangement Agreement.

10  A    The Contractor Team Arrangement Agreement, yes.

11  Q    Okay.  Can you just describe very quickly what the

12  Arrangement Agreement is?

13  A    It's an agreement among all the members of the team.  It

14  establishes the team, so everybody signs up to -- each of the

15  airlines that are going to be on the team sign up to it.  It

16  establishes that we are going to bid on the solicitation as a

17  team.  It says that -- and that we'll be active in the CRAF.

18  That's the purpose of the solicitation.  So we are going to

19  be.  As part of the Civil Reserve Air Fleet.  Then we forward

20  that agreement to the Air Mobility Command.  They either

21  accept it or reject it.  So they accept it and come back, and

22  that gives you the wherewithal to proceed with the rest of the

23  stuff.  So that happens every year we do the same type of

24  thing with.

25  Q    Thank you.

1          MR. BLUMBERG:  Robb, if you could put up Plaintiff's

2    Stipulated 171, which is 5957.

3    BY MR. BLUMBERG:

4    Q   And now we have the document you were just talking about.

5    This is the Team Arrangement Agreement, correct?

6    A   Yes.

7          MR. BLUMBERG:  Robb, if you could go to the next

8    page, 5958.  Okay, and if you could blow up clause 2 that says

9    "term."  And, Robb, highlight that and highlight just the

10   first sentence or so.

11   BY MR. BLUMBERG:

12   Q   It says, "The term of this agreement shall be for a period

13   concurrent with the contract awarded by U.S. TransCom."

14   Mr. Rachor, do you know why the term clause is in the

15   Arrangement Agreement?

16   A   Well, yes.  I mean, the Congress -- the Congress

17   establishes how the contracting has to be done within the

18   Government.  So they're limited -- you know, you can't spend

19   money that's not been appropriated.  So they do single-year

20   appropriations, so you have single-year contracts from the

21   military.

22   Q   Do you know whether there have been any requests or

23   comments asking to have this changed to go to a multiyear

24   contract?

25   A   Well, there's been a lot of --

1           MR. BROUGHTON:  Objection, calls for hearsay or

2     speculation.

3           MR. BLUMBERG:  I'm asking if he's aware of it.

4           THE COURT:  Rephrase.

5     BY MR. BLUMBERG:

6     Q    Have there been any requests to move this to a multiyear

7     contract?

8           MR. BROUGHTON:  Objection.  Calls for hearsay.

9           THE COURT:  Sustained.

10          Mr. Rasher, let me ask you a question.

11          THE WITNESS:  It's Rachor, Your Honor.

12          THE COURT:  Rachor.  I'm sorry.

13          THE WITNESS:  Thanks.  I'm the only one that gets it

14    right.

15          THE COURT:  We're talking about various agreements

16    here, the Team Agreement, Fee Agreement.  You're familiar with

17    all those, obviously?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Here we're talking about an agreement,

20    the Team Agreement, and that's the one-year agreement; is that

21    right?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.  And that's set by the Congress?

24          THE WITNESS:  The Congress sets the rules.

25          THE COURT:  But we've had evidence in the case and

*RACHOR – CROSS/MR. BLUMBERG*                    481

1    the jury has seen that there was an agreement for a three-year

2    period prior to what the issue is here, 2007, '8 and '9.  So I

3    guess, the prior three-year agreement would be 2004, '5 and

4    '6, right?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  So that's a three-year.  So I don't want

7    to have the jurors confused about, well, the Congress is

8    setting rules here where we have to have -- we have a

9    three-year agreement here previously.  So obviously, they can

10   have more than one year.  But I think that covers a

11   different -- that's a Fee Agreement, right, the three-year

12   agreement?

13             THE WITNESS:  The Fee Agreement is a one-year

14   agreement, sir.

15             THE COURT:  So what would that prior three-year

16   agreement, the 2004, '5, '6?

17             THE WITNESS:  Well, that would be preliminary

18   discussions to get you to the contract.

19             THE COURT:  Okay.

20             THE WITNESS:  So that would be preliminary to

21   establishing the Fee Agreement, which has to comport with the

22   contracting that's done by the Air Mobility Command, which

23   would be one year.

24             THE COURT:  There's a lot of agreements being talked

25   about here --

1          THE WITNESS:  I know that.

2          THE COURT:  -- and I want to be sure before we're

3    finished here that there's a good understanding here of what

4    agreement everybody's talking about and whether there can be a

5    multiyear agreement.

6          THE WITNESS:  You can't do multiyear contracts

7    unless it's been authorized.

8          THE COURT:  But apparently it had before, in 2004,

9    '5 --

10         THE WITNESS:  It's never been authorized for CRAF,

11   sir.  To do the contracts, those are one-year contracts.

12   They've never -- the Congress has never given the authority --

13         THE COURT:  What was that three-year agreement,

14   then, 2004, '5, '6?  Was that for the split?

15         THE WITNESS:  It's the same type of thing.  It's a

16   preliminary work-up to the contract, Government contract.

17         THE COURT:  That's an agreement not with the

18   Government but with the airlines themselves?

19         THE WITNESS:  It's a discussion about if we -- when

20   we do the contract, this is what we plan to do:  We'll split

21   the award this way when we do the contract.

22         THE COURT:  Okay.  All right.  So that --

23         THE WITNESS:  That doesn't always hold --

24         THE COURT:  The Government doesn't really care about

25   that, right?

*RACHOR - CROSS/MR. BLUMBERG*                              483

1           THE WITNESS:  No.  They approve the fact we're going

2   to be on a team, but how --

3           THE COURT:  How the team itself divides it up; the

4   Government really doesn't care, right?

5           THE WITNESS:  That's right, sir.

6           THE COURT:  How the team splits it up can be a

7   multiyear --

8           THE WITNESS:  No, sir.

9           THE COURT:  It can't?

10          THE WITNESS:  We can't get a contract for multiyear.

11          THE COURT:  There was a three-year agreement, 2004,

12  2005, 2006.  Tell me what that was.

13          THE WITNESS:  That was a preliminary setup to go to

14  contract.  When we went to do the Fee Agreement for the one

15  year, we either did that or we did something else.  It's a

16  general agreement, but it's not -- I don't want to testify

17  here.  You have to go to the Fee Agreement.  The Fee Agreement

18  has to be for one year because that's the way the contract is

19  set up.  So it establishes what you're going to do for that

20  year.  So, essentially, it supersedes the -- supersedes the

21  Fee Agreement and puts it into contract.

22          I'm not being clear?

23          THE COURT:  No.  There was a three-year agreement,

24  2004, 2005, 2006, right?

25          THE WITNESS:  Yes, sir.

*RACHOR – CROSS/MR. BLUMBERG*                    484

1          THE COURT:  That is a multiyear agreement, all

2    right?

3          THE WITNESS:  Correct.

4          THE COURT:  Among the team.  Okay?  Is that right?

5          THE WITNESS:  Well, it's between -- it's not the

6    entire team.  It's just part of the -- it's the --

7          MR. BLUMBERG:  Your Honor, I'm sorry.  I really

8    don't mean to interrupt.  May I approach with Mr. Broughton

9    for a moment?

10         THE COURT:  Sure.

11       (*Beginning of bench conference.*)

12         MR. BLUMBERG:  Your Honor, I understand that you're

13   trying to walk -- I didn't mean to interrupt in any way; but

14   by your saying there was, you know, a three-year agreement or

15   suggesting -- I'm concerned that you're -- I'm concerned that

16   the jury may not understand --

17         THE COURT:  Well, that's why I'm saying between '04

18   and '06, I mean '04, '05, '06.  There was.

19         MR. BLUMBERG:  What we're saying -- I mean, as we

20   briefed in summary judgment, our whole theory of the case here

21   and what we believe the contract law holds is that what those

22   letters are is an agreement on one term, one term of a

23   contract, but agreement on one term when there are other terms

24   that are yet to be decided on and then are going to be part of

25   a full, integrated contract.

*RACHOR - CROSS/MR. BLUMBERG*                      485

1          THE COURT:  Well, you need to make that clear

2   because there's a lot of confusion on that.  So if you would

3   clear that up with this witness, I would appreciate it.

4          MR. BLUMBERG:  Okay.

5      *(End of bench conference.)*

6          THE COURT:  Thank you, Mr. Rachor.

7          THE WITNESS:  Yes, sir.

8   BY MR. BLUMBERG:

9   Q   Mr. Rachor, let's -- I want to turn to the Fee Agreement,

10  which is Plaintiff's Exhibit -- Stipulated Exhibit 14.

11         MR. BLUMBERG:  Robb, that's 7469.

12  BY MR. BLUMBERG:

13  Q   Mr. Rachor, can you just give an overview of the Fee

14  Agreement?

15  A   The Fee Agreement itself has a number of things in it.  It

16  has scope, term, things of that nature, but primarily its

17  function is to establish what the fee is or the commission or

18  the price that we will have with each of the individual

19  carriers for the deal for that particular year.  Plus, it

20  firmly establishes the split -- it establishes what the split

21  is going to be for that year.

22         MR. BLUMBERG:  Robb, if you could turn to the second

23  page -- the next page of that document, please.  Can you blow

24  up No. 5 that says "fee."

25

1  BY MR. BLUMBERG:

2  Q   And No. 1, the little 1, it says, "For transportation

3  provided pursuant to the AMC fixed award with regard to

4  Category B, wide-body revenue charters, 7 percent of the ATA

5  revenue."  Can you please explain what that language means,

6  what it says?

7  A   It means that -- I'm making sure it's not -- oh, it's the

8  fixed award.  There's a fixed award, and there's an expansion

9  award.  One of the things they're doing is expanding the fixed

10  award.  On the fixed award, whatever that amount may be, then

11  whatever AMC flies out of the fixed award, then they will pay

12  us a 7 percent commission on that because they're flying our

13  points.

14        I need to point out that there's a kind of a second

15  thing that says whatever the airline is, they get to fly their

16  own points.  Whatever they bring to the table, they get to fly

17  that for us without commissions.  And essentially after that,

18  they're flying based on points that we had -- or the whole

19  team has, really, when you add it all up because we add it all

20  up and then go from there.

21  Q   Okay.  But, basically, the 7 percent, that is what's being

22  paid --

23  A   That's what we pay, and that's what we place in the Fee

24  Agreement for that year.

25        MR. BLUMBERG:  Okay.  Now, Robb, if you can go to

1   the next page.  If you can go to little paragraph 4.

2   BY MR. BLUMBERG:

3   Q   It says, "ATA shall be entitled to 50 percent of the

4   contractor team's pro rata share of the wide−body and

5   narrow−body fixed and expansion services."  Can you explain to

6   the jury what this part of the Fee Agreement is referring to?

7   A   Well, this expands the agreement a little bit.  It just

8   says they're going to −− for the expansion business, which I

9   talked about, they will get 50 percent of whatever that is to

10  our −− I said to our best efforts and it −− it doesn't

11  often −− doesn't always turn out that way in the end because

12  of the way the AMC awards missions.  So it's wide−body and

13  narrow−body, so it's both the large aircraft and the

14  narrow−body aircraft.

15  Q   That's the split for −−

16  A   That's the split for that year, and they'll get 50 percent

17  of that for that year, and we establish that in this

18  agreement.

19         MR. BLUMBERG:  Okay.  Robb, if you can push that to

20  one side of the screen and then call up −− with the little

21  blow−up language, if you could.  And push that, also, to the

22  side, if that's possible.

23         Well, put next to the Fee Agreement there

24  Plaintiff's Exhibit 13, 1302.  And if you can call up the

25  split that's there −− if you can call up −− I'm sorry −− the

RACHOR - CROSS/MR. BLUMBERG                    488

1  second sentence, "It is agreed that the distribution."

2  BY MR. BLUMBERG:

3  Q   Mr. Rachor, can you explain how the second sentence in the

4  letter relates to what's in the Fee Agreement?

5  A   Well, in this case, it's a match, I think.  It's agreed

6  that the distribution for the above passenger will be 50/50

7  respectively for both wide- and narrow-body, for both fixed

8  and expansion.

9        So that's -- so that whatever is in the letter is

10 codified -- I don't know if "codified" is the right word --

11 but is in the agreement.

12 Q   When you said that the letter -- you talk about that being

13 preliminary if we go to contract, what do you mean by that?

14 A   Well, that -- if you go -- I don't know if I understand

15 your question.  The letter's out there.  It's an agreement.

16 It gets codified one way or the other in the Fee Agreement, so

17 that's the translation.  It has to be -- we sign this, and

18 that's the way we operate under the contract.

19 Q   But what did you mean by "if we go to contract"?

20 A   Well, you can't live off the letter.  You have to live off

21 the contract.  So the contract comes -- we do it all the way,

22 and then we either do -- we either implement the letter as the

23 letter was written or we change the letter in some fashion.

24 In the end we have the Fee Agreement, which is what we're

25 bound to.

RACHOR – CROSS/MR. BLUMBERG                    489

1  Q   Does FedEx choose the team members each and every year?

2  A   Choose, let's see -- we work with the team.  We work with

3  all the members in the team.  It's not as dictatorial as you

4  would think, as it sounds.  So yes.

5  Q   But until --

6  A   We don't have a team until this is signed.

7  Q   Right.  Until a team member signs the Arrangement

8  Agreement, the Operating Agreement, the Fee Agreement, they're

9  not on the team?

10 A   There is no team until those three things are put

11 together.

12 Q   So no airline, no carrier has a right to be on the FedEx

13 team until those three agreements are signed?

14 A   You're not on the team until all three agreements are

15 signed, that's correct.

16 Q   And so this letter is one -- what the letter covers is one

17 term of the Fee Agreement?

18           MR. BROUGHTON:  Objection, leading.

19           MR. BLUMBERG:  I'm just asking for a little leeway

20 because of the Court's --

21           THE COURT:  Sure.

22 BY MR. BLUMBERG:

23 Q   So this letter is just one term of what's in the Fee

24 Agreement?

25 A   Yes.  That's what -- that's what's being negotiated

*RACHOR - CROSS/MR. BLUMBERG*                              490

1  between the passenger carriers; and then the Fee Agreement

2  itself is the document that lays out the exact split, what the

3  commission is going to be, the term, the scope, all those

4  types of things.

5  Q   And the Fee Agreement -- the commission is another term in

6  the Fee Agreement, correct?

7  A   Yes.  The Fee Agreement, the 4 1/2 percent or the

8  7 percent or whatever other percent it might be for another

9  carrier is codified there.

10         MR. BLUMBERG:  Your Honor, I have more questions,

11  but I'm at a very natural stopping point.  Would it be okay to

12  take the morning break?

13         THE COURT:  Why don't we take our morning break at

14  this time.  Please go back to the jury room.  Do not discuss

15  the case amongst yourselves.  Take ten minutes.

16         COURT CLERK:  All rise.

17    *(Jury out.)*

18    (A recess was taken.)

19    *(Jury in.)*

20         COURT CLERK:  You may be seated.

21         THE COURT:  All right, Mr. Blumberg, you want to

22  continue?

23         MR. BLUMBERG:  Yes.  Robb, if you could put

24  Plaintiff's 14, which is No. 7469 back up on the screen?

25

*RACHOR - CROSS/MR. BLUMBERG*                    491

1  BY MR. BLUMBERG:

2  Q   When we took a break, we were talking about the Fee

3  Agreement.  The Court had a question about Congress, and I

4  want to make sure that gets addressed with you.

5        MR. BLUMBERG:  Robb, if you go to 7450 -- I'm sorry,

6  7470, next page -- I'm sorry, next page.  Okay.  Can you blow

7  up "term"?

8  BY MR. BLUMBERG:

9  Q   Now, the Fee Agreement, the one that we're talking about

10 here, this Fee Agreement, this did not get sent to the

11 military, correct?

12 A   It does not.

13 Q   This Fee Agreement also has a term clause that says, "The

14 term of this agreement shall be coterminous with that of the

15 Contractor Team Arrangement and the Operating Agreement."  We

16 talked about the fact the team arrangement is one year because

17 of Congress.

18 A   Yes.

19 Q   But this term in the agreement just, you know, involving

20 the carriers, it doesn't go to Congress.  Why does this one

21 have a term clause?

22 A   Well, because along with the Contractor Team Arrangement

23 and the Operating Agreement, they are one and the same; and

24 they have to be -- they form the whole agreement, and they

25 have to be for the same period of time, coterminous.

1   Q   And you haven't signed other team members, correct?

2   A   We haven't signed --

3   Q   No one has yet signed the arrangement or Operating

4   Agreements, correct?

5   A   Say it again, please?  I'm sorry.

6   Q   At the time of this term you're talking about, the

7   Arrangement Agreement and the Operating Agreement, they all

8   have the same term, correct?

9   A   They all have the same term.  It's normally 1 October of

10  the year to 30 September of the next year.

11  Q   But this Fee Agreement, this is just the airlines.  This

12  one doesn't go to Congress, correct?

13  A   Congress just authorizes -- apparently I'm not explaining

14  as well as I should.  Congress either authorizes you to do

15  multiyear procurement or they don't.  For example, if you're

16  buying some ships, they may, for example, authorize multiyear

17  procurements because of the lead time necessary to buy big

18  parts, et cetera.

19        For normal contracts, they limit the contract to a

20  year such that the funds that are spent are funds that are

21  spent and appropriated by the Congress for that year.  So it's

22  just a rule.  If you want to have a multiyear program, you

23  have to go back to the Congress and ask for that permission to

24  do so.  So these all run for one year, so the Contractor Team

25  Arrangement, Operating Agreement, Fee Agreement are one-year

1  agreements always.  There is a little authority to extend them

2  for -- we're operating on an extension now of three months,

3  but it's still the same contract.

4  Q   Do team members move around from year to year?

5  A   There's tremendous movement amongst the teams, because

6  most significant with us back in '03, Northwest joined us in

7  '03.  Then in '09 when they merged with Delta, they went off

8  to the Alliance Team.  Continental and Hawaiian are in and

9  out, depending on their personal -- well, not just their

10  personal but their business desires.  They either sell points

11  and join the team or join the team and sell points anyway.  It

12  just makes them eligible to fly if they wanted to.

13       We had Kalitta on our team for a while.  They're a 747

14  operator.  They left the team in '06 to join a new team.  The

15  new team stood up in '06, which was the UPS team.  So Kalitta

16  left us and went over to the UPS team.

17       Gemini was a carrier we had that left us, went to

18  another team and came back again.  Who else?  ATI was not with

19  us for a period of about three years, left, and came back

20  again.  So there's a lot of movement amongst all the teams,

21  and people go from one team to the other, form a new team.

22       In '06, we also had a team, Miami Air stood up a team,

23  which is a small passenger carrier; stood up a team in Alaska,

24  and then they stood down the next year.  I don't know what the

25  reason is, but they did.

1        North American, which is ATA's sister company, went

2    from leading a team -- they actually led a team between '02

3    and '04.  And in '05 they were -- they were independent in

4    '05.  In '06 they joined the UPS team.  In '07 they joined the

5    Alliance Team.  So there's just a lot of movement amongst the

6    teams.

7    Q   So each year with this movement that you see, you may have

8    to adjust commissions --

9             MR. BROUGHTON:  Objection, leading.

10            MR. BLUMBERG:  I'm just trying to get this, what the

11   Court explained to me at the bench.

12            THE COURT:  Rephrase your question.

13   BY MR. BLUMBERG:

14   Q   As we've discussed earlier, the FedEx team needs to

15   collect enough in commissions in order to cover the legacy

16   carriers that are donating their points, correct?

17            MR. BROUGHTON:  Objection, leading.

18            THE COURT:  Overruled.

19            THE WITNESS:  I'm going to go slow.  It's -- the

20   larger carriers are in the CRAF because the military needs

21   these large passenger carriers in the CRAF to execute their

22   war plans.  They may never have to.  Stage 3 of the CRAF is a

23   national mobilization, essentially worldwide war.  So -- but

24   in order for the military to be able to stand up and meet its

25   commitments, they have to raise their hand and say yes, I have

1  enough assets to conduct a national mobilization and fight a

2  large war.

3         So the large carriers have to be there for them.  So

4  the large carriers participate; and for that participation,

5  they get points.  And so they sell -- there's an arrangement

6  where they sell their points.

7         Now it works differently all the time.  Sometimes

8  the carrier will -- the carrier has the option to flat out

9  sell their points to the team or sell a portion of their

10 points to the team or sell all their points to the team and

11 promise -- just about any way you can think of doing it is the

12 way you can set it up.

13        So the carrier is trying to optimize how they get

14 their fees or commissions.  We may pay them up front or FedEx

15 because we're ahead of a team may pay them as we go.  So we

16 have to collect these commissions at whatever rate it is in

17 order to meet our obligations to the team and to meet our own

18 business plans.

19 BY MR. BLUMBERG:

20 Q   So if the team makeup changes every year, how does that

21 affect the commission structure?

22 A   It can change it fairly dramatically.  You know, if you

23 can -- it's better to have more points obviously.  So we

24 always try to attract other carriers.  We would like to

25 attract the big point sellers, whether it was United,

1  American, or Delta.  Whoever it might be, we try to attract

2  them to the team and offer them, as a team, a certain amount

3  of money to come to our team and let us use their points, so

4  to speak.  So, it was a very dynamic operating environment.

5         MR. BLUMBERG:  Robb, if you can put up Plaintiff's

6  Exhibit 13 -- I'm sorry, No. 1302.  And if you can blow up the

7  second paragraph, "it is agreed."

8  BY MR. BLUMBERG:

9  Q   This is the letter that the jury has heard a lot about

10 that says that the segments will be 50/50 for both wide and

11 narrow body for fixed and expansion.  This is the letter,

12 correct?

13 A   I recognize it, yes.

14        MR. BLUMBERG:  Now, Robb, if you could go back to --

15 actually, push this to the side again.  Go back to Plaintiff's

16 Exhibit 14, which is 7469; and go to the second page, which is

17 7470, I'm sorry.  I'm sorry, 7471.  I'm sorry, with the

18 Court's indulgence for a moment.

19        Actually, Robb if you could put up on the left

20 side -- I'm sorry, Your Honor.  I'm sorry, Plaintiff's --

21 Robb, 5979.  And Robb, if you could put that on the right side

22 and put Plaintiff's Exhibit 13, which is 1302, on the left

23 side.

24        Now Robb, if you could blow up the second sentence

25 in Exhibit 13.

1          MR. BROUGHTON:  Your Honor, if I might interpose an

2    objection.

3          THE COURT:  You may.

4          MR. BROUGHTON:  Foundation.  Counsel is asking

5    Mr. Rachor to compare the three-year agreement with the annual

6    agreements, and Mr. Rachor testified he had never seen any of

7    the three-year agreements before this lawsuit was filed.

8          MR. BLUMBERG:  That's not what he testified to.  He

9    saw this agreement prior to.  And, in fact, there was

10   testimony elicited about this document during direct.

11         THE COURT:  Why don't you ask him a preliminary

12   question then and just clear that up.

13   BY MR. BLUMBERG:

14   Q   Mr. Rachor, are you aware that there is a letter that

15   talked about a 50/50 split between -- about how the business

16   would be split between ATA and Omni and dated September 7,

17   2006?

18   A   Yes.

19   Q   Were you aware of that letter before the initiation of

20   this lawsuit?

21   A   Yes.

22         MR. BROUGHTON:  I still object to foundation.  He

23   testified that he first saw it on or after the January 22,

24   2008 notice letter.  So it's still no foundation for him to be

25   comparing the three-year agreement with the one-year

*RACHOR – CROSS/MR. BLUMBERG*                    498

1  agreement.

2          THE COURT:  It is overruled.

3          MR. BLUMBERG:  Robb, if on 173, if you could go to

4  the second page, 5978?

5          MR. BLACKWELL:  5980?

6          MR. BLUMBERG:  I'm sorry, 5980.  5981?  I'm sorry.

7  I want to bring back the September -- one more page, 5981.  If

8  you could blow up that "it is agreed;" and then if you can go

9  to little 4, "ATA shall be entitled."

10 BY MR. BLUMBERG:

11 Q   These are -- the first says that the split will be 50/50.

12 That's what was in the letter, correct?

13 A   That's correct.

14 Q   But the Fee Agreement has a different split, says that ATA

15 will be entitled to 50 percent of the narrow-body expansion,

16 50 percent of the residual wide-body expansion after Northwest

17 has operated up to 10 flights per month, correct?

18 A   That's correct.

19 Q   Do you have an understanding as to why there's a

20 difference between these two?

21 A   Well, in the interim, Northwest had requested to fly; and

22 Northwest, of course, as you know, is one of our biggest point

23 holders within the team; and therefore, we made an

24 accommodation.

25          So when we went to contract, we changed the -- we --

*RACHOR – CROSS/MR. BLUMBERG*                        499

1   with the contract, I don't know if I'm using the right word or

2   not, but we'll just leave it at that -- codified an agreement

3   to operate 50/50, except we would do some other stuff with the

4   expansion business and give a portion of that to Northwest

5   Airlines.

6   Q    And are these the kind of changes that can occur from year

7   to year that you were testifying about?

8   A    Well, they occur all the time.

9   Q    And for FY2008, we -- if we went to contracts, which one

10  controlled?

11  A    In the end, the Fee Agreement signed controls, and if you

12  read it, it supersedes any other agreements.

13  Q    Let's go to the language you're talking about.

14          MR. BLUMBERG:  Robb, if you can go to 5982.  One

15  more page.

16          My apologies to the jury.  I'm still getting used to

17  this technology.

18          5983.  If you can blow up the entire agreement

19  clause.

20  BY MR. BLUMBERG:

21  Q    Is that what you were referring to a moment ago?

22  A    Yes, sir.

23  Q    What's your understanding of this clause?

24  A    Essentially, that when you put all three together, you

25  take the operating -- Arrangement Agreement, the Operating

1  Agreement and Fee Agreement and put them altogether.  And

2  those operate as the full understanding and agreement between

3  the parties.  That's the first thing.

4        Then the second thing is that it supersedes all prior

5  agreements.  So it's the sum of the agreement, and it's

6  codified in the contract.

7           MR. BLUMBERG:  Robb, if you can leave 1302 up on the

8  board, which is Plaintiff's 13.  But I want you to put now

9  side by side Plaintiff's Exhibit 3, which is 1283.  Take down

10  that "it is agreed" box for now, Robb.

11  BY MR. BLUMBERG:

12  Q   Mr. Rachor, you were asked some questions by plaintiff's

13  counsel about Plaintiff's Exhibit 3 during his examination of

14  you.

15           MR. BLUMBERG:  Robb, if you could blow up that box

16  that says "Re:  The 2006 agreement."

17  BY MR. BLUMBERG:

18  Q   I think this is the language that Mr. Broughton was asking

19  you about.  Where it says, "Re:  The 2006 agreement for FY07

20  to 09 that ATA refers to."

21        What were you referring to there?  Actually, if you

22  have the letter handy, you can point to that.

23  A   It's the letter on the left-hand side.

24  Q   You say, "The letter was from Gary (and therefore

25  signed)."  What was the basis for that statement?

*RACHOR - CROSS/MR. BLUMBERG*                    501

1  A    Just to let him know that he had sent the letter

2  officially and Gary had signed it.

3  Q    And Gary had, in fact, signed?

4  A    Yes.

5  Q    Then you went on to say it had a spot for signatures of

6  each airline?

7  A    Yes.

8  Q    What was your basis for that?

9  A    Looking at the letter, there was a space for ATA to sign

10 and for Omni to sign.

11 Q    You say in the letter, each airline was asked to concur?

12 A    Correct.

13         MR. BLUMBERG:  If you go to the -- Robb, if you can

14 go back to the letter now and blow up the second-to-last

15 sentence.

16 BY MR. BLUMBERG:

17 Q    Is that where that's coming from?

18         MR. BROUGHTON:  Objection, leading.

19         THE COURT:  Overruled.

20         THE WITNESS:  Yes.

21 BY MR. BLUMBERG:

22 Q    And the sentence says, "Omni did not sign."  Where did you

23 get that from?

24 A    Where did I get that from?

25 Q    Yes.

*RACHOR – CROSS/MR. BLUMBERG*                              502

1   A    From Gary and the fact that the letter is not signed.

2   Q    It says, "As they thought they should have a larger

3   percentage over the three-year period."  What was the basis

4   for that statement?

5            MR. BROUGHTON:  Objection.  Calls for hearsay.

6            THE COURT:  Sustained.

7   BY MR. BLUMBERG:

8   Q    It goes on to say, "Instead, we operated under the

9   original one-year agreement that gave ATA the 50/50 split but

10  for only that year."  What are you referring to there?

11  A    Just comparing the contracts back to the letter.  So in

12  2006 for fiscal year 2007, they matched.  In fiscal year -- in

13  calendar year 2007, we were signing up for -- figuring out

14  fiscal year 2008.  We did something different, that there

15  was -- that the Fee Agreement was not 50/50.  It was 50/50

16  fixed and expenses; but, as I emphasized there to Mr. Parker,

17  only after Northwest had operated up to 10 flights a month, so

18  not the same.

19  Q    And that's the Fee Agreement you were just looking at a

20  moment ago, Plaintiff's -- I'm sorry -- 173, the Fee Agreement

21  that had the Northwest flights, correct?

22  A    Yes.  The context of this is he has the letter and we want

23  to show him what this letter means vis-a-vis what the

24  contracts were.  So we're just explaining that the contracts

25  say one thing.  It's different from what the letter said.

RACHOR - CROSS/MR. BLUMBERG                    503

1  Q   Okay.  Mr. Rachor, I want to turn to another subject,

2  which is ATA's acquisition of World and North American

3  Airlines.  When did you first learn that ATA's parent was

4  acquiring some additional airlines?

5  A   Well, those negotiations were obviously very -- held

6  close.  I didn't know -- you never know until you see it in

7  the paper.  So whenever it was announced, I saw it.

8  Q   Okay.  What was your initial reaction when you heard of

9  the acquisition?

10 A   The specific acquisition of --

11 Q   I'm sorry.  When you learned that ATA's parent was

12 acquiring World and North American, what was your initial

13 reaction?

14 A   Well, that we were going to be dealing with a different

15 entity entirely here, not just ATA, but Global Aero Holdings,

16 which now consisted of a larger number of airlines.

17 Q   And when you first learned about it, what did you think

18 was going to happen?

19 A   Well, we had some great concerns, and this, of course, is

20 part of the basis here, that there would be -- let me explain.

21 When you fly for the FAA, you can operate separately.  That is

22 to say, you can have a certificate and be authorized to

23 operate -- operate the airline in one way; but the business

24 relationship can go across all three.  In fact, we're like

25 that at FedEx.  We have FedEx Express, FedEx Ground, FedEx

1   Freight, FedEx Services.  We all operate independently, but we

2   compete collectively.  So we know how that -- we know how that

3   works.

4           So, you know, if you come into FedEx for service, you

5   want a package to get there -- you want to pay for service,

6   for example, that will get there in three or four days.  That

7   would be FedEx Ground.  You wouldn't necessarily have to know

8   that as a customer.  It would just go into the Ground system.

9   But when we balance everything out and work the entire

10  business plan, we all compete collectively as a team into the

11  holding company, which is FedEx Corporation.  So this is a

12  similar type of arrangement wherein you deal -- the executives

13  in one are talking with the executives in the other.  So our

14  concern with this was that we would not be able to talk to ATA

15  directly without talking to the holding company and to the

16  executives of the other team; and that was our concern at the

17  time.

18          MR. BLUMBERG:  I'm going to offer Defendant's

19  Exhibit 74, which has been stipulated.

20          THE COURT:  74 admitted.

21      (Defendant's Exhibit 74 was received in evidence.)

22          MR. BLUMBERG:  Robb, can you put up 00421 on the

23  board.

24  BY MR. BLUMBERG:

25  Q   This is an e-mail chain, Mr. Rachor.  And at the bottom of

1  the chain, as you can see, there is an article about the

2  announced acquisition called World Air Holdings agrees to be

3  acquired by Global Aero Logistics, Inc.  That article is

4  forwarded by an individual named Ken Johnson to Mr. Molinari.

5          Then if you go to the next part of the chain, further

6  up --

7          MR. BLUMBERG:  I'm sorry, Robb, the part with

8  Mr. Molinari forwarding it to --

9  BY MR. BLUMBERG:

10 Q   So Mr. Molinari is sending you an e-mail, and it says,

11 "Bob, FYI, could change the teaming dynamics for FY09."  What

12 was your understanding when you received this e-mail?

13 A   Well, we had not -- we didn't have a contract for '09 at

14 this point, so ATA at that point could do whatever they wanted

15 to do.  So the impact of Global Aero Holdings making these

16 acquisitions could result in significant movement amongst the

17 teams, whether one way -- one way or another at that point.

18 And, of course, that would affect our commissions and fees and

19 the Fee Agreements.

