1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2               INDIANAPOLIS DIVISION

3
    ATA AIRLINES, INC.,           )
4                                 )
                                  ) CAUSE NO.
5           Plaintiff,            ) 1:08-cv-00785-RLY-DML
                                  )
6           -vs-                  )
                                  ) Indianapolis, Indiana
7    FEDERAL EXPRESS CORPORATION,) October 15, 2010
                                  ) 12:00 p.m.
8           Defendant.            ) VOLUME 5

9

10

11

12                    **BEFORE THE**
              **HONORABLE RICHARD L. YOUNG**

13

14         OFFICIAL REPORTER'S TRANSCRIPT OF

15                    JURY TRIAL

16

17

18

19

20

21

22  Court Reporter:    Cathy Easley Jones, RPR, FCRR
                        Official Court Reporter
23                      46 East Ohio Street, Room 291
                        Indianapolis, IN  46204
24

25         PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              COMPUTER-AIDED TRANSCRIPTION

Vol. 5 - 713

1                          **A P P E A R A N C E S**

2

     FOR THE PLAINTIFF:          Mr. Kenneth E. Broughton
3                                Mr. Francisco Rivero
                                 HAYNES AND BOONE
4                                Suite 2100
                                 Houston, TX  77010
5
                                 Mr. Thomas E. Kurth
6                                Mr. W. Alan Wright
                                 HAYNES AND BOONE
7                                901 Main Street
                                 Suite 3100
8                                Dallas, TX  75202

9                                Mr. John David Hoover
                                 Ms. Alice McKenzie Morical
10                               HOOVER HULL
                                 111 Monument Circle
11                               Suite 4400
                                 Indianapolis, IN  46204
12

13
     FOR THE DEFENDANT:          Mr. Peter D. Blumberg
14                               FEDERAL EXPRESS CORPORATION
                                 3620 Hacks Cross Road
15                               Building D, Third Floor
                                 Memphis, TN  38125
16
                                 Mr. Michael E. Gabel
17                               FEDEX LEGAL DEPARTMENT
                                 3620 Hacks Cross Road
18                               Building B, 2nd Floor
                                 Memphis, TN  38125
19
                                 Ms. M. Kimberly Hodges
20                               FEDEX LEGAL DEPARTMENT
                                 3620 Hacks Cross Road
21                               Building B-3
                                 Memphis, TN  38125
22

23

24

25

Vol. 5 - 714

1              I N D E X

                                    PAGE
2

3  WILLIAM A. GARRETT
   Direct Examination by Mr. Broughton ...........720
4  Cross-examination by Mr. Gabel ...............779
   Redirect examination by Mr. Broughton .........847
5

6  MARK PATTERSON
   Direct Examination by Mr. Broughton ..........865
7  Cross-examination by Ms. Hodges ..............881

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Vol. 5 - 715
1              I N D E X   O F   E X H I B I T S

2                                              PAGE

3    For Plaintiff:

4    93 ........................................787
     123 .......................................817
5

6

7

8

9

10

11

12   For Defendant:

13   131 .......................................783
     132 .......................................783
14   138 .......................................795
     158 .......................................842
15   185 .......................................846

