1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION

3
ATA AIRLINES, INC.,            )
4                              )
                               ) CAUSE NO.
5          Plaintiff,          ) 1:08-cv-00785-RLY-DML
                               )
6          -vs-                )
                               ) Indianapolis, Indiana
7  FEDERAL EXPRESS CORPORATION,) October 18, 2010
                               ) 9:00 a.m.
8          Defendant.          ) VOLUME 6

9

10

11

12                 BEFORE THE
            HONORABLE RICHARD L. YOUNG
13

14      OFFICIAL REPORTER'S TRANSCRIPT OF

15                 JURY TRIAL

16

17

18

19

20

21

22  Court Reporter:   Cathy Easley Jones, RPR, FCRR
                      Official Court Reporter
23                    46 East Ohio Street, Room 291
                      Indianapolis, IN  46204
24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
           COMPUTER-AIDED TRANSCRIPTION

```
                                                      Vol. 6 -  896
 1                     A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:        Mr. Kenneth E. Broughton
 3                            Mr. Francisco Rivero
                              HAYNES AND BOONE
 4                            Suite 2100
                              Houston, TX  77010
 5
                              Mr. Thomas E. Kurth
 6                            Mr. W. Alan Wright
                              HAYNES AND BOONE
 7                            901 Main Street
                              Suite 3100
 8                            Dallas, TX  75202

 9                            Mr. John David Hoover
                              Ms. Alice McKenzie Morical
10                            HOOVER HULL
                              111 Monument Circle
11                            Suite 4400
                              Indianapolis, IN  46204
12

13
    FOR THE DEFENDANT:        Mr. Peter D. Blumberg
14                            FEDERAL EXPRESS CORPORATION
                              3620 Hacks Cross Road
15                            Building D, Third Floor
                              Memphis, TN  38125
16
                              Mr. Michael E. Gabel
17                            FEDEX LEGAL DEPARTMENT
                              3620 Hacks Cross Road
18                            Building B, 2nd Floor
                              Memphis, TN  38125
19
                              Ms. M. Kimberly Hodges
20                            FEDEX LEGAL DEPARTMENT
                              3620 Hacks Cross Road
21                            Building B-3
                              Memphis, TN  38125
22

23

24

25
```

Vol. 6 -   897

1                            I N D E X
                                              PAGE
2    For Plaintiff:

3    LAWRENCE D. MORRISS, JR.
     Direct Examination by Mr. Kurth ...............906
4    Cross-examination by Mr. Blumberg .............999

5

6

7

8

9

10

11

12

13

14

15   For Defendant:

16   HOWARD ZANDMAN
     Direct Examination by Mr. Blumberg ...........1015
17   Cross-examination by Mr. Kurth ...............1050

18

19

20

21

22

23

24

25

```
 1              I N D E X   O F   E X H I B I T S

 2                                          PAGE

 3   For Plaintiff:
     6 ..................................901
 4   17A ...............................1027
     18 .................................900
 5   27 .................................900
     37 .................................900
 6   38 .................................901
     42 .................................901
 7   43 .................................901
     47 .................................900
 8   72 .................................900
     76 .................................900
 9   87 .................................901
     96 .................................901
10   100 ................................900
     102 ................................900
11   103 ................................901
     106 ................................901
12   116 ................................901
     126 ................................901
13   160 ................................930
     161 ................................930
14   162 ................................930
     163 ................................930
15   164 ................................900
     164 ................................930
16   167 ................................900
     171 ................................901
17   172 ................................901
     173 ................................900
18   173 ................................901
     177 ................................901
19   178 ................................900
     180 ................................900
20   184 ................................951
     185 ................................900
21   200 ................................996
     247 ................................950
22   248 ................................986
     249 ................................988
23   250 ................................996
     260 ................................934
24   261 ................................998
     262 ................................998
25   263 ................................998
```

Vol. 6 -  899

1              I N D E X   O F   E X H I B I T S

2                                              PAGE

3     For Plaintiff:

Chart 4 ....................................1042
4     Chart 19 ...................................1044

1    *(In open court)*

2    (Jury out.)

3         THE COURT:  Good morning.  I trust you all had a

4    nice weekend.  We're back in ATA versus Federal Express,

5    parties as before.  We're still in the plaintiff's case in

6    chief.

7         Are there any matters we need to discuss prior to

8    the jury being brought in the courtroom, Mr. Broughton?

9         MR. BROUGHTON:  Yes, Your Honor.

10        Both sides have been working hard to streamline

11   things, and ATA wants to offer the following exhibits from

12   last week.  I believe I have deleted all the ones that were

13   objectionable to FedEx.  And at this time, ATA would offer

14   Defendant's Exhibits 18, 27, 37, 47, 72, 76, 100, 102, 164,

15   167, 173, 178, 180 and 185.

16        MR. BLUMBERG:  No objection.

17        THE COURT:  Show them admitted.

18     (Plaintiff's Exhibit 18, 27, 37, 47, 72, 76, 100, 102,

19   164, 167, 173, 178, 180 and 185 were received in evidence.)

20        MR. BROUGHTON:  And ATA would offer Plaintiff's 6,

21   38, 42, 43, 87, 96, 103, 106, 116, 126, 171, 172, 173 and 177.

22        MR. BLUMBERG:  Mr. Broughton, did you say 116?  Is

23   that on your --

24        MR. BROUGHTON:  Right.  116.

25        MR. BLUMBERG:  It's just not on your e-mail.  Let me

Vol. 6 – 901

1  double-check.

2        MR. BROUGHTON:  I'm looking at 116.  It was shown on

3  the Pollard video, so we don't have a problem.  We won't

4  object.

5        THE COURT:  Show all those exhibits admitted.

6     (Plaintiff's Exhibit 6, 38, 42, 43, 87, 96, 103, 106, 116,

7  126, 171, 172, 173 and 177 were received in evidence.)

8        MR. BROUGHTON:  The second item of business, Your

9  Honor, is at the end of the day on Thursday, we took

10  Mr. Rachor on a proof of evidence regarding Plaintiff's

11  Exhibit 4, and the Court took that under advisement; and we

12  would like to reurge the opportunity to offer Plaintiff's

13  Exhibit 4 and to question Mr. Rachor solely on that exhibit.

14        THE COURT:  Mr. Blumberg, any further comment?

15        MR. BLUMBERG:  Yes.  I didn't realize this was still

16  on the table since it didn't come up on Friday.  In addition

17  to all the arguments we've urged before, now the prejudice is

18  magnified 11 times.  I mean, Mr. Rachor has been fully

19  examined.  To call him back up at this time on this one

20  document now takes an exhibit that the Court initially ruled

21  was more prejudicial than probative; and now the Court went

22  back over the weekend since it was such a close call.

23        To bring the witness back to solely talk about this

24  document, first it's going to signal to the jury that this

25  must be a huge deal to bring the witness back.  Second, it

Vol. 6 -   902

1  will appear as if FedEx did something improper, when we

2  didn't.

3         We objected to the document timely.  No motion was

4  made to -- pretrial to deal with the document.  We argued it,

5  we got our ruling.  The witness was fully examined, and the

6  Court asked Mr. Broughton, you know, anything further?  No,

7  and the witness was excused.  To now bring this document up

8  after the weekend, after Mr. Rachor's testified is highly

9  prejudicial, especially in this particular posture where it

10 will appear FedEx did something, we hid the document, that we

11 did something wrong.

12        Given the already, you know, close call as to

13 whether it should come in, it's completely unfair.  Finally,

14 him having testified, he's now subject to cross-examination,

15 which is, again, completely unfair.  He's testified.  If it

16 weren't for the fact that he was sitting here, we wouldn't

17 even be talking about this.

18        We would never bring back a witness just for this

19 one issue.  The fact that he's a corporate representative or a

20 615 allowed to sit here representing the party doesn't change

21 any of that.  So we'd urge that the Court not permit this

22 testimony to be heard.

23        MR. BROUGHTON:  Your Honor, I don't think that the

24 jury would perceive that recalling Mr. Rachor was anything out

25 of the ordinary at all.  I don't think they would give that a

Vol. 6 - 903

1  thought.  I believe that certainly ATA hasn't waived anything

2  by the way it attempted to -- I started off within 5 minutes

3  of my cross-examination of Mr. Rachor initially and tried to

4  offer that exhibit.  So I believe it's entirely appropriate.

5  I think it's very probative.

6         I think it passes on the credibility of the witness

7  and is very relevant for the jury's consideration in this

8  matter, particularly since it was referring to longer-term

9  commitments.  And Mr. Rachor actually said, "Are there any

10  other contracts," the implication being he was talking about

11  the September 7, 2006 contract upon which ATA has filed this

12  lawsuit.

13         Thank you.

14         MR. BLUMBERG:  Your Honor, my other further point is

15  this Court has never throughout this entire trial not allowed

16  to make a -- a party to make a full and complete record at the

17  time.  We were at the -- and these issues that are being

18  raised now could have been raised right there at side bar, and

19  they were not.  And I think it does unfairly prejudice FedEx.

20         THE COURT:  All right, very good.

21         All right.  The objection will be sustained.  The

22  e-mail is written post the filing of the lawsuit.  I do

23  believe that there is some vagueness to that.  I'm not sure

24  whether Mr. Rachor, when he said, "Are there any other

25  contracts out there" was referring to contracts -- although he

1    said it was referring to contracts, I think it just may have

2    been wording he was using when writing an e-mail that he just

3    may be looking for documents.

4            In any event, it does bother me and concern me that

5    this e-mail was in this whole conduct on the part of

6    Mr. Rachor was done after the lawsuit was filed.  I don't see

7    what -- well, I do see some -- highly prejudicial to bring it

8    in at this time.  I think it would be confusing to the jury,

9    and I'll sustain the objection.

10           MR. BROUGHTON:  Thank you, Your Honor.

11           One more matter.  We had earlier in the proceedings

12   referenced that there might be additional video depositions.

13           THE COURT:  Yes.

14           MR. BROUGHTON:  Other than Mr. Pollard -- and last

15   afternoon and evening, Mr. Blumberg and I reached an agreement

16   that neither side would show any more to move things along,

17   and we're just going to put on the expert witnesses.

18           THE COURT:  All right.

19           You anticipate that will take most of the day?

20           MR. BROUGHTON:  I do, and the only other thing I do

21   want to bring up is I anticipate that plaintiff will rest

22   today; and we do have some additional offers of proof on the

23   DC10s and the post-January 22 communications between ATA and

24   FedEx.  I don't know if the Court wants us to do those before

25   we rest or at the end of the day or over lunch or what the

Vol. 6 -  905

1   Court's preference is.

2          THE COURT:  More than likely, I would have you do

3   those before you rest.

4          MR. BROUGHTON:  Thank you.

5          MR. BLUMBERG:  Your Honor, just for the purpose of

6   the Court's scheduling, if plaintiff is going to rest its case

7   today, we will make a Rule 50 motion.  I wanted the Court to

8   be aware of that as it's balancing the jury's time.

9          THE COURT:  Absolutely.

10          Ready for the jury?

11     (Jury in.)

12          THE COURT:  Good morning members of the jury.

13   Welcome back for our trial.  Hope you had a nice weekend.

14   Beautiful, beautiful weather out over the weekend.

15          We're going to continue on today with the

16   plaintiff's case in chief, and we are on schedule.  I was

17   discussing matters with the attorneys this morning.  We

18   will -- we may finish the evidence today and then have final

19   instructions and arguments tomorrow; and your deliberations

20   then would begin tomorrow.  So we're on schedule to get you

21   back to your personal lives here in a few days.

22          While you were outside the courtroom, anyone make

23   any attempts to talk to you about the case?  Read any news

24   accounts?  Any independent research?

25          Okay.  Mr. Broughton, call your next witness.

Vol. 6 –   906

1        MR. KURTH:  Your Honor, ATA would call Mr. Larry

2   Morriss.

3        THE COURT:  All right.  Mr. Kurth will do the

4   examination.

5      LAWRENCE D. MORRISS, JR., PLAINTIFF'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7   BY MR. KURTH:

8   Q   Would you state your name for the record, sir?

9   A   My legal name is Lawrence D. Morriss, Jr.  But nobody

10  calls me that.  I'm Larry.

11  Q   How old are you, Mr. Morriss?

12  A   I'm 55 years old.

13  Q   Where are you from?

14  A   I'm from Kansas City; the Kansas City metropolitan area.

15  I grew up on the Missouri side.

16  Q   What is your business?

17  A   I am a CPA, and I specialize in forensic investigations,

18  valuations, and financial damage issues.

19  Q   Who do you work for?

20  A   I work for a company by the name of Mesirow Financial

21  Consulting, which is a subsidiary or a division of Mesirow

22  Financial.

23  Q   What is Mesirow Financial Consulting?

24  A   Well, Mesirow Financial Consulting –– well, the genesis of

25  Mesirow Financial Consulting is that Mesirow Financial

1  purchased the KPMG bankruptcy and reorganization group in

2  2004; and that became the genesis of our consulting group at

3  Mesirow Financial.  So Mesirow Financial includes bankruptcy

4  reorganization, litigation, and investigation services,

5  valuation services, interim management services, operations

6  improvement, employee benefit consulting, and real estate.

7  Q   Is Mesirow Financial consulting affiliated with Mesirow

8  Financial?

9  A   It is.  Mesirow Financial is a 40-billion-dollar

10 investment -- assets under management investment company

11 specializing in investment services, global services,

12 insurance services in our group, which is the consulting

13 services.

14 Q   What is your job title at Mesirow?

15 A   I am the senior managing director, and I am also the

16 co-head of the litigation and investigation group.

17 Q   Would you tell the jury what your areas of specialty are?

18 A   Sure.  Well, the litigation investigation group is kind of

19 like the TV show CSI, except other than we're not

20 investigating murder scenes; we're investigating financial

21 scenes and trying to put pieces together.

22       My group is the litigation and investigation services.

23 And what we do is things like lost profits, diminution in

24 value.  We do other kinds of damage issues, and we investigate

25 those; and we're often called to testify about our

1  conclusions.

2  Q    When did you join Mesirow?

3  A    I joined Mesirow in 2006.

4  Q    And prior to your joining Mesirow in 2006, what did you

5  do?

6  A    Well, it might be easier to go the other way around.

7  Q    Whatever direction you like.

8  A    I graduated from the University of Missouri in Columbia in

9  1977 with a Bachelor of Science in business administration,

10 emphasis in accounting.  And I started with a local CPA firm

11 in St. Louis, Missouri, by the name of Ruben, Brown &

12 Gornstein after I graduated.  The reason was my father was

13 also a CPA and had his own firm in the Kansas City area, and

14 the point was for me to get some experience outside of the

15 Kansas City market and then some day come back and join my

16 dad's firm.

17      But ultimately, after I spent two years at the local

18 CPA firm in St. Louis, I went to a larger firm that was by the

19 name of -- ultimately by the name of Laventhol & Horwath, and

20 I spent from '79 to 1990 at Laventhol & Horwath.  I was an

21 audit manager ultimately, and that's when I started doing some

22 of this CSI-type stuff in the mid '80s.

23      I decided that that was a little more interesting than

24 doing some of the accounting and tax work that my dad's firm

25 was doing.  So my dad ended up selling his firm to a larger

NORRISS - DIRECT/ROTH

Vol. 6 -  909

1   regional firm and becoming the managing partner of that firm.

2   And then ultimately, Laventhol went out of business in 1990,

3   and I joined Coopers & Lybrand, and I became a partner at

4   Coopers & Lybrand in 1991 and stayed there with -- through the

5   merger with Pricewaterhouse, so it was PricewaterhouseCoopers,

6   and I stayed there through 2001.

7           And around 2001 is when Sarbanes-Oxley came around

8   where they said CPA firms -- the big CPA firms have to

9   determine whether or not they want to be auditors or

10  consultants, but they can't do both.  And so I joined a group

11  called Crossroads Solutions Group, which was founded by a

12  former Pricewaterhouse group, and I stayed there from 2001 to

13  2006 before I joined Mesirow.

14  Q   What do you like most about your work, sir?

15  A   Well, it's -- like I said, it's solving; it's problem

16  solving.  It's piecing together puzzles of financial

17  information and coming up with an answer.

18  Q   Since your graduation from college, have you earned any

19  continuing professional education?

20  A   Yes, I have.  Well, I got my license as a CPA in 1979, and

21  then I became a certified valuation analyst, a CVA.  And then

22  I became a certified fraud examiner, a CFE.  And then I became

23  certified in financial forensics, a CFF.

24  Q   In total, how much public accounting experience do you

25  have?

1  A   I had 24 years of public accounting experience -- this is

2  my 33rd year in the same kind of business, but 24 of it was

3  with the bigger firms.

4  Q   What kind of work do you currently do in the context of

5  investigating financial problems?

6  A   Well, the kind of work that I do -- well, for example, I

7  was the expert in the Enron case -- one of the experts in the

8  Enron case.  I was MCI's expert on investigating the

9  substantive consolidation of WorldCom, could it be pulled

10  apart or did it have to be all in one.  So it was a forensic

11  investigation and some valuation as to the MCI part and the

12  WorldCom part.

13      Other investigations I did was in Enron.  I was

14  involved in the Enron bankruptcy, as well, where I valued what

15  were known as special-purpose entities in the Enron group and

16  specifically the pulp-and-paper business.  Enron had set up --

17  they were energy traders, but they had other kinds of trading

18  that they were doing, and part of it was in the paper trading

19  business.  And so they had gone out and bought timber

20  companies and pulp and paper companies to set up a trading

21  facility where they could trade pulp and paper commodities and

22  be the market maker in that.  So I did that.

23      I was also involved in TWA's bankruptcy, where I did

24  their preference actions and all the ordinary course of

25  business and all the other fraudulent conveyance issues in

MORRISS - DIRECT/NORTH

Vol. 6 -   911

1   connection with TWA's 2001 bankruptcy.

2          And then I was involved in Delphi's bankruptcy.

3   Delphi was General Motors' former parts manufacturer.  And I,

4   again, was involved with their ordinary course of business in

5   their preference actions within Delphi, as well.

6   Q   Mr. Morriss, what is a lost profits analysis?

7   A   Well, a lost profits analysis is a damage concept; and

8   it's a "but for" concept.  The "but for" concept is -- for

9   example, in this case, but for the alleged actions of Federal

10  Express, what would the incremental earnings have been had ATA

11  been involved in the contract for fiscal year '07 through '09

12  through its entirety.

13  Q   Have you had any prior experience performing such an

14  analysis?

15  A   Sure.  Over the last 30 years, I've probably done 40 to 50

16  lost profit calculations under that kind of scenario.

17  Q   What is a destruction of business value analysis, by

18  comparison or contrast?

19  A   Sure.  Well, the destruction of a business is a valuation

20  concept.  In other words, what's the value of the business as

21  of the date of damage versus what's the value that you have

22  currently, and the difference between that would be the

23  destruction of the business.  It's also known as the

24  diminution in value of the business.  That is a valuation

25  concept.  It's separate and apart from a lost profits concept

Vol. 6 -  912

1  that has a defined period of damage for a particular contract

2  period.

3  Q   Prior to your work in this case involving ATA Airlines,

4  have you had experience in dealing with companies in financial

5  distress, if you would describe that?

6  A   Sure.  Some of them, I've already talked about:  The Enron

7  case, the WorldCom case, the Delphi case, TWA.  I've been

8  involved with companies that weren't in bankruptcy, as well,

9  but they're troubled and distressed.  I can't name the names,

10 obviously, but the industries were in box manufacturing

11 industry, microcomputer manufacturer, a chip -- microcomputer

12 chip manufacturer; a company that did -- that manufactures CD

13 disks that we use for our computers and use for, you know,

14 music and data storage.

15        And then I've been involved with companies that are

16 large data companies.  For example, I did a company that was a

17 Canadian company that laid all the fiberoptic cables across

18 the Pacific Ocean for the Internet to connect Asia to North

19 America on Internet and voice traffic, as well.

20 Q   In the context of your experience with companies involved

21 in financial distress, reorganization, and restructuring, can

22 you tell us whether or not that has been a common situation in

23 the airline industry?

24 A   Yes, it has, especially in this decade.

25        In this decade -- well, the 9/11 didn't help matters

MORRISS - DIRECT/ROTH

Vol. 6 -   913

1   much, obviously; but US Airways kind of started everything

2   off.  And then they filed bankruptcy in 2002.  They filed

3   again in 2004.  In 2005 United filed bankruptcy, Delta filed

4   bankruptcy, Northwest filed bankruptcy.  So it's been a pretty

5   common occurrence, especially in this decade.  The '90s, not

6   so much.  The '80s had quite a bit because of the deregulation

7   of the airline industry, and everybody was trying to figure

8   out how to compete again in a rational market.  And the '90s

9   were pretty good.  TWA filed in '92, and then they filed again

10   in 2001.  So it's been a pretty common occurrence.

11   Q   Mr. Morriss, are there any common factors that, in your

12   experience, determine whether a company can recover from

13   financial distress?

14   A   Sure.  I think the biggest factor is whether or not

15   there's a core business, a business that is fundamentally

16   sound that you can work around and that you can have an

17   infrastructure to build off of.  If you don't have a core

18   business, then there really isn't much chance of success in

19   reorganizing that business.

20   Q   Okay.  Have you ever been qualified as an expert in

21   matters involving litigation?

22   A   I have.

23   Q   Many times?

24   A   I have.  I've been -- I've testified in deposition and

25   hearings probably 80 times over the last 30 years.  I've been

1  in court like this 15 to 20 times over the last 25 years.

2  Q   You had mentioned to the jury your professional experience

3  in the aviation industry and the work you did as an auditor,

4  as a consultant, as an expert.  Is there any benefit to you,

5  for purposes of your work in this case, having previously done

6  work in the aviation industry?

7  A   Sure.  In the aviation industry there are special terms of

8  art.  There are special operating statistics.  If you don't

9  understand those, it's hard to understand what you're looking

10  at as far as ATA or the military operation as well, because

11  there are benchmarking things and trending things that you

12  need to do in order to make some conclusions about what you're

13  looking at and what you're analyzing.

14  Q   Did the work in the aviation industry give you any special

15  insight with respect to the relationship between revenues and

16  expenses?

17  A   Sure.  In the aviation industry, if you think about what's

18  happening in the aviation industry, companies have these big

19  old planes.  With these planes, they have to put people in

20  them to make money.

21       So when you're looking at that, you have to be able to

22  understand the flights, the scheduling, the routing, the

23  infrastructure around getting people in the planes, getting

24  the planes to their destinations, hiring and training

25  qualified people to make sure that the planes fly to the

1  destinations like the pilots, the flight attendants, the

2  maintenance people, the other crew.  They're all involved in

3  that.

4       It's that kind of understanding that when you think

5  about the revenue side, all of those things, like the number

6  of miles the planes fly, the destinations that the planes fly

7  to, the number of seats, the type of aircraft, that all

8  affects revenue.  Revenue is what in the airline industry is

9  what drives the cost.  So as the revenues change in the –– in

10 an airline for inputs, as the revenues change, your costs are

11 going to change.

12      The input here in this particular case are going to be

13 planes, seats, cost of filling the seats, cost of training the

14 pilots, cost of training the flight attendants and the crew,

15 et cetera.  So as the revenues change, those costs associated

16 with it are going to change.

17      Now, there's going to be a base–level fixed cost

18 obviously because you have some costs that are already

19 incurred; but as everything else changes, costs are going to

20 change.

21 Q   Did you work –– prior work in the airline industry in

22 studying the relationship, for example, between revenues and

23 expenses, can you tell me whether or not there was any value

24 to you knowing whether and to what extent analytical tools

25 such as statistical models are useful?

1  A    Yeah.  Because in the aviation industry, the revenues and

2  the costs relate to each other.  So when you are thinking

3  about a relationship, there is -- as a cost accountant, there

4  is a concept known as a linear relationship. And cost

5  accountants always look at the variables, revenue, and costs.

6  Do they relate to each other in a linear pattern, meaning that

7  when the revenues change, do the costs change?  I already knew

8  that was true in the industry.  I knew from a tool, that from

9  a cost perspective, I could use, for example, I could use

10  regression analysis to estimate costs if I knew what my

11  revenues were.

12  Q   Mr. Morriss, have you had a byline for any writings or

13  publications?  Have you written any writings or publications

14  or done any teaching?

15  A   I have.  I have taught understanding financial statements.

16  I've written courses for understanding financial statements.

17  I have taught understanding business valuations, and I have

18  written courses on business valuations.  And I think I've

19  written articles on business valuations that have been

20  published within various trade publications, newspapers, and I

21  think I've even written some articles on forensic

22  investigations that have been published in some of the

23  newspapers as well.

24  Q   Mr. Morriss, were you and your firm retained by ATA

25  Airlines, the plaintiff in this case?

Vol. 6 -  917

1  A   Yes, we were.  We were retained in October of 2008, almost

2  two years ago -- more than two years ago.

3  Q   Are you and the members of your team being compensated by

4  ATA for your time?

5  A   No.  My firm is.  My firm is being compensated for the

6  work that we did.  There's been about 20 individuals under my

7  direction and supervision that have worked on this case.  To

8  date, we've put in about 5,400 hours on this matter; and we've

9  charged $2,857,000.

10 Q   Are you being compensated on an hourly basis; that is,

11 your firm?

12 A   Yes.  It's hourly basis.  The hourly basis ranges from

13 roughly $200 an hour to $710 an hour.

14 Q   Is there any kind of contingency arrangement between your

15 firm and ATA with respect to the outcome of this case?

16 A   No.

17 Q   What were you and your team hired to do in this case?

18 A   Well, we were hired to do several things; but one of the

19 things that we were asked to do is to determine whether or not

20 there were any damages that ATA suffered as a result of the

21 termination -- FedEx's termination of the 2007-2009 agreement.

22 Q   What requirements do you think were needed in order to

23 perform the work you have done on this case?

24 A   The requirements that were needed were a firm

25 understanding of the airline business, an understanding of ATA

1  itself, an understanding of the military operation, and an

2  understanding of how that kind of compares to industry and how

3  it compares to competitors closely related to ATA as well,

4  plus all understanding of ATA's cost structure and revenue

5  structure as well.

6  Q   From your investigation analysis, did you conclude whether

7  or not ATA had a future in the military charter business as a

8  member of the FedEx team?

9          MR. BLUMBERG:  Objection.  Beyond the scope of the

10  expert disclosure.

11          THE COURT:  Rephrase.

12  BY MR. KURTH:

13  Q   But for FedEx having been terminated -- I'm sorry -- let

14  me rephrase.

15          But for ATA having been terminated by FedEx from the

16  FedEx team, did you form an opinion whether or not ATA would

17  continue in business through fiscal year '09?

18  A   Yes.  May I explain?

19  Q   Please.

20  A   The -- you have to remember that ATA had been in the

21  military flying business since 1982 and specifically on the

22  FedEx team since 1992.  And over that course of period, they

23  really only had one unprofitable year, and that would have

24  been the fiscal year that incorporated the 911 terrorist

25  attack.  And they had a small loss in that particular year.  I

1  think it was roughly 800,000, 700,000, something like that.

2  Every other year they were profitable and cash flowed.  So for

3  all that period of time, they were a strong, long-term,

4  profitable, going-concern business.

5       Now, I know that you've heard because I've been

6  sitting here listening to testimony about they shut down --

7  they quit on April 2nd and stopped on April 3rd of 2008.  But

8  for the termination notice, they could have continued --

9       MR. BLUMBERG:  Objection.  Beyond the scope of the

10  expert disclosure.  May we approach?

11       THE COURT:  Sure.

12  (Beginning of bench conference.)

13       MR. BLUMBERG:  Your Honor, this witness can

14  certainly testify as to the profits that they would have

15  earned based on his projections.  That was the expert report,

16  but he was absolutely clear in his deposition and there's

17  nothing in his expert report that says he actually did any

18  analysis of whether they would have been able to survive a

19  shutdown, the costs on that, anything of that nature.  None of

20  that was discovered in his expert disclosure.

21       At his deposition when I asked him about these

22  questions, his response was, "That's not necessary.  It wasn't

23  part of my engagement."  I think this switches the area that

24  Mr. Yakola and Mr. Garrett both covered beyond the scope of

25  disclosure and, frankly, 403.  I think we've heard this part

Vol. 6 - 920

1  from the people that were there.

2        MR. KURTH:  Your Honor, this is an expert witness

3  talking about lost profits, the test being but for.  His

4  report talks about that as part of the determination of lost

5  profits, but for the termination of ATA would have continued

6  in business.  That's ground zero of the analysis.  It's the

7  expert opinion.

8        I don't know what Mr. Blumberg's referring to, but I

9  don't know anything more basic to this analysis than the but

10  for analysis that's part and parcel of the lost profits'

11  calculation.