20 Q   And the date on the e-mail here is April 5th, 2005?

21 A   2007.

22 Q   After September 7, 2006, correct?

23 A   You said "2005."  It's 2007.

24 Q   Right.

25 A   So, yeah, this is after the letter.

*RACHOR - CROSS/MR. BLUMBERG*                    506

1  Q   Okay.  And then if we can go up to your response, you say

2  to Mr. Molinari -- maybe I'll let you leave that part out and

3  do the --

4  A   Well, I'm not going to do it either.  But I really asked

5  him if we had a replacement for ATA because there was a

6  potential.  In other words, what was Gary thinking

7  strategically?  What if ATA moved off the team and went to the

8  other team or went to another team or combined with World or

9  did whatever they were going to do?  So we had some concerns

10 at that point, and I was wondering what he was thinking.

11 Q   If you could go to --

12         MR. BLUMBERG:  I'm also going to offer up FedEx

13 Exhibit 79, which has been stipulated?

14         MR. BROUGHTON:  No objection.

15         THE COURT:  Show it admitted.

16    *(Defendant's Exhibit 79 was received in evidence.)*

17         MR. BLUMBERG:  Robb, if you could put up 440.  Robb,

18 if we can start with the bottom of that chain.

19 BY MR. BLUMBERG:

20 Q   It says that ATA has asked me -- this is an e-mail from --

21 I'm sorry.  Let me start at the beginning.

22         This is an e-mail from Gary Molinari to you with the

23 date, again, of April 16th, 2007.  And Mr. Molinari is

24 informing you that he's headed to Indianapolis to meet with

25 ATA about the acquisition, correct?

1   A    Correct.

2   Q    Okay.  If you can go up to the next part of this e-mail

3   chain, and it goes on to say -- you say, "Tell them they are

4   to stay with us.  Have you submitted the FY08 team lineup yet?

5   Do you think he will be asking to pull chocks?"  Can you

6   explain to the jury what you're telling Mr. Molinari?

7   A    Well, at the time I'm inquiring about the status of the

8   contract.  So I wanted to know if the contract had been let

9   yet.  So the first comment is just kind of a generic.  We'd

10  like to, you know, keep them with us.  The second is where are

11  we in the contract process?  And the last question is kind of

12  self-explanatory.  Oh, I'm sorry.  Probably not.  "Pull

13  chocks" is an aviation term which means you would pull chocks

14  out of the aircraft, underneath the wheels when they leave, so

15  just an aviation expression.  So that what I was asking there

16  was were they planning to leave us or do you think they're

17  going to be asking to leave us?

18            MR. BLUMBERG:  Okay.  If you can go to the next part

19  of the chain.

20  BY MR. BLUMBERG:

21  Q    Mr. Molinari says to you, "They have already signed for

22  FY08."  What's your understanding of "they have already signed

23  for FY08"?

24  A    That meant that we had the agreements in place for fiscal

25  year '08, which were the Contracting Team Agreement, the Free

1  Agreement, and the Operating Agreement, but here he's

2  expressing concern that Omni may not be signing up to the

3  appropriate agreements.  So they're not signing up to the --

4  at this point they're not signing up to the Fee Agreement --

5  well, I don't know which one they're not signing up to.

6  Q   That's okay.  I was just going to take you to the next

7  sentence.  "Omni is now the one holding out."  What was your

8  understanding of what Mr. Molinari was telling you when he

9  said "Omni is now the one holding out"?

10 A   They're not satisfied with the arrangement at this point,

11 and they want to establish a different arrangement for the

12 fiscal year coming up.

13 Q   And if you go to -- actually, it then goes on to say, "The

14 CTA arrangement is due to AMC on the 18th."

15 A   Yeah.

16 Q   What was your understanding of that?

17 A   Well, we're getting ready at that point in April to put

18 the team together, have all the parties signed to the

19 Contractor Team Arrangement and forward that to the Air

20 Mobility Command to tell them that we're going to operate as a

21 team and support the CRAF in that manner.  They either accept

22 that or reject it.

23         MR. BLUMBERG:  And then, Robb, if you can highlight

24 the next sentence in that paragraph.  I think -- I'm sorry.

25 We're still on the that paragraph.

RACHOR − CROSS/MR. BLUMBERG                    509

1  BY MR. BLUMBERG:

2  Q   Mr. Molinari says, "I think the discussion will center on

3  what happens in FY09 and beyond."  What was your understanding

4  of that sentence?

5  A   Well, essentially, maybe −− perhaps '08 is okay and that

6  '09 is the thing that's up in the air, not '08.

7  Q   As you said in the first sentence, they had already signed

8  for FY08?

9  A   Yes.

10  Q   Okay.  Then if you go to the top of this e−mail, you

11  respond to Mr. Molinari, "Well, if they ask to be released,

12  the answer is no."  What were you telling Mr. Molinari?

13  A   At that time I was telling −− since he advised me that we

14  had a contract for that fiscal year, then if they came to the

15  meeting and asked to leave the team for some reason, as we

16  were concerned, that for that period of time the answer would

17  be no.

18        MR. BLUMBERG:  Your Honor −− Robb, you can take that

19  e−mail down.

20        Your Honor, I would like to offer FedEx Exhibit 81,

21  which has been stipulated to.

22        THE COURT:  81 admitted.

23    (Defendant's Exhibit 81 was received in evidence.)

24        MR. BLUMBERG:  Robb, if you can pull up 442.  And,

25  Robb, if you can blow up the −− that entire bottom part −−

*RACHOR - CROSS/MR. BLUMBERG*                    510

1  actually, the top of the e-mail first.  Actually, Robb, do the

2  bottom part first.

3  BY MR. BLUMBERG:

4  Q   Okay.  This is now an e-mail from April 20th, 2007, which

5  is also after September 7th, 2006.  This is an e-mail from

6  Gary Molinari to you entitled "ATA meeting."  It starts by

7  saying, "On Thursday I met with Subodh Karnick, who is

8  president and CEO of Global Aero Logistics and ATA."  What is

9  Mr. Molinari doing at the start of this letter?

10 A   He's advising me of the results of the meeting with ATA.

11 So he's establishing who he met with.  He talked with

12 Mr. Karnick, who is the president and CEO of Global Aero, and

13 Gary Ellmer, who is an executive at ATA.

14 Q   Okay.  Actually, I'm going to now just take you to the

15 third paragraph of that, which begins "They expect."

16 A   Okay.

17 Q   Okay.  He's telling you, "They expect to have the

18 requisite approvals by August to complete the transaction.  We

19 agreed to reconvene sometime after that to discuss the

20 possibilities of adding World/No Am to our team."  What is

21 your understanding of -- do you have an understanding of what

22 "World" is in that sentence?

23 A   World Airways.

24 Q   And "No Am"?

25 A   North American Airlines.

RACHOR – CROSS/MR. BLUMBERG                    511

1  Q    What is your understanding of that sentence?

2  A    Well, for the following -- of '08 was locked up and

3  they're moving on to the next year of '09.  We're looking at

4  increasing our team with the possibility of bringing whole

5  Global Aero Logistics Airlines, their passenger and their

6  cargo operations, under the FedEx team.

7  Q    Okay.  And World, that's a -- I think, for the jury,

8  that's a flier operator-type carrier?

9  A    Yes, very much so.

10  Q    And North American, that's also the flier operator-type

11  carrier?

12  A    Flier operator, passenger operator.

13  Q    So you were thinking about the possibility that for the

14  next year, World/North American could join the FedEx team?

15  A    Certainly.

16  Q    Then it goes on to say, "Bottom line" -- actually, it

17  says, "Karnick indicated they're going to emphasize growing

18  ATA's scheduled service business, currently at half a billion;

19  they want to get it to 1 billion."  What did you understand

20  that --

21  A    It seems that at this point they didn't want to depend on

22  military business but wanted to have, also, a scheduled

23  service business to maintain a balance, I imagine.

24  Q    Then it goes on to say, "Bottom line, status quo for FY08,

25  and we will see where we go for FY09 and beyond once they get

1  the acquisition completed."  What was your understanding of

2  Mr. Molinari's use of the phrase, "We'll see where we go for

3  FY09 and beyond"?

4  A   Well, first off, the contract's in place for '08.  So

5  nobody's asking for an amendment to those contracts.  And then

6  secondly, there's a lot up in the air for the next year, for

7  fiscal year '09.  There's a lot of possibility here with North

8  American and World coming over.  And, of course, we go out and

9  try and recruit other carriers to come over at the same time.

10 So there's a lot to change yet -- yet to come in '09.

11 Q   You were asked during Mr. Broughton's examination about

12 the decision that FedEx would not be part of the contract bid

13 for FY09.  Do you recall those questions?

14 A   I'm sorry.  ATA --

15 Q   I'm turning to another subject, Mr. Rachor, that FedEx's

16 decision that ATA wasn't going to be part of the FY09 team or

17 the bid for that year.

18 A   Yes.  Go on.

19 Q   Okay.  Were you involved at all in that decision?

20 A   Yes.

21 Q   Okay.  What was your involvement in that decision?

22 A   Well, Gary proposed that we not include ATA on the team

23 for '09, and we had a discussion regarding the rationale

24 behind that.  And as we mentioned before, Northwest wanted --

25 who is our major points supplier, wanted to fly more, which

1  would have a change in the team dynamics significantly.  Then

2  the Global Aero Logistics thing played very heavily with

3  respect to having ATA now part of this new company, which

4  could -- to our mind, they could go either way.  You saw that

5  North American and World were thinking about coming our way.

6  We also thought ATA and North American and World were thinking

7  about going another way.  ATA might be going to the UPS team.

8  So there was a significant uncertainty as to where '09 was

9  going to end up.

10 Q    And did you concur with the reasons that were given?

11 A    Yes, I did.

12          MR. BLUMBERG:  Court's indulgence.

13          Pass the witness.

14          THE COURT:  All right.

15          Mr. Broughton, re-exam?

16          MR. BROUGHTON:  Yes, thank you, Your Honor.

17                    **REDIRECT EXAMINATION**

18 BY MR. BROUGHTON:

19 Q    Mr. Rachor, you were just telling the jury that you

20 believed that what you call a conflict of interest existed

21 because of who owned ATA; is that right?

22 A    I don't -- did I say those words?

23 Q    I can't testify.

24 A    I don't know exactly.

25 Q    I'm happy to rephrase the question.

RACHOR - REDIRECT/BROUGHTON                    514

1  A   Okay.  All right.

2  Q   Your counsel just asked you -- you're speaking for Federal

3  Express here today, are you not?

4  A   Well, I'm -- you called me.  I'm testifying for what I

5  know about this, to the best of my ability.

6  Q   You're the corporate representative?

7  A   I am the corporate representative, but I'm testifying to

8  the best of my ability as to what I know.

9  Q   Okay.  Do you agree or disagree that you are speaking for

10  Federal Express here today?

11         MR. BLUMBERG:  Objection.  He's not a 30(b)(6)

12  witness.  He's an individual witness.

13         THE COURT:  Well, there's no big deal here.  He

14  works for Federal Express, and everybody knows that.  So let's

15  move on.

16  BY MR. BROUGHTON:

17  Q   Were you telling us that you believed a conflict of

18  interest existed because of who owned ATA?

19  A   There certainly was a potential for the conflict of

20  interest.

21  Q   Okay.  Now, FedEx hasn't claimed that FedEx canceled the

22  FY07-to-FY09 contract because of that conflict, has it?

23  A   There was no '07 to '09 contract.

24  Q   That is your argument, there were no three-year

25  agreements, right?

1   A    There were three-year agreements.  That was rather obvious

2   that there were three-year agreements, but the date when we

3   went to contract, the three-year agreements were changed.  And

4   we contracted at that point for what was required to meet the

5   Air Mobility Command solicitation.

6   Q    And we'll come back to that point, but let's stick with

7   this what you call a "conflict of interest."

8         So who owned ATA has nothing to do with whether or not

9   the September 7, 2006 three-year agreement was a contract,

10  does it?

11  A    No.  The September '06 -- I'm trying to figure out who

12  owned who at what point.

13            MR. BROUGHTON:  Hold on one second.

14            Would you please put up Plaintiff's Exhibit 13?

15  BY MR. BROUGHTON:

16  Q    All right, Mr. Rachor, you've seen this?

17  A    Yes, I have.

18  Q    You're not telling this jury that that's not a contract

19  because of who later owned ATA, are you?

20  A    No, sir.

21  Q    You're just saying it's not a contract?

22  A    Correct.  It's a Letter Agreement, and it gets codified in

23  the contract when we go to contract.

24  Q    So who owned ATA in late 2007 has nothing to do with

25  whether or not -- it's your testimony, whether or not that's a

RACHOR - REDIRECT/BROUGHTON                    516

1   contract; is that right?

2   A    The two don't -- the two don't go together.  I think I

3   agree with you.

4   Q    So who owned ATA is irrelevant as to whether or not that's

5   a contract, right?

6   A    You know, I don't know contract law very well.  So I would

7   have to be instructed in that regard.  I really don't.

8   Q    So you don't know contract law very well; is that right?

9   A    I'm not a lawyer, no, sir.

10  Q    But you were sure telling the jury how these three-year

11  agreements fit in with these annual agreements, weren't you?

12  A    I know what I read, yes, sir.

13  Q    You told us earlier you had never even seen these

14  three-year agreements before?

15  A    Correct.  Correct.

16  Q    Now, you also at the end were talking about how Northwest

17  wanted to do more flying, weren't you?

18  A    Yes.

19  Q    You said that was one of the reasons that the January

20  notice letter was sent, because Northwest wanted to do more

21  flying; is that right?

22  A    Yes.

23  Q    Northwest wanting to do more flying has nothing to do with

24  whether or not that's a three-year contract, does it?

25  A    I find it difficult to answer the question because you

*RACHOR – REDIRECT/BROUGHTON*                    517

1  keep referring to it as a contract.

2  Q   Okay.

3       I believe you called it a preliminary discussion,

4  didn't you?

5  A   I did use that characterization.  I did, yes.

6  Q   Do you see the word "preliminary" in there?

7  A   There's a lot of words not in there, sir; but preliminary

8  is not in there.

9  Q   How about words like "not binding," do you see that in

10 there?

11 A   No, sir.  I don't see that in there.

12 Q   Do you see a word like "proposal" in there?

13 A   No, I don't.

14 Q   It says, "This letter will serve as the agreement,"

15 doesn't it?

16 A   It does say that, yes.

17 Q   It doesn't say that agreement will be replaced by an

18 annual agreement, does it?

19 A   The annual agreement said the opposite.  It said it

20 replaced it.

21         MR. BROUGHTON:  Objection, nonresponsive.

22         THE COURT:  Sustained.

23 BY MR. BROUGHTON:

24 Q   That three-year agreement does not say it's going to be

25 replaced by another agreement, does it?

RACHOR – REDIRECT/BROUGHTON                518

1  A    No, it does not.

2  Q    Now, you mentioned several times about Congress and the

3  U.S. Government.  Do you recall your several bits of testimony

4  about that?

5  A    Yes.

6  Q    The U.S. Government isn't a party to this three-year

7  agreement, is it?

8  A    No.

9  Q    You're not telling this jury that the U.S. Congress has

10 forbidden private companies from into entering into multiyear

11 agreements, are you?

12 A    No, I'm not.

13 Q    And you're aware that other teams have multiyear

14 agreements with their members; are you not?

15 A    Actually, I'm not.

16 Q    Several times you have been referring to this three-year

17 agreement and the previous '04 through '06 three-year

18 agreement as a split letter, right?

19 A    You could refer to it as such, yes, sir.

20 Q    Isn't that what you've been calling it?

21 A    This is the first time I've ever testified in a court.  I

22 presume I did.

23 Q    So it's your testimony that the subject matter of this

24 three-year agreement and the previous '04 through '06, the

25 subject matter was a split; is that right?

RACHOR - REDIRECT/BROUGHTON                    519

1  A   Yes.

2  Q   And we've looked --

3  A   Or distribution.

4  Q   And you were shown several times by your counsel what you

5  and he called the Fee Agreement, didn't you?

6  A   Yes.

7  Q   And the subject matter of the Fee Agreement is the fee,

8  isn't it?

9  A   And the split.

10 Q   You call it a Fee Agreement?

11 A   It is what it is.  It's a Fee Agreement with a fee and the

12 split of the business in it.

13 Q   And you call that a split?

14 A   I call that a Letter Agreement as it is.

15 Q   You were shown in that annual Fee Agreement the term

16 provision, weren't you?  It's called term?

17 A   Yes.

18 Q   And the term of that was one year, right, the Fee

19 Agreement?

20 A   Yes.

21 Q   Well, the term of these three-year agreements is three

22 years, isn't it?

23 A   Those are written for three years, yes.

24 Q   So the subject matter of the annual agreements is one

25 year, and the subject matter of the three-year agreements is

*RACHOR – REDIRECT/BROUGHTON*                           520

1  three years, isn't it?

2  A   Yes, sir.

3            MR. BROUGHTON:  Would you please put PX14 up there?

4  And if you would go to the signature page, Mr. Brockwell,

5  please.  If you could zero in on this entire agreement?

6  BY MR. BROUGHTON:

7  Q   Your counsel showed you this, did he not?

8  A   Yes.

9  Q   Thinking back to what you told your boss, Mr. Parker, you

10 didn't tell Mr. Parker that there was no three-year agreement

11 because of this entire agreement clause, did you?

12 A   No, I didn't mention it to him in the e-mail.

13 Q   Now, if we look at this, the agreement, together with the

14 Contractor Team Arrangement agreement and the Operating

15 Agreement, constitute the entire agreement and understanding

16 of the parties on the subject matter hereof.  Subject matter,

17 right?

18 A   Yes.

19 Q   It goes on and says "and as of the effective date hereof,

20 supersedes all prior agreements, whether written or oral,

21 between the parties hereto concerning the subject matter

22 hereof."  Do you see that?

23 A   I see it.

24 Q   The subject matter of these three-year agreements is three

25 years, right?

*RACHOR – REDIRECT/BROUGHTON* 521

1  A   The subject matter is the Fee Agreement, not the three

2  years.  The subject matter is --

3  Q   I'm sorry if I wasn't clear.

4       The subject matter of the three-year agreements, the

5  '04 through '06 that we've seen and the '07 through '09, the

6  subject matter is three years, right?  It's a three-year

7  agreement?

8  A   No.  The subject matter is the subject matter therein

9  which is the Fee Agreement for the annual year, specifically

10 what it says.

11 Q   I apologize.  I'm not being clear.  I'm not talking about

12 the Fee Agreement right now.

13 A   This is in the Fee Agreement itself, is it not?  Isn't

14 that what you were showing me, the Fee Agreement?

15 Q   I had been.  I switched to a different question.

16       MR. BROUGHTON:  Let's put Plaintiff's 13 back up

17 there.

18 BY MR. BROUGHTON:

19 Q   If you would, look at Plaintiff's 13, the three-year

20 agreement.  The subject matter of that three-year agreement is

21 three years, correct?

22 A   The subject matter is the split -- it is the distribution

23 of the passenger segments.

24 Q   So you don't think three years is discussed there?

25 A   Oh, no, it's certainly discussed.

1  Q   And three years is not discussed in any other agreement,

2  is it?

3  A   To my knowledge, no.

4  Q   So the subject matter of that agreement is different than

5  the subject matter of any of these other agreements that we've

6  seen, right?

7  A   No.  The subject matter is the split, not the three years.

8  Q   Let's look at Federal Express 79, please.  You were asked

9  about Federal Express 79 a few moments ago by your counsel,

10 right?

11 A   Yes.

12 Q   This is from April of 2007.

13 A   Correct.

14         MR. BROUGHTON:  Mr. Brockwell, if you could enlarge

15 the second e-mail down from Mr. Molinari to Mr. Rachor at

16 2:50 p.m.

17 BY MR. BROUGHTON:

18 Q   And your counsel pointed out that next-to-the-last

19 sentence.  "I think the discussion will center on what happens

20 in FY09 and beyond."  Do you see that?

21 A   Yes.

22 Q   In April of 2007, you didn't even know Mr. Molinari had

23 signed two different three-year agreements that covered FY09,

24 did you?

25 A   Two?

*RACHOR - REDIRECT/BROUGHTON*                    523

1   Q   Signed the one with Omni that we've all seen?

2   A   Oh, I'm sorry, yes.

3   Q   You didn't know that, did you?

4   A   No, I didn't.

5           MR. BROUGHTON:  I'll pass the witness.

6           THE COURT:  Mr. Blumberg, further examination of

7   this witness?

8           MR. BLUMBERG:  No, Your Honor.

9           THE COURT:  Mr. Rachor, thank you very much for your

10  testimony.  You may step down.

11      *(Witness excused.)*

12          THE COURT:  Mr. Broughton, call your next witness.

13          MR. BROUGHTON:  I'm passing the torch to Mr. Kurth

14  here.

15          THE COURT:  All right.  Call your next witness.

16          MR. KURTH:  Gary Molinari, Your Honor.

17      **GARY MOLINARI, PLAINTIFF'S WITNESS, SWORN**

18                  **DIRECT EXAMINATION**

19          THE COURT:  Mr. Kurth, we'll go to approximately

20  12:30 or so, and then we'll take a lunch.

21          MR. KURTH:  Thank you, Your Honor.  Forgive me for

22  moving your podium.  I have to wire myself up.

23  BY MR. KURTH:

24  Q   Good morning, Mr. Molinari.

25  A   Good morning.

1  Q   I believe we've met before?

2  A   Yes, we have.

3  Q   About a year ago in June, as I recall?

4  A   About then, yes, sir.

5  Q   Mr. Molinari, where do you live?

6  A   I live in Los Angeles, California.

7  Q   How long have you lived there?

8  A   Approximately two years.

9  Q   Since you retired from FedEx in May of 2008?

10 A   Yes.

11 Q   You are retired?

12 A   Yes, I am.

13 Q   You were employed by Federal Express from 1989 to 2008,

14 correct?

15 A   Yes.

16 Q   And for that entire period, you were the Managing Director

17 of FedEx charters, correct?

18 A   Yes.

19 Q   And FedEx charters includes the military flying that FedEx

20 does as well as being the team leader of the FedEx team,

21 correct?

22 A   Yes.

23 Q   And as the team leader for the FedEx team, you managed the

24 day-to-day activities of that team?

25 A   Yes.

MOLINARI – DIRECT/KURTH                              525

1   Q   Would you tell the jury generally what your duties were as

2   the managing director as it pertained to military flying.

3   A   I'm sorry.  Can you --

4   Q   Yes, sir.

5           Just generally, what were your duties as the managing

6   director of FedEx charters in terms of running the FedEx team?

7   A   Okay.  As the manage -- well, as the team leader, we put

8   the team together at the start of each contract year; and as

9   the year progressed, we addressed any issues that the team

10  members were having or any issues that the military was having

11  with respect to our team.

12  Q   And your -- the last 10 years of your tenure at FedEx,

13  your immediate supervisor was Mr. Bob Rachor?

14  A   Yes.

15  Q   Sir, you made decisions on a daily basis as the Managing

16  Director of Charters for FedEx; isn't that right?

17  A   Yes.

18  Q   And correct me if I'm wrong.  You ultimately decided what

19  issues needed to be brought up to your boss, Mr. Rachor?

20  A   Yes.

21  Q   For the most part, you took care of the business you

22  needed to take care of?

23  A   Yes.

24  Q   The military charter business has been profitable for

25  FedEx over the years, hasn't it?

1  A   Yes.

2  Q   You assumed ATA and Omni were members of the FedEx team

3  because they expected to make a profit on the business?

4  A   I'm sorry, can you repeat that?

5  Q   Yes, sir.

6       You assumed that ATA Airlines and Omni Airlines were

7  members of the FedEx team because they expected to make a

8  profit on that business?

9  A   Yes.

10 Q   In addition to being the FedEx team leader, FedEx also

11 flies some of its own planes for the FedEx team, doesn't it?

12 A   Yes.

13 Q   FedEx has a large fleet -- at least at the time you left

14 FedEx two years ago, had a large fleet of DC10 aircrafts?

15 A   And a lot of other planes, yes.

16 Q   But it was a large fleet of DC10 aircraft?

17 A   Yes.

18 Q   At the time you left FedEx in 2008, would you agree with

19 me that the gross revenues of the FedEx team for fiscal year

20 '07 ending in '08 was in the range of 900 million to a billion

21 dollars?

22 A   I'm sorry, the revenue for --

23 Q   The FedEx team.

24 A   Yes, that's in the range.

25 Q   And as of the time you left FedEx -- correct me if I'm

1  wrong -- your department at FedEx was itself generating gross

2  revenues in the range of 30 to $60 million?

3  A   Gross revenue for our department?

4  Q   Yes, sir.

5  A   For the overall department, including commercial and

6  military?  Yeah, it was probably in that range.

7  Q   FedEx also earned monies in the form of commissions for

8  running the FedEx team, correct?

9  A   Yes.

10  Q   And those commissions ran between, on an average of 20 to

11  30 --

12          MR. GABEL:  The relevance.

13          MR. KURTH:  I'm sorry, the relevance?

14          MR. GABEL:  Yes.  What is the relevance?

15          MR. KURTH:  Well, we're talking about the FedEx team

16  and their running the FedEx team and the volume of revenues

17  being generated and that this is a substantial business, and

18  that we've been talking about commissions and the range of

19  their commissions.  I think that is part and parcel of the

20  discussion, the fabric of the discussion we're having.

21          MR. GABEL:  May we approach?

22          THE COURT:  You may.

23      (A bench conference was held on the record.)

24          MR. GABEL:  I understand the relevance of the

25  commission paid by ATA to FedEx when it's claiming it breached

1  a contract.  I guess that would be consideration of the

2  contract, but the overall commissions or profits that FedEx is

3  making as a team leader is irrelevant.

4          It's like asking us, you know, how much is FedEx

5  worth?  It's not a punitive damages case.  What we're making

6  off the contract as a company is not relevant.  It involves a

7  lot of nonparties to this lawsuit.

8          MR. KURTH:  Your Honor, we're talking about FedEx's

9  role as team leader, and we're talking about decisions they're

10  making that are affecting their commissions and we're talking

11  about the economic fabric of this team.  That's what the

12  lawsuit is about.

13          THE COURT:  All right.  Go ahead.

14     *(A bench conference was held off the record.)*

15  BY MR. KURTH:

16  Q   Annual commissions of FedEx as team leader of the FedEx

17  team, $23 million a year on average?

18  A   Yes.

19  Q   At the time you the left FedEx in 2008, the FedEx team

20  didn't have any written rules or procedures by which it

21  operated, did it?

22  A   I'm not sure I understand your question.

23  Q   Well --

24  A   The team responded to an RFP that was issued by the Air

25  Force in response to the contract every year.  Those had rules

1  in terms of how the team was to proceed and what we had to do

2  to submit a response to that RFP.  We did abide by those rules

3  and procedures.

4  Q   Do you recall -- we had a discussion you were testifying

5  under oath June of last year?

6  A   I'm sorry?

7  Q   Do you recall we had a discussion in June of last year

8  where you were under oath?

9  A   Yes.

10 Q   Do you recall what your testimony was when I asked you

11 that very question, now what, 16 months ago?

12 A   No, I don't.

13      MR. KURTH:  Would you play, Mr. Brockwell, page 112,

14 line 8 to 10?

15      (Excerpt of deposition played in open court.)

16 BY MR. KURTH:

17 Q   That was your testimony, now 14 months ago.  Do you wish

18 to change it?

19 A   Well, we followed the rules that were in the RFP.  We

20 didn't have any rules within FedEx that said here's our

21 procedures for putting a team together.  We abided by the

22 rules of the RFP.

23 Q   I asked you 14 months ago, and I'm asking you today, did

24 the FedEx team have any written rules and procedures by which

25 you operated?  Your answer 14 months ago was plainly no.  Do

1   you have a different answer today?

2   A   No.  It's still no.

3   Q   Thank you.

4   A   You're welcome.

5   Q   In fact, you make the rules.  You made the rules while you

6   were the manager of the FedEx team, didn't you?

7   A   With respect to what?

8   Q   With respect to the FedEx team, you made the rules?

9   A   Yes.

10  Q   There's no hesitation in your mind, is there?  You made

11  the rules?

12  A   Again, when you asked with respect to what, again, we

13  abided by the RFP --

14          THE COURT REPORTER:  I'm sorry, could I have you keep

15  your voice up a little bit please?

16          THE WITNESS:  We abided by the rules that this

17  Department of Defense issued in their RFP in terms of

18  responding and putting a team together.

19          MR. KURTH:  Mr. Brockwell, would you play --

20          MR. GABEL:  Your Honor, may we approach?

21      (Beginning of bench conference.)

22          MR. GABEL:  I think the clip he is about to play is

23  improper impeachment.  Mr. Molinari just testified that he was

24  the one that made the rules after a little bit of badgering.

25  He is about to try to impeach him with a very consistent

MOLINARI – DIRECT/KURTH                          531

1  statement.

2              THE COURT:  "Who makes the rules?"

3              **"I do."**

4              MR. GABEL:  Is that inconsistent with what the

5  answer was two questions ago?

6              MR. KURTH:  Yes, I'm talking about the rules that he

7  made.

8              MR. GABEL:  He made the rules two questions ago.

9              MR. KURTH:  He wants to talk about this stuff about,

10  "Well, military told me this, and the military told me that."

11  He gave straight, unequivocal answers 14 months ago.  Now,

12  he's trying to give us another story.

13              THE COURT:  Well, I think you've covered it pretty

14  well.  Let's go on.

15  BY MR. KURTH:

16  Q   As team leader, FedEx decided while you were there who

17  will be a member of the team and who will not be a member of

18  the team, correct?

19  A    Yes.

20  Q   And FedEx and FedEx alone made that determination,

21  correct?

22  A    Yes.

23  Q   And as Managing Director of Charter Operations at FedEx

24  you determined how teaming splits for the FedEx team occurred,

25  didn't you?

MOLINARI - DIRECT/KURTH                                    532

1    A    How teaming split of what?

2    Q    Split of business.

3    A    I'm sorry.  Can you repeat your question again?

4    Q    As Managing Director of Charter Operations, you determined

5    how teaming splits for the FedEx team occurred, didn't you?

6    A    With discussions with the participants, yes.

7    Q    But it was ultimately your decision and your decision

8    alone?

9    A    Yes.

10   Q    And the members didn't get to vote on who should be a

11   member of the team, did they?

12   A    No.

13   Q    Do you recall --

14         MR. KURTH:  Could you put up PX5?

15   BY MR. KURTH:

16   Q    While we're waiting, I'll ask a couple questions to get

17   through the pregnant pause.

18         Do you recall that for the fiscal years '04 and '06

19   there was a three-year agreement in place providing for a

20   split of business between Omni and ATA as the passenger

21   carrier on long-range or international business?

22   A    Yes.

23   Q    And that was an agreement which you signed?

24   A    Yes.

25   Q    And in that agreement, you defined the distribution of

MOLINARI – DIRECT/KURTH                          533

1  business, that particular business for that three-year period,

2  correct?

3  A    Yes.

4  Q    Now, you didn't propose that split of business.  You

5  defined it as the team leader, as the person who had the sole

6  authority to make that ultimate decision, correct?  Am I

7  parsing words with you?

8  A    Yeah.  Say that again, please.

9  Q    As the team leader, you had the authority to decide what

10 that split of business was going to be, as far as you were

11 concerned?

12 A    Yes, but any discussion we had was a mutual discussion

13 between the participants in what the split was going to be.

14 Q    But at the end of the day, you had the authority to make

15 that decision, regardless?

16 A    I wouldn't say regardless, but yes.

17 Q    Do you recall this three-year agreement, '04 to '06 fiscal

18 years, was an agreement made that you signed on FedEx

19 stationary with the FedEx logo?

20 A    Yes.

21 Q    At the time you signed the three-year agreement, you

22 intended for FedEx to honor it, didn't you?

23 A    Yes.

24 Q    Now, at the time both ATA and Omni wanted that multiyear

25 arrangement, didn't they?

1  A   Yes.

2  Q   They wanted it for fleet-planning purposes and other

3  business reasons that a multiyear arrangement would be more

4  advantageous to them than a single-year arrangement?

5  A   My recollection is they wanted it for planning purposes,

6  although there was never a guarantee what the business was

7  going to be, but they preferred to have --

8          THE COURT REPORTER:  I'm sorry, sir.  Can I ask you

9  to sit forward a little bit and keep your voice up?

10         THE WITNESS:  I can't move this chair.

11         THE COURT REPORTER:  No, I'm sorry.  If you could

12 sit forward.

13         THE WITNESS:  Okay.

14         THE COURT REPORTER:  Thank you.

15         THE WITNESS:  You're welcome.

16 BY MR. KURTH:

17 Q   That was fleet planning and other purposes?

18 A   Yeah, I assume that, plus others.  I'm not exactly sure

19 what their -- it's just a general planning process for them.

20 Q   And there's always the risk in this contract -- like in

21 any contract, there are always risks that can't be absolutely

22 pinned down, correct?

23 A   Yes.

24 Q   Risks like maybe the United States military comes home and

25 there are no wars.  That's a risk?

1  A    Yes.

2  Q    Put a smile on our face, but it's a risk.

3  A    Yes.

4  Q    There's a risk that a –– what you call a legacy carrier or

5  points contributor would move to another team in the meantime?