16

17

18

19

20

21

22

23

24

25
```

1      *(In open court)*

2           (Jury out.)

3           THE COURT:  Good afternoon.  Appreciate your

4    willingness to work around my schedule.  Hopefully, we'll get

5    a lot of work done yet this afternoon.

6           Any matters before we bring the jury in,

7    Mr. Broughton?

8           MR. BROUGHTON:  Yes, Your Honor, two matters.

9           ATA would like -- in light of Mr. Rachor's

10   testimony, ATA would like to renew its motion in limine that

11   was ruled upon in pretrial.  Yesterday, Mr. Rachor, when asked

12   did this alleged conflict of interest related to the parent

13   company of ATA have anything at all to do with whether or not

14   there was a valid three-year agreement, he said no; and we had

15   objected and pointed out in a motion in limine stage at the

16   pretrial that this conflict of interest is completely

17   unrelated and irrelevant to the question that's going to be

18   asked the jury:  Was there a three-year agreement?

19           FedEx has not pled any affirmative defense that

20   would relate to whether or not this conflict of interest was

21   somehow negated or breached this three-year agreement.

22   They've just said there is no three-year agreement.  So the

23   continued line of questioning and offering of evidence by

24   Federal Express trying to prove that because of the parent

25   company, there was a conflict of interest, is irrelevant; and

Vol. 5 - 717

1  it's a waste of the Court's time.

2          THE COURT:  Mr. Blumberg?

3          MR. BLUMBERG:  Your Honor, as the Court instructed

4  the jury at the outset, FedEx's contention in this case is

5  that its teaming contracts or its contracts with its team

6  members are annual contracts, year-to-year contracts, and that

7  every year that FedEx determines who will be on the team.  And

8  Mr. Rachor as well as Mr. Molinari and, in fact, even

9  Mr. Doherty all testified about how the team membership can

10 change from year to year.  FedEx made a decision not to

11 include ATA on the FY09 team, and the rationale as to why that

12 decision was made is relevant to FedEx's claim in this case

13 and remains so.

14         MR. BROUGHTON:  It has nothing to do with the

15 question that's going to be put to the jury:  Was there a

16 three-year agreement.  What we just heard is that FedEx, not

17 recognizing a three-year agreement at all, is offering its

18 explanation of why it didn't want ATA on the team in FY09,

19 okay?  And it's clear FedEx didn't need a reason if it didn't

20 want ATA on the team in FY09, absent this three-year contract.

21         Its position is:  We got to FY09.  We didn't have a

22 three-year agreement.  Everything was up in the air.  We

23 decided we didn't like their parent; and No. 1, Northwest

24 wanted to do more flying, bears no relevance to the existence

25 of the three-year agreement upon which ATA sues.

Vol. 5 - 718

1          THE COURT:  That's a great final argument, and

2    that's where you should argue that, in final argument.  Motion

3    in limine stands.

4          MR. BROUGHTON:  A second matter, Your Honor.

5          Along the same lines, we've had several bench

6    conferences.  Bill Garrett was the CFO.  As previously -- I

7    think it will come up in documents that -- and he might

8    reference that ATA asked FedEx to reconsider.  And that answer

9    was no, and it would go no further than that.  I just wanted

10   to go ahead and seek the Court's permission if he says no more

11   than that.

12         THE COURT:  Yes.  I think that's the way we left it,

13   right?

14         MR. BLUMBERG:  I think so, Your Honor.  I'll have to

15   hear as the evidence comes in, but Bill Garrett was not -- the

16   conversation about FedEx, about being asked, Bill Garrett was

17   not personally involved in that.  It may be subject to a

18   hearsay objection.  We'll have to see what comes in.

19         THE COURT:  Sure.

20         Anything else before we bring in the jury?

21         MR. BROUGHTON:  No, Your Honor.

22         THE COURT:  All right.  Ready for the jury then,

23   Philip.

24         Who do we have up first?

25         MR. BROUGHTON:  Mr. Garrett.

Vol. 5 - 719

1          THE COURT:  Mr. Garrett?  Okay.

2          Is he in the courtroom?

3          MR. BROUGHTON:  He's right next door.

4          THE COURT:  Can somebody get him?

5          MR. BROUGHTON:  I think my colleague already went to

6    get him.

7          THE COURT:  For the attorneys, Jean needs to leave

8    in about an hour for thirty minutes.  So I'm just going to

9    have her get up and leave.  Cathy will stay.

10         MR. BROUGHTON:  Did you want Mr. Garrett up there or

11   wait?

12         THE COURT:  He can stand right there.  That's fine.

13      (Jury in.)

14         THE COURT:  Good afternoon.  Missed the morning

15   session, but good afternoon.  We're going to continue on today

16   with evidence and testimony.  The Court had a function to

17   attend this morning.  I swore in 440 new lawyers.  Now, some

18   people might think that's good.  Some people might think

19   that's bad.

20          In any event, we've got a lot of really enthusiastic

21   young lawyers coming out to help people with issues they may

22   have that come up in everyday life.  So that's always an honor

23   for the Court to do that, and that's why I took the time this

24   morning to go over there and do that.

25          So I apologize for the down time that you may have

Vol. 5 - 720

1   had; but hopefully, you had an opportunity to take care of

2   some personal business as well.  While you were outside the

3   courtroom, did anyone make any attempts to talk to you about

4   the case?  Read or listen to any news accounts?

5           Okay.  We're going to continue on.  Mr. Broughton,

6   call your next witness.

7           MR. BROUGHTON:  Thank you, Your Honor.  ATA calls

8   Mr. Bill Garrett.

9           THE COURT:  All right, Mr. Broughton.

10          WILLIAM A. GARRETT, PLAINTIFF'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MR. BROUGHTON:

13  Q   Good afternoon, Mr. Garrett, will you please tell us your

14  name.

15  A   William A. Garrett.

16  Q   Where do you live?

17  A   I live in Purcellville, Virginia.

18  Q   How long have you lived there?

19  A   I've lived there about 10 years.

20  Q   Tell the jury a little bit about yourself, please.

21  A   I'm a -- I work for Global Aviation Holdings.  I've been

22  the CFO there for three years.  Prior to that time, I spent a

23  year with MatlinPatterson as a senior consultant helping with

24  their aviation investments.

25          Prior to that point in time, I spent six years with

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 721

1   Gemini Air Cargo as their CFO and Chief Operating Officer.

2   Prior to that, I was a CFO at Vanguard Airlines --

3            THE COURT REPORTER:  I'm sorry, sir, if I could ask

4   you to please slow down.

5            THE WITNESS:  Okay.

6            MR. BROUGHTON:  She has to take down everything you

7   say.

8            THE WITNESS:  I understand.

9            I was a CFO at Vanguard Airlines.  Prior to that

10  point in time, I spent nine years in public accounting, six

11  years with --

12  BY MR. BROUGHTON:

13  Q   Slow down.

14  A   Six years with Coopers & Lybrand in their New Jersey and

15  North Carolina offices and then three years with Ernst & Young

16  in Kansas City, Missouri.

17  Q   Okay.  And tell us about your college education.

18  A   I graduated from Washington & Lee University in Lexington,

19  Virginia.

20  Q   What was your degree in?

21  A   I had a Bachelor of Science in Business Administration and

22  Accounting.

23  Q   And upon -- if I understood you correctly, upon

24  graduating, you went to Ernst & Young; is that right?

25  A   Coopers & Lybrand.

GARRITY - DIRECT/BROUGHTON

Vol. 5 - 722

1   Q    Sorry.  What is Coopers & Lybrand?

2   A    Coopers & Lybrand today is a Big 4 Accounting Firm known

3   as PricewaterhouseCoopers.

4   Q    And what did you do there?

5   A    I was on the audit side.  I spent six years with Coopers.

6   I started out as an associate and rose to senior manager, and

7   my last -- that was my last job there.  And I ran engagements

8   in manufacturing, transportation were my two main fields of

9   discipline.

10  Q    Okay.  And for those of us who aren't accountants and

11  don't have any sort of an auditing background, just very

12  briefly tell the jury, what were you doing day-to-day back

13  then, particularly, as you mentioned, transportation and

14  things like that?

15  A    I had mainly large engagements.  My largest engagement was

16  Volvo North American and Volvo GM heavy trucks.  And we spent

17  most of the year certifying their accounts, that their books

18  and records were complete and accurate.

19  Q    And you may have mentioned it, but how long were you at

20  Coopers & Lybrand?

21  A    Six years.

22  Q    Okay.  And where did you go after that?

23  A    Ernst & Young in Kansas City, Missouri.

24  Q    Okay.  And what is Ernst & Young?

25  A    It is also a Big 4 Accounting Firm.

GARRETT - DIRECT/BROUGHTON

1  Q   All right.  And what kind of work were you doing at Ernst

2  & Young?

3  A   Same type of procedures, verifying the books and records

4  of high-growth companies, one of which was my client Vanguard

5  Airlines, which ultimately I left to become the CFO of.

6  Q   Okay.  And tell us very briefly, what kind of airline was

7  Vanguard?

8  A   Vanguard was a Trent 737 operator, similar to JetBlue or

9  AirTran.

10 Q   So what kind of flying were they doing?

11 A   They were doing passenger flying with a Kansas City and a

12 Chicago Midway hub.

13 Q   And did they do any of this military flying we've heard

14 about?

15 A   No, they did not.

16 Q   Okay.  And how long were you at Vanguard?

17 A   I was at Vanguard three years.

18 Q   And what did you do after that three years?

19 A   I left Vanguard and went to Gemini Air Cargo.  Gemini was

20 a high-growth cargo airline based in Washington, D.C., out of

21 Dulles Airport, and I went there to also grow Gemini Air Cargo

22 and take them public.

23 Q   Okay.  And is that why you still live in the DC area?

24 A   Yes.  I have -- we've spent close to 10 years there, and I

25 have kids in high school, so that's the main reason I did not

GARRITY - DIRECT/BROUGHTON

Vol. 5 - 724

1  relocate to Atlanta, which is where Global is headquartered.

2  Q   Did Gemini -- I think we've heard that name before.  Did

3  they do any military flying?

4  A   Yes, they did.

5  Q   Okay.  And tell us, did you have any involvement as CFO

6  there in the military flying that Gemini was doing?

7  A   No, I did not.

8  Q   Okay.  What were you doing at Gemini?

9  A   Three years as CFO, so I again was overseeing all the

10  financial functions of the airline, raising capital.  And then

11  after three years, I transferred over to chief operating

12  officer and ran the operation of the airline for three years.

13  Q   Now, when you say "raising capital," what are you talking

14  about?

15  A   In the normal course of business, we have debt and

16  shareholders, and Gemini's history was required that we do --

17  that we did restructure the airline on one occasion and that

18  we went out and raised new capital similar -- I mean, in that

19  case from private equity firms.

20  Q   Let me stop you there.  When you use the term

21  "restructure," what do you mean?

22  A   That simply means that the revenue generation of the

23  airline is not high enough to support the cost of the airline.

24  So we go out to the major vendors of the airlines -- in the

25  case of Gemini, it was the aircraft lessors -- and we

GARRETT - DIRECT/BROUGHTON

1  renegotiate the terms of the aircraft leases.

2  Q   Okay.  Did Gemini actually file bankruptcy to do that?

3  A   No, they did not, not when I was there.

4  Q   Okay.  And back to being -- your CFO duties, you said you

5  weren't -- if I understood you correctly, you weren't directly

6  involved in military flying, but were you dealing with any

7  monies generated from military flying at Gemini?

8  A   Yes, of course.

9  Q   Okay.  And was that a profitable line of business for

10  Gemini?

11  A   Yes.  It was a very profitable line of business.

12  Q   Tell us why military flying was profitable.

13  A   Military flying, the whole program is based on cost plus

14  profit, and the way the program works is that you accumulate

15  your actual costs.  They're commingled with the other

16  operators in that aircraft type.  And then the Government

17  comes in and audits your costs.  They accumulate them across

18  all the airlines, and they come up with a rate, and to that

19  rate they add 11-percent profit.  And that's what you're

20  reimbursed.

21  Q   All right.  And you mentioned that it's an 11-percent --

22  would you call that rate of return?  Would you call it profit?

23  I'm not an accounting person.

24  A   It's profit.  So after you have covered all your costs

25  which go into the rate-making package, they then add

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 726

1  11 percent on top of that, including fuel.  So you make margin

2  on fuel, also.

3  Q   So 11 percent, how does that relate to, if you know, when

4  we go down and put money into our savings account -- right now

5  are you familiar with what typical rates are on a savings

6  account?

7  A   Sure.  Savings accounts range from probably half a percent

8  to 1 percent.

9  Q   Okay.  In your experience, is 11 percent a good or an

10 average or a bad amount of profit?

11 A   In my experience in the aviation business, it's a very

12 high level of profit.

13 Q   And you said you became COO of Gemini at some point?

14 A   Yes.  Halfway through my career at Gemini I became COO.

15 Q   And how did your duties change there?

16 A   I ran operation of the airlines.  It changed materially.

17 I was involved -- I oversaw all the flight operations, the

18 flight crews, the whole SOCC, which is where we control all

19 the aircraft.

20 Q   What does that stand for?

21 A   Operating center; it's the control center, all the

22 mechanics.  So it went from a job of overseeing about 50

23 people to a job of overseeing close to 500 people.

24 Q   And did you have any duties with respect to military

25 flying as COO?

GARDNER - DIRECT/BROUGHTON

1  A   Yes.  We had an obligation to operate our military flights

2  on time.  We had an 85-percent on-time requirement with the

3  U.S. military.  And so since it was a very profitable business

4  and it was a business we wanted to obtain more of, we focused

5  on operating that business on time and successfully for the

6  military.

7  Q   Would you like some water?

8  A   That would be great.  Thank you.  Turning froggy.

9  Q   I didn't think I was choking you up.  I figured you needed

10  something.

11       So why did you decide or why did you leave Gemini?

12  A   I was there for six years.  The company had changed its

13  CEO, and I had a different view than the previous CEO, so I

14  moved on.

15  Q   Okay.  And where did you go at that point?

16  A   I went to work as a senior aviation adviser for

17  MatlinPatterson, which is a private equity firm based in New

18  York.

19  Q   Okay.  And the jury has heard their name mentioned a few

20  times, and you just told us what a private equity firm is.

21  But what's your understanding of a private equity firm?

22  A   A private equity firm is basically an entity that goes out

23  and raises money from what they call limited partners, and

24  they put their money into a fund at MatlinPatterson, and then

25  MatlinPatterson would go identify companies to invest in on

1  behalf of the limited partners.  And then they would attempt

2  to achieve a stated rate of return.

3        In the case of MatlinPatterson, their expertise is

4  distressed companies, so they invest in high-risk companies.

5  Their limited partners expect them to invest in high-risk

6  companies, also.  And as a result of investing in high-risk

7  companies, some make it; some don't.  But the ones that make

8  it are typically a very high rate of return.

9  Q   Now, you used the term "distressed companies."  And what

10 do you mean by that?

11 A   Companies having financial difficulties.  It's not

12 uncommon for MatlinPatterson to invest in a company that's in

13 Chapter 11 bankruptcy, reorganization, a company that is in

14 default of its loan covenants, unable to make its debt

15 payments.  So very troubled companies, that's their expertise.

16 Q   Okay.  And I've got to ask you this because I'd like to

17 think or most of us think, when we think about investing, we

18 want to invest in a good company.  Okay?  So from your

19 perspective, what's your understanding of why MatlinPatterson

20 would want to invest in a distressed company?

21 A   MatlinPatterson goes into companies and looks for pieces

22 of the company or an aspect, a product line of the company

23 that's very profitable.  And they typically reorganize the

24 company around that line of business.

25        In the case of ATA, which MatlinPatterson invested in

GARRITY - DIRECT/BROUGHTON

Vol. 5 – 729

1   in 2006, ATA was in bankruptcy protection at that point in

2   time, and the cash cow at ATA that they saw that was very

3   valuable was the military business.

4   Q   All right.  So I think in our timeline, you had taken us

5   up to -- you had started working for MatlinPatterson; is that

6   right?

7   A   Correct.

8   Q   And remind us what year that is, please.

9   A   That is 2007.  I worked the year of 2007 with

10  MatlinPatterson most of the year.

11  Q   All right.  And so at some point in time, did you end up

12  going to ATA?

13  A   Yes.  In September of 2007, MatlinPatterson asked me to

14  come on as chief financial officer of Global Aviation, which

15  included a subsidiary called ATA.

16  Q   Okay.  So you say MatlinPatterson asked you to become the

17  CFO of Global?

18  A   Um-hum.

19  Q   Is that right?

20  A   Correct.

21  Q   And what understanding did you have at that time of the

22  relationship between MatlinPatterson and Global?

23  A   MatlinPatterson was the majority shareholder of Global,

24  and Global owned 100 percent of the outstanding shares of ATA,

25  and so it was a wholly-owned subsidiary of Global.

1  Q    All right.  And did Global also own some other airlines?

2  A    Yes.  Global owned two other airlines, World Airways and

3  North American Airlines, with a very similar structure, owning

4  100 percent of the outstanding shares of those entities.

5  Q    And did you have any understanding -- let me ask you this:

6  I take it you at that time knew Mr. Doug Yakola who is seated

7  back here.

8  A    When I went to meet the company executives before I

9  accepted the job, I met Doug, yes.

10 Q    Okay.  And he was already at ATA?

11 A    Yes.

12 Q    Okay.  And are you aware that at some point in time he

13 became chief integration officer?

14 A    Yes.

15 Q    All right.  And what did you understand -- and that was

16 about the time you started; is that right?

17 A    Yeah, a month or two before.

18 Q    Okay.  And so what did you understand he was going to be

19 doing as chief integration officer?

20 A    Doug's job was to look at all three airlines that were

21 underneath Global and identify opportunities to save money, or

22 synergies, as we called them.  An example would be to take an

23 overhead function like the accounting department, and instead

24 of having three accounting departments, why don't we put one

25 accounting department in place that handles the accounting of

GARRITY - DIRECT/BROUGHTON

1  all three entities.  So in turn, it would save, you know, 20

2  or 30 -- you know, it would save the salary of 20 or 30

3  accounting professionals, for example.

4  Q    How about purchasing spare parts for aircraft?

5  A    The largest dollars were in maintenance, and when you look

6  at airlines, the largest discretionary amount of money is

7  aircraft maintenance, for obvious reasons.  And if you're able

8  to improve your purchasing power in maintenance; i.e., buying

9  engines, buying the overhaul of the airframes, buying the

10 spare parts, if you're able to knock percentages off those

11 contracts, you're able to save huge amounts of dollars for the

12 airlines.

13 Q    Now, earlier when you were talking about the cost plus

14 that is involved in military flying, if I understood you

15 correctly, did you say something about the Government comes in

16 and audits the military fliers' costs and then determines a

17 rate?

18 A    Correct.

19 Q    Tell us a little bit more about that in the context of the

20 synergies that Global was working on.

21 A    The -- with respect to a cost-plus program, the goal is to

22 continue to reduce costs because when they develop your cost

23 history, they look at your costs over a historical period.

24 Q    Let me stop you right there.  When you say they look at

25 your costs, who are you talking about?

GARDNER - DIRECT/BROUGHTON

Vol. 5 - 732

1  A    In the case of the military, it is the Department of

2  Defense.  They are an ancillary group that comes in, and they

3  audit your historical costs.  All airlines are also required

4  to file with the Department of Transportation a form called

5  Form 41s that have all your cost detail in it.

6         So they take your Form 41s which you have filed with

7  the DOT, and they come in and look at your cost structures and

8  they audit that against how much money you're spending for the

9  military.  To the extent you can save money for the U.S.

10 military, obviously, that's a very positive thing.  So it was

11 our goal not only for our U.S. military business but for our

12 cargo customers and for our other passenger customers that by

13 bringing Doug in and his group, we would reduce our cost

14 structure, and we would be a more attractive airline in the

15 long run.

16 Q    So not only was this the goal to reduce cost maintenance

17 and overhead for ATA and World and North American, but that

18 was going to reduce the cost to the military as well?

19 A    Correct.

20 Q    Okay.

21        So back to you starting as the CFO, do you recall what

22 month -- and maybe you told us, and I'm sorry.

23 A    I signed a contract that commenced work there November 1st

24 of 2007.

25 Q    So before November 1 of 2007, how much did you know about

CARLTON - DIRECT/BROUGHTON

Vol. 5 - 733

1  ATA?

2  A   Not very much.  I spent part of September familiarizing

3  myself with ATA and accepted the contract thereafter and then

4  went to work as a CFO at Global.

5  Q   So once you got in there, what did you understand about --

6  what did you come to learn about ATA's business?

7  A   ATA had basically a major strength and a major weakness.

8  Its major strength was its military business, very profitable.

9  Its major weakness was its scheduled service business.

10          As you may recall, in 2007 late in the year about the

11  time I got there, that's when fuel prices started to increase

12  materially.

13  Q   Do you recall how much jet fuel went up in late '07?

14  A   Not specifically, but it was rising from around $2 at some

15  point in 2007 to close to $2.80 near the end of the year.

16  That continued into the following year.

17  Q   $2 for what quantity?

18  A   A gallon.

19  Q   And what impact did that have on the airline industry?

20  A   It was devastating to the airline industry in that

21  obviously, the airlines were buying fuel.  The costs to

22  operate the airplanes was buying fuel.  The airlines

23  themselves tried to pass that cost on to the consumers as best

24  they could.  If you look at airline profits in 2008, it was

25  very devastating to the industry.

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 734

1  Q   Now, did the rising jet fuel costs have any impact on

2  military flying?

3  A   The rising jet fuel cost did not have any impact on the

4  military flying.  Conversely, rising jet fuel prices improve

5  your profit return in the military because you're paid

6  11 percent on your costs.  So by rising fuel costs, you can

7  increase margin on fuel also.

8  Q   Now, a few minutes ago you said what you immediately

9  learned upon starting at ATA was that they had -- I think you

10  said -- a positive aspect of their business in the military

11  and a negative aspect in the scheduled service; is that right?

12  A   Right.

13  Q   What did you view as positive about ATA's military flying?

14  A   ATA had been doing military flying for decades for the

15  U.S. military and specifically on the FedEx team for 16 years.

16  It was one of the larger fliers of military troops all over

17  the World during that period of time, given the cost-plus

18  nature of that contract.  It was a very profitable business

19  line for the company, and it continued.

20  Q   I want to ask you about a term that I never remember how

21  to pronounce, but I see it in these accounting documents,

22  E-B-I-T-D-A.  Is that EBITDA, EBITDA?  What is that?

23  A   EBITDA.

24  Q   EBITDA, okay.

25  A   It's a common financial term.  It's simply -- it is

GARRITY - DIRECT/BROUGHTON

Vol. 5 - 735

1   Earnings Before Interest, Taxes, Depreciation, and

2   Amortization.  When I talk to our company, to our employees, I

3   describe it as free cash flow generated from operations.  So

4   it's how much excess cash you generate by flying your

5   business; in our case, flying our planes.

6           So after we collect all our revenues and we pay out

7   all our expenses, it's the leftover cash you have to invest in

8   the airlines in other areas.

9   Q   And I'm going to write this down, "free cash generated

10  from operations"?

11  A   Right.

12  Q   All right.

13  A   In a very simplistic way, I would say it is, you know,

14  after you get your paycheck and you pay your mortgage and your

15  credit card bill and things of that nature, when you look at

16  how much cash you've got left over at the end of the day,

17  that's EBITDA.

18  Q   Walking-around money?

19  A   Walking-around money --

20  Q   Okay.  Walking-around money.

21  A   -- to do home improvements to your house.  In that case,

22  we spent a lot of money on our airplanes and our engines,

23  improve those, yes.

24  Q   At some point in time after you started November 1 of '07,

25  did ATA do any analysis or forecasting of this free cash flow

Vol. 5 - 736

1  generated by ATA's charter flying business for the coming year

2  2008?

3  A   Yes.  We were required under our bank agreement to submit

4  an annual budget.  The annual budget for our charter flying,

5  the majority of which is military, was EBITDA of $55 million.

6  Q   Okay.

7       So if I understand you correctly, for charter flying,

8  you thought you were going to have walking-around money of

9  $55 million; is that right?

10 A   Simply put, yes.

11 Q   Now, charter flying -- ATA's charter flying business, did

12 that include more than just the military flying?

13 A   Yes, it did.

14 Q   What else did it include?

15 A   It included passenger charter flying.  The best example of

16 that that ATA did is that we flew for Air Jamaica.  So during

17 peak seasons, the summer, mainly in the holidays, we would

18 place our airplane in Air Jamaica's fleet.

19      Our flight crews would operate the airplanes.  The

20 flight attendants would be Air Jamaica flight attendants, and

21 he we would operate additional business out of major cities

22 like New York, going to Jamaica when they didn't have enough

23 airplanes through their business.  It was short-term contracts

24 in nature operating for short periods for -- a lot of them are

25 for customers that you've heard of like Air Jamaica.  The

GARMONG - DIRECT/BROUGHTON

Vol. 5 - 737

1   other big --

2   Q   Let me stop you there.  That would be like these tourist

3   package deals?

4   A   Yes.

5   Q   Just going to Jamaica.  When it's cold up in New York, I

6   want to go to Jamaica?

7   A   Their customers are like Apple Vacations when you buy

8   those combo packages that includes airfare, hotel, and all of

9   that.  We do some of that flying during peak season.  We also

10  fly sports teams around, college football fans, things like

11  that.  So when the bowls are announced in December, we do a

12  lot of bowl flying, taking fans and football teams to their

13  bowls all over the World.

14  Q   You would call that charter flying?

15  A   Correct.

16  Q   Within the charter flying business, there's also military

17  charter?

18  A   Correct.

19  Q   You forecast that the total of those two combined would be

20  55 million for 2008; is that right?

21  A   Correct.

22  Q   And do you recall what percentage of that 55 million

23  related to this nonmilitary charter flying?

24  A   Yes.  On a revenue basis, 82 percent of the flying was

25  U.S. military, and 18 percent was charter.

GARMENT - DIRECT/BROUGHTON

Vol. 5 - 738

1  Q   All right.

2        Can you give us a ballpark on what would be 82 percent

3  of 55 million?

4  A   About $45 million.

5  Q   So you were projecting about 45 million in this free cash

6  generated from operations from the military for the year 2008?

7  A   I would even go farther and say the number was higher than

8  that, because as I mentioned, the military is cost plus 11

9  percent.  That profit margin is higher than what we would

10 normally achieve on a charter flight.  So it's a number

11 greater than 45 million but less than 55 million.  We didn't

12 allocate all our costs exactly to the business lines at that

13 level of detail.  So we had estimations in there between 45

14 and $55 million would be the U.S. military.

15 Q   Now, at about the same time that you started as CFO, had

16 Northwest Airlines started doing some flying on the FedEx

17 team?

18 A   Yes.  Going into -- the military operates on a fiscal

19 year.  So they start -- the Government year starts October 1st

20 and goes to September 30th of the following year.

21        So in fiscal 2008 -- that's the year beginning

22 October 1, 2007 through September 30th, 2008.  So beginning in

23 fiscal 2008, Northwest had the right to fly up to 10 military

24 flights on the FedEx team.

25 Q   Did you say up to 10?

GARRITY - DIRECT/BROUGHTON

1   A   Up to 10.

2   Q   Is it your understanding that they were required to fly

3   the full 10?

4   A   No.  It was just up to 10 at their discretion.

5   Q   It was their option if they accepted flights?

6   A   Correct.

7   Q   So you started November 1 of 2007.  Northwest had started

8   flying for the FedEx team as a passenger flier one month

9   before.

10  A   Correct.

11  Q   So would the statistics from those flights start coming to

12  you about the time you started?

13  A   Yes.  To be clear, Northwest was on the FedEx team prior

14  to and did military flying, but the 10-flight carve-out that

15  began in fiscal 2008 was a new -- was a new opportunity for

16  Northwest to fly more military than they had done

17  historically.

18  Q   In your position as CFO, did ATA make any analysis of what

19  impact, if any -- before I ask you that question, at that same

20  time, had the commission that was being paid by ATA to FedEx

21  changed?

22  A   That changed also in fiscal 2008.  So we gave up flying

23  opportunity to Northwest, but what we did pick up is a lower

24  commission rate.  The commission we paid out in fiscal 2007

25  was 7 percent that we would pay to FedEx.

GARMONG - DIRECT/BROUGHTON

Vol. 5 - 740

1    Q    Let me stop you there, so just so we can visualize this.

2    Give me some number of what -- if ATA flies an individual

3    flight, what was some destination that you can tell us that

4    ATA was flying?

5    A    Say to Kuwait.

6    Q    And they would leave from where?  Where would the plane

7    that off from?

8    A    A U.S. military base.

9    Q    Somewhere?

10   A    Somewhere in the U.S.

11   Q    And fly to Kuwait.  All right.