12        THE COURT:  Well, why don't you try to set up some

13  foundation then for that questioning.  What you're saying,

14  Mr. Kurth, is that he can't come to his lost profits without

15  going through his analysis first?

16        MR. KURTH:  Yes, yes.

17        MR. BLUMBERG:  But that analysis is not in his

18  expert report, and the rules require that all those -- any

19  opinion he's going to testify is disclosed.  He did an

20  analysis of past profitability.  He did an analysis of the

21  airline industry, and then he calculated his lost profits.

22  But nowhere in his expert report does he actually go through I

23  believe what he's about to testify about, what could have

24  happened.

25        It wasn't part of the report.  If Mr. Kurth can

MORRISS - DIRECT/KURTH

Vol. 6 -   921

1  bring it to me -- it's not in there.

2          MR. KURTH:  I guess I am looking at a different

3  report.  It sounds like cross-examination.  In his report he

4  went through from a point of breach, then what lost profits --

5  you calculated what profits would have been there for.

6      (End of bench conference.)

7          THE COURT:  Members of the jury, go back to the jury

8  room just for a moment or two.  We have some discussion out

9  here, and we will bring you back in shortly.  Thank you.

10          COURT CLERK:  All rise.

11      (Jury out.)

12          THE COURT:  All right.  The jury's outside the

13  courtroom.  Mr. Blumberg, do you have further comment here?

14  Of course, you're referring to the expert report, and I have

15  not seen it.  If I have seen it, I forgot what I read in it.

16          MR. BLUMBERG:  I'm trying to locate the language in

17  the --

18          THE COURT:  Why don't one of you ask this witness a

19  question which would direct us all -- he knows his report

20  better than anyone -- that will direct us, if it's in there,

21  would direct us to it.

22          Mr. Kurth?

23  BY MR. KURTH:

24  Q   Mr. Morriss, in the course of your analysis, did you

25  evaluate the prospects of ATA operating through fiscal year

Vol. 6 - 922

1  '09 but for the FedEx termination of ATA from the team?

2  A   In my report?  No.  It's an assumption due to the

3  computation of the damages.  My report says that it is —— that

4  it was a long—term going concern business through the years

5  that I examined up through 12—31—07.

6          MR. BLUMBERG:  Your Honor, I think on that basis, my

7  objection stands.  I mean, he's assumed that.  It's not in the

8  report, and if he wants to move on to his calculation of lost

9  profits based on that assumption, that's exactly what I was

10 saying at side bar.

11         He can go ahead and do the calculations; but he

12 can't testify about the exact things that Mr. Yakola and

13 Mr. Garrett have already testified about, which is, "Here's

14 our plan.  Here's what we're going to do.  Here's where the

15 money is going to come from.  Here's how companies of this

16 nature tend to work these things out."

17         If he says, "I assumed that scheduled service would

18 have been shedded and it would have been military only," then

19 we can move on.

20         THE WITNESS:  May I add something?

21         MR. BLUMBERG:  You may.

22         THE WITNESS:  I was asked about that in my

23 deposition, and I did say that in my deposition.  Would you

24 like me to read that?

25         THE COURT:  Sure.

1          THE WITNESS:  It's page 294, and it's by

2   Mr. Broughton.  It says:

3          "Mr. Morriss, let me hand you Exhibit 4, which is

4   Mr. Zandman's report, and ask you to turn to page 7, Paragraph

5   No. 2.  At the top, the very first sentence says, 'Despite

6   ATA's claim that its military segment was profitable, there is

7   a significant doubt of ATA's ability to continue on its own as

8   an ongoing business, going concern, beyond or even through

9   September 30th, 2008.'  Do you have an opinion about that,

10  Mr. Zandman's statement that I just read?"

11         Answer:  "Yeah, I think that ignores the "but for"

12  concept, and it's wrong."

13         "Okay.  What is your opinion in addition to what you

14  just said?"

15         "My opinion is, as I spoke to earlier with

16  Mr. Blumberg, that if ATA continued to have the contract, they

17  could have successfully restructured.  There was a high

18  probability that they could have successfully restructured

19  everything else to have a very viable business."

20         Question:  "Also turn to page 11, if you would, of

21  Mr. Zandman's report.  And I apologize if this is repetitive

22  from something Mr. Blumberg discussed with you earlier.  The

23  first full paragraph at the top of page 11, last sentence of

24  the first full paragraph, it says, 'He,' being you, Larry

25  Morriss,' failed to consider whether ATA could continue as a

1   going concern even if ATA had been part of the FedEx team for

2   fiscal year 2009.'  Do you have an opinion?  The previous

3   question was about going through September 30, 2008.  This is

4   for fiscal year 2009.  Do you have an opinion about this

5   sentence?"

6           Answer, "Yeah.  It's false, too, in that they could

7   have" -- "that they could have continued" isn't in there, but

8   it's in the corrected transcript, "through fiscal 2009."

9           "For what reasons?  Because having the fiscal

10  '07/'09 contract and being able to have the time to reduce

11  their scheduled service and reorganize."

12          MR. KURTH:  What page was that you were reading

13  from?

14          THE WITNESS:  That was page 294 through 296.

15          MR. BLUMBERG:  That doesn't -- I mean, he's

16  responding to Mr. Zandman's report.  That doesn't put it in

17  the scope of the opinions that he gave to FedEx that said that

18  this was what he would be testifying on.  There was an

19  opportunity to do a rebuttal report.  Mr. Morriss did not do

20  so.  In fact, we did a whole motion in limine that was agreed

21  upon by both parties that there would be no rebuttal from the

22  bench because there was no rebuttal report.  So this, in fact,

23  further supports that, again, he can't testify on an opinion

24  that he didn't give in the report that was disclosed to FedEx

25  and not supplemented.

1     MR. KURTH:  I think he's given in response to

2   examination, and in the deposition taken by Mr. Blumberg, he

3   was examined on the subject, and he testified on the subject;

4   and I think it makes the subject fair game to discuss today.

5          MR. BLUMBERG:  These are Mr. Broughton's questions

6   that he just read, not my questions.

7          MR. KURTH:  And Mr. Blumberg had an opportunity to

8   cross-examine.

9          THE WITNESS:  May I?

10         THE COURT:  Sure.

11         THE WITNESS:  Mr. Blumberg asked me kind of the same

12   things, too.  It would take me a while to find it in the

13   deposition; but he did ask me the same kind of things that

14   Mr. Broughton asked me, too.

15         THE COURT:  I guess my problem is, I mean, expert

16   reports under the rules are there for a reason, to give a

17   heads-up to the other side as to what the expert is going to

18   testify to.  It doesn't really matter what questions were

19   asked in the deposition.  The expert report is the key here.

20   And this information is not in his report or a supplement.  Is

21   that my understanding?

22         MR. BLUMBERG:  That's correct.

23         THE COURT:  So there's some difficulty here,

24   Mr. Kurth.  I mean, the rules are the rules.  And this is not

25   uncommon, and reports are -- expert reports are very important

Vol. 6 -   926

1  documents in civil litigation, and we need to follow the

2  rules.

3          So I'll sustain the objection.

4      (Jury in.)

5          THE COURT:  All right.  Mr. Kurth, continue your

6  exam.

7          MR. KURTH:  Thank you, Your Honor.

8  BY MR. KURTH:

9  Q   Mr. Morriss, for purposes of your investigation analysis,

10 did you make an assumption as to the prospects of ATA

11 operating the military charter business through fiscal year

12 '09 but for its termination from the Federal Express team?

13 A   I did.

14 Q   Let's take a moment and walk through your methodology and

15 work in this case, that is, of you and your team; that is, how

16 you went about your project in formulating your conclusions.

17 And in that regard did you or your team conduct any personal

18 or telephonic interviews?

19 A   We did.  We discussed several things with many of the ATA

20 or affiliated members of ATA.  For example, we spoke with --

21 is it okay for me to tell the jury who we spoke with?

22 Q   Please do so.

23 A   We spoke with Mr. Subodh Karnik.  We spoke with

24 Mr. Yakola.  We spoke with Mr. Garrett, Mr. Bill Garrett and

25 then Heath Garrett, Jack Schultz, Rob Binns, Misty Malone, and

Vol. 6 - 927

1  there might have been a couple others in there.  But we talked

2  to a lot of the people that had knowledge about the financial

3  aspects and the military arrangements, as well.

4  Q   Would you describe for the jury generally the sort of

5  investigation you and your team conducted?

6  A   Well, the investigation would have been an interview

7  process of many of the people that were involved with ATA or

8  their affiliated companies.  We actually reviewed financial

9  statements and things called flight profitability system,

10  which is a report that comes out of the general ledger and

11  that is part of the financial statements for ATA.  It's also

12  known as FPS, flight profitability system.

13         We reviewed tons and tons of documents that talked

14  about ATA's financial condition and results of operations, the

15  military results of operation, the aircraft configuration, the

16  types of planes that were being used, the costs associated

17  with the planes, the revenues associated with it, tons and

18  tons of documents.  And we did that internally, meaning that

19  we would compare that year to year from like 1998 to 2007 with

20  ATA, just the military itself, to see if there were any trends

21  that we could see.  Then we compared that to industry

22  companies, and we compared that to -- is it okay for me to

23  tell them what the 10 were?

24  Q   Yes.

25  A   For example, AirTran, Alaska Air, Express Jet, Frontier,

1  Jet Blue, Hawaiian, Midwest, Pinnacle, Republic and World.

2       Now, the reason I did that, only World was the one

3  that was primarily a military flier in the AMC contract; but

4  the reason I did this from a big picture is to see if there

5  were any trends that are systematic within the business.  And

6  when I mean "systematic," all these companies had something --

7  they were similar in that they flew planes.  They had to put

8  people and passengers in the planes, and they had to get to

9  destinations.  Some of them were long destinations, so they

10 needed an infrastructure to unload and repair and get the

11 planes there.  So there were some similar systematic risks

12 that you can look at trends and see if something was going on.

13      Then we backed off a little bit, and said, okay, after

14 this big picture trend -- and we did that roughly from 2003, I

15 think, through 2007 -- yes, then we backed off and we looked

16 just at fliers that were involved in the military operation,

17 Omni and World.  Now, Omni and World do other things in the

18 charter business, as well, but they do roughly 90 to

19 95 percent of their work is in the military flying business.

20      So then we looked and compared Omni and World to ATA's

21 military charter business to see if there's anything that came

22 out of this big picture analysis that needed further analysis

23 and also help me understand the relationship of cost and

24 revenues and how things were happening.

25 Q   All right.  Thank you.

1          Sir, in the course of your valuation and investigation

2   of records, did you come upon records called the COINS

3   Reports?

4   A   Yes, we did.  We came upon records called COINS Report,

5   and "COINS" is an acronym for Commercial Operation Integrated

6   Systems.  And it's an AMC report.

7   Q   Let me show you --

8              MR. KURTH:  May I approach, Your Honor?

9              THE COURT:  You may?

10  BY MR. KURTH:

11  Q   Let me show you what's been marked for identification as

12  Plaintiff's Exhibit 60.  Is this one form of a COINS Report?

13  A   It is.  It's one form of a COINS Report.  This is the

14  monthly October -- well, it's several months in fiscal year

15  2005, starting with October 2004.

16  Q   Okay.  Are those kind of reports -- do they repeat

17  themselves from year to year for the military charter

18  business?

19  A   They do.

20  Q   I'll show you what's marked for identification as

21  Exhibits 162 -- 161, 162, 163, and 164.  Are those

22  subsequent-year iterations of 160, COINS Reports?

23  A   They are.  These are various fiscal years of COINS

24  Reports.  It looks like 2008, 2005, 2007, 2006, 2008.

25             MR. KURTH:  We would offer Plaintiff's Exhibit 160

Vol. 6 -  930

1   through 164?

2           MR. BLUMBERG:  No objection.

3           THE COURT:  160, 161, 162, 163, and 164 admitted.

4     *(Plaintiff's Exhibits 160 through 164 were received in*

5   *evidence.)*

6           THE WITNESS:  Mr. Kurth, can I back up for one

7   second?  I forgot to tell the jury some of the things that we

8   looked at.

9   BY MR. KURTH:

10  Q   Oh, yes, please.  I was going to ask you a question about

11  that.

12          I would like you to share with the jury as much as you

13  can the breadth of things you looked at for purposes of doing

14  your analysis.

15  A   I forgot to tell you that some of the statistics that we

16  looked at that are aviation-oriented terms are passengers in

17  plane.  And passengers in plane is just the number of

18  passengers that are on the aircraft.  It's the statistic that

19  is used to develop other statistics.

20          We looked at departures.  And departures are the --

21  you know, from one destination to another.  And that also is

22  used to determine other statistics.  Could you compare them to

23  other companies, other companies' departures, other companies'

24  passengers in plane?

25          If we look at block hours, if you think of an

1    aircraft, remember, behind the tires there's blocks that hold

2    it in place.  Block hours is removal of the blocks from behind

3    the tires of the aircraft plane to putting the blocks back at

4    a destination.

5         Then we looked at revenue passenger miles.  Revenue

6    passenger miles tells you how many paying passengers there

7    were on -- in flying these planes.  Those are seats occupied

8    by a paying passenger times the number of miles.

9         We looked at the average stage length.  The average

10   stage length is part of a measurement of what is a typical

11   route that an airline flies, what are the miles, in other

12   words, for the average stage length.

13        We looked at the average seats available per mile, in

14   other words, available seat per mile.  In other words, the

15   there may be empty seats in a plane, and that's like something

16   that's available for sale that didn't get sold, and that's

17   another statistic.

18        A load factor tells you how many seats were actually

19   sold, so it's the revenue passenger per mile divided by the

20   available seat miles.  It's another statistic that is useful

21   in comparing to others.

22        And then some of the revenue statistics that we looked

23   at were just the operating revenue, which is self-explanatory.

24        We looked at the revenue per available seat mile.  In

25   other words, for all those seats that are available, you

1  divide it by the revenue; and you compare these to other

2  companies.

3       And then the yield.  The yield tells you what your

4  operating revenue is in cents by the miles, revenue per miles.

5       And then we looked at cost per available seat mile,

6  which is called CASM.  Revenue per available seat mile, by the

7  way, is called RASM.  And if you take the difference between

8  the RASM and the CASM, that gives you the net contribution.  I

9  know.  It's the net contribution, and it's pennies.  It's

10  pennies.  In other words, if you look at the revenue per

11  available seat mile and the cost per available seat mile, the

12  difference between that is half a penny, 7 cents.  And if you

13  can make 7 cents a seat like when you're sitting in an

14  airplane and you look at the seats, if you think of if they

15  made 7 cents on that seat and they did it all through the

16  plane, they might make some money.  That's just how close this

17  is in terms of an airline industry.

18  Q    Does the airline industry, like the military, have a

19  certain obsession of acronyms?

20  A    I'm sorry?

21  Q    Does the airline industry, like the military, have a

22  certain obsession with acronyms?

23  A    Yes, yes.

24  Q    Like RASMs, CASMs and COINS?

25  A    Yes.

1   Q   During the course of your work and doing your analysis,

2   did you analyze the cities and countries to which ATA flew as

3   a military charter passenger carrier for fiscal years 2004 to

4   2008?

5   A   Yes, we did.

6   Q   And did yourself or someone under your direction or

7   supervision prepare a summary of the data in terms of the

8   flights and cities and countries to which ATA flew during that

9   period of time?

10  A   We did.  My colleagues that I supervised and review, one

11  or two of them assisted in preparing this.

12  Q   Okay.  And would you have used the COINS Reports to do so?

13  A   Yes.

14          MR. KURTH:  May I approach, Your Honor?

15          THE COURT:  You may.

16  BY MR. KURTH:

17  Q   I show you what's been marked for identification

18  Exhibit 260.  Would you identify 260?

19  A   Exhibit 260 is ATA's military charter global reach that

20  shows through the whole world where the ATA military flew.

21  Q   Okay.  Where it flew military charter flights?

22  A   Yes.

23  Q   Okay.  Did it also calculate the number of flights,

24  countries, and destinations?

25  A   It does.

1   Q    Okay.  Is this a document -- this was a document prepared

2   by yourself or someone under your direction or supervision?

3   A    Correct.

4   Q    Okay.  And it was prepared from the COINS Reports?

5   A    Yes.

6   Q    Did you believe the information contained on Exhibit 260

7   to be accurate?

8   A    I do, yes.

9            MR. KURTH:  We would offer Exhibit 260.

10           MR. BLUMBERG:  No objection.

11           THE COURT:  260 admitted.

12       *(Plaintiff's Exhibit 260 was received in evidence.)*

13           MR. KURTH:  Show it to the jury for a moment.

14   BY MR. KURTH:

15   Q    Are the red dots the locales to which ATA flew during

16   those years, fiscal years '04 through '08?

17   A    They are.  And I need to point out that ATA only had half

18   of a year in 2008, not a full year.  And this shows ATA flew

19   1,865 flights to 210 cities in 56 countries.

20   Q    Thank you.

21           Now, you've been sitting here throughout this trial,

22   correct?

23   A    I have.  Well, since Wednesday.

24   Q    Prior to that time in the course of your investigation,

25   you became familiar with the, I'll call them trilogy of annual

1  agreements entered into by the FedEx team members with the

2  military, which also includes their Fee Agreements between

3  themselves?

4  A   Yes.

5  Q   Those trilogy of annual agreements repeated themselves on

6  an annual basis, '04, '05, '06, et cetera?

7  A   Right.  There would be an arrangement, an operating

8  agreement, and a teaming agreement.

9  Q   Okay.  Are you aware of any multiyear agreements involving

10  members of the FedEx team?

11  A   Yes, I am.

12  Q   And would you tell me what you became aware of in terms of

13  multiyear agreements.

14  A   Well, I saw that ATA and FedEx had a fiscal 2004/2006

15  three-year agreement.  And I saw that the ATA and FedEx had a

16  three-year agreement for fiscal '07 through fiscal '09, as

17  well.

18  Q   I'll show you on the board Exhibit 13.  Do you recognize

19  Exhibit 13?

20  A   I do.

21  Q   What is it?

22  A   It is the fiscal '07-'09 three-year agreement between ATA

23  and FedEx.

24  Q   During the course of your investigations, did you become

25  aware of an agreement with similar terms and duration between

Vol. 6 -   936

1   FedEx on the one hand and Omni on the other hand?

2          MR. BLUMBERG:  Objection, Your Honor.  Outside the

3   scope of the expert report and not related to the damages'

4   report.

5          THE COURT:  Rephrase your question if you want to

6   get that in.

7   BY MR. KURTH:

8   Q    In the course of doing your analysis, did you become aware

9   of an agreement between Omni Air International where there's a

10  blank signature page and FedEx on the same subject matter as

11  Exhibit 9?

12         MR. BLUMBERG:  Same objection.

13         THE COURT:  Overruled.

14         THE WITNESS:  I did, yep.  And as I discussed in my

15  report, I saw that there is an August of 2005 agreement as

16  well.

17         MR. KURTH:  Mr. Brockwell, would you put up

18  Exhibit 13 side by side, Exhibit 9 and Exhibit 13.

19         MR. BLUMBERG:  Sorry.  Objection.  May we approach

20  briefly?

21         THE COURT:  You may.

22     (Beginning of bench conference.)

23         MR. BLUMBERG:  Your Honor, this is the damages

24  expert.  We have established he assumed that ATA would be on

25  the FedEx team for FY09.  This is not a liability witness.  I

1  know exactly where this is going.  I have the two letters.  I

2  consider them one agreement.  This is a damages expert.  We're

3  here to say what the lost profits would have been.  He can say

4  what his assumptions were without going through this exercise,

5  and now, essentially turning into -- making argument as to --

6          THE COURT:  He's not saying this is a contract, is

7  he?  I mean, he can't do that.

8          MR. KURTH:  No.  He made an assumption.

9          THE COURT:  The only reason I let him go with this

10  is that your question was as part of your analysis, did you

11  come across the document?

12          MR. KURTH:  He makes an assumption it's an

13  agreement.  I'm not going to ask him anything like that.  He

14  wouldn't be competent to testify about that.

15          MR. BLUMBERG:  There's no reason to put it up at

16  all.  We are assuming he's taking a stand as a damages expert.

17  The assumption is, there's a contract; otherwise there's no

18  reason for him to testify.  We can start with that

19  presumption.  There's no reason to say why he had it or didn't

20  have it.  It's solely designed to, once again, "Oh, this one

21  has a signature.  This one doesn't," which is the proper area

22  of fact witness?  This is not an expert on damages.

23          THE COURT:  The jury already has this in front of

24  them.

25          MR. BLUMBERG:  That's exactly why it's time to get

MORRISS - DIRECT/KURTH

Vol. 6 -   938

1  to damages -- how much was this going to cost -- and not go

2  through these letters again?

3          MR. KURTH:  Going to show that this is the basis of

4  his assumption and --

5          THE COURT:  And that's it.

6          MR. KURTH:  That's it.

7          THE COURT:  Okay.

8      (End of bench conference.)

9          MR. KURTH:  Put those up side by side, please.

10  BY MR. KURTH:

11  Q   Mr. Morriss, looking at Exhibit 9 and 13 side by side,

12  these are the two documents which you assumed were the

13  agreements between FedEx, Omni, and ATA with respect to the

14  fiscal year '07 to '09 period?

15  A   Yes.

16  Q   For the 50 percent distribution between Omni and ATA of

17  the entitlement charter business?

18  A   Correct.

19  Q   In the course of doing your analysis, sir, did you

20  evaluate the ATA shareholder and affiliate funding and

21  structure?

22  A   I did.

23  Q   Would you share with the jury what your conclusion was

24  from that analysis?

25  A   Well, I discovered that ATA's shareholders or affiliate

1   companies invested over $260 million in ATA through

2   December 31st of 2007, and through January of 2008, they

3   invested another $20 million.  So roughly 200 --

4   Q   86?

5   A   Right.  Roughly 280 -- more than $280 million.

6   Q   I want to show you what's been marked for identification

7   as Plaintiff's Exhibit 188.

8           MR. KURTH:  May I approach, Your Honor?

9           THE COURT:  You may.

10  BY MR. KURTH:

11  Q   Do you recognize that as Plaintiff's Exhibit 188?

12  A   Yes, I do.  This is my work paper for the shareholder and

13  affiliates' investment in ATA.

14  Q   Without telling us the specific contents of the document,

15  was this prepared from a voluminous collection of records by

16  you?

17  A   Yes.

18  Q   What was the source of information?

19  A   ATA financial records and intercompany accounts within ATA

20  and conversations with ATA people.

21  Q   Does this document accurately summarize ATA's

22  capitalization at December 31, 2007?

23  A   It does.

24          MR. KURTH:  We offer Exhibit 188.

25          MR. BLUMBERG:  Objection to it being received as an

1   exhibit, but we don't object to it as a demonstrative.

2          THE COURT:   188 admitted as demonstrative as a

3   summary of voluminous documents.

4          MR. KURTH:   If we could put it up on the board, and

5   if we could magnify the top half of that where the numbers

6   are, Michael?

7   BY MR. KURTH:

8   Q   Now, looking at line item 6, Mr. Morriss, is that a

9   calculation of the previous line items, 1 through 5?

10  A   It is a sum, yes.

11  Q   Okay.  And what is the -- when it says -- looks like

12  263,756.  You said 263 million?

13  A   This is in millions.

14  Q   Okay.  So I should read it as 263 million?

15  A   Yes.

16  Q   But, actually, it's until thousands?

17  A   Right.

18  Q   Okay.  So the total capitalization of ATA as of 12-31-07

19  when you add in the contributions or affiliate payables

20  includes almost $264 million?

21  A   Yes, that's correct.

22  Q   And an additional $20 million was added to that sum in the

23  following month or two?

24  A   I don't think -- maybe I didn't understand your question.

25  Could you do that one more time for me?

1  Q   I'm not sure what --

2  A   The total is 266 million, and there's 20 million more that

3  came in in January.  So it would be 286 million.

4  Q   I stand corrected.  Thank you.  You read financial

5  statements better than I do.

6       Mr. Morris, what did you conclude from your

7  investigation with respect to the financial support, if any,

8  which ATA could expect had its fiscal 2007-to-2009 agreement

9  with FedEx not been terminated?

10 A   Well, my investigation showed that the parent and

11 affiliated companies had been funding ATA in excess of

12 $280 million at least through January of 2008; and my

13 investigation also told me through conversations with

14 Mr. Karnik and Mr. Yakola, perhaps others, they said that the

15 affiliated companies was committed to making sure that the ATA

16 military operation had the funds that it needed as long as it

17 had the fiscal '07 and '09 contract in place.

18 Q   This $266 million figure plus another 20 million,

19 thereabouts, in 2008, would that be fairly described as money

20 at risk if ATA shut down?

21 A   That's exactly what it is.  It's cash that they would --

22 that ATA parent company would stand to lose.

23 Q   Tell me, sir, from your historical financial analysis with

24 respect to ATA's military charter business, was it for the

25 most part a consistently profitable and cash flowing business?

1  A    It was.  It just had one year where -- in 2002 where it

2  had a slight loss.  2007, it had roughly a $2 million profit,

3  but in 2007 there were cost anomalies involved in that amount.

4  If you remember, they were switching over from L1011s to DC10s

5  during that particular period of time, so there are one-time,

6  nonrecurring costs that were associated with the 2007

7  profitability.

8  Q   Let's take a moment, sir, and make sure that we're all on

9  the same page.

10       When you have on the financial statement "year end

11  12/31/2007 capitalization," would you explain to the jury what

12  that means?

13  A   Capitalization?

14  Q   Yes, sir.  What goes into that?

15  A   Capitalization is just a term of art.  Capital, you know,

16  cash that the parent puts in to fund the actual company.  It's

17  their investment to fund the company, and it's just another --

18  capital or capitalization is just another form of saying

19  investment or cash.

20  Q   You're talking about the --

21            THE COURT:  Kind of like having a child in college?

22            THE WITNESS:  Three.

23  BY MR. KURTH:

24  Q   You don't really talk to your children about college

25  expenses as capital, I hope?

1  A   No, I just wait until they're off the capitalization.

2          THE COURT:  When does that -- do you have a vision

3  of that?

4          THE WITNESS:  I have a 22-year-old daughter that

5  graduated last summer that's still on capitalization.

6          THE COURT:  I understand.

7          Sorry for the interruption.

8          MR. KURTH:  No.  I appreciate the levity.

9  BY MR. KURTH:

10  Q   Mr. Morriss, giving a summary, this has been touched upon

11  from time to time during this trial.  From your analysis and

12  investigation, how is a military passenger charter carrier

13  such as ATA compensated by AMC for its services?  What is

14  baked into the compensation formula?

15  A   I understand what you're saying.  The formulization that

16  AMC uses is they ask all the operators to submit their cost to

17  fly various types of aircraft, like, you know, a 757-300 or a

18  DC10 or the different types of costs that are associated with

19  flying that aircraft.  So all of the participants -- not just

20  ATA but all of the participants in the AMC program submit

21  their costs, and it's analyzed over a two-year rolling basis,

22  so all the costs are accumulated together.  And AMC comes up

23  with a rate, and that rate is a cost from all that

24  information, plus then they add profit to it, like 11 percent.

25  So it doesn't mean that ATA only makes 11 percent, because if

1  ATA's costs are lower than all of the group's average costs

2  together, you can make a lot more than 11 percent.  You can

3  make, you know, 20, 25 percent, et cetera.  And ATA had in

4  previous years made up to more than 20 percent on a fully

5  absorbed basis.  And "fully absorbed" means all fixed costs,

6  all variable costs taken out of the equation.

7          But that's the compensation structure; it's all the

8  carrier costs together.  AMC comes up with the structure, adds

9  a profit to that, in which they pay on a per-flight, per-seat

10 basis.

11 Q   Was this a financially attractive arrangement for a

12 passenger charter carrier such as ATA?

13 A   Oh, yes.

14          MR. BLUMBERG:  Objection.  We've had fact witnesses

15 testify to that.

16          THE COURT:  Overruled.

17 BY MR. KURTH:

18 Q   Your answer, sir?

19 A   I think the question, was it profitable?

20 Q   Financially attractive.

21 A   It's very attractive because what I just explained is, you

22 know, you get all the cost of everybody else in there.  And so

23 if you can manage your cost to be lower than the group average

24 costs, it can be really attractive.

25 Q   Did AMC reimburse a charter carrier such as ATA for its

1  capital expenditures such as the costs for acquiring a new

2  fleet of aircraft?

3  A   No, they don't do that.  That's a balance sheet item, and

4  it's not a cost that's included in the calculation.

5          Lease costs sometimes are part of their ownership

6  costs, and I think that sometimes they allow for that

7  particular year, the rolling two-year period, some of the

8  lease costs to be baked into their cost structure.