6  A    Yes.

7  Q    But, nonetheless, there is a three-year agreement in place

8  for that period of time providing for the split of business

9  between ATA and Omni, that is, passenger business for

10  international charter flights?

11  A    Yes.

12  Q    And you expected those carriers that signed this

13  agreements, ATA and Omni, to have sufficient fleet

14  capabilities and operational capabilities to perform with

15  respect to that division of business, correct?

16  A    Yes.

17  Q    Now, there were also during that same period of time

18  annual Fee Agreements in place for FY04, FY05, and FY06,

19  correct?

20  A    Yes.

21  Q    And these Fee Agreements are of a standard form, correct?

22  They're of a standard form, these Fee Agreements?

23  A    Yes.

24  Q    Prior to the expiration of fiscal year '06, there were a

25  series of discussions that you were having with ATA and you

1  were having with Omni separately regarding a follow-on

2  three-year agreement for a split of business; isn't that

3  right?

4  A   Yes.

5  Q   And those discussions were not discussions that were

6  conducted in a conference room or on a conference call, were

7  they?

8  A   No, they were not.

9  Q   Those were individual discussions you had as team leader

10 with ATA and with Omni separately?

11 A   Yes.

12 Q   And those discussions led to -- I'm sorry.

13      Those discussions were primarily in the form of e-mail

14 exchanges, sometimes telephone conversations you would have

15 with Mr. Doherty at ATA or someone at Omni, correct?

16 A   That's correct, yes.

17          MR. KURTH:  Would you put up PX7.

18 BY MR. KURTH:

19 Q   Do you recognize PX7, Plaintiff's Exhibit 7?

20 A   Yes.

21 Q   It's -- it has two pages.  It's an e-mail string you

22 recognize?

23 A   Yes.

24 Q   The first e-mail is from Mr. Doherty, and he is proposing

25 a split of business that -- and giving his reasons as to why

MOLINARI - DIRECT/KURTH                       537

1   he thinks a split of business should be along the lines he's

2   proposing, correct?  You can --

3              MR. KURTH:  Blow up the --

4   A   Yes.

5   BY MR. KURTH:

6   Q   Okay.  And the follow-on e-mail from you addressed to

7   Mr. Doherty -- can you see that?

8   A   Yes.

9   Q   You've taken his input and you advise him that, in

10  essence, I think the best idea is for a 50/50 split so we can

11  move aggressively forward as a team, correct?

12  A   That's correct, yes.

13  Q   Okay.  And your last sentence was, "I would like to

14  proceed on this basis with a Letter Agreement for three

15  years."  Do you see that?

16  A   Yes.

17  Q   Then you asked Mr. Doherty to confirm?

18  A   Yes.

19  Q   And you all had a telephone conversation in August of '05,

20  and he confirmed that that was agreeable to him, that split

21  for that period of time?

22  A   We had discussions before this went out.  I don't recall

23  exactly what transpired after it went out.

24  Q   You don't recall any conversation?

25  A   No.

MOLINARI - DIRECT/KURTH                          538

1  Q   So if Mr. Doherty remembers there being a conversation,

2  you don't want to disagree with him on that subject?

3  A   No.  I'm sure we had discussions about it, yes.

4  Q   Now, at this time in 2005, there were only two passenger

5  carriers on the FedEx team, correct, ATA and Omni?

6  A   No.

7  Q   What other -- what carriers were there on the FedEx team?

8  A   Northwest.

9  Q   I'm sorry.  As operating carriers.

10 A   Yes.

11 Q   ATA and Omni alone?

12 A   Right.

13          MR. KURTH:  PX9, please, Plaintiff's Exhibit 9.  If

14 you could blow up --

15 BY MR. KURTH:

16 Q   That screen in front of you, Mr. Molinari, may be easier

17 to read.

18 A   It's not working.

19 Q   It's not working?

20 A   No.

21          THE COURT:  Are your screens working in the jury

22 box?

23      (Jurors answered affirmatively.)

24 BY MR. KURTH:

25 Q   Mr. Molinari, if you can't read it, raise your hand or

1   some sign of distress.

2          This is a -- sir, is a two-page document.

3          MR. KURTH:  And if you could scroll down a little

4   bit, Mike, so he can see it.

5   BY MR. KURTH:

6   Q   This is a fax exchange you had with Mr. Pollard, I

7   believe, at Omni, correct, sir?

8   A   Yes.

9   Q   And Mr. Pollard has sent you a Letter Agreement for you to

10  sign, and you responded by signing it and faxing it back,

11  correct?

12  A   That's correct, yes.

13  Q   And there's nothing in this letter that says -- well, let

14  me rephrase.

15         There's nothing in this letter that said, "Well, now,

16  you understand, Mr. Pollard, this really isn't an agreement.

17  It's just a conversation piece"?

18  A   In this letter?

19  Q   Yes.

20  A   No.

21  Q   It doesn't say, "Now, this is not something you're to rely

22  upon.  I'm just signing something that you put in front of

23  me."  Doesn't say that, does it?

24  A   No.  I think it does say we're going to enter into a

25  Teaming Arrangement Agreement like we had in previous years.

MOLINARI - DIRECT/KURTH                        540

1   Q   Consistent with what you just signed?

2   A   Right.

3   Q   And you say "accepted and agreed."  You signed it?

4   A   Yes.

5   Q   Did you ever follow up with the statement you made to

6   Mr. Pollard that you would have your legal department draft up

7   a more formal document?

8   A   Which statement is that?

9   Q   Do you recall making that statement, that this was an

10  agreement but I'm going to have the legal department draft up

11  something more formal?

12  A   I remember that being in one of my e-mails, yes.

13  Q   Did you do that?

14  A   I'm sure I must have.  I don't remember the timing of when

15  that was and what transpired.

16  Q   Now, these two -- this agreement and the previous one,

17  these are not agreements that were first approved by

18  Mr. Rachor before you signed them, were they?

19  A   This agreement and which other one are you referring to?

20  Q   '04'-'06.

21  A   No, they were not.

22          MR. KURTH:  Could you put up PX64.  Now, if you

23  could blow up the top.

24  BY MR. KURTH:

25  Q   This is an e-mail string, sir --

MOLINARI – DIRECT/KURTH                    541

1          MR. GABEL:  Your Honor, could we approach and could

2    we remove that for a second?

3       (*Beginning of bench conference.*)

4          MR. GABEL:  I would object to that exhibit.  It's

5    not in evidence yet, and I would rather not publish it to the

6    jury until the Court has had a chance to rule.

7          MR. KURTH:  I thought it was already in evidence.  I

8    apologize.

9          THE COURT:  What's the objection?

10         MR. BLUMBERG:  The objection is the top two parts of

11   the e-mail, we're fine with, and we're not going to object to.

12   What we would ask is -- and I think he has the technology to

13   do that -- to cut off the top two because the bottom parts of

14   the e-mail refer to ATA's folks coming up to Memphis to talk

15   about trying to get back on the team.  So we will withdraw

16   objection to the top two parts.

17         THE COURT:  Is that all you want is the top two

18   parts?

19         MR. KURTH:  Yeah, but isn't that already in play,

20   that there were discussions afterwards, after the termination

21   notice?  My recollection is, Your Honor, the evidence is

22   already in.  There's been discussions about the colloquy going

23   on between FedEx and ATA after the January notice letter

24   and -- that's -- if there's a cat in the bag, that cat's out.

25         MR. BLUMBERG:  I'm sorry.  The bottom part of the

MOLINARI - DIRECT/KURTH                    542

1   e-mail is the paralegal trying to set up an appointment.  We

2   don't have any problems with the first two paragraphs.

3   They're not hearsay.  We just don't want the part about the

4   paralegal calling and going back up to the jury.

5        THE COURT:  Okay.  All right.  Let's have them take

6   that out.

7      *(End of bench conference.)*

8        MR. KURTH:  All right.  Mr. Brockwell, if you could

9   put that back on the screen and go to the middle of the

10  document and to the top and -- there you go.  Now, if you blow

11  that up so we can see it.

12  BY MR. KURTH:

13  Q   All right.  This is an e-mail exchange you're having --

14  or, actually, between Mr. Rachor, Ms. Allmon and yourself?

15  And you are responding to Mr. Rachor's e-mail, correct?

16  A   Give me a second here.

17       Yes.

18  Q   You're giving Mr. Rachor background information,

19  information that, as far as you know, he didn't have before;

20  and he's asking for this information, and he's asking for your

21  comments, correct?

22  A   Correct.

23       MR. KURTH:  Now, this e-mail, Exhibit 64, which we

24  offer with the redaction agreed to.

25       MR. GABEL:  With the redaction, no objection, Your

 1   Honor.

 2          THE COURT:  All right.  Show it admitted.

 3       *(Plaintiff's Exhibit 64 was received in evidence.)*

 4   BY MR. KURTH:

 5   Q   This e-mail advice you gave to Mr. Rachor doesn't make any

 6   mention of the August '05 Letter Agreement you signed with

 7   Mr. Pollard at Omni with respect to a 50 percent split of

 8   business for three years, FY07 to FY09, does it?

 9   A   That's correct, yes.

10   Q   You're telling Mr. Rachor that if ATA wants to talk about

11   a three-year agreement, there is no three-year agreement

12   because Omni never agreed to three years, correct?

13   A   That's correct.

14   Q   Well, that's not true, is it?

15   A   Yes, it is true.

16   Q   I'm sorry.  Maybe I missed something.

17          There's an August '05 Letter Agreement that you signed

18   prepared by Omni, signed by Omni, providing for a 50-percent

19   split of the international passenger charter business for

20   FY07-FY09.  That agreement you testified did exist?

21   A   Yes.  It provided Omni with 50 percent of the passenger

22   business.  It didn't address the other 50 percent.

23   Q   Okay.  And then you've got another document a year later

24   that deals with the other 50 percent, don't you?

25   A   But it was never executed by all the parties.

MOLINARI – DIRECT/KURTH                              544

1   Q    It was executed by the other 50 percent, ATA, wasn't it?

2   A    Again, it was a three-party agreement that was never

3   executed by all three parties, so it didn't -- again, it was

4   never finalized.

5            MR. KURTH:  Objection, nonresponsive.

6            THE COURT:  Sustained.

7            MR. KURTH:  Put up PX9, please.  All right.  And put

8   up PX13.

9   BY MR. KURTH:

10  Q    All right.  I understand we've got two documents side to

11  side.  Let's see if we can squish them enough that you can see

12  what they're talking about.

13           You would agree with me, sir, that between the two

14  documents, you've got three signatures?

15  A    Yes.

16  Q    Okay.  You would agree with me that the subject matter of

17  the two documents you have in front of you, Plaintiff's

18  Exhibit 9 and Plaintiff's 13, are the same?

19  A    Yes.

20  Q    Thank you.

21           You didn't think it was worthwhile telling Mr. Rachor

22  that, well, the other half of the story is that we have two

23  agreements that all three parties signed covering the same

24  subject matter?  You didn't think it was worthwhile sharing

25  that with him with respect to ATA's claim that it had a

1   three-year agreement?

2   A    That wasn't the situation.  We had an agreement with Omni

3   for them to have 50 percent of the flying.  We had a -- I

4   think almost a year later a proposal that went out that was

5   never signed by all three parties that never became in effect.

6   I also advised at ATA.

7   Q    You told Mr. Doherty at ATA that, "Bill, I know I sent

8   this letter under my letterhead, and I signed it and you

9   signed it, but Omni is not agreeable to a 50/50 split for

10  three years."  Is that what you told Bill Doherty?  Is that

11  your testimony?

12  A    That's exactly what I told him, yes.

13  Q    Why would you tell him that when you've got that letter of

14  August '05 that you signed and Mr. Pollard signed?  Why did

15  you tell him that?

16  A    Because one had nothing to do with the other.

17  Q    Same subject matter talking about passenger split of

18  international traffic, 50/50, and you're signing it as team

19  leader.  What else do you have to have?

20  A    There are two different subjects.  I mean, there's two

21  different letters.  One was directly with Omni between Omni

22  and FedEx that set up a 50 percent -- they got 50 percent of

23  the business.  It didn't address the other 50 percent.  When

24  we sent this letter out in '06, Omni didn't agree to sign it.

25  So I told Bill we don't have an agreement between all three

MOLINARI - DIRECT/KURTH                                    546

1   parties so it's not going to be in effect.

2   Q    Omni didn't agree to sign -- correct me if I'm wrong --

3   because Mr. Pollard told you, "I've already signed an

4   agreement to that effect.  I don't need to sign another

5   document."

6   A    I don't think that's true.

7   Q    Did Mr. Pollard tell you, instead, that, "Well, I've been

8   thinking about it, Gary, and you know what?  Throw that in the

9   trash.  I'm not agreeable to a 50/50 split.  Throw that August

10  '05 agreement away"?

11  A    He was addressing the '06 letter, and he said he wouldn't

12  sign that.

13  Q    Have you read Mr. Pollard's testimony -- sworn testimony

14  given in this case?

15  A    No, I have not.

16  Q    Nobody's shared it with you?

17  A    No.

18  Q    Okay.  So whatever Mr. Pollard says about his view on that

19  August '05 letter, you don't know and you're not in a position

20  to challenge?

21  A    Yes.

22          MR. KURTH:  Okay.  Bob, is Plaintiff's Exhibit 3 in?

23          MR. BROUGHTON:  Yes.

24          MR. KURTH:  Could we go back just for a moment --

25  the document on the left, Exhibit 9, would you blow that up.

 1  BY MR. KURTH:

 2  Q   This is a fax exchange --

 3         MR. KURTH:  And move it up just a little bit,

 4  Michael.  There you go.  Thank you.

 5  BY MR. KURTH:

 6  Q   -- signed by Mr. Pollard to you.  First sentence reads, "I

 7  just returned from vacation to hear we've agreed to a 50/50

 8  split.  That should be fair all around."  That's what it says,

 9  isn't it?

10  A   That's what he wrote, yes.

11         MR. KURTH:  Pull up Plaintiff's Exhibit 3.  Let's

12  get that sized so it's visible to all of us.

13  BY MR. KURTH:

14  Q   Can you read it, Mr. Molinari?  My eyesight's challenged

15  like yours.  I have a copy of it.

16  A   It's a little bit blurry.  I can read it.

17  Q   Okay.  How about if we -- there we go.  Let's look at the

18  text.

19         First of all, do you see this is an e-mail from

20  Mr. Rachor to you?

21  A   Yes.

22  Q   And he asks you, "Do you concur with the following,"

23  correct?

24  A   That's what he's asking me, yes.

25         MR. KURTH:  Let's blow up the following, the next

1  three paragraphs.

2  BY MR. KURTH:

3  Q   That's getting almost visible I think, Mr. Molinari.

4  A   Yes, it is.

5  Q   Did you retire because of having to read stuff like this

6  all day?

7  A   No.

8  Q   It's a challenge.  I understand.

9        Looking at this -- read those three paragraphs

10  quickly, if you would, sir, to yourself.

11  A   Okay.

12        Yes.

13  Q   Thank you.

14        This is the story that you had told Mr. Rachor, and he

15  wanted to concur that's the story?

16  A   Basically, yes.

17  Q   Okay.  And what you told Mr. Rachor is -- well, you didn't

18  tell him about the Omni-FedEx agreement of August of '05, did

19  you?

20  A   I don't remember if I did or didn't.

21  Q   If he says he doesn't recall doing so, you won't challenge

22  him on that?

23  A   No.

24  Q   Given pause to reflect on it, don't you think that would

25  have been a good idea so that he could look at those two

1  documents side by side?

2  A   No, it didn't occur to me.

3  Q   Okay.  And the point of this e-mail is, you know, Omni has

4  not agreed to a 50/50 split, correct, because they wouldn't

5  sign the September '06 Letter Agreement, correct?

6  A   Correct.

7  Q   If they had signed that September '06 Letter Agreement,

8  would you think of that as an agreement?  When you signed it,

9  if the others had signed, would you consider that to be an

10  agreement?

11  A   Yes.

12  Q   When you send out a letter as the FedEx team letter to one

13  of the team members and you say, "This is the arrangement that

14  I want," they don't have to agree, do they?

15  A   Of course, they do.

16  Q   Why?

17  A   Because they're part of the team.  It's a mutually -- it's

18  not a dictatorship.  It's a mutually agreed-upon process, and

19  that was what we had contemplated and talked about and sent it

20  out, but it didn't get signed by all the parties, so we didn't

21  proceed.

22  Q   I thought you told me that you made the rules.  You and

23  you alone ultimately have the decision-making power with

24  respect to team membership and allocation of business?

25  A   I mean, we still have to have concurrence.  If they don't

1  agree, we have to work until we get an agreement.

2  Q   Okay.  And your position is they didn't agree?

3  A   They did not.

4  Q   Okay.  They didn't agree to sign that document or they

5  didn't agree to the substance of that document?

6  A   I'm not sure I understand the distinction.  They didn't

7  sign the agreement, so we didn't proceed under what the

8  agreement said.

9  Q   Is there a document that you know exists where Mr. Pollard

10 of Omni writes you an e-mail or sends you a letter and says,

11 "About that August 05, 2005, agreement we have, I've changed

12 my mind.  I don't want to agree to that"?

13 A   I don't know if there is one or isn't.  I don't remember

14 one.

15 Q   Okay.  It doesn't come to mind.  You don't remember such a

16 document?

17 A   No.

18        MR. KURTH:  Let's look at PX13 again.  Could we blow

19 it up, Michael, so we can see it?

20 BY MR. KURTH:

21 Q   At the time you sent this out, did you not feel as though

22 at the time, knowing that you had that Omni agreement of '05

23 in your pocket, that this is the deal, and we look forward to

24 a continued successful relationship over this period.  That's

25 what you said?

1   A   Yes.  That's what I said.

2   Q   Yeah.

3       And within the month, you signed Fee Agreements with

4   both ATA and Omni for a 50/50 split of the long-range

5   passenger charter business, correct?

6   A   Can you have him --

7   Q   FY07?

8   A   For FY07, yes.

9   Q   Now, during the time you were at FedEx, sir, did you ever

10  have occasion where FedEx had an agreement with someone and

11  there came a reason to change the agreement, to modify the

12  agreement, to amend the agreement?

13  A   I'm sure I must have.  I don't remember any specific

14  instances.

15  Q   Well, that's not an unheard-of event in business, is it?

16  A   It's not a common event, no.

17  Q   But it happens?

18  A   Possibly, yes.

19  Q   You have an agreement with somebody, some company; and for

20  whatever reason, you all decide to change the terms of the

21  agreement.  So you modify the agreement?

22  A   Possibly, yes.

23  Q   And in the fall of 2007, my client, ATA, Mr. Doherty, and

24  you, agreed to change the 50/50 split to allow Northwest to

25  have some flights, didn't you?

1  A   We didn't change the agreement.  That was the agreement

2  for that year.  There wasn't an agreement for anything other

3  than --

4  Q   Because you don't recognize the September '06 letter as an

5  agreement?

6  A   Correct.

7  Q   When you communicated with Mr. Rachor in February of '08

8  after you -- what's the word?  Dropped ATA, expelled ATA,

9  terminated ATA, removed them from the team, what's the

10 phraseology that you'd like me to use?

11 A   Well, none of those are applicable.  It's basically we

12 didn't invite them back for the FY09 period.  We didn't

13 terminate anything.  We didn't drop them.  We just told them

14 they weren't going to be on the team.

15 Q   They weren't part of the team because you don't recognize

16 the September '06 Letter Agreement signed by you and

17 Mr. Doherty as an agreement?

18 A   Absolutely.

19 Q   Absolutely.

20      And you're absolute that you told Mr. Doherty, "We

21 don't have a deal"?

22 A   Without a doubt.

23 Q   Without a doubt.

24      If Mr. Doherty remembers it differently, then he just

25 got it wrong?

1  A   He does.  Unfortunately, he does.

2  Q   Yeah.  He's just misinformed?

3  A   I'm not sure what he is, but we had the conversation.  I

4  distinctly remember that conversation.

5  Q   Now, when you were having this conversation with

6  Mr. Doherty in '06 -- this conversation you say you had after

7  Mr. Doherty signed your letter and sent it back to you, did

8  you mention to Mr. Doherty that you had in your files an

9  August 2005 contract and agreement signed by you and Omni?

10 A   No.

11 Q   Didn't you think that was something that should have been

12 shared with Mr. Doherty?

13 A   No.

14 Q   If Mr. Omni -- Mr. Omni -- if Mr. Pollard had signed the

15 September '06 three-year letter, would you think -- did you

16 plan on treating that as an agreement?  I mean, a real deal?

17 A   We would have as we had in the past incorporated that into

18 the Fee Agreements for the respective contract years, assuming

19 everyone was on the team and everything with the military was

20 the same.  You know, that was a different contract year, and

21 every year there were changes.

22 Q   The three-year agreements were to provide a framework,

23 weren't they, over a three-year span?

24 A   Over distribution of business, yes.

25 Q   Then you had additional contracts that basically

1   codified -- I think that's the word I heard today -- codified

2   the three-year agreements; is that right?

3   A    They were incorporated.  I think we even referenced them

4   at some point in the Fee Agreements.

5   Q    So if you signed it and the counter parties signed it, as

6   far as you're concerned, that's a deal?

7   A    If all the counter parties signed it, yes.

8   Q    Okay.  In your mind, they have to all sign the same

9   document about the same subject matter at the same time or

10  it's not a deal?

11  A    Absolutely.

12  Q    Absolutely.

13       You told Mr. Doherty that you were going to send him

14  documentation -- you told Mr. Doherty, August of '05, "I'm

15  going to send you documentation about the three-year agreement

16  split for FY07 to FY09."  Do you remember testifying to that?

17  A    I'm sorry.  I missed your --

18  Q    Do you remember our discussion earlier that you said you

19  told Mr. Doherty that you were going to send documentation

20  regarding the three-year agreement, the split; and this was a

21  discussion you had with Mr. Doherty in August of 2005?

22  A    I was my e-mail, yes.

23  Q    Yes.

24       And that written communication from you setting forth

25  the arrangement, the 50/50 split, was sent by you in

1  September 2006?

2  A    Yes.

3  Q    At Mr. Doherty's request?

4  A    I'm not sure how it transpired that it was sent at that

5  particular time, but that's when it was sent, yes.

6  Q    And about the same time you sent to him the FY -- fiscal

7  year 2007 Fee Agreement covering one year?

8  A    I mean, it would have been in that time frame.  I don't

9  remember the exact time frame of when those letters --

10 Q    If I represent to you that you did, will you accept that

11 representation?

12 A    If I looked at the Fee Agreement, I could look at the date

13 and confirm it.

14         MR. KURTH:  All right.  Let's look at the Fee

15 Agreement.  PX14, please.

16 BY MR. KURTH:

17 Q    PX14, do you recognize that?

18         MR. KURTH:  Go to the signature page, Michael.

19         THE WITNESS:  Yeah, that's around the same time

20 frame.

21         MR. KURTH:  Show us the signature page.

22 BY MR. KURTH:

23 Q    Do you see your signature, Mr. Molinari?

24 A    Yes.

25 Q    And that document, PX14, you recognize now is the Fee

1    Agreement for fiscal year 2007 that you signed and sent to Mr.

2    Doherty?

3    A    Yes.

4    Q    And that would have been at the same time that you sent

5    the three-year Letter Agreement, wouldn't it?

6    A    Within a month or so of it, yes.

7    Q    Within a couple weeks or less?

8    A    Remind me.  What date was the other letter sent?

9    September 5th?

10   Q    September 7th, I believe. so within a couple weeks?

11   A    Yes.

12   Q    Now, at the time you entered into this agreement with ATA,

13   ATA was -- the split of business that ATA was to receive was a

14   split of business that was a revenue stream of hundreds of

15   millions of dollars, potentially?

16   A    Yes.

17   Q    And at the time when you signed this agreement, you

18   believed that ATA was a quality charter operator and capable

19   of performing?

20   A    I believed ATA was capable of performing, yes.

21   Q    And you believed them to be a quality charter operator,

22   didn't you?

23   A    Yes.

24   Q    In fact, you recall that you had recommended -- just a

25   couple months previously, you had recommended them to some

1   folks as your best or one of your best charter operators?

2   A   I recall there was an inquiry about a charter, and I said,

3   you know, if ATA's on our team, you know, they can -- I'm sure

4   they can do that business, and recommended them, yes.

5   Q   You don't recall describing them as the best passenger

6   charter operator in that communication?

7   A   I don't know if those were the words I used.

8   Q   I can show you the document, if you like.

9   A   As I just said, I don't remember how I described them; but

10  I do remember the instance.

11          MR. KURTH:  All right.  Let's just show him.

12          We offer Plaintiff's Exhibit 1.

13          MR. GABEL:  Relevance?

14          MR. KURTH:  Well, they're claiming that they removed

15  us from the team because of some concerns with respect to what

16  kind of people we were and our ability to do the business.  I

17  mean, I think this is --

18          THE COURT:  Overruled.  Go ahead.

19          Then we have to break for lunch at some convenient

20  point in your examination.

21          MR. KURTH:  It would be good after this, Your Honor.

22          THE COURT:  All right.

23          MR. KURTH:  Plaintiff's Exhibit 3 -- I'm sorry.

24  Plaintiff's Exhibit 1, pull it up, Mike, to where we can see

25  the language about the best charter operator.

MOLINARI – DIRECT/KURTH                                    558

1   BY MR. KURTH:

2   Q    The subject of your e-mail at the top to a Mr. Blum and

3   Ms. Watters, subject is "FWS request regarding the best PAX

4   charter operator."  Your response was, "Phil, American

5   TransAir" -- that's ATA -- "operates 737 or 757s.  They are

6   partners with us in the CRAF program.  Let me know if you want

7   us to contact them."  That was your response to their inquiry

8   as to who's the best charter operator.

9   A    Yeah.  I mean, the best charter operator was the subject

10  matter.  That just got carried forward in the string of

11  e-mails.  I was just answering the e-mail.

12  Q    Okay.  You were just answering e-mail.

13            MR. KURTH:  Good time for me, Your Honor.

14            THE COURT:  All right.  Very good.

15            Members of the jury, let's take our lunch at this

16  time.  If you can please come back and be ready to go at 1:30.

17  Please do not discuss the case among yourselves.

18            Thank you.  Have a nice lunch.  Looks like a

19  beautiful day out.

20            COURT CLERK:  All rise.

21     (Jury out.)

22            THE COURT:  Mr. Kurth and Mr. Gabel, anything we

23  need to discuss prior to our lunch?

24            MR. KURTH:  No, Your Honor.

25            THE COURT:  Okay, 1:30.

1        *(A luncheon recess was taken.)*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **A F T E R N O O N   S E S S I O N**

2  (Jury in.)

3              THE COURT:  Okay.  We've finished our lunch break.

4  Nice day out.  Little fresh air.  Ready to go this afternoon.

5  We'll continue on with evidence and testimony this afternoon.

6              Mr. Kurth, you wish to continue your exam?

7              MR. KURTH:  Yes, Your Honor.

8              THE COURT:  All right, you may.

9  BY MR. KURTH:

10  Q   Mr. Molinari --

11             THE COURT:  I think the screen is operable.  Once

12  something comes up, you'll see it.

13  BY MR. KURTH:

14  Q   Mr. Molinari, we were talking before the lunch break

15  about, amongst other things, your testimony -- you say you

16  called Bill Doherty and told him Omni was not agreeable to a

17  50 percent split for three years, correct?

18  A   I called him and told him Omni refused to sign that

19  three-party letter, yes.

20  Q   Did you tell him -- I thought you testified you told him

21  Omni was not agreeable to a 50 percent split for three years?

22  A   No.  They just disagreed to sign the letter.

23  Q   So they didn't disagree with.  Did they reject or -- let

24  me withdraw.

25             Did Omni tell you they were not agreeable to a 50/50

1  split for three years, FY07 to FY09, before you called Mr.

2  Doherty?

3  A   They called me and said they were not going to sign that

4  letter, which was a 50/50 split for a three-year period.

5  Q   Ignoring the fact a year earlier they had signed a

6  document?

7  A   A document between FedEx and Omni for a 50 percent share

8  of the business, yes.

9  Q   And as we discussed before lunch, you did not tell

10  Mr. Doherty about the existence of that agreement that you

11  made with Omni a year earlier.  That's for the same period of

12  time for the 50 percent split of the same piece of business,

13  correct?

14  A   That's correct.

15  Q   Do you recall exchanging documentation with -- by way of

16  e-mail, documentation with Omni Air in April of '07 with

17  respect to the Teaming Arrangements for fiscal year '08 that

18  was coming up in a few months?  Probably not.

19  A   I've had numerous.  You have to be more specific.

20  Q   Let me show you what's been marked for identification as

21  Plaintiff's Exhibit 27, which is an e-mail string and ask you

22  if you recognize that as an e-mail string that you exchanged

23  with Omni in April of 2007.  Do you recognize that, or do you

24  have any reason to believe that is not an e-mail exchange you

25  had with Mr. Pollard, Mr. Coretz of Omni in April of '07?

1    A    Yes.

2    Q    In that exchange --

3            MR. KURTH:  I believe I'll offer Plaintiff's

4    Exhibit 27.

5            THE COURT:  Any objection to Plaintiff's Exhibit 27?

6            MR. GABEL:  No, Your Honor.

7            THE COURT:  27 is admitted.

8      (Plaintiff's Exhibit 27 was received in evidence.)

9    BY MR. KURTH:

10   Q    Mr. Pollard's response in which he responded and thanked

11   him, he states, and I'll read.  "Gary, this will confirm our

12   telephone conversation about Omni's role in the FedEx

13   Contractor Teaming Arrangement for the FY08 AMC long-range

14   international contract (the AMC contract).  Per the Letter

15   Agreement between Omni and FedEx dated August 18, 2005, FedEx

16   will cause the FedEx team to distribute 50 percent of its

17   long-range passenger award to Omni for the fiscal year '08 AMC

18   contract."  Did I read that correctly?

19   A    Yes, you did.

20   Q    And that 50/50 split we've agreed is the subject matter of

21   the August '05 Letter Agreement you signed with Omni and the

22   September '06 letter that you signed and that Doherty signed,

23   correct?

24   A    Again, it's not a 50/50 split.  The letter we had for Omni

25   was for them to have 50 percent of the long-range business.

1   It didn't address the other 50 percent.

2   Q   And this agreement dealt with -- September of '06 dealt

3   with the other 50 percent, correct?

4   A   The September -- just so I'm straight, the September

5   '06 -- three-party letter that never got signed?  Yes.

6   Q   The three-party letter that never got signed -- correct me

7   if I'm wrong.  Before lunch, you testified about e-mail

8   traffic conversations you had with Bill Doherty at ATA prior

9   to this Omni agreement you signed with them in late August;

10  that, "Let's go with the 50/50 split.  I think that's fair all

11  around."  That's what you told Mr. Doherty in e-mail traffic,

12  and is that not true?

13           MR. GABEL:  Objection.  Mischaracterization of

14  testimony.

15  BY MR. KURTH:

16  Q   Is that true?

17           THE COURT:  I think -- I don't think I recall that

18  he told Mr. Doherty that.  I think Mr. Pollard is the one who

19  said that's fair all around.

20  BY MR. KURTH:

21  Q   Did you have e-mail traffic with Mr. Doherty in

22  early-to-mid August 2005 to the effect that "Let's go with a

23  50/50 split"?

24  A   I believe I had an e-mail, the place we ended up, that I

25  would follow it up with a formal agreement letter or something

1  to that effect.

2  Q   And that was an e-mail that actually went to Bill Doherty,

3  didn't it?

4  A   Yes.

5  Q   There has been some discussion about certain carriers

6  switching teams from time to time.  When you were at FedEx and

7  the team -- leader of the team, were the points contributors

8  changing teams from time to time?

9  A   Yes, they were.

10 Q   And how many years had ATA been on the FedEx team at the

11 time you left FedEx in 2008, upwards of two decades?

12 A   I don't know.  I wasn't there that long but a long time.

13 Q   And you had had at least since 2004 until you uninvited

14 ATA in January of 2008, there had been two passenger operators

15 on FedEx team and that's all, correct?

16 A   I believe that's correct, yes.

17 Q   Omni never switched teams?

18 A   No.

19 Q   ATA never switched teams?

20 A   No.

21        MR. KURTH:  Would you put Plaintiff's Exhibit 3 up,

22 please?  Once again, we're challenged with -- let's blow it

23 up.  Thank you.

24 BY MR. KURTH:

25 Q   Now this is, again, the communication we visited with --

1  about earlier today, correct, that you and Mr. Rachor had on

2  the subject of post-uninviting ATA January 22nd.  You were

3  exchanging e-mail traffic with Mr. Rachor explaining what the

4  background of the story was, correct?

5  A   Yes.

6  Q   And explaining to him why, in your view, that there was no

7  agreement with ATA, and these are the reasons you shared?

8  A   I believe this is his information to me, but yes.

9  Q   And you responded with, "I concur"?

10 A   Correct.

11 Q   Now, looking at this document, do you recall advising

12 Mr. Rachor that one of the reasons ATA doesn't have an

13 agreement is because there's this entire agreement clause in

14 one of these annual agreements?