12        And would ATA send a bill to the military for that

13   flight?

14   A    Yes.  So we would bill the military the cost of the

15   flight, which based on the standard rates and how long the

16   flight is and how big the airplane was, how many seats were on

17   it, what the fuel price was -- so there were some variables in

18   that -- we would bill the military on a monthly basis.

19   Q    Let me stop you there.

20        Give us an idea.  What's the ballpark for what that

21   flight would cost if it was going to fly from some Air Force

22   base here in Indiana to Kuwait?

23   A    It would be about $600,000 for a large wide-body airplane

24   for a round trip flight to Kuwait and back.

25   Q    A lot of money.

GARRETT - DIRECT/BROUGHTON

1   A   Yes.

2   Q   And how would that 7 percent commission rate play -- what

3   does that $600,000 cost -- what relationship does it have to

4   the 7 percent commission rate that ATA used to have before

5   FY08?

6   A   It is very simple.  You take 7 percent times whatever that

7   revenue amount is, and that's the commission rate.

8   Q   So on a flight, on the flight you have just described,

9   what would be the ballpark dollar amount of commission that

10  ATA would have paid to the FedEx team when it was paying

11  7 percent?

12  A   So on a $600,000 round-trip flight, we would pay $42,000

13  in commission to FedEx.

14  Q   All right.

15        And that would be done for every flight?

16  A   For the most part, yes.

17  Q   And effective October 1 of '07 at the new FY08 year, that

18  rate changed to 4.5 percent?

19  A   Correct.

20  Q   So on that $600,000 flight where it had been 7 percent,

21  ATA was paying 42,000, what would ATA pay under the new

22  commission rate?

23  A   You're testing my math skills here.

24  Q   They're better than mine, I promise.

25  A   So it's about $25,000.

GARMEL - DIRECT/BROUGHTON

Vol. 5 - 742

1  Q   And how many flights was ATA flying a month, on average,

2  for military flights?

3  A   I don't recall, but we were -- you know, it's about

4  $300 million of business a year.

5  Q   So, in essence, if ATA was doing $300 million a year, they

6  were paying 4.5 percent commission of that 300 million?

7  A   Correct.

8  Q   Okay.

9       So back to Northwest starts flying up to 10 flights a

10  month.  The jury's heard something called a COINS Report,

11  C-O-I-N-S.  Do you know what a COINS Report is?

12  A   Yes.

13  Q   What is a COINS Report?

14  A   It's the operational reports that we receive from the U.S.

15  military as to how much flying was done for the U.S. military,

16  what was the O and D, who flew it, et cetera, et cetera, plane

17  size, those types of things.

18  Q   You lost me on the O and D.

19  A   The origination and destination.  So in my example, it

20  could be Scott Air Force Base in St. Louis to Kuwait would be

21  the O and the D.

22  Q   And so these COINS Reports, would they show how many

23  flights ATA flew?

24  A   Yes, they would.

25  Q   Would they show how many flights Northwest flew?

GARDNER - DIRECT/BROUGHTON

1    A    Yes.

2    Q    Would they show how many flights FedEx as a cargo flier

3    flew?

4    A    Yes.

5    Q    So everybody, it's public information.

6    A    Correct.

7    Q    So did ATA take a look and see how many flights Northwest

8    was actually flying under this up-to-10-flights arrangement?

9    A    Of course.  I think -- I could say most of the carriers in

10   the program would look at the COINS Reports every month,

11   determine who's flying what; and so, yes, we would watch

12   Northwest Airlines very closely, because that's revenue that

13   we were hoping to get now that Northwest was flying.

14   Q    And on average, do you recall how many flights Northwest

15   was actually flying back in FY08?

16   A    In FY08, it changed after ATA filed for bankruptcy on

17   April 2nd; but from October 1st of 2007 up through March 31st

18   of 2008, Northwest flew 5.8 flights on average per month.

19   Q    And did you do -- did ATA do any dollar analysis, taking

20   into account that FedEx was flying about 5.8 or so flights a

21   month -- and combining that with the change in commission rate

22   from 7 percent to 4.5 percent -- did ATA analyze what the

23   bottom line dollar impact of Northwest's flying was on ATA?

24   A    Yes.  You know, historically, we didn't think that was a

25   bad deal giving up the 10 flights.

1  Q    And why is that?

2  A    Historically, the major airlines, Northwest, American,

3  Delta, those airlines, the large-passenger airlines who are in

4  all these programs rarely do a lot of flying.  And

5  historically, they never have.  The reason for that is the

6  flying is typically to remote parts of the World.  In this

7  case, in this time and age, into Bishkek, which is Kyrgyzstan,

8  and Kuwait being two of the larger airports we fly into.  The

9  pilot flight rules that the major airlines operate under are

10 difficult.

11        For example, for the majority of our military flying,

12 we don't know where we're going up until 15 days prior to when

13 the flight's going to leave.  With respect to the major

14 airlines, a lot of them -- the crew union agreements require

15 60-days' notice as to where the planes are going.  There are

16 loop holes in those types of things, but for the most part,

17 it's difficult for a major airline to take that on.

18        If you don't operate a lot of this business -- for

19 example, if you're not going out every day to Kuwait, you end

20 up stranding your personnel, flight attendants and flight crew

21 members all over the world because your airplane's not coming

22 back through that city.  And so it becomes a not very

23 efficient process for the major airlines.

24        Lastly, I'll say the majors -- airplanes aren't really

25 configured properly for this level of flying.  You know, when

Vol. 5 - 745

1  you look at a large 747, for example, a lot of those are
2  configured in two or three classes of seats, so you have first
3  class, business class, and coach; whereas the military
4  airplanes that are operated by ATA or our sister airlines,
5  World and North American, it's all one class.
6       So the entire airplane is coach.  So it's very dense
7  seating compared to, I would say, a very lightweight seating.
8  And when you talk to the military, the colonels and generals
9  on the airplane with their troops, you know, they want
10  everyone treated the same.  They don't want people up in first
11  class and things like that.
12       And when you look at the costs that the majors are
13  being reimbursed for multi-class airplanes, it costs the
14  military more to pay for those airplanes because you don't get
15  as many seats at the end of the day on those airplanes as you
16  would a one-class airplane that's configured towards the
17  military.
18  Q   Okay.  So at the end of the day when you looked at this
19  analysis, what, if any, financial impact did the Northwest
20  flying have on ATA military flying revenue for FY08?
21  A   So clearly it was a reduction in our revenue.  If they're
22  flying 5.8 flights, that business in the previous year would
23  have gone to us or the other carrier, major flier on the team,
24  Omni, but this year it didn't.  But because we got a reduced
25  commission from 7 down to 4.5 percent, if you analyze the

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 746

1  profit margin that we would have gotten on that flight, having

2  a lower commission coupled with the belief that Northwest

3  would not fly all 10 flights, the bottom line was better --

4  was a better financial deal for ATA.

5  Q   Now, going back several minutes, you mentioned that

6  getting in there and acquainting yourself with ATA's business

7  in the fall of '07, you've told us about the good business,

8  the military flying.  Tell us a bit about the scheduled

9  service.  You told us jet fuel prices were high, but drill

10  down a little bit and tell us what was going on there with

11  scheduled service at ATA in November and December of '07.

12  A   Okay.  So ATA was a -- was a passenger airline that you

13  would go on the Internet and buy tickets, just like you would

14  any other airline.  ATA, as you probably know, was based here

15  in Indianapolis.  Their main piece of business was twofold.

16  They had a hub-and-spoke system out of Chicago Midway flying

17  to major cities like New York and Washington and Dallas.  In

18  addition, they had a large leisure business to Hawaii.  So

19  from -- I don't know the exact number -- from a handful of

20  cities off the West Coast, they would fly nonstop to Hawaii.

21        In addition to that, they had a codeshare arrangement

22  with Southwest Airlines.  So Southwest Airlines would fly

23  passengers into the cities off the West Coast that ATA flew to

24  Hawaii, and then they would get off a Southwest plane and get

25  on an ATA plane and fly to Hawaii.

1    So their core piece of business was what I call the

2 domestic business, which is the hub-and-spoke system out of

3 Chicago Midway and then the leisure business off the West

4 Coast to Hawaii.

5 Q   And what impact on ATA's cash was the jet fuel situation

6 having there in November or December of '07?

7 A   It was very negative.  The EBITDA, if I can use that, or

8 the free cash flow generated from operations was negative.  So

9 by flying the airplanes, we were not covering our costs.

10 Which if you go back to my mortgages example, that's a bad

11 thing because you don't have enough money to pay all your

12 bills.

13          MR. BROUGHTON:  Mr. Brockwell, would you put up

14 Federal Express 131, please.  Make that a little bigger so

15 everybody can see it.

16 BY MR. BROUGHTON:

17 Q   All right, Mr. Garrett, if he we can start at the bottom

18 of this, this is December of '07, right?

19 A   Correct.

20 Q   And down here at the bottom, you have copied several

21 people -- or I'm sorry -- not copied; you've sent your e-mail

22 to several people.

23          Who is Heath Garrett?

24 A   Heath Garrett was my vice president of financial planning

25 and analysis.

GARRITY - DIRECT/BROUGHTON

Vol. 5 - 748

1    Q    Is he your twin brother?

2    A    No, he's not related.  He's not related to me, though.

3    It's joked about a lot.

4    Q    Okay.  How about Gary Ellmer?

5    A    Gary Ellmer was the chief operating officer for ATA.

6    Q    All right.  Jeff Wehrenberg at NAA?

7    A    He was the chief operating officer at North American

8    Airlines.

9    Q    All right.  And that was one of the sister companies?

10   A    Yes.

11   Q    Why are you including him in this e-mail?

12   A    I'm including him because it's a message I want all the

13   chief operating officers at all three airlines to see and

14   read.

15   Q    All right.  Then we have an M. Flynn?

16   A    M. Flynn was the director of FP&A at North American

17   Airlines.

18   Q    I have no idea what those initials meant.

19   A    M. Flynn, Mike Flynn.

20   Q    But then you said he's the director of --

21   A    FP&A at North American, financial planning and analysis.

22   Q    Okay.  And then Charlie McDonald, who is Mr. McDonald?

23   A    He was the chief operating officer at World Airways.

24   Q    Read to us your message here.

25   A    "We cannot put a new planning system in place unless" -- I

GARDNER - DIRECT/BROUGHTON

1   can't read what exactly it says.

2   Q   "We/integration"?

3   A   "We/integration team see a clear analysis as to where the

4   savings is and we consider what is best for all Global."

5   Q   Okay.  Let me stop you there.  This referring to

6   integration, is that what you were talking about Mr. Yakola

7   was doing?

8   A   Correct.

9   Q   Okay.  So was this crew planning system one of these

10  overhead costs that you guys were trying to work on

11  collectively to reduce overall costs?

12  A   Correct.

13  Q   Okay.  You go on to say, "To be clear, every capital item

14  must have my signature.  Today I have not approved any capital

15  expenditure, including in-process projects."  Tell us what --

16  put it in plain English.  What are you saying there?

17  A   If I may, if I could just can step back a little bit, I'm

18  the new guy on the block, so to speak.  I just started in

19  November, so I've been an employee at this point in time less

20  than a month.  And so the intent of this e-mail specifically

21  is to tell the COO guys that every capital expenditure of this

22  company, I want to see; I want to get to learn.  I want to

23  start putting in place an environment that we're going to

24  start controlling cash better than we have previously.

25          MR. BROUGHTON:  All right.  Let's go up above,

Vol. 5 - 750

1  Mr. Brockwell, to whatever response there is there.

2  BY MR. BROUGHTON:

3  Q    Okay.  "Gary Ellmer," you told us he's at ATA, says "Where

4  did that come from," right?

5  A    Right.

6  Q    All right.  Let's go on up and see if you responded.  You

7  responded to Mr. Ellmer, "I am worried about cash at ATA.  I

8  just looked at November estimates; it is ugly."  So tell us

9  what was going on.

10 A    So Gary, if you read into what was that all about, he

11 wanted to know why I'm coming down so hard because

12 specifically that flight planning system was a request that

13 the ATA SOCC put in.  And in the case -- if we go back to

14 integration just for a second, it was a different flight

15 planning system than the other two airlines had.  And so an

16 example of integration in this case is if we all operate the

17 same flight planning system, we can go back to the vendor of

18 that system and get one price for all three systems, and that

19 price will be materially lower than each airline going

20 individually and getting a separate system.

21        So I was frustrated at that point and also trying to

22 prove a point that the teams weren't working on opportunities

23 to integrate, coupled with the fact I'm the new guy on the

24 block and coupled with the fact that Gary was the COO over the

25 operations of ATA and that he knew that the cash situation at

GARDNER - DIRECT/BROUGHTON

1   ATA was difficult and why his guys would even be putting forth

2   a capital expense request of a flight planning system that's

3   different than all the other airlines; and, in fact, when you

4   dig into it, not really necessary.  The flight planning system

5   currently at ATA was working fine.

6   Q   Okay.  Now, the jury's heard some about this before, but

7   at this point in time, had -- well, before you showed up in

8   November of '07 had ATA recently acquired some DC10s?

9   A   Yes, they had.

10  Q   All right.  And at the time -- December of '07, for

11  instance, what's going on with respect to those DC10s that had

12  been purchased several months before?

13  A   I believe at this point in time two of the DC10s were in

14  operation currently, and two are in overhaul facilities

15  waiting to come out for their initial flights.

16  Q   Okay.  And why couldn't -- as soon as ATA bought those

17  from Northwest, why couldn't you just paint the ATA name on

18  them and start flying them the next day?

19  A   Every airplane in the U.S. -- or every airline in the U.S.

20  has an FAA-approved maintenance program.  And when you move

21  airplanes between operators, you have to put the airplane

22  itself onto your maintenance program.  And the way you

23  typically do that is you bring it into the airplane overhaul

24  shop, similar to a car repair place, and they take -- in this

25  case these airlines went through a D check, which is the

1 heaviest of all the checks.  They basically open up the entire

2 airplane, open up every panel, and they inspect the airplane

3 for corrosion.

4         These airplanes happened to be sitting in the desert

5 for a little while, also, under a Boeing-approved storage

6 program.  And we also wanted to put new interiors in these

7 airplanes.  So while we had the airplanes opened up, we would

8 put all new seating and new AV equipment, you know, what you

9 see, whether it be TVs or sound systems in the airplanes.

10 Q  Let me stop you right there.  About the seating, since

11 these had been bought from Northwest, I assume they used to

12 have first class and business class and regular, right?

13         MR. GABEL:  Objection, relevance.

14         MR. BROUGHTON:  Relates to the costs they were

15 incurring to configuring the planes.

16         MR. GABEL:  I think that's the subject of the motion

17 in limine, Your Honor.

18         MR. BROUGHTON:  We're talking about their cash

19 situation here in December of '07.  I'm just eliciting

20 information that's affecting.

21         THE COURT:  Overruled.  But let's move on.

22         THE WITNESS:  Can you repeat the question, please?

23 BY MR. BROUGHTON:

24 Q   Well, was ATA, in December of '07, incurring some costs

25 related to getting these DC10s online?

GARMEY - DIRECT/BROUGHTON

Vol. 5 - 753

1  A   Yes.  Generally speaking, that event of overhauling the

2  airplane and putting in new interiors would cost approximately

3  $5 million an airplane.

4  Q   Okay.  And was that affecting your cash flow in December

5  of '07?

6  A   Yes.  Obviously, that's a big obligation to pay out.

7  Q   Were those DC10s going to be used for scheduled service or

8  for military flying?

9  A   For the most part, solely for military flying.

10 Q   And were these one-time start-up costs or were these

11 DC10-related costs going to be happening every year?

12 A   With respect to the major overhaul, it was a start-up cost

13 for the airplane that we would have a benefit of that overhaul

14 for the life of the airplane, which in this case was five

15 years.

16      In addition, though, preparing for a new fleet type to

17 be brought into ATA, the company spent a tremendous amount of

18 money in training all its crews and its flight attendants on a

19 new piece of equipment, on building up inventories, on

20 training its mechanics to repair those airplanes, and

21 basically putting that infrastructure to support that new

22 piece of equipment all over the world, because that's where we

23 were going to operate them.

24 Q   So these were one-time start-up costs that were hitting

25 ATA in November and December of '07 and going on into January

1   of '08?

2   A   Yes.  I believe -- I don't know the exact timing of when

3   those airplanes came on, but in '07 they started -- the first

4   DC10 came on, I believe, in the summer and then they were

5   coming on sort of nose to tail after that.  So late '07, into

6   early '08 before airplanes would be on.

7   Q   All right.  And we've heard earlier that this was a

8   package deal where ATA had bought 7 DC10s plus two airframes.

9   Does that sound right, setting the context here?

10  A   Yes.  I would call it nine airplanes.

11  Q   Okay.  But two of them didn't have engines?

12  A   Yeah.  The engine agreement was a separate agreement.  So

13  it was -- the engine agreement was for, I believe, 26 engines.

14  Q   Okay.  And at some point in time did ATA determine that --

15  well, tell me, at some point in time, did ATA decide to

16  transfer those or have someone else assume some of those

17  planes?

18  A   Yes.

19  Q   Tell us about that.

20  A   So ATA acquired all nine airplanes.  I'll start off by

21  saying that when you get into older airplanes, it's good to

22  build up your spare parts inventory.  So it's common when

23  entities buy, in this case DC10s -- that they buy extra

24  airplanes; and you cut them up -- literally cut them up, and

25  you put the parts into inventory, such that when the planes

1   break in the future, you have spare parts.  You know, DC10

2   parts aren't readily available all over the world because it's

3   not an airplane that's common operated anymore by some of the

4   major carriers.

5       So they bought nine.  Two of them, as Ken mentioned,

6   had no engines.  So those two airplanes were candidates for

7   parting out.  In my mind at least one or two more were

8   candidates to be parted out.  As time went on in '07 and into

9   '08, there was an opportunity that presented itself to move

10  three of those airplanes to a sister company, World Airways.

11  World Airways was a operator of freighters at the time and

12  also a historical operator of DC10 passenger airplanes.  World

13  Airways had three MD11 passenger airplanes that their leases

14  were expiring, and their goal during 2007 was to replace those

15  MD11 passenger airplanes with replacement MD11 passenger

16  airplanes, which is a more modern airplane.

17      The market at that point in time, there were no MD11

18  airplanes available.  So after they returned these three

19  airplanes that happened to be leased from UPS, World Airways

20  was short three passenger airplanes for it's military

21  business.  So it worked out nicely that the capacity

22  requirement in late '07 and early '08 for ATA was not seven

23  airplanes.  It was something less than seven, and World had a

24  real need for three airplanes.

25      So an assignment agreement ultimately was entered into

1  between World and ATA where three of the DC10s were

2  transferred over to World, and World took over those airplanes

3  and began paying lease payments and engine-power-by-the-hour

4  payments or engine rent payments to ATA's lessor.

5  Q   And so was that a positive or negative thing for ATA's

6  cash flow?

7  A   It was a very positive thing for ATA's cash flow because

8  if they weren't able to transfer those airplanes and they

9  weren't operating them, they would have to pay rent on those

10  airplanes, and they weren't generating any revenue.  So it

11  would have been a drag on the company's cash flow.

12  Q   Going back to the cash flow --

13        MR. BROUGHTON:  Mr. Brockwell, if you would put up

14  Federal Express 132, please.

15  BY MR. BROUGHTON:

16  Q   Now, this is about 10 days after the last e-mail we looked

17  at from you.  And you sent this on December 14, 2007; is that

18  right?

19  A   Correct.

20  Q   And you sent it to Jack Schultz, Heath Garrett, a whole

21  list of people here.  And you say, "We are very critical with

22  cash at ATA.  Positive cash flows at the other airlines do not

23  come close to offsetting the negative flows.  We need to shut

24  down as much as possible.  I need all your help.  Sean and

25  Jack are working on the L1011, Gary/Sean deferring the

1  overhaul of the RR engine."  Is that Rolls-Royce engine?

2  A   Correct.

3  Q   What's that?

4  A   Rolls-Royce.

5  Q   Is there a Rolls-Royce out in the parking lot?

6  A   Rolls-Royce's biggest business besides cars is aircraft

7  engines.

8  Q   Okay.  So that was an aircraft engine.

9        "Please stop all capital projects and hiring.  Gary,

10  Wisty, Sean, please make sure all expenditures not directly

11  supporting the aircraft operations are running through one of

12  you.  Once again, thank you for your help in this urgent

13  matter."

14        Tell us what's going on here.

15  A   Again, I being new, I was trying to put forth a statement

16  that at ATA, we're not going down the road, business as usual.

17  We're going to put in place tight controls.  We're only going

18  to spend money on things we really need.

19        The people that are on this airplane are all finance

20  people at ATA, and Gary Ellmer -- again, he's the head

21  operating guy, the COO at ATA.  When you look at ATA's 2007

22  business plan, which is before my time, it was a pretty robust

23  plan to grow the company and spend money and things like that.

24  That's what these people were operating towards.

25        So it was clear to me that we had to start conserving

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 758

1  cash because of the scheduled service operation I mentioned

2  before and that we needed to put in place a lot tighter

3  controls and a new cash plan for ATA quickly so people were

4  managing to a more stringent budget than what they had been

5  managing to in the previous couple of months.

6  Q   In December of '07 as the CFO, were you thinking about

7  actually selling off or closing down ATA's scheduled service?

8  A   No, not at that point in time.

9  Q   Was it on the horizon, though?

10  A   Yes.  It was on the horizon.  That changed pretty quickly

11  when we entered the new year.

12  Q   Did you ever think about closing down the military flying?

13  A   No.  It was very profitable.

14         MR. BROUGHTON:  Let's look at Federal Express 138.

15  Please go to the bottom e-mail which, of course, is the first

16  one on the string.

17  BY MR. BROUGHTON:

18  Q   December 21, a little bit before Christmas here, it's from

19  Andrew Thayer to Ellmer with a copy to Keith Garrett -- I'm

20  sorry, Heath Garrett.  Who is Andrew Thayer?

21  A   Andrew Thayer was the manager of FP&A, Financial Planning

22  Analysis at ATA.

23  Q   It looks like a pretty detailed e-mail to me.  If you

24  would skim it in your mind and just tell us what's going on

25  here.  I see that EBITDA word in here somewhere.

1    A    Yes.  So this is the roll-up of ATA's first cut of their

2    2008 budget that they were going to submit on to me.  These

3    are the preliminary results of that.  So basically, each

4    department head has now developed their budget and flight

5    operations, maintenance, and has submitted their budget to

6    FP&A, and FP&A has accumulated all of those budgets from those

7    department heads and consolidated it.  This is the initial

8    result from that process.

9    Q    Okay.

10            MR. BROUGHTON:  Let's go up to whatever the next

11   e-mail is, please, Mr. Brockwell.

12   BY MR. BROUGHTON:

13   Q    This says, "Thanks, Andrew for getting" -- sorry.  This is

14   from Heath, and you're copied on this one; is that right?

15   A    Correct.

16   Q    Heath says, "Gary, unfortunately I just sat down and

17   really looked at these numbers.  ATA will burn another

18   75 million of cash in 2008," bunch of question marks.  "I know

19   that this is a first pass, but the magnitude of the miss

20   versus expectations is staggering.  Have we went to DEFCON 5

21   in Indy yet?  What is the message?  Is Plan B a

22   shut-down-and-cut-our-losses scenario?  When you're back in

23   the office, I would like to set up a meeting with the folks on

24   this e-mail to discuss," signed Heath.

25            Let's go to the response to this.  This is from Gary;

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 760

1   and again, you're copied on this; is that right, Mr. Garrett?

2   A   Yes, I am.

3   Q   It says, "SK is aware of this."  Who is SK?

4   A   That's Subodh Karnik.  He was the CEO of Global at the

5   time.

6   Q   Okay.  And this is -- this e-mail answer is actually seven

7   days after the first one in the string, which was

8   December 21st, right?

9   A   Right.

10  Q   And it says, "Last week we prepared a paper for MP on the

11  timing and effects of ending scheduled service."  Do you see

12  that?

13  A   Yes.

14  Q   And who is "MP"?

15  A   That's the majority shareholder, MatlinPatterson, that

16  owns Global and all three airlines.

17  Q   So at least as of December 28 of '07, an actual paper had

18  been prepared about ATA just shutting down scheduled service;

19  is that right?

20  A   Yes.  It was shutting down a portion or all of scheduled

21  service.

22  Q   All right.  Next sentence says, "We asked MP for a

23  mid-January decision so that we can get to work."  Do you see

24  that?

25  A   Yes.

GARRITY - DIRECT/BROUGHTON

Vol. 5 - 761

1  Q    And why would ATA be asking MatlinPatterson for a

2  decision?

3  A    Basically, if you roll up this paper, it was prepared by

4  the COO of ATA, and then it was submitted to Subodh and

5  myself.  Subodh, again, is the CEO, the guy that runs Global.

6  And then if you look at the board of directors of ATA through

7  Global, ultimately to the board of directors at the Global

8  level, MatlinPatterson, being the largest shareholder, also

9  has the most seats on the board of directors.  So any type of

10 decision of this magnitude would have to get board approval.

11 And since MP controls the majority of the board seats,

12 MatlinPatterson would have to approve any significant change

13 in scheduled service, either shutting it down, all or in part.

14 Q    Okay.  Was there some discussion of trying to sell off

15 scheduled service?

16 A    As we got into January, yes.

17 Q    Okay.  We'll wait before we get there.

18      You've used the term "roll-up" a few times.  What do

19 you mean by that term, "roll-up"?

20 A    "Roll-up" just means the accumulation of the numbers.

21 Q    Okay.  This last sentence says, "That proposal wipes out

22 50 percent of the remaining post-GAL moves ATA

23 infrastructure."  And "GAL" is the name of the parent company,

24 Global Aero Logistics, right?

25 A    Correct.

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 762

1  Q    And what does that sentence mean?

2  A    I'm guessing at this point --

3  Q    Well, we don't want you to guess.  It doesn't mean

4  anything to me either.

5         Is that it for this e-mail?  Is there anything above

6  that?

7             MR. BROUGHTON:  Okay.  You can take that one down.

8             Mr. Brockwell, put up Plaintiff's Exhibit 2, if you

9  would.

10  BY MR. BROUGHTON:

11  Q    Mr. Garrett, I take it at some point did you ever see this

12  January 22nd letter from FedEx or at least hear about it?

13  A    Yes, I did.

14  Q    Okay.  At some point in time, did you hear about it on

15  that day or some --

16  A    I heard about it shortly thereafter.  I believe it was on

17  the 24th I actually heard about it.

18  Q    Okay.  Well, let's go to January 21st, the day before this

19  letter.  Had you done any forecasting or budgeting looking at

20  what you thought the year 2008 was going to look like at ATA?

21  A    Yes.  During the month of January, we began accumulating

22  all the budgets from all the airlines.  And to the extent like

23  the ATA one that we looked at previously, the numbers were in

24  my mind unacceptable.  They got pushed back down to the

25  various department heads to do a better job of reducing costs.

GARDNER - DIRECT/BROUGHTON

Vol. 5 - 763

1        In addition, with respect to ATA, we started running

2    scenarios whereby we looked at shutting down portions, if not

3    all, of the scheduled service.

4        There was basically three main avenues we were looking

5    at at that point in time.  One was shutting down a portion of

6    it, which was mainly the domestic flying, keeping the Hawaiian

7    business open.  The second piece was shutting down all the

8    flying, domestic and Hawaiian.  And then the third option we

9    were looking at and pursuing aggressively at this point in

10   time was -- or I should say prior to this point in time -- was

11   selling ATA's passenger business to some other operator.

12   Q   You mentioned Hawaiian business.  I don't know if there's

13   been much discussion about that.  What was ATA's Hawaiian

14   business as of early January of '08?

15   A   It was the biggest piece of their scheduled service.

16   Again, it was flying off large West Coast cities into Hawaii.

17   Q   Once -- well, were you engaged in some restructuring at

18   ATA before this letter came?

19   A   Yes.  We were heavily engaged in a project called

20   Thatcher, which I imagine we'll get into some, but it was --

21   Q   Is that Project Thatcher?

22   A   Project Thatcher.  That is Gary Ellmer's, his team as

23   supported by the ATA FP&A team.

24   Q   You've got to tell us what that FPA means again.

25   A   Financial planning analysis.

1   Q   Okay.

2   A   The numbers people.

3         As supported by them as to what the picture would look

4   like in 2008 if we removed portions of scheduled service, if

5   not all of scheduled service.

6   Q   Okay.  So if you're looking down the road at a whole year