9  Q   Did your historical financial analysis show a decrease in

10  ATA's military charter service profitability from 2006 to

11  2007?

12  A   Yes.  There was a decrease.  I think in 2006 the net

13  income -- the net income of ATA from charter -- military

14  charter was like 34 million, and in 2007 it was like

15  2.1 million.

16  Q   Why was there a decrease in profitability in 2007?

17  A   Two reasons.  If you remember, the first three-year

18  agreement -- the first three-year agreement that I discussed

19  about ATA and FedEx, they had a flight mix of 62 percent for

20  fiscal year 2004 through 2006.  Well, the second agreement --

21  three-year agreement that I was talking about, the fiscal

22  2007-2009, that went from 62 percent to 50 percent of the

23  flying mix.  So that's one of the reasons.

24          The second reason is that in December of 2006, ATA had

25  acquired DC10s, and they incurred substantial nonrecurring,

NORRISS  DIRECT/KURTH

Vol. 6 -  946

1   one-time costs to transfer over from L1011 flying to DC10

2   flying, such as training of the crew, the pilots, such as

3   training of the flight attendants, the maintenance people, the

4   ground crew, all the kind of infrastructure things that you

5   need to keep a DC10 safe in the air and get it to the

6   destinations that it needed.  And those were all incurred in

7   the 2007 time period, and it's not reflective of what would

8   happen in the future after they were operational, the DC10s.

9        Can I just add one more thing about that, Mr. Kurth?

10  Q   Please.

11  A   One of the issues that we had with this was that the

12  system operates into where they allocate costs based on

13  aircraft in service, and they allocate it through the whole

14  fleet of military fleet.  Well, the problem with this was that

15  the DC10s, they weren't activated during this time period

16  because they were still training and all those kind of things.

17  So the first one didn't get activated until roughly June of

18  '07, and then, I think, they had one in August and one in

19  October and then one in December of '07.

20       So ultimately by December 31 of '07, they had four

21  DC10 activated; but before they're activated, all the costs

22  that they're incurring, you can't track them because they're

23  allocated throughout the entire system of other aircrafts.  So

24  it's hard to pinpoint from a document standpoint what those

25  one-time costs were based upon the allocation, because, again,

1    it's only based on aircraft that are activated.  I don't know

2    if that made sense, but it was one of the struggles that we

3    had in this analysis.

4    Q   Mr. Morriss, during the course of this investigation, did

5    you determine how many total aircraft and airframes ATA had as

6    of December 31, 2007?  And in that regard, let me show you

7    what's been marked for identification Exhibit 247.

8           Did you determine the number of aircraft and airframes

9    ATA had as of December 31, 2007?

10   A   Yes.

11   Q   And you have in front of you Exhibit 247.  Would you tell

12   the jury, without telling us contents, what the subject matter

13   of Exhibit 247 is?

14   A   The subject matter is the total aircraft that were

15   available system-wide and the total that was available as of

16   December 31 of '07 and December 31, '06, for the charter

17   services.

18   Q   Was this document prepared by yourself or someone under

19   your direction and supervision?

20   A   It was.

21   Q   What was the source data for this Exhibit 247?

22   A   Voluminous data of the aircraft, and some of it is right

23   here in these boxes.  These are my work papers that support my

24   report.

25   Q   These are your work papers?

1  A    They are, yes.

2  Q    Okay.  And do you believe the entries and the information

3  contained in Exhibit 247 to be accurate?

4  A    Yes.

5  Q    From Exhibit 247, can you ascertain the total number of

6  aircraft in ATA's fleet, its entire fleet, civilian, military,

7  as of December 31, 2007?

8  A    Yes.

9  Q    What's the number?

10  A    36.

11  Q    And that breaks down into a number of aircraft?

12  A    It does.

13          MR. KURTH:  Okay.  We offer Exhibit 247.

14          MR. BLUMBERG:  Objection.  The document's hearsay.

15          MR. KURTH:  The document is based upon records of my

16  client.

17          MR. BLUMBERG:  Right, that haven't been certified as

18  business records.  They're still hearsay.

19          MR. KURTH:  I don't believe that's necessary, Your

20  Honor, for an expert to --

21          THE COURT:  Approach the bench.

22      (Beginning of bench conference.)

23          THE COURT:  My understanding is this document

24  summarizes voluminous documents; is that right?

25          MR. BLUMBERG:  Right.  As I said with 188, and I

1  think I wanted to be clear to this point, as a demonstrative

2  to be shown to the jury on the ELMO, we're not going to

3  object; it's going to aid in the testimony.  But it can't be

4  received as an exhibit back to the jury for deliberations

5  because it's hearsay.  So that's the distinction we're making,

6  and also on 188 I wanted to clarify that, as well.

7       THE COURT:  So you have no objection to 188 as a

8  demonstrative?

9       MR. BLUMBERG:  That's right.  In other words, it can

10  be put on the Elmo but not received.

11       MR. KURTH:  I guess I would have to ask that it be

12  treated as an exhibit under 106.  Experts can rely on hearsay.

13  It is a distillation of a voluminous volume of documents, and

14  it's testified to as accurate.  I think that qualified it

15  under 106 as an exhibit.  I wanted to make that statement, for

16  whatever it's worth.

17       THE COURT:  Right.  You're correct, Mr. Kurth, that

18  it absolutely does do that, but he's got -- Mr. Blumberg's got

19  a hearsay objection here, which presents a problem.  So let's

20  go ahead and just do it demonstratively.

21       MR. KURTH:  Thank you.

22     (End of bench conference.)

23       THE COURT:  Certainly, the underlyings are evidence.

24       MR. KURTH:  Thank you, Your Honor.

25       Could we put Exhibit 247 up?

1    THE COURT:  188 is demonstrative --

2    MR. KURTH:  Exhibit 247.

3    THE COURT:  Or excuse me, 247.

4    MR. KURTH:  Yes, 247.

5    *(Plaintiff's Demonstrative Exhibit 247 was received in*

6    *evidence.)*

7  BY MR. KURTH:

8  Q   This is the document prepared by your company from ATA's

9  records that reflect the total aircraft and airframes, I

10 guess, should we say in inventory as of December 31, 2007?

11 A   That's right, available.

12    MR. KURTH:  Okay.  May I approach?

13    THE COURT:  You may.

14 BY MR. KURTH:

15 Q   I show you what's been marked for identification as

16 Exhibit 184.  Do you recognize Exhibit 184?

17 A   I do.

18 Q   What is Exhibit 184?

19 A   Exhibit 184 is a compilation of the DC10s that were

20 available as of December 31st, 2007 -- that's not accurate.

21    It's the number of DC10s that ATA had at December 31st

22 of 2007.

23 Q   All right.  And is this document prepared by yourself or

24 someone under your direction and supervision?

25 A   Yes.

1   Q   And is the information contained in this document

2   accurate?

3   A   Yes, it is.

4   Q   And is this document prepared from records of ATA?

5   A   Yes.

6           MR. KURTH:  We offer Exhibit 184, Your Honor.

7           MR. BLUMBERG:  Again, object on the basis of hearsay

8   as being received as an exhibit, but we have no problem with

9   it going up to assist the jury as a demonstrative.

10          THE COURT:  Show it admitted as a demonstrative.

11      *(Plaintiff's Demonstrative Exhibit 184 was received in*

12  *evidence.)*

13          MR. KURTH:  Could we put Exhibit 184 up.

14  BY MR. KURTH:

15  Q   All right, Mr. Morriss, this document has a lot of

16  information on it.  Let's just distill it quickly.

17          MR. KURTH:  On the right-hand side of this paper, if

18  you can magnify that, Mike.  I don't know if you can.

19  BY MR. KURTH:

20  Q   This is called produced lease information.  Does this

21  right-hand column reflect the lease information for the 7 DC10

22  aircraft and two airframes?

23  A   It does.  It's from the actual lease -- it's from the

24  actual lease agreements for each of the DC10s.

25  Q   All right.  And it indicates -- at least a column, the

Vol. 6 -  952

1  inception date for these leases.  They started January 25,

2  2007, and then moved forward in time in terms of the inception

3  date of the leases?

4  A   That's correct.  Each lease had -- or each aircraft had

5  different lease dates within January, February, and March of

6  2007.

7  Q   And these are all dates subsequent to the letter agreement

8  between FedEx and ATA dated September 7th, 2006?

9  A   Oh, yes.

10  Q   And the left-hand side of this document, this reflects

11  information with respect to each of these DC10s?

12  A   It does.  It reflects the identifying numbers from the FAA

13  and the serial number of each as well.

14  Q   What is the column "cycles since new?"

15  A   That's the flights they've been involved with since

16  manufacture.

17  Q   All right, thank you.

18      Mr. Morriss, let me show you what's been marked for

19  identification as Exhibit 192.

20      MR. KURTH:  May I approach?

21      THE COURT:  You may.

22  BY MR. KURTH:

23  Q   What is Exhibit 192?

24  A   Exhibit 192 is, again, ATA's fleet schedule identifying

25  information.

1    MR. KURTH:  Your Honor, we would like to show

2  Exhibit 192 as a demonstrative?

3    MR. BLUMBERG:  As a demonstrative, we have no

4  objection.

5    THE COURT:  192, demonstrative.

6  BY MR. KURTH:

7  Q   All right.  Another document with a lot of information.

8  Let's go through this quickly.

9    Left-hand column is a description of the types of

10  aircraft which ATA had in its fleet, speaking in a collective

11  sense.

12  A   That's correct.

13  Q   We have got 757-200, 757-300 aircraft, 737-800 aircraft,

14  DC1030 aircraft, additional DC1030 leases, and Lockheed L-1011

15  aircraft.  Did I read that correctly?

16  A   Yes, you did.  Those are the abbreviations for Lockheed

17  L-1011.

18  Q   The next column is the FAA tail number?

19  A   It is.

20  Q   Following column is serial numbers, manufacturer's serial

21  numbers?

22  A   Yes.

23  Q   The next column is cycles since new, these are for the

24  engines?

25  A   Yes.

Vol. 6 -  954

1  Q   The last column is the lessor for -- or debtor for each of

2  these aircraft?

3  A   That's right.

4  Q   With respect to the DC10 leases, were these DC10s

5  initially acquired by ATA and then sold to the aircraft

6  leasing company and leased back?

7  A   Yes, they were.  I think it was roughly December 19th of

8  2006, ATA purchased the nine DC10s from Northwest Airlines,

9  then as we saw on one of the previous exhibits, January,

10  February, March, ATA then sold them back to another company

11  who then entered into a lease with them for long-term --

12  five-year leases on each of them.

13  Q   Thank you.

14      You had earlier discussed with the jury your industry

15  analysis, and would you say your industry analysis was

16  exhaustive?

17  A   Yes, I would.

18  Q   And without beginning to go into all of the details of

19  your industry analysis, can you give the jury a snapshot, if

20  you will, of what your industry analyses consisted of so they

21  could have an understanding -- at least a general

22  understanding of what you did and how it was bracketed?

23  A   Sure.  Well, the 10 companies that I talked about in the

24  big picture and the two companies in the small picture that we

25  talked about, I compared those to ATA.  What I did is I looked

1   at things like net income to sales, earnings before interest

2   and taxes to sales, also known as EBIT.  I also looked at

3   earnings before interest, taxes, depreciation, and

4   amortization to sales, also known as EBITDA.  EBITDA is the

5   acronym for earnings before interest, taxes, depreciation, and

6   amortization.

7         And then I looked at another acronym called EBITDAR.

8   Now, EBITDAR is interest, taxes, depreciation, amortization,

9   and rents, and that's an important factor in the aircraft

10  business because most -- as you saw in this previous slide, a

11  significant number of the craft are leased.  So as far as a

12  earnings metric, EBITDAR is something that is looked at within

13  the industry as a measurement since it's a capital-intensive

14  business.

15        I also looked at net income as a percentage of charter

16  passenger revenues.  I looked at the EBITDA as a percentage of

17  charter passenger revenue.  I looked at net income as a

18  percentage of charter passenger revenue -- although I think I

19  might have said that one already -- EBITDA as a percentage of

20  charter passenger revenue.  And then back to the acronyms, the

21  RASM, the CASM, the contribution, the average stage length,

22  the yield.  And I did that in the macro and in the micro, as

23  well.  I looked at charter passenger revenues per departure,

24  aircraft miles per departure, charter passenger revenue per

25  mile, all comparing this to ATA, as well.

1  Q   Mr. Morriss, based on net income to sales, how did ATA's

2  military charter profitability compare to most of the industry

3  companies' profitability?

4  A   Well, it was very good.  Now, remember, in the big picture

5  analysis, a lot of those companies other than World, if they

6  flew military flying, it was a small percentage of their

7  capacity.  But for World and Omni, it was pretty much all they

8  did.  So ATA compared very favorably from a net income

9  profitability standpoint, again, because of this cost

10  structure that we talked about before, how AMC develops the

11  reimbursement, it's all the airlines' costs.  So if you can

12  manage your costs to get below the industry average, you can

13  make a fairly good return.

14  Q   Based on EBITDA -- did I say that right?

15  A   You did.

16  Q   Based on EBITDA for 2005 through 2007, how would you

17  compare ATA's military charter EBITDA to sales, compared to

18  the industry average?

19  A   It was either at or above the industry average.

20  Q   You described your analyses, I believe, with respect to

21  the industry as a macro -- I guess that means a big control

22  group?

23  A   Yes.

24  Q   And then a micro, a smaller group?

25  A   That's correct.

1  Q   And the micro group was the group involved in military

2  charter business, charter passenger flying?

3  A   That's right.  The micro group or the small picture, the

4  more focused laser picture was Omni and World, which

5  predominantly flew military passenger business.  90 to

6  95 percent of their revenues were from that.

7  Q   In 2005, how did ATA compare to, for purposes of the micro

8  industry analysis, the industry average net income?

9  A   Again, they were either at or above the average.

10 Q   Okay.  And how did ATA's military charter service compare

11 with the industry average net income as a percentage of

12 charter revenue for other years?

13 A   At or above the average.

14 Q   Let's turn to lost profits and what lost profits is and

15 how it's measured.

16 A   Sure.

17 Q   Did you analyze ATA's lost profits, if any, associated

18 with its contract with FedEx and the actions of FedEx?

19 A   I did.

20 Q   What are lost profits?

21 A   Lost profits is a damage concept.  It's a "but for"

22 concept.  The "but for" concept means that but for the alleged

23 behavior of Federal Express, what would have been the

24 incremental earnings before income tax that ATA would have

25 received from the time period of April 3rd of 2008 through

1  September 30th of 2009.  And it's an incremental earnings

2  calculation, meaning that it's just the variable costs

3  associated with the military, no fixed costs.  It's a

4  generally accepted methodology that the fixed costs would be

5  there no matter if the contract was there or not.  So it's

6  just the variable costs associated with the contract.

7  Q    Sir, this definition of lost profits that you shared with

8  the jury, is this a definition of your own creation or is it a

9  definition generally accepted by financial analysts?

10  A    No, it's the generally accepted definition that is

11  throughout the industry.  It's in lots of different reference

12  books, such as Dunn on Damages; and, I think, Roman Weil and

13  some of his colleagues have published books on damages.  Just

14  about any kind of damage book you find on lost profits, that

15  would be the definition.

16  Q    Now, does lost profits in terms of setting a number, is

17  this an EBITDA number?

18  A    Well, it's an incremental earnings.  So it's what would

19  accrue from an earnings end.  One of the measurements is

20  EBITDA, earnings before interest, taxes, depreciation, and

21  amortization, which gets you to a proxy of cash.  That's what

22  the EBITDA number is.  I think the testimony that might have

23  been -- I heard last week was the walking-around money.  It's

24  cash.  It's a proxy for cash.  And that's why depreciation and

25  amortization is added back, because depreciation and

1  amortization is not a cash expense.

2  Q   With respect to your methodology to determine lost

3  profits, if any, of ATA, did you fabricate a methodology out

4  of whole cloth, or did you use a methodology that's generally

5  recognized by financial analysts?

6  A   I used a methodology that is generally recognized by

7  financial analysts.

8  Q   You weren't inventing a new system or methodology, were

9  you, sir?

10  A   No.  It might be easier if I go to the board and explain

11  some things.

12  Q   If you could explain the components to -- that is, the

13  methodology to determining lost profits.  That was my very

14  next question.  So if you could do that in a summary form.

15          THE WITNESS:  Your Honor, may I go to the board?

16          THE COURT:  I think before that, we'll take our

17  morning break.  Please go back to the jury room.

18          Do you folks think it's hot in here, or is it just

19  me?  They shut the air conditioning off over the weekend in

20  this building, and it just takes a long time to get it back up

21  to speed.

22          I'm going to see if I can address that somehow.

23          But let's take our break at this time.  Do not

24  discuss the case among yourselves.  Thank you.

25          COURT CLERK:  All rise.

1    (Jury out.)

2    (A recess was taken.)

3  (Jury in.)

4          THE COURT:  Okay.  Mr. Kurth, continue.

5          MR. KURTH:  Thank you, Your Honor.

6  BY MR. KURTH:

7  Q   Mr. Morriss, what period did you use to calculate ATA's

8  lost profits?

9  A   Is it okay if I go to the board?

10  Q   I'm sorry, that's right.  You were going to give us the

11  methodology bullet for lost profits analysis.

12  A   Yes.

13          THE WITNESS:  Your Honor, may I go to the board?

14          THE COURT:  You may.

15          THE WITNESS:  In a lost profits calculation,

16  remember, it's a but for concept; and there are components to

17  this.  The first one --

18          THE COURT:  Excuse me, can all the jurors see the

19  board?

20          THE WITNESS:  Would you like me to move over here

21  for you, Your Honor?

22          THE COURT:  No, that's all right.

23          THE WITNESS:  The first step is the measurement.

24  That is what is the component that is going to measure the

25  lost profits.  In this case, as we talked about, it's the

1  incremental earnings before tax, before tax, before fixed

2  costs, things like that.

3          And in this case, it was the EBITDA.  Again, the

4  EBITDA is earnings before interest, taxes, depreciation, and

5  amortization.

6          THE COURT:  Why do you say incremental earnings

7  instead of just earnings?

8          THE WITNESS:  In the generally-accepted methodology,

9  Your Honor, it specifies incremental only.  In other words, if

10 you think about an income statement, an income statement has

11 revenues and expenses.  In those expenses there could be like

12 direct expenses and indirect expenses.

13         In the literature for lost profits, the direct

14 expenses are the only ones that are appropriate.  So in an

15 accountant's terminology or financial terminology, the revenue

16 less the direct expenses is called incremental.

17         THE COURT:  Give me an example of a direct and an

18 indirect expense.

19         THE WITNESS:  A direct expense would be something

20 like fuel for an airline business.  The aircraft can't fly

21 unless there's fuel in it; and if it flies, it's got to burn

22 the fuel.  However, that could also be a fixed cost -- if they

23 hedge and do a bunch of fuel purchases and they just have it

24 stored and nobody flies, that could be a fixed cost.  But

25 generally speaking if you think about in terms of something

Vol. 6 -  962

1   that might be more useful for us, if you think about your

2   mortgage, if you're in your house or not in your house, your

3   mortgage continues.  That's a fixed cost.

4          If you have a car payment, if you're in your car or

5   you're not in your car, your car payment continues.  That's

6   fixed.  But the gasoline that you put into the car, that's

7   variable.  The heat and gas that you use in your home, that's

8   variable.  The electricity may be variable because it's all

9   based upon use.

10          THE COURT:  Okay.  Thank you.

11          THE WITNESS:  So again, it's the incremental

12   earnings, and that is measured in this case by EBITDA.

13          The second issue that has to be considered is the

14   loss period.  The loss period is an important part because

15   this is what's known in the damage component aspect as an

16   impaired period, meaning that during the loss period,

17   everything about the company has been impaired.  It's been

18   damaged.  In this particular case --

19   BY MR. KURTH:

20   Q   Mr. Morriss, let me ask a question.  ATA was terminated by

21   FedEx -- being a member of the FedEx team on January 22.  Why

22   are you using April 3?

23   A   I was just going to explain that.

24   Q   Please.

25   A   The loss period, meaning that it's an impaired period of

1   time where there are damages in the company, and so things

2   about the company have been impaired.  In this particular

3   case, the assumption is that the damage period starts on

4   January 22nd of 2008, which is the date of the termination

5   notice and continues through September 30th of 2009, which

6   would have been the end date of the fiscal '07-'09 contract.

7        The reason I'm starting here at April 3rd of '08 is

8   because I'm going to give credit for the period of time that

9   ATA actually flew the DC10s.  I'm going to deduct that amount

10  of profit from my lost profits number.  And it's also just a

11  cleaner, more precise date to be able to start when they

12  actually stopped flying and terminated their services.

13       Now everything in this particular period of time is

14  impaired, and everything before this particular period of time

15  is unimpaired.  And that's an important concept that we're

16  going to talk about in a second when we get to measuring

17  things.  It's just important to understand that during this

18  particular period of time, the company is damaged.  So this is

19  called an impaired period of time.

20       Before that, it wasn't damaged, and so it's called

21  unimpaired; and again, the loss period that we're using is

22  April 3rd, 2008 through September 30th of 2009.

23       The next thing that needs to be considered is the

24  projection of revenue.  Now the projection of revenue in this

25  particular case is, again, but for the alleged behavior of

1  FedEx, what would that revenue have been for ATA, the military

2  charter revenue of ATA, for the period April 3rd, 2008 through

3  September the 30th of 2009?  And the projected revenue, there

4  are different methods to determine this.  One is called --

5  actually, it's called the benchmark method, also known as

6  yardstick.

7       In the benchmark or yardstick method, what you're

8  trying to do is you're trying to find something.  And

9  sometimes it might be in the impaired period.  You might want

10 to find something that you can benchmark to what should have

11 happened during the damage period.  Sometimes you look at

12 other companies.  Sometimes you can look at similar results of

13 other companies that have no damage to them and say this would

14 be something that might have happened with ATA.

15      Another method for the projection of the revenue is

16 called the before-and-after method.  Now, the before-and-after

17 method says -- the concept is in the unimpaired period, my

18 results were something that should have happened in the

19 impaired period.  And so it's kind of looking at it from,

20 well, historical aspect of this is a best predictor of what

21 might happen in the future; but my future that I've got here,

22 the actual results are impaired.

23      So I can look in the historical aspects and say, all

24 right, if I understand the historical results during the

25 unimpaired period, can I overlay that on to what would happen

Vol. 6 -  965

1  during the damaged period or the unimpaired period.  Because

2  remember in the unimpaired period, there's all kinds of damage

3  issues going on that have altered the company's performance.

4         The last one is called hybrid.  Now the hybrid method

5  takes parts of the benchmark or yardstick and part of the

6  before and after and says, I have something I can benchmark

7  to, and I can look at the past to project into the future as

8  well.  It's the best of both of these methodologies; and the

9  hybrid method is usually the one that is generally accepted --

10  well, they're all generally accepted.  What I meant to say is

11  the hybrid method is the one that most experts use because

12  there's not one particular method that is going to fit every

13  fact circumstance.

14  Q   Which method did you use in this case?

15  A   Well, in this case, I used the hybrid method, and we'll

16  talk about that.

17  Q   Let me ask a question.

18         You've got this concept of impaired period running

19  through September 30, 2009.  What's the significance of that

20  date for purposes of the loss period?

21  A   The September 30th of 2009 date?

22  Q   Yes.

23  A   That's the end date of the fiscal 2007-2009 contract.

24  Q   This is not the date that you assumed ATA went out of

25  business, it's just the end date of the contract?

1  A    That's correct, yes.

2  Q    Thank you.

3  A    Now, then the last method or the last step in this is cost

4  estimation.  Now again, what you don't want to do is you don't

5  want to pull any of the information from the impaired period

6  and overlay it on the cost, because that's full of impaired

7  damage issues.

8         So the issue really is what is the matching of this

9  revenue with this cost, and if you can use some kind of

10 historical basis, most cost accountants will use a regression

11 analysis to estimate the cost in this particular case.  And

12 remember one important thing about the cost.

13        In this case, only variable cost.  And this was the

14 discussion that Your Honor and I had about the incremental.

15 It's only variable costs that are considered.  In other words,

16 only costs that are associated with the military contracts and

17 no other costs should be included, no fixed the costs, no

18 costs from scheduled service, no costs from any other parts of

19 the organization, because the contract is what we're trying to

20 measure.

21        We're trying to measure what the lost profits are just

22 from that military contract, the fiscal '07 to fiscal —— '09.

23 So it's just those costs directly attributable to that.  So

24 that's the concept of the incremental earnings before income

25 tax.

1          Now some of you might be saying, well, why before

2    income tax?  Well, the reason it's before income tax is

3    because they would be double taxed.  If you awarded a damage

4    to ATA in this particular case, they would have to pay income

5    tax on it.  So if it was already reduced for income tax, they

6    would get a double hit for the income tax.

7          So all of the literature recognizes that in loss

8    profits, concept is a before-tax concept.  Those are the steps

9    from a loss-profit standpoint, and I guess we'll walk through

10   how we applied these steps as well.

11   Q   All right.  Thank you, sir.

12         How did you determine ATA's lost military revenue in

13   this case?

14   A   Well, in this particular case, I used -- there were

15   several things that I found.  In this particular case, the

16   military revenues, I looked at the historical aspect of the

17   military revenues.  I saw then for the year ended 12/31/07,

18   that the military revenue was about 287 -- $287 million.

19         There was ATA's 2008 budget; and in their budget, they

20   projected for 2008 for the full 12 months of 2008 that the

21   military revenues would be 339.3 million.  So I looked at

22   historical of about 287 million.  I see a projected of

23   339.3 million for the whole 2008, and then they analyzed this

24   in a -- I think you've heard this term before, Project

25   Thatcher.

NORRISS - DIRECT/ROTH

Vol. 6 -  968

1        The 2008 budget was incorporated into the Project

2   Thatcher.  The Project Thatcher term was to shed itself of

3   scheduled services and focus just on the military business;

4   and based on the military and charter business, they thought

5   that the military would do $339.3 million versus the 287 they

6   did the year before.

7        I also looked at what ATA did for the six months ended

8   April 3rd of 2008.  Remember, the contract periods are

9   September periods.  So October of 2007 through April 3rd of

10  2008, ATA did about 156.5 million, just for those six months

11  in military revenue.  So if you annualize that for a whole 12

12  months, that's 313 million.

13  Q   Can I stop you?

14  A   Yes.

15  Q   The six months runs from October 1, 2007.  We tend to

16  think in calendar periods, but you're speaking in terms of

17  military or government fiscal periods.

18  A   That's correct.  Again, it is the 156.5 million runs from

19  October 1 of 2007 through the time that ATA stopped flying on

20  April 3rd of 2008.

21       Again, you know, if you added six more months to that

22  on an annualized basis, that's 313 million.  So now I've got

23  287 million in 2007 actually done, 339.3 million as a

24  projection for 2008.  They actually did 156 million -- 156.5,

25  which is 313 million for the 2008.

1           So then I went back and I looked at Thatcher, and I

2    said okay, is this 339.3 million reasonable?  And I tested

3    Thatcher by comparing it to 2007, 2006.  I looked at things

4    like the aircraft fleet departure, the miles that are built

5    into this, you know, how many miles are they anticipating that

6    they would fly in 2008 for the 339 million versus what they

7    actually did in 2007?

8           And I have to say that it's hard to project what this

9    is going to be, because it's based on the type of plane -- and

10   there's very different types of planes.  It's based on the

11   number of seats.  It's based on the contract rate that's

12   appropriate.  It's based on fuel, and you have to determine

13   the number of flights.

14          So all these things are kind of hard to determine, but

15   ATA decided that, you know, they would fix this at

16   339.3 million.  And based upon the capacity issues from the

17   prior year of 2007, it looked reasonable.  It looked

18   reasonable because, you know, there was just a slight increase

19   in capacity issues, and that would account for the DC10s.  The

20   DC10s weren't up and flying in 2006.  There was only about one

21   and a half full-time DC10s in 2007.

22          Remember I said that they put one in service in June,

23   one in service in August, one in October, and one in December?

24   If you annualize that out, that's one and a half aircraft of

25   DC10 for all of 2007.  So it would make sense that in 2008,

1   they would get the rest of the DC10s employed.  So okay,

2   that's reasonable.

3        But then I looked at one more thing.  Then I looked at

4   what actually happened for the full 12-month period in 2008?

5   What did the FedEx team do?  And the FedEx team revenue, even

6   though ATA wasn't there for six months of that period and the

7   FedEx team did $601 million.  So theoretically, ATA is

8   entitled to half of that $601 million.