15 A   I'm sorry, can you say that again?

16 Q   Did you ever tell Mr. Rachor the reason we don't have an

17 agreement with ATA is you see that each of these annual

18 agreements has an entire agreement clause, and that's why

19 there's not a three-year agreement?

20 A   No, I don't recall doing that.

21 Q   I want to ask you if you can identify for the record

22 Plaintiff's Exhibit 24.

23         MR. KURTH:  Can we blow that up a little bit,

24 please?

25

1  BY MR. KURTH:

2  Q   Mr. Molinari, does this appear to be another e-mail

3  exchange between yourself and the folks at Omni Airlines?

4  A   Yes, it is.

5  Q   And this is -- and the communication from Mr. Coretz of

6  Omni Airlines, if I can point you to those two bullet points

7  there?  The first bullet point reads -- I'm sorry.

8          MR. KURTH:  Offer Plaintiff's Exhibit 24?

9          MR. GABEL:  No objection.

10          THE COURT:  24 admitted.

11      (Plaintiff's Exhibit 24 was received in evidence.)

12  BY MR. KURTH:

13  Q   Reading the first bullet point, it states, "Our current

14  three-year agreement which began this year is for Omni to fly

15  off 50 percent of the total team passenger business in both

16  wide-body and narrow-body category."  Did I read that

17  correctly?

18  A   Yes, you did.

19  Q   Thank you, sir.

20          MR. KURTH:  You can take that down.

21  BY MR. KURTH:

22  Q   In your exchange with Mr. Rachor in February of '08 when

23  you were discussing and Mr. Rachor was asking your input an

24  said, "What's the story on ATA claim of a three-year

25  agreement?"  I don't recall any reference to your telling

1  Mr. Rachor, "Well, this multiyear agreement claim is invalid

2  because all we ever have are one-year contracts.  There are no

3  other contracts other than one-year contracts"; is that right?

4  A    That's correct.

5  Q    That wasn't a sentiment you shared with Mr. Rachor at that

6  time?  That wasn't a sentiment you shared with Mr. Rachor?

7  A    I'm confused now.  What sentiment are you referring to?

8  Q    The sentiment that the ATA's claim of a three-year

9  agreement was unfounded because all we ever have are annual

10 agreements because that's all the military will ever give us.

11 A    Correct.

12 Q    Now prior to January 22, 2008, when you, in your terms,

13 uninvited ATA from the team, that wasn't a decision that you

14 made impromptu that day or the day before, was it?

15 A    No, it was not.

16 Q    That was a decision that was several months in the making?

17 A    Yes.

18 Q    And that was a decision that was a product of extensive

19 discussions you had with Omni Airlines where Omni was hustling

20 you to increase their business share?

21 A    With Omni and others.

22 Q    And Northwest as well?

23 A    And Atlas.

24 Q    Atlas.  I hadn't heard about Atlas.  What was Atlas

25 telling you?  They wanted on the team?

1  A    Pardon me?

2  Q    Did Atlas want on the team?

3  A    They were already on the team.

4  Q    I'm sorry.  Did they want more business?

5  A    Everybody always wanted more business.

6  Q    I don't recall that the long-range international charter

7  business, whatever volume that was, that Atlas was ever on

8  that group that was handling that business.  Were they?

9  A    Oh, absolutely.

10  Q    And was Atlas part of the division of the business after

11  you uninvited ATA?

12  A    Atlas has been part of the team for a number of years.

13  They were always part of the business on the cargo side.  They

14  were a cargo carrier.

15  Q    We're talking about passenger carriage, aren't we?

16  A    Yes.

17  Q    Let's talk about passenger carriage.  I am not talking

18  about cargo, you understand?

19  A    I understand.

20  Q    We haven't been talking about cargo, have we?

21  A    You referred to the team.  The team includes both cargo

22  and passenger carriers.  They're all connected.  You just

23  can't exclude them.  If our team goes down by 25 percent, for

24  example, that impacts the cargo carriers as well as the

25  passenger carriers.

MOLINARI – DIRECT/KURTH                              569

1  Q   If I can tie this back to what I was talking about, you

2  had begun the process and a serious effort to uninvite ATA in

3  the fall of 2007.

4  A   Yes.

5  Q   And ATA, you had never approached ATA in all those

6  conversations you had for several months in 2007, nor before

7  January 22, 2008, that you had any sentiments other than that

8  they would remain a member of the team for year '09 at least?

9  A   I had no discussions with them in either direction, either

10 that they would be on the team or would remain on the team.

11 Q   You had signed a fiscal year '08 Fee Agreement with ATA in

12 September of '07?

13 A   Yes.

14 Q   And at that time -- strike that.

15       If you were considering and seriously considering

16 uninviting ATA from the team, do you not think the appropriate

17 thing to do with or without a 2006 three-year agreement is to

18 let them know that --

19       MR. GABEL:  Your Honor, objection, relevance,

20 politeness in a breach of contract case.

21       MR. KURTH:  There's a plea of mitigation of damages

22 here, Your Honor.

23       THE COURT:  Overruled.

24 BY MR. KURTH:

25 Q   Did you not think it was the right thing to do to share

MOLINARI – DIRECT/KURTH                              570

1   with them that they were in peril of being removed from the

2   team?

3   A   I didn't think it was right to let them know that until it

4   was the appropriate time for our team.

5   Q   I thought ATA was still on the team.

6   A   They were for '08, but we were looking at '09.  So I let

7   them know at the appropriate time for '09 that they weren't

8   going to be invited back.  I didn't uninvite them.  They

9   weren't invited.

10  Q   So you really didn't need to tell them they were uninvited

11  because they weren't invited in the first place?

12  A   I could have not done that, yes.  I could have just waited

13  until the contract came up and really left them in a lurch.

14  Q   So you decided to leave them in a lurch for four, five

15  months and then let them know, correct?

16  A   I let them know when it was appropriate for the team to do

17  so.

18  Q   You say "appropriate."  It means appropriate for you?

19  A   Appropriate for the team.

20  Q   The team would exclude ATA; and provided that you the kept

21  Northwest on the team, preserved your commission flow,

22  preserved your revenue flow, preserved your position as team

23  leader, only then when you had all those parts in place for

24  FedEx did you decide to let my client know that they were

25  going to be uninvited; is that about the picture?

MOLINARI - DIRECT/KURTH                         571

1   A   I let them know when I was able to determine that I could

2   preserve the revenue stream for the entire team, which we were

3   actually a small part of what we actually flew.  Yes, that's

4   true.

5             MR. KURTH:  Put up Plaintiff's Exhibit 2, please.

6   BY MR. KURTH:

7   Q   Mr. Molinari, you recognize this letter and your

8   signature?

9   A   Yes, I do.

10  Q   This is the uninvited letter?

11  A   Yes, it is.

12  Q   This is actually -- there are two points to this letter,

13  aren't there?  One, you say "ATA, you're uninvited for fiscal

14  year '09.  And oh, by the way, don't forget, you're under

15  contract for fiscal year '08, so we expect you to perform"?

16  A   Correct.

17  Q   Had they given you any indication they hadn't planned on

18  performing?

19  A   At that point in time?

20  Q   Yeah.

21  A   No.

22  Q   So did you the throw the second sentence in there just to

23  throw salt in the wound or what was the point of that?

24  A   Just clarification.

25  Q   Was there some question -- had they raised a question

1  about their willingness to perform?

2  A   I don't recall in my conversation with Gary Ellmer whether

3  he brought that up or not.  I just wanted to make sure.  I

4  might have put that in there because -- I don't remember.

5  Q   Had you ever sent out a letter like that before to a team

6  member?

7  A   No.

8  Q   When you sent out that letter, you say you did not believe

9  there was a three-year agreement in place with ATA for fiscal

10 years '07, '08, and '09?

11 A   That's correct.

12 Q   Let's talk a little bit about the change of ownership of

13 ATA in 2007.  Do you recall that sequence of events?

14 A   Yes, I do.

15 Q   Now, you were apprised; that is, informed of the plans for

16 ATA to have new ownership in a merger as part of that process

17 in the spring of 2007, correct?

18 A   I believe that's correct, yes.

19 Q   And you and -- you came to Indianapolis and visited with

20 the folks at ATA at their invitation in April of '07?

21 A   Yes.

22 Q   And they told you that they didn't have any mischief in

23 their mind, correct?

24 A   They told me they were still in the formative stages of

25 doing the merger, and that they were just trying to get that

1  accomplished.  I don't think it had been approved yet, but

2  they were going to try to get that accomplished and would

3  advise further as things developed.

4  Q   And you talked about, amongst other things, whether or not

5  the folks at World or North American, maybe there's a prospect

6  for them joining the FedEx team?

7  A   Yes.

8  Q   Now, when you told Mr. Rachor your reasons why you wanted

9  to uninvite or did uninvite ATA, one of them had to do with a

10 conflict of interest, a secondary issue I think you described

11 it.  Do you recall that?

12 A   Yes.

13 Q   Conflict of interest.  That was the language?

14 A   Yes.

15 Q   A conflict of interest related to ATA's affiliation with

16 Global Aero Logistics, correct?

17 A   Yes.

18 Q   As of April 2007, had ATA ever done anything as a team

19 member to indicate that it was anyone other than a committed

20 team member?

21 A   As of when, April of --

22 Q   Of '07.

23 A   I don't recall whether they did or didn't at the time.

24 The timing is --

25 Q   Let's put it in context.  The merger closed in August of

MOLINARI – DIRECT/KURTH                    574

1  '07.  In September of '07 you sent and ATA signed a fiscal

2  year 2008 Fee Agreement.  Looking at that spot in time, at

3  that time did you have any questions as to the loyalty of ATA

4  to the FedEx team?

5  A    No.

6  Q    Or you wouldn't have signed up with them, would you?

7  A    Well, we were already committed at that point.

8  Q    Well, if you thought that they were somebody that couldn't

9  be trusted, if there's something foul about them, having them

10 on the team, would you have signed a Fee Agreement with them

11 anyway?

12 A    No.

13 Q    If I recall correctly –– and you probably remember these

14 documents better than I do –– I think it's a Teaming

15 Arrangement agreement, the same form that's signed every year,

16 has a confidentiality provision in it, doesn't it?

17 A    I don't recall if it does or doesn't.  It's the same

18 document that's signed every year.  The only thing that

19 changes is the date and the RFP reference and if the team

20 members change.

21 Q    Did you ever have any issue with any member of the team in

22 the 2004 through 2007 time frame as to their failure to

23 maintain confidentiality?

24 A    No.

25 Q    Was there any specific confidential information that all

1  the team members had that they shouldn't share with anyone?

2  A   Certainly.  At the start of the process every year, we

3  were always looking to improve the size of the team, and we

4  would always talk to other carriers about possibly joining our

5  team.  I would always have discussions with our various team

6  members to say -- for example, if we had Carrier X, we'll go

7  from this percentage to this percentage.

8         What we thought in terms of a range of business that

9  might change for them and just pose a question.  If we did

10 that, could you handle it, yes or no?  Just to get a comfort

11 level before we went further with trying to pursue those other

12 carriers.  So that kind of information became impossible to

13 have with ATA once they became affiliated with North American

14 and World.

15 Q   It became impossible, so you questioned their loyalty?

16 A   Well, yes.

17 Q   And when did this -- this concern began, you say, in April

18 of '07 and culminated when the merger was closed in August of

19 '07?

20 A   I don't know the dates.  As soon as they became affiliated

21 with the same parent that had North American and World on the

22 team and ATA, it became problematic for us, yes.

23 Q   And the next month you signed the fiscal year '08 Fee

24 Agreement with them.

25 A   That's because we had already signed a Teaming Arrangement

1  Agreement in April of '07 of that year.

2  Q   Was there any information that FedEx team members would be

3  privy to that as a group was confidential and not to be

4  shared?

5  A   I'm sorry.  Can you repeat that, please?

6  Q   Was there any information that FedEx team members would be

7  privy to that as a group was confidential and not to be shared

8  with anybody else?

9         MR. GABEL:  Objection.  Asked and answered.  I think

10 that's just the same question he just responded to.

11 BY MR. KURTH:

12 Q   And the answer was there is confidential information?

13 A   Again, if I was having discussions with carriers that we

14 were going to pursue, I wouldn't want that going back to the

15 competition.

16 Q   Once again, you recall giving your video deposition a year

17 ago, 14 months ago?

18 A   Yes.

19         MR. KURTH:  Would you play page 123, line 25 to 124,

20 line 3?

21         (Excerpts of video deposition of Mr. Molinari were

22 played in open court.)

23 BY MR. KURTH:

24 Q   That was your testimony 14 months ago.  Do you want to

25 change it?

MOLINARI – DIRECT/KURTH                    577

1  A   I stick with the answer I just gave you.  That's the

2  appropriate answer.

3  Q   Did the FedEx team ever meet as a group to discuss

4  business?

5  A   We would get together occasionally.  Sometimes AMC would

6  host a carrier meeting; and generally if everyone was

7  available, we would go out to dinner one night.  It was more

8  of a social event than a business-type event.  We discussed if

9  there were common things that -- such as the military

10  contemplating --

11          THE COURT REPORTER:  I'm sorry, sir.  I need you to

12  slow down, please.

13          THE WITNESS:  I'm sorry.

14          Contemplating that the military's proposing changes

15  to the contract, for example, the 60-40 rule.  And I would

16  just poll the carriers there and see if I could get their

17  thoughts, whether they thought it should be changed, not

18  changed, try to get a sense of where they were.

19  BY MR. KURTH:

20  Q   This is a discussion you would have over dinner?

21  A   Yes.

22  Q   I believe it was at a steakhouse in O'Fallon, Illinois,

23  out of Scott Field?

24  A   Good memory.

25  Q   I happened to live there at one time.

1          Now, these conversations you had where you were

2   discussing whatever it was over steak and potatoes, I take it

3   nobody was taking notes or keeping minutes about those

4   conversations?

5   A    Not that I remember.

6   Q    Pretty informal?

7   A    Pretty informal, yes.

8   Q    Wait staff moving in and out, a lot of people around?

9   A    Yes.

10  Q    Okay.  Now, in April of '07, you met with representatives

11  of ATA here in Indianapolis.  In October of '07, you met with

12  representatives of ATA in Memphis, correct?

13  A    Yes.

14  Q    And on both occasions, the representatives of ATA told you

15  in plain terms that the acquisition of World would not have an

16  impact on the FedEx team, didn't they?

17  A    They may have.  I mean, I don't recall the entire

18  conversation we had that day.

19  Q    Well, if they told you anything else, you would remember

20  that, wouldn't you?

21  A    We discussed a lot of things.

22          MR. KURTH:  Would you play page 155, lines 24

23  through 156:6.

24          MR. GABEL:  Your Honor, may we approach?

25      (Beginning of bench conference.)

1          MR. GABEL:  155, 24 through what?

2          MR. KURTH:  156, 6.  Here it is, Bob.

3          MR. GABEL:  Mike.

4          MR. KURTH:  Mike, I'm sorry.

5          MR. GABEL:  I believe his testimony was he doesn't

6   recall.  His testimony here was yes.  Is that inconsistent?

7          THE COURT:  Well, I think he can play that.

8      *(End of bench conference.)*

9      (Deposition excerpt played)

10  BY MR. KURTH:

11  Q   14 months ago, it was clear to you at the time that that

12  was -- that those reassurances were given by representatives

13  of ATA.  Would you agree?

14  A   I believe so, yes.

15  Q   Did you have any reason to believe that those

16  representatives of ATA were trying to mislead you or lying to

17  you?

18  A   No.

19  Q   Did you ever have the view, prior to uninviting ATA from

20  the FedEx team in January of '08, that -- I think the

21  expression I heard was "the wheels were coming off"?

22  A   I'm not sure what you mean by that reference.

23  Q   Well, it's a colloquial expression.  "Wheels coming off"

24  doesn't sound like a good thing.

25          Did you have any impression, had you formed any

1  impression that ATA's operations were collapsing, that they

2  were in imminent doom?

3  A    No.  I know they were having some trouble.  There were

4  some reliability problems, but that was not untypical for

5  carriers.

6  Q    That was not atypical for carriers, was it, from time to

7  time?

8  A    Depending on the volume, no.

9  Q    Omni from time to time had penalty box -- I think it's

10  called the penalty box issues?

11  A    Yes, that's what it's called.  Not nearly as many times as

12  ATA but occasionally, yes.

13  Q    But that wasn't the reason, at least, you gave to

14  Mr. Rachor or the reasons you gave to ATA for your decision to

15  uninvite them, was it?

16  A    That's right.

17  Q    Now, when ATA shut down operations, filed bankruptcy in

18  early April of 2008, in the wake of that event, to your

19  knowledge, were any military servicemen stranded because of

20  ATA's bankruptcy and suspension of operations?

21  A    Define "stranded" for me, please.

22  Q    They didn't have a lift.  They didn't have a way of

23  getting home or getting to where they needed to be.

24  A    There were some military flights that were delayed by a

25  day or two, but I wouldn't define that as being stranded.

MOLINARI – DIRECT/KURTH                                581

1           MR. KURTH:  Okay.  Mike, would you play the

2    deposition page 206, line 20 to 207, line 5.

3           *(An excerpt of the deposition of Mr. Molinari was*

4    *played in open court.)*

5           MR. KURTH:  Thank you.

6    BY MR. KURTH:

7    Q    That was your testimony a year ago, correct?

8    A    Correct.

9           MR. KURTH:  Pass the witness.

10          THE COURT:  All right.  Thank you.

11          Mr. Gabel, examination.

12                        **CROSS EXAMINATION**

13   BY MR. GABEL:

14   Q    Good afternoon, Mr. Molinari.

15   A    Good afternoon.

16   Q    When Mr. Kurth was asking you some questions, I think you

17   mentioned that you live in the state of California; is that

18   correct?

19   A    Pardon me?  Yes.  I live in California.

20   Q    Can you describe for the jury how you came to be in

21   California?

22   A    I retired from FedEx in May of –– end of May of '08.  I

23   think I moved out there in November of that same year.  When I

24   worked for Flying Tigers back in way back when and FedEx

25   bought Flying Tigers in 1989, required me to move to Memphis.

1  I was there about 20 years, but I kept my house in California.

2  So when I retired, I just moved back to LA.

3  Q    Did you continue to have ties in Los Angeles other than

4  your house?

5  A    My children are out there, my grandchildren.

6  Q    When did you first decide to retire from FedEx?

7  A    I think I let my boss know in November -- I sent them a

8  memo saying I was going to be retiring six months later.  So

9  November of '07.

10  Q    And what was your final date at FedEx?

11  A    Last day of May, 2008.

12  Q    Was there any significance to that date to you?

13  A    Yeah.  FedEx had made a decision to -- well, there was a

14  couple reasons.  Our pension plan allowed us to retire with

15  full benefits at age 60.  I was going to turn 60 that summer.

16  Plus, our pension plan had been frozen.  The traditional plan

17  was frozen and they enacted a new pension plan.  It wasn't

18  really going to contribute much to my retirement, so I decided

19  it was a good time to go.

20  Q    Other than your pension or retirement benefits, have you

21  received any income from FedEx since you left?

22  A    No, I have not.

23  Q    Are you being paid for your time here today?

24  A    No, I'm not.

25  Q    Are you under subpoena to be here?

*MOLINARI - CROSS/GABEL*                                    583

1   A    No, I'm not.

2   Q    Can you briefly go through your educational background?

3   A    I attended the St. John Fisher College in Rochester, New

4   York, and I graduated with a BBA degree.  I don't remember

5   which year.  1970?

6   Q    And go through your employment history.

7   A    (Unintelligible)

8          THE COURT REPORTER:  I'm sorry, sir.  I can't

9   understand you.  I need you to slow down.

10  A    That was in 1970, I believe.  I moved to California.  I

11  worked for an insurance company for a year.  I then worked for

12  Flying Tigers from 1972 until 1989, when the merger occurred.

13  BY MR. GABEL:

14  Q    What was Flying Tigers?

15  A    Flying Tigers was an all-cargo airline.  Oh, we did have

16  passenger -- some passenger operations for our military

17  flying.  We had two 747s that flew military passengers.

18  Q    And they merged with FedEx then?

19  A    Merged with FedEx in the fall of 1989.

20  Q    And then what did you do?

21  A    FedEx offered me a job as the -- same thing I was doing at

22  Flying Tigers, as the managing director of charters, with

23  FedEx, just required me to go to Memphis.  So I moved to

24  Memphis and did that job through my retirement.

25  Q    Now, during your time with FedEx, you were in charge of

1  FedEx's participation in the military program, correct?

2  A   That's correct.

3  Q   Can you describe for the jury how FedEx fit into that

4  program?

5  A   The Department of Defense has a -- what they call a CRAF

6  program, Civil Reserve Air Fleet, where they, in times of

7  emergency, may need either passenger or cargo airplanes above

8  and beyond what they have in their organic fleet, which is

9  their C5s or C17s.  They contract with commercial carriers to

10 pool airplanes into the Civil Reserve Air Fleet.  Commercial

11 airplanes are then ordered to mobilization points, which in

12 turn equates to buying power which allows them to get

13 peacetime business as it's available.  That's in lieu of their

14 commitment.  If there's an emergency like Desert Storm or like

15 recently, after 9/11, the airplanes are called into service or

16 volunteered for service, depending on the situation.

17 Q   As a participant in this program, does FedEx sign its

18 planes up to be called up if necessary?

19 A   Yes.  We sign up 100 percent of our long-range fleet of

20 airplanes, MD11s, DC10s into that program.

21 Q   Have any of those airplanes owned by FedEx ever been sort

22 of called into service or drafted by the military?

23 A   When CRAF was activated for the first time for Desert

24 Storm, we had a number of airplanes activated, yes.

25 Q   Do you know how FedEx's participation in Desert Storm

1  compared to the participation of other airlines?

2  A   We flew the most cargo missions of any carrier in the

3  program.

4  Q   During the 2004 through 2008 time frame, who were members

5  of the FedEx team in the CRAF program?

6  A   Oh, the primary members were Atlas, Polar Air Cargo.  They

7  became one at some point in time.  I don't remember the timing

8  when they merged.

9  Q   You mean Atlas and Polar Air merged into one entity?

10  A   Yes.

11  Q   Okay.

12  A   Ourselves, Northwest, Omni, ATA; ATI, Air Transport

13  International, they were a DC8 cargo carrier.  At some point

14  we had Gemini on our team, but they came and went.  And

15  Hawaiian Airlines was also on our team, and they came and

16  went.  And continental -- we usually bought Continental's

17  points.  They weren't part of the team, but we purchased their

18  mobilization value.

19  Q   You mentioned ATI.  That's a separate airline from ATA,

20  the plaintiff in this lawsuit?

21  A   Yes, a completely different entity.

22  Q   Okay.  Now, Mr. Kurth had asked you about this figure of

23  900 to a billion dollars of CRAF business to the team.  And

24  earlier in this trial, we've seen sort of a publicity

25  announcement that CRAF would put out at the beginning of its

1  year talking about the size of awards to different teams.  Did
2  you ever see any of those publications about CRAF talking
3  about the size of an award to a team?
4  A   Yes, I believe when that came out, I did.
5  Q   If they published a headline saying, "We've awarded
6  900 million, a billion dollars to the FedEx team for the next
7  year," did that mean the military was obligated to pay that
8  much revenue to the team?
9  A   No.  The way the contract was set up is there was a fixed
10  component and an expansion component.  The fixed component was
11  relatively small, probably about total -- for the total
12  contract, about 300 million.  So our portion -- for example,
13  the year that we had an award of a billion dollars, probably
14  only 150 million of that was guaranteed.  The rest was all
15  expansion, and there was absolutely no guarantee on that.
16  Q   Describe for the jury what the difference is between fixed
17  and expansion.
18  A   Fixed business is -- at the start of the contract period,
19  they list the number of both passenger and cargo trips that
20  they are going to go to contract for for one year.  They give
21  you the date, the time it's going to the operate, and where
22  it's going to and from, and then the carriers offer on that.
23  But then they also have --
24  Q   Before you get to that, what type of destinations would be
25  on these fixed business routes?

1  A    It was all international flying.  All of this was all long

2  range international you flying, so it would be U.S. going to

3  the Middle East, to Europe, to Asia.

4  Q    And these were regularly scheduled flights that the

5  military knew ahead of time they were going to have a regular

6  shuttle going back and forth to this location?

7  A    Yes.

8  Q    All right.  Can you explain to them what expansion flights

9  were?

10  A    Expansion is an ad hoc situation where they could either

11  come up with something within two days' notice or sometimes

12  they would come out a month ahead and say, "We need 20 trips

13  going from here to here."  It was just a process that they had

14  where they would continually throughout the month let carriers

15  know what expansion trips, ad hoc business was -- needed to be

16  filled.  Carriers offered on that requirement.

17  Q    Now, what portion or what ratio would you say the fixed

18  sort of guaranteed business was to the expansion business and

19  in the total sort of military pie?

20  A    Probably 10 percent fixed, 90 percent expansion.

21  Q    And expansion was the part there was really no guarantee

22  whether it would happen or not?

23  A    That's correct.

24  Q    The -- who were the other teams flying on the CRAF

25  program?

1   A   There were two other teams.  The Alliance Team was the

2   largest team.  That was comprised of all the legacy carriers

3   like United, Delta, American, but it was actually run by

4   World, and Evergreen controlled that team.

5   Q   Is World the same World that eventually became under the

6   same corporate umbrella as ATA?

7   A   Yes.

8   Q   And they were essentially a controller of the Alliance

9   Team?

10  A   Yes.

11  Q   Do you know who founded the Alliance Team?

12  A   It just evolved over time.  Basically World and Evergreen.

13  Q   Were there any other teams other than the Alliance Team

14  and the FedEx team?

15  A   The UPS team.  UPS had a team.  They were a small team,

16  probably 10 or 12 percent of the total contract.

17  Q   UPS had 10 or 12 percent.  What percentage of the total

18  military pie did the Alliance Team have had?

19  A   Probably 48, something like that.

20  Q   And the balance would have been FedEx?

21  A   FedEx.

22  Q   So --

23  A   It varied year to year depending on who's committing what

24  airplanes.

25  Q   Ballpark of what portion of the pie the FedEx team would

*MOLINARI – CROSS/GABEL*                                    589

1  get?

2  A   Forty.

3  Q   Now, how would the military determine who's going to get a

4  particular flight?  If they have an expansion flight come up

5  on short notice where they need to go to the Middle East, how

6  does the military determine who they're going to give that to?

7  A   They have an automated system called the COINS system.  I

8  don't remember what that acronym stands for.  The carriers

9  could log onto that system and see what requirements are open.

10  They would simply go into that system -- for example, if it

11  was a cargo trip we could do as an MD11, we would simply bid

12  on it as FedEx, say you can fly this trip on this date, give

13  them a schedule, and wait to see if we were awarded it.

14  Q   If two different airlines, let's say they put out a

15  passenger trip to the Middle East, and an airline from the

16  Alliance Team and an airline from the FedEx team both said we

17  can get a plane.  Where do you need it to be on those dates,

18  how would the military determine who would actually fly that

19  mission?

20  A   They went by the entitlement percentages.  If there were

21  10 trips available and we were entitled to 40 percent, they

22  would try to give us 40 percent of those 10 trips.

23  Q   Did it always work out that FedEx got 40 percent of those

24  10 trips?

25  A   Actually, generally we had more because we had carriers

1    that had greater capacity than some of the other teams.  So we

2    usually ended up doing better than what our entitlement was.

3    Q    Within the FedEx team, let's say you had -- at one point,

4    say, 2004, you had two sort of operating passenger carriers,

5    correct?

6    A    Yes.

7    Q    Let's say that both of your operators said, you know, I've

8    got a plane that can fly that mission from the U.S. to the

9    Middle East.  Who determined who got to fly that mission?

10   A    AMC.  When they awarded the trips, they would make that

11   determination.

12   Q    Did FedEx have a vote in who got that trip?

13   A    No.

14   Q    Well, we've looked at some letters where you contemplated

15   split of business.  We always looked at Fee Agreements where

16   you memorialized a split of business within the team.  Let's

17   say in 2005 the Fee Agreement for that year for ATA said that

18   they were going to get 62 percent of the FedEx business, and

19   the Fee Agreement for Omni said they're going to get

20   38 percent.  What role did FedEx have in trying to make that

21   happen?

22   A    Virtually none.  With the exception of at the start of the

23   contract when we submitted our response to the RFP, we would

24   note that that percentage split is what we wanted AMC to

25   attempt to distribute the business accordingly.  They always

1    told me they were under no obligation.

2         Their first obligation is to ensure the team got its

3    percentage.  Then they would go from there.  Their first

4    obligation was to move -- meet the requirement on the day they

5    wanted it to operate.  And then they would ratchet down from

6    there.  If they could he meet our recommended split, then they

7    would do that.

8    Q   Were there times in history the FedEx team where, what you

9    had recommended at the beginning of the year is what

10   internally the FedEx team wanted to happen among its members

11   did not actually play out in reality?

12   A   Oh, yes.

13   Q   And what would be some of the causes of the FedEx team

14   recommending that, for instance, Omni get 38 percent and ATA

15   get 62 percent, and then those percentages not actually work

16   out at the end of the year?

17   A   There were situations.  I know Omni was having a problem

18   getting the narrow-body expansion percentage.  It was just the

19   way AMC was awarding the business based on airplane type.

20   They just simply told us that's the way it was going to be and

21   that's the best they could do.  So Omni ended up getting very

22   little of their narrow-body expansion requirement.

23   Q   How about the wide-body side?  Were there terms where --

24   A   The wide-body, again, for the most part, we ended up

25   getting more than our entitlement for the team.  So I think

1  both carriers seemed to be happy with what they were getting.

2  I don't recall too many instances where there was disagreement

3  about the actual award process.

4  Q    As team leader, did you have the ability to compel the

5  military to award a flight to somebody to balance it out?

6  A    No.

7  Q    If a carrier had operational issues with its planes or a

8  particular type of plane so that they couldn't bid on missions

9  and that resulted in them getting less than what internally in

10 the Fee Agreement the FedEx team thought they should get,

11 what, if anything, would happen?

12 A    Well, again, I use the same example of the narrow body.

13 Both Omni and the ATA had 757 airplanes, but ATA, I believe,

14 had dash 200s and dash 300s.  Omni only had dash 200s.  For

15 some reason the 300 seemed to be more in line of what the

16 military wanted.  So that's where the trips were going.

17       But I would go back to them and say your contract

18 doesn't delineate between those two types of airplanes, but we

19 didn't make any progress on that.  They just continued forward

20 as they saw fit.

21 Q    As the team leader, did you make any efforts to increase

22 the business of the team?

23 A    Every year I would look to who we were going to have on

24 our team, and if we could add someone that I thought would

25 increase the buying power of our team, we would evaluate that

1  and make offers to various carriers to join our team.

2  Q    Financial offers to a point seller?

3  A    Yes.  Generally they were to the legacy carriers, point

4  sellers, and offering them a commission rate to join the team.

5  Q    Any of the legacy carriers that you were talking to, were

6  any of them already members of another team?

7  A    They were always members of the other team.

8  Q    Were you ever concerned that the other team might find out

9  what you were doing and try to match or beat your offer?

10  A    Of course.

11  Q    Did you take any steps to try to make sure that didn't

12  happen?

13  A    Well, all we could do is make an offer and -- I'm sure we

14  were always being played one against the other for that

15  particular carrier to get a better deal.

16  Q    Were there a lot of negotiations back and forth with

17  airlines, either fliers or point contributors about the

18  different details of each year's agreement?

19  A    In respect to --

20  Q    Did you -- well, let's just start with recruiting.  Would

21  there be communications back and forth between you and someone

22  you were trying to recruit to the team?

23  A    Oh, yes.

24  Q    Did they sometimes -- well, you were the team leader.  You

25  could ultimately determine what you were going to offer,

1   correct?

2   A   Yes.

3   Q   Did they have any options if they didn't like your offer?

4   A   The person I was offering it to?

5   Q   Yes.

6   A   They could always come back with a counter and say that's

7   not enough or we want this instead or change it to this.

8   Q   Did they have the option of staying where they were and

9   joining your team?

10  A   Absolutely, yeah.

11  Q   With the fliers, did the fliers have the option of leaving

12  your team?

13  A   On our team, yes.

14  Q   Did you have some back and forth with some of your fliers

15  about issues like what their percent of business would be or

16  what their commission would be on a year-to-year basis?

17  A   Yeah.  If we had more than one operator in any category of

18  the business, we always had a discussion about how the split

19  was going to be set up for that particular contractor.

20  Q   And if the operator decided they were no longer getting a

21  fair shake or they weren't happy, could they counteroffer?

22  A   There was always a dialogue, yes.

23  Q   And if ultimately they weren't happy with what you were

24  offering, did they have the option to leave and look for a

25  better deal elsewhere?

MOLINARI − CROSS/GABEL                          595

1   A    Absolutely.

2   Q    I will show you what we will mark or what has been marked

3   as Plaintiff's Exhibit 171.

4            MR. GABEL:  And Robb, that's Document 5957.  If you

5   could blow up the title of that.