7   and you're in early January, what would ATA have looked like

8   by the end of January of '08 if it had sold off or closed its

9   scheduled service?  What was going to be left?

10  A   Basically, what would be left if scheduled service went

11  away in its entirety would be just the military business and a

12  small piece of passenger charter that I mentioned previously.

13  Q   And why did ATA want basically to end up just being, what

14  you said, 82 percent military and the rest are these charter

15  flights?

16  A   Because it was highly profitable.

17  Q   Did receipt of this notice from FedEx change that plan?

18  A   It materially changed the plan because now we have an

19  issue not only with our scheduled service, which we were in

20  the process of addressing.  We have a major issue with our

21  military business in that, if you read that closely, that

22  September 30th of 2008, it wouldn't exist anymore on the FedEx

23  team.

24  Q   So this is January 22nd, and that letter says after

25  September 30th, you're not going to be on the team in FY09,

1  right?

2  A   Right.

3  Q   Meanwhile, you're supposed to continue flying in FY08.  Is

4  that what that says?

5  A   Correct.

6  Q   All right.  Now, I assume you guys didn't take out an ad

7  in the newspaper, put this on a billboard; is that right?

8  A   We did not.

9  Q   Okay.  What was -- did ATA come up with a plan of action

10 to respond to -- before we do that, when ATA upper management

11 received this, what was the response?

12 A   I was difficult.  We didn't know what to expect from this

13 letter.  Initially, we actually thought it was a negotiating

14 ploy.  As we --

15 Q   Let me stop you there.  What do you mean, you thought it

16 was a negotiating ploy?

17 A   You know, there are aspects of -- i.e., the commission

18 rate, that's negotiated every year.  And as I mentioned

19 previously, the commission rate was reduced from 7 to

20 4.5 percent, which was a very positive for ATA; it was a

21 negative for FedEx.

22        In addition, there's a piece of the program that was

23 moved out of the long-range program.  I know this is

24 complicated, but the 757-300 program was moved out of the

25 international program into the short-range domestic program.

GARRITY - DIRECT/BROUGHTON

1   And that piece of the business, we actually had to pay no

2   commission on.

3          So both those commissionable items -- or the

4   significant reduction in commissions was a big positive for

5   ATA and a negative for FedEx.  And so people familiar with the

6   relationship with FedEx felt that this may have been a

7   negotiating ploy to get the commissions back up in the

8   7-percent range.

9   Q   At some point in time, did ATA management realize that

10  FedEx actually was canceling it off of the FY09 team?

11  A   Yes.  Over the next couple of weeks, there were a series

12  of calls in to FedEx and to Mr. Molinari, who signed this, and

13  Mr. Molinari's heads, bosses.

14  Q   And did you understand -- did ATA ask FedEx to reconsider

15  its decision?

16  A   Yes, ATA did ask that.

17  Q   All right.  Back to the fact that -- well, was ATA trying

18  to keep this as quiet as possible?

19  A   Yes.

20  Q   And why is that?

21  A   Because if this letter got out to the flying community,

22  the military flying community, our competitors or, more

23  importantly, the pilots or the flight attendants, the major

24  employee groups, the mechanics -- and the majority of these

25  people have been at ATA for numerous years -- they would

1  realize that their major profitable line of business was at

2  risk of being lost.

3  Q   And at this point in time, did -- well, let me ask you

4  this:  When did ATA expect that this was going to become

5  public knowledge?

6  A   I mean, a letter like this and the termination of a

7  program of this size, we thought it would leak out in the

8  normal course.  But, ultimately, the military would release

9  the fiscal 2009 teams in April.  And so --

10 Q   In April of '08?

11 A   April of '08 it would be public knowledge that ATA was not

12 on the FedEx team.

13 Q   Okay.  So you're at the end of January, right?  So you

14 were going to have a short month of February, all of March,

15 and then this was going to become public knowledge?

16 A   Correct.

17 Q   All right.  So in reality, you had, what, 10, 12 weeks to

18 come up with a solution?

19 A   Correct.

20 Q   Okay.  Now, you mentioned that it was of concern that once

21 the military flying community would hear about this, that it

22 would have a negative impact.  What would that negative impact

23 be?

24 A   I mean, in my mind, it would affect us.  And, you know,

25 first off, we looked at as many alternatives as possible.

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 768

1  Q   Tell us what you were looking at.

2  A   Okay.  So over the next week or two, it became clear that

3  this letter was real, that we would be kicked off the team

4  beginning fiscal '09.

5        So in the military flying, there's three teams:

6  There's the Alliance Team, the FedEx team, and the UPS team.

7  So we began approaching the two remaining teams to determine

8  whether there would be a spot on the teams for us where we

9  could fly the capacity that we had, which is our new DC10

10 fleet, our 757s mainly, were the two main aircraft types, the

11 two types of 757s that we operated, and find out whether we

12 could step onto another team and maintain our current level of

13 business.

14 Q   Okay.  Now, the jury's heard that for a long period of

15 time, the FedEx team only had ATA and Omni as the fliers.

16 A   Correct.

17 Q   And is it your understanding that ATA and Omni were flying

18 off the FedEx team's full entitlement for the FedEx team?

19 A   Yes.  Historically ATA and Omni flew the majority of the

20 FedEx team flying.

21 Q   Okay.  And you've told us from these COINS Reports that

22 you could see what all the other teams and all the other

23 airlines were doing; is that right?

24 A   Correct.

25 Q   Who were the fliers on the Alliance Team?  Who were the

1  equivalents to ATA and Omni on the Alliance Team?

2  A   The two major fliers on the Alliance Team was World and

3  North American, the sister airlines.

4  Q   Were they flying off the full entitlement of the Alliance

5  Team?

6  A   For the most part, and occasionally Delta would fly some

7  flights, and United would occasionally fly some flights, but

8  very few.

9  Q   Delta and United were on that Alliance Team?

10 A   Correct.

11 Q   So did it appear to ATA that the Alliance Team needed

12 another flier?

13 A   No.  The capacity that already existed on the Alliance

14 Team was able to fly their full entitlement.  So by putting

15 another flier on the team, they wouldn't benefit because the

16 revenue was being flown in its entirety with the existing team

17 members.

18 Q   How about the UPS team?  And the jury has heard several

19 times that it was a small team.

20 A   Yes.

21 Q   Small percentage of business.

22     What was its status in terms of fliers?

23 A   The UPS team had one flier, Ryan International.

24 Q   Is that R-Y-A-N?

25 A   Yes.

CARDIFF - DIRECT/BROUGHTON

1  Q   Okay.

2  A   And they did all the flying on the UPS team.

3  Q   Now, we've heard about these points sellers, the big

4  airlines.  Did the UPS team have a big airline other than

5  itself?

6  A   It had some large cargo airlines on the team; but from a

7  percentage of the teams, the Alliance Team was the largest

8  currently in this fiscal year.  They represent 56 percent of

9  the business.  The FedEx team is around 29 or 30 percent of

10  the business, and the UPS team is currently whatever that is,

11  the residual up to 100, 14, 15 percent.

12  Q   Okay.  So tell the jury what ATA did in looking at the UPS

13  team as an option to replace FedEx team membership.

14  A   Okay.  So the first team we looked at was the UPS team.

15  UPS had contacted some of the other fliers historically, so

16  our goal was to become the flier on the UPS team.  We thought

17  if we became the flier on the UPS team, we would be able to

18  salvage a larger percentage of our revenue.  It was our best

19  alternative to salvage as much of the revenue that we were

20  receiving on the FedEx team.

21  Q   Let me stop you there.  But the UPS team already had one

22  flier, Ryan; is that right?

23  A   Yes.  UPS already had one flier, but keep in mind this is

24  for fiscal '09 that started October 1st of 2008.  So since the

25  Teaming Arrangements were not announced yet, we did not know

1  exactly whether Ryan had already signed up with UPS.  So you

2  really don't know because all of that information is

3  confidential until the military releases the Teaming

4  Arrangements.

5  Q    Okay.  So tell us how it progressed or didn't progress

6  with UPS.

7  A    Okay.  So we -- in early February we went to UPS and

8  started negotiations to determine whether it was feasible for

9  us to become a member of the UPS team.  There initially was

10 optimism in that.  As we continued negotiations in the month

11 of February, that optimism deteriorated materially.  We think

12 at some point UPS got word that we were not renewed on the

13 FedEx team, in which case they offered us their final bid at

14 the end of the day was 40 percent of the passenger flying of

15 the UPS team.

16       So the simple math around that, it's taking the pie of

17 100 percent of military flying, and they only had -- I don't

18 know the exact number, but 10 to 15 percent of the flying.

19 And then we were going to only get 40 percent of that flying.

20 And Ryan International would get the other 60 percent.

21       So when you do the math on that, that's a revenue

22 stream that's materially less than what we were currently

23 flying.

24 Q    So other than looking at -- you urged FedEx to reconsider.

25 They said no.  You looked at UPS.  Did you conclude that

1   wasn't acceptable?

2   A   Yes.  When you ran out those numbers, the EBITDA, free

3   cash --

4   Q   Walking-around money?

5   A   Yes, the walk-around money was not enough to support our

6   DC10 and 757 and 737-800 infrastructure.

7   Q   Okay.  And you weren't going to be able to start with UPS

8   until FY09, if that had worked out?

9   A   Correct.

10  Q   So that was going on through February and March of '08

11  when you were talking to UPS?

12  A   Yes, February and early March.

13  Q   Okay.  Now, you had told us, also, with respect to this

14  that in April the Teaming Arrangements were going to become

15  public?

16  A   Correct.

17  Q   And you had mentioned that you had some concern about what

18  would happen when ATA's employees, their mechanics, their

19  pilots, their flight attendants found out that ATA was not

20  going to have any military flying anymore; is that right?

21  A   Military flying at the level on the FedEx team.

22  Q   Okay.  And in FY09, there wasn't going to be any flying at

23  all -- military flying at that point in time once UPS didn't

24  work out, right?

25  A   Correct.  Or we looked at two other alternatives.

GARMONG - DIRECT/BROUGHTON

1  Q    What were those?

2  A    The two other alternatives, as I mentioned briefly, was

3  joining Alliance team.  But there was already enough fliers on

4  the team, so the results of that were the worst.

5        Then the final alternative we looked at was starting

6  our own team, the fourth team, that ATA would be the head.

7  The results were very similar to what the UPS flying

8  40 percent were.

9  Q    Wasn't going to be enough money?

10  A    No, not enough money.

11  Q    Okay.  So why did ATA end up shutting down in early April

12  of 2008?

13  A    ATA shut down in early April because the management of

14  that airline, given the difficulties in scheduled service and

15  the termination of our arrangement with FedEx later in the

16  year, was too much to manage, and that the employee issues and

17  exodus that would have taken place in our pilot ranks or

18  mechanics and the people that ensure the operation and safety

19  of our airline were going to be so significant, in our

20  estimation, that we had no other alternatives than to shut the

21  airline down.

22  Q    Okay.  Let's back up there for a minute.  So in April, the

23  Teaming Arrangements would become public information; is that

24  right?

25  A    Yes.

GARRETT - DIRECT/BROUGHTON

1  Q    So the mechanics and the pilots and the employees were

2  going to know ATA's profitable business is gone; is that

3  right?

4  A    Correct.

5  Q    Would you expect them to start looking for a new job at

6  that point?

7  A    I would have.

8  Q    All right.  Can an airplane -- can an airline fly without

9  pilots and mechanics?

10  A    No, they can't fly.  I mean, to give you a better example,

11  you know, pilots bid and flight attendants bid on where

12  they're going to fly in advance.  And to have a pilot or a

13  flight attendant not show up for their flight on a regular

14  basis or an unpredictable basis is really chaos.  And having

15  mechanics walk off the job and things like that, I mean, the

16  situation was, as you can imagine, was very strenuous.  And,

17  you know, we thought that we would lose control of the

18  oversight of the airline.

19  Q    Now, you were continuing to fly military flights on the

20  FedEx team at this point, right?

21  A    Correct.

22  Q    So you were still getting money from those flights?

23  A    Correct.

24  Q    But after April, it was your concern you wouldn't have

25  pilots and mechanics around to fly those flights?

GARRITY - DIRECT/BROUGHTON

Vol. 5 - 775

1   A    Yeah.  We weren't sure what was going to happen with the

2   employee base.  It was unpredictable.

3   Q    Was one of the things that ATA considered back at that

4   point in time going through a restructuring bankruptcy again?

5   A    Yes.

6   Q    And why didn't you do that again?  You had done it before.

7   Other airlines have done it.

8   A    Obviously, it was a topic of conversation when we were

9   looking at the scheduled service business.  As you may read in

10  the papers, bankruptcies in airlines are somewhat common,

11  probably more so than most any other business, that you read

12  about in the papers, at least.

13       So its one option and in my opinion the most

14  profitable option would have been to restructure ATA through a

15  reorganization and returning -- with the protection of the

16  courts and returning the assets related to the scheduled

17  service business back to its lessors.  That's mainly returning

18  the airplanes operated just in scheduled service back to the

19  lessors and then forming an airline of 10 to 12 airplanes,

20  very similar to other airlines that are currently operating

21  for the U.S. military around the very profitable military

22  business.

23  Q    So why didn't you restructure there in April of '08

24  instead of shutting down?

25  A    That option was removed when we were terminated from the

1  FedEx team.

2  Q   Why?

3  A   Because the core cash cow business was not out there in

4  the future.  So when we went out to raise money or restructure

5  our capital, the way we had historically done or the company

6  had historically done it, they had showed the new investors,

7  you know, the military business and the commitment to the

8  teaming arrangements and the history that they had been flying

9  at ATA in this case for the FedEx team, which was 16 years.

10         Not having that history and that relationship in

11  place, the ability for us to restructure successfully was very

12  remote in my mind.

13  Q   Is restructuring sometimes called reorganizing?

14  A   Yes.

15  Q   Without a military business, was there anything left to

16  reorganize?

17  A   In my opinion, no.

18  Q   Did ATA ask for cash from its parent company before it

19  shut down in August?

20  A   Yes.  So to fund the scheduled service business, as I

21  touched on in one of the e-mails, the amount of negative

22  EBITDA that scheduled service was generating was more than

23  what the military was generating of ATA.  So the parent

24  company, Global, and its sister airlines who were profitable

25  were loaning ATA money through a series of notes.

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 777

1   Q   All right.  And when ATA asked for cash in late March or

2   early April, was the answer no?

3   A   The answer was no.

4   Q   Subsequent to that shutdown, you're still involved at

5   Global, correct?

6   A   Correct.

7   Q   Has MatlinPatterson continued to invest money in military

8   flying?

9   A   Yes, they have.

10              MR. GABEL:  Objection, relevance.

11              THE COURT:  Relevance of that?

12              MR. BROUGHTON:  Your Honor, I believe it's very

13   relevant in that MatlinPatterson had been funding ATA while it

14   still had military flying, and MatlinPatterson continued to

15   fund military flying operations at that company afterwards.

16              THE COURT:  Go ahead.

17              MR. GABEL:  Your Honor, we're losing the distinction

18   between ATA, the plaintiff in this case, and Global, the

19   parent company that owned two entirely separate airlines.  And

20   MatlinPatterson's willingness to fund profitable airlines is

21   totally irrelevant to whether or not they're willing to fund a

22   money loser.

23              THE COURT:  I'll allow a brief exam on this, but not

24   much.

25              MR. BROUGHTON:  Thank you, Your Honor.

Vol. 5 — 778

BY MR. BROUGHTON:

Q   I think he answered the question.

    So MatlinPatterson has continued to fund military flying operations at other airlines?

A   Yes.  They funded additional cash to help Global pay off the ATA lease guarantees.

Q   Did MatlinPatterson raise new money for military flying?

A   Yes, they did.

        MR. BROUGHTON:  I'll pass the witness.

        THE COURT:  All right.  Need a break?

        THE WITNESS:  I'm fine.

        THE COURT:  Well —

        THE WITNESS:  I didn't know if you were looking at me or not.

        MR. BROUGHTON:  I would love a break.

        THE WITNESS:  I apologize.

        THE COURT:  Certainly, I'm considerate of your needs, but these folks who are here are my priority at this time.

        Why don't you go back to the jury room.  We'll take a brief break at this time.  Then everybody else can take a break as well.  So 10 minutes.

        Do not discuss the case among yourselves.

        COURT CLERK:  All rise.

    (Jury out.)

GARRETT - DIRECT/BROUGHTON

1    (A recess was taken.)

2    (Jury in.)

3         COURT CLERK:  You may be seated.

4         THE COURT:  Mr. Gabel?  Cross exam.

5         MR. GABEL:  Thank you, Your Honor.

6                    CROSS EXAMINATION

7    BY MR. GABEL:

8    Q    Good afternoon, Mr. Garrett.

9    A    Good afternoon.

10   Q    I think we met about a year ago in Atlanta; is that

11   correct?

12   A    I figured that out.  It's been about a year.

13   Q    On your direct exam you had discussed a little bit about

14   the cash problems that ATA was experiencing shortly after you

15   got there.  I would like to look at some documents, some of

16   the documents that you discussed with Mr. Broughton.

17        MR. GABEL:  Robb, if you would, pull up Exhibit 131,

18   Document 827.  I believe Mr. Broughton had asked you about

19   this.  Robb, if you will, blow that up and highlight the top

20   e-mail language.

21   BY MR. GABEL:

22   Q    Now, you and Mr. Broughton discussed this e-mail.  This

23   was something that you wrote December the 4th of 2007; is that

24   correct?

25   A    Correct.

Vol. 5 - 780

1  Q   And at that point, you had been the Chief Financial

2  Officer of Global, the parent company of ATA for about two

3  months -- one month?

4  A   One month, yeah.

5  Q   You had some September getting-up-to-speed time?  Were you

6  going down to Atlanta?

7  A   I was determining whether I wanted to take the position in

8  September.

9  Q   So you were going to Atlanta and coming --

10          THE COURT REPORTER:  Mr. Gabel, could you slow down,

11  please?

12          MR. GABEL:  Slow down, slow down.

13          THE WITNESS:  I spent time at each of the airlines

14  in Atlanta, yes.

15  BY MR. GABEL:

16  Q   So between your getting-up-to-speed time in September and

17  an entire month as the Chief Financial Officer, you had

18  started to get into the numbers of what the entire Global

19  enterprise was doing as well as what ATA, its subsidiary was

20  doing, correct?

21  A   Yes.

22  Q   Your opinion at that point was that the cash situation at

23  ATA was -- I believe your word was "ugly"; is that correct?

24  A   Correct.

25  Q   As of December the 4th, 2007, do you know whether ATA had

1  received any word from FedEx about FedEx not inviting them

2  back to be a member of their team in fiscal year 2009?

3  A   Not to my knowledge, no.

4  Q   So at that point, your opinion of the cash situation being

5  ugly at ATA had nothing to do with anything FedEx might or

6  might not do in the future.

7  A   No.

8           MR. GABEL:  Robb, if you will, go down to the bottom

9  e-mail and blow that up, please.  Highlight the last two words

10 in the first full sentence.

11 BY MR. GABEL:

12 Q   Now, from your perspective as the Chief Financial Officer

13 of Global, if you were going to crack down on somebody wanting

14 to spend some money, you were concerned about what was good

15 for all of Global and not necessarily what was good for one

16 particular airline, correct?

17 A   I was concerned about all the airlines equally, I would

18 say.

19 Q   Well, in this particular instance, I think you said the

20 folks at ATA thought they needed some new flight planning

21 system, and you said, "No way."  I believe the word you used

22 in your -- you write this e-mail, correct?

23 A   Yes.

24 Q   And the word that you used in your e-mail was that -- I

25 believe the words you used, "We consider what is best for all

GARRETT - CROSS/GABEL

Vol. 5 - 782

1  Global."  I believe you put that in all caps; is that correct?

2  A    Correct.

3  Q    So if ATA had something that they thought was good for ATA

4  but in your opinion was not good for all of Global, you were

5  going to be against that, correct?

6  A    It depends on the circumstances.  In this case, if any of

7  the airlines had come forth for a new planning system that was

8  different than the other two airlines, I would have had the

9  exact same response.

10  Q    I'm sorry, my question probably wasn't that clear.

11        Was your primary concern what was good for the entire

12  enterprise or what was good for ATA, the plaintiff in this

13  lawsuit?

14  A    I view ATA to have the same attention or concern that any

15  of the airlines at Global would have.  I was the only chief

16  financial officer for all three airlines.

17  Q    And if some -- if some decision had to be made where it

18  would benefit ATA as an individual airline but may not be good

19  for the entire enterprise, all of Global, where did your

20  allegiance lie?  Did you go with the whole airline or just

21  ATA?

22  A    If the -- if the cash ramifications of that decision were

23  favorable to ATA in excess of the unfavorability of the other

24  airlines, I would pick ATA.

25  Q    Okay.

GARRETT - CROSS/GABEL

Vol. 5 – 783

1          MR. GABEL:  Robb, if you can, let's go to

2    Defendant's 132, 6994.

3          Before we do that, Your Honor, I would offer

4    Defendant's Exhibit 131, the prior exhibit.

5          MR. BROUGHTON:  No objection.

6          THE COURT:  131 admitted.

7      (Defendant's Exhibit 131 was received in evidence.)

8    BY MR. GABEL:

9    Q   I believe you were also asked by Mr. Broughton about

10   Defendant's Exhibit 132, and did you send this e-mail dated

11   December the 14th, 2007?

12   A   Yes, I did.

13         MR. GABEL:  Your Honor, I'll go ahead and offer into

14   evidence for the jury's review during their deliberations

15   Defendant's Exhibit 132.

16         MR. BROUGHTON:  No objection.

17         THE COURT:  132 admitted.

18     (Defendant's Exhibit 132 was received in evidence.)

19   BY MR. GABEL:

20   Q   And Mr. Garrett, was it your opinion, "That as of December

21   the 14th, 2007, we are very critical with cash at ATA.

22   Positive cash flows at the other airlines do not come close to

23   offsetting the negative flows."  Was that your opinion as of

24   December the 14th, 2007?

25   A   Yes.

1   Q    When you say the other airlines, you're talking about

2   World and North American?

3   A    Correct.

4   Q    The other airlines owned by Global?

5   A    Yes.

6   Q    And as the Chief Financial Officer of the parent, you

7   would probably be the person most knowledgeable about whether

8   the positive cash flows at the other airlines was offsetting

9   the negative cash flow at ATA, wouldn't you?

10  A    Correct.

11  Q    At the time that you expressed this opinion, did you know

12  anything about whether or not FedEx was going to invite ATA to

13  be a member of its team in fiscal year 2009?

14  A    No, I did not.

15  Q    So this opinion had nothing to do with anything FedEx

16  might do in the future?

17  A    No.  I would add specifically again, I was trying to get

18  the attention of the people here.  Also, as it turned out,

19  when the 2008 budget was completed by the --

20          MR. GABEL:  Object as nonresponsive, Your Honor.

21          THE WITNESS:  I'm talking about the cash flow of all

22  three airlines put together.

23          THE COURT:  Okay.  Ask a question.

24  BY MR. GABEL:

25  Q    Do you know the date that ATA or anyone at Global first

GARRETT - CROSS/GABEL

Vol. 5 - 785

1  learned that FedEx would not invite ATA back for fiscal year

2  2009?

3  A   I don't know the exact time, no, or date --

4  Q   Does January 22nd of 2008 sound --

5         THE COURT REPORTER:  I'm sorry, one at a time,

6  please.

7         THE WITNESS:  Yes.

8  BY MR. GABEL:

9  Q   Does January 22nd of 2008 sound like a familiar date, the

10 date you've become familiar with --

11 A   Yes.  That's the date of the letter, so yes.

12 Q   You agreed with me that you expressed this opinion before

13 that information was conveyed to ATA, correct?

14 A   Yes, sir.

15 Q   Now, when you say, "We are very critical," that's

16 referring to the entire Global, not just ATA, correct?

17 A   I think in this instance, this is just ATA.  If you look

18 at the individuals up on the two lists, those are all

19 ATA-related employees except for Heath Garrett.

20 Q   How firm do you feel about when you say "we," you're

21 referring to just ATA?

22 A   In this sentence, I feel pretty firm in the first sentence

23 that ends with ATA since ATA is in the sentence.

24 Q   Okay.

25      Well, you remember we did meet a year ago in Atlanta,

1  correct?

2  A    Correct.

3  Q    I asked you questions, and you gave me answers just like

4  we're doing here today?

5  A    Yes.

6  Q    Before you did that, you were sworn in to tell the truth

7  and be honest?

8  A    Correct, correct.

9  Q    You did that just like you're being honest with these

10  folks, correct?

11  A    Correct.

12  Q    I asked you a very similar question about what you mean by

13  we.

14         MR. GABEL:  Robb, if you would, please play

15  Deposition page 14, lines 6 through 8.

16         (Excerpt of the deposition of Mr. Garrett was played

17  in open court.)

18  BY MR. GABEL:

19  Q    Was that your answer a year ago?

20  A    It appears so, yes.

21  Q    If you could go to Plaintiff's Exhibit --

22  A    That exhibit --

23         MR. GABEL:  Let's go to Plaintiff's Exhibit --

24         THE COURT REPORTER:  I'm sorry.  I can only take

25  down one of you at a time.

GARRITY - CROSS/GABEL

Vol. 5 - 787

1          THE COURT:  Right, right.  Next question.

2          MR. GABEL:  Let's go to Plaintiff's Exhibit 93, page

3  2025, please, Robb.

4  BY MR. GABEL:

5  Q   I believe you were also asked about this exhibit on direct

6  exam.  We've looked --

7          MR. GABEL:  Can we look at the heading information,

8  Robb?

9          MR. HELT:  Top or bottom?

10          MR. GABEL:  Top.

11  BY MR. GABEL:

12  Q   Did you receive this e-mail from Subodh Karnik dated

13  December 18, 2007?

14  A   Yes.

15  Q   Actually, you may not have been asked about this on direct

16  exam.

17          MR. GABEL:  Your Honor, I would offer Plaintiff's

18  Exhibit 93 into evidence for the jury's consideration.

19          MR. BROUGHTON:  Plaintiff's 93?  No objection.

20          THE COURT:  I would assume not.  Show it's admitted.

21     (Plaintiff's Exhibit 93 was received in evidence.)

22          MR. GABEL:  Robb, if you would go to the text of the

23  e-mail.  Go down to the one that has some information.

24  BY MR. GABEL:

25  Q   You received the, I guess, forwarded e-mail that attached

CARNEY - CROSS/GABEL

Vol. 5 - 788

1  this information from Subodh Karnik, correct?  I mean, the top

2  e-mail was from Subodh to you and apparently had this attached

3  to it.

4  A   Okay.

5  Q   So you would have had this information that Subodh --

6          MR. GABEL:  Robb, if you will go back, go to the top

7  again.

8  BY MR. GABEL:

9  Q   Subodh Karnik apparently forwarded to you this bottom

10  e-mail, correct?

11  A   Right.

12          MR. GABEL:  Let's go to the bottom e-mail, Robb.

13  BY MR. GABEL:

14  Q   So as of December the 18th, 2007, you had information from

15  Mr. Karnik.  And who was Mr. Karnik?

16  A   He was the CEO of Global.

17  Q   And was it your understanding that the CEO of Global was

18  at least thinking about a quote, shutdown, unquote for

19  scheduled service at ATA as of December the 18th, 2007?

20  A   Yes.  It appears there, yes.

21  Q   And you'll agree with me that that was prior to any

22  knowledge on behalf of ATA or Global of what FedEx may or may

23  not do with respect to the military's fiscal year 2009,

24  correct?

25  A   Correct.

1   Q   Now, this e-mail had an attached PowerPoint slide to it.

2           MR. GABEL:  And Robb, if you will, go over to the

3   attached PowerPoint slide in Exhibit 93.  The second page of

4   that should be 2027.  If you will, turn that over, we can read

5   it.  Blow up the bottom bullet point there.

6   BY MR. GABEL:

7   Q   Did Mr. Karnik forward to you an e-mail with an attached

8   PowerPoint slide before FedEx had ever said anything about

9   fiscal year 2009 that indicated that ATA was looking at a

10  potential negative cash flow of 30 million to 45 million for

11  2008?

12  A   Yes.

13  Q   And was that consistent with your understanding that as of

14  December of 2007, ATA was looking at a negative 30 million to

15  45 million negative free cash flow for 2008?

16  A   At this point in time based on this first-cut analysis,

17  yes.

18          MR. GABEL:  Let's go over to page 4 of the

19  PowerPoint that Mr. Karnik forwarded to you, which, Robb,

20  should be 2029 of Plaintiff's Exhibit 93.  If you will blow

21  that up.  Robb, if you would blow up the second bullet point

22  to this PowerPoint.

23  BY MR. GABEL:

24  Q   As of this December of 2007 e-mail from the CEO of Global

25  to you, did you understand the CEO of Global had already

GARRETT - CROSS/GABEL

Vol. 5 - 790

1  identified two logical points in 2008 for effecting an end

2  state for ATA, one of those being April 1st and the other

3  being September 1st?

4  A   Those are two logical points for the end state of

5  scheduled service.  That would be consistent with most

6  scheduled service airlines, also, I would add.

7  Q   And this logical date for the end of, at least, scheduled

8  service at ATA had been identified before FedEx had conveyed

9  any information about whether or not it would invite ATA back

10  to be part of its team in FY2009, correct?

11  A   Correct.

12       MR. GABEL:  And, Robb, if you would blow up the next

13  bullet point on this page.

14  BY MR. GABEL:

15  Q   Now, apparently Mr. Karnik had identified some of the pros