9        But I went back, and I looked historically at their

10  percentage breakout of flying.  It was more like 46,

11  47 percent on a revenue basis.  So what I did is I said, all

12  right, on 47 percent of 601, it's 285.6 million.  I said okay,

13  there's another data point to look at.  285.6 million based

14  upon what actually happened -- now, that was in the impaired

15  period although.  I need to make that clear.  It was in the

16  impaired period.

17       So this is kind of the benchmark part of the theory,

18  and even though ATA wasn't there for a full year, the team --

19  if ATA had its percentage of share would have been

20  285.6 million; 2007, 287 million.  So I'm looking like I've

21  got a fairly reasonable revenue number.  I know that my

22  Thatcher revenue of 339 million is reasonable based upon the

23  testing.  I also know that had ATA been in business the whole

24  12 months, it's possible it would have done 313 million for

25  2008.

1          And then there was one more test.  There was a Bain

2   Capital report that was done in 2006.  Bain Capital was a

3   group that helped ATA structure itself during its first

4   bankruptcy; and it projected that it could do in 2008 anywhere

5   from 260 million to 470 million in military revenue.  So now

6   I've got all these data points.

7          I think to myself, well, I'm not going to use the

8   highest ones, right?  I'm not going to use the 470 million.

9   I'm not going to use the 339 million.  I won't use the

10  313 million, although it's reasonable to do that.  Instead I

11  said, this is the closest to what happened in 2007, an

12  unimpaired period, right?  So I'll go ahead and select the

13  285.6 million as my revenue number.

14  Q   Your revenue number of 285.6 million, is that a revenue

15  number that you believe was reasonably probable in terms of a

16  projected revenue number but for the termination of ATA?

17  A   Yeah.  All of my tests showed that it was a very

18  reasonable and probable number based upon what happened in the

19  past and what was expected in the future.

20  Q   Did you analyze ATA's projected military charter expenses

21  contained in Project Thatcher?

22  A   I did.  Remember Project Thatcher estimated to be

23  339.3 million for the military revenue?  The problem with the

24  expenses is that ATA lumped all their expenses together in

25  that document.  What I mean by that is that they broke out

1  scheduled service, but they lumped in commercial and charter

2  altogether.  So you can't separate what the commercial versus

3  the military charter expenses were from Project Thatcher.  So

4  again, I went back to taking a look at what historically

5  happened from 1998 through 2007, and remember our discussion

6  that we had before about how revenues and costs are related to

7  each other?  So since I knew that, I knew that I had a linear

8  example that I could overlay onto this process.

9  Q    You mentioned earlier the cost estimation is part of the

10  methodology for measuring lost profits; is that correct?

11  A    Yes.

12  Q    And how did you measure ATA's military costs in this case

13  for purposes of your analysis?

14  A    Well, in this particular case, what I was able to do is I

15  was able to find from 1998 through 2007 for a 10-year period,

16  I was able to find what the military revenues were and what

17  those related costs were.  So I used a regression analysis,

18  which is a standard cost accountant's technique.

19        I already knew my variables were matched.  I knew they

20  were linear.  I knew they were the right variables.  Part of

21  understanding from, you know, a business standpoint, it has to

22  make sense, right, the variables?  You can't just use

23  regression analysis with things that don't make sense.

24        For example, I couldn't take my costs and take Peyton

25  Manning's statistics over the last 10 years and regress them

1    together.  I could, but it's meaningless.  That's called

2    economic plausibility.  There's no economic plausibility with

3    those two particular variables.  So in this particular case,

4    if you have a logic that tells you my revenues drive costs --

5    and remember, revenues is the substitute for the input for

6    costs because of all the things that we talked about before

7    that go into revenue that changed the costs.  So if you know

8    that when the revenues change, your costs are going to change,

9    you know you have economic plausibility between those two

10   verbals.  So I was table to run a regression analysis for that

11   10-year period in order to determine and estimate what my

12   costs might be for the military in the future.

13   Q   What is the benefit of regression analysis as you used it

14   in this case?

15   A   Well, the benefit is that it is statistically measured;

16   and it's statistically quantified and statistically tested as

17   a reliable method.  I use -- since I just have one variable,

18   one revenue, one cost variable, that's called simple

19   regression.  So I can use Ordinary Lease Squares, OLS is the

20   abbreviation for the methodology.

21          Ordinary Lease Squares, by definition, if you have

22   economically plausible variables is the Best Linear Unbiased

23   Estimator.  I mean, by definition, that's what it does.  The

24   acronym is called BLUE.  Sorry to use all the acronyms, but

25   that's what it's called.

Vol. 6 -  974

1  Q   Did you use regression analysis to determine ATA's

2  military costs for the lost profits period?

3  A   I did.

4  Q   Would you explain to the jury -- you explained what a

5  regression analysis does and the concept of independent versus

6  dependent variables and your choice of those variables.  Now,

7  would you tell us how you went about performing your

8  regression analysis?

9  A   Well, the first thing I did is I tried to say, do I have

10  linearity?  Remember, I knew from my exhaustive study and

11  based on my experience in the airline industry that these

12  things do go together.  So economically rational, I understood

13  that.  But there are certain assumptions built into

14  regression.  One of them is, is there linearity?

15       So the first thing one does is they plot.  They do a

16  scattergram of the points.  Now what are the points?  The

17  points would be the 10-year revenues and the 10-year costs.

18  What do they look like on a scattergram?  That way you can see

19  just the visual effect and test for linearity.

20       MR. KURTH:  May I approach, Your Honor?

21       THE COURT:  You may.

22  BY MR. KURTH:

23  Q   Let me show you two documents, one which I've just labeled

24  for reference purposes as Exhibit 255 and Exhibit 256.

25       MR. KURTH:  Your Honor, we would like to use these

Vol. 6 -  975

1   as demonstrative.

2          MR. BLUMBERG:  No objection as demonstratives.

3          MR. KURTH:  255 and 256 as a demonstrative.

4          THE COURT:  Members of the jury, we've been using

5   the term demonstrative exhibits.  Demonstrative exhibit is not

6   evidence.  What it does is it represents what evidence is.

7   Remember those earlier summaries of all those boxes?  Well,

8   you could go through all those boxes, which is the evidence,

9   and come up with the same results that were on that summary.

10          So what we do is use the summary as a demonstrative

11   exhibit to let you know what are in those voluminous

12   documents, okay?

13   BY MR. KURTH:

14   Q   I interrupted, Mr. Morriss; but you were talking about

15   plots.

16          MR. KURTH:  Let's show the other one too, the next

17   one.  Let's blow up the second one.  Is that 256?

18          THE WITNESS:  Yes.

19   BY MR. KURTH:

20   Q   So I take it the 255 is the precursor to 256?

21   A   It is.

22   Q   And 256, you've taken data points, and what have you done?

23          THE WITNESS:  Your Honor, may I approach the screen?

24          THE COURT:  Sure.

25          THE WITNESS:  Well, if we could go back to 255 for a

1  second?

2        Remember I was talking about is there a linear

3  relationship to the costs and the revenues?  Well, that's what

4  these plots show you.  These plots show you over the 10-year

5  period, the relationship, the actual historical relationship

6  of revenues and costs.  As you look at that, it looks linear,

7  right?  The reason it looks linear, as we knew before, is

8  revenues drive costs, and there's a linear relationship.

9        So that's one of the first tests of regression is,

10  is there a linear relationship between the variables in this

11  particular case.  Your first step is to see if there's that

12  linear relationship.  Yes.  Okay, I passed the test.

13        So now I know I can run the ordinary lease squares

14  regression line to be able to develop a formula that I can

15  apply to my revenue number.  Remember the 285.6 million, that

16  formula I'm going to apply to the 285.6 million.

17        The next one, the 256, shows me what that formula

18  is.  In other words, this formula shows you the line within

19  the relevant range of my observations that the -- the formula

20  is the Y equals AB times X, and we'll get to that in a second.

21  That's the regression line, and the regression line says the

22  best fit of this historical pattern is this line; and it's

23  represented by a formula called Y equals A plus B times X.

24        Y in this particular case will be the predicted

25  military costs.  X in this case will be the projected

1    revenues, the 286; and then the formula fills in A and B for

2    you, which are really the amount that when there's zero

3    revenue and the amount of variable when the revenue changes.

4    BY MR. KURTH:

5    Q    Thank you.

6         Did you use all of ATA's military charter expense in

7    your regression analysis?

8    A    Yes, I did.

9    Q    Why did you do that?  I thought there's a fixed and

10   variable.  I don't want to say difference --

11   A    Yes.

12   Q    -- but one you used.  One you were not supposed to use.

13   Why do you use both?

14         THE WITNESS:  Your Honor, can I go back to the

15   board?

16         THE COURT:  You may.

17         THE WITNESS:  If you remember in the

18   generally-accepted methodology for lost profits, it's only the

19   variable costs that are supposed to be used.

20         In my case, I didn't have a method of looking at

21   documents because generally, a company -- you have to remember

22   by the time I arrived on the scene, ATA was gone, and the

23   documents and the people to be able to pull those documents,

24   they weren't there.

25         Now, the documents I'm talking about would be

1  invoices and contracts, things that aren't part of the general

2  ledger or aren't part of the financial statements that I had

3  to use.  In order for me to determine fixed versus variable, I

4  would have had to have gone through invoices and contracts and

5  determined which part of which expense is fixed and which part

6  of which expense is variable.

7        From a big picture standpoint, based on my skills

8  and my experience and education and training, I kind of knew

9  what those percentages should be; but in a proceeding like

10 this, you have to prove it.  So I just didn't want to come to

11 you and say I think 50 percent is fixed and 50 percent is

12 variable.

13       So instead, I used all the costs in here.  So my

14 regression analysis includes all fixed costs and all variable

15 costs.  It understates my lost profits, I understand that, but

16 I couldn't really determine a reasonable methodology that I

17 could come to you and prove it based upon the documents.  And

18 I didn't want to just sit there and tell you 50 percent based

19 on my skill and knowledge.

20       So the other thing that is included in here,

21 remember in 2007 we had those one-time, nonrecurring costs,

22 for the DC10s?  They're also in here.  I don't know how to get

23 those out of there either, because remember how they were

24 allocated based upon aircraft in service?  And my DC10s aren't

25 in service; and so they're spread out through the rest of the

1   aircraft, the L-1011s, the 757s, things like that.  So that's

2   also in here too.

3            So I have fixed costs in there.  I have all costs

4   included in there, including the one-time, nonrecurring costs

5   that should have been removed.

6   BY MR. KURTH:

7   Q   You have shown the jury, and we have discussed, the

8   product of your linear regression analysis, this line that has

9   this math formula at the end of it.  Did you test your

10  regression results using generally-accepted regression tests?

11  A   I did.

12  Q   Without going into great detail, please, just give us a

13  snapshot of all these tests.

14  A   There's lots of acronyms, I'm really sorry.  Within

15  regression analysis, there are certain assumptions that have

16  to be tested.  Those are called significance tests.  There is

17  something called an R squared.  An R squared is -- it's one is

18  the standard.

19           R squared of one means it's a perfect correlation.  My

20  R squared was .956 or something like that.  So I almost had a

21  perfect correlation, and the correlation, by the way, goes

22  from zero to one.  So it's everything in between there.  So my

23  significance test is based upon economically plausible

24  variables was a .95.

25  Q   .95, is that a statistically significant number?

Vol. 6 -  980

1  A   It is.  What it means is that a change in revenue

2  accurately predicts more than 95 percent of the change in

3  cost.  That's what it means.

4  Q   It's 95 percent probable?  Can I use that language?

5  A   Yeah.  I think that's an appropriate thing to call it,

6  sure.

7  Q   I'm sorry to interrupt.  Go ahead.

8  A   Or 95 percent reasonably certain.

9  Q   Okay.

10 A   There is another thing called R.  R is another correlation

11 measurement, and it goes from zero -- actually goes from

12 negative one to one.  That's the range, negative one to one.

13       Now, negative side means that they're inversely

14 correlated, that when revenues go up, costs go down.  On the

15 positive side of the scale, it means they're positively

16 correlated, which means when revenues go up, costs go up.  My

17 R was a .97.  Again, it's almost a perfect correlation again

18 of the revenues with the expenses.

19       Sorry for using the terms again, but my R squared

20 indicated I had a statistically significant result, my R

21 indicated I had a statistically significant result, and then I

22 have other tests as well that measured it.

23       Would you like me to talk about the other tests as

24 well?

25 Q   Briefly.

1  A    Well, there are other tests known as -- there are other

2  tests known as a Durbin-Watson test.  A Durbin-Watson test for

3  10 observations in the range of 1.3 to 2.2 is an acceptable

4  score.  My score was 1.4.  So I'm in the acceptable range for

5  the Durbin-Watson.  The Durbin-Watson measures kind of how

6  well your data fits in these -- see these differences in

7  points?  It's really measuring residual differences.  I'm not

8  going to bore you with the details, but it just means it's

9  good.

10       Another test that I had was the T statistic for the

11  p-value.  My test resulted in a .000001322.  In other words,

12  there is less than one one-hundredth -- one one-hundredth

13  percent of a chance that this result is by random chance.  It

14  means it's statistically valid and probable.

15       The other is the T stat for my military revenue.  My T

16  stat for my military revenue was 12.7, and anything above two

17  means that revenue is a driver of the cost.  So if you put all

18  these things together, you've got a statistically valid

19  result.  It's -- it passes all the tests.

20       It passes all the assumptions of regression analysis;

21  and the output, that Y equals A times BX is a statistically

22  reasonable, confident, and probable number.

23  Q    So through this statistical exercise, and I don't mean to

24  trivialize it, this is how you went about doing your cost

25  estimation for purposes of your lost profits analysis?

1  A    It is.  After I went through and analyzed all of ATA's

2  costs and after I understood how they behaved with the

3  revenues and how it reacted in the industry aspect, yes.

4  Q    With respect to your regression analysis, the statistical

5  analysis and the associated tests applied to that analysis,

6  can you tell the jury whether or not this is an analytical

7  method and associated tests that are recognized in your field

8  and profession?

9  A    Oh, yeah.  Every cost accountant -- I mean, this is just a

10 standard tool for every cost accountant.  In the real world,

11 cost accountants are probably doing this right now as we

12 speak, and their job is to try to determine what my future

13 costs might be in some kind of a cost standard or prediction

14 of what's going to happen in the future.  It happens daily,

15 hundreds and hundreds of times.

16 Q    All right.  You've written on the board four steps to your

17 methodology, 1, 2, 3, and 4, last being cost estimation.  Is

18 the next step the lost profits number?

19 A    Not quite.

20         THE WITNESS:  Can I go back to the board, Your

21 Honor?

22         THE COURT:  You may.

23         THE WITNESS:  Is it okay if I erase this?

24         If you remember, my revenue was 285.6 million.

25 BY MR. KURTH:

1  Q    Is that sometimes represented by "MM"?

2  A    It is sometimes represented by "MM".

3  Q    That's a thousand thousands?

4  A    Yes.  I think that's the Roman numeral for a thousand,

5  thousand thousand.

6  Q    There you go.  I'm learning.

7  A    The costs, based upon my regression analysis, were

8  253.8 million.  Now, remember, this has all costs, which

9  includes fixed and one-time DC10 changeover costs.  It

10 shouldn't.  It should be a lower number, obviously.  But as I

11 explained before, I didn't have a reasonable methodology of

12 finding a fixed or a reasonable way of determining the DC10

13 costs that were included or embedded in the regression

14 analysis.

15       So, now, this gets me to a net profit.  My net profit

16 is roughly 32.6 million.  And this is a fully absorbed; it

17 means it's all costs; all costs are taken out of that.  And,

18 you know, again, this is understated because of the generally

19 accepted -- the generally accepted methodology for lost

20 profits.  So now we're almost close to getting to a lost

21 earnings because I now have to add back my depreciation.

22 Q    Is this our effort to get to EBITDA?

23 A    Yes, sir, absolutely.

24 Q    All right.  So we've got to net profit.  We've gone from

25 revenue, deducted costs, got net profit, and now we're adding

1  back up to get EBITDA?

2  A   Yes, we are.

3  Q   Okay.

4  A   So remember depreciation and amortization aren't cash

5  costs; they're allocation, and there's no cash involved.

6       So I was able to tell from the records that included

7  in my 285.6 million, I could look at a historical percentage

8  of what the interest was based upon historical revenues, and I

9  could look at what the historical percentage was to revenue

10  based on the past as to what depreciation and amortization

11  was.  So my depreciation in this particular case was about

12  7.8 million, and my interest in this particular case was about

13  3.6 million, which gets me to roughly 44 million of EBITDA.

14       And this 44 million, the exact number is 43 -- I

15  rounded on the board.  There's other -- but it's 43,998,941 is

16  the actual number.  So now I've arrived at my EBITDA for a

17  full 12-month period, which is my lost incremental profits

18  before tax, but it's fully loaded with fixed costs and the

19  one-time DC10 cost.

20  Q   This is a 12-month number?

21  A   Yes, it is.

22  Q   What is the impaired period for the purposes of your

23  profit loss analysis?

24  A   It's 18 months.

25       THE COURT:  Your net profit, that's revenue minus

1   cost, right?

2           THE WITNESS:  All costs, yes.

3           THE COURT:  All costs.

4           THE WITNESS:  Yes.

5           THE COURT:  So subtract costs from those two figures

6   there and you come up with --

7           THE WITNESS:  32.6.

8           THE COURT:  Is your math right there?

9           THE WITNESS:  Well, I've rounded.

10          285.6 minus 253.8.  It's 31.8, but it's a rounding

11  issue.

12          THE COURT:  It's a rounding issue?

13          THE WITNESS:  If I did all of it, that's what it

14  would come up to be.

15          THE COURT:  Okay.

16          THE WITNESS:  Right, because the actual revenue is

17  286,478,392.  And the actual costs are 253,843,094, which gets

18  me an annual profit of 32,635,298.

19          MR. KURTH:  May I approach, Your Honor?

20          THE COURT:  You may.

21  BY MR. KURTH:

22  Q   Sir, I want to show you two documents, the first being

23  what I've labeled as Exhibit 248.  Would you tell the jury

24  what Exhibit 248 is without telling them the contents, that

25  is, the specific contents.

1  A   Exhibit 248 extrapolates the 44 million into the 18-month

2  period.

3  Q   All right.  So you took a 12-month period that you got

4  through that calculation on the board, and then you went

5  through some calculations and converted that number into an

6  18-month number?

7  A   Yes.

8  Q   Okay.  And this is a calculation that was done by you?

9  A   Yes.

10         MR. KURTH:  Your Honor, we would offer Exhibit 248.

11         MR. BLUMBERG:  Objection to the document as hearsay.

12         MR. KURTH:  I believe we have the author sitting on

13  the witness stand.

14         MR. BLUMBERG:  I still object; it's hearsay.

15         THE COURT:  Overruled.

16     *(Plaintiff's Exhibit 248 was received in evidence.)*

17         MR. KURTH:  Let's put Exhibit 248 up on the board.

18  BY MR. KURTH:

19  Q   We've got the cap, military lost profits.  Let me ask this

20  question:  We're not talking about ATA lost profits for the

21  entire business?

22  A   No, just ATA's military lost profits.

23  Q   We're not talking about scheduled service?

24  A   No.  Remember, the generally accepted methodology is just

25  the contract.  There was no contract for scheduled service.

1           MR. KURTH:  All right.  Let's look at the numbers.

2           Mike, box the numbers.

3           Can everybody see that?  There's a box there in

4    front of you.

5    BY MR. KURTH:

6    Q   So let me understand this.  We're taking a 12-month

7    number, dividing it -- which is 43,998,941 divided by 12 to

8    give you a monthly number, multiplied times 18?

9    A   Yes.

10   Q   Even I can do that.

11          So we end up with a number of $65,998,411?

12   A   Yes.

13   Q   Now, take another look at Exhibit 249.  That 18-month

14   period, did you break that number into the period for the

15   fiscal year 2008 and fiscal year 2009?

16   A   Yes, I did.

17   Q   And did you do that calculation?

18   A   I did.

19   Q   All right.  And does Exhibit 249 reflect your calculation

20   of breaking that 65 million-dollar number, 66 million-dollar

21   number into two periods?

22   A   Yes.

23           MR. KURTH:  We offer 249.

24           MR. BLUMBERG:  Same objection, hearsay.

25           THE COURT:  Overruled.  249 admitted.

1      (Plaintiff's Exhibit 249 was received in evidence.)

2   BY MR. KURTH:

3   Q   At the risk of belaboring the point with the jury, we've

4   taken your previous chart and broken it into actual time

5   periods, two time periods, correct?

6   A   Yes.

7   Q   This reports the calculation from the previous exhibit

8   where you had broken it down into monthly components and run

9   those monthly components first through fiscal year '08,

10  correct?

11  A   That's correct.

12  Q   Producing a number of $21,999,470, correct?

13  A   That's correct.  That's a six-month period.

14  Q   Now we take that monthly period and multiply it through

15  the fiscal year '09 beginning October 1, 2008, and math tells

16  us 12X times the number you have for the monthly number is

17  $43,998,941?

18  A   Right, and it's the calculation for a 12-month period that

19  we went to on the board.

20  Q   Adding that all up together, we're getting up to real

21  money now, $65,998,411?

22  A   Yes.

23  Q   Just to make sure we've packaged all this together as best

24  we can, this is your opinion based to a reasonable degree of

25  certainty of ATA's military lost profits for that period of

Vol. 6 - 989

1   time?

2   A   Yes, but I have to emphasize to you that it's understated.

3   Q   Okay.  You've explained why it's understated?

4   A   Right.

5             MR. KURTH:  Your Honor, may I approach?

6             THE COURT:  You may.

7       (Beginning of bench conference.)

8             MR. KURTH:  I had estimated a half hour; but,

9   obviously, it took a little more time than that.  Your Honor,

10  I have DC10 costs that I wanted to either urge the Court to

11  let me ask Mr. Morriss in front of the jury or, alternatively,

12  make an offer of proof.  So how would the Court like me to

13  proceed?  You've heard our arguments on why we think the DC10

14  costs are costs that are different from and part of the

15  consequences of this breach.  Alternatively, we think they are

16  at least reliance costs, that while we have the jury in the

17  box, they should answer and we can sort it out afterwards as

18  to whether they're includable, excludable.  If the jury

19  doesn't smile on me and doesn't give me lost profits, I would

20  like to take a shot at my DC10 costs as part of my

21  consequential damages or my reliance damages.  So I'm

22  compelled to want to ask to do that with the jury in the box

23  rather than use it as something to argue to the Seventh

24  Circuit about.  That's my thinking.  I'll leave it to you,

25  counsel.

Vol. 6 - 990

1          MR. BLUMBERG:  It has to be as an offer of proof.

2   The whole case has been tried with the Court's motion in

3   limine in place.  The law hasn't changed.  We've had all the

4   witnesses here and didn't put on the kind of evidence that

5   would show reliance and particularly for consequential

6   damages, which requires that at the time of the contract it

7   was perceived by FedEx.  So it would be unfairly prejudicial.

8          THE COURT:  You pick either one or the other, lost

9   profits or reliance.  You've gone with the lost profits, so

10  you can make an offer of proof.

11         MR. KURTH:  Thank you, Your Honor.

12         Your Honor, I think I'm finished.  Let me take a

13  moment and look at my notes.  Shall we will excuse the jury

14  and do that now?

15         THE COURT:  Sure, I think that will be fine.  That

16  will be fine.  Then we'll break for lunch.

17     (End of bench conference.)

18         MR. KURTH:  Just a moment, Your Honor.

19         Your Honor, with the exception of the matters we

20  discussed off the record, that concludes my examination -- my

21  direct examination of Mr. Morriss.

22         THE COURT:  All right.  Thank you.

23         Members of the jury, it's right before noon.  I've

24  got a couple things to do with the lawyers before we all get

25  to go to lunch, but you can go to lunch now.  So we'll take

MORRISS - DIRECT/KURTH

Vol. 6 -   991

1  our lunch break at this time.

2          If you'd come back at one o'clock, we'll be ready

3  with cross-examination of Mr. Morriss by Mr. Blumberg.

4          Have a nice lunch.  Please do not discuss the case

5  among yourselves.

6          COURT CLERK:  All rise.

7     (Jury out.)

8          THE COURT:  Please be seated.

9          All right.  You have an offer?

10          MR. KURTH:  Yes, Your Honor, I do.

11  BY MR. KURTH:

12  Q   Mr. Morriss, did you undertake an investigation to account

13  for ATA's DC10 losses?

14  A   Yes, I did.

15  Q   How do you define DC10 losses?

16  A   DC10 losses are the costs associated with acquiring the

17  aircraft in order to fulfill the 2007-2009 agreement.

18  Q   Are you making assumptions with respect to these DC10s as

19  to whether or not they would have been incurred with this ATA

20  FedEx agreement?

21  A   I guess -- I'm sorry?

22  Q   Did you make an assumption as to whether or not the DC10

23  costs were incurred because of the FedEx-ATA agreement?

24  A   Yes.

25  Q   Okay.  What investigation did you and your team do to

1  calculate ATA's DC10 costs?

2  A   Well, we went through the balance sheet of ATA to be able

3  to determine the capitalized portion of the leasehold

4  improvements.  In other words, the DC10s were all leased, but

5  the lease cost was just part of the costs.  They made

6  improvements to those.  They aren't in any of the expenses;

7  they're all capitalized on the balance sheet.  And so we are

8  able to quantify the capitalized part, the asset part of the

9  DC10s that was on the balance sheet; we were able to quantify

10  the lease costs that are associated with that.

11         Then we were able to determine what profits the DC10

12  actually gave to ATA, and we reduced our costs by those

13  profits.  Then I further reduced it by the L-1011.  They sold

14  the L-1011s at the end of the bankruptcy.  So I further

15  reduced it by the proceeds of the L-1011s.

16  Q   Were the DC10's costs accounted for in your calculation of

17  lost profits?

18  A   No, they were not.

19  Q   Did the DC10 losses, did they include the nonrecurring

20  DC10 expenses you previously mentioned?

21  A   No, they did not.

22  Q   What costs --

23  A   May I just back up for a second?

24  Q   Go ahead.

25  A   Even if they did, though, they would have been deducted

Vol. 6  -  993

1   from my –– they were deducted from my lost profits.  So it's

2   not in the mix anywhere.

3   Q   Let me show you what's marked for identification as

4   Exhibits 200 and 250.  Since the jury's not here, I guess we

5   can put them up on the screen.

6        Would you tell us what Exhibit 200 is?

7   A   Sure.  Exhibit 200 is just the –– when I was talking about

8   the balance sheet part of the leasehold improvements, this is

9   for the balance sheet part.  In other words, ATA actually put

10  in service by December 31st of 2007, four DC10s.  And these

11  are the ones that have the Tails 701, 702, 705, and 706.  They

12  had paid a certain amount that totaled $19,500,000.

13       Now, they also owed an additional $3,920,000 on those.

14  Those were obligations that had to be satisfied and ultimately

15  in the bankruptcy court would have to be satisfied.

16       So the total was 23,420,000.  That's the amount on the

17  balance sheet, and from that, there was an integration

18  agreement where VX Capital would pay $2 million for every

19  aircraft that had been activated and put in service and had

20  been fully paid by the people that did the reconditioning and

21  the servicing of the aircraft.  Once that certificate was

22  given to VX Capital, they would pay to offset some of these

23  costs $2 million.

24       To this date in April of 2008, they had paid

25  $4 million for the integration of these –– to offset some of

1  the cost of these airlines.  That's the total of 19,420,000.

2  That's the total DC10 capitalized costs.

3  Q   In terms of your calculation of DC10 losses, is there also

4  provision made for DC10 lease costs; and if so, would you

5  explain what those are?

6  A   Yes.  It's not in Exhibit 200, but the DC10 lease costs,

7  we had -- remember we had 7 aircraft that we had, that ATA had

8  leased; and they had four of them placed in service by

9  December 31st of 2001.  And by February 8th of 2008, they had

10  transferred three of those over to World Airlines as well.

11      So the lease costs run from lease inception date

12  through 2008 -- 2009, Your Honor.  They run from lease

13  inception date, and if you remember my previous testimony,

14  they staggered January, March -- January, February, March.  So

15  it would be a staggering from January, February, March of 2007

16  through February 9th of 2008 for seven of them.  And then for

17  the three that were transferred to World at that date, they

18  drop out of the equation; and then the other four continue to

19  August 31st of 2008, which was the date the leases were

20  terminated by the lessor.

21  Q   Mr. Morriss, you also mentioned a few moments ago some

22  accommodation made in the calculation of DC10 losses for DC10

23  profits earned through -- is this earned through April 3,

24  2008?

25  A   That's correct.

MORRISS - DIRECT/KURTH

Vol. 6 - 995

1  Q   Please tell us what that number is and how you arrived at

2  it.