6   BY MR. GABEL:

7   Q    Do you recognize that document?

8   A    Yes, I do.

9   Q    Can you tell the jury what the sort of shorthand name for

10  that document would be?

11  A    Shorthand name?  CTA agreement.

12  Q    If in the course of this trial we refer to something as

13  the Arrangement Agreement, do you understand that to be what

14  we are talking about?

15  A    Yes.

16  Q    Describe for the jury what the Arrangement Agreement did.

17  A    Well, the RFP required that if you were going to submit --

18  in response to the contract request -- they allowed for

19  Teaming Arrangements.  They pretty much spelled out what that

20  had to entail.  I think it was unity of purpose, the carriers

21  who were going to participate, the airplanes they were going

22  to contribute to the CRAF program.  All those things were

23  included in this agreement.

24           MR. GABEL:  Robb, if you could blow it up a little

25  bit more, and let's look at the date.

1  BY MR. GABEL:

2  Q   Do you know what military flying year this particular

3  Exhibit 171, Plaintiff's 171 would cover?

4  A   Should have been for FY08.

5  Q   Do you recall about what date you would have entered it

6  with the various fliers on the team?

7  A   April 16th, sometime in early April.

8  Q   Is April typically when you would be entering into an

9  Arrangement Agreement?

10  A   Typically, yes.  It follows when the RFP comes out.  The

11  RFP is on the street for 30 days.  We have to submit our

12  Teaming Arrangement Agreement 20 days after the RFP comes out

13  because military has to take some time to review it and

14  approve it before we can submit our final to the RFP.

15  Q   Now, we've looked at sort of three different contracts

16  every year that members of the FedEx team would sign.  Is this

17  the only one of those three that would actually get submitted

18  to the military?

19  A   Yes.

20  Q   And did this identify what airlines would be on your team

21  the next year and what airplanes they would commit?

22  A   Yes, it did.

23  Q   So once this had been submitted to the military, it

24  created great difficulty on your part in sort of changing the

25  team for that next year –– for the year you're signing up for?

1   A   Oh, yeah.

2           MR. KURTH:  Objection, leading.  I haven't stood up

3   before, but if we could get back into more of a direct

4   examination.

5           THE COURT:  Overruled.  Go ahead.

6   BY MR. GABEL:

7   Q   So if events occurred after you had somebody signed up in

8   April or so of '07, your hands would be sort of tied for FY08,

9   and the earliest you could change it would be FY09?

10  A   Yes.

11          MR. KURTH:  Objection, leading.

12          THE COURT:  Sustained.

13  BY MR. GABEL:

14  Q   What was the term of this Arrangement Agreement?

15  A   What was the term?  One year.

16  Q   Do you understand the meaning of the word "term?"

17  A   Yes.

18  Q   How long something would last?

19  A   Exactly.

20  Q   And you understand -- do you understand that to be

21  something different from the subject matter of an agreement?

22  A   Yes.

23          MR. GABEL:  Robb, if you will, pull up Plaintiff's

24  Exhibit 172, which is Document 5968.  Blow up the title for

25  me, please.

*MOLINARI – CROSS/GABEL*                                    598

1  BY MR. GABEL:

2  Q   Mr. Molinari, could you tell the jury what this document

3  was?

4  A   This is the Operating Agreement.  It's the agreement that

5  we signed that coincided with the Teaming Arrangement

6  Agreement.  It spells out each carrier's obligation under the

7  team's -- under that contract.

8  Q   Was this document submitted to the military?

9  A   No, it was not.

10 Q   Who drafted this document?

11 A   We did, FedEx.

12 Q   What was the term or length of this document?

13 A   Same as the team Arrangement Agreement.

14         MR. GABEL:  Robb, if you will, go over to the --

15 page 5969.  Let's look down at Paragraph B.

16 BY MR. GABEL:

17 Q   Mr. Molinari, if you will, take a minute and read through

18 that paragraph and explain to the jury what your understanding

19 of that term was.

20 A   Basically said that if one of our team members were unable

21 to perform, that we would have to arrange for someone else on

22 the team to perform that or will go outside the team to

23 perform that mission.  But we were obligated to fly that

24 mission.

25 Q   Did you also understand it to give you the right to pursue

1  whatever remedies might be available for that nonperformance?

2  A   Correct.

3        MR. GABEL:  Robb, if you will, go over to page 5973.

4  And blow up that lower Paragraph E there.

5  BY MR. GABEL:

6  Q   Mr. Molinari, do you recall that paragraph being in the

7  Operating Agreement that you would sign?

8  A   Yes.

9  Q   What was your understanding of that clause in the

10 Operating Agreement?

11 A   We sent this out as a broadcast to all our team members.

12 They would sign it individually.  When it came back, we would

13 collate it as a whole and send it back out to everybody so it

14 could be signed in individual parts.

15       MR. GABEL:  Robb, if you will, if you will pan down.

16 BY MR. GABEL:

17 Q   Is that your signature on that document?

18 A   Yes, it is.

19 Q   Did you sign that in April of 2007?

20 A   Yes, I did.

21       MR. GABEL:  Robb, if you will, go to the next page,

22 which should be 5974.  Let's blow up that signature.

23 BY MR. GABEL:

24 Q   Can you tell us whose signature that is?

25 A   Bill Doherty's.

MOLINARI – CROSS/GABEL                              600

1   Q    Did you understand who he was signing on behalf of?

2   A    ATA Airlines.

3             MR. GABEL:  Robb, if you will, go to the next page,

4   Document 5975.  If you will blow up that signature.

5   BY MR. GABEL:

6   Q    Do you recognize that signature?

7   A    Trisha Frank.

8   Q    Do you know what airline she was signing on behalf of?

9   A    Omni International.

10            MR. GABEL:  Robb, if you go to the next page, 5976.

11  BY MR. GABEL:

12  Q    Do you recognize those two signatures?

13  A    Yes.

14  Q    Who are they?

15  A    Ken Johnson signing on behalf of Polar Air and Atlas Air.

16  Q    Was this around the time those entities merged?

17  A    I think they merged before that, but they were operating

18  under separate certificates so we had to show them separately.

19            MR. GABEL:  Robb, if you would go to the next page,

20  5977 and blow up that signature.

21  BY MR. GABEL:

22  Q    Do you recognize that signature?

23  A    Yes, Bill Wernecke from Northwest Airlines.

24            MR. GABEL:  And Robb, could you go to the next page,

25  5978.

1  BY MR. GABEL:

2  Q    Do you recognize that signature?

3  A    Yes.  Eric Korth with Air Transport International.

4  Q    Now let's go to Plaintiff's Exhibit 173, which is document

5  1178, Robb.  I may have a typo on here.

6        If you would, blow up the title of Plaintiff's

7  Exhibit 173, Robb.

8  BY MR. GABEL:

9  Q    Can you tell the jury what this document was?

10 A    This was the Fee Agreement.

11        MR. GABEL:  Robb, blow up the top paragraph.

12 BY MR. GABEL:

13 Q    In particular, who would have been the parties to this

14 agreement?

15 A    The Fee Agreements were between FedEx and each individual

16 team member outlining what our commercial arrangement was with

17 them for that particular contract year.  That's ATA Airlines.

18 Q    Who drafted this document?

19 A    We did.

20 Q    And were there any other parties other than ATA and FedEx

21 to this?

22 A    No.

23 Q    What was the term of this particular document?

24 A    Same as the Team Arrangement Agreement.

25 Q    Did AMC have any requirements that would have precluded

1  FedEx from drafting up one of these that covered a longer

2  period, two years, three years, four years regardless of

3  whether it actually ever turned into business?

4  A    No.

5  Q    AMC never saw this, right?

6  A    No, they never saw it.

7  Q    Did FedEx choose not to draft these for more than one

8  year?

9  A    We always made them match the Teaming Arrangement

10 agreement year.

11 Q    Was there a business reason for that?

12 A    Because that's the only year we had contracted for.

13 Q    You mean with the military?

14 A    Yes.  I should mention the military had a unilateral right

15 to extend the contract for six months.  So I believe our

16 agreements also had that provision in our language that it was

17 a one-year deal, but they could unilaterally extend the

18 contract for six months.  So we had to be coterminous with

19 that, I believe is the terminology.

20          MR. GABEL:  If you would, go over to page 591, the

21 third page of Plaintiff's 173, Robb.  Blow up the top

22 paragraph of that.

23 BY MR. GABEL:

24 Q    Could you explain for the jury what this paragraph is

25 discussing?

1  A   That spells out the percent of commission that ATA will

2  pay FedEx for both fixed and expansion business that they

3  operate for wide-body to narrow-body, 4 1/2 percent of their

4  gross revenue.

5  Q   Put some context into what you're looking at with 4 1/2

6  percent of the revenue there.

7  A   Oh, if the team was doing -- say, there was about a total

8  pie of all passenger business, fixed and expansion, might have

9  been close to a billion.  The team would have gotten, say,

10 400 million of that.  ATA's percentage might have been, I

11 don't know, 45 percent or 40 percent of that.

12          I don't do math in my head anymore, so I don't know

13 what that equates to.

14 Q   Let's put it this way.  Does 4 1/2 percent represent a

15 small amount of money, hundreds of dollars, or millions of

16 dollars?

17 A   Millions of dollars.

18 Q   Millions of dollars.

19 A   Yes.

20 Q   Would variations of 1 percent or 2 percent, would that

21 represent hundreds of dollars or millions of dollars?

22 A   Millions of dollars.

23 Q   So you're talking about a significant amount of money if

24 this changes?

25 A   Yes.

MOLINARI - CROSS/GABEL                              604

1   Q   Was there any rule or requirement or other thing that

2   governed what FedEx could charge its team members?

3   A   No, there was not.

4   Q   Was there a cap imposed by anyone?

5   A   No.

6   Q   If, hypothetically, FedEx in FY09 had decided to invite

7   ATA to be part of its team but told ATA it was going to charge

8   them 20 percent, 25 percent commission, could FedEx have put

9   that in the Fee Agreement?

10  A   We could have tried, yes.

11  Q   Is that something you think they would not have accepted?

12  A   I think they would have balked, yes.

13  Q   Well, if you had put 25 percent in an FY09 Fee Agreement

14  and offered that to ATA and they said, "We can't do that.

15  We're going to lose money if you do that," would you have

16  said, "Well, you have to be a member of my team because you

17  signed a letter back in 2006 that said you would have

18  50 percent of the expansion business," the same letter Omni

19  didn't sign?  Would you have held that over their head and

20  required them to fly on your team?

21  A   No.

22           MR. KURTH:  Your Honor, object, speculative.

23           THE COURT:  Sustained.

24           MR. GABEL:  Robb, if you can, go down to the

25  paragraph IV of this agreement.

 1  BY MR. GABEL:

 2  Q   Can you describe for the jury what this language governs?

 3  A   This delineates the split of what business they will have,

 4  which says they'll have 50 percent of the wide-body,

 5  narrow-body fixed business and 50 percent of the narrow-bodied

 6  expansion and 50 percent of the residual wide-body after

 7  Northwest has operated its 10 flights per month.

 8  Q   Okay.  Now, the Northwest 10 flights per month, can you

 9  quantify what that might be worth?

10  A   Oh, probably in the range of 4 to $5 million of revenue.

11  Q   For what period of time?

12  A   Per month.

13  Q   Per month?

14      So if you do the math, 5 times 12 would be --

15  A   60 million a year.

16  Q   Did you understand this language governing what percentage

17  of the passenger business ATA would get within the FedEx team

18  to be part of the subject matter of this document?

19  A   Oh, yes.

20      MR. GABEL:  Robb, if you will, go over to page --

21  well, let's go to the next page, 5982.  And let's go one more

22  page.  If you will, blow up that last paragraph.

23  BY MR. GABEL:

24  Q   We've looked at this a good bit.  I'm not going to make

25  you read it, but was this paragraph in this contract at the

MOLINARI – CROSS/GABEL                          606

1  time you sent it to ATA?

2  A   Yes, it was.

3  Q   And it makes repeated references to the subject matter of

4  the agreement.  Was part of that subject matter ATA's

5  percentage of team flying?

6  A   Yes.

7  Q   Do you recall whether ATA agreed to this contract?

8  A   Yes.  Bill signed it.

9  Q   Was it your -- did you have any understanding as to

10 whether Bill had any authority to do things on behalf of ATA?

11 A   Bill was authorized to sign on behalf of ATA.

12 Q   How did you know that?

13 A   They sent a letter to that effect that was included in our

14 RFP.

15 Q   And during your prior dealings, had he been the one that

16 you would deal with?

17 A   He had been the one I had been dealing with for years,

18 signed a lot of the agreements.

19         MR. GABEL:  Robb, if you will, go back to the 5981

20 and blow up that paragraph 4 again.

21 BY MR. GABEL:

22 Q   Do you recall whether the 2008 Fee Agreement here made any

23 reference to any other outside letter that may have been

24 signed by the parties leading up to this agreement?

25 A   No, I do not.

1   Q   Okay.  Had past Fee Agreements made that type of

2   reference?

3   A   Yes, they did.

4   Q   Do you remember what years might have made that type of

5   reference?

6   A   For the period where we had the three-party agreement

7   signed by all the parties, I think in our Fee Agreement we

8   referred to that under the similar paragraphs.

9           MR. GABEL:  Okay.  Let's go back to -- Robb, if you

10  will, pull up Plaintiff's Exhibit 5, document 1288.

11  BY MR. GABEL:

12  Q   You just made reference to a three-party letter signed by

13  all parties.  Is this document dated January 17th, 2003, what

14  you were referring to?

15  A   Yes, it is.

16  Q   And what years did it make reference to the split for?

17  A   FY04 through FY06.

18          MR. GABEL:  And so, Robb, if you can, let's look at

19  the Fee Agreement for FY06, which should be document 69,

20  Defendant's Exhibit 15.

21  BY MR. GABEL:

22  Q   And Mr. Molinari, can you tell the jury what that is?

23  A   That's the Fee Agreement for FY06.

24  Q   And who are the parties to this agreement?

25  A   FedEx and ATA.

1          MR. GABEL:  Your Honor, I will offer Defendant's

2   Exhibit 15.

3          MR. KURTH:  Just a moment, Your Honor.

4          MR. GABEL:  I think it's stipulated.

5          MR. KURTH:  Your Honor, I have no objection.

6          THE COURT:  15 admitted.

7      *(Defendant's Exhibit 15 was received in evidence.)*

8          MR. GABEL:  Robb, if you will, go over to the page

9   that has the percent of flying, page 71.  If you will blow up

10  the paragraph 4 there on the 2006 Fee Agreement, Defendant's

11  Exhibit 15.

12  BY MR. GABEL:

13  Q   Mr. Molinari, do you remember that in 2006, the Fee

14  Agreement between ATA and FedEx did reference an outside

15  letter?

16  A   Yes.  As it states there, it refers to the split,

17  62 percent, as referenced by the January Letter Agreement.

18  Q   And that was the letter that everyone had signed?

19  A   Yes.

20  Q   To your knowledge, did that reference to an outside letter

21  appear in ATA's Fee Agreement for FY07 or for FY08?

22  A   No, it did not.

23  Q   Was there a reason you didn't make a reference to a

24  three-party letter in FY07 and FY08?

25  A   Because we didn't have a three-party letter signed.

MOLINARI – CROSS/GABEL                    609

1   Q   Would ATA have been provided a copy of this contract that

2   had language that made no reference to a letter in those

3   years?

4   A   I'm sorry?

5   Q   During FY07 and FY08 when your recollection is a Fee

6   Agreement did not make a reference to any three-party letter,

7   would ATA have had knowledge of that?

8   A   Sure.

9   Q   They would actually have signed that agreement, correct?

10  A   Yes.

11         MR. GABEL:  Robb, if you would, please pull up

12  Plaintiff's Exhibit 14, which is document 1303.

13  BY MR. GABEL:

14  Q   And, Mr. Molinari, can you tell us what that document is?

15  A   It's the Fee Agreement for FY07 between FedEx and ATA.

16         MR. GABEL:  Okay.  And, Robb, if you will go to page

17  1305.

18  BY MR. GABEL:

19  Q   And is this the paragraph 4 talking about what percentage

20  of passenger flying ATA would get in FY07?

21  A   Yes, it is.  It specifies 50 percent for wide-body and

22  narrow-body fixed and expansion business.

23  Q   And it makes no reference to any outside vendor?

24  A   That's correct.

25         MR. GABEL:  Robb, if you will, go up to the first

1   full paragraph there.

2   BY MR. GABEL:

3   Q    What is that paragraph discussing in the FY07 Fee

4   Agreement?

5   A    That specifies the commission we will receive as 7 percent

6   of all expansion business.

7   Q    Now, do you recall the '08 Fee Agreement we looked at a

8   minute ago had a 4.5 percent commission, correct?

9   A    That's correct.

10  Q    Do you recall any reason that ATA's commission went from

11  7 percent to 4 1/2 percent?

12  A    Because I reduced it.

13  Q    Okay.  Did you have the authority to do that?

14  A    Yes.

15  Q    Were there any limits on that authority?

16  A    No.

17  Q    By the same token, did you have the authority to raise it?

18  A    Yes.

19  Q    If they didn't agree with the percent that you raised it

20  to, what were their options?

21  A    To leave the team.

22  Q    You were asked on direct about some communications you had

23  in August of 2005 with both -- well, don't let me misstate

24  this.  I don't know how many communications were actually

25  joint, but some communications with Omni and some

*MOLINARI - CROSS/GABEL*                                    611

1   communications with ATA during that time frame.  Do you recall

2   that?

3   A   Yes.

4           MR. GABEL:  Let's pull up Defendant's

5   Exhibit No. 20, which is document 78, Robb.  And blow up the

6   top portion of that.

7   BY MR. GABEL:

8   Q   And do you recall receiving an e-mail from Bill Doherty

9   around August 9th of 2005?

10  A   Yes.

11          MR. GABEL:  Okay.  Your Honor, I'll offer

12  Exhibit 20, but it may already be in, Defendant's 20.

13          MR. KURTH:  One moment, Your Honor.

14          No objection.

15          THE COURT:  20 admitted.

16      *(Defendant's Exhibit 20 was received in evidence.)*

17  BY MR. GABEL:

18  Q   Now, was Mr. Doherty communicating with you about the

19  proposals that were bantered back and forth about how the team

20  would split its passenger business in the future in this

21  e-mail?

22  A   Yes, he was.

23          MR. GABEL:  Robb, if you will, blow up the last full

24  paragraph of that.  And, if you will, highlight the second

25  sentence of that paragraph.

 1  BY MR. GABEL:

 2  Q   Do you recall that language being in the communication

 3  that Mr. Doherty made to you about what he was looking for

 4  going forward?

 5  A   Yes, I do.  He mentioned that he could live with a shorter

 6  period of time.

 7  Q   So as of August of 2005, was it your understanding that

 8  Mr. Doherty was willing to agree on behalf of ATA to a split

 9  for less than three years?

10  A   Yes.

11          MR. GABEL:  Let's look at Plaintiff's Exhibit 10,

12  document 1297, Robb.  And let's go to the -- well, let's go to

13  the top first.

14  BY MR. GABEL:

15  Q   Mr. Molinari, did you engage in an e-mail exchange with

16  Chuck Pollard in August of 2005?

17  A   Yes, I did.

18  Q   And go down to, I guess, the third e-mail from the bottom.

19  Yeah, there you go.

20          Did you send this e-mail to Mr. Pollard in August of

21  2005?

22  A   Yes, I did.

23  Q   Did -- this says, "I'm waiting to get with our legal to

24  draft an agreement that all parties sign."  Was it your

25  intention to come with an agreement that all parties would

1  sign?

2  A   Yes.

3  Q   As the team leader for FedEx and the person who was making

4  the offer, did you have the power to dictate how people would

5  accept your offer, the authority to tell people what they had

6  to do to accept your offer?

7  A   Oh, no.

8  Q   Could you specify that you wanted people to signify their

9  agreement with what you were asking for in a particular

10  method?

11  A   Yeah.  We wanted a mutual agreement between the partner

12  and the team members on what they were going to do, yeah.

13  That was always our desire.  I wouldn't have as much gray hair

14  if I could dictate what they could do.

15  Q   You were the author of what you were negotiating with them

16  or offering them, correct?

17  A   Yes.

18  Q   And you were envisioning at this point that you were going

19  to author something that all parties would be required to

20  sign; is that correct?

21  A   That's correct.

22  Q   Now, if we can, let's go over -- now, these communications

23  were going on in August of 2005.  Do you recall that?

24  A   That's correct, yes.

25  Q   Did you ever send out a document that you intended for all

1   parties to sign?

2   A   About a year later, yes.

3           MR. GABEL:  All right.  Let's look at Plaintiff's

4   Exhibit 7, document 1291.

5           Sorry.  That's not the one I'm looking for.

6           Before we do that, let's go back to Plaintiff's

7   Exhibit 10, 1297, Robb.

8   BY MR. GABEL:

9   Q   Just above the e-mail we were looking at, did Chuck

10  Pollard send you an e-mail at that point?

11  A   Yes, he did.

12  Q   Did Chuck Pollard take the initiative to do anything

13  immediately before you sent that letter a year later?

14  A   Yes.  He sent a letter under his letterhead.

15  Q   And how many parties were on that letter?

16  A   Just Omni and FedEx.

17  Q   Okay.  And that was something authored by Chuck?

18  A   Yes.

19  Q   Asking you to agree to it?

20  A   Yes.

21  Q   And did you agree to what Chuck, Mr. Pollard, offered?

22  A   Yes, I did.

23          MR. GABEL:  Let's look at that document.  If you

24  will, Robb, go to document 1296, Plaintiff's Exhibit 9.

25

1  BY MR. GABEL:

2  Q   Is this the document that Chuck Pollard sent to you in

3  August of 2005?

4  A   Yes, it is.

5         MR. GABEL:  Robb, if you will, blow up the second

6  paragraph.

7  BY MR. GABEL:

8  Q   Can you describe to the jury what you understood this

9  language to mean you were agreeing to?

10  A   It obligated FedEx to distribute 50 percent of the

11  long-range passenger business, fixed and expansion, to -- both

12  wide-body and narrow-body to Omni.

13  Q   What, if anything, did this obligate FedEx to do with the

14  other 50 percent of its airline business?

15  A   Not addressed.

16  Q   Now, do you see any where in this particular letter any

17  reference to 50/50?

18  A   No.

19  Q   Do you understand the phrase "50/50" to mean something

20  different than just one 50, 50 percent?

21  A   Yes.

22  Q   Can you explain to the jury what your understanding is on

23  that?

24  A   Just exactly what it is.  "50/50" means an equal

25  distribution, half and half; and "50 percent" means 50 percent

MOLINARI — CROSS/GABEL                              616

1  of a number that goes to somebody.

2  Q   Now, do you know what Mr. Pollard's background was, what

3  he did before he went to Omni?

4  A   Not sure, no.

5  Q   Do you know if he had any legal training?

6  A   I think he had some legal training, but I don't know

7  exactly what that was.

8  Q   So you don't know whether he would have particular

9  expertise to know how to craft language to get what he wanted?

10 A   No, I don't.

11         MR. GABEL:  Let's go back to the fax cover sheet

12 that Mr. Pollard sent to him, which would be the prior page,

13 Robb, 1294, I believe -- no.  Okay.  It's not in that one.

14         Yeah, that's it.  Let's blow up that language.

15 BY MR. GABEL:

16 Q   Now, you were asked about whether you had read

17 Mr. Pollard's deposition.  What was your answer to that

18 question?

19 A   That I had not.

20 Q   Okay.  And you were asked if you knew what -- how he had

21 described the agreement.  And the question you were asked on

22 direct may have been a little confusing because it didn't

23 specify whether it was talking about the fax cover page or

24 whether it was talking about the actual letter that was

25 attached.  Which of the documents did you actually sign?

MOLINARI - CROSS/GABEL                           617

1   A    The letter document.

2   Q    Did you consider the information on the fax cover page to

3   be part of what you were agreeing to?

4   A    No.

5   Q    If Mr. Pollard in the deposition testified that he may

6   have used somewhat loose language in the description of what

7   he was sending on his fax cover page, would you agree with his

8   characterization?

9   A    Yes.

10  Q    At some point subsequent to August of 2005, did

11  Mr. Pollard or Omni take any actions that led you to believe

12  that whatever they may have been talking about back in

13  negotiations, they were no longer willing to agree to a 50/50

14  split?

15  A    Yes.

16  Q    What did they do to lead you to that belief?

17  A    When I sent the three-party letter for them to sign, they

18  called and said, "We're not signing this.  We don't agree with

19  the" -- the whole idea was, "We're not going to sign it."

20  Q    I assume that would have happened after September 7, 2006,

21  when the three-party letter was sent?

22  A    Yes.

23  Q    So 12 1/2 months after all these negotiations?

24  A    Yes.

25          MR. GABEL:  Robb, if you will, go over to

MOLINARI – CROSS/GABEL                          618

1   Defendant's Exhibit 47, page 259.  Could you turn that

2   straight, please.

3   BY MR. GABEL:

4   Q    Do you recognize this document?

5   A    Yes, I do.

6   Q    What is this document?

7   A    It's an e-mail that I sent to both Bill Doherty and Chuck

8   Pollard with a letter attached to it for each of them to sign

9   for the period -- for the 50/50 split.

10  Q    And did you have any expectation when you sent this of who

11  you would expect to sign it to ratify this or make it

12  legitimate?

13  A    Well, yes, bill Doherty or someone at ATA and someone at

14  Omni.

15  Q    And did you explain that to them in any way when you sent

16  this e-mail?

17  A    Well, it says, "Each of you to sign."

18  Q    Now, after you sent this and after Omni said, "We're not

19  signing it," at some point did you ever have any conversations

20  with Bill Doherty about that?

21  A    Yes.  As soon as Omni told me they're not going to sign, I

22  called Bill Doherty and said, "Look, Bill, they're not going

23  to sign so we don't have a deal."

24  Q    Did you say anything else to him?

25  A    I'm sure we had a conversation, but I don't recall what we

1  discussed.

2  Q   Did Bill say anything to you?

3  A   I'm sure he wasn't happy about it.

4  Q   I'm sorry.  I didn't hear.

5  A   I said I'm sure he wasn't happy about it, about not

6  signing; but he acknowledged that they hadn't signed it.

7  Q   Did he indicate that if they're not willing to sign up for

8  this, that he no longer wanted to be part of the FedEx team?

9  A   No, he did not.

10 Q   Did he indicate any intention with ATA with respect to

11 whether they had any desire to be on the FedEx team going

12 forward?

13 A   I don't even think that came up.

14 Q   Around the same time that you were sending this letter,

15 were you signing any more formal documents with the team in

16 the September -- August, September of 2006 time frame?

17 A   This typically would have been about the time we were

18 doing Fee Agreements.

19            MR. GABEL:  And, Robb, if you will, pull up

20 Plaintiff's Exhibit No. 14, page 1303.

21 BY MR. GABEL:

22 Q   Was this the Fee Agreement for 2007?

23 A   Yes, it is.

24            MR. GABEL:  If you will go over to the signature

25 page, Robb, which is -- yeah, that one.  Blow up the

1   signatures.

2   BY MR. GABEL:

3   Q    Did Bill Doherty sign that?

4   A    Yes, he did.

5   Q    Do you have any indication of when he signed that?

6   A    It says 22 August 2006.

7   Q    Do you recall if that was before or after you sent him

8   that three-party letter?

9   A    Before.

10  Q    Okay.  What was the term of this agreement?

11  A    One year.

12  Q    How much -- what percentage did this agreement give ATA

13  for the next year?

14  A    50 percent.

15  Q    Was that in any way based on that three-party letter?

16  A    No.  This is what we had agreed to for that year.

17  Q    His signature actually predated the three-party letter,

18  correct?

19  A    Yes.

20         MR. GABEL:  If you would pan up, Robb, and highlight

21  that next paragraph.

22  BY MR. GABEL:

23  Q    That was paragraph in this agreement at the time that Bill

24  Doherty signed it?

25  A    Yes, it was.

1  Q    And does that make any reference to oral communications

2  that may have come before August of 2006?

3  A    It says it supersedes all prior agreements, whether

4  written or oral.

5  Q    Did you understand that to include written and oral --

6  A    Yes.

7  Q    -- agreements?

8  A    Yes.

9  Q    And did Bill Doherty sign that?

10         And at the time he signed that, that was after all

11  those e-mails we had looked at about a year before, correct?

12  A    That's correct.

13  Q    Any phone calls in conjunction with those e-mails would

14  have been before Bill Doherty signed that, correct?

15  A    Correct.

16  Q    Now, when you sent Bill Doherty the 2008 Fee Agreement,

17  the one that mentioned Northwest flying flights, did Bill

18  Doherty object and raise that three-party letter from 2006 and

19  say, Hey, you can't do this; This letter said I get 50 percent

20  with nobody chiseling into it, to the tune of 60 million?

21  A    No, he did not.

22  Q    Did he raise the 2006 three-party letter at all?

23  A    No.

24  Q    Did anybody mention anything about needing to amend that

25  2006 three-party letter?

MOLINARI – CROSS/GABEL                          622

1  A    No.

2  Q    Did Bill Doherty leave ATA at some point?

3  A    Yes.  I think October of 2008, I believe, sometime in that

4  time frame.

5  Q    Would that have been shortly after he signed that 2008 Fee

6  Agreement?

7  A    I believe so, yes.

8  Q    How did you learn that Bill Doherty was no longer at ATA?

9  A    I was going to a function, a military function someplace,

10 and I got a call from my admin that Gary Ellmer was trying to

11 find me to talk about something, and I needed to call him

12 ASAP.  When I called him, he just let me know that Bill had

13 retired, and Wil Lilly was taking his place.

14 Q    Did you ever talk to Bill about his departure from ATA?

15 A    I talked to him shortly after that.

16 Q    What was the nature of that conversation?

17 A    He was looking for a job.

18 Q    So he called you?

19 A    Yes.

20 Q    In the course of your conversation, did he say anything

21 along the lines of –– did he express anger at you or blame at

22 you that he may have lost his job?

23 A    No.  He was looking for a job, and he also was telling me

24 he was trying to set up a consulting company and was looking

25 for some leads.  I think I gave him a couple things to

1  possibly consider.

2  Q    Did he in any way indicate that he felt like you had

3  misled him into thinking he had a deal that he didn't really

4  have?

5  A    No.

6          MR. GABEL:  Let's go over to Defendant's Exhibit 67,

7  Document 386, Robb.  Blow up just the top part first.

8  Actually, blow up the bottom portion.

9  BY MR. GABEL:

10  Q    Did you send an e-mail to Rob Coretz and Chuck Pollard

11  around April 13th of 2007?

12  A    Yes, I did.

13  Q    Is this that e-mail?

14  A    Yes.

15          MR. GABEL:  I would offer Defendant's 67.

16          MR. KURTH:  No objection.

17          THE COURT:  67 admitted.

18      (Defendant's Exhibit 67 was received in evidence.)

19  BY MR. GABEL:

20  Q    Now, the first sentence of this letter says, "I have not

21  been successful in getting ATA to back off the current

22  agreement of 50/50 split for both wide-body and narrow-body

23  AMC fixed and expansion passenger distribution."  Did you see

24  that?

25  A    Yes.

1  Q   What did you mean by current agreement?

2  A   FY07 agreement.

3  Q   In particular, what FY07 agreement?  What would you call

4  the document you're referring to?

5  A   Well, the Fee Agreement.

6  Q   Well, April of '07, what fiscal year were you in at the

7  time?

8  A   Oh, excuse me.

9  Q   I'm not trying to trick you.  Was April of 2007 in FY2007?

10 A   Yeah.  That would have been FY07, yes.

11 Q   So by April of 2007, would ATA have signed up to the FY07

12 Fee Agreement that gave them 50 percent?

13 A   Yes.

14 Q   And would Omni have signed a separate FY07 Fee Agreement

15 that gave them 50 percent?

16 A   Yes.

17 Q   So as a result of those Fee Agreements, did you have a

18 50/50 split in operation when you sent that e-mail?

19 A   Yes, we did.

20 Q   Was -- from the context, it sounds like Omni was lobbying

21 for something more than 50 percent.  Do you recall them

22 lobbying for more than 50 percent?

23 A   Yes.  That was pretty routine from all the carriers to try

24 to get more business, yes.

25 Q   When they would lobby you for more than 50 percent going

*MOLINARI – CROSS/GABEL*                          625

1  forward, that would be talking about future fiscal years,

2  correct?

3  A    Yes.

4  Q    Did Omni ever say, "Well, we would really like to have

5  more than 50 percent, but we know we need to get around that

6  letter you sent that we didn't sign"?  Anything like that?

7            MR. KURTH:  Objection, hearsay.

8            THE COURT:  Sustained.

9  BY MR. GABEL:

10  Q    When Omni came to you and said, "Hey, we're looking

11  forward.  We would like more than 50 percent," did you tell

12  them, "I would love to, but I'm bound with ATA through FY09"?

13  A    No.

14  Q    Did you actually tell them the opposite?

15            MR. GABEL:  Robb, if you would highlight the bottom

16  sentence of that first paragraph.  I'm sorry.