16  and cons of this April shutdown date for scheduled service

17  that he's looking at back in December of 2007.  The first of

18  those is he says "proxy for," quote, "ASAP," closed quote,

19  "due greater than 60-day WARN and union requirements."  What

20  is your understanding of the meaning of the word "WARN,"

21  capital W-A-R-N?

22  A   It's a law requiring 60-day notice to employees if you're

23  going to terminate them.

24  Q   Is it your understanding that there's a federal law that

25  if you're going to lay off a large number of employees, you

1  have to given them 60-days notice and then they continue to be

2  employed for the next 60 days after you give them that notice

3  before you have that major layoff?

4  A   Yes.  You said it nicer than I did.  That's my

5  understanding.

6  Q   And during that 60 days, they still get paid after they've

7  been told there's going to be a major layoff, correct?

8  A   Correct.

9  Q   And paying employees for an additional 60 days is an

10  expense for a company.  Would you agree with that?

11  A   Correct.

12  Q   So if they were going to comply with this federal law and

13  issue a WARN notice and then take 60 days to wind down the

14  scheduled service, they were going to go ahead and have to let

15  their employees know pretty quick.  If we're looking at

16  April 1st, they're going to have to let them know by the end

17  of January, right?

18  A   Correct.

19  Q   Did they let their employees know they were shutting down

20  scheduled service by the end of January?

21  A   No, they did not.

22  Q   But Mr. Karnik was at least thinking about it in December,

23  correct?

24  A   Yes.  I think that's fairly common in the airline

25  business.

1  Q   Okay.  Now, if you just turned out the lights and shut

2  down the service in the middle of the night and went into

3  bankruptcy, you wouldn't have to pay employees for another 60

4  days, correct?

5  A   I don't know.  Maybe, maybe not.

6       What does that mean, "shut the lights off"?

7  Q   Pull the plug on the business --

8  A   Right.

9  Q   -- go into Chapter whatever and not operate anymore, no

10 longer fly missions, let them get in line in the proceedings.

11 A   I mean, we've complied with the WARN Act, if that's what

12 you're referring to.  I mean, I'm not sure what your question

13 is leading towards.

14 Q   Now, during your direct examination, at one point

15 Mr. Broughton had asked you if you were looking at shutting

16 down scheduled service in December of 2007, and your immediate

17 response was, no, not at that point.  But I think he later

18 came back and asked you a follow-up question and said it was

19 on the horizon, wasn't it?  Well, clearly, as of this

20 December 18th, 2007, e-mail from Mr. Karnik, someone was

21 thinking about the possibility of shutting down scheduled

22 service, correct?

23 A   Yeah.  That's correct.  I really didn't start

24 participating in the plan in detail until January.  But you're

25 correct, yes.

GARRETT - CROSS/GABEL

Vol. 5 - 793

1  Q    But you don't dispute that Karnik -- Mr. Karnik had sent

2  you this --

3  A    I do not.

4  Q    -- PowerPoint on December 18th?

5  A    I do not, no.

6         MR. GABEL:  Okay.  Robb, if you will, go to

7  Defendant's Exhibit 138, which is document 870.

8  BY MR. GABEL:

9  Q    You were asked about this document on direct.

10        MR. GABEL:  Robb, if you will blow up the top --

11  well, blow up the middle e-mail first.

12  BY MR. GABEL:

13  Q    I believe this is the one where you explained that you and

14  Heath Garrett are in no way related, correct?

15  A    Correct.

16  Q    What is Mr. Heath Garrett's position again?

17  A    He's vice-president of financial planning and analysis.

18  Q    Now, when Mr. Heath -- wait.  Vice president of financial

19  planning and analysis, was that for Global or for one of these

20  subsidiaries?

21  A    He is a Global employee.

22  Q    Okay.  So he's looking at it from the perspective of the

23  parent company, correct?

24  A    No.  I think this is just the ATA specific business plan

25  that's been submitted.

GARRETT - CROSS/GABEL

Vol. 5 - 794

1  Q   Okay.

2  A   Andrew Thayer is the manager of FP&A that works

3  exclusively on ATA.

4  Q   Okay.  Did Heath Garrett report to you?

5  A   Yes, he did.

6         MR. GABEL:  Okay.  Now, Robb, if you will, highlight

7  the second paragraph of Mr. Heath Garrett's e-mail to you.

8  BY MR. GABEL:

9  Q   Mr. Heath Garrett said, "After looking at the numbers, ATA

10  will burn through another 75 million of cash in 2008????  I

11  know this is a first pass, but the magnitude of miss versus

12  expectations is staggering.  Have we went to DEFCON 5 in Indy

13  yet?  What is the message?  Is Plan B a

14  shutdown-and-cut-our-losses scenario?"

15         What do you understand the term "DEFCON 5" to mean?

16  A   It's a difficult situation.

17  Q   Okay.  Now, at the time that Heath Garrett conveyed this

18  information to you on December the 28th, 2007, did you have

19  any knowledge of what FedEx may or may not do with regard to

20  inviting ATA to be part of its team in FY2009?

21  A   No.

22         MR. GABEL:  Robb, if you will --

23         Well, first, Your Honor, I would offer Defendant's

24  Exhibit 138.

25         MR. BROUGHTON:  No objection.

GARRETT - CROSS/GABEL

Vol. 5 - 795

1    THE COURT:  138 admitted.

2    (Defendant's Exhibit 138 was received in evidence.)

3         MR. GABEL:  Robb, if you will, go to Plaintiff's

4  Exhibit 106, which should be page 2096.  Go ahead and blow up

5  the top paragraph -- well, just blow up the title for now.

6  That's good.

7  BY MR. GABEL:

8  Q   Mr. Garrett, this exhibit, Plaintiff's Exhibit 106, is the

9  minutes of the telephonic meeting of the board of directors of

10 Global for January 22nd, 2008.  Did you attend that meeting?

11 A   Yes, I did.

12 Q   And there in the second line down, it says that this

13 meeting occurred at 9 a.m. in the morning on January the 22nd,

14 2008.  At nine o'clock in the morning of January 22nd, 2008,

15 you made presentations to the board of directors at Global,

16 correct?

17 A   Correct.

18 Q   You had prepared your materials for presentation before

19 that morning, right?

20 A   Correct.

21 Q   And as of the time you were preparing your materials and

22 then as of the time you were actually presenting your

23 materials, you and anyone else at Global had no idea of what

24 phone call may or may not come later in the day on January the

25 22nd, 2008, correct?

GARRETT - CROSS/GABEL

Vol. 5 - 796

1    A    Generally speaking, correct, yes.  I'm not sure --

2    Q    And more specifically, at the time you prepared the

3    materials and the time you presented the information, at the

4    time y'all had this meeting, nobody knew that later that day

5    FedEx was going to inform ATA that as of FY2009 it would not

6    invite them to be part of their team, correct?

7    A    That's my understanding, correct.

8    Q    So any numbers that you presented to the board of

9    directors of Global in Plaintiff's Exhibit 106 would be

10   numbers that you had created assuming that -- well, without

11   any knowledge of any information coming from FedEx related to

12   FY2009, correct?

13   A    Correct.

14        MR. GABEL:  Let's go over to the second page of this

15   board of directors minutes, Robb, which should be 2097.  Now,

16   down at, I guess, paragraph B, Robb, if you will blow up that,

17   the cash part.  Actually, just the first paragraph of

18   paragraph B there.

19   BY MR. GABEL:

20   Q    Paragraph B of the board minutes of this morning of

21   January 22nd, 2008, board minutes indicate that Mr. Garrett

22   reviewed the company's estimated cash position through March

23   of 2008 and refers to board materials, page 7.  Was it your

24   experience that generally these board minutes would attach,

25   first, the minutes that kind of describe what happened in the

1  meeting, and then as an attachment, the PowerPoint slides or

2  the slides that y'all went through at this meeting kind of

3  presenting what's going on to the board?

4  A    Correct.

5  Q    So when you read the board materials, page 7, you

6  expect -- you flip over a couple of pages.  We'll see some

7  PowerPoint slides of what you actually told them about while

8  y'all were at that meeting that morning, right?

9  A    Correct.

10  Q    And you did do that.  You presented part of some

11  PowerPoint slides to the board the morning of January 22nd?

12  A    Right.

13  Q    And then this summarizes that you told them that ATA is

14  burning through cash at the rate of approximately 2MM to 3MM

15  per week to fly scheduled service.  What does "2MM" mean?

16  A    Two to $3 million a week.

17  Q    And did you convey accurate information to the board on

18  the morning of January 22nd?

19  A    Yes, sir.

20  Q    So ATA's scheduled service was burning cash at the rate of

21  2 million to 3 million per week as of that time?

22  A    Correct.

23  Q    You also conveyed that ATA was going to have DC10

24  induction costs in the first quarter of 2008 between 2 million

25  to 3 million, with another 5 to 8 million owed for certain

GARRETT - CROSS/GABEL

Vol. 5 - 798

1  engine overhauls performed in 2007.  Was that true?

2  A   Correct.

3  Q   ATA was facing those expenses?

4  A   Correct.

5  Q   Now, the last sentence of this paragraph says that you

6  stated that this cash forecast does not include the impact of

7  ATA going on penalty with AMC; is that correct?

8  A   That's correct.

9  Q   So whatever numbers you're coming up with with regard to

10 how much cash ATA is losing as of the morning of January 22nd,

11 2008, doesn't even account for the additional losses that

12 might kick in if ATA goes in what's called the penalty box

13 with the military.  Do you agree with that?

14 A   Correct.

15 Q   Okay.  Let's look over at what you actually presented to

16 the board on that date.

17     MR. GABEL:  Robb, if you will, go over to page 7 of

18 Mr. Garrett's PowerPoint that's attached to Plaintiff's

19 Exhibit 106.  I think you will find that at Bates No. 2017.

20     2017.  Okay.  Let me try that again.  We may have a

21 typo there, Robb.

22     THE WITNESS:  I think it's up there now.

23     MR. GABEL:  2107.  I'm sorry.  2107.

24     Robb, first if you'll blow up the graph on the

25 right, the upper right where we can see it.

Vol. 5 - 799

BY MR. GABEL:

Q   Mr. Garrett, I think the board minutes said that you presented page 7 of the PowerPoint in Plaintiff's Exhibit 106. And this is a graph that would be on that PowerPoint on page 7.  Did you present this graph to the board of directors of Global on the morning of January 22nd?

A   Yes.

Q   Now, I realize that this photocopy probably isn't that clear, but it's entitled "cumulative cash flow by week"; is that correct?

A   Correct.

Q   And then across the bottom, we see 1/11, 1/18, 1/25, 2/1, 2/8, 2/15, 2/28.  Are those dates?

A   Correct.

Q   So January 11 through March 28?

A   Correct.

Q   And that's for calendar year 2008, correct?

A   Correct.

Q   And this is information you've come up with before ATA has any idea of what FedEx may or may not do later that afternoon.

A   Correct.

Q   Now, you've got different types of little legends identifying some different letters up at the top.  It looks like a -- maybe a star identifies a line for World, and a square identifies a line for NAA.  Would that be North

GARRETS - CROSS/GABEL

1  American Airlines?

2  A    Correct.

3  Q    And a triangle identifies ATA.  That would be the

4  plaintiff in this lawsuit, correct?

5  A    Correct.

6  Q    And then an X identifies GAL.  Now, that would be Global,

7  the parent company?

8  A    Correct.

9  Q    But that's just a holding company.  That's not adding up

10  the first three and coming up with an average.  That's just

11  sort of administrative costs being sucked up by the parent,

12  right?

13  A    Correct.

14  Q    So we're not averaging the first three to get that line

15  where the X is.  We're just talking about whatever extra

16  expenses we're just putting into the parent's account, right?

17  A    Right.

18  Q    Now, the scale on the left of this graph that you

19  presented, is that in millions of dollars?

20  A    Yes, it is.

21  Q    And the line that sort of nosedives off from negative 10

22  to somewhere between negative 40 and negative 50 millions of

23  dollars by March of 2008, does that correspond to the ATA

24  Airline?

25  A    Yes, it does.

GARRITY - CROSS/GABEL

Vol. 5 - 801

1    MR. GABEL:  Okay.  Robb, if you will, go back out to

2 the full -- let's blow up the burn drivers, the first three

3 PowerPoint bullet points under the graph there.  And this is

4 page 7 of the PowerPoint in Plaintiff's Exhibit 106.

5 BY MR. GABEL:

6 Q   And, again, did you identify that the burn drivers for the

7 cash included ATA scheduled service degradation?  And you have

8 2 to $3 per week.  That means, again, scheduled service is

9 costing ATA 2 million to $3 million per week, correct?

10 A   Correct.

11 Q   And if my math is correct, if you kept that same average

12 going for a full year, losing $2 million a week is

13 $104 million a year?

14 A   Right, but that's not an analysis I would put forth, given

15 the seasonality of the business.

16 Q   I understand.  You're just looking at a quarter here.

17    Okay.  And $3 million a week would obviously be even

18 more than that, correct?

19 A   Correct.

20 Q   I think you've got another 2 or $3 million related to DC10

21 induction costs.  And apparently you still owe another 5 to

22 8 million from things you've already done, correct?

23 A   Correct.

24    MR. GABEL:  Robb, if you will, go over to the ninth

25 page of that PowerPoint that was presented on the morning of

1  January 22nd, 2008.  That would be Plaintiff's Exhibit 106.

2  The ninth page of the PowerPoint would be page 2109.  If you

3  will, highlight the left lower ATA background information.

4  BY MR. GABEL:

5  Q   Mr. Garrett, do you recall when y'all were presenting on

6  the morning of January 22nd, 2008 -- do you recall when we

7  were looking at those board minutes that kind of summarized

8  what you told them, you said that the nosediving cash

9  information you were given about ATA did not count the effect

10 of the penalty box that the military might impose on ATA, did

11 it?

12 A   No, it did not.

13 Q   Now, did you convey to the Board of Directors of Global

14 that in addition to whatever nosediving problems that ATA

15 might be having as of that morning, that by not getting its

16 flights on time, off on time, there on time to the required

17 percentage that the military required, that it might be put in

18 the penalty box effective February 20th of 2008?

19 A   Correct.

20 Q   And did you advise the Board of Directors that the result

21 of that could have an additional cash impact to ATA of

22 $5 million per month for March and April?

23 A   Yes, it could have.

24 Q   And were you aware that in addition to reducing the

25 revenues as a penalty of the penalty box, another remedy

GARRETT - CROSS/GABEL

Vol. 5 – 803

1  available to the military for airlines that fell into the

2  penalty box for not getting their flights off on time was to

3  put them sort of last in line as far as whether or not they

4  would even get the flight in the first place?

5  A   It's my understanding that did not happen though in March;

6  but yes, that is a possibility.

7  Q   And if ATA was unable to correct its on-time performance

8  problems and deficiencies, then this penalty box would even

9  extend beyond March and April of 2008, correct?

10 A   Yes, it could have.

11        MR. GABEL:   Robb, if you will, go over to the 14th

12 page of the PowerPoint that was presented on the morning of

13 January 22, 2008, which should be 2114, if I wrote it down

14 right.   Okay.

15 BY MR. GABEL:

16 Q   Mr. Garrett, do you recall that after you had given a

17 presentation on the financial performance of the company that

18 morning that Mr. Karnik talked about the operations, and then

19 Mr. Yakola talked about something called integration.   And

20 then to close it off, you and Mr. Karnik both talked about

21 some special topics that morning?

22 A   Correct.

23 Q   Again, we're still talking about the morning of

24 January 22, 2008, before anybody knows anything about what

25 FedEx is going to communicate later that day.

 1   A   Correct.

 2           MR. GABEL:  Robb, let's go over to some of those

 3   special topics in that PowerPoint they discussed that morning.

 4   Let's go over to page 19, which should be page 2119.

 5   BY MR. GABEL:

 6   Q   Now, I think you and Mr. Broughton mentioned on direct

 7   something called Project Thatcher; is that correct?

 8   A   Correct.

 9   Q   Did you talk about Project Thatcher that morning,

10   January 22nd?

11   A   Yes, I believe so, if this is in the special topics

12   section of the Board of Directors' minutes.  It's hard to

13   tell.  It's one page.

14           MR. GABEL:  Robb, if you would blow up the first

15   bullet point and supporting information there.  Let's blow up

16   the title too, Robb.

17   BY MR. GABEL:

18   Q   As of the morning of January 22, 2008, did you present to

19   the Board of Directors of Global Aero Logistics that the

20   likely best options for ATA's scheduled service included

21   either selling it off to another airline or simply liquidating

22   it?

23   A   Mr. Karnik or I did present this.  I'm not sure who; but

24   yes, it was discussed.

25   Q   Now, at some point ATA did discuss selling its scheduled

GARRETT - CROSS/GABEL

Vol. 5 - 805

1  service to some other airlines, correct?

2  A   Correct.

3  Q   And one of those was Aloha Airlines; is that correct?

4  A   Correct.

5  Q   And Aloha ultimately didn't buy the scheduled service

6  business, right?

7  A   They did not.

8  Q   In fact, they went bankrupt themselves, correct?

9  A   In late March they did, yes.

10 Q   ATA ultimately didn't sell its scheduled service, did it?

11 A   Ultimately did not.

12 Q   Option 1 ultimately didn't work out, correct?

13 A   The company spent a tremendous amount of time examining

14 six or seven potential buyers; and by the time we filed

15 Chapter 11 on April 2nd, we did not sell the airline -- the

16 scheduled service piece of the airline.

17 Q   As of January 22nd, you realized you were going to have to

18 sell or just liquidate the scheduled service, or in your view,

19 that's the best options.  And you weren't able to do that by

20 April; is that correct?

21 A   Right, which I'll add is a very, very unreasonable short

22 period of time.

23 Q   At least one of your potential buyers went bankrupt?

24 A   Correct.

25            MR. GABEL:  Robb, if you will, go over to the next

Vol. 5 - 806

1  page of the PowerPoint that they presented in special topics

2  under Project Thatcher.  Now Robb, go ahead and blow up the

3  top two bullet points there.

4  BY MR. GABEL:

5  Q   Now, on the prior page, you recall we had looked at --

6  y'all were looking at two sort of best options for the

7  scheduled service as of the morning of January 22, 2008,

8  correct?

9  A   Yes.  Is it possible I could get a copy of the full pages?

10  Q   Sure.

11          MR. GABEL:  Is this 106, Robb, page 20?

12          May I approach, Your Honor?

13          THE COURT:  You may.

14          THE WITNESS:  Thank you.  Appreciate it.

15  BY MR. GABEL:

16  Q   Now, these top two bullet points we're looking at, the top

17  one, does that relate to the first option, trying to sell the

18  scheduled service of ATA?

19  A   Yes, it does.

20  Q   And the second bullet point, does that relate to the

21  second option, just liquidating the scheduled service of ATA?

22  A   Correct.

23  Q   And as of the morning of January 22, 2008, did you present

24  to the Board of Directors of GAL that a possible problem with

25  the sale was that you would have a potential erosion of

1  employee morale and customer confidence once you let them know

2  you're shutting down half your airline?

3  A   At this point in time, no, we didn't talk about that.  We

4  just talked about --

5             THE COURT REPORTER:  I'm sorry, "We just talked

6  about"?

7             THE WITNESS:  At this point in time it was not

8  talked about, but it was talked about often.

9  BY MR. GABEL:

10  Q   When you read the second line under the first bullet point

11  for me?

12  A   Second?  Oh, I'm sorry.  Yeah, I'm sorry.  I misunderstood

13  the question.

14  Q   Let me reask the question.  I'll try to make it a little

15  clearer.

16        As of the morning of January 22, 2008, before you had

17  any knowledge of anything FedEx might do in the future, did

18  you consider a real problem faced by ATA if it tried to just

19  sell off its scheduled service a potential erosion of employee

20  morale and customer confidence?

21  A   Correct.

22  Q   Now, when you looked at the second option of what you

23  could do with the scheduled service, as of the morning of

24  January 22, 2008, before you knew anything about what FedEx

25  may or may not do, were you thinking of killing that portion

GARRETS - CROSS/GABEL

Vol. 5 - 808

1  of the business off as early as April?

2  A    Yeah, a portion of the business, the Midway domestic

3  business, yes.

4  Q    And at that point, you were thinking you would keep the

5  other portion, the Hawaii business alive until maybe as long

6  as May or June; is that correct?

7  A    Yes, and through the summer.

8  Q    And when you killed off the first portion -- we're in

9  January 28th of 2008.  When you're killing off one portion of

10 your business and trying to keep the Hawaii portion alive a

11 little longer, the message you were going to convey to your

12 employees and your customers about the Hawaii is it was still

13 under review, correct?

14 A    Correct.

15 Q    Even though you already knew what was coming once it got

16 reviewed, right?

17 A    No.  The Hawaii business was strong during the summer.

18 And with the exit of Aloha, it would have been even stronger.

19 Q    Well, at this point, you didn't know Aloha was going to

20 exit, right?

21 A    No.  We didn't know we were going to exit either.

22 Q    So when you presented to the board probable exit by May to

23 June of 2008, that didn't mean probable exit by May to

24 June 2008?

25 A    It meant announcing we would leave the market and operate

GABEL - CROSS/GABEL

Vol. 5 - 809

1   it through the summer.

2            MR. GABEL:  Robb, if you will, go to page 15 of this

3   PowerPoint that they presented on the morning of January 22nd,

4   which should be 2115.  Blow up the exploring best No. 5 --

5   it's down there, the second thing under fleet.

6   BY MR. GABEL:

7   Q   As of the morning of January the 22nd, 2008, when you and

8   Mr. Karnik were presenting some special topics to the Board of

9   Directors of Global, did you tell them one problem you were

10  facing was figuring out the best No. 5 wide-body option for

11  ATA and looking at perhaps inducting a desert aircraft or

12  leasing an incremental DC10?

13  A   Correct.

14  Q   And was that because ATA was telling you that at least in

15  some months, they might could, could have some business for

16  five DC10s?

17  A   I wouldn't put it that way; but yes, they could fully

18  deploy a fifth aircraft, yes.

19  Q   Well, they had bought nine from Northwest a year before,

20  right?

21  A   Correct.

22  Q   But two of those were basically parts bins.  They had no

23  engines.  They were in the desert.  You were going to part

24  them out.  You said that, right?

25  A   Correct.

Vol. 5 - 810

1  Q   ATA at this point had four of them or plans to get four of

2  them, correct?

3  A   Correct.

4  Q   And the other three had already been committed to World,

5  correct?

6  A   Not legally, no.

7  Q   You knew that the reason that ATA couldn't get five DC10s

8  out of the seven arguably-functional DC10s it had bought from

9  Northwest was because the parent had already given three of

10 those away to the sister airline World, correct?

11 A   That's one consideration, yes.  The other consideration

12 is, as I testified earlier, that it cost $5 million to get one

13 of the desert airplanes and one of the Northwest airplanes up

14 and running.  Entering into an operating lease would cost

15 three to $400,000, materially less.

16 Q   I want to set aside -- it looks like the two options

17 you're looking at there for ATA is either one, take one of

18 these desert aircraft with no engines; or two, go out and find

19 one on the open market; is that correct?

20 A   Correct.

21 Q   Because -- correct me if my math is wrong -- you bought

22 nine.  Two of them are sitting out there with no engines,

23 right?

24 A   Right.

25 Q   Nine minus two, that means there's seven left in this

GARRETT - CROSS/CABLE

Vol. 5 - 811

1   batch, correct?

2   A    Correct.

3   Q    Three of the seven have already been given to World,

4   correct?

5   A    Again, I don't think the assignment was signed at this

6   point in time.

7   Q    You will agree with me, if we assume for a second that

8   three had been given to World, that would leave four?

9   A    Right.

10  Q    The math is right?

11  A    Correct, the math is right.

12  Q    If ATA says we want five, the only reason they can't get

13  give out of the seven functional ones they bought is because

14  three of them were given away, right?

15  A    Correct.

16  Q    So is it your testimony today that you did not have three

17  DC10s committed to World as of January 22, 2008, that morning

18  where you were presenting this information?

19  A    I don't know the answer to that.  I believe it's February,

20  but I'm not sure.

21  Q    Do you know when World had first started making plans to

22  transfer those?

23  A    No, I do not.

24  Q    We discussed earlier that you had given a deposition in

25  this case about a year ago?

Vol. 5 - 812

1    A    Yes.

2    Q    Was your knowledge of when that commitment date occurred

3    probably fresher in your mind a year ago than it was today?

4    A    No.  It was sometime either late in the year or early in

5    2008, but you're asking me on a specific day in January.  I

6    don't know.

7    Q    Well, and maybe I didn't state my question.  My question

8    is, was your memory of when these three planes were given to

9    World better a year ago than it is today?

10   A    No.

11            MR. GABEL:  Robb, if you will, play Mr. Garrett's

12   deposition at page 40, line 18 through 41, line 25.

13            (An excerpt of the deposition of Mr. Garrett was

14   played in open court.)

15   BY MR. GABEL:

16   Q    Was that your testimony a year ago?

17   A    Yes.

18            MR. GABEL:  Robb, if you will, go over to page 23 of

19   the PowerPoint we've been looking at, which should be Document

20   2023 -- 2123.  Turn that to where we can read it.

21   BY MR. GABEL:

22   Q    Mr. Garrett, does this appear to be financial information

23   that you presented to the Board of Directors of Global on the

24   morning of January 22, 2008?

25   A    Yes.

GARRETT - CROSS/GABEL

Vol. 5 – 813

1  Q   And so this information that you presented was prior to

2  any knowledge of what FedEx may or may not do later that day,

3  correct?

4  A   Correct.

5           MR. GABEL:  Robb, if you will, let's –– for now,

6  let's blow up the chart on the left of that sort of bold

7  line –– there we go –– where we can read it.

8  BY MR. GABEL:

9  Q   Now, Mr. Garrett, did you present that morning a 2008

10 forecast to the Board of Directors?

11 A   Yes.

12 Q   And did this forecast break down certain performance

13 numbers by each airline underneath the total Global umbrella?

14 A   Yes.

15 Q   And the first column says "WA" over it.  Did that stand

16 for World Airlines?

17 A   Correct.

18 Q   And the second column says "NAA" over it.  Did that stand

19 for North American Airlines?

20 A   Yes.

21 Q   The third column says "ATA."  That stood for American

22 Trans Air, ATA Airlines?

23 A   Yes.

24 Q   And the fourth column is entitled "Synergy."  We've heard

25 a lot of talk in this trial about a word "synergy."  Did that

Vol. 5 - 814

1  represent the savings you hoped to achieve doing sort of group

2  buying of parts, that sort of thing?

3  A    That's correct.

4  Q    And then looking over the last column is "total."  Does

5  that add up everything you're showing the board there?

6  A    Correct.

7  Q    That morning, did you present to the board that the 2008

8  forecast for EBITDA or walking-around cash as Mr. Broughton

9  would call it, for ATA was bracket 7, closed bracket?

10  A    Correct.

11  Q    Was that in the scale of millions?

12  A    Yes.

13  Q    So the walking-around cash for ATA as of the morning

14  before they knew anything about FedEx's plans about inviting

15  them back in 2009 was that they would have negative $7 million

16  in walking-around cash that year, correct?

17  A    Correct.

18  Q    Now, you add all this up to something call FCF.  What does

19  that stand for?

20  A    Free cash flow.

21  Q    Free cash flow.  And the free cash flow for ATA for 2008

22  that you forecast that morning was a negative 66 million in

23  free cash flow, correct?

24  A    Correct.

25  Q    When you add up the total of the impact of that on what

Vol. 5 — 815

1    World was going to bring in and North American was going to

2    bring in across the bottom, and even if you add in what these

3    synergies hoped to bring in, the total enterprise is still

4    looking at a negative 19 million of free cash flow as of that

5    morning, correct?

6    A   Right, on a preliminary basis, yes.

7            MR. GABEL:  Robb, if you can pan out to the full

8    slide Mr. Garrett presented.  Let's blow up that first bullet

9    point below the totals.  I guess this is page 23 of

10   Plaintiff's Exhibit 106 PowerPoint slide.

11   BY MR. GABEL:

12   Q   Did you present to the board that morning information that

13   ATA schedule service degradation continues, 75 million OM

14   loss?

15   A   Yes.

16   Q   What does OM mean?

17   A   Operating margin.

18   Q   Are you familiar with an accounting term known as a "going

19   concern"?

20   A   Yes.

21   Q   What does "going concern" mean to you?

22   A   It's a view from an accounting perspective that the

23   company will continue on indefinitely in business.

24   Q   Indefinitely?

25   A   Yes.

1  Q    No time period limit on that?

2  A    It's used commonly when it relates to a going concern

3  opinion, what an accounting firm would give an entity.  And

4  when it's used in that specific, that specific

5  characterization, it's -- the accounting firms typically look

6  out a year.

7  Q    So when it's used in that sort of common application to an

8  accounting firm giving an opinion about a company, the

9  accounting firm is opining either sort of thumbs up or thumbs

10 down, this company will still be in business one year from

11 today, correct?

12 A    It's an explanatory paragraph that is informing the reader

13 that it may or it may not.  It's not saying it will or won't.

14 It's saying it's something you should consider while reading

15 the statements.

16 Q    Okay.  It's their opinions as outside auditors coming in

17 and looking at that company's numbers and formulating what

18 they see happening, correct?

19 A    Correct.

20          MR. GABEL:  Robb, if you can, let's go to

21 Plaintiff's Exhibit 123, which should be document 2236.  If

22 you will blow up just the heading of that.

23 BY MR. GABEL:

24 Q    Mr. Garrett, do you recall if you attended a meeting of

25 the board of directors of Global Aero Logistics on March 4th,

Vol. 5 - 817

1  2008?

2  A   Yes.

3  Q   And did you present some information at that meeting?

4  A   Yes.

5          MR. GABEL:  Okay.  Your Honor, we would offer

6  Plaintiff's Exhibit 123.

7          MR. BROUGHTON:  No objection.