3  A   Well, we were able to look at the records of ATA to

4  determine --

5  Q   Let's stop for a minute.  Let's work from a document that

6  reflects these.  If you would put up Exhibit 250.  It would be

7  more helpful to the Court and everybody else if we're on the

8  same page of the prayer book.

9        All right.  Looking at Exhibit 250, we've now gotten

10 through the first two line items?  Let's go to the third line

11 item and explain what that is.

12 A   The third line item is the actual profits that ATA earned

13 from the first flight.  And the first flight happened in June

14 of 2007 through December 31st of 2007.

15       Now, remember there was only one and a half full-time

16 equivalent DC10s in place during that particular period of

17 time, and then we were able to quantify that profit, and then

18 actually through January of 2008.  And then for February,

19 March, and April, we estimated it based upon the historical

20 profit that we had -- that we had in our lost profits

21 calculation, added those together, and deducted the profits

22 that ATA would have earned from flying the DC10s, which was

23 the 2,858,728 number.

24 Q   All right.  Thank you, Mr. Morriss.

25       Would you explain to the Court the fourth line item

1  that says less actual L-1011 disposition proceeds, which is

2  part of your calculus for determining the DC10 losses?

3  A   Right.  Since the DC10s were replacing the L-1011s, I

4  thought it was fair that we should reduce whatever the DC10

5  costs were by the proceeds that the L-1011s brought in to the

6  bankruptcy, and that's the 4,050,000.

7  Q   And what is the total amount of DC10 losses that you have

8  calculated based on the assumptions and the information you've

9  given to the Court?

10  A   The total is $27,842,748.

11         MR. KURTH:  For purposes of this offer of proof

12  record, we would offer Exhibits 250, and what is the other

13  one, 249?

14         THE WITNESS:  Yes, 200.

15         THE COURT:  200 and 250.

16   *(Plaintiff's Exhibit 200 and 250 was received in*

17  *evidence.)*

18         MR. KURTH:  200 and 250.

19         No further questions on the offer of proof, Your

20  Honor.

21         MR. BLUMBERG:  No examination.

22         THE COURT:  Very good.  Let's take our lunch at this

23  time, and we'll have cross-examination then.

24         MR. BROUGHTON:  Your Honor, we do have some

25  additional offers of proof from depositions.

Vol. 6 - 997

1          THE COURT:  Okay.

2          MR. BROUGHTON:  I can offer those now.

3          THE COURT:  Sure.  Why don't we do them now, sure.

4          MR. BLUMBERG:  Your Honor, may I approach actually?

5          THE COURT:  I don't think we need to approach.

6   There's no jury here.

7          MR. BLUMBERG:  Sorry about that.  I'm not sure what

8   the purpose of an offer of proof in this instance is.  Has

9   plaintiff's counsel made a decision to show anymore deposition

10  excerpts?  What would be the reason to -- it's not evidence

11  that's been excluded.

12         THE COURT:  Mr. Broughton?

13         MR. BROUGHTON:  The basis would be we have two

14  offers of proof.  One relates to the Court's limine on

15  excluding the DC10 damages, and there were portions of

16  depositions that we designated from fact witnesses related to

17  the DC10 damage claim.  We were just going to offer page and

18  line, not to read, but just here's the deposition.

19         Also from portions we had previously designated from

20  the depositions of Subodh Karnick and Gary Ellmer, we were

21  offering their page and line descriptions of the

22  post-January 22, 2008 discussions they had with FedEx.

23         MR. BLUMBERG:  With that understanding.

24         THE COURT:  Sure.

25         MR. BROUGHTON:  And Your Honor, we've actually

Vol. 6 -  998

1    prepared two items, and we have PX261.

2           So for purposes of our offer of proof, the purposes

3    of offer of proof purely related to the DC10 damage claims and

4    post-January 22, 2008 communications between ATA and FedEx,

5    ATA offers PX261, 262 and 263.

6       *(Plaintiff's Exhibits 261, 262, and 263 were received in*

7    *evidence.)*

8           THE COURT:  Show those admitted for purposes of the

9    offer.

10          Anything else before lunch?

11          MR. BROUGHTON:  I don't believe so, Your Honor.

12          THE COURT:  Okay.  One o'clock.

13      (A luncheon recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25

MORRISS - DIRECT/KORTH

Vol. 6 -  999

1               A F T E R N O O N   S E S S I O N

2       (Jury in.)

3               COURT CLERK:  You may be seated.

4               THE COURT:  Mr. Blumberg, cross exam.

5                    CROSS EXAMINATION

6  BY MR. BLUMBERG:

7  Q   Good afternoon, Mr. Morriss.

8  A   Good afternoon, Mr. Blumberg.

9  Q   We've also met before.  I think we met in New York about a

10 year ago when I took your deposition?

11 A   Yes.

12 Q   Do you recall that?

13 A   I do.

14 Q   As part of your engagement in this matter, you submitted a

15 expert report to FedEx; is that correct?

16 A   I think in June of 2009, yes.

17 Q   And you have not submitted a supplemental report since

18 that date, correct?

19 A   No.

20 Q   I want to ask you some questions about the numbers you

21 have up on the board over there.  To make sure that I'm

22 comparing apples to apples, I want to talk a little bit about

23 the net profit number.  I think you testified the net profit

24 number is the revenues less the costs before you've taken out

25 the depreciation, interest, and any other fixed expenses,

Vol. 6 - 1000

1   correct?

2   A   I'm sorry.  Say that again, please.

3   Q   That was very lengthy.  I want to ask you some questions

4   about the net profit number.

5         As part of your analysis, did you look at the military

6   charter net profit numbers for FY06 and FY07?

7   A   I did.

8         MR. BLUMBERG:  Your Honor, may I approach?

9         THE COURT:  You may.

10  BY MR. BLUMBERG:

11  Q   Mr. Morriss, if you can take a look at that.  Is that the

12  chart you prepared?

13  A   Oh, you mean in the body of my report?

14  Q   Within the body of the report.

15  A   Yes, that's true.  Correct.

16  Q   And I believe this chart was prepared based on a review of

17  the flight profitability reports you were testifying about

18  earlier?

19  A   Yes.

20  Q   And do you believe the numbers in these charts you've

21  created to be accurate?

22  A   Yes, they are.

23        MR. BLUMBERG:  Your Honor, at this time I would like

24  to be able to show this chart just as a demonstrative.

25        THE COURT:  You may.

MORRISS - CROSS/BLUMBERG

Vol. 6 - 1001

1        MR. BLUMBERG:  Robb, can you call up 7187 but just

2   the chart, please, none of the text.

3   BY MR. BLUMBERG:

4   Q    These are ATA's -- now, these charts relate to military

5   charter, correct?

6   A    Correct.

7   Q    No commercial charter, no scheduled service in these

8   numbers?

9   A    That's correct.

10  Q    Looking at 2006, we have a total revenue number of

11  342 million, total cost of 306 million, for a net profit of

12  35 million, correct?

13  A    Yes.

14  Q    Now I want to look at the numbers that you have up there.

15  You have -- your regression analysis was a result of your

16  revenue and your costs coming to the net profits.  You

17  projected a revenue number of 285 million, correct?

18  A    No, that's not correct.

19        THE WITNESS:  Your Honor, now -- I remember your

20  asking me about the math.  I got that transposed.  It's 286.5.

21  BY MR. BLUMBERG:

22  Q    I'm sorry, just to make things easier, would you mind

23  correcting it?  Otherwise I will misstate it every time I look

24  at it.

25  A    Yes.  (The witness complied).

Vol. 6 - 1002

1   Q   And so the revenue -- your projected revenue for the --

2   what we'll call the annualized period was 286.5, which is

3   about $58 million less than 2006, correct?

4   A   You mean for September 30th?

5   Q   Let me take a step back.

6       The September 30, 2006, that is FY06, correct?

7   A   That's correct.  That's October 1 through September 30th.

8   Q   Correct.  For FY06, ATA had $342 million of revenue,

9   correct?

10  A   Correct.

11  Q   And your projection is -- for the annualized period, is

12  286.5, correct?

13  A   That's correct.

14  Q   The costs, however, in the -- I'm sorry.  The revenue in

15  your annualized period drops by about I want to say 50 -- I'm

16  sorry.  Do you have a calculator?

17      I should not be doing these things in my head.  342.5

18  minus 286.5, 56 million.  So revenue drops by about

19  56 million, correct?

20  A   Approximately.

21  Q   Now, the costs -- so the revenues dropped by 56 million,

22  but you still have a net profit of 35 million, correct?  I'm

23  sorry.  Let me take a step back.

24      You have the cost -- the revenue dropping 56 million,

25  costs dropping by 306 -- by about 53 million.  So the revenue

Vol. 6 - 1003

1   goes down by the 56, and the costs go down by about 53 in

2   2006.  But here --

3   A    Excuse me?  I'm not following you.

4   Q    Sorry about that, Mr. Morriss.  The bad part of that was

5   that I was very thirsty.

6         Let me ask you a different question.  Let's look at

7   2006 versus 2007.  In 2006, ATA -- the net profit number was

8   35.8 million, correct?

9   A    Yes.

10  Q    And in --

11  A    For the September 3rd -- for the fiscal year ending

12  September 30th of 2006.

13  Q    For FY06?

14  A    Yes.

15  Q    Now for FY07, the net profit was just 2.1 million,

16  correct?

17  A    That's right.

18  Q    I think you testified this change is attributable to two

19  events or two aspects, correct?

20  A    Primarily two events, correct.

21  Q    The first is for the FY06, the split of business or ATA's

22  allocation of business was 62 percent, correct?

23  A    That's true.

24  Q    And going to FY07, ATA's allocation was 50 percent for

25  FY07; is that correct?

MORRISS - CROSS/BLUMBERG

Vol. 6 - 1004

1  A   Yes.

2  Q   Now, that change, moving from 62 to 50, that was not going

3  to be different even under, assuming a contract for FY08 or

4  FY09, correct?

5  A   I'm sorry, you lost me.  The 62 percent wouldn't be

6  different or the 50 percent wouldn't be different?

7  Q   The 50 percent.  For FY07, that was the first year, or

8  that was the year where the split was 50 percent to ATA,

9  correct?

10  A   That's correct.

11  Q   And your projections assume 50 percent to ATA in FY08 and

12  FY09, correct?

13  A   Yes.

14  Q   So what we're seeing here in FY07, that resulting in the

15  $2.1 million number, that part of it, the allocation was not

16  going to change in FY08 or FY09?

17  A   Correct.

18  Q   Now the second thing you mentioned was one-time costs

19  related to the DC10s, correct?

20  A   Right.  The changeover from L-1011s to DC10s.

21  Q   The changeover.  I don't know if you were -- I know you've

22  been in the courtroom for most of the trial.  Mr. Yakola

23  testified about bringing these planes in from the desert,

24  changing in the seats to fit the military specs, repainting

25  the planes, working on the engines.  Those costs, however, are

1  called capitalized costs, correct?

2  A   Most of them would be, yes.

3  Q   And capitalized expenses don't appear on an income

4  statement like this, correct?

5  A   They might be in the overhead as amortization of the

6  capitalization of the costs.  Probably are.

7  Q   They might be, probably are?

8  A   Well, I'm thinking about ownership cost, overhead.

9  Capitalized costs would be amortized; and if I'm remembering

10 my amortization is in overhead, yes.

11 Q   And anywhere in the expert report that you tendered, did

12 you say that amortization was part of the overhead costs?

13 A   Yes.

14 Q   Where?

15 A   In -- remember when I was calculating my depreciation and

16 amortization?

17 Q   Yes.

18 A   I said that the depreciation and amortization is included

19 in the overhead costs, in that section of my report.

20 Q   Well, let me take a step back then.  At this point we're

21 comparing net profits to net profits.

22         MR. BLUMBERG:  I'm sorry -- with the Court's

23 indulgence for one moment.

24         I'm sorry.  As far as the maintenance -- I'm sorry.

25         As far as the maintenance expenses on the DC10s --

Vol. 6 - 1006

1  let me take a step back.

2  BY MR. BLUMBERG:

3  Q   The DC10s were not purchased until June of -- I'm sorry,

4  until December of 2006, correct?

5  A   December 19th of 2006.

6  Q   And none of them went into service until at least June

7  of -- I'm sorry, until June of 2006, correct?

8  A   2007.

9  Q   June of 2007.  So as far as the numbers that we see here

10 for crew, maintenance, commission, these expenses -- the DC10s

11 only figure in in the last four months of that period,

12 correct?

13 A   No.

14 Q   Aren't these based on the company's flight profitability

15 system statements?

16 A   They are.

17 Q   They are?  I think you testified that the DC10 expenses,

18 you didn't expect these expenses to recur in 2000 after -- one

19 moment.

20     MR. BLUMBERG:  Sorry about that, Mr. Morriss.

21 BY MR. BLUMBERG:

22 Q   Okay.

23     Let's take a look at that overhead expense there.  The

24 overhead from 2006 is 15 million, and it goes to 24 million in

25 2007, correct?  Were you able to establish how much of that

1  $9 million is for amortization on DC10s?

2  A   No.  I didn't investigate that.

3  Q   Were there any schedules or anything that you looked at

4  that -- you did not break down how much of that 24 million

5  that moved from 15 million to 24 million was amortizations on

6  the DC10s, correct?

7  A   No.

8  Q   And that's -- and there are other costs in the overhead

9  costs, correct, besides just amortization?

10 A   Yes.

11 Q   So these other costs besides the DC10s could also be

12 accounting for that increase in overhead?

13 A   Perhaps.

14 Q   Now you say that once the DC10s went into service, there

15 would no longer be a need for the L-1011s, correct?

16 A   No, I don't think I said that.

17 Q   You didn't say that once the DC10s were fully in service,

18 relieving the needs for the L-1011s, ATA's military segment

19 maintenance crew expense would have been more closely aligned

20 with its historical percentage?

21 A   You mean when I was looking at the Project Thatcher,

22 comparing it to 2007?

23 Q   No.  I think it was referring to the 2007 number, the net

24 profit of 2.1 million.  And you said that was an anomaly,

25 unusual.  The reasons you gave were one, the change in the

Vol. 6 - 1008

1  split, which we've talked about; and the second was the

2  one-time expenses involved in the DC10s.

3         I believe you said that once the DC10s went into

4  service -- excuse me.

5         The DC10s once they went into service would still have

6  maintenance expenses, correct?

7  A    Sure.

8  Q    They weren't brand new planes?

9  A    No.

10 Q    They were older planes?

11 A    They were older planes, but there's got to be a comparison

12 or something to them.

13 Q    Now, in your loss profit calculation, you also -- we

14 talked a little bit about depreciation and interest.

15 Actually, you've just testified that some of the number for

16 2007 could be depreciation or amortization expense, correct?

17 A    I'm sorry, what's that?

18 Q    In the overhead number.

19 A    Overhead.

20 Q    Some of that you just testified is depreciation expense,

21 correct?

22 A    Oh, in the overhead?

23 Q    Yes.

24 A    If I said that, I probably meant ownership.  Depreciation

25 and amortization is in ownership.  Overhead has interest.  So

Vol. 6 - 1009

1   if I meant -- if I said overhead, I meant ownership for

2   depreciation and interest.

3   Q    So let me take a step back then.

4        You're saying that ownership, that's where

5   depreciation would be, correct?

6   A    And amortization.

7   Q    And amortization.

8        Between 2006 and 2007, the ownership costs went down,

9   correct?

10  A    Yes.

11  Q    Absolutely 23 million versus 18 million; and as a

12  percentage basis, 6.9 versus 6.7, correct?

13  A    Yes.

14  Q    Okay.  And the capital expenses, the costs of changing out

15  the seats, all that kind of stuff, those expenses aren't part

16  of that list, just the amortization, correct?

17  A    Correct.

18  Q    But the amortization between '06 and '07, those numbers

19  actually went down?

20  A    Yes.

21  Q    Okay.  So the amortization doesn't account for the -- the

22  amortization on DC10s does not account for a 33 million-dollar

23  profit drop?

24  A    Oh, you mean the difference between the 2.1 and the 35.8?

25  Q    That's correct.

MORRISS - CROSS/BLUMBERG

Vol. 6 - 1010

1  A   No, it wouldn't.

2  Q   Okay.

3  A   It would be part of it.  It wouldn't be all of it,

4  obviously.

5  Q   Well, the ownership costs went down between 2006 and 2007?

6  A   Yes.

7  Q   So the depreciation, I mean, is not the cause of why the

8  net profits between 2006 and 2007 went down by $32 million?

9  A   It could be part of it.

10 Q   It could be part of it?

11 A   Right.

12 Q   Okay.  And the split under your analysis, that wasn't

13 going to change, correct?  I'm sorry.  The split of business

14 between ATA and Omni, that wasn't going to change in '07 and

15 '08, correct?  I mean, you're claiming that was a contract?

16 A   Are you talking about --

17 Q   I'm sorry, Mr. Morriss.  I am probably going too fast.

18 Let me take another step here.

19        Part of the costs -- I'm sorry.

20        You say that in the ownership, there's a depreciation

21 expense on the DC10s, correct?

22 A   There would be.

23 Q   There would be.

24        Okay.  That's a cost that ATA beared -- bore in 2007,

25 correct?

Vol. 6 - 1011

1   A    For fiscal -- for September 30, 2007, yes.

2   Q    Okay.  And you continue to depreciate an asset year after

3   year, correct?

4   A    Right; but more importantly, these are going to be

5   amortization of leasehold improvements.

6   Q    Okay.  But those cost as you amortize those leasehold

7   improvements, you do that year after year after year over the

8   life of the lease?

9   A    Right.  So you're coming off some who have low

10  amortization, and the amortization works its way back on the

11  new ones.

12  Q    Right.  But that expense, at least in part, continues year

13  after year after year, correct.

14  A    No, only through the life of the lease.

15  Q    Only through the life of the lease.

16       So as long as the DC10s were being leased, ATA would

17  have that expense?

18  A    Yes.

19  Q    So in 2000 -- I'm sorry.  I want to go to another part of

20  information that you've got back there.  That is the

21  depreciation, subtraction of depreciation and subtraction of

22  interest.  I think we just talked about how ATA had a

23  depreciation expense in 2007.  That's part of what you said

24  accounts for the drop in profit, correct?

25  A    Could be, yes.

1  Q   So you don't know?

2  A   Well, as I testified before, I didn't do that analysis

3  that you've been asking me about.

4  Q   So sitting here today, you don't know for certain that the

5  amortization of the DC10s was the reason that the profits

6  dropped by $33 million?

7  A   Well, intellectually I know that it had some portion to it

8  just because of how amortization works.

9  Q   But there could be other factors unrelated to those DC10s?

10 A   I don't understand what the question is.  You made a

11 statement, and I'm not sure what the question is.

12 Q   In your report, you were not able to confirm that the

13 amortization of the DC10s was the reason that the net profits

14 dropped from 35 to 33 million, correct?

15 A   I didn't say that in my report.

16 Q   I want to ask you about -- just a few questions about the

17 interest expenses.  Where do the interest expenses lie on this

18 income statement?

19 A   Probably in overhead.

20 Q   So in 2006 when ATA operated, it had an interest expense,

21 correct?  It paid interest?

22 A   It incurred interest.

23 Q   It incurred interest.  And in 2007, we know ATA

24 operated -- it incurred interest, correct?

25 A   Yes.

Vol. 6 - 1013

1  Q   I think you testified that it was your assumption that ATA

2  would shed itself of its scheduled service business and then

3  continue only as a military charter with some commercial

4  charter, correct?  That was the company's plan?

5  A   Right.  That was the company's plan.

6  Q   So under that plan, it would no longer have a scheduled

7  service segment, correct?

8  A   It could be a smaller scheduled service or none at all.

9          MR. BLUMBERG:  Court's indulgence?

10  BY MR. BLUMBERG:

11  Q   Mr. Morriss, I just have a couple other questions.

12          Looking at the fiscal year ending September 30th,

13  2007, that was the last full year of ATA's operations,

14  correct -- I'm sorry, the last full fiscal year that ATA ran a

15  military charter service?

16  A   No.  The 12/31/07 would have been the last full 12 months

17  that they ran the charter service, which is what we did our

18  analysis on.

19  Q   I'm sorry, I asked about fiscal year.  Was this period

20  here on the chart the last full fiscal year that ATA ran

21  military charters?

22  A   You mean under the October 1 to September 30th time

23  period?

24  Q   Well, FY07, did ATA operate for all of FY08?

25  A   No.  They only operated for six months.

Vol. 6 - 1014

1  Q    But they operated for all of FY07, correct?

2  A    Yes.

3  Q    And this is the -- and FY07, that year was before FedEx

4  informed ATA that it wouldn't be part of the '09 Teaming

5  Arrangement, correct?

6  A    Yes.

7          MR. BLUMBERG:  Nothing further.

8          THE COURT:  Thank you.

9          Mr. Kurth, redirect?

10         MR. KURTH:  Pass the witness, Your Honor.

11         THE COURT:  Mr. Morriss, thank you very much for

12  your testimony.  You may step down.

13     (Witness excused.)

14         MR. BROUGHTON:  Plaintiff rests.

15         THE COURT:  All right.

16         Members of the jury, you've now heard all the

17  evidence from the plaintiff, ATA, in support of the

18  allegations its made in the complaint.

19         Now the defendant, Federal Express, may present

20  witnesses and testimony.

21         MR. BLUMBERG:  Your Honor, may I approach?

22         THE COURT:  Yes.

23     (Beginning of bench conference.)

24         MR. BLUMBERG:  As we're at the close of the

25  plaintiff's case, we would like to make a Rule 50 motion.  We

Vol. 6 – 1015

1  would like to excuse the jury for a few minutes to make our

2  motion.

3          THE COURT:  What I usually do is just move right on,

4  and I allow you to make our argument at our afternoon break

5  and then we'll just insert it in the record at this point.

6          MR. BLUMBERG:  Okay.

7          THE COURT:  Mr. Gabel, call your witness.

8          MR. GABEL:  Mr. Blumberg is going to call my

9  witness.  May I erase the blackboard?

10          THE COURT:  Yes.

11          MR. GABEL:  White board.

12          THE COURT:  Mr. Blumberg?

13          MR. BLUMBERG:  Your Honor, the defendant calls

14  Howard Zandman.

15          THE COURT:  All right, Mr. Blumberg.

16          HOWARD ZANDMAN, DEFENDANT'S WITNESS, SWORN

17                    **DIRECT EXAMINATION**

18  BY MR. BLUMBERG:

19  Q   Can you please state your name?

20  A   Yes.  My name is Howard Zandman.

21  Q   Your occupation?

22  A   I'm a CPA by trade, and I do have some other designations

23  as well.

24  Q   Where are you currently employed?

25  A   I'm employed at the accounting firm of Habif, Arogeti &

1    Wynne, which is a major local firm in the Atlanta, Georgia

2    area.

3    Q   What position do you hold there?

4    A   I'm a partner with the firm and serve on its executive

5    committee.

6    Q   Do you have a specialty or area that you focus on?

7    A   Yes.  Our firm is made up of various groups, like a

8    typical accounting firm might be.  It has audit.  It has tax,

9    has investment advisory services and the like, and I'm in the

10   litigation support department.

11   Q   What academic degrees do you hold?

12   A   I have a BS in accounting from Long Island University,

13   Brooklyn, New York, where I graduated with honors as a cum

14   laude; and I started attending graduate school for tax; but

15   due to my travel schedule at the time, I never did complete

16   that.  Since then, I've gotten some additional certifications.

17         I attended professional classes and the like, such as

18   I've gotten my CFAA, which is a Certified Forensic in

19   Financial Accounting through the NACVA, the same association

20   that Mr. Morriss got his CVA from.  That's a week-long class,

21   and then after that class is a fairly intensive full-day exam

22   to understand the inner workings of financial forensics.

23         I also do have a CFF, which is a degree -- a

24   designation until recently that was pretty much given away by

25   the AICPA, and anybody with any kind of experience could on a

Vol. 6 - 1017

1  points system pretty much get that, and those are my

2  designations.

3  Q   Are you a member of any professional organizations?

4  A   Yes.  I am a member of the National Association of

5  Certified Valuation Analysts.  I'm on various committees with

6  that group.  I teach in front of that group.  I'm a member of

7  the AICPA, and I attend many of their conferences for

8  continuing education, as well as that with the NACVA.  And I'm

9  associate member of the American Bar, the Atlanta Bar, the

10 Defense Research Institute, and other legal-related

11 organizations as well to hone my skills in what it is that I

12 do.

13 Q   Do you hold any leadership positions in these

14 organizations you've described?

15 A   Yes, I do.  As I said, I'm conference chair of the -- for

16 the annual conference for the national association of CVAs.  I

17 also have been a former member of its litigation support group

18 on its executive committee.

19 Q   Can you give the jury an overview of the positions you've

20 held prior to your current position?

21 A   Yes.  As soon as I graduated school, I started working for

22 a firm called Richard Eisner & Company.  That's E-I-S-N-E-R

23 out of New York.  They have since grown.  When I started with

24 them, they were what I guess what was called back then a

25 medium-sized firm of about 75 people or so.

Vol. 6 - 1018

1      They have since grown.  As a matter of fact, just

2  recently they merged with a much larger firm, with another

3  firm by the name of Amper, so they're now EisnerAmper, a

4  multi-discipline firm, as well, of over a thousand people, I

5  would think, at this point.

6      I stayed with them for about four years, in which I

7  got some auditing training, basic accounting training in tax

8  and general business knowledge.  And then I left New York to

9  move down south to Atlanta, where I also obtained a position

10 with Laventhol & Horwath, similar to Mr. Morriss, but I only

11 stayed there for about two years, at which time -- and I was

12 an auditor with them and was a senior accountant.

13      After that, I went into private accounting for a

14 while, where I became a CFO of a civil engineering firm.

15 Stayed there for about a year and then started my career in

16 forensic accounting.  This is around 1980 or so, and I've been

17 doing forensic accounting ever since.

18 Q   Okay.  And how much total experience do you have in the

19 area of forensic accounting?

20 A   Well, since 1980, and this is 2010; if my math is right,

21 roughly about 30 years.

22 Q   Have you done any teaching or lecturing in your field?

23 A   Yes.  I've taught many times for both corporate groups as

24 well as insurance groups as well as just students of the

25 trade, if you will.  I've taught for NACRA.  I've taught for

Vol. 6 - 1019

1    the American Institute.  I've taught for the Georgia Society

2    of CPAs in various disciplines, one of them specifically.

3    I've taught in lost profits and have taught on commercial

4    damages as well as lost profits.

5    Q    Okay.  Do you specialize in a certain kind of work with

6    Habif Arogeti?

7    A    Well, it's Habif Arogeti.  People do that all the time.

8    It's understood.  You know, you look at it, and you think it's

9    Habif; but it's Habif Arogeti & Wynne.

10         I do.  My area of expertise is basically in the field

11   of complex economic damages.

12   Q    Can you give us some examples of the kind of assignments,

13   cases that you've worked on over the years?

14   A    Absolutely.  This is a very typical assignment of what I

15   do where there are breach-of-contract claims amongst parties

16   that they have a dispute as to what the actual profits are.  I

17   don't necessarily get into the legalities of the issue, other

18   than, of course, understanding them somewhat.  And I do

19   computations both for plaintiff and defense in the area of

20   lost profit analyses.

21         I've done work with Sony Ericsson.  I've done work

22   with other major companies as well as smaller companies in

23   both intellectual property area, some insurance loss area,

24   business interruption.  I've done a lot of work in the Hugo --

25   Hurricane Hugo way back when.  I did some work on Hurricane

Vol. 6 – 1020

1   Andrew, mostly lost profits work for businesses that were

2   affected by those sort of calamities.  I also did a big loss

3   with Hurricane Katrina, working for the hotel establishment as

4   to -- it was a resort complex in Florida and what were the

5   profits that they lost on account of the damage that was

6   caused by Hurricane Katrina.

7   Q    Now, have you ever testified before in court as an expert

8   witness?

9   A    Yes, many times.

10  Q    Okay.  Can you ballpark about how many occasions?

11  A    Well, in both testimony at deposition as well as, you

12  know, court itself, I would say upwards of 60 to 70s times in

13  my career over 30 years.

14  Q    Okay.  Now, you said you've testified for both plaintiffs

15  and defendants in those cases?

16  A    Yes, I have.

17  Q    Okay.  Now, you were retained on this matter by FedEx,

18  correct?

19  A    Yes, that's correct.

20  Q    What's your hourly rate?

21  A    525 an hour is my hourly rate.

22  Q    Okay.  And how much have you billed to date to this

23  engagement?

24  A    To date, including time prepping for this trial and all,

25  which is this point still unbilled, is roughly about $600,000.