17  BY MR. GABEL:

18  Q    Can you read that sentence, please?

19  A    Yeah.  I let them know starting in FY09 we could revisit

20  the split.

21  Q    Now, at the time, April of '07, I think earlier we

22  discussed that you usually signed the Arrangement Agreement

23  around April of each year, correct?

24  A    Correct.

25  Q    And so once you had signed that Arrangement Agreement for

1  the upcoming year, it was very difficult to change the teaming

2  members?

3  A   Oh, yes.

4  Q   So at the time you were having these communications, is it

5  likely that for FY08, the next fiscal year as opposed to FY09,

6  Omni and ATA had already signed an Arrangement Agreement?

7  A   Yes.

8  Q   So you've already got their signature on a document saying

9  we're going to be signing up these planes for FY08, correct?

10 A   Correct.

11 Q   But in your mind, did you have anything that precluded you

12 from talking about FY09?

13 A   No.

14 Q   Why didn't you think that three-party letter you had sent

15 back in 2006 precluded you midway through FY07 from talking to

16 Omni about having a bigger chunk in FY09?

17 A   The three-party letter?

18 Q   Yes.

19 A   That had never been signed, so that just was not valid.  I

20 considered it tossed.

21         MR. GABEL:  Robb, if you will, go to Plaintiff's

22 Exhibit 24, Document 1409.  Let's blow up that bottom e-mail,

23 the introductory language, first.

24 BY MR. GABEL:

25 Q   I believe that during your direct examination, Mr. Kurth

*MOLINARI – CROSS/GABEL*                                627

1   asked you about this specific e-mail; and in particular, he

2   blew up the first bullet point on this e-mail.

3              MR. GABEL:  Robb, would you please blow up that

4   first bullet point?

5   BY MR. GABEL:

6   Q   Do you remember Mr. Kurth asking you about language in an

7   e-mail -- I guess that bottom e-mail is from Robb Coretz at

8   Omni to you referring to our current three-year agreement

9   which began this year for Omni to fly 50 percent of the total

10  team passenger business in wide-body and narrow-body category?

11  A   Yes.

12  Q   What did you understand Mr. Coretz at Omni to be referring

13  to when he says "our current three-year agreement"?

14  A   The Letter Agreement we had signed between FedEx and Omni.

15  Q   What year was that signed?

16  A   FY07, FY09.

17  Q   Is this referring to the 2005 letter that Chuck Pollard

18  sent you?

19  A   Yes.

20  Q   And not the 2006 three-party letter that you had sent?

21  A   Oh, correct, yes.

22  Q   That was your understanding?

23  A   Right.

24  Q   Did Mr. Coretz say anything about the other -- well,

25  actually, before I ask you that question, Mr. Kurth asked you

*MOLINARI – CROSS/GABEL*                                    628

1   about this bullet point.  I want to ask you about the second

2   bullet point he didn't show you.

3            MR. GABEL:  Robb, if you would blow up the second

4   bullet point that Mr. Molinari was not asked about on direct.

5   Just that top, the bullet point language, if you can make that

6   big enough to read.

7            VIDEO TECHNICIAN:  It is what it is.

8            MR. GABEL:  It is what it is.  Can you highlight the

9   bullet point language?

10  BY MR. GABEL:

11  Q   Mr. Molinari, what did Mr. Coretz tell you in that bullet

12  point?

13  A   It is proposing that they increase their wide-body and

14  reduce their narrow-body.

15  Q   Was he wanting to increase Omni's -- any of Omni's stuff

16  above 50 percent?

17  A   Yes, his wide-body, from 50 to 60.

18  Q   And this was in February of 2007, correct?

19  A   Correct.

20  Q   So it's after that three-party agreement that Omni hadn't

21  signed, correct?

22  A   Correct.

23  Q   Was it your understanding that Omni felt like they were

24  bound and couldn't ask for anything more than 50 at that time?

25  A   I'm sorry?

*MOLINARI - CROSS/GABEL*                                    629

1   Q   That's a poor question.  Did Omni ask you for more than

2   50 percent of a particular type of flying at that time?

3   A   Yes.  They were asking to go up to 60.

4            MR. GABEL:  Let's go to Defendant's Exhibit 74.

5   Well, first, let's just go back -- yes, Defendant's

6   Exhibit 74, which is document 421, Robb.  First, let's just

7   focus on the sender and receiver information of the second

8   e-mail.

9   BY MR. GABEL:

10  Q   Did you send an e-mail to Bob Rachor on April 5th of 2007?

11  A   Yes.

12           MR. GABEL:  If it's not already in, I offer

13  Defendant's 74.

14           MR. KURTH:  No objection.

15           THE COURT:  74 in.

16     *(Defendant's Exhibit 74 was received in evidence.)*

17  BY MR. GABEL:

18  Q   Let's go down a little bit and blow up the actual text of

19  that second e-mail.  Well, who was Bob Rachor?

20  A   He was my boss.

21  Q   And were you forwarding some information you had received

22  on to Mr. Rachor?

23  A   Yes.  I was forwarding him the information that World had

24  been acquired by Global Aero Logistics and just telling him

25  that that could possibly change the teaming dynamics for FY09.

*MOLINARI — CROSS/GABEL*                                    630

1   Q    And you were telling him this in April of 2007?

2   A    Yes.

3   Q    Which is after you had sent out that three-party letter

4   that Omni wouldn't sign?

5   A    Correct.

6   Q    Did you indicate to Mr. Rachor that there was any document

7   out there that would make that not true?

8   A    No.

9   Q    Subsequent to this acquisition, did anybody from ATA ever

10  come and meet with you to talk to you about this acquisition?

11  A    About this acquisition?

12  Q    Yes.

13  A    No.

14  Q    Did you ever go and talk to them related to this

15  acquisition?

16  A    After it occurred, yes.

17  Q    Who did you talk to?

18  A    Subodh Karnick and Gary Ellmer.  I believe I met with both

19  of them.

20  Q    First, let's go to Defendant's 79.

21        MR. GABEL:  Document 440, Robb.  Let's start at the

22  bottom e-mail.  This one's already been admitted into

23  evidence.

24  BY MR. GABEL:

25  Q    Do you recall approximately when ATA asked you to come to

MOLINARI - CROSS/GABEL                              631

1    Indy to meet with them?

2    A   I'm sure it was a few days before that e-mail was sent or

3    possibly the same day.  I don't remember.

4    Q   Did you, in fact, go and meet with them?

5    A   Yes, I did.

6    Q   What type of things did they tell you when you met with

7    them?

8    A   That the acquisition was in the early stages.  I don't

9    think it had been approved yet.  I think the essence was they

10   were trying to look for synergies on the expense side, and we

11   continue to operate all the carriers under a separate

12   certificate.

13   Q   Did you talk about things going forward into the future?

14   A   I did.  They said it was too early to talk about that

15   because they really hadn't gotten much beyond the initial

16   acquisition.  They said they really couldn't discuss anything

17   further.

18   Q   They didn't want to talk about future plans with you?

19   A   They just said they didn't know where they were going to

20   be going.  They were concentrating on getting that initial

21   acquisition done and beyond that --

22   Q   What were you concerned about?  What were you concerned

23   about at first?

24   A   I was concerned if they were going to merge certificates,

25   what that would do -- whether World or North American would

1  come on to their certificate or vice versa, which could have

2  an impact into our team.

3  Q   You could potentially lose an airline if it got merged

4  into a competing team?

5  A   Sure.

6          MR. GABEL:  Let's go up to the next e-mail, Robb.

7  BY MR. GABEL:

8  Q   So at this point y'all are concerned they may leave you in

9  a lurch, so to speak; is that correct?

10 A   Yes.

11 Q   Did Mr. Rachor indicate that he was hoping that wouldn't

12 happen?

13 A   He's basically asking me to stay with us.  He's asking if

14 we submitted the FY08 team lineup yet.

15 Q   What year are you talking about in April of 2007?

16 A   FY08.

17 Q   Did you respond to Mr. Rachor?

18         MR. GABEL:  Robb, if you will go to the next e-mail.

19 If you can highlight the e-mail just above that one, please.

20 BY MR. GABEL:

21 Q   Did you indicate to Mr. Rachor that ATA had already signed

22 on for FY08?

23 A   Yes, I did.

24 Q   What documentation would they have signed committing them

25 to be on your team for FY08?

1  A    CTA Teaming Arrangement Agreement.

2  Q    That's the one that goes to the military?

3  A    Yes, and the Operating Agreement.

4  Q    Well, this indicates that Omni was holding out in April of

5  2007; is that accurate?

6  A    Yes.

7  Q    Well, didn't that two-party agreement -- or did that

8  two-party agreement you had in 2005 between you and Chuck

9  Pollard require Omni to stay on your team for the next three

10 years?

11          MR. KURTH:  Objection, Your Honor.  The document

12 speaks for itself, what its contents are.

13          THE COURT:  Sustained.

14 BY MR. GABEL:

15 Q    Did you understand that Omni couldn't negotiate with you

16 or hold out because they had signed a letter that would

17 require them to be on your team going forward?

18          MR. KURTH:  Irrelevant.  What his understanding is

19 about something that talked about the agreement, he said what

20 the agreement said.  Whatever mental impressions he had on his

21 own is just not relevant.

22          THE COURT:  Rephrase your question.

23 BY MR. GABEL:

24 Q    You were one of the people who wrote the three-party

25 letter made the basis of this whole lawsuit, correct?

*MOLINARI - CROSS/GABEL*                                  634

1  A   Yes.

2  Q   You understand that one of the things we're here about

3  today is what you were thinking, what your intent was when you

4  wrote that letter, correct?

5  A   Yes.

6  Q   What your understanding was?

7          MR. KURTH:  Objection.  I don't believe what was in

8  his mind in terms of when he wrote that letter -- the letter

9  speaks for itself.

10         THE COURT:  Sustained.

11 BY MR. GABEL:

12 Q   When Omni was holding out, did you go back to them and

13 tell them you can't hold out?  You signed a 2005 letter

14 talking about you would get 50 percent of the split and that

15 obligates you to stay on my team for three years?

16 A   No, I did not.

17         MR. GABEL:  Robb, if you will, go to the e-mail

18 identification information for document 442, Defendant's

19 Exhibit 81.  Go to the bottom one.

20 BY MR. GABEL:

21 Q   Did you send the e-mail identified as Exhibit 81 to Bob

22 Rachor on April 20, 2007?

23 A   Yes, I did.

24         MR. GABEL:  Your Honor, I would offer Defendant's

25 Exhibit 81 into evidence.

1          MR. KURTH:  Your Honor, I don't believe I have an

2    objection.

3          THE COURT:  Show it admitted.

4      (Defendant's Exhibit 81 was received in evidence.)

5    BY MR. GABEL:

6    Q   In that e-mail did you report back to Mr. Rachor the

7    results of your meeting with ATA?

8    A   Yes, I did.

9          MR. GABEL:  Robb, if you would go back to the body

10   of the e-mail and blow it up.

11   BY MR. GABEL:

12   Q   Does this reflect who you had met with at ATA in

13   Defendant's 81?

14   A   Yes, it does.

15   Q   And that was Subodh Karnick and Gary Ellmer?

16   A   Yes, it was.

17         MR. GABEL:  If you would, highlight the last

18   sentence above the signature, last -- starting with bottom

19   line.

20   BY MR. GABEL:

21   Q   Can you read that last sentence for me, Mr. Molinari?

22   A   "Bottom line, status quo for FY08 and will see where we go

23   for FY09 and beyond once they get the acquisition completed."

24   Q   Is that what you reported to your supervisor that

25   Mr. Karnick and Mr. Ellmer had told you about their

*MOLINARI – CROSS/GABEL*                              636

1    acquisition?

2    A   Yes.

3    Q   At any point in discussing this see where we go for '09,

4    did they say, "We realize we're bound to 50 percent for FY09

5    on the FedEx team because of that three-party letter"?

6    A   No.

7    Q   Did they raise that three-party letter at all when you met

8    with them in April of 2007?

9    A   No, they did not.

10   Q   And you were talking about the future of their

11   participation on the FedEx team in this meeting?

12   A   Yes, we were.

13           MR. GABEL:  Your Honor, if you're going to take a

14   break, this might be a good spot.

15           THE COURT:  All right.  Ladies and gentlemen, let's

16   take our afternoon break.

17           Please go back to the jury room.  Do not discuss the

18   case among yourselves.

19           COURT CLERK:  All rise.

20           THE COURT:  About 10 minutes.

21   *(Jury out.)*

22   (A recess was taken.)

23   *(Jury in.)*

24           COURT CLERK:  You may be seated.

25           THE COURT:  Okay.  Mr. Gabel, continue your exam.

1          MR. GABEL:  Thank you, Your Honor.

2   BY MR. GABEL:

3   Q   Mr. Molinari, earlier I think you testified about the

4   amount of business that the team gained by having Northwest as

5   a member of the team.  Can you refresh the jury approximately

6   what amount that was?

7   A   Yes.  Northwest represented approximately 25 percent of

8   the team's size, so they had 25 percent of our buying power.

9   Q   Well, among your responsibilities as team leader, did any

10  of them relate to efforts with regard to team size?

11  A   Oh, yes.  The larger the size, the more business we did,

12  and the more business our team members had.

13  Q   The 25 percent that Northwest brought to the pie, what all

14  airlines did that benefit?

15  A   Every airline on the team.  That 25 percent is across the

16  board in the cargo business, passenger business, both

17  narrow-body, wide-body.

18  Q   I guess that sort of anticipates my question.  From the

19  military's perspective when they're figuring out how much

20  business the team is going to get, do they distinguish or

21  discriminate between the team members that are passenger

22  carriers and the team members that are cargo carriers?

23  A   No.

24  Q   So how do they add up the points and say, "This is your

25  share of pie"?

1  A   They just take the total mobilization points and add them

2  together; and whatever percentage you are of the total, that's

3  your percent of the entitlement.

4  Q   So if Northwest left the team, it would adversely impact

5  the -- was it Atlas and ATI and the other -- well, let me let

6  you answer.

7        Who would it impact if Northwest left the team?

8  A   If Northwest left the team, we would have had 25 percent

9  less business across the board.  That would have impacted,

10  yes, the cargo carriers and passenger carriers on our team.

11  Q   About how many different airlines were you adversely

12  impacting if you couldn't negotiate to keep Northwest on the

13  team?

14  A   About five or six airlines.

15  Q   At some point did Northwest indicate that they desired to

16  do more than just sell their points to the team?

17  A   Yes, they did.

18  Q   Do you remember about when that was?

19  A   I think it was in the fall of -- I don't remember if it

20  was '07 or '06.  They indicated a desire to start flying

21  passenger business, as they were going to have some excess 747

22  passenger aircraft in their fleet.

23  Q   Let me show you what's been marked as Defendant's 61 --

24        MR. GABEL:  Which, Robb, is document 373, if we

25  could put up the transmission information on the bottom

MOLINARI — CROSS/GABEL                              639

1   document.

2   BY MR. GABEL:

3   Q    Did you receive an e-mail from Bill Wernecke around

4   December 2006?

5   A    Yes, I did.

6   Q    And who is Mr. Wernecke?

7   A    Bill Wernecke is the director of charters for Northwest.

8   Q    What do you recall Mr. Wernecke communicating to you at

9   that time?

10  A    I think that's the e-mail he requested some additional

11  business, passenger business.

12          MR. GABEL:  Your Honor, I would offer Defendant's

13  Exhibit 61.

14          MR. KURTH:  No objection, Your Honor.

15          THE COURT:  61 admitted.

16    (Defendant's Exhibit 61 was received in evidence.)

17          MR. GABEL:  Robb, if you will, go down and blow up

18  the top —— actually, the third paragraph down —— the fourth

19  paragraph down.  Go ahead.  You can do three and four.  That's

20  fine.

21  BY MR. GABEL:

22  Q    Do you recall how many flights Northwest thought they

23  wanted back in December of 2006?

24  A    Well, as it says in this e-mail, they were looking for 15

25  initially.  I think we ended up settling on 10.

*MOLINARI - CROSS/GABEL*                                    640

1  Q   He talks about, "As you mentioned in our meeting in

2  October, the team did 170 ops to KWI."  What does that mean?

3  A   I believe he's referring to 170 flights to Kuwait -- KBI

4  is Kuwait Airport.

5  Q   Well, subsequent to this communication in December of

6  2006, we've seen that in the Fee Agreement for 2008 that

7  Northwest was -- or in ATA's Fee Agreement Northwest was

8  entitled to some flying, correct?

9  A   That's correct.

10  Q   And do you know how many flights they were getting then?

11  A   We set up for them to fly 10 flights a month.

12  Q   They were entitled to that?

13  A   Yes.

14  Q   After that '08 contracting period, did Northwest indicate

15  that they might want to do even more flying?

16  A   Yes.  They indicated that they would have another airplane

17  available to do this type of business, and they wanted to

18  double the 10 to 20.  And they also wanted to do some cargo

19  flying because they had some excess 747 freighter capacity, as

20  well.

21  Q   I'll show you what is marked as Defendant's 123, document

22  7408.

23        MR. GABEL:  Robb, if you would, just go to the

24  e-mail information.  Let's go to the bottom one first.

25

*MOLINARI - CROSS/GABEL*                                641

1  BY MR. GABEL:

2  Q   Do you remember e-mailing Northwest around December of

3  2007 regarding FY09?

4  A   Yes, I do.

5         MR. GABEL:  Your Honor, I would offer Defendant's

6  Exhibit 123.

7         MR. KURTH:  Your Honor, may we approach?

8         THE COURT:  Sure.

9     *(A bench conference was held off the record.)*

10        THE COURT:  They've got it worked out.

11        **123 admitted.**

12    *(Defendant's Exhibit 123 was received in evidence.)*

13        MR. GABEL:  If you would, blow up the bottom e-mail,

14  Robb.

15  BY MR. GABEL:

16  Q   Were you talking about your offer to Northwest at this

17  time?

18  A   Yes.  I was referring to the offer we made for FY09, what

19  business they would have and what our commission levels would

20  be, et cetera.

21  Q   And by the nature of your e-mail saying you're checking to

22  see if Northwest has received your offer, I take it that

23  whatever the deal may or may not be with Northwest had not

24  been finalized as of December 28th, 2007, correct?

25  A    That's correct.

MOLINARI - CROSS/GABEL                              642

1              MR. GABEL:  If you would go to the next e-mail,

2    Robb.

3    BY MR. GABEL:

4    Q    And did you get this response from Northwest.

5    A    Yes, I did.

6              MR. GABEL:  If you will, blow up the middle large

7    paragraph, Robb, or highlight it.

8    BY MR. GABEL:

9    Q    What was your understanding of what Northwest was

10   respond -- well, did you get this on January 4th, 2008?

11   A    Yes, I did.

12   Q    What was your understanding of the status of Northwest's

13   response to your offer as of January 4th, 2008?

14   A    He was in essence telling me he had another offer from

15   another team that was more favorable than our offer that we

16   had in hand.  He was asking me to take a look and see if we

17   could adjust our offer.

18   Q    And did you have additional negotiations with Northwest

19   after January 4th of 2008?

20   A    Yes, I did.

21             MR. GABEL:  Let's go to Exhibit 145, Robb.  It's

22   914, defendant's Exhibit 145.

23   BY MR. GABEL:

24   Q    First of all, did you --

25             MR. GABEL:  Blow up the second e-mail exchange

1   there, Robb, just the e-mail information.

2   BY MR. GABEL:

3   Q   Did you have an exchange with Bill Wernecke on

4   January 16th of 2008 at 2 p.m.?

5   A   Yes, I did.

6           MR. GABEL:  Your Honor, we would offer Defendant's

7   145 into evidence.

8           MR. KURTH:  No objection.

9           THE COURT:  145 admitted.

10      *(Defendant's Exhibit 145 was received in evidence.)*

11  BY MR. GABEL:

12  Q   And who is Mr. Wernecke, again?

13  A   He's the director of the charter department for Northwest

14  Airlines.

15  Q   So he handled their membership on the CRAF team?

16  A   Yes.

17  Q   Was this the first indication that you had gotten that

18  Northwest was going to be willing to sign on with FedEx?

19  A   Yes, it was.

20  Q   And let's go up to the top e-mail.

21          Also on the same day, January 16th, 2008, did you

22  respond to Northwest?

23  A   Yes, I did.

24  Q   What did you do after y'all had this e-mail communication

25  saying, "Okay, we've made up our mind.  We're not leaving.

1   We're staying with FedEx for '09"?  What did you do?  What was

2   your next step after that, after the e-mails?

3   A   At this point?

4   Q   Yes.

5   A   That's when I finalized the decision to --

6   Q   Well, with respect to Northwest, what was your next step?

7   A   Prior to this e-mail, I had already sent him a revised

8   offer.  So he had that in hand.  I was just waiting for him to

9   sign that and send it back.

10  Q   You had already sent him the offer.  In the e-mails you

11  say, "Hey, we're on board with it."

12          Did you consider the e-mail ratification or did you

13  need a signed agreement?

14  A   No, I waited for the signed agreement.

15  Q   And do you recall how long after you got this e-mail on

16  January 16th it was before you got the signed agreement signed

17  by Northwest?

18  A   I don't think I got it back until the beginning of the

19  following week.

20  Q   So if this is Wednesday, the 16th, the beginning of the

21  following week would be, probably, Monday, the 21st, or

22  Tuesday, the 22nd?

23  A   Probably, yes.

24  Q   Once you officially had in your hand a signed contract

25  from Northwest, did you take any additional steps with regard

MOLINARI — CROSS/GABEL                              645

1   to the team in FY09?

2   A    Yes.  That's when I notified ATA that we were not going to

3   include them in our FY09 team.

4   Q    Now, you were asked on direct some questions about

5   confidential information that other team members might have

6   access to as a result of being on your team.  Going to that

7   topic, do you recall any strategic or confidential information

8   that you would have shared with at least some members of your

9   team from time to time?

10  A    Sure.  Every year when we had a discussion about the size

11  of the team, if I was contemplating or actually actively

12  courting another carrier to join the team, I would have had a

13  discussion with each team member kind of delineating what

14  percentage I thought we might go to, what level of business I

15  thought that might equate to, just to get a sense if they

16  would be able to handle it.  That was all part and parcel -- I

17  didn't want to increase the size of the team and then not be

18  able to take advantage of it.

19           MR. GABEL:  Robb, would you put up Defendant's

20  Exhibit 5, which is document 46.  Just put up the e-mail

21  information for now.

22  BY MR. GABEL:

23  Q    Defendant's Exhibit 5 reflects an e-mail from you to Jim

24  Hlavacek.  Who is Jim -- I'm probably saying it wrong.

25  A    Jim Hlavacek was chief operating officer for ATA at the

 1  time.

 2          MR. GABEL:  And if you would go down to the body of

 3  the e-mail, go down to the bottom e-mail.

 4  BY MR. GABEL:

 5  Q   First of all, before we --

 6          MR. GABEL:  Well, on the topic we're talking about,

 7  Robb, will you highlight the last full sentence on this

 8  e-mail?  Yeah, the last full sentence there.

 9  BY MR. GABEL:

10  Q   What did that communication from ATA's Jim -- Mr. Jim

11  indicate to you?

12  A   I had a discussion with him.  I was in the process of

13  courting United Airlines to join our team, and we were waiting

14  for them to make a decision on what they were going to do.

15  Jim was just inquiring how that process was going.

16  Q   So you were trying to recruit United to your team?

17  A   Yes.

18  Q   Whose team were they on?

19  A   The Alliance Team.

20  Q   Which was a competing team in CRAF?

21  A   Yes.

22  Q   Did you consider your efforts to recruit them something

23  that would be of strategic value to your competitors?

24  A   Oh, yes.

25  Q   Did you, in fact, have phone conversations with someone

1   about ATA filling them in on your efforts to recruit a large

2   airline to the team?

3   A   Yes.  My process was to talk to every team member to let

4   them know what we were looking at doing, what we thought the

5   size of the team might go to, and what levels of business that

6   would equate to, just to ensure ourselves that they would be

7   able to handle it.

8            MR. GABEL:  If you could go to Defendant's

9   Exhibit 8, Robb, which is page 49.

10  BY MR. GABEL:

11  Q   Mr. Molinari, Defendant's Exhibit 8, I believe, is already

12  in evidence.

13           Who were you sending this e-mail dated January 28,

14  2005 to?

15  A   That went to both folks at ATA and Omni.

16           MR. GABEL:  Okay.  If you would, go down to the body

17  of the e-mail, Robb.

18  BY MR. GABEL:

19  Q   So the folks it was going to -- before I get to that --

20  they were ATA and Omni.  Was that your entire team?

21  A   No.  Those were just the passenger carriers on the team at

22  the time.

23  Q   So that was just a portion of the team you were

24  communicating with?

25  A   Right.

*MOLINARI - CROSS/GABEL*                                    648

1  Q   What was the nature of information you were telling them

2  about in this communication?

3  A   As it states, I was giving them an assessment of what I

4  thought the levels of business would go to if we were

5  successful in acquiring United to join our team.

6  Q   And, again, at this point, you had not signed United to

7  your team?

8  A   No, we had not.

9  Q   Were you ultimately successful in recruiting United over

10  to your team?

11  A   No, we were not.

12  Q   Where did United go after you made these efforts to

13  recruit them?

14  A   They stayed with the Alliance Team.

15  Q   Is this information you were sharing with two members of

16  your team, if not your entire --

17  A   With the entire team.  I would probably have a similar

18  message to that to the cargo guys saying here's what cargo

19  would look like if we did the same thing.

20        MR. GABEL:  If you could, put up Defendant's

21  Exhibit 24, Robb, which is document 95.  Just go to the e-mail

22  information on the bottom e-mail.

23  BY MR. GABEL:

24  Q   Did you send an e-mail to Robb Coretz and a

25  gsnzaj@coair.com in November of 2005?

1    A    Yes.

2    Q    Who is Rob Coretz?

3    A    He's the chairman of Omni.

4    Q    Do you recognize that other e-mail, the coair.com?

5    A    Yeah.  The copy is Gary Schneider from Continental, and I

6    think it's going to -- I think his name Brian Anslinger.  I'm

7    not sure how you spell it.

8    Q    What entity other that Rob Coretz were these other folks

9    with?

10   A    The two other gentlemen were with Continental Airlines.

11             MR. GABEL:  We would offer Defendant's Exhibit 145,

12   Your Honor -- I'm sorry.  That's 24, Defendant's 24, Your

13   Honor.

14             MR. KURTH:  I have no objection.

15             THE COURT:  24 admitted.

16        (Defendant's Exhibit 24 was received in evidence.)

17             MR. GABEL:  Would you blow up the body of the

18   e-mail, Robb.

19   BY MR. GABEL:

20   Q    What is the nature of the communication that you were

21   making in this e-mail?

22   A    It's a revised offer letter for Continental to join the

23   FedEx team.

24   Q    Okay.  Did you consider that strategic information for the

25   team?

1   A    Oh, yes.

2   Q    And at least on the CC, at least one of your fliers was in

3   the loop on that?

4   A    Yes.

5   Q    Now, after ATA acquired World –– or ATA's parent acquired

6   World and North American Airlines, did that have any impact on

7   your feelings about sharing this type of information?

8   A    Yes.

9   Q    What impact did it have?

10  A    I felt I couldn't share that information with them any

11  further.

12  Q    With who?

13  A    With ATA.

14  Q    Why not?

15  A    It would get back to the competing carriers.

16  Q    Who were the competing carriers you were referring to?

17  A    World and North America.  They both had the same parent

18  company.  We just couldn't have that dialogue any longer.

19  Q    Didn't ATA assure you they would keep your secrets?

20  A    Not necessarily, no.  We talked about what their merger

21  was going to do and whether they would merge certificates.  I

22  told them I was uncomfortable with that process.  It didn't

23  matter what they said; I just couldn't have that conversation

24  with them any further.

25  Q    You had a confidentiality clause in the contract.  Didn't

*MOLINARI – CROSS/GABEL*                                    651

1  that mean that there was no way that information would get

2  shared between these sister companies?

3  A   No.  I just didn't have faith in that, and I just didn't

4  feel I could share information with them and keep it from the

5  competition.

6  Q   As time went on after this merger happened, were there any

7  events that sort of gave some legs to your suspicions or

8  fears?

9  A   Yes, there were.

10  Q   Tell the jury about those.

11  A   There was -- there were passenger trips that ATA should

12  have been operating that ended up going to North American and

13  World.  ATA called me up about a -- Gary Ellmer called me and

14  said they wanted to start flying cargo because they --

15  Q   Before we get to the cargo -- on the passenger, the first

16  thing you said, passenger trips, tell me a little more about

17  that.  You said there were trips that ATA should have been

18  operating that went to --

19  A   Trips that were awarded to ATA that they, for one reason

20  or another, couldn't operate.  Those were transferred to

21  either North American or World.

22  Q   And the fact that the flight got transferred to North

23  American or World, who would ultimately decide to make that

24  transfer?

25  A   They did.

*MOLINARI – CROSS/GABEL*                                    652

1  Q   They didn't share that flying with members of the FedEx

2  team?

3  A   No.  They should have come back to us and said they

4  couldn't operate something, and we would have at least tried

5  to do it within the team first before we went outside the

6  team.

7  Q   Were there any indicia that -- well, was there anything

8  about the timing of the flights that supported your

9  suspicions?

10  A   Well, just the fact that when they notified us that they

11  couldn't do the trip, it was in hours before the trip.  In

12  reality, I think they had transferred the trip, you know, days

13  before.

14  Q   Why do you think that?

15  A   Well, I would do some checking with catering companies;

16  and I wanted to find out, "Hey, when did you know that World

17  was going to fly this trip rather than ATA?"  "Oh, we got that

18  two days ago.

19  Q   Now, the other thing you'd mentioned was cargo flying.

20  Tell me a little bit about cargo flying.  Well, the FedEx team

21  did cargo flying for military, as well as passenger, correct?

22  A   Correct.

23  Q   Did ATA ever express any interest in doing cargo flying

24  for the FedEx team?

25  A   At some point after the merger, yes, they did.

*MOLINARI - CROSS/GABEL*                              653

1  Q   You mention that as a factor.  Why was that a factor in

2  supporting your suspicion there was a conflict?

3  A   Well, because they weren't -- they weren't on the team to

4  fly cargo.  We already had cargo operators on the team.  They

5  also called us to say what they wanted to do is just transfer

6  airplanes off the World certificate to their certificate; but,

7  in essence, they would have been flown by World.  So we were

8  already covering all the cargo trips.  We were actually doing

9  more than our entitlement, so I told them there was absolutely

10 no interest in doing that.

11 Q   At the time ATA approached you about flying cargo for the

12 FedEx team, were you knowledgeable about what type of planes

13 ATA had in its fleet, whether passenger or cargo?

14 A   Yes.

15 Q   What type of planes did they have?

16 A   They had all passenger airplanes.

17 Q   Did they have any cargo planes?

18 A   No, they did not.

19 Q   Can you explain for the jury the difference between a

20 passenger plane and cargo plane?

21 A   Real simple:  One has seats; one doesn't.  All the

22 airplanes I can think of, there's a 747 PAX and there a 747

23 cargo.  They're just completely empty --

24        THE COURT REPORTER:  I'm sorry, sir.

25        THE WITNESS:  There's an equivalent cargo airplane

1  for every passenger airplane that you're familiar with.  The

2  747 passenger airplane is full of seats.  The 747 cargo

3  airplane is completely empty, just a rollerized floor that can

4  accept palletized cargo.

5  Q   Well, if you had given them some cargo flights, couldn't

6  they have just taken a screwdriver and walked in one of their

7  planes and pulled a few seats out and shown up?

8  A   No.

9  Q   Well, what is involved in turning a passenger airplane

10 into a cargo plane?

11 A   Depending on the airplane, about 5 to $10 million and a

12 year or so to make the conversion.

13 Q   Now, did you have -- there were public reports about which

14 airlines were flying which missions for CRAF, for the

15 military; is that correct?

16 A   Yes.

17 Q   Did you ever look at those reports to kind of see what the

18 competing teams were doing?

19 A   Oh, certainly.

20 Q   Based on those reports, did you have any insight into the

21 amount of cargo flying that different entities on the

22 competing Alliance Team were doing?

23 A   Well, I know pretty much that the Alliance Team was set up

24 that Evergreen did the cargo; World/North American did the

25 passenger, and that's how they were set up.  So World, having

1  some cargo airplanes in their fleet, wasn't getting cargo

2  business; and they were looking for a way to change that.

3  They thought they could transfer those to put them on --

4  somehow operate them as ATA flights.

5  Q   Well, if they slapped an ATA sticker on a World plane and

6  flew cargo for the FedEx team, would that impact any other

7  members of the FedEx team?

8  A   Yes.  It would impact not only FedEx but Atlas and Polar,

9  our other cargo operators.

10  Q   So would you describe -- what was your view of this --

11  what did you tell them when they approached you about cargo?