8          THE COURT:  123 admitted.

9      (Plaintiff's Exhibit 123 was received in evidence.)

10         MR. GABEL:  Let's go over to page 2 of these board

11 minutes of Plaintiff's Exhibit 123, Robb, which should be

12 2237, and let's blow up the fourth or fifth paragraph down,

13 the big one.  Go down and, if you will, highlight this

14 sentence about midway down starting with "Mr. Garrett

15 reported."  Yeah, there you go.

16 BY MR. GABEL:

17 Q   Mr. Garrett, on the morning -- or at the board meeting you

18 attended on March 4th of 2008, did you report to the board

19 that in your opinion, it was unlikely that E & Y -- what does

20 "E & Y" stand for?

21 A   Ernst & Young.

22 Q   And that was the outside accounting firm that would be

23 looking at your books, correct?

24 A   Correct.

25 Q   Did you report to the board that as of March 4th of 2008,

1  it was unlikely that Ernst & Young would be able to conclude

2  that the company is a, quote, going concern, closed quote,

3  based on a liquidity and cash balance test over a one-year

4  period?

5  A   Yes.

6  Q   And a one-year period would be going forward from when

7  they're issuing that opinion, correct?

8  A   Correct.

9  Q   So if they issued that opinion the next month,

10 essentially, they would say, We can't conclude that you're

11 still going to be in business a year from March of 2008,

12 correct?

13 A   Correct.

14       MR. GABEL:  Robb, let's go to --

15 BY MR. GABEL:

16 Q   Before we do that, you were asked about the

17 reclassification of certain aircraft of ATA.  Do you remember

18 that?

19 A   Yes.

20 Q   And was it your understanding that some of ATA's airplanes

21 known as 757-300s had traditionally qualified to do what's

22 called long-range flying for the military?

23 A   Correct.

24 Q   And the military had decided that was no longer the case.

25 They were no longer going to meet whatever requirements it was

1   to let them go overseas and to these faraway places.  So if

2   you were going to fly for the military, you would be limited

3   to what the military calls short-range flying?

4   A   Yes.  I wouldn't exactly describe it that way; but, yes,

5   it was put in a new category called short-range flying, yes.

6   Q   ATA had 757-300s in its fleet, correct?

7   A   Correct.

8   Q   And historically, in past years, those had qualified to

9   bid on what's called long-range missions, correct?

10  A   Yes.

11  Q   So if I looked back at historically what type of revenue

12  ATA had gotten back in 2005, 2006, 2007, part of that revenue

13  would be from long-range missions flown by these 757-300s,

14  correct?

15  A   Correct.

16  Q   But starting with 2008 and going on into the future, this

17  portion of ATA's fleet would no longer be able to fly

18  long-range missions, correct?

19  A   Correct.

20  Q   And long-range missions were more lucrative.  I mean, the

21  military pays more to fly from here to Kuwait than it pays to

22  fly from an Air Force base near St. Louis to a somewhere near

23  a Marine base in South Carolina, correct?

24  A   I'm not specifically sure, but I'll say the operation of

25  the 757-300s didn't change.  In other words, the type of

Vol. 5 - 820

1  destinations they were flying to had not changed.

2  Q   Okay.  But what the military would call it, it no longer

3  would consider them a long-range carrier?

4  A   Correct, yeah.

5  Q   Okay.  Do you know whether the three-party letter with

6  only two signatures made the basis of this lawsuit said

7  anything about short-range missions?

8  A   I don't recall.

9  Q   Okay.  If I told you that the only word in there says

10  something about long range, would you have any reason to

11  dispute that?

12  A   No.

13  Q   And is it your understanding that regardless of what may

14  have happened up through 2007, going forward 2008 and forward,

15  an entire category of ATA's fleet would no longer fall within

16  what's called long-range missions for the military?

17  A   Correct.

18  Q   Now, you weren't directly involved in any of the

19  negotiations of team membership for these airlines, were you?

20  A   No, not at all.

21  Q   And you didn't directly participate in dealings with the

22  military, the CRAF, right?

23  A   I was responsible for presenting ratemaking packages to

24  the military.  So there are aspects of the program, yes, I was

25  involved in.

GARRETT - CROSS/CABLE

Vol. 5 - 821

1  Q    You weren't the front-line guy sort of submitting the

2  contracts, committing teams or signing up the planes, right?

3  A    No.

4  Q    There were probably people at the airlines who were a

5  little more knowledgeable than you of how CRAF operated,

6  correct?

7  A    Correct.

8  Q    On direct you had talked about how the military would make

9  adjustments for the gas prices.  So if gas went up after you

10 committed to do a mission, you could submit paperwork, and

11 they would pay you the additional cost of gas, correct?

12 A    Correct.

13 Q    I think on direct you saw potential for a windfall there

14 where if you managed to get gas cheaper than what the military

15 thought gas would be, that would be even more profit than this

16 11 percent you talked about.  Is that what you testified to?

17 A    No, that's not what I testified to.

18 Q    Then I misunderstood you.

19 A    No.

20 Q    Because it's true, isn't it, that if you got a windfall on

21 gas price, you actually had to pay the military back, right?

22 A    You reconcile actual gas price every month to the peg

23 rate.

24 Q    Okay.  I must have misunderstood what you said on direct

25 because -- so gas was neither a positive or a negative, right?

GARRETT - CROSS/GABEL

Vol. 5 - 822

1  A    No.  If the peg rate is at $2.80 and the actual gas price

2  is lower, for example, at $2 even, I get a -- I get margin on

3  the peg rate.

4  Q    And you have to reconcile with the military to its peg

5  rate?

6  A    The actual to the peg rate.

7  Q    And the military adjusts its peg rate?

8  A    Yes.

9  Q    So it's not like at the beginning of the contract year it

10  says, "We're going to pay 2.50 a gallon for these missions";

11  and then if you come back and say, "Okay, well, I spent $3 a

12  gallon.  Gas has gone up.  Cover it."  But on the other hand,

13  if you come back and say, "Well, I only spent $2 a gallon in

14  June, it's in my pocket," that's not what happens?

15  A    No, that's not what I said.

16  Q    They're going to track the market for gas.  They may be a

17  few days off because of when they set their peg rate; but

18  they're going to track it through the year, right?

19  A    Well, they historically have set the peg rate once a year.

20  In 2008, because of the high movements in gas, they set it

21  more often that year.

22  Q    And when they would move the peg rate, they would make you

23  reconcile.  So if you got a benefit, you had to pay them back

24  money, right, to the peg rate?

25  A    To the peg rate, but I still kept the margin on the peg

GARRETT - CROSS/GABEL

Vol. 5 - 823

1  rate.

2  Q   Okay.

3  A   Which results in more profit.

4        MR. GABEL:  Robb, if you will, let's go to

5  Plaintiff's Exhibit 125, which should be document 2265.

6  Actually, scratch that, Robb.  Hold off on that one.

7        Before we go to that -- we can take that one down.

8  BY MR. GABEL:

9  Q   Mr. Garrett, do you recall around March of 2008, Heath

10 Garrett informing you that the total scheduled service

11 shutdown costs for ATA would add up to about $42 million?

12 A   Is there an exhibit?

13       MR. GABEL:  Robb, go to 125.

14       THE WITNESS:  I think you're right.

15       MR. GABEL:  2265.  Just blow that up.

16 BY MR. GABEL:

17 Q   Did you get an e-mail from Heath Garrett dated March 6th,

18 2008?

19 A   Yes.

20 Q   And did he attach a PowerPoint to that e-mail?

21 A   Yes.

22       MR. GABEL:  Robb, if you would, go over to page

23 2268.  And if you will blow up that information, turn it where

24 we can see it, and blow that up.

25

GARRETT - CROSS/GABEL

Vol. 5 - 824

1  BY MR. GABEL:

2  Q   Did Heath Garrett provide this information to you about

3  ATA Airline's scheduled service shutdown costs?

4  A   Correct.

5  Q   And was the total shutdown costs that he identified to you

6  $42 million?

7  A   Correct.

8  Q   And was part of that made up of aircraft return costs?

9  A   Correct.

10  Q   What is an aircraft return cost?

11  A   It's the amount of money the company would incur

12  delivering the aircraft back to the owner, the lessor.

13  Q   Okay.  Why would it cost money to give the plane back to

14  the lessor?

15  A   Generally in aircraft leases, at least in this case,

16  there's a stated maintenance condition of the airplane in the

17  lease.  So when you return it, you have to put that

18  maintenance condition back on the airplane.  Typically when

19  you return an airplane to a lessor, they want to be able to

20  relet it quickly.  So if engines had a thousand hours at

21  delivery, generally, you've got to give it back with engines

22  with a thousand hours on it again.

23  Q   And Mr. Garrett estimated at least at this point that

24  those costs would be $33 million, correct?

25  A   Correct.

GARRETT - CROSS/CABLE

Vol. 5 - 825

1  Q   And that's because you're working with the lender or

2  lessor to give them back their plane, and they're imposing a

3  penalty on you?

4  A   Again, I wouldn't call it a penalty.  It could be or it

5  could be just putting the airplane back in the maintenance

6  condition it was in when it was delivered.

7  Q   But you're going to have to write a check for 33 million

8  if you give up using these planes?

9  A   Yes, uh-huh.

10 Q   So it's not like you just walk away and leave them there

11 and no longer owe any money.  You have to pay somebody?

12 A   Yes.  Unless we reorganize the company, in which case we

13 could just walk away.

14 Q   So -- by "reorganize," if you go bankrupt, then you could

15 walk away and not owe the 33 million?

16 A   Correct.

17 Q   Okay.  The next entry is a 5.  That means $5 million,

18 correct?

19 A   Correct.

20 Q   And that's what it's going to cost to let your pilots know

21 and keep paying them for two months?

22 A   Correct.

23 Q   And the next entry is a 2.  That's because you had a

24 contract with SABRE that was going to run through December of

25 2008?

1  A   Correct.

2  Q   And that's a flight scheduling -- a computer thing where

3  you tie in with other airlines to route passengers who buy

4  tickets?

5  A   Yeah.

6  Q   Ties in with travel agents?

7  A   It's a lot of things, but that's one of them, yeah; that

8  and operations, flight controls.

9  Q   But that's for scheduled service, for ticket-buying

10 passengers?

11 A   Yes.

12 Q   Then you've got another couple of million tacked on on top

13 of that to come up with a total of $42 million to shut down

14 scheduled service, correct?

15 A   Correct.

16 Q   And scheduled service is totally separate from the

17 military side of ATA?

18 A   Correct.

19       MR. GABEL:  Robb, if you will, go to Plaintiff's

20 Exhibit 123, which is 2236.  Blow up the top portion of that.

21 BY MR. GABEL:

22 Q   Mr. Garrett, did you attend board of directors meetings of

23 Global Aero Logistics on March 4th, 2008?

24 A   Yes.

25 Q   Did you present information at that meeting?

GARRETT - CROSS/GABEL

Vol. 5 - 827

1    A    Yes.

2              MR. GABEL:  Your Honor, we would go ahead and offer

3    Plaintiff's Exhibit 123.

4              MR. BROUGHTON:  No objection.

5              THE COURT:  I believe it's already in.  I think

6    we've already -- he's already testified about this.

7              MR. GABEL:  Okay.

8              Robb, if you will go over to page 2 of this

9    document, 2237.  Let's go down to the fourth paragraph,

10   starting with Mr. Garrett.

11             I'm sorry.  I must have the wrong exhibit.

12             THE COURT:  This is the going concern that he's

13   testified to about half an hour ago.

14             MR. GABEL:  Okay.  Your Honor, if you want to take

15   an afternoon break, this might be a good point.

16             THE COURT:  Well, really not.

17             Do you wish to have a break, or would you like to

18   go?

19             JUROR:  I don't wish to have a break.

20             MR. GABEL:  Robb, pan back out, if you will.  Go to

21   the paragraph just above that.

22   BY MR. GABEL:

23   Q    As of this meeting on March 4th, was it still an option

24   for ATA to agree to be a member of the UPS team for 2009?

25   A    Yes.  At this point in time, yes.

GARRETT - CROSS/GABEL

Vol. 5 - 828

1    Q   Okay.  And they were expecting a pretty quick response;

2    but when the board is considering it, they could still say,

3    "Yes, we want to join the UPS team for 2009," correct?

4    A   Correct.

5              MR. GABEL:  Let's go over to page 5, which should be

6    the next -- well, just go down to the next paragraph first,

7    Robb.

8    BY MR. GABEL:

9    Q   We talked about this before, the going concern paragraph.

10   But up there at the top, board materials, pages 7, 8, 9, and

11   10, that was material in the attached PowerPoint that you

12   would have presented to the board on that date, correct?

13   A   Yes.

14             MR. GABEL:  Okay.  Robb, let's go over to -- well,

15   before we go that, page 3 of the PowerPoint, which is 2242.

16   If you'll turn that up, blow up the first bullet point there.

17   BY MR. GABEL:

18   Q   Mr. Garrett, did you present information that day that the

19   best solution on a free cash flow basis was a WOA versus -- or

20   plus NAA stand-alone option?

21   A   Yes.  I didn't present this slide, but the slides

22   reference that I did have similar information.

23   Q   This was presented?

24   A   Yes.

25   Q   Now, the, quote, stand-alone option, was that something

1  that meant -- correct me if I'm wrong, but "stand-alone" meant

2  World and North American essentially standing alone with ATA

3  no longer in existence, correct?

4  A    Correct.

5  Q    Okay.  So by "stand-alone," we mean no ATA?

6  A    Correct.

7  Q    Now, in your direct testimony, you use the term "cash cow"

8  a couple of times.  Is that a term that you use in your

9  conversation or that you use to describe things?

10  A    It's fairly common.  I use it a fair amount and when I

11  present Global because the military business for each of the

12  airlines is profitable, and so I do refer to the EBITDA

13  generation of that business over the foreseeable future as the

14  cash cow of Global's business independently with each airline.

15  Q    Did you ever describe this choice of killing off ATA and

16  proceeding with just World and North American as a "cash cow"

17  for Global?

18  A    No.

19  Q    Did you ever see a version of this PowerPoint slide where

20  someone else used "cash cow" as an alternate version of the

21  term for the standalone option?

22        MR. BROUGHTON:  Objection.  It calls for speculation

23  on if someone else ever used the term cash cow.

24        THE COURT:  I think he asked if he had ever seen it.

25        MR. BROUGHTON:  I'm sorry.

GARRETT - CROSS/GABEL

Vol. 5 - 830

1          THE WITNESS:  I mean, I'm not sure what your

2    question is asking me; but I will say again, when you look at

3    the companies and all the businesses in their entirety, the

4    word cash cow has not been used.  When you look at the

5    military business within each airline, it's commonly used by

6    me.

7    BY MR. GABEL:

8    Q   I'm sorry.  I'm not being very clear in my question.  Did

9    you see an earlier version of this PowerPoint presentation to

10   the board where the option of killing off ATA but keeping

11   World and North American alive was a cash cow for Global?

12   A   I don't recall.  If it's not in here, no.  If it's in

13   here, yes.

14   Q   Is it possible you knew it at one point and you've

15   forgotten it as of today?

16   A   If I flip through the board minutes, I would look and I'd

17   look for the word, whether I used it or not.

18          MR. GABEL:  Your Honor, may I approach the witness

19   to refresh his memory?

20          THE COURT:  Yes.

21          THE WITNESS:  I'm not trying to be difficult.

22   BY MR. GABEL:

23   Q   This is a document we got when we sent a subpoena to

24   Global.  It's not something that ATA would have given us.  If

25   you will, take a look at that document.  At the top, does it

Vol. 5 - 831

1  appear to be an e-mail you would have gotten from Yolanda

2  Holmes on March the 3rd, 2008?

3  A   Yes.

4  Q   That would have been the day before the March 4th board

5  meeting?

6  A   Yes.

7  Q   Did she attach sort of a draft of what was going to be

8  presented the next day?

9  A   It looks that way, yes.

10  Q   And if you look over it, the draft PowerPoint you guys

11  were looking at, does this refresh your memory that this best

12  solution for a free-cash-flow basis is World plus North

13  American quick standalone was also referred to as a cash cow?

14  A   No, I don't recall that; but if it's -- no, I don't recall

15  that, no.

16  Q   Well, look over two pages over --

17          THE COURT:  Mr. Gabel, will you back up a little

18  bit?  You're blocking the view of the jurors of the witness.

19          MR. GABEL:  I'm sorry.

20          THE COURT:  That's better.

21  BY MR. GABEL:

22  Q   If you look over two pages over in the draft PowerPoint,

23  do you recall when you got this e-mail draft PowerPoint the

24  day before you presented this that under the bullet point

25  options, it was described as cash cow or standalone?

GARRETT - CROSS/GABEL

Vol. 5 - 832

1   A    No, I don't recall that.  It's there obviously, but I know

2   it's two years ago.  No, I don't remember including or

3   removing the word cash cow.

4   Q    So even though you use cash cow as part of your common

5   vernacular, you didn't say, "Before this goes into the final

6   board minutes, we need to delete the word 'cash cow' from the

7   idea of an option where we kill off ATA and keep the other two

8   alive."  That was your idea?

9   A    I have no idea.  I don't recall it, and every executive at

10  Global -- executives at ATA and each of the airlines review

11  that.

12            THE COURT REPORTER:  I'm sorry, sir, could I have

13  you speak up just a little bit?

14            THE WITNESS:  Yes.  All the executives at Global

15  review those minutes before they're sent out to the board, and

16  the executives at each of the airlines review those minutes

17  before they're sent out to the board.  So I don't know.  I

18  can't answer your question.

19  BY MR. GABEL:

20  Q    The e-mail of the draft was -- Yolanda, who was that?

21  A    She was -- she's my assistant.

22  Q    She was your assistant e-mailing out the draft of the

23  PowerPoints?

24  A    She's the general counsel's assistant and the CEO's

25  assistant.

GARRETT - CROSS/GABEL

Vol. 5 - 833

1  Q   So you or the general counsel of the CEO had given her

2  this draft that referred to killing off ATA but keeping on

3  World and North American as a cash cow, but you don't recall

4  who did that?

5  A   The draft probably came from Heath Garrett who produces

6  the board minutes.  So I don't think that draft came from any

7  one of those people.  I think it was probably sent to her from

8  somebody to give to us.

9  Q   Do you recall why someone decided to delete the term cash

10 cow from the option of killing off ATA and keeping the other

11 two alive?

12          MR. BROUGHTON:  Calls for speculation.

13          THE COURT:  Sustained.

14          MR. GABEL:  Let's go over to page 6 of this

15 PowerPoint in Plaintiff's Exhibit 123 please, Robb.  That

16 should be 2245.  Let's turn that where we can see it.

17 BY MR. GABEL:

18 Q   Now Mr. Garrett, does this describe the three options that

19 you were reporting about at this March 4th, Board Of

20 Directors' meetings?

21 A   Correct.  This page is from those minutes.

22 Q   Do you want a copy of them?

23 A   No, that's fine.  As long as I can see that.  This is

24 larger print.

25 Q   And again, the stand-alone option or as referred to in

Vol. 5 - 834

1   earlier versions, the cash cow option was just World and North

2   American and ATA chapter, correct?

3   A    Yeah.  The stand-alone version says that, yes.

4   Q    And then the UPS 40 was joining the UPS team, correct?

5   A    Correct.

6   Q    And then beamer -- correct me if I'm wrong -- but that was

7   moving certain aircraft to World and North American.  What

8   happened to ATA under that option?

9   A    If you go to the previous page, I think it does file

10  Chapter 11.

11  Q    So ATA goes bankrupt under either standalone or beamer?

12  A    I believe so.

13  Q    Is there a different form of bankruptcy?

14  A    In this scenario -- in these two scenarios, no.

15  Q    Then why do you need two scenarios where ATA is going

16  bankrupt?

17  A    Because the first scenario is the ATA airplanes are all

18  returned to the lessor subject to the airplanes that have

19  Global guarantees, which are 12 of them.  The beamer solution

20  is that some of the ATA airplanes are absorbed into the

21  entities that remain, which is World and North American.

22  Q    And so there's a financial difference if you -- one, if

23  you bankrupt or essentially -- I think you had mentioned

24  before there was 33 million in aircraft return costs that you

25  would be faced with if you would just return aircraft, but

GARRETT - CROSS/GABEL

Vol. 5 – 835

1   that you might be able to zero that out if you become

2   bankrupt, correct?

3   A    Right.

4   Q    So under stand-alone shutdown, you're not returning --

5   well, you might zero out the 33 million, correct?

6   A    You may or may not, yeah.

7   Q    And under beamer where you're just giving them to another

8   airline, somebody might still be facing some of those aircraft

9   return costs?

10  A    Again, some of the airplanes are going to North American

11  and World.  So assuming you stepped into the lease, there

12  would be no redelivery requirement because you would continue

13  to operate the airplanes.

14  Q    And now, these options are looking at '08 and '09,

15  correct?

16  A    Yes.

17  Q    Just looking at it from the total perspective of the

18  Global, not from just ATA, right?

19  A    Yes.

20  Q    So when we're looking at the these numbers, this has got

21  the profitable airlines, World and North American, added into

22  whatever is happening at ATA and sort of a sum for that?

23  A    Yes.

24         MR. GABEL:  Let's go over, Robb, if you will, to

25  page 7 of this, which should be 2246.

Vol. 5 - 836

1  BY MR. GABEL:

2  Q   Now, on page 7, did you kind of break it out by airline

3  and what these options might mean?

4  A   Yes.

5          MR. GABEL:  Robb, if you will, blow up the top

6  paragraph, I guess, ATA, all the way across?

7          THE WITNESS:  Can I get a copy of the page?

8          MR. GABEL:  Sure.  It's Plaintiff's Exhibit 123.

9          Your Honor, may I approach the witness?

10          THE COURT:  You may.

11          THE WITNESS:  Thank you.

12  BY MR. GABEL:

13  Q   Now, the UPS option that was still on the table as of

14  March 4th -- I mean, UPS's offer is still out there when y'all

15  were discussing this information, correct?

16  A   Yes, till three o'clock that day, correct.

17  Q   So y'all could green-light it, and whatever is under this

18  UPS column could become a reality, correct?

19  A   Correct.

20  Q   But when you're analyzing the UPS option, that's talking

21  about joining the UPS team in FY2009, right?

22  A   Correct.

23  Q   So that would mean continuing to fly as a member of the

24  FedEx team for the remainder of FY2008?

25  A   Correct.

Vol. 5 - 837

1    Q    These are the projections you're projecting to the board;

2    and under UPS option for 2008, this is what is going to happen

3    if we stay on the FedEx team for 2008, correct?

4    A    Correct.

5    Q    Under the 2008 column, did you present to the board that

6    if you stayed on the FedEx team during 2008 and continued to

7    fly the rest of that year on the FedEx team, that ATA was

8    going to have an EBITDA, or as Mr. Broughton calls it,

9    walking-around cash of negative $27.8 million?

10   A    Correct.

11   Q    And then below that, did you tell them that it was going

12   to have a FCF?  I think you said that's free cash flow?

13   A    Yes.

14   Q    Of negative 78 point -- can you read that on your copy?

15   A    I think it's 78.4.

16   Q    Negative 78.4 million free cash flow continuing to fly on

17   the FedEx military team for the rest of 2008?

18   A    Correct.

19   Q    Now, going forward, looking at 2009, from the perspective

20   of ATA or one of its 2800 employees, the only way they have a

21   job and any walking-away cash is if y'all said yes to UPS

22   before three o'clock that afternoon, right?

23   A    No.

24   Q    Was there an EBITDA under an option other than the UPS

25   option there?

GARRETT - CROSS/CABLE

Vol. 5 - 838

1   A    Well, if we hadn't been terminated from the FedEx team --

2   Q    No, I'm moving on to 2009.

3        Looking at your projections of 2009, FY2009 -- let me

4   rephrase my question.

5   A    There's one best option.

6   Q    Well, when you're looking at it not from the perspective

7   of Global and the parent, but looking at it from the

8   perspective of ATA, the subsidiary and the one who claims it

9   had a contract in this case.

10  A    Uh-huh.

11  Q    Did your projections indicate there was any EBITDA for ATA

12  under the standalone/cash cow option?

13  A    Yes.  It produced -- I think if I understood your question

14  right -- 4.5 million.  Is that the question?

15  Q    I'm sorry, I'm not being clear.

16  A    Okay.

17  Q    I've now moved beyond 2008.  I'm talking about FY2009 now.

18  So the right-hand side of these numbers.

19  A    Okay.

20  Q    Once we finished flying for 2008 --

21  A    Okay.

22  Q    -- going forward, did the stand-alone option for FY2009,

23  the year that ATA claims they had a contract to fly on the

24  FedEx team, did the stand-alone option provide any EBITDA for

25  ATA?

GARRETT - CROSS/GABEL

Vol. 5 - 839

1  A   No.

2  Q   Did the beamer that shut down ATA --

3         THE COURT REPORTER:  I'm sorry, Mr. Gabel, could I

4  have you repeat your question, please?

5         MR. GABEL:  Yes.

6  BY MR. GABEL:

7  Q   The third option, called the beamer option, where you

8  still shut down ATA, but instead of bankrupting the planes,

9  you try to transfer some to some other airlines, did that

10  provide any EBITDA for ATA?

11  A   No.

12  Q   Did the UPS option provide any EBITDA for ATA?

13  A   1.1 million.

14  Q   Okay.

15         So on an EBITDA basis, the UPS option was the only one

16  that provided any EBITDA for ATA in 2009, correct?

17  A   Correct.

18  Q   So from ATA's perspective as opposed to Global's

19  perspective, EBITDA was better on the UPS team in 2009 than if

20  it just shut down, correct?

21  A   I would hope that the executive team would look at the

22  negative free cash flow of 12 million.  So at the end of that

23  year, it will still be a loser.

24  Q   Okay.

25         So you're saying if they didn't just focus on EBITDA,

GARRETT - CROSS/CABLE

Vol. 5 - 840

1  if they also looked at that next line of free cash flow, and

2  because free cash flow is negative, even though you had

3  positive EBITDA, that makes that choice a loser?

4  A   Right.  So if you have zero dollars in the bank at the end

5  of that year, ATA would have negative 12 million in the bank,

6  yeah.

7  Q   And that would be a rational business choice to value a

8  negative free cash flow more than you would value a positive

9  EBITDA?

10 A   It's a reality.  I mean, I look at both the numbers

11 equally.  They're both very important to me.

12 Q   And FCF is free cash flow?

13 A   Yeah, so --

14 Q   It's a very important number to consider?

15 A   Yes.  I mean, EBITDA, the operation itself produced a

16 million dollars, but the operation did not produce enough

17 money to pay for the capitalized improvements of the company.

18 Q   And that would be a problem?

19 A   Yeah.  I would say so, sure.

20 Q   During this time that ATA is considering what options it

21 should pursue, whether it should join another team or if

22 Global is just going to pull the plug altogether, did you

23 become aware of a financial analysis that said essentially if

24 we pull the plug on ATA, we don't think the FedEx team will be

25 able to fly off all of its military business, which means some

Vol. 5 - 841

1  of that business will spill from the FedEx team to the

2  Alliance Team, which has both World and North American on it

3  in which a Global executive estimated would mean as much as

4  60 million to a $120 million revenue that could be spilled to

5  the Alliance Team if you pulled the plug on ATA?

6  A   Yeah.  There was a fairly large spill number.  I don't

7  know the exact numbers, but that sounds reasonable.

8  Q   And that's something that the officials at Global were

9  looking at in deciding on the future of ATA?

10  A   Yes.  A lot depended on how much Northwest Airlines would

11  fly, and we were skeptical they could fly.

12  Q   But there was a potential benefit to the Alliance Team of

13  ATA ceasing operations?

14  A   Yes, to all the teams, there was a benefit.

15  Q   And Global had two airlines that were the passenger fliers

16  for the Alliance Team, right?

17  A   Correct.

18  Q   And the number 60 to 120 million sounds like a number that

19  might have been bantered about about how the Alliance could

20  benefit if you pulled the plug on ATA?

21  A   Yeah, it seems reasonable.

22         MR. GABEL:  Robb, if you will, go to Defendant's 158

23  and go to the top e-mail information, 1047.

24  BY MR. GABEL:

25  Q   This is Defendant's Exhibit 158.  It appears to be an

1  e-mail from Sean Frick to you dated January 25th, 2008.  Who

2  is Mr. Frick?

3  A   At this time he was a vice president of finance.

4  Q   And do you have any reason to doubt that you received this

5  e-mail from him?

6  A   No.

7         MR. GABEL:  Your Honor, we'll offer Defendant's

8  Exhibit 158.

9         MR. BROUGHTON:  No objection.

10        THE COURT:  158 admitted.

11    (Defendant's Exhibit 158 was received in evidence.)

12        MR. GABEL:  Robb, if you would, blow up the top two

13  e-mails there.

14  BY MR. GABEL:

15  Q   On January 25th of 2008, did you e-mail Mr. Frick and say

16  "From talking to SK, I thought a signed contract exists with

17  AMC/FedEx.  I have not seen one thus far.  Can you verify if

18  one exists with Gary?"  Did you send that to Mr. Frick?

19  A   Yes, I did.

20  Q   And did Mr. Frick respond to you on that date, "Yes, there

21  is a contract with FedEx that runs through September 30th,

22  2008, but we have not been told we're in default of it.  FedEx

23  is saying they will not renew our contract for FY2009"?

24        Is that the information Mr. Frick conveyed to you on

25  that date?

GARRETT - CROSS/GABEL

Vol. 5 - 843

1   A   Yes.

2   Q   Do you have any reason to doubt the accuracy of that?

3   A   No.

4           MR. GABEL:  Your Honor -- well -- did I already

5   offer 158?

6           THE COURT:  Yes.

7   BY MR. GABEL:

8   Q   On direct, you talked about how the military looks at sort

9   of the general average cost of all the airlines in determining

10  what it's going to pay for this military flying, and then it

11  adds about an 11-percent profit rate to that; is that correct?

12  A   Correct.

13  Q   Now, as a part of all these costs that the military adds

14  up, one of the components of the cost of doing business that

15  the military does not figure in is the commission that you

16  would pay to a team to be a member of a team, correct?

17  A   Correct.

18  Q   So that's not a factor the military's looking at?

19  A   Right, correct.

20  Q   So if the military averaged out all of the average costs