1  Q    Okay.  What specifically were you asked to do?

2  A    Well, I was asked to opine on Mr. Morriss' report, review

3  his report specifically, and come up with an opinion as to

4  whether or not I agreed with his ultimate conclusions.

5  Q    Okay.  Now, for purposes of this analysis, I mean, did you

6  assume that FedEx and ATA had a contract to give ATA a place

7  on the FedEx team through FY09?

8  A    Well, naturally, I had to.  I mean, if I was not to

9  assume -- if I were to assume that there was no contract,

10 there would be no reason for me to ultimately be sitting here

11 because the argument would be there's no contract; therefore,

12 no damages.

13 Q    Okay.  Can you please give the jury an overall summary of

14 your findings, your review?

15 A    Yes, basically in three areas.  In looking at Mr. Morriss'

16 report, I felt that he did not take into account very basic

17 things such as avoided costs.  He talked somewhat about these,

18 and I'll get more specific into them later.

19        Also, I think that he used the wrong period of

20 measure, if there is a period to measure at all in this case.

21        And, also, I think that his report does have some

22 basic errors in it.

23 Q    Let's review these one by one.  Let's start with the

24 damages period.  I think you stated that you believe

25 Mr. Morriss used an incorrect damages period.  Is that one of

Vol. 6 - 1022

1  your opinions?

2  A   That is one of my opinions.

3  Q   Okay.  Taking a step back, what does a commercial damages

4  expert consider in determining the damages period?

5  A   Well, again, not as a lawyer but as a layperson, someone

6  who handles these type of cases, I mean, we're dealing with a

7  potential breach of contract case here.  And that is assuming

8  that there was a three-year agreement that is to be

9  interpreted as a contract.  That's given as the basic

10 assumption.

11      Then what is the damage period that we're looking at?

12 Ultimately, it's my opinion the damage period would be

13 September 1 of '08 through -- I'm sorry -- October 1 of '08

14 through September 30 of '09 because of the fact that it was

15 ATA's business decision to ultimately cease operations

16 effective April 3rd of '08.

17      And FedEx gave ATA every opportunity -- again,

18 assuming that there was this three-year agreement that can be

19 interpreted to be a contract, FedEx gave ATA every opportunity

20 to continue to do what is believed to be a very profitable and

21 lucrative military contract through the end of September 30th

22 of '08.

23 Q   Okay.  And what did you consider in reaching this opinion

24 or what documents did you review?

25 A   There was the Fee Agreement.  There was the Operating

Vol. 6 - 1023

1  Agreement, and there was the Teaming Agreement.  And those

2  agreements specifically said that the agreement was through

3  the end of '08.  And then ultimately, the letter dated

4  January 22nd of '08 that has been brought into evidence here

5  and shown many times as I've been sitting here all week, says

6  and basically gives ATA the -- not only the right but also the

7  ability to continue on -- and the desire for FedEx, for ATA to

8  continue on the contract through September 30th of '08.

9  Q   Now, the second matter that you've put in your summary is

10 you said that Mr. Morriss made errors and mistakes in his

11 calculation of lost profits.  I want to ask you about some of

12 those, but first I know that Mr. Morriss did a demonstration

13 of how lost profits are calculated.  Did you agree with the

14 methodology that he put on the board?

15 A   Well, in essence, the basis of his presentation was very

16 well said.  However, there are certain things in the

17 methodology that were mistaken and not according to, as he

18 says, as to be generally accepted lost profits methodology, if

19 you will.

20 Q   Do you think you can demonstrate on the board what you're

21 talking about?  Do you have a pen?

22            THE WITNESS:  May I, Your Honor?

23            THE COURT:  Yes.

24            THE WITNESS:  Thank you.

25            Well, as Mr. Morriss stated, basically, you look at

Vol. 6 - 1024

1  the methodology.  And where I start the dispute with him

2  ultimately is that "but for" is not a methodology.  "But for"

3  is really the concept, if you will, the overall concept of

4  lost profits.  So -- because you always look at what would

5  happen but for the event, and then you transpire and go to

6  what happened during the affected event and then take the

7  difference.  It's really very simple.

8          So starting with that premise, if you take what

9  would be revenues, the first thing that you would do is you

10  would look at what the projected period you would project

11  these numbers.  So you would look at revenues.  You take a --

12  some sort of trend analysis, which is a method such as what's

13  called the sales projection method.  You would look at the

14  sales projection method.  You would look at the yardstick or

15  benchmark, as he said, or you would look at the hybrid, which

16  is the difference between -- or, actually, a hybrid between

17  the sales projection method and the benchmark or yardstick.

18          But just for example purposes just so that you

19  understand the concept -- and very simple concept, that is --

20  of lost profits, you take revenues, and say revenues are

21  projected to be 100 -- say $100 million.  Okay?  That's the

22  projected.  Then with those revenues you do have to take into

23  account the costs, the cost that would be associated in

24  earning those revenues.

25          Now, looking at it from a standpoint of lost profits,

Vol. 6 - 1025

1   you do have to take into account all costs.  You have to take

2   into account both the fixed and the variable costs in order to

3   ultimately come to what we call net income or net profit.

4   Now, realize that, also, there could be a loss; there could be

5   an operating loss where cost would exceed revenues.

6           Okay?  But say in our example you have costs of, say,

7   95 million, and you end up with a profit of 5 million.  Now,

8   mind you, in here there are both fixed and variable costs.

9   And I think Mr. Morriss did a very good job of explaining the

10  difference between variable and fixed.

11          That's not the issue that I differ with.  Where I

12  differ with him is that you then have to look at the actual,

13  what is called the "but for."  And then ultimately this last

14  column is the difference.

15          So what we need to look at is what actually did the

16  company, in this case, ATA, do during the damage period?

17          Now, mind you, we differ on what that damage period

18  is; but, regardless, after April 3rd of 2008, all of these are

19  zeros, every single one of these, because they shut their

20  doors.  They no longer had revenues.  They no longer had

21  variable or fixed costs because they went into bankruptcy,

22  which means that the company as an operating entity stopped

23  incurring those costs.  The estate of the bankrupt incurred

24  whatever costs there may be, including, actually, the cost of

25  this litigation, et cetera.

1        So what you have, then, is you can't now separate what

2   Mr. Morriss tried to say was that you separate your variable

3   from your fixed.  And in typical lost profits analysis, you

4   would.  And that would assume that you have an operating

5   entity to compare it to.

6        So if ATA did continue to operate, you would have some

7   revenues; you would have some costs, and you would have either

8   profit or loss during the affected period.  However, what

9   we're dealing with is all zeros.  So that, in effect, you have

10  to subtract it all out, and you come out with the difference

11  being whatever your projection is and not adding anything

12  back.  You don't add back any depreciation or amortization.

13  You don't deal with EBITDA because you're dealing with the

14  company as a whole, and that company as a whole did not

15  operate.  So that's what I see to be the error in the lost

16  profits methodology.

17  Q    All right.  Mr. Morriss, when he was going through his

18  analysis, he used a revenue figure of 286.5 million for the

19  annualized revenue number.  Do you believe that there were any

20  mistakes and errors in that calculation?

21  A    Yes, I do.  If you look -- and I think I prepared a chart

22  as to what the -- what the revenues were looking like on a

23  trend basis.

24       May we present that chart?

25  Q    Mr. Zandman, I see you have the materials in front of you.

1   What's the chart number?

2   A   Okay.  I'm sorry.  Let me take a look.  Chart 17 and chart

3   17A, which also gets into the costs, but they do show the

4   annualized revenue.

5            MR. BLUMBERG:  Wait before those go up.

6   BY MR. BLUMBERG:

7            MR. BLUMBERG:  Mr. Zandman, a chart -- let's look

8   at -- for chart 17A, did you prepare this chart?

9   A   Yes, I did.

10  Q   Okay.  And what did you use as the data to prepare this

11  chart?

12  A   I used Mr. Morriss' own data in his own report, page 66 of

13  his report.

14           MR. BLUMBERG:  Your Honor, only as a demonstrative.

15           MR. KURTH:  No objection, Your Honor.

16           THE COURT:  You may.  What number is that?

17           MR. BLUMBERG:  17A.

18           THE COURT:  17A is demonstrative.

19    *(Plaintiff's Demonstrative Exhibit 17A was received in*

20  *evidence.)*

21  BY MR. BLUMBERG:

22  Q   Mr. Zandman, if you can describe what this chart shows to

23  the jury.

24  A   Well, this top line -- if this will work.  Well, this

25  doesn't work on there.  My old teaching tools.

Vol. 6 - 1028

1          If I may, Your Honor.

2              THE COURT:  You may.

3              THE WITNESS:  Thank you.

4          This top line is the blue line, which is the

5   military revenue over the course of the years using fiscal

6   years, the September 30 years, for ATA, and that being for the

7   years 2002 through 2007; and then it shows, ultimately, what

8   Mr. Morriss' annual forecast is for 2008 and beyond.

9              So, ultimately, if you look at this chart and the

10  trend going down of 277 million and you understand what's

11  going on here with regard to the fact that the -- we all know

12  and we've all been educated this entire week about the fact

13  that through this period here, there was a 50-percent split in

14  revenue between Omni and ATA; and then -- or, actually,

15  62 percent split here going through this period, and then

16  going out here, there would be a 50-percent split.  It just

17  doesn't make sense that the revenues would increase to

18  $286 million.

19             And even looking at some of the analysis that

20  Mr. Morriss did in terms of justifying his $286 million, where

21  he did a analysis of the FedEx team percentage share to ATA's

22  percentage share is also flawed in order to justify the

23  $286 million.  And that's on chart one.

24  Q    Okay.  And chart one was a chart that you prepared?

25  A    Yes, it is.

Vol. 6 - 1029

1  Q   Okay.  What was the underlying data or documents that you

2  used to prepare this chart?

3  A   Again, part of it -- the first part of it was directly

4  after Mr. Morriss' report dated June 10th.  The other sources

5  were the revenue by carrier and the COINS -- COINS Reports.

6          MR. BLUMBERG:  To show to the jury as a

7  demonstrative?

8          MR. KURTH:  No objection, Your Honor.

9          THE COURT:  You may.

10          MR. BLUMBERG:  Sorry.  Robb, 7374.

11          THE WITNESS:  Okay.  So if I may again, Your Honor?

12          THE COURT:  You may.

13          THE WITNESS:  Thank you.

14          So what you see here is Mr. Morriss made an analysis

15  and said that he assumed that the FedEx team percentage share

16  for the years 2005 and 2006 would be 39.9 percent; and

17  therefore, by virtue of the math that he did, that ATA's share

18  would be 65.5 percent and 55.4 percent of FedEx team's share.

19          Well, and then he uses those numbers to justify

20  without going into all the math and what not, to justify his

21  $286 million.  He says, well, if you look at and you do some

22  sort of wading between the numbers here and then you look at

23  it, it's like 95 percent certain that that $286 million looks

24  like a good number.

25          Well, when you look back to what actually occurred

Vol. 6 - 1030

1   by looking at the actual reports, the FedEx team share

2   actually was higher, which means ultimately, which makes sense

3   and what we figured to happen, is that beginning in 2006 and

4   then into 2007, the FedEx -- the ATA share of FedEx team

5   revenue declined because of the change in the agreement and

6   the change in the split of the military revenues.

7           Doing that would yield a lower revenue number by at

8   least $40 million.

9   BY MR. BLUMBERG:

10  Q   These are -- so he's got it at 65.5 percent, but the

11  actual ATA share was just 56.3 percent?

12  A   Yes.  That's for 2005, yes.  Then for 2006, he says that

13  the ATA share would be 55.4, when the actual figures come up

14  to 46.4.

15  Q   So the 2007 numbers agree.  What about 2007?

16  A   2007 does agree, that's correct, but he weights the

17  numbers in order to come up with his projected revenue.

18  Q   Did he use 2007?

19  A   No, for the revenue percentage, he used -- well, he used

20  2005, '6, and '7 for -- no, I'm sorry.  For his revenue

21  projection, he ended up using these, the '4, '5 and '6 to

22  justify the number.  But he used ultimately 2008 to come up

23  with his revenue projection.

24  Q   Can you explain what you mean by that as far as using 2008

25  for the revenue projection?

1  A   Okay.  If you look here -- and again, the math is not

2  here.  Again, I'm sorry, Your Honor.

3          The math is not here, but ultimately what he does is

4  he says that 2004, '5, and '6 was the last full three-year

5  period that is unaffected by this contract dispute.

6          So weighting these three periods, he then aligns

7  himself to believe that if you were then to use the 2008

8  numbers applied to the percentages on a waiting basis between

9  2004 and 2006, that that would be the revenue achieved for

10 2008 and beyond.

11 Q   So just to summarize, where is the error?  Where is the

12 mistake that accounts for what you say are higher revenues?

13 A   The mistakes start right here where he assumes that the

14 FedEx team percentage was 39.9 percent for those two years

15 without looking at the actual data where it was 46.7 and 47.3,

16 which would then yield different percentages for ATA.

17 Q   And those were the percentages you would then apply to the

18 FedEx total team number, correct?

19 A   Correct.

20 Q   So that causes that number to be too high?

21 A   That's correct.

22 Q   Now, we've talked about in your opinion the revenue number

23 is too high.  Let's turn to the second line there, costs.  To

24 project costs, Mr. Morriss used a regression analysis,

25 correct?

Vol. 6 – 1032

1  A   That's correct.

2  Q   Are you familiar with regression analyses?

3  A   Yes, I am.

4  Q   Have you used regression analyses in your work?

5  A   I've used it occasionally, yes.

6  Q   You've stated that you don't subscribe to the use of

7  regression analysis in this instance; is that correct?

8  A   That's correct.

9  Q   Why not?

10  A   Well, the regression analysis is good as Mr. Morriss

11  described it; and you have an independent variable and a

12  dependent variable that more or less remain in track and along

13  the same plane, and you try to draw that linear regression

14  line that he talks about.

15       However, what you have is going into 2008, we have a

16  different operating model.  You have an operating model that

17  he talks about which specifically is strictly the military

18  charter business operating alone, but even aside from that,

19  you have the situation where the whole percentage mix is

20  changing.

21       So you're going from a regression where you had

22  62 percent before, or you had 50 percent after, and now it's

23  totally changing.  The aircraft dynamics are changing between

24  L-10s and DC10s.  The percentage split is changing because of

25  Northwest coming into the picture.

Vol. 6 - 1033

1       So the whole dynamic of change is there, and he

2  doesn't take that into account by virtue of using the

3  regression analysis.

4  Q   You've obviously heard testimony it was ATA's plan to shed

5  itself of its scheduled service and move to being a military

6  only with some commercial charter.  You've heard that

7  testimony, correct?

8  A   Yes, I have.

9  Q   How does that impact your views on whether regression

10 analysis was appropriate?

11 A   Well, again, what you have is you have a total package.

12 Like I talked about in my firm, for instance, where we have a

13 litigation support group, we have an audit group, we have a

14 tax group, we have a financial analysis group.

15      If we were to take away, for instance, the audit

16 group, we would still have the cost of the higher-ups so to

17 speak.  We would still have the cost of the managing partner.

18 We would still have the cost of the staff relating to the

19 bookkeeping and the time keeping and all that sort of thing.

20 If you want to relay it -- since we're all football fans in

21 this day and age and you want to relate it to the Colts, you

22 take the coach away, for instance -- or you take Peyton

23 Manning away from the equation, what happens?

24      You still have his salary even though he's out on

25 leave because of disability.  If he were to get hurt, you

Vol. 6 - 1034

1  would still have his salary.  If you take a piece away from

2  the puzzle, the puzzle pieces don't disintegrate.  They all

3  pretty much stay together, and you can't shed yourself of all

4  those costs that are built in.  Or as we talked about and have

5  heard, costs that are baked in.  You have many of these costs

6  that are baked in that just don't go away.

7  Q   Now, as far as the regression analysis, Mr. Morriss

8  applied that to the $286 million of revenue to get his net

9  income number, correct?

10 A   That's correct.

11 Q   Okay.  You've been in the Court, and you've heard

12 testimony about an offer that the UPS team made to ATA,

13 correct?

14 A   Yes, I have.

15 Q   And you've heard testimony that that wasn't going to be a

16 moneymaker for ATA, correct?

17 A   Well, I've heard testimony that it wasn't going to be a

18 moneymaker, but yet Mr. Garrett, as I recall, even said that

19 it may yield something like $1.1 million or so in free cash

20 flow.

21     So, you know, depending on how you look at it, the

22 analysis that they did was this Project Thatcher; and Project

23 Thatcher scenario for UPS showed that, in essence, it was a

24 money loser.  But yet, as I stated, I heard testimony from

25 Mr. Garrett as you all have, that the best case scenario for

1  UPS would be roughly $1.1 million free cash flow, which wasn't

2  going to be enough to offset the losses from the additional

3  shutdown costs that they were going to have to sustain in

4  order to -- in order to stay operating.

5  Q   Now, this UPS offer, did you -- as part of your

6  engagement, did you look at the UPS offer and apply

7  Mr. Morriss' regression analysis to it?

8  A   Yes, I did, which is very interesting.  If I took the

9  $174 million of revenue that was in the UPS offer based on

10  Project Thatcher and I applied the formula that Mr. Morriss

11  has and wants to make you believe is, you know, 95 percent

12  certain in all circumstances, I would have you believe that

13  Mr. -- Mr. Morriss in that case would also have you believe

14  that using those numbers, the UPS $174 million in revenue

15  would yield $8 million in net profit.

16       And that's just not the case according to ATA's own

17  management and the folks that put together that report as well

18  as testimony that we've heard here.  So something is rotten in

19  Denmark in terms of that regression analysis.  It just doesn't

20  work.

21  Q   So on the $174 million of the UPS offer, the regression

22  analysis yields about $8 million of net profit?

23  A   That's correct.

24  Q   Now, we talked about revenues, we talked about costs.  I

25  want to talk to you a little bit about avoided costs.  You

Vol. 6 - 1036

1  mentioned that you believe Mr. Morriss erred by not

2  subtracting out all the avoided costs.  I want to start with

3  the ones that were presented to the jury as part of EBITDA.

4  It's taken me a while to not call it something else.

5       Let's start with the I.  What is the I?

6  A    I is interest.

7  Q    Actually, let me take a step back.  We've heard a lot of

8  references to EBITDA as walking-around money.

9  A    Correct.

10 Q    And therefore, it is the correct measure of lost profits

11 according to Mr. Morriss.  Why do you disagree that this

12 notion of walking-around money is not the correct measure?

13 A    If I may go back to the board again just to demonstrate

14 that.  I mean, what we have to look at again is reality.  In

15 terms of lost-profits methodology and what is

16 generally-accepted methodology is that there has to be a

17 three-tier proof for lost profits.  In essence, you could take

18 your projected revenues, less your costs, and come up with

19 your net profit.

20      So in this case, if you take the difference, which is

21 what I subscribe to as an example and say that if you lost

22 $100 million in revenue in this circumstance and had no

23 continuing operations, which is what happened in this case,

24 which means that you saved $95 million in costs.  You saved

25 every dollar of cost.  So therefore, all you lost was

Vol. 6 - 1037

1   $5 million.

2        What Mr. Morriss would have you believe is that, well,

3   some of these costs really did not -- were not incurred -- no,

4   should be added back is what he's saying because they were

5   incurred.  Well, I would like to know how a company that is

6   shut down and is not operating, how it continues to incur

7   depreciation and amortization on assets such as airplanes that

8   are not flying, which according to the guide that we subscribe

9   to, the American Institute of CPAs, in that guide, states if

10  airplanes aren't flying, there's no depreciation to be taken

11  from them.  That's in effect what's happening here.

12       So that's the one subscription.  You look at your

13  revenue, less your cost to come up with your net profit.

14  Another way to look at it is you take your net profit and add

15  back the cost incurred in order to come up with your net loss.

16  If you take your net profit and you add back costs incurred,

17  what do you come back with?  You come back with the same

18  number, the same $5, $5 million, $5,000 whatever you want to

19  subscribe to in this formula.

20       The third way of looking at it is very simply you take

21  the difference between the two bottom lines.  The one bottom

22  line says, well, I would have made $5 million.  The actual

23  bottom line says, well, nothing happened because they were in

24  bankruptcy.  They did not operate.

25       So therefore, the loss is the same.  It's $5 million.

1  The three-tier proof works.  If you were to add back

2  depreciation and amortization with zero being there, you're

3  double counting.

4  Q   Now Mr. Morriss says that these are fixed costs.  He talks

5  about fixed versus variable costs; and therefore, because they

6  are -- and I think the phrase was established lost profits

7  model.  I'm sorry if I'm probably misstating it.  He says that

8  because these are variable costs -- I'm sorry, that these are

9  fixed costs, that don't vary with the generation of the

10 revenue, you don't include them.  How do you respond to that?

11 A   Well, in the typical lost-profit scenario, you are not

12 looking at a business that is shut down.  I would subscribe to

13 exactly what Mr. Morriss said if this business were operating.

14 Basically the lost-profits formula and define it as you wish,

15 and I don't think we're different in our ultimate definition.

16 It's revenue less the incremental saved costs.  Now, what are

17 those incremental saved costs?

18         In most cases when a company is operating, the fixed

19 cost continues.  So therefore, the incremental saved costs are

20 only the variable costs, and I would agree with him.  However,

21 in this case, the company is not operating.  So the

22 incremental saved costs are all costs; and that is

23 lost-profits methodology.

24 Q   Now, for example, the salary of a Chief Executive Officer,

25 that's a fixed cost?

1   A    Yes.

2   Q    Using that as an example, how does that fit what you just

3   talked about?

4   A    Well, when they shut the doors on April 3rd, they no

5   longer were responsible for the continuation of the cost on

6   their leases, on the costs of their salaries.  They didn't

7   play their employees after April 3rd.  They no longer paid

8   their gate leases after April 3rd.  They no longer paid their

9   fleet leases after April 3rd.  So all those costs disappeared.

10  Q    Okay.  Now let's talk about the costs that are involved in

11  EBITDA.  Interest?

12  A    Yes.

13  Q    Why do you believe it was improper to add back the

14  interest costs?

15  A    Well, again, it's the same reason, is because, again,

16  after the company shut down, it was no longer responsible for

17  that interest.  It became a matter of the creditors to work

18  its way out as to what percentage or -- you know, we've all

19  seen bankruptcies, and we've all seen airlines go through

20  bankruptcies.  And ultimately, they come out with -- basically

21  much leaner and, I guess, more nimble sort of financial

22  institutions.  But what happens?  They shed themselves of many

23  of these costs during the course of the bankruptcy and do not

24  pay them, such as the pension costs, for instance, which was a

25  big deal back in 2006, '7.  When Delta went bankrupt and

Vol. 6 - 1040

1  Northwest went bankrupt, they shed all those costs.

2  Q   And what about depreciation/amortization expenses.  How do

3  they factor into -- what's your opinion on Mr. Morriss' adding

4  back those costs?

5  A   Again, those costs do not continue.  In this case because

6  it's a total shutdown of a business, they become incremental

7  saved costs.

8  Q   We were talking about avoided costs.  Did ATA's not

9  operating after April 2nd, 2008, result in any other avoided

10  costs?

11  A   Yes.  We've heard testimony and also seen board minutes.

12  I think it's the February 2008 board minutes, if I'm not

13  mistaken, maybe the March -- I think it's the February 2008

14  board minutes where there was discussion about should ATA

15  continue, should it not continue in operations; and there was,

16  you know, this whole sort of, I guess you would say

17  conversation within the board minutes.

18      And they talked about there being shutdown costs or

19  fleet return costs of anywhere between 36 to $60 million in

20  those board minutes.  And needless to say, by just shutting

21  down April 3 and not shutting down the airline -- of scheduled

22  service, that is, to just operate a so-called a leaner and

23  more nimble military flying machine, they were ultimately able

24  to avoid these fleet return costs.  They just gave it back to

25  the lessors, and we've heard testimony of that; that's what

Vol. 6 - 1041

1  they did.

2  Q    Now, you mentioned that you reviewed the board minutes to

3  talk about these saved costs.  Was that part of your -- part

4  of your analysis, part of the review to review the GAL board

5  minutes?

6  A    Yes, it was.  Well, Mr. Morriss has those boxes of data.

7  I guess I subscribe to more this method.  This is 2 gigabytes.

8  I don't know which is more, but I have a lot of data on this

9  that I've been reviewing throughout the week.

10          MR. BLUMBERG:  Okay.  And let me -- Robb, if you

11  could put up previously admitted FedEx 167, which is 1098.

12  These are the February 12 board minutes.

13          THE WITNESS:  Those are the February 12th board

14  minutes I was speaking of, yes.

15          MR. BLUMBERG:  Okay.  And, Robb, if you could now go

16  to 1116.

17  BY MR. BLUMBERG:

18  Q    Mr. Zandman, did you -- as part of preparing your opinions

19  about avoided costs, is this one of the documents you

20  reviewed?

21  A    Yes.  This is a document I reviewed.  We talked about the

22  fleet return costs.

23          THE WITNESS:  Your Honor, if I may just point it

24  out.

25          The fleet return costs are located on this line,

Vol. 6 - 1042

 1  fleet return costs, cumulative.  And this scenario shows up to

 2  $36 million of fleet return costs which by July of 2008 would

 3  have been accumulated.  And there was discussion, as well,

 4  within the board minutes that it can go as high as

 5  $60 million.  So there's a swing of $24 million, somewhere

 6  between -- yeah, $24 million, somewhere between 36 million and

 7  24 million.

 8  Q   Okay.  Did you -- this chart here has a lot of parentheses

 9  and numbers.  After reviewing this page of the board minutes,

10  did you create a chart based on these numbers?

11  A   Yes, I did.  I prepared a chart to try to explain what's

12  going on with those numbers on my chart 4, or we could look

13  at -- which is the other one?  19?

14            MR. BLUMBERG:  Let's call up 4.

15            THE WITNESS:  Yes.  Chart 4 or 19.

16            MR. BLUMBERG:  Robb, if you could call up 7377 as a

17  demonstrative.  Any objection?

18            MR. KURTH:  Chart 4 as a demonstrative?  No

19  objection.

20            THE COURT:  Okay.

21    *(Demonstrative Exhibit Chart 4 was received in evidence.)*

22  BY MR. BLUMBERG:

23  Q   Now, here, Mr. Zandman, you were talking a moment ago

24  about avoided costs.  Those are costs that ATA would have paid

25  had it continued to operate.

1    A    Well, it's a cost that they would have —— that they would

2    have paid had they continued to operate and made decisions

3    that they were talking about.  As this chart says, made

4    decisions that —— hard decisions that they were being forced

5    to make in terms of shutting down scheduled service to

6    continue operating simply as an AMC military charter aircraft.

7          So in that case, these would be avoided costs because

8    they would not have gone through a bankruptcy and they would

9    have sustained these costs.  The fact that they went into

10   bankruptcy, they ended up saving those fleet return costs.

11   Q    Okay.  And if you can describe to the jury what this chart

12   is illustrating?

13   A    Well, this is the cash balance of Global Aero Logistics,

14   which is ultimately the parent company; and it's not just ——

15   this is —— includes ATA but it shows what effect the ATA and

16   the drag ATA had on GAL, the parent company, and why those

17   hard decisions had to be made, even without taking into

18   account whether or not there was a continuing agreement with

19   Federal Express or not.

20         So what we have ——

21         THE WITNESS:  Your Honor, if I may, once again?

22         THE COURT:  Go ahead.

23         THE WITNESS:  So what we have is we start with $27

24   million of unadjusted GAL cash balance per these board

25   minutes.  We have $27 million in February of 2008, per the GAL

1   board minutes.  And after -- by June of 2008, we go to a

2   negative -- in other words, the drag on ATA continuing its

3   scheduled service and operating as a full airline, including

4   scheduled service and military charter, would bring the GAL

5   cash balance down to a minus $5 million or $4 million right

6   here as is shown on this chart.

7          And then this is at the best-case scenario with

8   $36 million of fleet return costs.  If we were to look at a

9   total of $60 million of fleet return costs by July or even

10  June, there would be an additional $24 million of drain on GAL

11  parent-company cash.

12         So the obvious, of course, is what happens, the fact

13  that ATA decided to make its business decision to close the

14  doors on April 3rd.  Well, ultimately it saves what would have

15  occurred had remained in business, which is those fleet return

16  costs.

17  Q   Okay.  Let me put up a second chart that may illustrate

18  this point a little bit better.

19         MR. BLUMBERG:  This is chart 19, which, Robb, is

20  7460.

21         Any objection as a demonstrative?

22         MR. KURTH:  No objection.

23      (Demonstrative Exhibit Chart 19 was received in evidence.)

24  BY MR. BLUMBERG:

25  Q   First, Mr. Zandman, let's describe what we have on this

1  chart here.  You've called it ATA free cash flow, including

2  shutdown costs with penalty box effect and fleet return costs.