12  A   When he called me, he said --

13  Q   Well, who called you?

14  A   Gary Ellmer had called me.  He said, "I hear from my cargo

15  guys that you guys have money on the table on the cargo side,

16  and we would really like to fly some cargo."  I told him, I

17  said, "Gary, first you don't have any cargo guys.  You're

18  talking about the World cargo people.  They're mistaken.

19  We're doing better than our entitlement, and the answer is

20  no."

21  Q   So would ATA, not having cargo planes, have cargo guys to

22  be talking to Gary?

23  A   No.

24           MR. GABEL:  Robb, if you would, go to Defendant's

25  Exhibit 150, which is Document 1024.  This is Defendant's 150,

1  but it's the same letter we've been talking about.  I think we

2  used the Plaintiff's version, your copy.

3              MR. KURTH:  PX2.

4              MR. GABEL:  PX2?  Okay.

5  BY MR. GABEL:

6  Q   Mr. Molinari, after you got that signed contract back from

7  Northwest indicating they were going to be on your team for

8  FY09, did you send out -- well, did you make any

9  communications?

10 A   I called Gary Ellmer to advise him we were not going to

11 include him on the FY09 team.  I followed up with this

12 attached letter.

13             MR. GABEL:  Robb, if you will pull down the

14 Defendant's and leave Plaintiff's Exhibit 2.

15 BY MR. GABEL:

16 Q   When you say the attached letter, you're referring to

17 Plaintiff's Exhibit 2?

18 A   Yes, I am.

19             MR. GABEL:  Can we blow up the text of that?  Robb,

20 if you will highlight the bottom sentence of that.

21 BY MR. GABEL:

22 Q   What was your understanding or intention when you

23 communicated that information to Gary Ellmer?

24 A   That the flight activity that they had signed up for and

25 were committed to for the balance of FY08, which was about

1   eight months worth of flying, were still to continue to

2   proceed as contracted.

3   Q   And as far as you were concerned, were they welcome,

4   invited, expected to perform their role on the FedEx team

5   throughout the rest of FY08?

6   A   Absolutely, yes.

7   Q   And get paid for that if they flew the missions?

8   A   Absolutely.

9   Q   And if they found that to be a profitable business, you

10  were more than happy for them to continue that through

11  September?

12  A   Absolutely.

13  Q   After you sent them this letter on January 22, 2008, did

14  they continue to fly for the FedEx team through September of

15  2008?

16  A   No.

17  Q   When did they stop?

18  A   I don't remember the exact date.  I think it was early

19  April.  They shut the doors without any notice to us.  I got a

20  call about -- I think it was three in the morning from Wil

21  Lilly at ATA saying they were closing the doors and they were

22  no longer going to operate any of their flights.  He was

23  e-mailing me a list of flights they had committed to with AMC

24  that needed to be covered.

25  Q   Who was Wil Lilly?

*MOLINARI - CROSS/GABEL*                              658

1  A   Wil Lilly replaced Bill Doherty.

2  Q   Let me show you just the e-mail portion of Defendant's

3  Exhibit 187, Document 833.

4          MR. GABEL:  Take that one down, please.  1267, Robb.

5  Sorry, I had the Bates number 833.

6  BY MR. GABEL:

7  Q   Mr. Molinari, I'll show you what's been marked as

8  Defendant's Exhibit 187.  Is this the letter that you got from

9  Will Lilly?

10 A   Yes, it is.

11         MR. GABEL:  Your Honor, I'll offer Defendant's

12 Exhibit 187.

13         MR. KURTH:  No objection, Your Honor.

14         THE COURT:  187 admitted.

15    *(Defendant's Exhibit 187 was received in evidence.)*

16 BY MR. GABEL:

17 Q   Was this -- well, I think you mentioned something about a

18 phone call.  When was the phone call?

19 A   Early that morning.  I think it was like three o'clock or

20 four o'clock in the morning, calling me at home.

21         MR. GABEL:  Robb, would you go to the fax

22 information at the top of this letter?

23 BY MR. GABEL:

24 Q   Is it your recollection that you got a fax at roughly

25 6:14 a.m. on April the 3rd?

1    A    Yes.

2    Q    Was that phone call and fax on that date at four o'clock

3    in the morning and 6:14 the first notice that you had that ATA

4    was not going to fly flights for the military?

5    A    Yes, it was.

6    Q    Now, back in '04, '05, '06 when ATA was on FedEx's team,

7    it had undergone bankruptcy, correct?

8    A    Yes.

9    Q    During that time, did it still perform on the team while

10   it was in bankruptcy?

11   A    Yes.

12   Q    So in your mind, was the prospect of bankruptcy equivalent

13   to not flying military flights?

14   A    Oh, no.  They operated during the bankruptcy without a

15   hitch.  It was pretty transparent that it was still in

16   bankruptcy to us from our perspective for the military flying.

17   Q    If you'll go back down to the body of the letter, was it

18   your understanding that they were doing a lot more than just

19   filing bankruptcy this time around?

20   A    Yeah.  They were ceasing operations.

21   Q    Shutting their doors?

22   A    Shutting their doors.

23   Q    Did you receive subsequent communications from Mr. Lilly

24   about flights that ATA had been doing with the military?

25   A    I think he followed this letter up with an e-mail with an

*MOLINARI – CROSS/GABEL*                                    660

1    attachment that had a list of flights that they had on our

2    books, expansion trips that they had accepted, whatever fixed

3    business they still had.

4            MR. GABEL:  Robb, if you will, put up the e-mail

5    information for Defendant's Exhibit 188 which is Document

6    1261.  Just blow up the e-mail information.  Actually, the

7    bottom e-mail.  I'm sorry.

8    BY MR. GABEL:

9    Q   Is this the e-mail you would be referring to from Wil

10   Lilly?

11   A   Yes, it is.

12   Q   And it's apparently sent at 5:11 in the morning on April

13   the 3rd?

14   A   Yes.

15           MR. GABEL:  We would offer Defendant's Exhibit 188,

16   Your Honor.

17           MR. KURTH:  No objection.

18           THE COURT:  188 admitted.

19      *(Defendant's Exhibit 188 was received in evidence.)*

20           MR. GABEL:  Will you blow up the bottom e-mail of

21   Wil Lilly, Robb, please?

22   BY MR. GABEL:

23   Q   Was it your understanding from Mr. Lilly's communication

24   at five in the morning on April 3rd that ATA had committed to

25   do some flying for the military that they were not going to

1  do?

2  A   Yes, there was.

3  Q   Did Mr. Lilly let you know what that was?

4  A   Yes.  He sent me an attachment that had a list of flights

5  that they were supposed to cover.

6  Q   And what did you do with that information?

7  A   I re-sent it out to our remaining passenger carriers and

8  asked them to let me know what availability they had to cover

9  those trips.

10  Q   And then what did you do?

11  A   I started covering the trips.

12  Q   And what type of steps did you have to take to see that

13  that happened?

14  A   We went through the carriers −− when we couldn't get a

15  full plane load to do a charter, we ended up buying commercial

16  seats on the various scheduled carriers to move passengers

17  between U.S. and Asia, that type of thing.  We contracted

18  outside the team, I think, on some flights possibly.

19  Q   What amount of effort was involved on your part or on

20  behalf of the team leader to make that happen?

21  A   From that day for the next probably 10 days to 14 days, I

22  was pretty much doing nothing but that for about 15, 20 hours

23  a day.

24  Q   Now, these flights that the −− that you as team leader

25  were covering for ATA, some of them obviously since they're

*MOLINARI – CROSS/GABEL*                                    662

1   military flights, the military would still pay for them,

2   correct?

3   A   Yes.

4   Q   Did the military payments cover all of the money that

5   FedEx spent?

6           MR. KURTH:  Your Honor, excuse me.  I have an

7   objection.  If we can approach?

8           THE COURT:  Sure.

9   (*Beginning of bench conference.*)

10          MR. KURTH:  I think we're going in the direction of

11  the counterclaim, and we have an objection to any discussions

12  of amounts paid or whatever.  We have made an objection to

13  their Exhibit 191.  Amongst other reasons, their disclosures

14  under Rule 26 don't give us any amounts.  All they assure us

15  are forthcoming with supplemental disclosures.  They were

16  never made.

17          MR. GABEL:  What FedEx sent to them is the next

18  exhibit I'm going to offer, which is a spreadsheet that

19  Mr. Molinari had put together that totals up the amount that

20  FedEx spent.  Ken Broughton called Mr. Blumberg and said,

21  "Where's the support for this?"  And Mr. Blumberg sent an

22  entire box of hotel receipts, passenger tickets, an entire box

23  of this.  I think they had some humorous exchange about, "I'm

24  not going through that."  So I don't know if they've audited

25  it to see if it adds up to the spreadsheet, but it has been

MOLINARI — CROSS/GABEL                                    663

1   produced.

2          MR. KURTH:  Well, I know what Rule 26 says.  What

3   they gave are disclosures.  What they didn't give, although

4   they gave the assurances forthcoming with supplemental

5   disclosures, they gave us a document in a box of thousands of

6   pieces of paper.

7          I guess the message was go fish, and you figure it

8   out.  I don't think that meets the prescriptions of Rule 26.

9   I think that's -- I think that's a fatal problem in terms of

10  them going forward with this.  If they want to give us fair

11  notice and give us a document that is -- that gives us the

12  necessary underlying information.

13         But to hand us a big summary, one-sheet piece of

14  paper and tell us, "Here's a thousand pieces of paper, you go

15  figure it out," I don't think that meets full disclosure.  I

16  don't think that meets Rule 26.

17         MR. GABEL:  Your Honor, I believe that Rule 26

18  allows a party to produce documents in a manner that they are

19  kept within its files.  Frankly, as you just heard them say,

20  this was all done on a fairly emergency basis; and an admin

21  added it all up and threw a bunch of stuff in a box.  That's

22  what we have.

23         THE COURT:  Um-hum.

24         MR. GABEL:  And it's been produced.  It's not like

25  it's a surprise.

1          THE COURT:  Well, when was it produced?  Was it

2   produced late?

3          MR. BLUMBERG:  It was in one of our initial

4   productions of documents, has the underlying receipts to cover

5   all those.  And along with --

6          THE COURT:  I mean, what is this, the classic

7   shoebox full of receipts?

8          MR. BLUMBERG:  We photocopied them and Bated them

9   all.  We actually produced them in a better form than they

10  came to us; and, I mean, they've had the underlying

11  information for approximately two years prior to

12  Mr. Molinari's deposition.  We talked about this document

13  prior to the trial.  Mr. Broughton asked me for --

14         THE COURT:  Are you telling me this issue has been

15  pending for two years and now I just heard about it a few

16  weeks ago?

17         MR. BLUMBERG:  I was never aware there was an issue

18  with it until now.

19         MR. KURTH:  When they put it on the list, we

20  objected to it on the basis that I have outlined.  We got

21  these documents.  We got them on the eve of Mr. Molinari's

22  deposition.  We got a summary page, and then we got a banker's

23  box full of paper.

24         THE COURT:  When was that?

25         MR. KURTH:  That was last June.

1        THE COURT:  Why wasn't that brought to the attention

2    at least to the magistrate judge to say, "Hey, we've got the

3    classic shoebox here.  It's not our job to go through these"?

4        MR. KURTH:  I got a piece of paper that has a bunch

5    of numbers on it.  I don't know what it is for, okay?  It

6    talks about --

7        THE COURT:  It should have been brought to the

8    attention of the Court though.

9        MR. KURTH:  Your Honor, I think it's supposed to be

10   part of the supplemental disclosures.  Their initial

11   disclosures say we're going to tell you what the numbers are

12   and the basis for the numbers, and that never came.  We have a

13   piece of paper with a bunch of numbers on it and a big box of

14   paper, and I'm supposed to connect the dots and figure out

15   what all this is?  I don't think that's full disclosure.

16       THE COURT:  We're not going to be able to straighten

17   this out here.  We may have to stay after the jury goes home a

18   little bit to do that.  Can you move on to some other areas

19   here with him?

20       MR. GABEL:  The problem is he's going to have

21   personal knowledge of it, and he's here from California now;

22   and we're going to dismiss him.

23       MR. KURTH:  Could I ask this question?  When was

24   this document prepared, the summary?

25       MR. GABEL:  Obviously before May 31st of 2008.

MOLINARI - CROSS/GABEL                                    666

1            MR. KURTH:  Did he prepare it?

2            MR. GABEL:  His admin prepared it at his direction

3    and his oversight.

4            MR. KURTH:  Well, I object to the idea of him being

5    here from California.  Why don't we let it -- Your Honor, I

6    don't want to waive this.

7            THE COURT:  I understand, and you're not waiving

8    this.  What we might do is --

9            MR. KURTH:  Let it come in and we talk --

10           THE COURT:  Let it come in; and then if later on,

11   depending on what the result is -- and it will depend on

12   whether we need to ever address it or not.  We may need an

13   adjustment depending on if there is need for an adjustment.

14           MR. KURTH:  I think we ought to get it on the

15   record, and we'll figure it out.

16           THE COURT:  We just have.

17           MR. KURTH:  I mean in terms of the jury, the

18   testimony.

19           THE COURT:  Okay.

20           MR. GABEL:  Okay.

21           THE COURT:  Good enough.

22      (End of bench conference.)

23   BY MR. GABEL:

24   Q   Mr. Molinari, before you left FedEx, did you make any

25   effort to do an accounting of what the difference was

1   between –– well, first, before we get to that, we had looked

2   earlier at the Arrangement Agreement in a paragraph that said

3   if a team member didn't fly, the team could cover on a pro

4   rata basis.  The difference between what the military paid to

5   FedEx and what FedEx paid, did you bill that out to the team

6   on a pro rata basis, or what did you do?

7   A   No.  FedEx absorbed that.  We covered all the costs.

8   Q   Okay.  And did you ask any member of your staff to ––

9   well, did you make any effort to determine what those costs

10  were that FedEx had to spend to cover these flights?

11  A   Yes, just to get an understanding of where we were, what

12  we were spending versus what –– because the military only paid

13  what was in the contract.  If they cost us more to secure

14  those seats, that extra cost was incurred by FedEx.  So I had

15  just kept an accounting of –– had my admin keep track of what

16  we were spending for each individual mission versus what we

17  got paid and then a summary what we had spent above and beyond

18  what we were reimbursed by the Government.

19  Q   And I realize that it's been over two years since you

20  retired; but while you still worked there, did you look at

21  that summary and educate yourself as to what the total was,

22  the difference between what we spent and what the Government

23  paid us?

24  A   Yes, I did.

25  Q   And was your memory fresher than it is now?

MOLINARI – CROSS/GABEL                    668

1  A   It was roughly around 180,000, 190,000, somewhere in that

2  range.

3  Q   Do you remember specifically the dollar amount here today?

4  A   No.

5  Q   Are you aware of a document in existence that would

6  refresh your memory of the memory that you once had?

7  A   Yes, the spreadsheet I asked my admin to prepare would

8  have that exact amount on it.

9       MR. GABEL:  Your Honor, may I approach?

10      THE COURT:  You may.

11      THE WITNESS:  That's it.

12 BY MR. GABEL:

13 Q   And based on your refreshed memory, what was the total of

14 the difference between what FedEx had paid and what the

15 military paid FedEx?

16 A   $187,324.57.

17      MR. GABEL:  I'll pass the witness, Your Honor.

18      THE COURT:  All right.

19      Mr. Kurth, further exam of this witness?

20      MR. KURTH:  Yes.

21                    **REDIRECT EXAMINATION**

22 BY MR. KURTH:

23 Q   Mr. Molinari, the amount you just recited, these relate to

24 expenses that were documented after the time you left?

25 A   No, I was still there when those occurred.

MOLINARI - REDIRECT/KURTH                           669

1   Q   Well, were these some of these expenses, and a number of

2   them occurred and incurred and documented after you left on

3   May 31, 2008?

4   A   I'm not sure I understand your question.

5   Q   You gave a number to this jury.  That number, does it

6   include amounts for which Federal Express was billed or sought

7   reimbursement after you left FedEx?

8   A   No.  All of that occurred while I was still there.  We

9   covered those trips while --

10  Q   That's not my question.  You gave an amount.  That amount

11  is a cumulative total of some pieces of paper, charges and

12  what not that you are -- FedEx is seeking to recover from my

13  client.  Were those charges, those pieces of paper that total

14  that amount, were they accumulated and received after you left

15  FedEx?

16  A   Again, I'm sorry, but I'm not sure I understand your

17  question.  Are you saying were the charges incurred -- were

18  the papers presented --

19  Q   Yes, the documents that totaled forming that amount that

20  you just quoted from counsel after looking at a piece of

21  paper.

22  A   Okay.  And again --

23  Q   Are we communicating?

24  A   No, I'm sorry.  We're not.

25          MR. KURTH:  Can I have the piece of paper that he

1   was shown?

2              MR. GABEL:  Yes.  You're entitled to that.

3              MR. KURTH:  May I approach?

4              THE COURT:  You may.

5   BY MR. KURTH:

6   Q    Are any of those dates that appear on that document that

7   I'm pointing out to you before May 31, 2008?

8   A    No.  Those are after.

9   Q    Thank you.

10  A    You're welcome.

11  Q    Do you know how many of these other amounts reflected on

12  this thing are invoices or documentation before that were

13  received by FedEx or whatever before you left FedEx on May 31,

14  2008?

15  A    This was a weekly flight that occurred on a repetitive

16  basis.  That's why these are showing up after.  These were all

17  incurred before.  That Diners Club was my personal credit card

18  that those were incurred on.

19  Q    Okay.  But these invoices and whatnot and all this

20  paperwork had to be accumulated in total after you left FedEx,

21  correct?

22  A    Some of it was incurred while I was still there.  Some of

23  it may have been incurred afterwards.

24  Q    And you can't speak to the documentation that was received

25  after you left, can you?

1  A   Only to the extent that if it was a repetitive flight -- I

2  think like on the Continental flight, they were going to

3  charge us X number of dollars per flight above what AMC was

4  paying us, the flights may have occurred after I left; but the

5  rate we were going to pay them happened while I was still

6  there, so --

7  Q   And the document that you were shown by counsel was

8  prepared -- had to have been prepared after you left, wasn't

9  it?

10 A   I don't know.

11 Q   Well, it's got dates after May 31.

12 A   Well, those could have been projected dates of future

13 flights.  That's what I'm saying.  The flights were known and

14 scheduled and the rate agreed.  I don't know.

15 Q   You don't know.  Is that your answer:  You don't know?

16 A   I don't know when that document was prepared.  I remember

17 seeing it when I was still there.  I assume it was when I was

18 still there.

19 Q   But you don't know if this is the same document that you

20 saw when you were there?

21 A   I don't know.

22 Q   Thank you.

23 A   You're welcome.

24 Q   All right.  I've got a few more questions.  I'll try not

25 to --

1          MR. KURTH:  Your Honor, may I approach?

2          THE COURT:  Sure.

3       (*Beginning of bench conference.*)

4          MR. KURTH:  Your Honor, I think the proverbial door

5    has been opened on the matter of bankruptcy and what kind of

6    bankruptcy Mr. Molinari was expecting.  And part of the limine

7    covers testimony that Mr. Karnick will give by deposition and

8    that Mr. Molinari would give that Mr. Karnick told him this

9    will be the demise of this company; This will be the end if

10   you don't relent, if you don't reconsider.  It was plainly

11   within the prescription of your limine, but I think that door

12   is wide open now.

13         MR. GABEL:  Your Honor, the only thing I asked him

14   about bankruptcy was whether ATA had performed back in 2004,

15   2005, and 2006 when they were in bankruptcy.  And then I

16   talked about a letter that he got the day they shut down.

17   It's got nothing to do with any intervening communications.

18         MR. KURTH:  That's what he spoke of is his

19   expectations of this company in terms of whether it was

20   prepared for company, ATA shutting down by filing bankruptcy.

21   So the notion that this bankruptcy filing was a hollow threat

22   or hollow advice doesn't work.  We told them it was the end.

23   It would be bankruptcy and our demise if they didn't

24   reconsider, and that's the point of why we wanted to bring it

25   in.  And now they've opened the door because that's what he's

 1   talking about in his testimony.  Their expectations were

 2   reorganization if we filed bankruptcy, not liquidation.

 3             MR. BROUGHTON:  If I could add, I wrote it down when

 4   he said it.  He was asked, "Did you have any prior warning or

 5   notice?"  That was the reason they showed that letter.  "Did

 6   you have any prior notice that they might file bankruptcy or

 7   go out of business," and he said, "No."  Karnick and Ellmer

 8   had told him that's exactly what would happen in the February

 9   meeting in Memphis.

10             MR. GABEL:  I didn't write it down, but I thought my

11   question was, "Did you have any" -- my intention was to ask

12   him, "Did you have any notice that they were going to cease

13   flying before you got this phone call?"  And then the

14   bankruptcy question was about a totally different time period.

15             MR. BROUGHTON:  But his answer clearly opened the

16   door.

17             MR. KURTH:  Your Honor, I would ordinarily put this

18   off, but I don't know what impact it's had on the jury -- put

19   it off to Karnick and Ellmer, but I think I have to ask this

20   question now while it's still fresh in the jury's mind.

21             THE COURT:  But Karnick and Ellmer are going to

22   testify --

23             MR. KURTH:  They will talk about it, yes, Your

24   Honor.

25             THE COURT:  Okay.  I'll allow just that.

MOLINARI – REDIRECT/KURTH                    674

1      *(End of bench conference.)*

2   BY MR. KURTH:

3   Q   Mr. Molinari, you testified a few moments ago these words

4   or to the effect that you had received no prior notice or

5   warning that ATA might go into bankruptcy shutdown; is that

6   right?

7   A   That's correct.

8   Q   Isn't that exactly what Mr. Karnick and Ellmer of ATA told

9   you and your boss in February of 2008 when they traveled to

10  Memphis and told you that if you didn't reconsider, it would

11  be the demise, the end of ATA?

12  A   That's not what he said.  He said it might be a

13  bankruptcy, but they had been in bankruptcy before.  He never

14  said they were going to shut the doors down without -- and not

15  fly, period.

16  Q   So you disagree with my suggestion of the statement of the

17  two representatives of ATA made that this decision of yours to

18  uninvite us would be the end of ATA?  That isn't what they

19  said?

20  A   Absolutely.

21         MR. KURTH:  Well, we'll see.

22  BY MR. KURTH:

23  Q   You made a point to counsel talking about these two

24  instances where you felt that my client had been less than

25  loyal to the FedEx team after it merged with GAL.  Do you

MOLINARI - REDIRECT/KURTH                              675

1   recall those two instances?

2   A    Yes.

3   Q    Okay.  Did those instances occur before or after the

4   September 2007 Fee Agreement that you signed with my client?

5   A    After.

6   Q    Both of them?

7   A    I believe so, yes.

8   Q    Okay.  Let's talk about the first one, Contour Cargo.

9   A    I'm sorry?

10  Q    Contour Cargo?

11  A    Contour Cargo?

12  Q    You know what Contour Cargo is, don't you?

13  A    No, I don't.

14  Q    Okay.  Well, isn't it true that my client approached you

15  and said, "We've been reading the COINS Reports, and there

16  seems to be some cargo trips that are not being picked up by

17  the FedEx team," what's called spill, "and that ATA proposes

18  to -- would like to pick up some cargo trips and make

19  arrangements to do so"?

20  A    That's not how they stated it, no.

21  Q    How else would they state it?

22  A    They said we were leaving money on the table on the cargo

23  side, and could they do some cargo flying.  That's pretty much

24  exactly how they said it.

25  Q    All right.  So were you embarrassed when they suggested

MOLINARI - REDIRECT/KURTH                          676

1  you were leaving money on the table?

2  A    No, because they were wrong.

3  Q    Oh, so the COINS Reports were wrong?

4  A    I have no idea what they were referring to, but all I know

5  is that we were doing better than our entitlement.  So,

6  therefore, we weren't leaving money on the table.  We were

7  doing everything that was available to us.

8  Q    Your suggestion is that if ATA did cargo flights, that

9  those weren't going to be ATA flights; they were going to be

10  somebody else's flights?

11  A    We never got that far because I told them that we weren't

12  even interested in having that discussion any further.

13  Q    And you suggested because you thought what ATA was trying

14  to do deceitfully is move cargo trips over to the World and

15  North American -- the Alliance Team from the Federal Express

16  team.  Isn't that the suggestion that you felt that's what

17  they were trying to do?

18  A    Yes.

19  Q    In fact, sir, couldn't it be just the opposite, if you had

20  been listening or if you had thought about it, that ATA could

21  fly those trips for the FedEx team using planes that World and

22  North American had, and those would go to the credit of the

23  FedEx team and the FedEx team would benefit from those

24  revenues, you included?

25  A    I did think about it, and I didn't need to -- that is not

1   the case.  The case would have been they would have been

2   taking that flying away from the existing cargo carriers that

3   were signed up under the FedEx team to fly cargo.  So I told

4   them emphatically, "No, we're not going to discuss it."

5          Gary Ellmer called me three different times trying to

6   re-raise the same issue; and I told him, "Look, don't call me

7   anymore about this."  He said, "I wish I understood this

8   process better."  And I told him, "Yes, I wish you did, too,"

9   because he would have known that what he was asking was

10  totally inappropriate.

11  Q   It wouldn't have anything to do with World and North

12  American, the Alliance team, just a question of whether ATA

13  was hustling you to do some more business, isn't it?

14  A   No, absolutely not.

15  Q   That wasn't your perspective?

16  A   No, not at all.

17  Q   They were trying to do something underhanded?

18  A   Certainly.

19  Q   Certainly?  Because that's just the kind of people they

20  are?

21  A   No, because that's what they were proposing.  They were

22  proposing to use another carrier's airplanes that would have

23  taken away lifts, taken away flying from carriers on our team.

24  Q   Even if ATA was flying those flights with those borrowed

25  planes for the FedEx team, that wasn't a good thing for the

1  FedEx team?

2  A    Not if it was at the expense of FedEx or Atlas or Polar

3  doing cargo flying.  No, it was not because ATA was not on the

4  team to fly cargo.  They were on the team to fly passengers.

5  Q    It has nothing to do with World or North American.  It's

6  just a question of whether it's ATA or those other folks on

7  the FedEx team, correct?

8  A    You can phrase it however you want, but it was World

9  airplanes.

10 Q    All right.  Let's talk about passenger flights.  You've

11 also testified that you thought we were moving passenger

12 flights over to World and North American.  Is that your

13 testimony?

14 A    Yes.

15 Q    Who decides on subservice -- that is, where ATA can't fly

16 flights -- who decides on who those flights go to, what's

17 called subservice?

18 A    ATA.

19 Q    Isn't it the United States military, the Air Mobility

20 Command makes those decisions, Gladys whatever-her-name-is in

21 Scott Field outside of Belleville, Illinois?  Isn't that where

22 the decision making is made?

23 A    No.  ATA might make a recommendation and say, "We're

24 proposing to do this"; but it's ATA initially who makes the

25 recommendation what they're going to do.  They can't do it

1   without notifying the military.

2   Q   So your suggestion is that ATA, being the sneaky, little

3   devils they are, waited until the last minute when Omni

4   couldn't cover these flights just so they could squirrel them

5   over to World and North America?  That's the story you're

6   putting out?

7   A   Basically, yes.

8   Q   Did this client of mine, ATA, go through a personality

9   change after they merged with GAL such that before, they were

10  loyal and abided by the rules; and afterwards they were -- you

11  couldn't trust them because of their skullduggery?

12  A   I don't know if you would call it a personality change,

13  but based on some of the things that occurred, yes.

14  Q   Would this have anything to do -- sir, your sensitivity

15  have to do with the fact that you found out for the first time

16  what the military had published six months earlier in October

17  of 2007, that a fleet of aircraft that ATA had, the 757-300s,

18  were no longer classified as long-range aircraft; they were

19  classified as short-range aircraft, and for which you would no

20  longer receive a commission?  And that news hadn't -- whether

21  you hadn't read your mail or whatever, you got that news from

22  ATA at the same time they're talking to you about picking up

23  cargo lift.  And you had a bad moment when you figured out

24  that you just were reclassified by the military out of several

25  million dollars in commissions?

1   A    Not at all.  It had no bearing on it.

2   Q    Let's talk about commission rates.  The commission rate

3   paid to my client -- I can show you the documents; you'll

4   probably recall -- for fiscal years '04, '05, '06, '07 was

5   7 percent?

6   A    Paid from your client?

7   Q    Yes.

8   A    Okay.

9   Q    I'm sorry?

10  A    You said "paid to."

11  Q    Let me rephrase, and thank you for correcting me.

12  A    Yes.  They paid us 7 percent, yes.

13  Q    For four years, at least?

14  A    Yes.

15  Q    In fiscal year 2008, you agreed to lower the commission to

16  4 1/2 percent?

17  A    I lowered the commission to 4 1/2 percent, yes.

18  Q    Well, you agreed to it in exchange for my client agreeing

19  to allow up to 10 flights a month --

20  A    There was no dialogue between me and ATA.  I just sent

21  them a Fee Agreement that had a lower percentage on it.

22  Q    No discussion?

23  A    No.

24  Q    You just felt sorry for them or you just wanted to give

25  them a better deal?  You wanted to take a couple million

1  dollars out of Mr. Fred Smith's pocket?  What was that all

2  about?

3  A   It was about they were going to be operating on less

4  revenue, so that's why I changed the commission level.

5  Q   And you had the authority to just do that?

6  A   Yes.

7  Q   Because you're a team leader?

8  A   Yes.

9  Q   Yes.  Decide on commissions, decide on distributions;

10  that's the authority you have, isn't it?

11  A   Mutually agreed distribution.

12  Q   And you don't have the authority, you think, to decide --

13  we've had this discussion, so I'll let the record speak for

14  itself on this.  The day is long.

15          MR. KURTH:  Just for the record, Your Honor, we

16  would offer -- Mr. Gabel, these are --

17          MR. BROUGHTON:  Stipulated.

18          MR. KURTH:  Are they?

19          MR. BROUGHTON:  Yes.  Give them the numbers.

20          MR. KURTH:  These are Plaintiff's Exhibits 168, 169,

21  170, and 14.  And these are the FY04, FY05, FY06, and FY07 Fee

22  Agreements between Federal Express and ATA.

23          THE COURT:  Show them admitted.

24          MR. GABEL:  No objection, Your Honor.

25

1    *(Plaintiff's Exhibits 14, 168, 169, and 170 were received*

2    *in evidence.)*

3           MR. KURTH:  Mike, would you put up on the screen

4    Plaintiff's Exhibit 24 and 26 side by side?

5    BY MR. KURTH:

6    Q    The challenge of weak eyes, Mr. Molinari.

7    A    Pardon me?

8    Q    Small print and weak eyes.

9           MR. KURTH:  Mike, can you try to bundle those a

10   little bit as best you can?  Yeah, there you go.

11   BY MR. KURTH:

12   Q    All right.  Let's walk through these.  I'll try to do it

13   quickly.  We've been talking about it in bits and pieces.

14          We have an Exhibit 24, which I believe is the

15   exhibit on the left, an e-mail string in February of 2007

16   between yourself and the folks at Omni Air.  Do you see that?

17   A    Yes, I do.

18   Q    Okay.  And the e-mail to which you're responding -- you're

19   responding at the top, but the e-mail that you got from Omni

20   is talking about the first bullet point, which we talked a

21   little bit about before, their current three-year agreement,

22   which began in FY07 for Omni to fly all 50 percent.  Do you

23   see that?

24   A    Yes.

25   Q    Okay.  And it refers to the total team passenger business

MOLINARI - REDIRECT/KURTH                          683

1  in both wide-body and narrow-body category, correct?

2  A   Yes.

3  Q   And that's the same business that is described in the

4  September '06 letter that you signed and sent to Mr. Doherty

5  and he signed and sent back to you?

6  A   Yes.

7  Q   Thank you.

8       The second bullet point is a proposal by Omni that

9  based on historical levels, they want to increase their

10 wide-body percentage from 50 to 60 percent in exchange for

11 reducing their narrow-body business from 50 percent to

12 40 percent.  Did I read that correctly?

13 A   You did.

14 Q   And they conclude with the statement in the last sentence,

15 "With respect to NWA" -- that's Northwest Airlines, correct?

16 A   Yes.

17 Q   -- "we do not object so long as it is clear that any

18 business NWA performs does not come out of our share of our

19 current three-year agreement of 50 percent of the total

20 passenger business of the FedEx team."  Did I read that

21 correctly?

22 A   Yes, you did.

23 Q   Now, looking at Exhibit 26, the e-mail of April 2007, do

24 you see that now?

25 A   Yes.

1   Q    And this e-mail is in response to this exchange back in

2   February, correct?

3              MR. GABEL:  Objection, lack of foundation.

4              MR. KURTH:  He testifies.  He can say whether it is

5   or isn't.