21  these airlines were having to do business with the military

22  and says, "This is what it should cost to fly this mission,

23  and we're going to add 11 percent to that," that's what they

24  would pay, right?

25  A   Correct.

GARRETT - CROSS/GABEL

Vol. 5 – 844

1   Q   And that wouldn't account for whatever out of that they

2   pay you're going to have to pay back to the team, right?

3   A   Correct.

4   Q   So if your -- let's say you're operating your business

5   just like an average airline, like what the military figured

6   it should cost you to do this business --

7   A   Right.

8   Q   -- typically you're going to make 11 percent profit,

9   right?

10  A   Right.

11  Q   And if you pay 7 percent for team membership, that's going

12  to cut your profit down to 4 percent, correct?

13  A   Correct.

14  Q   If the team membership was going to cost you 12 percent,

15  you would lose money, right?

16  A   Correct.

17  Q   Are you aware of anything that would have prohibited FedEx

18  from charging ATA 12 percent, 17 percent, 20 percent as its

19  commission rate for FY2009?

20  A   FedEx could have offered that rate, sure.

21  Q   If FedEx said, "That's your rate.  Take it or leave it,"

22  what would be your options?

23  A   I think the military would be very upset with you guys,

24  very upset.  The purpose of the program is to make money and

25  for these airlines to fly the troops.

GARRETT - CROSS/GABEL

Vol. 5 - 845

1  Q   That's not my question, sir.  What would be ATA's options?

2  A   That's speculation.  I have no idea.  We could either pay

3  it or not pay it.  We would have to look at the options that

4  were available.

5  Q   If you chose not to pay it, you wouldn't be on the team,

6  right?

7  A   If you kicked us off, yes.

8  Q   If we said, "You're welcome to come, but it's going to

9  cost you 20 percent," you could either do it or not do it,

10 correct?

11 A   Correct.

12 Q   If you did it, you would be losing money, correct?

13 A   Correct.

14 Q   And there was no document that would stop that from

15 happening, correct?

16 A   Not to my knowledge.

17        MR. GABEL:  Robb, if you will, let's go to

18 Defendant's Exhibit 185, page 1250.

19 BY MR. GABEL:

20 Q   Mr. Garrett, did you attend the board of directors

21 meetings of Global Aero Logistics on April 2nd, 2008?

22 A   Yes.

23        MR. GABEL:  Your Honor, I would offer Defendant's

24 Exhibit 185.

25        MR. BROUGHTON:  No objection.

1    THE COURT:  185 is admitted.

2    (Defendant's Exhibit 185 was received in evidence.)

3    MR. GABEL:  Robb, if you will, blow up the first

4  paragraph under Roman numeral -- well, whatever, "ATA request

5  for funding."  Actually, the first two paragraphs of that.

6  BY MR. GABEL:

7  Q   Mr. Garrett, on April 2nd, 2008, did you report to the

8  Global board of directors that ATA had requested immediate

9  additional funding from the company to enable ATA to continue

10  operations?

11  A   Yes.

12  Q   And when you say "from the company," you mean from Global,

13  from the parent, yes?

14  A   Yes, from Global or one of its subsidiaries.

15  Q   Okay.  So ATA had made that request on April the 2nd,

16  2008, correct?

17  A   Correct.

18  Q   And then in the second paragraph, is it your recollection

19  that the board of Global, the parent company, discussed it and

20  unanimously decided, no, we're not pouring any more cash into

21  ATA?

22  A   Correct.

23  Q   And was it your testimony earlier that MatlinPatterson,

24  the New York investment firm, had majority control of that

25  board of directors?

Vol. 5 - 847

1  A   Yes.

2  Q   So if MatlinPatterson wanted to give additional cash to

3  ATA, it had the majority; it could have voted to do so,

4  correct?

5  A   Correct.

6          MR. GABEL:  I'll pass the witness.

7          THE COURT:  All right.

8          Redirect exam, Mr. Broughton?

9          MR. BROUGHTON:  Yes, Your Honor.

10                  **REDIRECT EXAMINATION**

11  BY MR. BROUGHTON:

12  Q   Mr. Garrett, you were asked several times on

13  cross-examination about what your knowledge was in December of

14  '07 before FedEx sent that January 22nd, 2008, termination

15  letter, weren't you?

16  A   Yes.

17  Q   If you had known in December of 2007 that FedEx was

18  already planning then to terminate you, was that some

19  information you would have liked to have known?

20          MR. GABEL:  Objection.  Calls for speculation.

21          THE COURT:  Sustained.

22  BY MR. BROUGHTON:

23  Q   Mr. Garrett, are you aware that in December of '07, FedEx

24  entered into a new three-year agreement with Omni covering

25  '09, 2010, and 2011 that didn't include ATA?

GARRETT - DIRECT/BROUGHTON

Vol. 5 - 848

1    A    I did not.

2    Q    Would you have been interested to know that, that they

3    had, in fact, entered into such an agreement?

4              MR. GABEL:  Objection, relevance of his interest.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes, I would be very interested.

7    BY MR. BROUGHTON:

8    Q    What difference would it have made to you in December of

9    2007 if you'd have known that FedEx was already -- that you

10   wouldn't be on the team in FY09?

11             MR. GABEL:  Objection, calls for speculation.

12             THE COURT:  Sustained.

13   BY MR. BROUGHTON:

14   Q    Well, Mr. Garrett, you've said that you ended up having a

15   short time fuse after January 22nd to do something before the

16   information became public in April of '08; is that right?

17   A    Correct.

18   Q    Could you have used more time?

19   A    Definitely.

20   Q    So if you'd have found out in November of '07, would that

21   have given ATA more time to do something different?

22   A    Yes.

23   Q    Could you have approached UPS earlier?

24   A    I believe that would have been a big help.

25   Q    Let's look at Plaintiff's Exhibit 106, please, the

GARRETT - REDIRECT/BROUGHTON

Vol. 5 - 849

1    January 22nd board minutes.  You were asked questions about

2    the January 22nd board minutes, were you not?

3    A   Yes, I was.

4           MR. BROUGHTON:  And, Mr. Brockwell, if we could turn

5    to -- there's one that says "burn drivers" that you were asked

6    about.  Oh, sorry, page 7 of the PowerPoint portion of the

7    board minutes.  If we can zero in on that "burn drivers."

8    BY MR. BROUGHTON:

9    Q   And you were asked on cross about these particular three

10   bullet points, were you not?

11   A   Yes.

12   Q   Okay.  "And this ATA scheduled service degradation

13   continues (2 to $3 million a week)."  Do you see that?  You

14   were asked about that?

15   A   Yes.

16   Q   Did that assume that that was going to go on the rest of

17   the year?

18   A   No.  It was just for the time period that's on the graph

19   through the end of March.

20   Q   Okay.  And was ATA planning to either sell or close its

21   scheduled service?

22   A   Yes.

23   Q   So would that amount of cost continue through the end of

24   the year?

25   A   No.

GARRETT - REDIRECT/BROUGHTON

Vol. 5 - 850

1  Q    You were also asked about the DC -- well, the other two

2  bullet points, DC10 induction costs.  Was that going to be a

3  one-time start-up cost, or was that going to reoccur over the

4  future years?

5  A    That would be one time.

6  Q    How about the multiple engine overhaul payments?

7  A    Yeah, we would have to continue to overhaul the engines in

8  the normal course.

9  Q    Okay.  You were also asked about -- under "penalty box"

10  about last use, that ATA would go to the bottom of the line in

11  receiving flights.  Do you recall that?

12  A    Yes.

13  Q    Did ATA ever go into the last use, technically?

14  A    No.

15  Q    Did it ever lose any flights as a result of penalty box?

16  A    No.

17  Q    You were also asked about -- something about the length of

18  the sales process of selling off the scheduled service.  And

19  you said something about you were announcing we were going to

20  leave the market and then operate through the summer.  Would

21  you explain what you meant by that.

22  A    Can you state the question one more time?

23  Q    You were asked about -- with respect to what the timeline

24  was for either selling scheduled service or shutting it down.

25  A    Right.

GARRETT - REDIRECT/BROUGHTON

Vol. 5 – 851

1  Q   All right.  And you said something about, "We would

2  announce we were going to do it."

3  A   Right.

4  Q   But then it would take a while or something to that

5  effect?

6  A   Yeah.  The Hawaiian market, obviously, during the

7  summertime, a lot of people go to Hawaii.  So we looked at in

8  detail continuing to fly the Hawaiian market through the end

9  of the summer, through Labor Day, but announcing it at the

10 beginning of summer.

11 Q   All right.  Also on cross you were asked three or four

12 times questions that said ATA was giving away DC10s to World.

13 Do you recall that?

14 A   Correct.

15 Q   Was ATA giving away those planes?

16 A   No.  They weren't giving them away.  Obviously, ATA has an

17 obligation to pay for those airplanes while they have them.

18 By transferring the airplanes to World Airways, World Airways

19 would then have to pay for the airplanes; and ATA would have

20 no further obligation.

21 Q   So ATA was being relieved of the cost of those three

22 airplanes?

23 A   Correct.

24        MR. BROUGHTON:  Let's go back to Plaintiff's

25 Exhibit 106 and go to the last page of the PowerPoint, which

GARRETT - REDIRECT/BROUGHTON

Vol. 5 - 852

1   is page 23.

2   BY MR. BROUGHTON:

3   Q    Mr. Garrett, on cross you were asked about this page; is

4   that right?

5   A    Yes.

6   Q    All right.  At this time, preliminary budget, what

7   assumptions were you making -- what assumptions are being

8   reflected here in this January budget?

9   A    Again, this is the roll-up of all the department heads at

10  all three airlines in Global, rolling up their budgets, us

11  accumulating them.  There has been some back and forth with

12  the operating officers on the level of where the budgets stand

13  at this point in time.

14  Q    Okay.  Let me interrupt you.  Let's just focus on ATA.

15  Okay?

16       So is this including both scheduled service and

17  military flying?

18  A    Yes.

19  Q    That's combined there?

20  A    Correct.

21  Q    It's not just breaking out one or the other?

22  A    Right.

23  Q    All right.  Was this assuming that scheduled service was

24  going to continue?  Is this assuming scheduled service is

25  continuing through the end of the year, or is it taking into

Vol. 5 - 853

1  account that scheduled service is going to be either sold or

2  stopped?

3  A   Continuing.

4  Q   Okay.  So this is assuming in January that no change is

5  going to happen between January and December of '08?

6  A   Correct.

7  Q   Okay.  Was ATA planning any changes?

8  A   Yes.  We were heavily involved into the options of

9  shutting it down at that point in time.

10 Q   So if, indeed, scheduled service had been shut down, what

11 impact would it have had on those numbers by year end?

12          MR. GABEL:  Objection, calls for speculation.

13          THE COURT:  Sustained.

14 BY MR. BROUGHTON:

15 Q   Were those numbers reflected there on page 23 impacted by

16 scheduled service?

17 A   Yes, materially.

18 Q   And were they impacted positively or negatively?

19 A   Negatively.

20 Q   And if scheduled service -- and it was the plan by the end

21 of the year scheduled service would be gone?

22 A   No.  In this budget, scheduled service continues for the

23 whole year.

24 Q   But in reality, you were planning scheduled service to go

25 away?

Vol. 5 - 854

1   A    Correct, either through sale or shutdown.

2   Q    If by the end of '08 ATA had been operating after having

3   gone through a reorganization as a military flying only --

4   military and charter flying only operation --

5            MR. GABEL:  Objection, calls for speculation.

6            THE COURT:  Finish your question.

7   BY MR. BROUGHTON:

8   Q    Mr. Garrett, was it the plan of ATA to become a military

9   flying and charter operation airline only?

10  A    That was one option if we were still on the FedEx team,

11  yes.

12  Q    Okay.  You were asked about the reclassification of the

13  757-300s, were you not, on cross?

14  A    Yes.

15  Q    The change to ATA was that it no longer had to pay

16  commissions to FedEx in flying those, correct?

17  A    Correct.

18  Q    Was that a positive or a negative impact?

19  A    Positive.

20  Q    Mr. Garrett, you were also asked about some discussion or

21  some analysis by Global of how much spill -- you used the term

22  "spill" -- would occur to the other teams if ATA ceased as a

23  military flier.  Do you recall that?

24  A    Yes.

25  Q    And why did you believe that spill would result if ATA

GARRETT - REDIRECT/BROUGHTON

Vol. 5 - 855

1   ceased?

2   A    We did not believe between Omni and Northwest and the

3   other passenger fliers that were on the FedEx team would be

4   able to operate their entitlement.

5   Q    So did that mean some of the spill would go to UPS, and

6   some would go to the Alliance Team?

7   A    Correct.

8   Q    How much of a net loss to Global was there as a result of

9   ATA shutting down?

10           MR. GABEL:  Objection, relevance.

11           MR. BROUGHTON:  Counsel tried to infer that a

12   motivation for ATA going out of business was that North

13   American and World might pick up a little business.

14           THE COURT:  Overruled.  Go ahead.

15   BY MR. BROUGHTON:

16   Q    How much money did Global lose, round number, because ATA

17   went out of business?

18   A    Global -- I don't know the exact number, but hundreds of

19   millions --

20           MR. GABEL:  Objection, lack of personal knowledge.

21           THE COURT:  Foundation.

22   BY MR. BROUGHTON:

23   Q    You were asked on cross that it was forecast that there

24   might be spill to other teams.  Do you remember what Mr. Gabel

25   pointed out?

1  A   Yes, 60 to 120 million.

2  Q   60 to 120 million.  So maybe there was going to be 60 to

3  120 million to Global; is that right?

4  A   Correct.

5  Q   Did Global stand to lose more than that amount by ATA

6  shutting down?

7  A   Yes.

8  Q   How much more?

9         MR. GABEL:  Objection, lack of personal knowledge.

10  I think he already testified he didn't know.

11  BY MR. BROUGHTON:

12  Q   You're the CFO.  Do you have an idea?

13  A   I know how much money was invested in ATA by its owners,

14  yes.

15  Q   Okay.  How much was invested in ATA by its owners?

16         MR. GABEL:  Objection relevance.

17         THE COURT:  Overruled.

18         THE WITNESS:  Over $200 million.

19         MR. BROUGHTON:  Okay.  Let's look at Federal Express

20  158, please.  If we can just go to the top, Mr. Brockwell.  If

21  you can make it a little bit bigger, please.

22  BY MR. BROUGHTON:

23  Q   Mr. Garrett, you were asked about this on cross.  Do you

24  recall?

25  A   Yes.

GARRETT - REDIRECT/BROUGHTON

Vol. 5 - 857

1  Q   From Sean Frick to you?

2  A   Yes.

3  Q   It says, "Yes, there is a contract with FedEx that runs

4  through September 30, 2008, but we have not been told we're in

5  default of it."  Do you see that?

6  A   Yes.

7          MR. BROUGHTON:  Would you put up PX13,

8  Mr. Brockwell.  Just enlarge PX13, which is the September 7

9  agreement.

10 BY MR. BROUGHTON:

11 Q   Take a look at that really quick, if you would.  I'm sure

12 the jury's memorized it by now.

13         Okay.  Tell us, how could ATA be in default of that

14 three-year agreement?

15         MR. GABEL:  Lack of foundation.  Calls for a legal

16 conclusion.

17         THE COURT:  Sustained.

18 BY MR. BROUGHTON:

19 Q   When you look at that, what is -- by signing its name to

20 that, what is ATA --

21         MR. GABEL:  Same objection.

22         THE COURT:  Finish your question.

23 BY MR. BROUGHTON:

24 Q   As you read that, what do you understand the obligations

25 of ATA to be under that three-year agreement?

Vol. 5 - 858

1          MR. GABEL:  Lack of foundation, lack of personal

2  knowledge, calls for speculation.

3          THE COURT:  Sustained.

4  BY MR. BROUGHTON:

5  Q   Mr. Garrett, assume ATA is promising to fly for three

6  years there.

7          MR. GABEL:  Your Honor, may we approach?

8          THE COURT:  Sure.

9     (Beginning of bench conference.)

10         MR. GABEL:  This guy didn't work for the company

11  until two years after this letter was written.  There's been

12  no -- if he ever saw it, it was after a lawsuit was filed.

13  Why are we asking him what he thinks about this letter?  It's

14  irrelevant.  He has no knowledge.  It's going to be jury

15  argument through Mr. Broughton with him saying "yeah."

16         MR. BROUGHTON:  Well, he's been sent an e-mail that

17  he tried to imply to the jury was talking about that agreement

18  when, in fact, it was talking about the annual agreement.  He

19  was sent an e-mail from Sean Frick that he was asked about on

20  cross.  Counsel for FedEx tried to imply that the subject

21  matter of that e-mail was this three-year agreement, when, in

22  fact, it was an annual agreement.

23          The only way you can be in default of that

24  three-year agreement is if ATA didn't fly for three years, so

25  they couldn't have been talking about a default of the

1  three-year agreement.  They could only be talking about a

2  default of the annual FY08 agreement.  And that's the reason

3  it's relevant.

4          MR. GABEL:  Your Honor, the only thing he was asked

5  on direct was whether he received an e-mail from Sean Frick

6  and whether that e-mail said what it said.  If he has a

7  different explanation for what he thinks Mr. Frick was talking

8  about, Mr. Broughton can try to elicit that; but there's no

9  need for him to speculate about what a letter means that was

10 drafted three years before the guy worked at the company.

11         THE COURT:  I agree.

12         MR. BROUGHTON:  Okay.

13    (End of bench conference.)

14         MR. BROUGHTON:  Let's go back to Plaintiff's

15 Exhibit 158 -- I'm sorry, it's Federal Express 158.  I

16 apologize.

17 BY MR. BROUGHTON:

18 Q  "Yes, there is a contract with FedEx that runs through

19 September 30, 2008.  But we have been told we're not in

20 default of it."  Do you see that?

21 A  Yes.

22 Q  Were you aware that ATA would also enter into annual

23 contracts with FedEx?

24 A  Yes.

25 Q  And were you aware that each year, ATA and FedEx would

Vol. 5 – 860

1  renew these annual contracts?

2  A    Yeah.  That's my understanding, correct.

3  Q    At the end of your cross-examination, you were asked some

4  hypothetical questions about commission rate.  Do you recall

5  that?

6  A    Yes.

7  Q    What if FedEx charged 20 or 25 percent, right?

8  A    Yes.

9          MR. BROUGHTON:  If we could look at Plaintiff's

10  Exhibit 168.  Actually, don't put those up.

11          If I could approach the witness?

12          THE COURT:  Sure.

13          MR. BROUGHTON:  I believe Plaintiff's Exhibit 168,

14  169, 170, and Plaintiff's 14 have already been admitted.

15  BY MR. BROUGHTON:

16  Q    Mr. Garrett, just to move things along instead of waiting

17  for the TV, if you look at Plaintiff's Exhibit 168, I'll

18  represent to you that's a Contractor Team Fee Agreement for

19  FY04.

20  A    Okay.

21  Q    If we turn to that second page, what was that commission

22  rate?

23          MR. GABEL:  Objection, personal knowledge.  He's

24  showing him a document four years before he worked there and

25  asking him to read from it.

Vol. 5 - 861

1    THE COURT:  Sustained.

2    BY MR. BROUGHTON:

3    Q   Mr. Garrett, are you aware of what the commission rate --

4    are you aware ATA paid a 7 percent commission rate for '04,

5    '05, '06 and '07?

6    A   I knew '07.  I know now the other three years too.

7    Q   You've already testified with respect to FY08, that that

8    commission rate changed from 7 percent?

9    A   Correct.

10   Q   Are you aware -- as you know, ATA was not on the team in

11   FY09, was it?

12   A   No.

13   Q   It's your understanding Omni continued to be on the team?

14   A   Correct.

15   Q   Did you know that Omni's commission rate for --

16           MR. GABEL:  Objection, lack of personal knowledge.

17   BY MR. BROUGHTON:

18   Q   Do you know what Omni's commission rate was for FY09?

19   A   Yes.

20   Q   And what was it?

21           MR. GABEL:  Objection.

22           THE COURT:  Sustained.

23   BY MR. BROUGHTON:

24   Q   You were involved at Gemini, right?

25   A   Correct.

 1   Q    So you've been involved in military flying for how many

 2   years?

 3   A    Probably close to 10 now.

 4   Q    Have you ever heard of any team leader charging commission

 5   rates as high as you were asked about on cross?

 6            MR. GABEL:  Objection, relevance on what some other

 7   team leader might do.

 8            THE COURT:  Rephrase your question.

 9   BY MR. BROUGHTON:

10   Q    From your experience in years of military flying, would

11   you expect a team leader who wanted fliers to stay on their

12   team to charge an outrageous commission rate?

13            MR. GABEL:  Objection, relevance and speculation.

14            MR. BROUGHTON:  Merely responding to the questions

15   he posed to him.

16            THE COURT:  Sustained.

17   BY MR. BROUGHTON:

18   Q    Mr. Garrett, after -- what is the highest commission rate

19   that you are aware of, that you have personal knowledge of,

20   that any flier was ever charged?

21            MR. GABEL:  Objection.  Relevance as to whatever

22   someone other than FedEx may have charged.

23            THE COURT:  Overruled.

24            THE WITNESS:  7 percent.

25            MR. BROUGHTON:  I'll pass the witness.

GARRETT - REDIRECT/BROUGHTON

Vol. 5 - 863

1          THE COURT:  Recross, Mr. Gabel?

2          MR. GABEL:  No further questions.

3          THE COURT:  Sir, thank you very much for your

4   testimony.  You may step down.

5          THE WITNESS:  Thank you, sir.

6          THE COURT:  Let's take a 10-minute break at this

7   time and figure out where we're at.  Please do not discuss the

8   case among yourselves.

9          COURT CLERK:  All rise.

10     (Jury out.)

11         THE COURT:  Please be seated.

12         Mr. Broughton, where are we at?

13         MR. BROUGHTON:  We have a witness here from out of

14   state who I understand is waiting in the hall.

15         THE COURT:  Okay.  How long will this witness take,

16   do you think?

17         You can step down, sir.

18         THE WITNESS:  Thank you.

19     (Witness excused.)

20         MR. BROUGHTON:  From my direct questioning, I

21   haven't timed it, but 20 minutes, 30 minutes?  And we have

22   another witness that we can start if we finish.

23         THE COURT:  He is out of state.  You would like to

24   finish him today?  Is that what you're telling me?

25         MR. BROUGHTON:  If at all possible.

Vol. 5 – 864

1          THE COURT:  Out of state can be from California or

2    Illinois.

3          MR. BROUGHTON:  He's from New York, but I understand

4    business is taking him to China on Monday.  I am planning on

5    being really quick with him.

6          THE COURT:  Okay.

7          So whatever you want to do, if you want to call him

8    or you want to call another one, it doesn't matter.  I think

9    we can only take another witness.  I don't want to keep the

10   jurors much past five.

11         MR. BROUGHTON:  I definitely want to take him.

12         THE COURT:  Okay.  Thank you.

13         COURT CLERK:  All rise.

14    (A recess was taken.)

15    (Jury in.)

16         COURT CLERK:  You may be seated.

17         THE COURT:  All right.  Members of the jury, we're

18   going to try to finish up one more witness here.  The witness

19   is from out of state.  We'll see if we can try to get him out

20   of here today, but I don't want to go much past five o'clock.

21   The attorneys have promised me they are going to be very

22   efficient in their examination; isn't that right,

23   Mr. Broughton?

24         MR. BROUGHTON:  That's right.

25         THE COURT:  Please call your next witness.

Vol. 5 - 865

1        MR. BROUGHTON:  ATA calls Mr. Mark Patterson.

2        MARK PATTERSON, PLAINTIFF'S WITNESS, SWORN

3                     DIRECT EXAMINATION

4  BY MR. BROUGHTON:

5  Q   Please tell the jury your name.

6  A   Mark Patterson, M-A-R-K -- I speak a little funny -- Mark

7  Patterson.

8        MR. BROUGHTON:  You might need to speak up a little

9  louder.

10        THE WITNESS:  Is that better?  No?  Can you hear?

11 Can you hear that?

12        THE COURT REPORTER:  Yes.

13        MR. BROUGHTON:  Much better.

14        THE WITNESS:  Mark Patterson.

15 BY MR. BROUGHTON:

16 Q   Where do you live, Mr. Patterson?

17 A   In Bronxville, about 12 miles outside of New York City.

18 Q   You don't sound like you have a New York accent.  Where

19 are you from?

20 A   I'm a southerner.  I'm from Capetown, South Africa --

21 actually Stellenbosch, which is the wine farming district in

22 South Africa.

23        THE COURT REPORTER:  I'm sorry, sir.

24        THE WITNESS:  Still not working?

25        THE COURT REPORTER:  It's working.  I just need you

Vol. 5 - 866

1  to keep your voice up.  If you can repeat your answer for me.

2       THE WITNESS:  Stellenbosch, I come from

3  Stellenbosch, S-T-E-L-L-E-N-B-O-S-C-H.  It is like the wine

4  district of South Africa about 30 miles from Capetown, and I

5  went to school there.

6  BY MR. BROUGHTON:

7  Q    And where did you go to school in South Africa?

8  A    Stellenbosch University, which is a very small town, by

9  the way, very, very small town.  Went to law school there, and

10  then I got a postgraduate economics degree there too.  They

11  don't speak English there.  They speak Afrikaans.  I'm not

12  kidding.

13  Q    About what year did you get out of school?

14  A    That's embarrassing.  That's 1974 I got the second degree.

15  Q    So how did you end up in the United States?

16  A    Well, my father is South African.  My mother is American

17  from Illinois, Detroit, and Chicago.  Family, my brother lives

18  here, by the way in Indiana.  I had an American passport

19  conditional upon living here for two years before age 28.

20  That rule's been changed.

21       I wanted to come over here with my wife and live in

22  America.  So we arrived in December of 1976 on a one-way

23  ticket to New York with not a lot.

24  Q    Okay.

25       And tell us about what you did when you got to New

Vol. 5 - 867

1  York with your wife back then.

2  A    Begged for a job.  I really needed to get employed.  I got

3  employed by Bankers Trust that got bought by Deutsche Bank,

4  German Bank; and I begged for an international assignment like

5  Michigan or Indiana.  They gave me Michigan.  So I traveled to

6  get to know the car companies, Whirlpool, Kellogg, Bendix, all

7  those kind of -- Dow Chemical.  I got a really great education

8  about American business in the Midwest.

9  Q    How did you end up at a company named MatlinPatterson?

10 A    I had a fairly long career.  I went from Bankers Trust on

11 to Wall Street, and I was running -- I was Vice Chairman of

12 Credit Suisse First Boston.

13       And one of the businesses was my partner, David

14 Matlin.  I had hired him, and we were doing this kind of

15 business for Credit Suisse First Boston on their balance

16 sheet.  So after a while, they asked us to raise a fund; and

17 eventually the fund, the business was allowed to leave in

18 2002.  So now we have our own business.

19 Q    Okay.  When you say "this kind of business," what are you

20 talking about?

21 A    We're called a distressed investor.  So we would buy

22 companies that are in financial difficulty.

23 Q    And why in the world would you buy a company that's in

24 difficulty?

25 A    Well, a lot of companies, even good companies get in

Vol. 5 - 868

1  financial difficulty; even good people do, actually, from time

2  to time.  And it's a specialty business that allows us to try

3  to attack the problems that cause the company to fail.  It's

4  very exciting, very challenging; no question about that.  But

5  it's what we do.

6         It's a little bit like perhaps in this town -- a

7  little bit like you being a bit apprehensive driving at

8  220-miles an hour around the Indy track.  But for Helio

9  Castroneves and Franchitti, that's the work they do.  In a

10  similar vein, this is the work we do.

11  Q   There's some risk in their work?

12  A   Yes.  There's a risk -- from my grandmother's point of

13  view, there's a lot of risk, but this is what we do day to

14  day.  It's exciting, I promise you.  And it's incredibly

15  rewarding to be able to take companies that are down on their

16  knees and wiped out and be able to restructure them and get

17  them back on a growth curve where they're actually growing the

18  top line, the revenue line, the sales line, where they're

19  growing the profitable lines, where they're making new

20  acquisitions.  We've done that for about 74 companies around

21  the world in the last -- since 1994, actually.

22  Q   Tell us the names of some of those.

23  A   Some you wouldn't have heard of because they're in other

24  countries, perhaps; but you're sitting on Foamex's product,

25  foam rubber.  You sleep on their beds and pillows.

Vol. 5 - 869

1    WorldCom perhaps you've heard of, at the time the
2    largest buyer in what's called the junk bond market, the
3    high-yield market.  We were the party that helped them come
4    out of bankruptcy, with others, I assure you; but we were the
5    leading property.
6          NRG is a big public utility that you could buy the
7    stock of today, if you wanted to.  And it was bankrupt, out
8    and out bankrupt with 10 billion of debt; and we got them
9    resurrected, and it's a healthy investment-grade company
10   today.  To me, that's a great story, beyond things we've done
11   in Thailand and Australia and England and so on.  Nothing in
12   South Africa yet.
13   Q    All right.  What is your position at MatlinPatterson?
14   A    I'm the chairman; co-founder and chairman.
15   Q    And at some point in time, did MatlinPatterson become
16   involved with ATA?
17   A    Yes.  They were bankrupt.
18   Q    You can take a drink of water first.
19   A    ATA, I think, went bankrupt in about 2004, and in 2005 we
20   started to do some work, yes.
21   Q    And why did MatlinPatterson become -- choose to become
22   involved at ATA?
23   A    Well, first off, it was distressed.  And if you look at
24   our business we represent as a sort of a fiduciary, we
25   represent money.  Investors have given us a -- large,

1  responsible investors have given us money, and they ask us to

2  do one thing and only one thing only, and that's to buy

3  distressed companies.  So first off, we're doing what they're

4  asking us to do.  Second, we don't get distracted looking at

5  good companies.

6          This was a company in tough shape at the time.  And

7  so, obviously, we were evaluating this and numerous other

8  companies, I assure you.  We're always looking at lots and

9  lots of companies that are in financial difficulty to see

10 which ones we can understand and which ones we can turn

11 around.

12 Q   And did your company analyze ATA back when it was in

13 bankruptcy in 2005?

14 A   Yes, we did, operationally, financially.

15 Q   And at some point did you decide to go ahead and invest in

16 ATA?

17 A   Yes, we did.  In 2005, I believe.

18 Q   Okay.  And do you recall how much MatlinPatterson put in

19 at that time?

20 A   Well, first off, in the bankruptcy court you have -- the

21 company, the bankrupt company needs to have money, capital to

22 come out of the bankruptcy as a strong entity.  So we

23 committed 120 million for that, of which the company used

24 100 million to come out of the bankruptcy.