3       Let's start, you know, line by line.  What does this

4  chart demonstrate?

5  A   Now, mind you, the difference between this chart and the

6  last chart, the last chart dealt with the overall parent,

7  Global Aero Logistics, and its cash balance.  This is dealing

8  strictly with the bottom half of that chart that's in the

9  board minutes of February of '08 and just deals with the ATA

10 free cash flow.

11 Q   What's free cash flow?

12 A   Free cash flow is —— EBITDA is walking-around money; then

13 free cash flow is the change after the walking-around money.

14 I mean, free cash flow has to deal with —— you take out all

15 fixed items and ultimately look at what is just the cash that

16 comes into the business and leaves the business.

17      THE WITNESS:  So what we have on this chart, Your

18 Honor, once again?

19      THE COURT:  Yes.

20      THE WITNESS:  What we have in this chart is we have

21 ATA starting in February of '08 at the time of these board

22 minutes with negative $10 million in free cash flow.

23 Q   And what does that mean exactly, if that has negative

24 10 million in free cash flow?

25 A   It means your pockets are turned inside out.

1  Q   Okay.

2  A   Okay?  That as you walk, you're spilling money on the

3  floor because you don't have it to begin with.

4        And then each month, starting with this green line

5  going to this blue line, okay, simply is the ATA free cash

6  flow, including the shutdown costs of $36 million and what the

7  effect would be of operating the airline in total, which

8  includes scheduled service, commercial charter, and military

9  charter, through the end of September of '08.

10        The red line is what the board at that point -- I know

11  we've heard testimony about the fact that there was no penalty

12  box effect to ATA prior to its shutdown.

13  Q   What do you mean by the penalty box?

14  A   Well, it would become the airline of -- yeah, the airline

15  of last resort to the military because it didn't comply with

16  the regulations in terms of on time and other sort of things

17  that they were required to do with the military flights, that

18  they're unreliable.

19  Q   But you have it there as an effect on the revenues.  Why

20  would it be an effect on the revenues?

21  A   Well, because if they become the flight or the airline of

22  last resort, they end up losing revenues, and they end up

23  losing share other than what would otherwise have been lost

24  through the new deal that was cut between FedEx and ATA and

25  Northwest coming into play, so that they would end up losing

1   additional flight revenues, which is shown here in the penalty

2   box effect.

3        Mind you, these are not my numbers.  These are the

4   numbers -- I'm just illustrating what was in those board

5   minutes.

6        And then the green line is basically taking into

7   account the maximum effect of the negative free cash flow or

8   the emptying of the pockets, if you will, to below zero, had

9   ATA had the maximum amount of fleet return costs in order to

10  shut down its scheduled service and only operate as a military

11  charter.

12  Q   I'm sorry.  What do you mean by "fleet return costs"?

13  A   Fleet return costs?  Well, what would happen is if they

14  were to shut down military service, they would still have

15  lease obligations.  And there's penalties in those leases as

16  to what is the requirements of ATA or of any company, any

17  airline.  Once they return -- and we've had testimony as to

18  that about, well, you know, you have to put the aircraft back

19  in the same maintenance condition.  Those are fleet return

20  costs, as well as lease penalty costs, et cetera.

21       I mean, the whole thing about this is that Mr. Morriss

22  would have you believe that, well, you know, this is a

23  breach-of-contract issue, and all we have to look at is AMC

24  charter service for ATA.

25       Well, they can't operate in that vacuum.  There are

Vol. 6 - 1048

1   other pieces to this puzzle that have to fit in, and those

2   other pieces are going to cost money before they're going to

3   be able to operate strictly as a military charter.

4   Q   And did you reach an opinion or conclusion about how much

5   these avoided costs as far as shutting down scheduled service

6   as planned, how much those amounted to?

7   A   Well, I mean even if you use the minimum of $36 million,

8   you end up coming and negating all of the lost profits that

9   Mr. Morriss says that were sustained for the fiscal year '09.

10  Q   What was the high end of the costs?

11  A   The high end of the costs were $60 million.

12  Q   And where did these estimates come from?

13  A   These come from management in the February 12th board

14  minutes.

15  Q   Mr. Zandman, I think you also mentioned mitigation or

16  talked about the issue of mitigation.  What is mitigation?

17  A   Well, mitigation is what one needs to take into account

18  and what one is required to do in order to reduce the amount

19  of otherwise incurred losses due to a breach of contract or

20  due to any event that might cause a loss.

21        For instance, you have a flood in your house.  Well,

22  let me put it this way.  You know a tornado may be coming.

23  You have a tornado warning.  What you do is put the shutters

24  on your windows, right?  Why do you put the shutters on your

25  windows?  In order to avoid damage.

Vol. 6 - 1049

1          Well, if you don't have shutters, you go out to Home

2  Depot, Lowes -- whoever your favorite is -- and you end up

3  buying, you know, plywood and boards and you board up your

4  windows so that you attempt to put in some costs in order to

5  mitigate future damage of the ultimate destruction of your

6  home.  That's ultimately what mitigation costs are, trying to

7  avoid creating additional losses.

8  Q   What is your criticism of Mr. Morriss' report as far as

9  mitigation?

10 A   Well, he didn't take into account -- again, going back to

11 the theme, and this is the theme that's important, is that ATA

12 in order to operate in the silo of simply a military charter

13 aircraft, had to go through this transformation to get there.

14 And in order to go through that transformation, they would

15 have sustained costs.

16         Those costs need to be taken into account as otherwise

17 saved or an incurred cost.  And there's also the mitigation

18 of -- and the possibility of getting the revenue from, say,

19 UPS, which could have been, according to Mr. Garrett,

20 $1.1 million of free cash flow that could have been taken into

21 account to offset the losses claimed to be sustained on

22 account of FedEx.

23 Q   Mr. Morriss used a regression analysis or the regression

24 to come up with the costs for ATA, correct?

25 A   That's correct, yes.

1  Q   And there was a UPS offer on the table, correct?

2  A   There was a UPS offer on the table, yes.

3  Q   So how does that relate to mitigation?

4  A   Well, there is -- you're supposed to take into account

5  options that are available.  Again, getting into the fact that

6  what Mr. Morriss has done is try to portray ATA and the silo

7  of just military charter aircraft and airline.  If that was

8  all they were able to do, well, then they had the option if

9  that's all they were going to do if they operated under UPS.

10 If they operated under UPS, they would have at least sustained

11 some income.  It would have been less income.  I think we all

12 agree to that.  They would have sustained some income that

13 should have offset some of the losses that are being claimed

14 here.

15          MR. BLUMBERG:  Pass the witness.

16          THE COURT:  All right.  Thank you.

17 Cross-examination, Mr. Kurth?

18          MR. KURTH:  Yes, Your Honor.

19                   CROSS-EXAMINATION

20 BY MR. KURTH:

21 Q   Good afternoon, Mr. Zandman.

22 A   Good afternoon.

23 Q   We've met before, haven't we?

24 A   Yes, we have, sir.

25 Q   We met in Atlanta, as I recall?

1  A    In a hotel conference room, as I recall.

2  Q    Do you recall when that was?

3  A    Oh, roughly about a year ago, I guess, in that

4  neighborhood.

5  Q    Do you like musicals, Mr. Zandman, Broadway musicals?

6  A    At times.  It depends on the musical, but yes.

7  Q    Are you old enough to remember the musical "The Music

8  Man"?

9  A    Yes, I do.

10  Q    You remember the refrain at the beginning of the musical,

11  "A man's got to know his territory"?

12  A    That's correct.

13  Q    As of January 22, 2008, that's a date of some significance

14  in your engagement, isn't it?

15  A    Yes, sir.

16  Q    What is the significance of that date to you?

17  A    That's the date that FedEx sent a letter to ATA saying

18  that it was asking it to continue operations through fiscal

19  '08 and that it was no longer going to continue on the team

20  beyond that.

21  Q    You've heard the testimony of various folks from ATA that

22  that was a watershed moment, a catastrophe, a terrible day.

23  Are you in a position to disagree with the assessment of those

24  officers, those former representatives of ATA, that they just

25  got it wrong?

1  A    I don't understand your question, I'm sorry.

2  Q    It was an important date to ATA, wasn't it?

3  A    Yes.  I was an important date to ATA.

4  Q    And you don't disagree with at least from their

5  perception -- you heard their testimony.  It was a very

6  important date.

7  A    It was a date, yes, that they had to consider as to what

8  they were going to do going into the future.

9  Q    How long -- strike that.  Would you say that rendering

10 expert testimony and expert opinions in legal proceedings is

11 the bulk of your practice?

12 A    Yes, it is.

13 Q    As of January 22, 2008, ATA was performing its

14 responsibilities as a team member in the FedEx team, correct?

15 A    Up until that date, yes, it was.

16 Q    It was not performing its responsibilities on January 22,

17 2008?

18 A    I'm sorry.  Until April 3rd, it was.  I'm sorry, yes, sir.

19 Q    At the time FedEx issued its notice to ATA in January of

20 2008, ATA was not in the penalty box with the military, was

21 it?

22 A    As of that date, it was not, but it was projected to be.

23 Q    ATA, to your understanding, had been a standing member of

24 the FedEx team since early '90s, correct?

25 A    That's correct.

Vol. 6 - 1053

1  Q   And would you agree with me that for at least three years

2  before ATA shut down its military charter business on April 2,

3  2008, that that business had shown a positive cash flow and

4  reflected profitability?

5  A   It showed positive cash flow.  It showed profitability;

6  however, it was declining but yes.

7  Q   ATA's military charter business was, in your view, an

8  established business, correct?

9  A   It was a business that was in operation for a long time,

10  and it had its ups and downs.

11  Q   Project Thatcher, you report in -- your testimony

12  references to a Project Thatcher, correct?

13  A   That's correct.

14  Q   And you accept the contents of Project Thatcher as

15  reliable, correct?

16  A   In what I testified here to today, it was just something I

17  did rely on but not in terms of any opinions I gave here

18  today.

19  Q   You remember giving your testimony?  We can agree on the

20  that?

21  A   Yes, sir.

22  Q   And you were telling the truth when you gave your

23  testimony back in Atlanta a year ago?

24  A   Yes, and I relied on it for my report but not for any

25  opinions I gave here today.

Vol. 6 - 1054

1    MR. KURTH:  Would you play Mr. Zandman's deposition,

2  page 99, lines 3-5?

3    MR. BLUMBERG:  Objection.  Improper impeachment.

4  It's just something he didn't talk about today.  There's no

5  inconsistency.

6    MR. KURTH:  The testimony he's given today, Your

7  Honor, I intend to show is different than the testimony he

8  gave when I asked him the very same question a year ago.

9    THE COURT:  All right, go ahead.

10  BY MR. KURTH:

11  Q   Would you look at the screen?  That was your testimony a

12  year ago?

13  A   Yes.  And that's what I just stated.

14  Q   We'll let the record stand as to whether you have changed

15  your testimony since.

16    You were speaking of UPS and UPS as an option in your

17  direct examination by Mr. Blumberg.  Do you remember that?

18  A   Yes, sir.

19  Q   Now, isn't it true that UPS was not an opportunity that

20  made financial sense to ATA or to you?

21  A   According to the testimony that I've heard and sitting

22  here in court all week and Mr. Garrett's depositions, etc. --

23    THE COURT REPORTER:  I'm sorry, sir.

24    THE WITNESS:  And depositions, etc.

25    THE COURT REPORTER:  I'm having trouble.  Your

Vol. 6 - 1055

1 microphone is not working.

2          THE WITNESS:  Oh.  Is it working now?

3          THE COURT:  Let's see if we can get some new

4 batteries.

5          THE WITNESS:  Is this working now?

6 BY MR. KURTH:

7 Q   Mr. Zandman, we were talking about UPS.

8 A   Yes, sir.  If I could continue my answer, that's fine.

9 Q   Are you ready?  Let's make sure the jurors are on the same

10 page.

11          It was your assessment at the time we visited a few

12 years ago that UPS was not really a financial opportunity to

13 ATA that made any sense; isn't that right?

14 A   That's correct.  I mean, even Mr. Garrett testified to the

15 sense that, you know, $1.1 million in cash flow didn't make

16 sense in light of the other, you know, operating costs that

17 they had with the scheduled service and all.  It just wouldn't

18 be a viable alternative.

19 Q   Now, the focal point of Mr. Morriss' report and his

20 testimony is an analysis of lost profits with respect to the

21 military charter business with respect to ATA; is that

22 correct?

23 A   That's correct.

24 Q   The focal point of your commentary is about the entire ATA

25 business, correct?

Vol. 6 - 1056

1   A    Slightly but not totally.  That's not totally correct.

2   Q    Would you agree with me that you're looking at ATA from a

3   different perspective when you look at ATA's entire business

4   from the perspective of Mr. Morriss was looking at the

5   military charter business of ATA.

6   A    I think what you have to do is you can't just cut a slice

7   of the pie and make sure that there's no leakage, if you will,

8   out of that pie --

9   Q    When you cut the pie, blueberry pie --

10          THE COURT REPORTER:  I'm sorry, one at a time.

11          THE COURT:  Mr. Kurth, ask a question.

12          MR. KURTH:  Yes, sir.

13  BY MR. KURTH:

14  Q    I asked a question as to whether the perspective of

15  looking at ATA as a whole business, including scheduled

16  service was different from Mr. Morriss' perspective of looking

17  at ATA as a military charter operator.

18  A    Sir --

19  Q    Is it different?

20  A    Sir, if you would calm your tone, I would be able to

21  answer your question.

22  Q    My tone is fine.  I would just like to know if there's a

23  difference.

24  A    Yes, sir.  There is a difference between looking at the

25  whole company and the military charter.  That difference is

Vol. 6 - 1057

1   what makes the difference.

2   Q   You would agree that the lost profits damage methodology

3   is an appropriate damage method in this case, wouldn't you?

4   A   Yes, I would.

5   Q   And you would agree that one of the forms of quantifying

6   damages in a breach of contract case is lost profits?

7   A   That's correct.

8   Q   And as part of the lost-profits calculation, you calculate

9   lost revenues?

10  A   That's correct.

11  Q   And in calculating lost revenues, one of the questions you

12  ask is what is the revenue that the complaining party would

13  have received but for the critical event, correct?

14  A   That's correct.

15  Q   And the critical event in this case, at least claimed to

16  be, the termination notice from FedEx of January 22, 2008?

17  A   Can you restate that?  I'm sorry.

18  Q   The critical event for purposes of this case, you would

19  agree, is the termination notice from FedEx to ATA in

20  January 22, 2008.

21  A   Well, that is the date in which ATA was asked to continue

22  operating through fiscal '08 and then no longer begin and

23  continue with FedEx beginning October 1 of '09 -- October 1 of

24  '08, correct.

25  Q   Did you forget about the first half of that letter, the

Vol. 6 - 1058

1  first sentence of that letter?

2  A   The first sentence of the letter?

3  Q   Yes.

4  A   That states they would no longer be on the team beginning

5  October 1 of '08, that's correct.

6  Q   And it is the complaint you understand of ATA that that

7  was wrong for FedEx to do?

8  A   Well, I think the Court here will decide whether or not

9  that's wrong.  I'm here to determine what the damages are in

10  relation to that event, and I think that we're looking at the

11  wrong contract period.

12  Q   Mr. Morriss' damage analysis did not venture into other

13  lines of business of ATA or looking at ATA as a whole, did it?

14  A   That's correct, it did not.

15  Q   And Mr. Morriss' testimony is that is the proper

16  viewpoint.  That's the proper frame of reference when

17  evaluating whether or not lost profits were incurred by a

18  party to the contract.  You look at the contract, and you look

19  at the business that is the subject of that contract.  That's

20  your understanding of Mr. Morriss' position, and that's stated

21  in his report.

22  A   I'm sorry.  That was a compound question as I heard it.

23  Q   Okay.  I'm sorry to confuse you.

24       You understood that the lost profits analysis of

25  Mr. Morriss was focused on the military charter business and

1    the claim of ATA that there was underlying contract with

2    FedEx?

3    A    That's correct.

4    Q    And that's -- the analysis that he did for lost profits

5    focused on that contract and lost profits associated with the

6    termination of that contract?

7    A    Well, the alleged termination, that's correct.

8    Q    And he described a concept of impaired versus unimpaired

9    periods.  Do you recall that?

10   A    Yes.  I recall his chart to that.

11   Q    And the concept of impaired versus unimpaired period, is

12   that a concept that you recognize in doing analysis of lost

13   profits?

14   A    Absolutely.

15   Q    The unimpaired period, according to Mr. Morriss -- and

16   correct him if you disagree -- the unimpaired period would

17   predate January 22, 2008?

18   A    I think that his analysis shows it was April 3rd of 2008,

19   and he says operations continue over that period.  So we'll

20   call that a net break even, but ultimately, yes.

21   Q    And the impaired period is the period that is the period

22   that is affected by the actions complained of by FedEx,

23   correct?

24   A    Well, what you have to look at is what is it -- what were

25   those actions of FedEx, and what was FedEx asking its team

Vol. 6 - 1060

1   partner to do?

2   Q   The first thing that FedEx said is, you are removed from

3   the team.  You are terminated from the team effective

4   October 1, 2008.

5   A   As I recall, I think that it said that it was no longer

6   going to participate on the team effective October 1, 2008.

7   Q   Now, you have no experience or have ever done work for the

8   airline industry, do you?

9   A   No.  That's correct.

10  Q   You've never done any work involving the AMC military

11  charter program known by the acronym CRAF, C-R-A-F, have you?

12  A   That's correct.

13  Q   You did not perform any evaluation of whether prior to

14  January 22, 2008, ATA could continue to expect positive cash

15  flow and profitability in its military charter business, did

16  you?  Did you perform such an evaluation?

17  A   Define the term evaluation.  It's not a term I'm familiar

18  with.

19  Q   Do you recall giving your testimony when I asked you that

20  very question a year ago in Atlanta?

21  A   Yes, but you may have said something else.

22  Q   Well, let's play it.  Page 33, please.

23              THE COURT:  Do you have a hard copy?

24              MR. KURTH:  Let me just do this from a hard copy.

25

1  BY MR. KURTH:

2  Q   Mr. Zandman --

3          MR. KURTH:  May I approach, Your Honor?

4          THE COURT:  You may.

5  BY MR. KURTH:

6  Q   Okay.  I'm looking at page 33, lines 20 to 25:

7          "QUESTION:  Prior to January 22, 2008, have you formed

8  an opinion as to whether ATA could continue to expect positive

9  cash flow and profitability in its military charter business?

10          "ANSWER:  I did not perform that evaluation."

11  A   Correct.

12  Q   You didn't ask me at that time and say, "I don't

13  understand what you mean by valuation," did you?

14  A   I used the term "evaluation," and you used the term

15  "valuation."  Evaluation is a different term than valuation.

16  Q   Okay.

17          Speaking of valuation, Mr. Morriss' analysis does not

18  address the value of the ATA as an entire business, correct?

19  A   That's true.  It does not.

20  Q   He did not do a valuation of ATA?

21  A   That's correct.

22  Q   And you did not do a valuation of ATA?

23  A   That's correct.

24  Q   And valuing ATA's entire business would be a distinct

25  methodology for analyzing damages from doing a lost-profits

Vol. 6 – 1062

1  analysis, wouldn't it?

2  A   That's correct.  You could also do a valuation of a

3  business segment as well, and that wasn't done.  So yes, a lot

4  of things could have been done that are distinct and different

5  from doing lost profits.

6  Q   Did I ask you whether you had any credentials for

7  valuation of a company?

8  A   I don't know.

9  Q   Do you have any valuation credentials?

10 A   I don't have valuation credentials, correct.

11 Q   You didn't perform a destruction of business analysis in

12 this case, did you?

13 A   No, I did not.

14 Q   You would agree with me, wouldn't you, that it is

15 necessary in making a lost-profits analysis to identify and

16 segregate fixed and variable costs?

17 A   You need to segregate and identify fixed and variable

18 costs, and you need to analyze item in total to the situation

19 so that if a business is continuing, it makes a difference.

20 If a business does not continue, it does not make a

21 difference, because they all become incremental, saved,

22 avoided costs.

23 Q   Isn't the concept of the but-for analysis and lost-profits

24 valuation –– the concept is that you're looking at the

25 profits, the company who claims it was injured, would have

Vol. 6 - 1063

1  earned but for the actions of the defendant?

2  A   That's correct.  You want to put them back in the same

3  place they would have been but for the event, whatever that

4  event may be.

5  Q   And you don't go into the impaired period and do an

6  analysis of what actually happened in the impaired period

7  because to do so would essentially reward the bad guy for

8  being the bad guy?

9  A   That's absolutely incorrect.  You have to look at the

10 impaired period for the actual because the difference between

11 the two bottom lines is your but for, is your net profit loss.

12 Q   Would it be fair to state you and Mr. Morriss are in

13 disagreement to that point?

14 A   It would be fair to say he is incorrect on that point.

15 Q   That is to say you all don't agree.  You're not of a

16 common mind?

17 A   I think the text would prove out what the proper

18 calculations are.

19 Q   Sir, did you hear my question?  Are you of a common mind

20 with Mr. Morriss on the but-for analysis?

21 A   I am not and neither are texts.

22 Q   Mr. Morriss referred to texts, and you referred to some

23 other texts.  Apparently you don't all read the same books?

24 Is that the problem?

25 A   Apparently if we read the same texts, we read them

Vol. 6 - 1064

1  differently.

2  Q   Did you do any analysis of ATA as a going concern?

3  A   I did some analysis of that, yes, sir.  Not in an audit

4  sense, mind you.  And I think I mentioned that in my

5  deposition as well.  I looked at it strictly from a financial

6  overview.

7  Q   You did not make an independent analysis of the viability

8  of ATA as a long-term business, correct?

9  A   Not from a going concern opinion audit standpoint, I did

10  not.

11  Q   You never looked at the military charter business of ATA

12  and analyzed whether ATA's military charter business was

13  viable, did you?

14  A   I looked at ATA's military business operating within the

15  context of ATA as a whole, and that the losses sustained by

16  ATA as a whole would not have sustained its business operating

17  strictly as a military charter because of the losses sustained

18  on scheduled service.

19          MR. KURTH:  Objection, nonresponsive.

20  BY MR. KURTH:

21  Q   My question to you, sir, in your testimony -- strike that.

22          In your report and today, you would admit that there

23  is no place and no time did you ever look at the military

24  charter business of ATA only and analyze whether the military

25  charter business of ATA was viable?

Vol. 6 – 1065

1  A    That is correct.  I looked at the military charter

2  business as part and parcel of the entire business operation

3  of ATA as it was operating.

4            MR. KURTH:  Objection to that portion as

5  nonresponsive.

6  BY MR. KURTH:

7  Q    You don't claim to be an expert in statistical techniques

8  such as regression analysis, correct?

9  A    I have used regression; but no, I am not an expert in the

10 area.

11 Q    As a matter of fact, when you took on this engagement, you

12 sought another gentleman to come in and analyze the

13 statistical techniques utilized by Mr. Morriss, correct?

14 Mr. Frank Adams, correct?

15 A    Dr. Frank Adams.

16 Q    Dr. Frank Adams.  Dr. Frank Adams is from Georgia?

17 A    Yes, he is.

18 Q    And he is not here?

19 A    I don't see him in the courtroom.

20 Q    You're not here today as an expert on the solvency or

21 insolvency, are you?

22 A    No, sir.  I'm not opining on that.

23 Q    And you're not here today to testify as to whether ATA's

24 plans to discontinue scheduled service were realistic, are

25 you?

Vol. 6 - 1066

1  A    What I am doing is I am looking at what management said

2  the scheduled service was going to be doing, the effects of

3  scheduled service on its overall business operations and

4  taking that into account as a collective in doing my analysis.

5  Q    And you're telling the jury that your reading of the GAL

6  board minutes of February 12, 2008, you're reading them

7  correctly?  You're not misrepresenting or misstating the

8  contents of those board minutes?

9  A    That's correct.

10 Q    I'm looking at those same board minutes, sir; and I think

11 on the third page -- do you have them in front of you?

12 A    No, I do not.

13 Q    Let's look at the third page of those board minutes.

14         THE COURT:  Do you have a number on that?

15         MR. KURTH:  I'm sorry, this is Defendants

16 Exhibit 167, Plaintiff's Exhibit 118.  And while Mike's

17 looking for that --

18 BY MR. KURTH:

19 Q    You repeatedly in direct examination used the number

20 $60 million?

21 A    Somewhere between 36 and 60, yes, sir.

22 Q    And these were numbers -- were these as far as you were

23 concerned, numbers that the GAL board considered hard and

24 reliable numbers?

25 A    They considered them a range of numbers that would be a

Vol. 6 – 1067

1   part of the fleet return costs, yes, sir.

2   Q   But these numbers were not factored into the financial

3   analysis they did in that board meeting, were they?

4   A   It was on the chart that was displayed.

5               MR. KURTH:  If you would blow up that first

6   paragraph.

7   BY MR. KURTH:

8   Q   We see on the second sentence beginning, "Mr. Karnick

9   emphasized that aircraft return costs (ranging between an

10  estimated 36 million to 60 million) is not factored in the

11  financial analysis provided in the board materials because

12  present circumstances (various negotiations to mitigate

13  financial impact) are too fluid to provide an accurate

14  estimate."

15          Did I read that correctly?

16  A   You read that correctly.  The $36 million is reflected on

17  the chart that I presented, the $60 million as the upward

18  range I inserted into my chart.

19  Q   You didn't share with the jury the statement of Mr. Karnik

20  in your direct examination, did you?

21  A   Well, the $36 million --

22  Q   Did you?

23  A   The $36 million is in that chart, sir.  We can go back to

24  the chart, and I can show you where the $36 million is.

25  Q   Did you share that statement of Mr. Karnick in your direct

1   examination with the jury?

2   A    What Mr. Karnick is saying there is untrue as to that

3   chart, that is reflected in that chart.

4   Q    The analysis that the GAL --

5   A    Also, if you notice at the --

6              THE COURT:  Mr. Zandman, there is no question.

7              THE WITNESS:  I'm sorry.

8              MR. KURTH:  Excuse me --

9              THE COURT:  Hold it, Mr. Zandman.  There's no

10  question.

11             THE WITNESS:  I'm sorry.  I was just responding to

12  the question that you asked me.

13             MR. KURTH:  I don't recall a question being pending.

14             THE COURT:  Well, let's ask a question and move on.

15             MR. KURTH:  Yes.

16  BY MR. KURTH:

17  Q    The analysis that the GAL board was doing, Global Aero

18  Logistics was doing in February and March of 2008 as reflected

19  in the board minutes, was to evaluate the continued viability

20  of the military charter business.  And then looking at the

21  company as a whole what the company had to look forward to

22  without a military charter business and shutting down

23  scheduled service, correct?

24  A    I'm sorry.  You're holding your hand over your mouth.

25  Q    I'm sorry.  I want to be clear.

1   A    Yes, please.

2   Q    The GAL board in February and March of 2008 was looking at

3   a scenario that included the absence of a military charter

4   business unless FedEx relented or they found an alternative

5   military charter team.  They were also looking at the

6   liquidation or shutdown of scheduled service.

7   A    As of what date?

8   Q    February, 2008.

9   A    Yes, as of February, and they were looking at that even

10  prior to February, January board minutes.

11  Q    And they were doing financial projections just looking at

12  if costs kept running on scheduled service through the end of

13  the year, just what an ugly scenario that would be.

14  A    That's correct.

15  Q    And they were resolved in those board minutes.  They

16  weren't going to keep scheduled service around for a very

17  short period of time.  Either they were going to shut it down

18  and liquidate it, or they were going to sell it.

19  A    Well, that's the testimony we've heard.  They were going

20  to leave their passengers stranded in Hawaii or whatever when

21  they decided to shut down the scheduled service sometime in

22  June and tell their passengers sometime in September.

23  Q    You were talking earlier in your direct examination for

24  Mr. Blumberg about you were perplexed why ATA didn't continue

25  to operate till September 30, 2008, when they were invited to

1  do so by FedEx?

2  A   I don't think I used the term perplexed.

3  Q   You were critical of ATA for not staying around until

4  September 30, 2008?

5  A   I just don't think that's the appropriate damage period.

6  Q   Do you think it's appropriate for an airline to operate

7  without flight crews?

8  A   I don't think it's very safe to do so.

9  Q   You think it's appropriate for an airline to operate

10 without maintenance crews?

11 A   I don't think it's very safe to do so.

12 Q   Mr. Morriss included fiscal years '05 and '06 as part of

13 his analysis, and you're critical of him doing so?

14 A   No.  I'm not critical of him doing so.  I'm critical of

15 his math in doing so.