6              THE COURT:  Overruled.

7              THE WITNESS:  I don't know, maybe.

8   BY MR. KURTH:

9   Q    You don't recall?

10  A    I don't.

11  Q    Let's just look --

12  A    I don't remember the date of the other one.

13  Q    The previous one is February?

14  A    Okay.  That's three months later, so.

15  Q    More like two months?

16  A    Two months, whatever.

17  Q    Well, let's just talk about Exhibit 26.  You're writing

18  Mr. -- well, Mr. Coretz and Mr. Pollard of Omni.  And you're

19  advising them that you have not been successful in getting ATA

20  to back off the current agreement of 50/50 split for both

21  wide-body and narrow-body AMC fixed and expansion passenger

22  distribution, correct?

23  A    Correct.

24  Q    The wide-body and narrow-body AMC fixed and expansion

25  passenger distribution, that business is the business that's

1  the subject of your agreement with Omni in August of '05 and

2  the letter you sent in September of '06 to Mr. Doherty which

3  he signed and sent back to you?

4  A    No.   This is talking about the current FY07 agreement.

5  That's what I'm referring to.

6  Q    That's what you're referring to?

7  A    Yes.

8  Q    Because you don't recognize the September '06 letter that

9  you sent and signed by Doherty as an agreement?

10  A    That's correct.

11  Q    It goes on to say, "They are insistent," they being ATA,

12  correct?

13  A    Yes.

14  Q    "That they have also made fleet decisions based on the

15  above split and are not willing to change."

16        Did I read that correctly?

17  A    Yes, you did.

18  Q    And your testimony is that the fleet decisions they have

19  made based upon the referenced split was just for -- they made

20  fleet decisions based on a one-year agreement?

21          MR. GABEL:  Objection.  Personal knowledge.

22          THE COURT:  If he knows.

23            THE WITNESS:   I have no idea what they're

24  referring to.

25  BY MR. KURTH:

1  Q   When they told you they had made fleet decisions, you

2  didn't ask?  You didn't know?

3  A   No.

4  Q   All right.  It goes on to say, "At this point you will

5  need to fleet plan/maintenance check accordingly.  I

6  understand your position on your fleet and the potential

7  long-term impact this may have."

8        Did I read that correctly?

9  A   Yes, you did.

10 Q   Thank you.

11        All right, let's talk about a few other things.  You

12 testified that the Fee Agreements, the annual agreements that

13 were executed by Omni and ATA independently with you; that is,

14 FedEx for fiscal years '04, '05, and '06, all had a legend or

15 some statement to the effect there's a three-year agreement in

16 place, correct?

17 A   Yes.

18 Q   For fiscal years '07 and '08 with respect to the Fee

19 Agreements with Omni, there was at that time, if I understand

20 you, a three-year agreement in place with Omni.

21 A   Yes.

22 Q   And yet in both of those Fee Agreements, Plaintiff's

23 Exhibit 177, 179, there's no mention of a three-year agreement

24 with Omni, is there?

25 A   I'm --

MOLINARI - REDIRECT/KURTH                    687

1  Q    But we're supposed to draw significance to the fact that

2  there was a provision, a reference to a three-year agreement

3  in '04 and '06, and the fact that there isn't a reference in

4  subsequent documents.  They have --

5          THE COURT REPORTER:  Mr. Kurth, could I have you

6  repeat your question?

7          MR. KURTH:  It was probably a bad question.

8  BY MR. KURTH:

9  Q    Your testimony -- correct me if I'm wrong -- was to

10 suggest there is significance to the fact that the previous

11 three years, fiscal years '04 through '06, had some mention of

12 a three-year agreement, and that the subsequent years, even if

13 Omni didn't have mention of that three-year agreement and the

14 fact they weren't mentioned meant that there was no agreement.

15 Is that the drift of your testimony?

16         MR. GABEL:  Objection.  Mischaracterizes his

17 testimony, Your Honor.

18         THE COURT:  The jury will determine what the

19 evidence is.

20         THE WITNESS:  I'm not sure what the testimony is.

21 That sentence was so long and covered so much area --

22 BY MR. KURTH:

23 Q    You don't remember?

24 A    I really don't.

25 Q    But we can at least agree that there is no reference in

1  the fiscal years '07 or '08 Omni Fee Agreements to this

2  three-year agreement of August of '05?

3  A    I'll accept your position.  I don't remember.

4  Q    Thank you.  I'll make that representation.  Will you

5  accept it, or would you like to look at the documents?

6  A    Guess I better look at the document.  I don't remember.

7  If you say it's not there, I guess I assume that's correct.

8  Q    I'm going to step out on a limb and tell you it's not

9  there.

10  A    I presume you've checked.

11  Q    Now, we were talking briefly about the agreement -- the

12  Fee Agreement of fiscal year '08, the Fee Agreement between

13  ATA and FedEx that spoke to Northwest doing some flights.  Do

14  you recall that discussion you had with counsel for FedEx?

15  A    Yes.

16  Q    And you referred to -- I believe you said Northwest was

17  going to fly 10 flights a month; is that right?

18  A    That's right.

19  Q    Well, actually the language is up to 10 flights a month,

20  isn't it?

21  A    I believe that's correct, yes.

22  Q    And Northwest had not flown any passenger flights for the

23  FedEx team prior to fiscal year '08, had it?

24  A    They may have flown a few when they had availability.  I

25  can't say for sure that they never flew any.

1  Q   Would it be a fair statement, sir, that at least through

2  the time you were at FedEx through May of 2008, that Northwest

3  was not flying 10 flights a month?

4  A   That's -- yes.

5  Q   And their performance in terms of flight frequency was --

6  well, let's just say it wasn't necessarily dependable over

7  that 8 month period, 7 month period, that is the eight months.

8  That they flew sometimes 3 or 4 flights, sometimes 5 or 6 a

9  month but never up to 10?

10 A   I don't know what the numbers they actually flew were, no,

11 I don't.

12 Q   I wanted to make sure I understood your testimony about

13 the conversations you said you had with Mr. Doherty in

14 September 2006 after you sent him the letter that you signed,

15 he signed and sent it back to you.  And you called him and

16 advised him about Omni's position with respect to the letter,

17 all right?

18 A   Okay.

19 Q   Did you -- this conversation you say you had, did you

20 report to Mr. Doherty that Omni had told you they weren't

21 signing that agreement, or Omni was not agreeable to ATA

22 receiving 50 percent for three years?

23 A   I told him that Omni was not signing that agreement.

24 Q   Do you distinguish between Omni not signing that agreement

25 and Omni -- versus Omni saying, "I'm not agreeable to ATA

1 receiving 50 percent"?

2 A   Yes.  I mean, yes.

3          MR. KURTH:  Thank you.  Pass the witness.

4          THE COURT:  Mr. Gabel?

5                    **RECROSS-EXAMINATION**

6 BY MR. GABEL:

7 Q   Mr. Molinari, you had a somewhat extended discussion about

8 ATA's desire to fly cargo for the FedEx team going forward.

9 The three-year letter about passenger split that you sent in

10 2006 that Omni refused to sign, did that in any way mention

11 ATA doing any cargo flying?

12 A   No, it did not.

13 Q   Are you aware of any agreement that you signed or ATA

14 signed or any -- or Omni signed that envisioned ATA doing

15 cargo flying for the FedEx team?

16 A   No.  There were none.

17          MR. GABEL:  Thank you.  I'll pass the witness.

18          MR. KURTH:  Your Honor, if I may ask a couple

19 questions?

20          THE COURT:  Sure.

21               **FURTHER REDIRECT EXAMINATION**

22 BY MR. KURTH:

23 Q   Mr. Molinari, the Omni Fee Agreements for fiscal years

24 '07, '08 had entire agreement clauses, didn't they?

25          MR. GABEL:  Objection, beyond the scope.

MOLINARI – FURTHER REDIRECT/KURTH                    691

1          THE COURT:  Are these omitted questions?

2          MR. KURTH:  Yes.

3          THE COURT:  Go ahead.

4   BY MR. KURTH:

5   Q    Those Fee Agreements that you had with Omni had entire

6   agreement clauses in them, didn't they?

7   A    I believe so, yes.

8   Q    You considered your three-year agreement with Omni made in

9   August of '05 to be effective nonetheless; did you not?

10  A    Yes.

11         MR. KURTH:  Thank you.

12         THE COURT:  Mr. Gabel, anything further?

13         MR. GABEL:  Nothing further, Your Honor.  Pass the

14  witness, Your Honor.

15         THE COURT:  Mr. Molinari, thank you very much for

16  your testimony.  You may step down.

17     (Witness excused.)

18         THE COURT:  Okay, members of the jury.  It's a

19  little after five.  You've been here a long time today, and

20  we'll continue on with the trial tomorrow.  While you're

21  separated and outside the courtroom, do not read or listen to

22  any news accounts.  Do not let anyone talk to you about the

23  case.  Do not do any independent research.

24         We'll have a change in schedule tomorrow.  Because

25  of an obligation that I have in the morning, we'll start at

692

1    noon tomorrow.  Please eat your lunch prior to noon, because

2    we won't break for lunch right after you get here.  And we'll

3    have one break in the afternoon, and then we'll go till about

4    five o'clock tomorrow.

5            So maybe this will give you an opportunity to catch

6    up on some of your personal things in the morning; but if you

7    could be here at noon, then we'll continue on with testimony.

8    I think we're pretty close to being on schedule here.

9            The attorneys have worked hard to make their case

10   run as on schedule as we possibly can.  So I still think I'm

11   looking for next Tuesday to be finished up; but in any event,

12   that's my best guess at this time.

13           So have a good evening, be careful, and we'll see

14   you tomorrow at noon.  Thank you.

15           COURT CLERK:  All rise.

16     *(Jury out.)*

17           THE COURT:  Please be seated.  Mr. Kurth,

18   Mr. Broughton, anything we need to discuss prior to

19   adjourning?

20           MR. BROUGHTON:  We have an offer of proof issue at

21   some point.

22           THE COURT:  You can do it.

23           MR. BROUGHTON:  On the Plaintiff's Exhibit 4 and

24   also on the post January 22, 2008 communications I was going

25   to put on with Mr. Rachor, but he's here the whole time.

1      MR. KURTH:  Whatever the Court's pleasure is.

2      THE COURT:  If you're going to do it, you might as

3  well do it now.  Mr. Rachor is here?  All right.

4      THE WITNESS:  Can I ask what the procedure is?

5      THE COURT:  Well, they're going to ask you --

6  obviously the jury is not here.  There's an objection made.  I

7  sustained the objection.  They want to preserve their record

8  in the event there's an appeal for that.

9      So you recall you're still under oath?

10      THE WITNESS:  Yes, sir.

11      THE COURT:  All right.  Mr. Broughton?

12      MR. BROUGHTON:  Thank you, Your Honor.  If you could

13  put up PX4, please.  If you could enlarge that, please,

14  Mr. Brockwell.

15      THE COURT:  Who is -- who handled this?  Was that

16  you, Mr. Blumberg?  Yes.  Refresh me what the objection was.

17      MR. BLUMBERG:  The objection was prejudicial value.

18  This was a document that was post-lawsuit and really was

19  involved in the --

20      THE COURT:  Okay.  Thank you.

21      MR. BROUGHTON:  I believe for the record that this

22  lawsuit was filed on July 25, 2008.  So the lawsuit had not

23  been filed at this time.

24      MR. BLUMBERG:  I think it was June 11th.

25      MR. BROUGHTON:  Was it June?  Sorry, all right.

**OFFER OF PROOF**

**ROBERT RACHOR, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

**<u>EXAMINATION</u>**

BY MR. BROUGHTON:

Q   Anyway, can you identify this, Mr. Rachor?

A   Dave Lange is the gentlemen who relieved Gary Molinari after he departed FedEx.  He's the Managing Director of Aircraft Charters at this time.

Q   So Dave Lange is Mr. Molinari's successor; is that right?

A   That's correct.

Q   In your bottom e-mail, you say, "Did Gary have any CTA contracts out there that extend beyond the current FY08 contract."  Do you see that?

A   Yes, sir.

Q   The next sentence says, "Are there any other contracts out there that legal did not see?"  When you said "other contracts out there that legal did not see," you were talking about the September 7, 2006 agreement that ATA was suing on, weren't you?

A   No.  I was just searching for -- it's actually a pretty poorly written e-mail --

        THE COURT REPORTER:  I really need you to slow down.

        THE WITNESS:  Again?  Okay.

        I was really looking for any other pieces of paper out there that would bear on the case that he had is my

1  recollection.  So if I used the term contracts, I used it

2  ill -- I just didn't use it correctly.  I should have been

3  much more expansive than that.

4  Q   So when you said -- why did you use the word "other"

5  there?

6  A   Because I had used contract in the previous sentence.

7  Q   Why did you use the word "other"?

8  A   I don't know.  Again, it's poorly written from stem to

9  stern.  So I just should have been much more precise at that

10 time as to what I meant.  So I was looking for -- the purpose

11 of this e-mail was to find out is there anything else out

12 there that I need to see.  That was the purpose of that.

13 Q   All right.  And if we look at Mr. Molinari's successor's

14 response, he says, "The FY09 Teaming Arrangement Agreement has

15 been reviewed and accepted by AMC and our legal group.  Dana

16 is currently reviewing the Fee Agreements for all the CTA team

17 members for FY09.  We are looking through our files to

18 determine if there are any letters that confirm longer-term

19 commitments than are what are in the Fee Agreements."  Do you

20 see that?

21 A   Yes.

22 Q   You were looking for other letters just like the

23 September 7, 2006, letter that was for longer than one year,

24 right?

25 A   Yes.

RACHOR – EXAMINATION/BROUGHTON                          696

1  Q    And you were --

2  A    Actually, anything -- what I was looking for was anything

3  out there that I hadn't seen that I needed to see, and that

4  was Dave's response.

5  Q    And you understand that it has been FedEx's position in

6  this lawsuit that there are no agreements or longer term

7  commitments related to military flying that are anything other

8  than annual, right?

9  A    Can you say the question again?

10 Q    You understand that FedEx has taken the position in this

11 lawsuit that all contracts related to military flying can only

12 be annual?

13 A    The contracts, that's correct, yes, sir.

14 Q    And here -- how do you distinguish between a longer-term

15 commitment and a contract?

16 A    I was looking for any other letters that were of a longer

17 nature.  So I don't know if it would be -- it certainly

18 wouldn't be a contract, but if there was any other letter

19 between Gary and anyone else out there that I needed to see

20 that was longer.

21 Q    For more than one year?

22 A    Yeah, longer than one year, longer than 10 years, longer

23 than whatever was out there.  I just wanted to see are there

24 any other papers out there -- excuse me, are there any other

25 papers out there that I need to see.

1  Q    How do you distinguish between a longer-term commitment

2  and a long-term contract?

3  A    Well, a long-term contract is one that to my -- to my mind

4  is one that we've gone through the contracting process on,

5  that has the appropriate matters within the contract that

6  specify the term, scope, the fee, the conditions, the amount

7  of service each person is going to provide, the normal things

8  you see in contracts.

9  Q    Isn't what really happened here is that after FedEx got

10 sued, you finally realized that Mr. Molinari had been

11 executing not one but several longer-term commitments, and

12 that came as a surprise to you, didn't it?

13 A    Surprise -- he had authority to do that type of work.  So

14 I can't say that I was necessarily surprised by it because

15 that would be within the realm of his duties.  Did I know

16 about it?  No, and I've clearly testified that I did not know.

17 Q    And it's also very clear that FedEx had an internal policy

18 of the entire company that contracts were to be approved --

19 preapproved by its legal department before a FedEx manager

20 such as Gary Molinari signed them, much less drafted them, and

21 sent them out; isn't that right?

22 A    Legal should approve contracts, that's correct.

23 Q    Legal had not approved the Omni '07 through '09 contract,

24 had they?

25 A    Let me answer this way.  I just want to make sure -- I

1   don't know whether they did or not, but there were no legal

2   initials on the document which would indicate that they had.

3   Q   And it was typical at FedEx for there to be a little stamp

4   or some little initials that it had gone through the FedEx

5   legal department, right?

6   A   That's right.

7   Q   And that's not on the '07 through '09 Omni agreement, is

8   it?

9   A   No.

10   Q   It's not on the September 7, 2006, three-year ATA Letter

11   Agreement, is it?

12   A   The Letter Agreements, no.

13   Q   And that's the reason in your initial e-mail you said are

14   there any other the contracts out there legal did not see,

15   isn't it?

16   A   No.  I told you exactly what I was trying to do here.  I

17   was trying to find out what other pieces of paper were out

18   there.  A pretty natural thing to do, actually.

19   Q   Let's go to after the January 22, 2008 notice letter,

20   which is Plaintiff's Exhibit 2, if you will.  Are you aware

21   that Mr. Karnick and Mr. Ellmer traveled to Memphis after they

22   received that letter to meet with Mr. Molinari?

23   A   Yes.

24   Q   Were you present at that meeting?

25   A   No.

1  Q   Did you know it was going to happen in advance?

2  A   You know, I don't know -- no, I did not, and I don't know

3  when I learned of it.

4  Q   Did Mr. Molinari report to you that ATA had urged FedEx to

5  reconsider?

6  A   I don't recall.

7  Q   Did Mr. Molinari tell you that ATA told him that it would

8  be the demise of ATA if it lost its core business?

9  A   I don't recall.

10  Q   After that, ATA requested that they talk to Mr. Molinari's

11  superiors; is that right?

12  A   Yes.

13  Q   And that ended up being you and Jim Parker?

14  A   They were calling for Parker.  I listened to the phone

15  call.

16  Q   You were in on the phone call, that's right?

17  A   I listened to the phone call.

18  Q   And Subodh Karnick, who was ATA's president, called you,

19  correct?

20  A   Yes.

21  Q   And Mr. Ellmer, the COO was also on the phone; is that

22  right?

23  A   Don't know.

24  Q   And we've seen previous e-mails where you prepared

25  Mr. Parker for this discussion, right?

RACHOR - EXAMINATION/BROUGHTON                    700

1   A    That's correct.

2   Q    And one of the things you prepared him on was that if

3   Mr. Karnick or anyone from ATA mentioned the September 7,

4   three-year Letter Agreement, that that should be of no import

5   to Mr. Parker because Omni refused to sign because Omni did

6   not agree with the 50/50 split, right?

7   A    That was my impression, yes.  That's what's in my e-mail

8   to him.

9   Q    During this phone call, Mr. Karnick specifically stated

10  that FedEx's termination from the team would bankrupt the

11  company, didn't he?

12  A    No.  He -- to my recollection, he said something similar

13  to that.  He said his lawyers advise him that -- his lawyers

14  advise him that -- I can't remember the exact words at this

15  time, but the word bankrupt was used.  His -- he said his

16  lawyers advised him -- and I can't remember the exact

17  sentence -- that ATA could go bankrupt.

18  Q    So he did tell you that?

19  A    Yeah, he told Mr. Parker that.

20  Q    You heard Mr. Karnick say FedEx's termination from the

21  team would bankrupt it?

22  A    No.  I just told you what I heard him say.  I heard him

23  say his lawyers told him or advised him that this -- and I

24  can't remember all the words, but the word bankrupt was used.

25  Q    Could bankrupt?  Is that what you're testifying?

RACHOR – EXAMINATION/BROUGHTON                701

1   A   I don't know.  I just don't know.

2   Q   Can you play page 186, lines 10 through 12.

3           MR. BLUMBERG:  Your Honor --

4   BY MR. BROUGHTON:

5   Q   Can you recall giving a deposition in this case in

6   Memphis?

7   A   Yes, sir.

8   Q   And you were under oath?

9   A   Yes.

10          MR. BROUGHTON:  Can you please play 186, 10 through

11  12?

12      (An excerpt of the video depositon of Mr. Rachor was

13  played in open court.)

14          MR. BROUGHTON:  Your Honor, it's okay.  He's

15  basically said --

16  BY MR. BROUGHTON:

17  Q   The issue of bankruptcy came up, right?

18  A   It's essentially the same to me, yes.

19  Q   And during the call, you heard Mr. Karnick ask Mr. Parker

20  that ATA be allowed back on the FedEx team, right?

21  A   No.

22  Q   You don't think he ever said that?

23  A   Right now when you ask me, I don't recall that.

24  Q   In fact, as of that call, FedEx had already entered into a

25  new three-year agreement with Omni for years FY09 through

1   2011; isn't that right?

2   A   At the time I didn't know that they had.

3   Q   Now you realize that FedEx entered into yet another

4   three-year agreement, right?

5   A   Yes.

6   Q   Going through 2011?

7   A   Yes.

8           MR. BROUGHTON:  I'll pass the witness.

9           THE COURT:  Mr. Blumberg?

10          MR. BLUMBERG:  No questions.

11          THE COURT:  Mr. Rachor, thank you.  You may step

12  down.

13      (Witness excused.)

14          MR. BROUGHTON:  No further offer of proof.

15          THE COURT:  Any further argument on this?

16          MR. KURTH:  Your Honor, may I make one observation

17  argument, I guess?

18          THE COURT:  Well, you can ask Mr. Broughton to do it

19  for you, but one lawyer at a time.

20          MR. BROUGHTON:  Your Honor, we would re-urge the

21  relevance of Mr. Rachor's testimony, both on the fact that

22  apparently he draws some distinction between a longer-term

23  commitment and a contract as well as I think the fact that he

24  said what other contracts out there did legal not see?

25          I agree it's prejudicial to FedEx because I think

1    it's an admission that Mr. Molinari was just kind of doing

2    whatever he wanted and wasn't following the internal rules,

3    didn't run it by legal, and actually made commitments; that

4    whether or not he realized they were a commitment, they were a

5    contract.

6              MR. BLUMBERG:  I think Mr. Rachor's testimony

7    actually confirms the correctness of the Court's order, that

8    he was in the process of trying to gather information on a

9    lawsuit that had been filed seven days earlier and that the

10   rationale holds that this is far more prejudicial than

11   probative; and therefore, that the Court's decision should be

12   upheld.

13             THE COURT:  Well, I wasn't quite aware earlier

14   regarding the point being that -- the point that's trying to

15   be made here is that -- of course, the issue here is whether

16   that is a -- whether it is a contract.  I guess what ATA's

17   trying to point out here is that Mr. Molinari was writing

18   these letters and may or may not have known the legal effect

19   of what he was writing, was not passed by the legal

20   department.  And something that he may have thought might not

21   be a contract, lawyers may differ on that.

22             So I'm going to find that on that point, there is

23   some relevance.  Your 403 objection is considered, and

24   although there is certainly some prejudicial -- there's also

25   probative value to it as well on that particular issue.  I'm

704

1   going to go ahead and allow that.

2           MR. BLUMBERG:  Your Honor, can we be heard on one

3   more point to that?

4           THE COURT:  You may.

5           MR. BLUMBERG:  The issue of the legal review, all

6   those points being made are made and can be made without that

7   particular e-mail, that the letters don't bear the legal

8   initials, and that some of the contracts do bear the legal

9   initials are points that were known to counsel and are

10  available independent of that e-mail.  So that doesn't change

11  the fact that the e-mail itself is really only a document in

12  collection and those points about it can be brought out

13  regardless of the use of that e-mail.

14          I mean, certainly -- and these were things that were

15  brought up in deposition.  Those questions were, well, did

16  this go through legal?  Did this not go through legal?  That

17  doesn't require the admission or change the fact of what that

18  e-mail is.

19          THE COURT:  Mr. Broughton.

20          MR. BROUGHTON:  Your Honor, I really do think

21  there's a big difference in the wording of that e-mail.  I

22  personally don't think the explanation of the use of the word

23  "what other contracts are out there that legal did not see" is

24  credible testimony, and I believe that does bear on the

25  credibility of the witness.

1            I also find it a little strange that I believe FedEx

2     has a legal department of over 100 lawyers.  I'm sure they

3     have a very -- quite the process for producing documents and

4     gathering documents; and here is a nonlawyer dealing with

5     another nonlawyer on this issue.  There's no mention of the

6     legal department.  And as I see that e-mail, it really looks

7     to me more like Mr. Rachor, the boss, is asking the successor

8     of Gary Molinari, "What else is out there I don't know about?

9     What else was out there that wasn't shown to legal?  What

10    other long-term commitments are out there that I don't know

11    existed?"  So I don't think it would have near the impact with

12    the jury just to say, "Oh, well, some have this little legal

13    stamp and these don't."

14            MR. BLUMBERG:  Now we're moving beyond relevance.

15    What else is out there doesn't bear on this case and these

16    letters; and therefore, it needs to be cabined to.  Again,

17    these points about whether the letters went through legal,

18    certainly that's a question that could have been asked while

19    the witnesses were live:  Did this go through legal?  Did

20    these contracts go through legal?  That's a question that

21    could be asked live as well and they weren't.

22            I think this is now taking a document that all agree

23    was done in the course of collecting documents to bring up

24    points that weren't brought up during the opportunity; and for

25    these reasons, I think again, the Court's initial decision

1  that we're taking something that was part of our document

2  collection efforts and putting out there, it's going to

3  mislead the jury and confuse the jury.

4         MR. BROUGHTON:  Your Honor, if you look at the very

5  top e-mail and the response from Dave Lange, Mr. Blumberg said

6  something about looking for all documents.  I mean, this is

7  very focused.  "Dana is currently reviewing the Fee Agreements

8  for all the CTA team members for FY09.  We are looking through

9  our files to determine if there are any letters that confirm

10 longer-term commitments."  So clearly, they were thinking, "We

11 better look at what else is out there that is longer than

12 annual for everybody on our team."  And for that reason, I

13 think it is very relevant and very probative.

14         MR. BLUMBERG:  I think this is also -- I mean, our

15 looking at what else might be out there and this process to

16 see what is going on, as Mr. Rachor said, he's looking to see

17 what else is out there and what is going on.  That also falls

18 into the subsequent remedial measure exception.

19         Here we are.  We've just been sued.  This is seven

20 days after the lawsuit.  Here's someone trying to, you know,

21 gather information now.  It's going to be put out.  It

22 wouldn't allow a company to, you know, do exactly what has

23 been going on here.  We got sued.  We're collecting

24 information, and we -- now it's being turned.

25         MR. BROUGHTON:  Again, I don't see any reference to

 1  a lawsuit here.  I don't see any reference to a document

 2  review collection process other than like, "Oh, my gosh, what

 3  else is out there?"

 4          MR. BLUMBERG:  This is post-lawsuit, and it's seven

 5  days thereafter.  I mean, if I didn't complete my offer of

 6  proof and I need to ask -- I think he even said that during

 7  the offer of proof.  I'll put him back on.  He'll testify yes,

 8  a lawsuit came in.  ATA is suing us I think at the time for

 9  $150 million or more.  I've got to do some things.  Again,

10  there's other opportunities to bring out what got legal review

11  and what didn't get legal review.

12          MR. BROUGHTON:  I don't know what their codes mean;

13  but on the back page, the second page, under "conversation

14  topic," the conversation topic only says "contracts."  The

15  importance is normal.  The priority is normal, sensitivity

16  normal.  So it just doesn't seem like they're talking about

17  something in response to this lawsuit other than the fact that

18  Mr. Rachor was, like, "What else is out there I don't know

19  about?"

20          MR. BLUMBERG:  I think those priority headers just

21  go to an e-mail system.  If someone, you know, hits the

22  exclamation point, I don't think that's definitive on urgency.

23          MR. BROUGHTON:  But the conversation topic only says

24  contracts, not legal review or --

25          MR. BLUMBERG:  I think that's just pulled from the

1    title of the e-mail itself.

2           THE COURT:  Well, let me think about this a little

3    while; and I'll let you know tomorrow.

4           MR. BROUGHTON:  Thank you, Your Honor.

5           THE COURT:  Anything else?

6           MR. KURTH:  Your Honor, there's only one other

7    thing.  I would ask for some guidance from Mr. Gabel on this.

8    I guess it's the counterclaim that FedEx is making for

9    $187,000.  At least that's the number I heard today.

10          Mr. Molinari is finished, and I don't want to take

11   the Court's time today necessarily; but is there another

12   witness that's going to talk about the counterclaims that's

13   going to talk about this document and the numbers?

14          MR. GABEL:  Your Honor, I think we've very likely

15   completed our proof of the counterclaim.  We've talked about

16   the contract.  We've talked about the fact they didn't

17   perform, and Mr. Molinari just gave the jury damages figure.

18   We're not going to beat a dead horse.

19          While it's a significant amount of money to me, we

20   also recognize ATA is in bankruptcy; and we'd be at the back

21   of the line.

22          MR. KURTH:  Your Honor, I'd like to move to strike

23   the testimony of Mr. Molinari.  The $187,000 number he picked

24   off a document that he didn't prepare.  It contains entries on

25   it that are -- and I would ask that it be put in the record.

1  The document which he's making reference, this couldn't have

2  been a document -- he testified it's not a document he

3  prepared.  Couldn't have been prepared under his direction and

4  supervision and is a number that he clearly doesn't have any

5  personal knowledge of.  And based on a document that he didn't

6  prepare --

7          THE COURT:  Didn't he testify that before he left,

8  he saw it and agreed with it?  He instructed, I'm assuming a

9  member of his staff, to put together that document based upon

10 the shoebox receipts.  And I believe his testimony was that he

11 saw it before he left, that the entries subsequent to his

12 retirement were projections and that he saw the final document

13 and agreed with it.  I mean, it certainly goes to the weight

14 that anybody would give that.  I don't know.

15         MR. KURTH:  I understand your point, Your Honor.  I

16 just -- for the record, as he testified, he's looking at

17 entries and whatnot.

18         THE COURT:  Of course, he can't speculate; and what

19 he's doing here is he's saying well, we had regular flights,

20 consistent flights with Continental or whoever and they did it

21 so many times a month.  And so we just ran it out to these

22 dates here and put down those costs.  Of course, that's

23 speculation.

24         MR. GABEL:  Your Honor -- I don't mean to interrupt.

25 I interpreted his testimony as we were buying these flights

710

1   ahead of time.  Some of the expenses he said he paid with his

2   own credit card.

3            THE COURT:  That could be too.  My knowledge of all

4   that is very limited as to how they do that.  I'm thinking,

5   Mr. Kurth, that this might go to the weight of the document,

6   what weight the jury might give it as to whether it actually

7   comes in.

8            MR. GABEL:  For clarification, Your Honor, I didn't

9   offer this document.  I just think all we have is oral

10  testimony that he gave without any objection after I refreshed

11  his memory of his ballpark 180,000 number.

12           THE COURT:  That's right.  That's exactly right.  It

13  wasn't admitted into evidence, but certainly he testified off

14  it.  And you referred to it in your examination --

15           MR. KURTH:  I did.

16           THE COURT:  -- of him.

17           MR. KURTH:  Yes, I necessarily did.

18           THE COURT:  It's all fair game.

19           MR. KURTH:  All right.

20           That is fine.  Thank you.

21           THE COURT:  Anything else?  Mr. Broughton,

22  Mr. Kurth, who do we have tomorrow?

23           MR. BROUGHTON:  We will have Bill Garrett to start

24  with; and I'm not sure if Mark Patterson can stay long enough

25  to testify, but I'll try.  If it's not Mark Patterson, then it

1  would be Larry Morriss, our damages expert.

2           THE COURT:  Then that will be it?

3           MR. BROUGHTON:  That will be it, Your Honor.

4           THE COURT:  So you anticipate then finishing

5  tomorrow?

6           MR. BROUGHTON:  Only if FedEx agrees not to do any

7  cross-examination.

8           MR. BLUMBERG:  I think probably if Ken and I and Tom

9  agree, I think what will probably happen is that we'll get

10 through Garrett and I imagine Mr. Morriss' direct.  His cross

11 will be somewhat lengthy if that went Monday morning, and then

12 Mr. Zandman, our expert.  I think then all the proof would be

13 in, and we would be able to close Tuesday morning.

14          MR. BROUGHTON:  You're not playing any depositions?

15          MR. BLUMBERG:  We need to go back and look.  A lot

16 of what we had designated has already come in.  We don't want

17 to burden the jurors with what they've heard before.  There

18 may be a short amount of testimony from Robert Binns that we

19 mentioned, possibly something from Subodh Karnick but nothing

20 that would exceed an hour.

21          THE COURT:  I should have a draft of my final

22 instructions for you tomorrow sometime so you can take a look

23 at them over the weekend as well.  So, we're kind of pointing

24 toward arguing then on Tuesday with deliberations on Tuesday?

25 Does that make sense?

712

1        MR. BROUGHTON:  Makes sense to me.

2        MR. BLUMBERG:  That would be nice.

3        THE COURT:  Again, I'm sorry about not working in

4   the morning, but this is just one of those court functions

5   that needs to be attended to and --

6        MR. KURTH:  Having been a young lawyer once, I would

7   regard it as important.

8        THE COURT:  I mean it's always a good occasion for

9   the young lawyers to celebrate passing the bar and not having

10  to take it again.

11       We'll see you tomorrow morning at 11:45.  We'll get

12  you a ruling out on your issues raised on your offer to prove

13  as well.  Thank you.

14       COURT CLERK:  All rise.

15       *(The proceedings were adjourned at 5:39 p.m.)*

16

17

18

19

20

21

22

23

24

25

1               CERTIFICATE OF COURT REPORTER

2

3        I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8     /s/ Cathy Jones_____              October 14, 2010
      CATHY JONES, RPR, FCRR
9     Official Court Reporter
      Southern District of Indiana
10    Indianapolis Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25