25 Q   And at that point in time, what was it about ATA that

1  attracted you to invest 120 million in it?

2  A   In this case and many other cases like it, there are good

3  parts to the company, average parts and some tricky parts,

4  some of which you may never be able to turn around.  But the

5  good part -- it was two -- fundamentally, two parts of the

6  business; one is a rock, a foundation, called the military

7  business, and we loved that business.  It was very dependable.

8         And the much more risky business, which was the what's

9  called passenger or scheduled airline business, Delta, United,

10  and all that, ATA had a piece of that business.  The footprint

11  was too big.  It needed to be shrunk dramatically, and it was

12  quite unprofitable.  The first part was the bedrock on which

13  we could rebuild both parts of the company, we hoped.

14  Q   You said the footprint was too big.  What did you mean by

15  that?

16  A   Each airline has a set of defined routes that it flies,

17  and the big ones, United, Continental and Northwest and all

18  the big ones, they largely are flying the national and

19  international route.  And little airlines, when they grow, try

20  to compete with those big ones.  And so the footprint, the

21  scheduled array of flights offered back and forth by ATA tried

22  to compete with those big people, and it's hard to do, very

23  hard to do.

24  Q   So was that changed as a result of the earlier bankruptcy?

25  A   If you mean the 2004-2005 --

1  Q   Yes.

2  A   -- when they entered the bankruptcy, normally the company

3  itself and the people who are going to put the money up to

4  help them get out of bankruptcy work together to find a plan

5  that makes the company viable coming out.  And we had a lot of

6  input.  We had a lot to do with them downsizing --

7  dramatically downsizing the footprint of where they flew,

8  where the scheduled airlines flew, yes.  That was an integral

9  part.  One of the reasons why we were willing to give them

10 money was only if the passenger airline business was shrunk

11 dramatically.

12 Q   And so that was in 2005, right?

13 A   Yes.

14 Q   And do you recall that ATA actually emerged from

15 bankruptcy in February of 2006?

16 A   Yes, I do.

17 Q   All right.  Let's fast-forward a year and a half or so to

18 late 2007, and do you recall that at that point in time, jet

19 fuel prices were very high?

20 A   Yes, at a record high, actually.

21 Q   Okay.  And do you recall whether or not these record high

22 jet fuel prices had any impact on ATA's scheduled service

23 business?

24 A   Yes.

25 Q   And what do you recall that impact being?

1  A    Well, I don't recall it being unique to ATA's business.

2        Do you mind if we split the business?  The scheduled

3  business, the airline business that moves domestic passengers

4  around, that business suffered dramatically, as did many other

5  commercial airlines -- suffered dramatically from the cost of

6  fuel.  Fuel is one of the largest single cost items related to

7  running an airline.

8        When I was a kid, a barrel of oil was a tiny little

9  number.  It had moved up to sort of 50, 60 -- it had moved up

10  to 100, to $140 a barrel, and the vaunted Goldman Sachs and

11  the vaunted Texas oil people were predicting $200 a barrel for

12  oil.  So this was crippling for all airlines.  Virtually any

13  airline -- commercial passenger airline was crippled by that.

14        However, in the old rock that we referred to earlier,

15  the foundation business, the military business, Uncle Sam pays

16  cost plus.  So if the cost of a barrel of oil or a gallon of

17  fuel for the plane is -- let's stay with the barrel because I

18  know those numbers -- are 40, 50, 60 bucks a barrel, Uncle Sam

19  pays that to us and many others who are supplying these

20  services to move soldiers around.  But if the price of a

21  barrel of oil is 100 or 140 -- and it did get over 140 bucks a

22  barrel -- Uncle Sam still pays.  So there's no loss to the

23  service provider in being in the military business if the oil

24  price doubles or is cut in half.  We're just working for about

25  a 10 percent margin on the whole cost of running that

Vol. 5 - 874

1   business.  So it had a dramatically negative effect, in

2   summary, on the passenger business, had no effect on the

3   military business.

4   Q   Okay.  Did MatlinPatterson have some -- have members of

5   MatlinPatterson that sat on the board there at Global?

6   A   Yes.  It's very typical of what we do in all the

7   investments we make, at least one partner, often two, sit on

8   these boards.

9   Q   Okay.  And do you know if ATA had any plan in late 2007,

10  early 2008 to address the scheduled service problems?

11  A   Yes.  I believe it fell into two sort of categories.  One

12  was to try, with our help, to see if we couldn't find a

13  strategic partner or even somebody to buy the whole business,

14  the airline, the passenger airline.  If that was going to be

15  unsuccessful, we would have probably had to shut it down, the

16  passenger airline business, and then stay in the military

17  business.

18  Q   Was MatlinPatterson providing support to ATA or its

19  parent, Global?

20  A   During the bankruptcy and all the way till the end, yes.

21  Q   Okay.  And what kind of support was MatlinPatterson

22  providing?

23  A   Typically, it's a bit arrogant, perhaps, to say it but we

24  provide a financial expertise for companies in distress.  We

25  don't know how to make shirt tops.  We don't know how to make

Vol. 5 - 875

1   ballpoint pens, but we know how to help companies in severe

2   difficulty.

3           So first off, we're providing an expertise not easily

4   obtained everywhere.  Number two, we typically provide equity

5   capital, which we did in this case, too, to help the company

6   stabilize.  Three, we lend money to these companies.  And to

7   ATA -- I'm not talking too generically here -- we also arrange

8   other people to invest in these companies or to loan to them.

9           We hire new CEOs.  We bring consultants in before and

10  after we become involved to help us understand and to help the

11  board and the management understand how to run the business

12  better.  So I hope that's not too long an answer, but it's a

13  myriad of things that we're trying to do to help the company

14  get on its feet, get strong enough that it can be taken public

15  or sold to a strategic buyer, another airline, another service

16  provider.

17  Q   Now, is MatlinPatterson as a company -- does it have

18  several funds?

19  A   Yes.

20  Q   Okay.  And explain what that means to us.

21  A   Well, when you say "funds," there's mutual funds and hedge

22  funds.  We have a thing called a private equity fund, so we

23  would go out every three or four years and solicit state

24  pension funds and universities and charities and corporate

25  pension funds and so on, even countries, actually, to put

Vol. 5 - 876

1  capital up for a dedicated fund.  So in 2002, we had the first

2  fund; in 2004, the second fund; in 2007, the third fund.  And

3  each of them is a completely separate vehicle that buys a

4  specific number of companies.  Somewhere between 10 and 20

5  companies is bought by each of those funds.  This was in the

6  second fund, by the way.

7  Q   Okay.  And do any of those funds have -- is there any

8  limit on how much money MatlinPatterson can put in a fund?

9  A   In a fund?  The fund -- I think -- did you mean in the

10 fund?  We put the money --

11 Q   Apparently I didn't.  I'm showing my ignorance there.

12 Tell us how these --

13 A   We're what's called the general partner, the decision

14 maker.  If you have a pool of, say, $100 of capital in the

15 fund, we, obviously, can't put all of the money into one

16 company.  It would be great if we made a great profit, but

17 what happened if we lost?  So typically they ask us not to put

18 more than 10 or 15 cents, 10 or $15 of the hundred dollars

19 into one company at a time.  So 15 is the limit that we've

20 used; and then with the approval of the advisory board to that

21 fund, made up of some of those investors, we can go to

22 20 percent, meaning that's a risk limit so that we're all

23 behaving within reasonable risk tolerance limits.

24 Q   Okay.  So sometimes in the past, have you gone back to the

25 fund and got approval to go to 20?

1   A   Yes, in all funds, yes, all three.

2           MR. BROUGHTON:  Okay.  All right.  If we could,

3   let's turn to Federal Express 148.  If we could go to page 4

4   of the front part, Mr. Brockwell, and if you could enlarge

5   item C that says "Gemini Air Cargo."

6   BY MR. BROUGHTON:

7   Q   Can you read that, Mr. Patterson?

8   A   Yes.

9   Q   Okay.  "Gemini Air Cargo," says, "Mr. Karnik reported that

10  the due diligence on Gemini was well under way and that so far

11  no significant surprises had been uncovered.  While

12  MatlinPatterson is prohibited by its fund covenants from

13  providing the company with any additional cash at this

14  time" --

15          MS. HODGES:  Objection, Your Honor, relevance.

16          THE COURT:  Relevance?

17          MR. BROUGHTON:  This is Mr. Patterson of

18  MatlinPatterson, and we're just going to discuss whether or

19  not MatlinPatterson was limited at this point in time from

20  providing additional money to ATA or to its parent.

21          THE COURT:  Go ahead.

22  BY MR. BROUGHTON:

23  Q   "While MatlinPatterson is prohibited by its fund covenants

24  from providing the company with additional cash at this time,

25  the board, after discussion, instructed management to continue

1  with the due diligence review process."  Do you see that?

2  A   Yes, I do.

3  Q   Does MatlinPatterson -- is providing additional cash to a

4  particular fund the only option that MatlinPatterson has to

5  provide financial assistance or support to a company?

6  A   No.  I hope it's clear.  These are board minutes, you

7  said?

8  Q   Board minutes of Global.

9  A   Yes, so we wouldn't write these.  We would never refer to

10 it as providing cash to companies.  We have to provide capital

11 to them.  It can come in many, many forms.  It can come from

12 us in the form of equity out of the fund that you referred to,

13 or we arrange other equity investors or we arrange other

14 lenders to come in and provide facilities to the company to

15 keep it healthy.

16         And we've continued to do that, by the way, long past

17 this in this business, in the military service business.

18 We're still in this business, by the way; and we've done some

19 very clever financing.  So if this was trying to imply that we

20 were incapacitated or something like that, it's absolutely

21 wrong.

22 Q   Okay.  Did there come a point in time when you found out

23 that FedEx had notified ATA that it would no longer be on the

24 FedEx team?

25 A   Could you repeat the question?  Was there a time?

Vol. 5 - 879

1    MR. BROUGHTON:  Put PX2 up on the screen, please.

2  And if you could enlarge it.

3  BY MR. BROUGHTON:

4  Q   Mr. Patterson, whether or not you ever saw this letter,

5  did there come a point in time that MatlinPatterson learned

6  that ATA had been advised by FedEx that FedEx was terminating

7  it from the team?

8  A   Yes.  Our team members were advised, for sure, on the ATA

9  deal.

10 Q   Okay.  And did that make any difference to

11 MatlinPatterson?

12 A   Of course.

13 Q   Why?

14 A   Well, this undermines the underpinning of the whole deal.

15 We were devastated when we got this.  This is -- just to go

16 back, this was the good part of the company that we trusted

17 and built the rescue plan around; and the option or the

18 dangerous part of the business, the passenger business, you

19 know, we didn't -- we would never have sufficient cash flow or

20 good profits over here to help this thing grow if this thing

21 was decapitated.  And that's what this letter did:  It just

22 knocked the legs off this thing, off the military business,

23 I'm saying.

24 Q   Okay.  And did this letter have any impact on

25 MatlinPatterson's desire to provide additional support or

Vol. 5 - 880

1  investment in ATA going forward?

2  A    It certainly affected our ability and desire, given that

3  we were no longer going to be this massive partner with FedEx

4  in that part of the service contracts to the Pentagon, to the

5  Air Force.  But it didn't affect our opinion about the quality

6  of this business and being in this business.  And we are still

7  in that business, but obviously not changed our view about

8  being able to be viable in the military business and ATA

9  combined.  But we had to do what we could to try to save it,

10 so we obviously urged ATA to try to talk FedEx out of this

11 letter.

12 Q    You're aware that ATA ended up shutting down in early

13 April of 2008; is that right?

14 A    Yes.

15 Q    Okay.  From late January to early April, was

16 MatlinPatterson involved at all in working with ATA to try to

17 find a solution?

18 A    I know -- I can't validate those dates, I'm afraid.  I

19 wasn't involved in those conversations, but I know that our

20 firm and ATA did have discussions with FedEx to try to

21 repudiate this or negotiate a better solution than termination

22 of a contract.

23 Q    Okay.  Did there come a time -- a point in time prior to

24 ATA's shutdown that MatlinPatterson determined it would not

25 provide any more financial assistance?

1    A    Did there come a time when we decided, MatlinPatterson --

2    Q    Yes.

3    A    -- that we would no longer provide assistance?

4    Q    Yes.

5    A    Yes.

6    Q    Okay.  And why was that decision made?

7    A    We found that the foundation business, the military

8    business, was no longer sustainable once the contract had been

9    broken by FedEx.  This is a megatrustworthy, large,

10   influential company that had a 20-year relationship with a

11   company that we owned.  It tore up a contract halfway through

12   the life of it, so we didn't have time to replenish that

13   business with other parts of the airlines that supply -- the

14   other teams that supply the military transportation.  So we

15   couldn't salvage the business.

16              MR. BROUGHTON:  I'll pass the witness.

17              THE COURT:  Cross-examine, Ms. Hodges.

18              MS. HODGES:  One second, Your Honor.

19                        **CROSS-EXAMINATION**

20   BY MS. HODGES:

21   Q    Good afternoon, Mr. Patterson.

22   A    How are you?

23   Q    My name is Kim Hodges.  We've never met before, I don't

24   believe.  I'm going to do my best to keep our dueling accents

25   from causing a problem.

PATTERSON - CROSS/HODGES

Vol. 5 - 882

1    A    Sounds like we're both from the South.

2    Q    South of somewhere.

3         Just so I'm clear, a private equity fund, you said

4    earlier, invests in troubled or distressed businesses,

5    correct?

6    A    No.

7    Q    I'm sorry.  MatlinPatterson, though, invests in distressed

8    or troubled --

9    A    Private equity funds invest in an array -- commercial real

10   estate, leveraged buyouts and distress for control.  So our

11   firm and firms like ours specifically invest in distressed

12   companies, correct.

13   Q    Okay.  And when your firm invests in those distressed

14   companies, sometimes they survive, sometimes they don't,

15   correct?

16   A    Correct.

17   Q    ATA was one of these businesses, obviously, that

18   MatlinPatterson invested in, correct?

19   A    Yes.

20   Q    And you testified that ATA was in bankruptcy in --

21   A    You asked a question before that about -- I wasn't sure

22   whether you were asking a question about do we invest in

23   companies that do and don't succeed?

24   Q    I believe my question was when you invest in companies, in

25   distressed companies, sometimes they end up surviving, and

PATTERSON - CROSS/HODGES

1  sometimes they don't, correct?

2  A   After we've acquired them, yes.  Now I understand.

3  Q   Okay.  And in 2005 when MatlinPatterson first invested in

4  ATA, of course, they were in bankruptcy, correct?

5  A   Yes.  That's the -- you wouldn't find us, you know, at IBM

6  or PepsiCo's doorstep, no.  That's not where we shop.

7  Q   Okay.  And I believe you said you invested some -- was it

8  $120 million?

9  A   No, we committed 120 million so that the court, the

10  debtor -- the debtor being ATA -- and all the old creditors

11  could see that we were going to have a solvent company coming

12  out of the bankruptcy process.  So 120 was committed, and 100

13  was initially used, yes.

14  Q   Okay.  At that time, your original plan was to grow the

15  scheduled service business to help pull ATA up; is that

16  correct?

17  A   No, to shrink it.  I think you misunderstood.  I said the

18  footprint was dramatically too big, and we had to downsize it

19  significantly.  We joined into an exclusive codesharing

20  agreement.  This is where the big airlines get together, and

21  our little, teeny airline got together with Southwest, the

22  best, most efficient commercial passenger service provider.

23  So we were just piggy-backing with them off their great 737

24  scheduled service business.

25          So no, it was not growing the business; it was

Vol. 5 - 884

1  shrinking it down to where it could be profitable.  Big

2  difference.

3  Q   Okay.  Well, your plan to help pull ATA up, though, didn't

4  work, did it?

5  A   ATA passenger didn't work because of the spike in fuel

6  prices, yes.

7  Q   Okay.  Well, it's true, isn't it, that it was in bad shape

8  even after 2005, correct?

9  A   All the companies we buy are in bad shape when we buy

10 them, and they're definitely in bad shape for a while while

11 we're correcting them.  It's a little bit like healing a

12 broken arm.

13 Q   Sure.

14 A   Your arm is not ready to throw a baseball two weeks after

15 you put the cast on it.  And these companies are in exactly

16 that -- some of them for three or four years.  It's painful to

17 help some of these companies back up onto their feet.  It's

18 never an instant rebound, I assure you.

19 Q   Well, it lost money in 2006, right, and lost money in

20 2007?

21 A   Most of our companies lose money.  You're talking about

22 earnings?  We focus on cash flow, and cash flow is what you

23 use to pay your bills with, not net income.  That's a very

24 good company's yardstick of performance is net income.

25 Q   Let me make sure I understand --

Vol. 5 - 885

1          MS. HODGES:  Actually, Robb, could you put up 0442?

2     This is Exhibit 81.  I believe it's a stipulated exhibit.

3          THE WITNESS:  Can you blow it up a bit?

4          MR. BROUGHTON:  Objection, foundation.

5          MS. HODGES:  Your Honor, he testified a moment ago

6     that he was not intending to grow scheduled service.  I'm just

7     using this exhibit to establish that that was, in fact, the

8     plan.

9          MR. BROUGHTON:  There's no indication that he's ever

10    seen this document or saw a copy of it or it was to or from

11    him.

12         MS. HODGES:  The document -- I'm sorry, your Honor.

13    I will lay some foundation for this.

14    BY MS. HODGES:

15    Q    Who is Subodh Karnik?

16    A    I think he was the president or CEO of the business for a

17    while when we first got involved.  If I'm right, we put him in

18    there.  I don't know if he was there already.

19    Q    Was he responsible for reporting, reporting up to the

20    board information with regard to ATA?

21    A    Yes.  Most CEOs are, yes.

22    Q    And as MatlinPatterson's majority shareholder, that would

23    mean that the information was coming to you, correct?

24    A    Generally, yes.

25    Q    Is it your testimony that he never indicated to anyone

Vol. 5 - 886

1   with Federal Express that he was intending to emphasize

2   growing ATA's scheduled service business?

3           MR. BROUGHTON:  Objection.  It calls for hearsay.  I

4   think it calls for speculation.  Again, there's no foundation.

5           THE COURT:  Sustained on the hearsay.

6           MS. HODGES:  I'll move on, Your Honor.

7   BY MS. HODGES:

8   Q   Now, you don't actually sit on the board yourself, do you?

9   A   No, Kim.

10  Q   Okay.

11  A   I sit on some boards but not this board.  I have never sat

12  on this board.

13  Q   So you do not have personal knowledge as to the actual

14  day-to-day operations of ATA; isn't that correct?

15  A   That's correct.

16  Q   You only have information that's reported up to you?

17  A   Yes.  Part of the job as chairman in our firm -- it's not

18  uniformly this way in private equity firms -- but I talk to

19  the limited partners.  I'm the chief spokesman for our firm,

20  so I need to know whether I'm on the board or not.

21          All of our portfolio companies' general activities --

22  and we report formally every quarter, today, in writing,

23  20-page reports.  And it has a writeup on each company, good

24  or bad, but we write them up; and too, we have an annual

25  meeting every year, a big meeting in New York where 150 people

Vol. 5 - 887

1  show up.  And we report to them then.

2       In between all that, I'm -- 24/7 I'm available to take

3  calls from any of those investors around the world.  So yes, I

4  need to be minimally involved from an information point of

5  view to be able to report accurately to them, yes.

6  Q   So your perspective on ATA is really more from a Global

7  standpoint -- if you'll excuse the pun -- as opposed to a

8  close-up standpoint; is that correct?

9  A   Yes.  When companies are in trouble, I get better

10  informed, yes.

11  Q   You testified earlier, I believe, that FedEx had -- strike

12  that, I'm sorry.

13       It's your understanding that ATA was under the

14  impression it was going to be entitled to participate on the

15  FedEx team through FY09; isn't that correct?

16  A   Entitled?  It's a long sentence.  I got lost.

17  Q   Is it your understanding that ATA is claiming that it was

18  entitled to participate in the military charter flying on the

19  FedEx team through FY09.

20  A   For three years?  The three-year contract?  I'm aware of

21  that, yes.

22  Q   You are not aware of any document that would allow ATA any

23  entitlement to fly on the FedEx team past FY09 though; is that

24  correct?

25  A   That's correct.

PATTERSON - CROSS/HODGES

Vol. 5 - 888

1  Q   And you don't know -- you don't know, excuse me.  You

2  didn't know as of December '07 or even January of '08 what

3  ATA's deal was going to be with FedEx, did you, for FY09?

4  A   I'm not sure I follow the logic of that because we have a

5  three-year deal with the team leader.  There would be no

6  reason to be poking around to find out why that had changed.

7  Q   Well, you didn't know what ATA would have to pay FedEx in

8  terms of commissions, did you?

9  A   The small details of those things that were always

10  governed long before we bought the company were governed by

11  agreements that were always struck.  So there was no basis to

12  be afraid or to be nervous about FedEx misbehaving.  I mean,

13  the long history before we got there and the history initially

14  with them was well above board until that letter showed up.

15  Q   If you don't know what the actual commission rate is going

16  to be, though, how would you have any idea whether ATA would

17  be able to run a profitable business in FY09?

18  A   Well, it's very difficult to say that we would know to the

19  last dollar how profitable.  But when the business doesn't

20  have a bad customer, the customer is the guy I pay the taxes

21  to, right?  It's my money coming back to our company, by the

22  way.  Meaning Uncle Sam is not going to default on its

23  payment, on its payment obligation.

24        So I feel very secure about that, No. 1; and No. 2, we

25  know what the profit margin is.  Do we know what the profit

Vol. 5 - 889

1  margin is between us and FedEx I think is what you might be

2  asking, Kim.  That we couldn't determine.  And it could never

3  be so bad or egregious on FedEx's side that they wouldn't want

4  us or we wouldn't want -- we being ATA -- we would want to

5  stay with them.  So I think it's stretching it to pretend that

6  we couldn't assess this to be a profitable business that's

7  still very profitable for us today in Global Air.

8  Q   But again, you didn't know what ATA's deal would be --

9  A   That's right.

10 Q   And you had no reason to believe that they would have any

11 expectation at all of flying on FedEx's military charter team

12 past FY09, correct?

13 A   That's correct.  This isn't a discussion about what might

14 happen after '09.  It's what happened before '09, and this

15 contract was abrogated or cut in half by somebody that we all

16 looked up to and trusted.  That's what I was confused by.

17 Q   You knew that ATA had the ability to stay on the FedEx

18 team through the close of FY08, correct?

19 A   Could you repeat that?  I knew that ATA had the right to

20 stay?

21 Q   You knew that ATA had been invited -- had been expected

22 even by FedEx to stay and fly on the FedEx military charter

23 team through the close of FY08, correct?

24 A   Whatever the final date of the three-year contract?  Yes,

25 that's what I represented to our investors that we could rely

1  on was FedEx's three-year contract to keep us on the team for

2  three years and the 50 percent of the travel points.

3  Q   But when you made a decision to shut ATA down, you knew

4  that there was still an undisputed period of time through the

5  close of FY08 that ATA would have been able to fly, correct?

6  A   About six months or less, because once we got this

7  terrifying letter of recision cutting the three-year contract

8  more than in half, we -- I think we've testified that we tour

9  around with ATA looking for alternative acquisitions, meaning

10 somebody to buy us.

11        We could sell our business to them, or alternatively,

12 getting on other teams to see if we could rescue some of that

13 business.  We were unable to do that, and so there's a couple

14 of months left by the end of the notice period that FedEx had

15 given us.  The company couldn't get saved.  You're right.

16 Q   I believe you said it was about six months left, correct?

17 A   Yes.

18 Q   So about six months left of the time they could have flown

19 on the FedEx team, and yet the decision was made to shut it

20 down anyway, correct?

21 A   Yes.

22 Q   So beyond that period of time, beyond those six months,

23 you were only looking for an additional 12 months, correct,

24 through the close of FY09?

25 A   You mean at the time that we cut the business off

Vol. 5 - 891

1  completely?  There was only about 12 months left on the

2  original three-year deal?

3  Q   No.  At the time that you made the decision to shut down

4  ATA.

5  A   Yes.

6  Q   You knew already that ATA had the -- had been invited and

7  even expected to continue flying through the close of FY08,

8  correct?

9  A   Yes.

10 Q   Do you know what the Government fiscal years are?  Do you

11 know what the dates of those are?

12 A   No.

13 Q   If I told you they run from October 1 of every year to

14 September 31st, you have no reason no dispute that, correct?

15 A   No.

16 Q   So when you made the decision to shut down ATA -- and I

17 believe it was approximately in April of '08.  Does that sound

18 correct to you?  Okay.

19       You knew that ATA was expected to continue to fly all

20 the way through the close of fiscal year '08 through the end

21 of September 2008, correct?

22 A   Yes.

23 Q   So beyond that time when you're making the decision to --

24 when you're deciding whether MatlinPatterson would continue to

25 fund ATA, even ATA doesn't think that they had any entitlement

PATTERSON  CROSS/HODGES

Vol. 5 - 892

1   to fly past October -- September 31st of 2009, correct?

2   A    That's correct.

3             MS. HODGES:  Just one minute, Your Honor.

4             I'll pass the witness, Your Honor.

5             THE COURT:  Redirect, Mr. Broughton?

6             MR. BROUGHTON:  Two minutes early.

7             THE COURT:  You're done?

8             MR. BROUGHTON:  That's it.

9             THE COURT:  All right, very good.

10            Mr. Patterson, thank you very much for your

11   testimony.  You may step down.

12            THE WITNESS:  Thank you, sir.

13      (Witness excused.)

14            THE COURT:  Members of the jury, that will conclude

15   proceedings for today.  We will continue on Monday at nine

16   o'clock.  Boy, you've all got smiles on your face.  You're

17   ready to get out of here.  I don't blame you.  It's been a

18   long week.  You've worked hard.

19            You know, everybody thinks just sitting there all

20   day, you're not physically exerting yourself; but you're

21   mentally exerting yourself all day long.  And that's

22   exhausting in itself, just focusing on what's going on here.

23   You deserve a good weekend, and I hope you have one.

24            Of course, while you're outside the courtroom, do

25   not read or listen to any news accounts.  Do not do any

Vol. 5 – 893

1    independent research.  We'll see you Monday morning at nine

2    o'clock.  Thank you so much.  Be careful.

3                  COURT CLERK:  All rise.

4        (Jury out.)

5                  THE COURT:  Please be seated.  Plan for Monday,

6    Mr. Broughton?

7                  MR. BROUGHTON:  We will call Larry Morriss, who is

8    our damages expert, and I believe we would plan to rest after

9    that.

10                 THE COURT:  All right, okay.

11                 And Mr. Blumberg, what's your plan for Monday then?

12                 MR. BLUMBERG:  I believe that all of FedEx's fact

13   witnesses were called in Plaintiff's case in chief.  So I

14   think that we may discuss with Mr. Broughton whether there are

15   any videos.  I think if there are, they would be

16   extraordinarily short.  Then we would proceed with Howard

17   Zandman, and that would conclude our case.

18                 THE COURT:  We would finish the evidence then

19   Monday, certainly?

20                 MR. BLUMBERG:  I believe so.  The experts are a bit

21   lengthy.  We could drift possibly to Tuesday morning.

22                 THE COURT:  Okay.

23                 MR. BROUGHTON:  It's going to be bad, Your Honor.

24   It's going to be really bad.

25                 MR. BLUMBERG:  We will close Tuesday.

Vol. 5 - 894

1          THE COURT:  All right, okay.  That's fine.  That's

2   what you promised me you would do.  That's great.  I

3   appreciate all the hard work you've done getting this case in

4   shape for trial.  There's a lot -- it's document intensive.

5   You've done an excellent job for that.

6          I do have a draft of my proposed final instructions.

7   Kathryn will give those to you before you go.  Take a look at

8   them over the weekend, and we will go over those sometime on

9   Monday.  The first 15 or 20 are all boilerplate instructions,

10  and then we've looked at both of your proposed.  And we've

11  tried to put them in the best shape that we think we can, but

12  we'll certainly listen to any comments you might have as well.

13         Okay.  Anything else we need to discuss before we

14  take our weekend break?

15         MR. BROUGHTON:  I'm not aware of any.

16         MR. BLUMBERG:  Nothing for us.

17         THE COURT:  Have a nice weekend.  We'll see you

18  Monday.

19         COURT CLERK:  All rise.

20         (The proceedings were adjourned at 5:02 p.m.)

21

22

23

24

25

1           CERTIFICATE OF COURT REPORTER

2


3      I, Cathy Jones, hereby certify that the foregoing is a

4 true and correct transcript from reported proceedings in the

5 above-entitled matter.

6


7


8   /s/ Cathy Jones                    October 15, 2010
   _____
9   CATHY JONES, RPR, FCRR
   Official Court Reporter
10  Southern District of Indiana
   Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25