16 Q   You all don't do math the same way?

17 A   Well, his math doesn't work.  So I guess not.

18 Q   Another area where you're not of a common mind?

19 A   Well, my one plus one equals two.  His doesn't.  I don't

20 know who's right.

21 Q   That's kind of catty, don't you think?

22         THE COURT:  Let's ask a question and answer.

23 BY MR. KURTH:

24 Q   You don't have any idea what ATA would have done if it

25 hadn't received the termination notice from Federal Express,

Vol. 6 - 1071

1  do you?

2  A    I guess that's what we're here to determine.

3  Q    You don't know?

4  A    I don't think anybody knows unless we had a crystal ball.

5           MR. KURTH:  Pass the witness.

6           THE COURT:  Redirect?

7           MR. BLUMBERG:  No redirect.

8           THE COURT:  Mr. Zandman, thank you very much for

9  your testimony.

10          THE WITNESS:  Thank you, Your Honor.

11     (Witness excused.)

12          THE COURT:  FedEx witness?

13          MR. BLUMBERG:  Your Honor, FedEx has no additional

14 witness, and we rest at this time.

15          THE COURT:  Members of the jury, you have now heard

16 the evidence that is presented by FedEx in support of its

17 counterclaim and also in support of its defense here.  And

18 also remember I told you earlier some of FedEx's witness were

19 previously called in ATA's case, and we did that so we

20 wouldn't have to call them back again.  So you will consider

21 those witnesses as well as part of FedEx's case.

22          Rebuttal?

23          MR. BROUGHTON:  No rebuttal, Your Honor.

24          THE COURT:  Members of the jury, you've now heard

25 all the evidence in this case from which you're to determine

Vol. 6 - 1072

1   the facts.  The next phase of the trial, of course, is final

2   instructions from the Court, final comments from the

3   attorneys, and argument.  You remember what the attorneys say

4   is not evidence.

5           You've already heard all the evidence in this case.

6   What their final statements will be, will, of course, be

7   made -- will be made to help you come to correct conclusions

8   about the evidence that you've heard.  Obviously, also,

9   they're going to try to persuade you to one verdict or

10  another.  And you may accept or reject their arguments any way

11  you see fit.

12          That's it on the evidence.  As I said, we will

13  finish this case up tomorrow.  The attorneys and I have

14  several things to do to prepare for tomorrow, so I'm going to

15  let you go early today.

16          We couldn't actually start final arguments today

17  anyway because it would keep you here way too late.  So we'll

18  start fresh in the morning at nine o'clock.  All right?  Thank

19  you very much.

20          Please do not discuss the case among yourselves.  Do

21  not read or listen to any news accounts.

22          COURT CLERK:  All rise.

23  (Jury out.)

24          THE COURT:  Please be seated.  All right,

25  Mr. Blumberg.  I indicated to you at the close of the

Vol. 6 - 1073

1  plaintiff's case that we would have your Rule 50 argument at

2  this time; and I will, of course, incorporate it into the

3  record after the close of the plaintiff's case.  And also I'm

4  assuming you're going to want to make it for the close of all

5  the evidence as well.

6          MR. BROUGHTON:  And Your Honor, we have a Rule 50

7  motion as well on their counterclaim.

8          THE COURT:  Okay.  Sure.

9          MR. BLUMBERG:  Your Honor, at this time we move

10  under Rule 50 for judgment as a matter of law, incorporating

11  many of the arguments from our motion for summary judgment.

12          In this case, FedEx sent ATA a letter stating that

13  it would not be part of the FY09 Teaming Arrangement.  ATA

14  claims that this decision breached the contract.  The question

15  here is what is that contract.

16          We do know from the evidence that at the time of

17  that letter ATA had not signed its arrangement, operating or

18  Fee Agreements.  So it did not have a contract under those

19  documents to be part of a team.  ATA looks to a letter dated

20  September 7, 2006 and says that this document is a contract

21  that gave it a position on the FedEx team, and that is the

22  contract that was breached.

23          This document is not a contract under Tennessee law.

24  It is, first of all, missing an essential term, the term of

25  price.  Tennessee law under Jane Doe v. Healthcare Services of

Vol. 6 - 1074

1  Tennessee makes very clear that in order to be a contract, a

2  document must contain all essential terms.

3        As we heard from the testimony of Mr. Yakola, this

4  document does not have the essential term of price.  Price was

5  clearly material, as Mr. Yakola testified.  It was part of the

6  company's financial record keeping.  It was enough to get the

7  attention of the CFO.  It could be the difference between

8  making money and losing money.

9        I know that it has been argued or there is Tennessee

10 case law that says that if a term is missing, the Court can

11 impose one, but that doesn't apply here for two

12 reasons:  First, those cases hold that the Court can only

13 impose a term if there already is a contract, not a term to

14 create a contract.

15        But in addition, as put forth in FedEx's motion for

16 judgment on the pleadings, FedEx is covered by the Airline

17 Deregulation Act.  Under the Airline Deregulation Act, not

18 only can the only state law claim as a breach of contract

19 claim; but in addition, the court can only enforce the terms

20 that the parties have agreed to.  The Court cannot impose and

21 state law cannot impose its own term.  So in this particular

22 instance, the missing term prevents the document from being a

23 contract.

24        Second, the September 6th -- the September 7th

25 letter fails for want of consideration.  It is a document that

Vol. 6 - 1075

1   says what ATA gets or what Omni would have gotten, but there

2   is no return consideration.  It does not have the return

3   promise for Federal Express.  A contract, of course, must have

4   consideration.

5          While obviously it's ATA's contention that this

6   contract or this document bound FedEx to have these two

7   airlines on the team, we did not hear the reverse argument.

8   There was no testimony introduced that said that the airlines

9   were bound under changing circumstances.

10         We put on testimony both through William Garrett and

11  through Doug Yakola about what would happen if it turned this

12  18 percent, 20 percent?  There was no testimony that said they

13  were stuck.  They were bound.

14         If a contract is not mutually binding and you impose

15  an obligation on one party, the contract is illusory; and

16  therefore, not a contract.

17         Third, as set forth in our motion for summary

18  judgment, I think as demonstrated by the evidence here, what

19  this document is -- and this is the *Herenton* case and the

20  other cases we cited, it is a preliminary agreement to agree

21  on one term.

22         It is a negotiation or a decision on one term of the

23  Fee Agreement, the term of split with subsequent terms, the

24  price term to be negotiated later, and that all of these terms

25  would then be incorporated in a single writing.  And what

1    these cases hold, as we put forth before, is that if the

2    parties agree to one term and understand that additional terms

3    are to be negotiated and that all the terms are going to be

4    put into a single integrated agreement, the negotiations,

5    discussions, and even the writings on the first term do not

6    form a contract.

7           That's established Tennessee law under the *Herenton*

8    case and the other cases, and the evidence, now that it has

9    come in, completely supports the argument put forth in summary

10   judgment.  There were negotiations regarding what the split

11   would be.  Those negotiations resulted in a letter, an

12   agreement on one term of the overall flying relationship.

13          The other term, what these airlines would pay in

14   order to be on the team, had yet to be negotiated.  Those two

15   elements, the split and the amount to be negotiated, were then

16   to be incorporated in a single writing in the Fee Agreement.

17   Therefore, while the Fee Agreement is a contract, the initial

18   agreement on the term is a preliminary agreement to agree and

19   not a contract under Tennessee law.

20          Your Honor, these are the bases, because there is a

21   missing essential term, no consideration; that it was an

22   illusory contract within neutrality, and it's a preliminary

23   agreement.

24          Finally, under the law -- under the proposed jury

25   instructions, when a party makes an offer, it can have a -- it

Vol. 6 - 1077

1  dictates the terms to which that offer is going to be

2  accepted.  As the evidence shows, FedEx prepared a letter for

3  all three parties to sign.  In this case the third party,

4  Omni, did not sign.

5          FedEx did not view the document as a binding

6  contract.  We saw that from the e-mails between Mr. Molinari

7  and Mr. Rachor.  There was no intent.  There was no evidence

8  of intent, but on the other side there's no evidence of intent

9  from ATA either.

10         There is no evidence after September 7, 2006 that

11 ATA viewed this as a binding agreement.  In fact, what the

12 evidence shows is when it came time for 2008, a different term

13 was agreed to.  And while -- and ATA at no point came to FedEx

14 and said we have an agreement, we're going to change it, or

15 can we change the letter.  Nothing was said about the letter.

16 So the understanding and intent by both parties at the time

17 was that there was no agreement.

18         So for all these grounds, the missing essential

19 term, the lack of consideration, the fact that the contract is

20 illusory, and that it is a preliminary agreement to agree

21 under Tennessee law.  For these reasons FedEx moves for a

22 judgment as a matter of law and asks the Court to dismiss

23 ATA's claim.

24         THE COURT:  Thank you, Mr. Blumberg.

25         Response, Mr. Broughton?

1              MR. BROUGHTON:  Thank you, Your Honor.

2         First of all, I would point out that the Supreme

3    Court decision in Reeves versus Sanderson Plumbing Products,

4    in entertaining a motion for judgment as a matter of law, the

5    Court should review all of the evidence in the record.

6         In doing so, however, the Court must draw all

7    reasonable inferences in favor of the nonmoving party.  And it

8    may not make credibility determinations or weigh the evidence.

9    Credibility determinations, the weighing of the evidence, and

10   the drawing of legitimate inferences from the facts are jury

11   functions, not those of a Judge.  Thus, although the Court

12   should review the record as a whole, it must disregard all

13   evidence favorable to the moving party that the jury is not

14   required to believe.

15        With respect to the argument just advanced by FedEx,

16   it is absolutely undisputed from the record that FedEx, ATA,

17   and Omni entered into a previous three-year agreement.  In

18   response to questions of both FedEx representatives,

19   Mr. Rachor and Mr. Molinari both agreed that the previous

20   three-year agreement was indeed a multiyear agreement.  And

21   they made no assertion that I was invalid.

22        That's highly relevant in that the '07 through '09

23   agreement that ATA is suing on is virtually the same as the

24   previous '04 through '06, except that it covers a different

25   time period, and the split was different.  But in other

1  material respects, it was the same subject matter.

2          Furthermore, as the Court pointed out in its summary

3  judgment ruling -- and I would incorporate by reference all

4  the cases that ATA cited in opposition to FedEx's previous

5  motion for summary judgment -- agreements don't have to be set

6  forth in a single document.  They can be certainly more than

7  one document put together; and that's exactly what we have

8  here.

9          First of all, we start with Plaintiff's Exhibit 7,

10  which was the 50/50 three-year proposal in writing in the

11  e-mail from Mr. Molinari.  There was actually undisputed

12  testimony, I believe, from Mr. Doherty that he accepted that

13  offer.  I believe Mr. Molinari said he just didn't remember

14  hearing anything back from it.  So that was a verbal contract.

15          Then we go forward only a couple of weeks to

16  Plaintiff's Exhibit 9, which was the three-year Omni agreement

17  where very unambiguously Omni and FedEx agreed that FedEx

18  would cause 50 percent of the passenger flying for '07 through

19  '09 to be delivered to Omni.

20          The cover sheet -- and this is important -- the

21  cover sheet Omni said, Chuck Pollard said, "While on vacation

22  I've learned that we've agreed to a 50/50 split.  That should

23  be fair all around."  In Mr. Pollard's deposition, he

24  specifically was asked -- did he -- was he talking about with

25  ATA?  He said yes.

1          He was specifically asked if he refused to sign the

2    September 7, 2006 agreement, which is PX13.  He was asked, did

3    you refuse -- "Did Omni refuse to sign it because it was

4    inaccurate?"

5          Mr. Pollard, being the lawyer that he is, said "No,

6    we weren't saying it was inaccurate.  Rather, Omni had already

7    signed a previous agreement covering the same subject matter,

8    and I believed Omni's interests were protected."

9          So clearly, Omni has agreed to a 50/50 split in

10   PX13.  ATA and FedEx agreed to a 50/50 split.  Furthermore,

11   it's very, very clear from the undisputed evidence from

12   Mr. Rachor and Mr. Molinari and Mr. Doherty that Mr. Molinari

13   and FedEx were the decider.

14         FedEx and ATA did not need the agreement of Omni

15   anyway as to the 50 percent of the business that FedEx gave to

16   ATA in the -- in Plaintiff's Exhibit 13.  FedEx was the lone

17   decider.  FedEx decided it was going to cause 50 percent of

18   the passenger business for those three years to be delivered

19   to Omni and the other 50 percent to ATA.

20         With respect to this concept of want of

21   consideration, the record is also very clear that it was of

22   prime importance to FedEx as the team leader to be sure that

23   it had sufficient fliers to fly off all of the team's

24   entitlement.  If it did not have sufficient fliers to fly off

25   the entitlement, that income would spill to other teams; and

1  so there was a clear quid pro quo in PX13 as well as with Omni

2  in PX9 that not only was FedEx promising to give each of them

3  50 percent of the business for three years; but in turn, they

4  were promising to supply enough aircraft and crews to fly off

5  that 50 percent of the business.

6         And indeed, there's been evidence that they were

7  required to update FedEx with lists of their airplanes, and it

8  was -- there was actually a meeting in Memphis where ATA was

9  explaining its fleet planning because FedEx wanted to be sure

10 that ATA could fly off that 50 percent if it gave it

11 50 percent.  So there absolutely was consideration there.

12 Plus, as a matter of law, all written contracts are presumed

13 to be supported by consideration.  There clearly was

14 consideration here.

15        With respect to FedEx's argument that there was no

16 subsequent recognition or discussion of these three-year

17 agreements, Plaintiff's Exhibit 26 -- I take that back --

18 Plaintiff's Exhibit 24 is a discussion between Omni and FedEx

19 in April of 2007.  That is halfway through FY07 where the

20 context of the discussion was our current three-year

21 agreement, and in that, Omni was asking FedEx as the team

22 leader to go back to ATA and see if there could be a little

23 tweaking because of differences in aircraft that Omni had

24 versus ATA.  And three months later, Gary Molinari responds to

25 this -- our current three-year agreement and says, "I have not

Vol. 6 - 1082

1  been able to get ATA to back off the three-year agreement."

2  So that is certainly a recognition.  I think

3  furthermore, with respect to the argument about a missing and

4  essential element, I would cite to the Court to the cases in

5  our opposition to motion for summary judgment; but it was very

6  clear from the testimony that the commission rate had been

7  consistent at 7 percent for several years.  And FedEx tried to

8  hypothecate about 18 percent or 20 percent or 25 percent of

9  which there was absolutely no evidence.  The evidence was no

10  one had ever charged higher than 7.  It had been 7 percent for

11  '04, '05, '06, '07.  It actually dropped to a more favorable

12  commission rate in FY08 of 4.5 percent.

13  Furthermore, the evidence showed that Omni and ATA

14  had been consistently paying the same commission or virtually

15  the same commission over that period of time.  The evidence is

16  in FY09, Omni's commission went down to 4 percent.  So the

17  evidence has been that commission rates were falling rather

18  than elevating.

19  Mr. Garrett testified that he couldn't imagine any

20  team leader demanding an exorbitant rate because the military

21  has set up CRAF, and indeed, I believe it was undisputed that

22  CRAF was set up to reward and encourage companies like ATA to

23  fly for the military.  So I think this commission rate issue

24  is a straw man.

25  Furthermore, the evidence was that ATA had been on

1   the FedEx team since '91 or '92, and there had been no issue

2   about ever having any trouble over reaching a commission.

3          With respect to the FY08, a slight tweaking of that

4   50/50 split so that Northwest got up to 10 flights a month,

5   the testimony was very clear that was a negotiated change.

6   Parties are free to modify or amend an existing contract, and

7   the evidence showed that's exactly what they did.  Gary

8   Molinari went to ATA and said, "FedEx wants to fly."  And ATA

9   responded, "Well, then you're going to have to lower the

10  commission rate.  It was lowered from 7 to 4.5 percent."

11         I think the very fact that FedEx was the decider,

12  okay?  It didn't need to go -- if as FedEx argues, there was

13  no three-year agreement here, there were only annual

14  agreements.  FedEx did not need to go hat in hand to ATA and

15  say, "Would you please let Northwest fly up to 10 flights a

16  month?"  It could have just issued the edict, and they could

17  have continued to charge ATA 7 percent.  But the fact that

18  they went and asked, "Will you agree to let Northwest fly"

19  proves there was a three-year agreement there as a backdrop.

20         I think also with respect to -- I think FedEx has a

21  faulty supposition here that there were only annual

22  agreements.  That argument was never advanced until after this

23  lawsuit was filed.

24         Mr. Rachor pointed out specifically that he

25  considered the Omni three-year agreement to be valid, and yet

Vol. 6 - 1084

1   it has the same entire agreement, boilerplate clauses in its

2   Fee Agreements that ATA has in its.  So apparently entire

3   agreement clauses only apply to ATA.  They don't apply to

4   Omni, even though the subject matter is precisely the same.

5          Also, FedEx had argued that the contract was

6   illusory.  I think, clearly, it was not illusory.  It was a

7   two-way street.  FedEx was implicit in that three-year

8   agreement that ATA was committing to fly on the team for three

9   years, and Mr. Doherty so testified.  On its face, FedEx was

10  promising to give 50 percent of the flying to ATA for those

11  three years.  So it is not illusory.

12         Furthermore, it is clearly not preliminary, and

13  there is no language in there indicating that it was not

14  binding, that it was merely a proposal, that it was

15  preliminary.  In fact, on its face it says this will define --

16  this is the agreement to define the distribution of the

17  business.  The second paragraph says, "It is agreed."  The

18  third paragraph says, "We look forward to a continued

19  successful relationship over this period."  The only period

20  being discussed is '07 through '09.  So there's nothing on the

21  face of that document to indicate that it's preliminary.

22         Furthermore, going to the intent of the parties,

23  contracts that are executed essentially contemporaneously are

24  to be considered together, and there is a presumption that

25  they can be harmonized.  I think the fact that the

Vol. 6 - 1085

 1   September 7, 2006, three-year agreement and the FY07 Fee

 2   Agreement containing this boilerplate entire agreement clause

 3   shows that it was the intent of the parties that Gary Molinari

 4   was not going to send that September 7, 2006, an agreement

 5   that had been negotiated for months.  He bothered to draft it

 6   and send it; and two weeks later he's going to sign a Fee

 7   Agreement, saying, "Well, we just signed this three-year

 8   agreement two weeks ago, but I'm hereby negating it."  His

 9   conduct clearly indicates otherwise.

10           So I believe that's all ATA has to say at this

11   point.

12           THE COURT:  All right.

13           Any reply?

14           MR. BLUMBERG:  Some brief points in response.

15           There's a very significant point that's been left

16   out, and that is when we talk about these agreements in 2008,

17   there's the e-mail traffic that talks about Omni holding out

18   for a new commission.  And this shows and demonstrates that,

19   in fact, what we have is a preliminary agreement on one term,

20   split, but that nothing's final; nothing's set in stone;

21   you're not committed to the team until you sign the

22   Arrangement, Operating and Fee Agreements.

23           We have the example of Omni holding out, and,

24   indeed, we have the example that Mr. Broughton just raised,

25   the change in 2008.  Indeed, that really cuts the other way,

Vol. 6 – 1086

1  that FedEx could not be assured that ATA was going to agree

2  and could go another direction and that no one was bound to

3  the team until such time as the Arrangement, Operating and Fee

4  Agreements were signed.

5        And the language of the letter, I think, is very

6  telling on the preliminary agreement to an agree point.  It

7  says that this letter will -- this is the agreement that will

8  define the distribution of business.  The distribution of

9  business is only one element of military flying, and that's

10  precisely why this situation that the Court has in front of it

11  is exactly the *Herenton* situation we recited in our brief.

12  It's, in a sense, the textbook example that parties work out

13  one term, and that is what the term would be of that contract

14  if they chose to go to contract to agree to all the other

15  terms each and every year.  But it's only one term and is not

16  in and of itself a contract for all the reasons that we've

17  previously argued.

18        There are a number of issues on which Mr. Broughton

19  discussed some evidence.  I don't know if at this point I will

20  go point by point, say that we have different recollections.

21  But the fundamental legal point is that the letter, because it

22  is missing an essential term, because it's preliminary to a

23  final, fully-integrated contract, is not itself a legal,

24  enforceable contract under Tennessee law.

25        THE COURT:  Thank you, Mr. Blumberg.

Vol. 6 - 1087

1        All right.  Mr. Broughton, you wish to make a Rule

2   50 motion, as well?  Do you wish to incorporate most of what

3   you just said and turn it around, or how do you want to do it?

4        MR. BROUGHTON:  I do, and I would just say very

5   briefly on this commission rate issue, I would refer the Court

6   to the Tennessee case of German versus Ford, 300 S.W.3d 692,

7   which was cited in our summary judgment briefing.

8        But with respect to our -- ATA's motion for summary

9   judgment, I would incorporate everything I said with respect

10  to the fact that I believe a reasonable jury does not have

11  sufficient evidence to find that there absolutely was a

12  three-year agreement.  It was undisputed that the FedEx team

13  leader was the decider of who would get the business, and that

14  was specifically by Mr. Rachor at page 442 of his testimony

15  that we've gotten in the daily reports.

16       It's undisputed that Omni signed the three-year

17  agreement.  It's undisputed that ATA and FedEx signed

18  Plaintiff's Exhibit 13.  The subject matter of 9 and 13 are

19  exactly the same.  You put them together, and you have an

20  agreement.  And there is absolutely a legally sufficient basis

21  for the jury to absolutely find that that was an agreement

22  just like the '04 through '06 was an agreement.

23       Plaintiff's Exhibit 2, the January 22, '08, notice

24  letter, absolutely establishes that FedEx breached that

25  three-year agreement by telling ATA it would not be on the

Vol. 6 - 1088

1  team the third year.

2          And I believe that as a matter of law, the existence

3  of the three-year agreement and its breach has been satisfied.

4          I, likewise, believe that Mr. Morriss' damages --

5  the fact that damages were incurred was really not rebutted.

6  There was a little poking holes at a million there or a

7  million here.  But the fact of damage was not rebutted.

8          An additional point with respect to FedEx's

9  counterclaim, they have counterclaimed saying that by going

10 out of business on April 2nd or 3rd of 2008 and not continuing

11 to fly through September 30, 2008, that ATA had breached that

12 annual agreement.  And, again, I think the record is clear

13 that there were annual agreements and there were multiyear

14 agreements.  There was no evidence, really, to establish that

15 those two couldn't coexist side by side.  Both Mr. Rachor and

16 Mr. Molinari verified that FedEx entered into multiyear

17 agreements concerning military flying.  In fact, it's

18 undisputed they did it '04 through '06.  They did a separate

19 one with Omni.  They did a separate one with ATA.  They did a

20 fourth one in December of '07 with Omni doing '09 through

21 2011.  So, clearly, they manifested their intent.  They

22 believed that they could do multiyear agreements with respect

23 to military flying.

24          Back to this counterclaim, by virtue of -- well, the

25 evidence is undisputed there was a three-year agreement.  The

1  evidence is undisputed that FedEx actually committed a prior

2  material breach by sending that notice on January 22nd so that

3  FedEx's breach relieved ATA of any further obligation to

4  perform under that FY08 annual agreement; and by virtue of

5  FedEx's prior material breach of that three-year contract,

6  that was clearly an anticipatory repudiation, excusing ATA of

7  further performance.  And, therefore, FedEx's claim for

8  damages should be barred as a matter of law.

9            THE COURT:  Thank you, Mr. Broughton.

10            MR. BROUGHTON:   Thank you.

11            THE COURT:  Response, Mr. Blumberg?

12            MR. BLUMBERG:  I don't want to repeat what the Court

13  has already heard, other than to -- on all the letters,

14  summarize an agreement is not a contract; they are two

15  different things.  They have different elements.  And as we

16  have said, these letters don't have the elements to make up a

17  contract, whether it's price, all the other terms that are

18  required.

19            But turning to the counterclaim, it remains

20  undisputed, even after all the evidence, that two

21  things:  First of all, that the Arrangement, Operating and Fee

22  Agreements that had been signed were in place.  No recision of

23  those agreements were sought at any time by ATA.  And,

24  therefore, there's no dispute that the counterclaim damages

25  were directly incurred by ATA's suddenly ceasing operations.

Vol. 6 - 1090

 1  So the counterclaim should remain, and the counterclaim

 2  damages should remain.

 3          As far as the letter from FedEx being an

 4  anticipatory breach, in fact, as a matter of law, that has now

 5  been proven not to be the case.  FedEx's letter is not an

 6  anticipatory breach.  And we know this under *University of*

 7  *Tennessee v. Vote*, that an anticipatory breach requires --

 8  they say that if a party is in material breach of a contract,

 9  the other party can treat it as anticipatory repudiation.  But

10  Vote says it must do one of three things:  Immediately cease,

11  which ATA did not do.  As the evidence shows, they continue to

12  fly in January, February, March.  We introduced that testimony

13  from all the witnesses.

14          They need to seek a recision is the second choice.

15  Well, we've spent most of this trial with ATA trying to prove

16  just the opposite, not that they sought a recision, but that

17  they tried to come back and get FedEx to change its mind.

18          And the third is to await the time for performance

19  and then sue, and that didn't happen here either because ATA

20  went out of business before the time came.

21          This is not an anticipatory repudiation of a

22  contract.  It's a company that went out of business in the

23  midst of a contract.  There is no legal basis, given the

24  evidence that's come in, to claim the anticipatory

25  repudiation, which is significant not just on the

Vol. 6 - 1091

1  counterclaim; but my very next motion was going to be to renew

2  our motion to exclude FY08 damages.  These were the exact

3  issues that we raised with the Court during that motions

4  hearing.  The Court said, We're going to table that because I

5  need to hear the evidence that's come in.

6         But we've now proven that this was not an

7  anticipatory repudiation because it was not an immediate

8  cessation; a recision was not sought; and the plaintiff just

9  did not await the time for performance.

10        That being the case, ATA's claim for FY08 damages

11 should be dismissed as a matter of law for the reasons and the

12 case law that we set forth in our motion.

13        ATA went out of business and closed its doors in

14 April of 2008.  Obviously, there's testimony about the

15 reasons.  What those reasons show is that it was a business

16 decision the company made.  But there's no evidence that it

17 was ever treated or that it falls under anticipatory breach.

18 And it not being an anticipatory breach, there was no basis,

19 as a matter of law, for recovery of the FY08 damages.

20        THE COURT:  Thank you, Mr. Blumberg.

21        Reply, Mr. Broughton?

22        MR. BROUGHTON:  Thank you, Your Honor.

23        With respect to this awaiting the time of

24 performance argument, the evidence clearly established that

25 FedEx's termination letter of January 22nd, '08, set in motion

Vol. 6 - 1092

1   a chain of events that ultimately precluded ATA from the

2   ability to obtain any financing, precluded ATA from the

3   ability to retain pilots and mechanics and other key personnel

4   necessary to put a plane in the air safely, put a plane down

5   on the ground, and maintain a schedule.

6           So FedEx is merely trying to benefit from the injury

7   it caused by saying ATA was not able to stay in business long

8   enough to await the beginning of FY09.  So I believe that

9   argument is a red herring.

10          Furthermore, on this issue and the offer of proof

11  that ATA has made with respect to the subsequent

12  post-January 22, '08, discussions between ATA senior

13  management and FedEx, ATA made it very, very clear that this

14  was going to cause it to shut down and go out of business if

15  FedEx did not relent.  So I do believe that there is plenty of

16  evidence in this record that ATA did everything it could to

17  stay in business and that this concept of awaiting the time of

18  performance, FedEx precluded it from being able to make it to

19  September 30 '08.

20          Thank you.

21          THE COURT:  Thank you.

22          All right.  I'll take both motions under advisement

23  at this time.

24          Anything else we need to discuss before we -- we're

25  going to take a little break, and then we'll come back out and

Vol. 6 – 1093

1  do our instruction conference.  Then, as I indicated to you

2  the other day, make sure that your lists of exhibits admitted

3  are consistent with Philip's list before you go.

4          So let's take about 10 minutes, and then we'll come

5  back out and have our informal instruction conference.

6          Cathy and Jean will be here tomorrow in the event

7  you need to make any record on those instructions, but I'm not

8  going to ask them to stick around any longer and listen to us

9  chat about stuff.

10         Okay.  We'll see you in about 10 minutes.

11         *(The proceedings were adjourned at 3:42 p.m.)*

1               CERTIFICATE OF COURT REPORTER

2

3     I, Cathy Jones, hereby certify that the foregoing is a

4 true and correct transcript from reported proceedings in the

5 above-entitled matter.

6

7

8   /s/ Cathy Jones               October 18, 2010

     _____

9   CATHY JONES, RPR, FCRR
   Official Court Reporter

10  Southern District of Indiana
   Indianapolis Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25