1                     UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF INDIANA
2                         INDIANAPOLIS DIVISION

3
      ATA AIRLINES, INC.,          )
4                                  )
                                   ) CAUSE NO.
5             Plaintiff,           ) 1:08-cv-00785-RLY-DML
                                   )
6             -vs-                 )
                                   ) Indianapolis, Indiana
7     FEDERAL EXPRESS CORPORATION,) October 19, 2010
                                   ) 9:00 a.m.
8             Defendant.           ) VOLUME 7

9

10

11

12                            BEFORE THE
                     HONORABLE RICHARD L. YOUNG
13

14                  OFFICIAL REPORTER'S TRANSCRIPT OF

15                           JURY TRIAL

16

17

18

19

20

21

22    Court Reporter:    Cathy Easley Jones, RPR, FCRR
                         Official Court Reporter
23                       46 East Ohio Street, Room 291
                         Indianapolis, IN  46204
24

25            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              COMPUTER-AIDED TRANSCRIPTION

Vol. 7 - 1095

A P P E A R A N C E S

FOR THE PLAINTIFF:        Mr. Kenneth E. Broughton
                          Mr. Francisco Rivero
                          HAYNES AND BOONE
                          Suite 2100
                          Houston, TX  77010

                          Mr. Thomas E. Kurth
                          Mr. W. Alan Wright
                          HAYNES AND BOONE
                          901 Main Street
                          Suite 3100
                          Dallas, TX  75202

                          Mr. John David Hoover
                          Ms. Alice McKenzie Morical
                          HOOVER HULL
                          111 Monument Circle
                          Suite 4400
                          Indianapolis, IN  46204


FOR THE DEFENDANT:        Mr. Peter D. Blumberg
                          FEDERAL EXPRESS CORPORATION
                          3620 Hacks Cross Road
                          Building D, Third Floor
                          Memphis, TN  38125

                          Mr. Michael E. Gabel
                          FEDEX LEGAL DEPARTMENT
                          3620 Hacks Cross Road
                          Building B, 2nd Floor
                          Memphis, TN  38125

                          Ms. M. Kimberly Hodges
                          FEDEX LEGAL DEPARTMENT
                          3620 Hacks Cross Road
                          Building B-3
                          Memphis, TN  38125

Vol. 7 – 1096

1        **I N D E X   O F   E X H I B I T S**

2                                                              PAGE

Plaintiff's Exhibit No.:

3      178 .......................................1107

4

5

6

7

8

9

10

11

12     Defendant's Exhibit No.:

13     5 .........................................1106
       39 ........................................1106
14     93 ........................................1106
       106 .......................................1106
15

16

17

18

19

20

21

22

23

24

25

Vol. 7 – 1097

1     *(In open court)*

2     *(Jury out.)*

3          THE COURT:  Good morning.  All right.  Back on the

4     record.  ATA versus Federal Express, 1-08-cv-785.  Parties as

5     before.

6          While we're waiting for our last juror to appear

7     this morning, we'll go ahead and make some record.

8          Last evening after the evidence closed, the

9     attorneys met with the Court for an informal instruction

10    conference.  We went through the instructions and the verdict

11    forms.

12         The Court entertained parties' comments and

13    objections, and we made pretty good progress on a final group

14    of instructions.

15         Mr. Wright, any further record you wish to make on

16    instructions?

17         MR. WRIGHT:  Just briefly, Your Honor.

18         THE COURT:  All right.  Sure.

19         MR. WRIGHT:  I think we have four objections to the

20    final form.

21         Plaintiff objects to the omission from the Court's

22    final jury instructions of the following instruction requested

23    by ATA in its proposed instruction No. 11:

24         "A written contract need not be signed by all

25    parties so long as the parties evince an intent to be bound by

Vol. 7 – 1098

1    the contract."

2           Your Honor, this requested instruction is supported

3    by the evidence in this case and correctly states Tennessee

4    law on that issue.

5           ATA's second objection is to the Court's final

6    instruction No. 27.

7           Would you like for me, Your Honor, to make all my

8    objections before you rule or would you like to take them up

9    one at a time?

10          THE COURT:  Let's go ahead and take them one at a

11   time.

12          You're talking about -- your first objection was

13   regarding Court's final instruction 21?

14          MR. WRIGHT:  Yes.

15          THE COURT:  The Court overrules the objection.

16   Mr. Wright, could you state it again, please?

17          MR. WRIGHT:  Yes, Your Honor.  The requested

18   instruction is, "A written contract need not be signed by all

19   parties, so long as the parties evince an intent to be bound

20   by the contract."

21          THE COURT:  All right.  And I guess I'm a little

22   confused here.  ATA is objecting to that instruction?

23          MR. WRIGHT:  No.  We are objecting to its omission

24   from the final instructions.

25          THE COURT:  All right.  I've got this wrong here.  I

Vol. 7 – 1099

1  had Defendant's objection instead of Plaintiff's objection.

2      The Court overrules Plaintiff's objection.  The

3  Court finds that instruction 21 is a correct statement of law

4  supported by the evidence and that the requested instruction

5  is covered by the instructions as a whole.  All right.

6      MR. WRIGHT:  Your Honor, ATA objects to the Court's

7  final instruction No. 27 on the ground that there is no

8  legally sufficient evidentiary basis to support the submission

9  of the instruction to the jury and no legally sufficient

10  evidentiary basis from which a reasonable jury can find for

11  Defendant on that issue.

12      THE COURT:  All right.  The Court inserted as final

13  jury instruction No. 7 Defendant's proposed 20.  Plaintiff

14  objected.  The Court overruled the objection.  The Court

15  believes there is evidence in the record to support the giving

16  of this instruction and is a correct statement of law.

17      MR. WRIGHT:  Thank you, Your Honor.

18      Your Honor, ATA objects to final instruction No. 36

19  and the accompanying questions in the Court's verdict form on

20  the ground that there's no legally sufficient evidence to

21  support the submission of the instruction to the jury and no

22  legally sufficient evidentiary basis from which a reasonable

23  jury could find for the Defendant on this issue.  This is the

24  mitigation issue, Your Honor.

25      THE COURT:  Could you state your objection again,

Vol. 7 – 1100

1  please?

2       MR. WRIGHT:  The objection, Your Honor, is that

3  there's no legally sufficient evidence to support the

4  submission of this instruction or the accompanying questions

5  to the jury.  Under the standards applicable to mitigation, we

6  believe that the evidence conclusively shows that ATA

7  undertook all reasonable efforts in an effort to mitigate the

8  damages from FedEx's breach in this case.

9       THE COURT:  The Court overrules the objection.

10  Correct statement of law.  Evidence in the record supports the

11  instruction.

12       MR. WRIGHT:  Your Honor, ATA's final objection is to

13  the Court's final instruction No. 37 and the accompanying

14  questions in the verdict form.  These are the instruction and

15  questions on FedEx's counterclaim, and our objection to that

16  along the lines of what we stated in our motion for judgment

17  as a matter of law is that there's no legally sufficient

18  evidentiary basis to support this submission to the jury and

19  no legally sufficient evidentiary basis from which a

20  reasonable jury could find for FedEx on this issue.

21       THE COURT:  All right.  Court overrules the

22  objection.  There is evidence –– the Court believes there is

23  evidence to support –– in the record to support its

24  instruction, and it's a proper element of damages.  All right.

25       MR. WRIGHT:  That concludes the Plaintiff's

Vol. 7 – 1101

1   objections, Your Honor.

2            THE COURT:  Thank you.

3            All right, Mr. Blumberg.

4            MR. BLUMBERG:  Your Honor, before objections, I

5   think there may be an extra word or a typographical error in

6   final instruction No. 27.

7            THE COURT:  27.

8            MR. BLUMBERG:  The word "essential" in the first

9   line should probably come out.  I think it should read, "If

10  either party knows or has reason to know that the other party

11  regards an agreement as incomplete."  I think the word

12  "essential" falls later, but I don't think it belongs there.

13           THE COURT:  I think that's right.  Take that out.

14           Okay.

15           MR. BLUMBERG:  FedEx objects to -- starting with the

16  verdict form.

17           THE COURT:  Yes.

18           MR. BLUMBERG:  On juror interrogatory No. 1, we

19  believe that the proper interrogatory is the one proposed by

20  FedEx and submitted on October 1 that simply states that, "Has

21  ATA proven that it had an enforceable contract for FY09 team

22  membership?"

23           The conduct here is the claim that FedEx breached a

24  contract by not including ATA on the FY09 team; and therefore,

25  the proper interrogatory should refer to that conduct.

Vol. 7 - 1102

1          THE COURT:  Mr. Wright, any comment?

2          MR. WRIGHT:  Your Honor, ATA's view is that the

3   question is in proper form as the Court has it now.

4          THE COURT:  The Court overrules the objection as to

5   the verdict form 1, question 1.  The Court believes that's a

6   proper question for the jurors, and it appropriately states

7   the law and the evidence -- and is supported by the evidence.

8   Okay.

9          MR. BLUMBERG:  In addition, in FedEx's proposed

10  interrogatories, FedEx had a separate specific interrogatory

11  on proof that -- given that an anticipatory repudiation is

12  being claimed, proof that the party claiming repudiation would

13  have been ready and able to perform at the time performance

14  was due.

15         We believe that should be a separate interrogatory.

16  We think that's supported by the Ching-Men case I think which

17  found error when the Court was -- when it was not submitted as

18  a separate interrogatory.

19         So we would ask that there be an interrogatory:

20  "Has ATA proven by a preponderance of the evidence that ATA

21  would have been able to perform the contract?"

22         THE COURT:  Mr. Wright?

23         MR. WRIGHT:  Your Honor, Plaintiff is of the view

24  that this anticipatory repudiation is properly addressed in

25  the Court's final instruction No. 29 and the accompanying

Vol. 7 - 1103

1  question that is currently in the verdict form, that there's

2  no need to duplicate that in another question.

3         THE COURT:  Show the objection overruled.  The Court

4  finds that the issue is discussed in the Court's instructions

5  and is covered in the verdict form.

6         Mr. Blumberg?

7         MR. BLUMBERG:  Final instruction No. 21, FedEx

8  objects to the reference to oral promises or oral terms

9  because in this instance, there are no oral promises or oral

10 terms separate from the terms that are in the September 7,

11 2006, letter that's the crux of Plaintiff's case.

12        While this does accurately reflect Tennessee law in

13 the appropriate circumstances here, because there are no

14 additional oral terms separate from the written agreement, we

15 think that the instruction is confusing and misleading.

16        THE COURT:  Mr. Wright, any comment?

17        MR. WRIGHT:  Just briefly, Your Honor.  I think we

18 just disagree on what the evidence shows in the case, and we

19 believe the instruction is in proper form.

20        THE COURT:  Objection overruled.  Show the evidence

21 may very well support this instruction.

22        MR. BLUMBERG:  And finally, Your Honor, I think on

23 final instruction No. 25, we had raised the ability of a term

24 to be supplied by the Court as improper under the Airline

25 Deregulation Act.  So we ask that this sentence -- the second

Vol. 7 – 1104

1    sentence of final instruction No. 25 be omitted.

2            THE COURT:  Mr. Wright?

3            MR. WRIGHT:  Your Honor, for the reasons we have

4    previously stated to the Court, we believe that the Court's

5    instruction is in proper form and that the Airline

6    Deregulation Act would not prohibit this instruction.

7            THE COURT:  The Court overrules the objection.  The

8    Court understands the preemption of the ADA to cover expansion

9    of the parties' agreement by certain public regulations or

10   policies such as an additional term being made to a party's

11   agreement which complies with, say, a local airport authority

12   regulation.  That certainly would be preemptive, but the Court

13   believes that the preemption provisions of the ADA would not

14   cover this specific term, which is a correct statement of law;

15   and the Court overrules the objection.

16           MR. BLUMBERG:  Thank you, Your Honor.

17           THE COURT:  Okay.  Great.  Mr. Wright, any other

18   record regarding instructions or verdict form?

19           MR. WRIGHT:  No, Your Honor.

20           THE COURT:  Mr. Blumberg, any other record regarding

21   instructions or verdict form?

22           MR. BLUMBERG:  No, Your Honor.

23           THE COURT:  The Court, of course, considered the

24   proposed instructions -- final instructions filed by Plaintiff

25   and filed by defense; incorporated many of those

Vol. 7 – 1105

1   instructions -- those proposed instructions into the Court's

2   final jury instructions.  And we now have final instructions

3   and record made regarding the parties' concerns on the final

4   instructions and the verdict form.

5            Okay.  Yes, Mr. Gabel.

6            MR. GABEL:  Your Honor, if I may, there were a

7   couple of exhibits that were referred to in testimony that I

8   don't show as being admitted yet.  I would like to move for

9   admission of the three that were referred to during the

10  examination of Bill Doherty that I believe are stipulated

11  defendant's exhibits. Those are Defendant's Exhibit No. 5,

12  Defendants Exhibit No. 39 and Defendant's Exhibit No. 106.

13  And then I'll have one more from Mr. Yakola.

14           THE COURT:  Any objection?

15           MR. BROUGHTON:  Your Honor, if I can grab my exhibit

16  book and look at those.

17           THE COURT:  Sure.

18           MR. BROUGHTON:  Five, no objection.

19           MR. GABEL:  39.

20           MR. BROUGHTON:  No objection.

21           MR. GABEL:  106.

22           MR. BROUGHTON:  Your 106?

23           MR. GABEL:  Yes.

24           MR. BROUGHTON:  106, no objection.

25           THE COURT:  Hold on.

Vol. 7 - 1106

1          Defendant's 5, 39, 106 admitted.

2      *(Defendant's Exhibits 5, 39 and 106 were received in*

3  *evidence.)*

4          MR. GABEL:  Then, Your Honor, from the examination

5  of Doug Yakola, my recollection is this one was objected to;

6  but you overruled ATA's objection.  Defendant's Exhibit 93,

7  the SEC filings.

8          MR. BROUGHTON:  What number was that again?

9          MR. GABEL:  Defendant's Exhibit 93.

10         MR. BROUGHTON:  No objection.

11         THE COURT:  All right.  93 admitted.

12     *(Defendant's Exhibit 93 was received in evidence.)*

13         MR. GABEL:  Thank you, your Honor.

14         THE COURT:  Mr. Broughton?

15         MR. BROUGHTON:  Similarly, during the testimony of

16 Gary Molinari, he was questioned about numerous different Fee

17 Agreements that had been signed by FedEx; and one of them is

18 PX178.

19         THE COURT:  Plaintiff's 178.

20         MR. BROUGHTON:  I don't remember if it was

21 stipulated to or not -- it's stipulated.  Plaintiffs offer

22 178.

23         MR. GABEL:  No objection, Your Honor.

24         THE COURT:  178 admitted.

25

Vol. 7 - 1107

1      *(Plaintiff's Exhibit 178 was received in evidence.)*

2              MR. BROUGHTON:  I believe that's it, Your Honor.

3              THE COURT:  All right.  Plaintiffs happy with the

4      record at this point?

5              Defendants?

6              MR. BLUMBERG:  I don't know how to answer that

7      question, Your Honor.

8              THE COURT:  I should say happy that you've made your

9      record?  Satisfied that you've made your record?

10             MR. BLUMBERG:  Yes.

11             THE COURT:  All right.  We'll show the record closed

12     then regarding the evidence and objections.

13             All right.  We're ready to proceed on with final

14     instructions then final argument.

15             I'll instruct -- as I said, I'll instruct them; and

16     I leave the last two to give to them after you make your

17     statements.

18             My understanding, Mr. Broughton is you're requesting

19     an hour.  How do you want that divided up?  45-15, 50-10?  I'm

20     not going to ring a bell in an hour.

21             MR. BROUGHTON:  Mr. Rivero is going to shoot me

22     signs.

23             THE COURT:  Okay.  That's fine.  We'll hear from

24     Mr. Broughton then.  The jurors will need a break after that.

25     I imagine you'll need one as well.  We'll take five minutes

1  between the arguments.  Then we'll come back out,

2  Mr. Blumberg; and then, of course, Mr. Broughton can in

3  rebuttal finish up.  Does that sound like a good plan to

4  everybody?

5           The jurors here now, Philip?

6           COURT CLERK:  I'll see.

7           All rise.

8     *(Jury in.)*

9           THE COURT:  Good morning, members of the jury.

10 Welcome back.  We're here today for our final day in this

11 trial.

12           As you know, you've already heard all of the

13 evidence in the case.  In a few minutes I'm going to instruct

14 you as to the law and the evidence in the case.

15           You'll remember I told you during jury selection

16 that your job -- one of your jobs is to take the facts that

17 you find and apply those facts to the instructions to the law

18 as I give it to you; and from that application then, you will

19 make your verdict.

20           So you'll have a copy of these in front of you, and

21 I will read all but the last two to you before arguments.

22 Then after arguments, I'll read the last two to you and then

23 discuss the verdict form with you as well.

24           But I'll read these to you; and then you'll hear

25 first from Mr. Broughton, representing the Plaintiff.  Then

Vol. 7 – 1109

1   we'll probably take a little break after that.  Then you'll

2   hear from Mr. Blumberg, representing Federal Express.  Then in

3   rebuttal you'll hear one more time from Mr. Broughton.  Then

4   you'll be allowed to deliberate your verdict.  So that's the

5   plan this morning.

6          While you were outside the courtroom, did anyone

7   make any attempts to talk to you about the case?

8          Read any news accounts?

9          If you could turn to instruction No. 27, please?

10          Oh, it's been changed.  Well, as usual, I'm a step

11   behind.  The staff has already changed –– there was a typo and

12   they've already fixed it.

13          So go to instruction No. 1.

14     (Jury instructions were read to the jury.)

15          THE COURT:  Members of the jury, those are my final

16   instructions.  As I indicated, I have a few instructions to

17   read to you after the arguments; but we are now ready for

18   final arguments from the attorneys.

19          Representing plaintiff, ATA, is attorney Ken

20   Broughton.

21          MR. BROUGHTON:  Thank you, Your Honor.  May it

22   please the Court.  Ladies and gentlemen of the jury, I can't

23   thank you enough for your attention in the last many days.  I

24   have never seen a jury truly that's paid this much of

25   attention.  Even yesterday, hearing about EBITDA and RASM and

Vol. 7 – 1110

1  CASM and all that other stuff, you guys were paying attention;

2  and we really appreciate it.

3          Jury service is important, and here was your chance

4  to give something back to the system and we thank you.

5          I'm going to try to make this work myself.

6          It struck me when I looked at the evidence of this

7  case that you would not send a termination letter unless there

8  was something to terminate.  But yet, that's exactly what

9  FedEx did.  Out of the blue, they say, "You know what, you're

10  not going to be on the team in FY09."  That's because they

11  knew there was something to terminate.

12          But let's look -- why do we have these three-year

13  agreements?  Why?  That's what we're here about.  Was there a

14  three-year agreement?  We've heard from all three parties why

15  there was one.

16          Mr. Pollard.

17      (A video excerpt of the deposition of Mr. Pollard was

18  played in open court.)

19          MR. BROUGHTON:  What did Bill Doherty say?  He was

20  asked, "What was ATA's motivation in wanting to enter into a

21  three-year agreement?"

22          He said, "It gives some stability when you're

23  dealing with bankers and other investors.  It gives you

24  something that shows you are in this agreement for a period of

25  time and you can predict to them and show them the level of

Vol. 7 - 1111

1  compensation or level of revenue."

2          What was in these three-year agreements for FedEx?
3  What was FedEx getting out of it?

4          Mr. Molinari said, "And you expected those carriers
5  that signed this agreements, ATA and Omni, to have sufficient
6  fleet capabilities and operation capacities to perform with
7  respect to that division of business, correct?

8          Mr. Molinari said, "Yes.  In other words, ATA and
9  Omni were promising we're going to have the fleet.  We're
10  going to fly off this 50 percent."

11          What was the benefit to FedEx?  It wanted to
12  maximize its entitlement.  It didn't want that spill going to
13  other teams.  So it promised, okay, guys, if you fly for three
14  years, I'll give each of you 50 percent for three years.

15          And what did Omni and what did ATA do in response to
16  this concept of FedEx wanting them to have sufficient capacity
17  to fly off 50 percent.  You heard from Mr. Pollard?  Omni
18  bought DC10s.  You saw in December of '06 -- that's three
19  months after the September 7, 2006 contract -- ATA actually
20  bought DC10s, and the testimony was undisputed that DC10s are
21  used for military flying.

22          Now, let's look at this three-year agreement that
23  ATA is suing on.  This wasn't the first time the parties have
24  done this.  The contract that ATA is suing on is simply a
25  renewal of what had been done before.  And it's significant,

Vol. 7 - 1112

1  given the fact that FedEx claims they don't do multiyear

2  agreements; that the testimony was consistent from Mr. Rachor,

3  from Mr. Molinari, from Mr. Pollard and Mr. Doherty.  Everyone

4  considered the previous three-year agreement to be valid, and

5  all of those parties performed it.  Now, how can that

6  three-year agreement be valid and FedEx say the subsequent one

7  was not valid?

8          You've heard the Court's instruction, and it said a

9  contract may be made up of several different documents if the

10 parties intended that the various documents would be one

11 contract.

12         You've seen this several times, I hope.  What we

13 have here is two parts, one contract.  It is absolutely

14 undisputed from the documents produced by Omni that Omni said,

15 "We've agreed to a 50/50 split.  That should be fair all

16 around."

17         If those words aren't clear enough -- before I get

18 there, here's what we have.  We have two parts, one contract.

19 We have Omni and FedEx signing up for 50 percent for the

20 passenger flying for '07 through '09.  We've got ATA and FedEx

21 signing up for that other 50 percent.  50 plus 50 is obviously

22 100 percent; and that was two parts, one contract.

23         In sum, we can look at that last sentence

24 Mr. Molinari wrote on that three-year contract.  In

25 Mr. Molinari's words, he said, "We are looking forward to a

1   continued successful relationship over this period, '07

2   through '09."  He didn't say looking forward to a continued

3   successful relationship for annual contracts.  He said "over

4   this period."

5           As you will see later in the review he claims

6   that -- FedEx claims that two weeks after this when he signed

7   that Entire Agreement clause, that that wiped out this

8   three-year contract that the parties spent months going back

9   and forth negotiating, 60-40, 50/50 -- he would have you

10  believe it was going to be in effect for two weeks and then he

11  signs it away?  That's not what the intent of these parties

12  was.

13          Unfortunately, this successful relationship over

14  this period is not what happened.  We've heard a series of

15  excuses from FedEx as to why its word was not its bond.

16          If you read Omni 9 and -- I mean Plaintiff's 9 and

17  Plaintiff's Exhibit 13, the words are very clear.  Agreement

18  was reached, both sides, 50/50.  But FedEx doesn't want you to

19  focus on those agreements.  They've provided, as I told you in

20  opening, a whole list of reasons why they don't want to talk

21  about that agreement.

22          Excuse No. 1.  FedEx claims Omni did not agree to

23  the 50/50 split.  We just saw in the document written by Chuck

24  Pollard Omni did agree, 50/50 split and that should be fair

25  all around.  And he said "all around" meant FedEx, ATA and

Vol. 7 - 1114

1  Omni.

2        You saw this e-mail from Mr. Rachor that he wrote to

3  Mr. Molinari shortly after FedEx terminated ATA from FY09.

4  And what did Mr. Rachor say as the reason?  He says, "2006

5  agreement for FY07 through '09 that ATA refers to."  That's

6  the contract ATA is suing on.  It was for 2006.  It was for

7  FY07.  So Mr. Rachor is saying ATA has raised this three-year

8  agreement as the reason that FedEx cannot terminate them in

9  FY09.

10       Then he goes on to say, "It has a spot for

11 signatures of each airline.  In the letter, each airline was

12 asked to concur.  Omni did not sign" -- here's the important

13 part that you know is not true -- "as they thought they should

14 have a larger percentage over the three-year period."

15       You absolutely know that's not true.  You heard

16 Mr. Rachor say he had never been shown the Omni agreement.  He

17 didn't know it existed.  So when he said this, he was relying

18 on what Mr. Molinari had told him.  And as we heard from

19 Mr. Molinari, he had never shared the Omni three-year

20 agreement with his boss.  He didn't tell his boss the whole

21 story.

22       Therefore, when Mr. Rachor wrote this e-mail, he

23 didn't -- all he had to go on was what he had been told, and

24 he was led to believe by Mr. Molinari that Omni disputed the

25 three-year split when, in fact, we know that's not true.

Vol. 7 - 1115

1          But who can speak best to this?  Omni.  Chuck

2    Pollard.

3       *(A video excerpt of the deposition of Mr. Pollard was*

4    *played in open court.)*

5          MR. BROUGHTON:  He said it very clearly.  He didn't

6    refuse to sign the September '07, 2006, agreement because it

7    was wrong.  Chuck Pollard, being the lawyer that he was, said,

8    "We already signed that previous one.  I don't think I need to

9    sign a second agreement saying the same thing."

10         Let's look at excuse No. 2.  You heard a whole lot

11   about this proposed conflict of interest because of who ATA's

12   parent became a year after the three-year contract was signed.

13         Let's look at what Mr. Rachor said about this

14   conflict of interest.

15         "You're not telling this jury that that's not a

16   contract because of who later owned ATA, are you?"

17         "No, sir."

18         "So who owned ATA in late 2007 has nothing to do

19   with whether or not -- it's your testimony, whether or not

20   that's a contract; is that right?"

21         Mr. Rachor answered, "The two don't -- the two don't

22   go together.  I think that I agree with you."

23         So this is a red herring.  This whole business about

24   a conflict has nothing to do with the question that you're

25   being asked:  Was there a three-year agreement?

Vol. 7 - 1116

1          Excuse No. 3.  FedEx told you there were a lot of
2    changes in team membership each year; and therefore, it would
3    never enter into these three-year agreements, even though we
4    have seen it consistently entered into three-year agreements
5    in 2003, in 2005, in 2006.
6          Let's look at what happened during the years we've
7    been looking at.  FY06, FedEx, ATA, Polar, Northwest, Omni,
8    Atlas.
9          Let's look at FY07.  Same.
10         Let's look at FY08.  Same.
11         There weren't these radical changes each year that
12   you've heard about.
13         Significantly Mr. Molinari testified Omni never
14   switched teams.  ATA never switched teams.  It's undisputed
15   that Omni had been on the FedEx team for years.  ATA had been
16   on it since '91 or '92.
17         No. 4, you heard that -- incredibly, you heard FedEx
18   say they don't do multiyear agreements.  Well, we've seen
19   multiyear agreements over and over again that FedEx kept
20   signing.  Let's see what Mr. Rachor has to say.
21         "You admitted there's a three-year agreement
22   covering 2004, 2005, 2006, right?"
23         "Yes, sir."
24         "You're not telling this jury that the U.S. Congress
25   has forbidden private companies from entering into multiyear

Vol. 7 - 1117

1  agreements, are you?"

2          "No, I'm not."

3          "Well, the term of these three-year agreements is

4  three years, isn't it?"

5          "Those are written for three years, yes."

6          He didn't say those are written for one year.  He

7  didn't say there's only annual contracts, and the annual

8  contracts wipe out these.  He said, "Those are written for

9  three years."

10         What did Mr. Molinari say about multiyears?  "You

11 considered your three-year agreement with Omni made in August

12 of '05 -- that's the three-year Omni contract for '07 to

13 '09 -- to be effective nonetheless, did you not?"

14         "Yes."

15         So he's saying the Omni agreement for FY07 through '09

16 is valid.

17         Now, I know this was confusing because you heard about

18 annual contracts; and you heard about three-year contracts;

19 and it's obvious that all of them existed.  And this is really

20 how the three-year contract fits with the annuals.  It was an

21 umbrella of three years over the top of the FY07, the FY08 and

22 the FY09.  That was clearly the intent of these parties in

23 negotiating these three-year agreements, in drafting them and

24 signing them.  It wasn't so they could be in place for two

25 years and then be wiped out.

Vol. 7 – 1118

1           And you will see exhibits where after these Fee

2   Agreements were signed, Mr. Molinari is talking with the

3   parties and still calling it our current three-year agreement,

4   even though the Fee Agreements with the Entire Agreement

5   clauses had already been signed.

6           Excuse No. 5, that the three-year contract was just a

7   preliminary discussion.

8           "Mr. Rachor, I believe you called it a preliminary

9   discussion, didn't you?"

10          "I did use that characterization.  I did, yes."

11          "Do you see the word 'preliminary' in there?"

12          "There's a lot of words not in there, sir; but

13  preliminary is not in there."

14          "How about words like 'not binding,' do you see that

15  in there?"

16          "No, sir, I don't see that in there."

17          "Do you see a word like 'proposal' in there?"

18          "No, I don't."

19          What words do we see in there?  "This letter will

20  serve" -- this is what ATA is suing on -- "as the agreement

21  for the distribution between ATA and Omni of both fixed and

22  expansion for both wide and narrow-body long-range

23  international for FY07 through '09."  This will serve as the

24  agreement.

25          The next paragraph, "It is agreed that the

Vol. 7 - 1119

1   distribution will be 50/50."  There is nothing preliminary

2   about that.

3        No. 6, you also heard FedEx had no choice.  Northwest

4   wanted to do more flying.  Let's look at what Northwest had to

5   say about this.  You will find this in the Northwest custodian

6   of the records affidavit.  Look at that.

7        Northwest is saying, "There would have been sufficient

8   military business on the FedEx team for both ATA and Northwest

9   to achieve their respective desired flying levels."

10       So that's not a good excuse either.

11       Excuse No. 7.  FedEx now says, now that there's a

12   lawsuit, it might have decided in '09 to double or triple the

13   commission rate in the future.

14       We heard from Mr. Bill Garrett, the CFO.

15       "Are you aware of anything that would have prohibited

16   FedEx from charging ATA 12 percent, 17 percent, 20 percent as

17   its commission rate for FY09?"

18       Answer, "FedEx could have offered that rate I'm sure."

19       FedEx counsel asked him, "If FedEx had said, 'That's

20   your rate.  Take it or leave it,' what would be your option?"

21       Mr. Garrett said, "The military would be very upset

22   with you guys, very upset.  The purpose of the program is to

23   make money and for these airlines to fly troops."  Not only

24   did Mr. Garrett say that.  Mr. Rachor agreed with him.

25       Mr. Rachor, "Why do you say" -- and he's talking about

1  military flying –– "it's profitable flying by design?"  Those
2  were Mr. Rachor's words, profitable flying by design.
3          Answer, "The military wants to attract carriers to the
4  CRAF.  So when they reimburse you, they reimburse you for
5  costs.  So it becomes profitable flying in that regard."
6          That flies in the face of FedEx's hypothetical, "Oh,
7  what if we decided to charge you 20 percent?"  They're
8  answering to the military.  The military through this CRAF
9  program is trying to attract carriers, not run them off by
10 charging them exorbitant commission rates that no one had ever
11 charged anybody.
12         Let's look at what the parties had actually done.
13 Let's look at the history here.  FY04, '5, '6, '7, it was
14 consistent at 7 percent.  What happened after that?  It didn't
15 go up.  It didn't go up to this hypothetical 20 percent.  It
16 went down to 4.5 percent.
17         Okay.  If you look at these agreements, you will see
18 that each year ATA and Omni were paying about the same
19 commission rate each year.  FY09, Omni paid 4 percent.  It
20 went down again.  This commission rate argument is absolutely
21 when pigs fly.  It has nothing to do with the evidence in this
22 case or the reality of how the CRAF program works.
23         You've heard a lot about this Entire Agreement clause.
24 Okay.  You heard the Court's instruction; and it says here,
25 "During the trial, you have heard testimony regarding an

Vol. 7 – 1121

1    integration clause, or Entire Agreement clause, contained in

2    the FedEx Teaming Arrangement Fee Agreement.  It is your role

3    as jurors to determine the parties' intent."

4         Look at these parties' intent when you're thinking

5    about what happened.  Look at when they signed what.

6         Importantly, the Court goes on to say, "The intent of

7    the contracting parties at the time of executing the agreement

8    governs, not their intent after they've been sued."  And

9    that's the difference you hear.  You're hearing FedEx's intent

10   now after it's been sued.  Let's look at FedEx's intent when

11   they signed these.

12        All right.  That Entire Agreement, let's look at what

13   it says.  "This agreement, together with the Contractor Team

14   Arrangement agreement and the Operating Agreement, constitute

15   the entire agreement and understanding of the parties on the

16   subject matter hereof and as of the effective date hereof,

17   supersedes all previous agreements, whether written or oral

18   between the parties hereto concerning the subject matter

19   hereof."

20        FedEx wants to emphasize the word "supersedes," which

21   is mentioned here once.  There is a reason this provision

22   mentions "subject matter" twice, because by signing this,

23   you're not superseding everything under the sun, only the

24   subject matter.

25        What was the subject matter?  Mr. Rachor was asked,

Vol. 7 – 1122

1  "So the subject matter of the annual agreements is one year
2  and the subject matter of the three-year agreements is three
3  years, isn't it?"
4         Answer, "Those are written for three years."
5         He didn't say they're written for one year, annual.
6  He said those are written for three years.
7         He was also asked, "And three years is not discussed
8  in any other agreement, is it?"
9         "To my knowledge, no."
10        So subject matter, there's only one agreement that
11 discusses a three-year subject matter; and that's the one ATA
12 is suing on.  The annual agreements are a different subject
13 matter.
14        You've seen the umbrella before.  The subject matter
15 of the three-year agreement, the umbrella over all of them is
16 three years.  The subject matter is the three-year split
17 between ATA and Omni.  The subject matter of the annuals are
18 one-year contracts.
19        You know what's kind of interesting is FedEx tries to
20 have it both ways in this case.  All right.
21        Mr. Molinari was asked, "Those Fee Agreements that you
22 had with Omni had Entire Agreement clauses in them, didn't
23 they?"
24        "I believe so, yes."
25        Question, "You considered your three-year agreement

Vol. 7 - 1123

1   with Omni made in August of '05 to be effective nonetheless,

2   did you not?"

3          "Yes."

4          So he's saying well, yeah, Omni's got the same Entire

5   Agreement clauses but it doesn't take Omni out.  Apparently

6   Entire Agreement clauses only apply if you're ATA.

7          There they are.  You can put them side by side.  It's

8   the same exact No. 8.  It's the boilerplate both at the end of

9   the ATA Fee Agreement and the Omni Fee Agreement.  It can't be

10  the parties' intent that when they signed these, they intended

11  to negate the three-year agreement; and it can't be that the

12  Entire Agreement clause only wipes out ATA and doesn't wipe

13  out Omni, but Gary Molinari said it didn't wipe out Omni.

14         It can't be that FedEx has valid three-year contracts

15  only with Omni, and it can't be that the same Entire Agreement

16  clause that FedEx says applies to ATA does not apply to Omni.

17         Now, let's look back at the Court's instruction on

18  this integration clause.  It says what was the parties' intent

19  at the time.  As we look at it, these agreements, the

20  September 7 was signed within two weeks of the Fee Agreement.

21         If you recall, Mr. Molinari sent the FY07 Fee

22  Agreement that contains the entire agreement clause to

23  Mr. Doherty first; and Mr. Doherty signed it on August 22nd.

24  I realize the chronology is going from right to left here, but

25  that's how the document was.

Vol. 7 - 1124

1          Two weeks after Mr. Doherty signs the Fee Agreement,

2    Mr. Molinari sends the September 7 agreement, all right, that

3    Mr. Molinari wrote and Mr. Molinari signed saying it was a

4    three-year agreement.

5          Two weeks after that, Mr. Molinari signs the Fee

6    Agreement which FedEx now claims wiped out this three years.

7    That can't be the parties' intent back at the time

8    Mr. Molinari signed it.  He didn't go to the trouble of

9    drafting that September 7 three-year contract, to supersede it

10   two weeks later.

11         And that brings us back to where we started, the

12   termination letter on January 22nd of 2008.

13         You heard complaining from FedEx that ATA didn't

14   finish out FY08; and, in fact, FedEx has sued ATA for not

15   finishing out FY08.  If you recall in opening, I said that

16   counterclaim is kind of like FedEx shot us, and we didn't die

17   quick enough -- or we didn't hang on long enough.  We died too

18   quick.

19         Many of you have heard that expression, "It's a

20   Hobson's choice."  I looked it up.  The American Heritage

21   Dictionary defines this as an apparently free choice that

22   offers no real alternative.

23         Here FedEx says, "Hey, we told you you could have --

24   you were supposed to fly the rest of FY08."  That wasn't a

25   real alternative.  And it wasn't a real alternative because

Vol. 7 - 1125

1   FedEx had set in motion a chain of events that robbed ATA of

2   its options.

3           FedEx put ATA on the spot with no core military

4   business after 9-30-08.  ATA had no ability to obtain new

5   funding.  ATA had no ability to keep mechanics, pilots and

6   other key personnel from leaving.

7           Howard Zandman, FedEx's expert on damages, was asked,

8   "Do you think it's appropriate for an airline to operate

9   without flight crews?"

10          Answer, "I don't think it's very safe to do so."

11          "You think it's appropriate for an airline to operate

12  without maintenance crews?"

13          "I don't think it's very safe to do so."

14          The undisputed testimony was going to be that in April

15  of '08, the Teaming Arrangements were going to become public

16  knowledge, not only to everybody who did military flying

17  because that's when FedEx released what the teams are.

18  Everybody in the military flying community was going to know

19  ATA's core business was gone in six months.

20          But ATA's pilots were going to know that.  Their

21  mechanics were going to know that, and their key personnel

22  were going to know that.  And you heard Mr. Yakola say he

23  wouldn't blame everybody -- they were going to start looking

24  for a job, and they were going to go get a job as quick as

25  they can.

Vol. 7 - 1126

1          You heard Mark Patterson.  He was asked, "Did there

2    come a time -- a point in time prior to ATA's shutdown that

3    MatlinPatterson determined it would not provide anymore

4    financial assistance?"

5          He said, "Yes."

6          "And why was that decision made?"

7          "We found that the foundation business, the military

8    business, was no longer sustainable once the contract had been

9    broken by FedEx."

10          All right.  That brings us -- we're getting towards

11    the end here of my first part.  Final instruction No. 24,

12    "When a contract is breached, the injured party is entitled to

13    be placed in as good a position as it would have been occupied

14    had the contract been fulfilled."

15          It's very clear the January 1st -- I mean the

16    January 22nd, 2008, notice letter that it wasn't going to be

17    on the team for FY09 was a breach.  ATA had a contract.  It

18    had a promise.  It had FedEx's word.  "ATA, you're going to be

19    on the team for three years" and then in January of '08 says

20    "Oh, by the way, you're not going to be on the team that third

21    year."  That's a breach.  I believe ATA was actually excused

22    from further performance at that time because FedEx had

23    terminated, in essence, that three-year agreement.

24          Significantly, ATA's not suing about its scheduled

25    service.  It's not suing about all this other parts of its

Vol. 7 - 1127

1 business.  It's suing on the benefit of bargain of that one

2 military flying contract.  It's not trying to blame FedEx for

3 its other problems, all right.  It's trying to recover the

4 income and profits it would have received from that one

5 military flying contract.

6         We go on.  "The injured party is not entitled to be

7 put in a better position by a recovery for breach of

8 contract."  We're not trying to do that.  All we're trying to

9 say is we had this three-year contract, and you heard

10 Mr. Morriss -- Larry Morriss testify yesterday.  Here's the

11 profits that would have been generated had ATA been able to

12 finish that in FY08 and FY09.

13         We heard from Mr. Rachor, "Military flying is

14 profitable by design."  Several witnesses testified that the

15 CRAF program paid fliers 11 percent on top of -- 11 percent

16 profit over their costs.

17         Again, to make it clear, ATA is only seeking to

18 recover the benefit of its bargain on this three-year military

19 contract.  It's not suing on anything else except for the

20 profits it would have earned in the remainder of FY08 and all

21 of FY09.

22         Another instruction, No. 35, "As damages, ATA is

23 seeking lost profits.  An injured party may recover lost

24 profits for breach of contract.  The measure of lost profits

25 damages is the profits the plaintiff would have made had the

1  contract been performed."  That's the only thing we're suing

2  on.  That's the only thing Larry Morriss told you about

3  yesterday.  This is how much would have flowed from that

4  contract.

5        And how much were we talking about?  Well, you saw it

6  was undisputed.  For FY08 alone, FedEx team was awarded

7  $1 billion.

8        You saw this -- and I get scared when I see something

9  like incremental lost cash, all right -- but I think

10 Mr. Morriss did a good job of explaining that, and in total

11 said the total ATA military charter lost profits from this

12 contract that we're suing on, a little over 65 -- almost

13 66 million there.

14       How did he get there?  For example, we start out for

15 the 12-month period $1 billion for the 2008 passenger and

16 cargo award.  You heard him say 286.5 million would have been

17 ATA revenue.

18       For FY09, that ended up being about 44 million EBITDA;

19 and, of course, he gave you the explanation that once you

20 divided that on a monthly basis, then when you added the

21 months of FY08 to the 44 million, it totaled over 65 million.

22       And with that, I'm going to reserve the rest of my

23 time for rebuttal.  Thank you very much.

24            THE COURT:  Thank you, Mr. Broughton.

25            Members of the jury, why don't we take a five-minute

1  break at this time; and then we'll proceed on with argument

2  from Mr. Blumberg on behalf of Federal Express.

3          Please do not discuss the case among yourselves

4  while you're in the jury room.

5          COURT CLERK:  All rise.

6  *(Jury out.)*

7  (A recess was taken.)

8  *(Jury in.)*

9          THE COURT:  All right, members of the jury.  That

10  will be our morning break.  We will now continue on with final

11  argument from Mr. Peter Blumberg, representing Federal

12  Express.  Then you'll hear one more time from Mr. Broughton.

13  Then I'll give you final instructions; and more than likely,

14  that will take us right up to lunch.  You will have your lunch

15  and then deliberate.

16          All right, Mr. Peter Blumberg on behalf of Federal

17  Express.

18          MR. BLUMBERG:  Thank you, very much, Your Honor.

19          I also want to thank you for all your time and

20  attention over the last week, not just on behalf of the team

21  of FedEx attorneys here but the team of people that work for

22  FedEx out at the Indy hub, the 4,000 employees there and the

23  95,000 employees across the country.

24          The lawyers here have been kind of lucky.  We've had

25  a little over two years to get familiar with expansion and

Vol. 7 - 1130

1   wide-body flights and MVP points and all these concepts, and

2   you all have had five days.  From everything that I think

3   everyone, both sides, can see, you guys have mastered that in

4   five days.  We really appreciate everything you've done and

5   appreciate the service that you're offering here.

6          This case at the end of the day -- I know we've been

7   here five days and heard a lot of evidence -- really comes

8   down to one question; and that is:  Is this a contract?  Is

9   this a contract to be on the FedEx team?  Is this a contract

10  worth millions and millions of dollars?

11         The answer to that question is:  It is not.  It's

12  not a contract because it doesn't have all the material terms.

13  It's not a contract because it's what the law calls a

14  preliminary agreement on a single term; and it's not a

15  contract because for this particular letter, it was never

16  signed and executed by all the parties.

17         I want to start for a second by talking about

18  essential terms, and I want to use an example with you.

19         If I come to you and say, "I'll come paint your

20  house on Sunday," maybe I even put a letter -- send you a

21  letter, have I made an agreement with you?  Probably.  But do

22  we have a contract?  And the answer to that question is no.

23         And that's in the jury instructions you have.  Why

24  is the answer to that question no?  Because I've made a

25  promise to you, but I've not received the return promise back.

Vol. 7 - 1131

1  You haven't told what you're going to pay me.  You haven't

2  given me the return promise; and as you see in the jury

3  instructions, a contract is an exchange of promises.

4         In this instance, the letter, these letters set out

5  what FedEx is doing for ATA and Omni, how the business will be

6  allocated.  But what the letter doesn't have is the return

7  promise, what ATA and Omni are doing in exchange for this

8  business.

9         You heard Mr. Broughton say in opening, oh, it's the

10  exchanges -- the exchange is they're going to fly all the

11  entitlement.  Well, that's not a promise to FedEx or the other

12  team members.  All the money they fly stays with those team

13  members except for the commission.  The commission is the

14  price term.  The commission is the return promise.

15         As you heard, even in the stipulated facts from the

16  very beginning of this trial, the way the teaming works is

17  that you have some members, the majors; and what they do is

18  they donate their planes or pledge their planes to create all

19  the points.  That's that half of the bargain.

20         The flier operators, what they do is they fly the

21  business; but their half of the exchange is to pay money to

22  the team in order to create that balance.  And what this

23  letter doesn't have and what it doesn't consider is that half

24  of the promise.

25         In your jury instructions, you'll see a reference to

1  essential terms.  And make no mistake about it.  All the
2  evidence you've heard, the commission is clearly an essential
3  term.  In fact, Bill Doherty used that very term in his
4  examination.
5          Doug Yakola explained that it was one of the things
6  in doing the company's overall financial models -- that it
7  looked at that commission, what the commission was.
8          But probably the most compelling evidence on that
9  came from Bill Garrett.  You heard throughout the trial and
10 various times throughout this 11 percent rate of return.  You
11 make 11 percent.  Well, the 11 percent, as you heard from
12 Mr. Garrett, does not include the commission.
13         So really, the 11 percent is less the 7 percent,
14 leaving only a 4 percent profit margin.  So if that commission
15 moves a percentage point here, a percentage point there, that
16 is not only millions and millions of dollars; but it could be
17 the difference between making money and losing money on
18 military flying.
19         And there's no question that the commission can
20 change from year to year.  Yes, you saw the chart that the
21 commission had been steady; and in hindsight, for ATA it was
22 steady.  But what did you see from Bill Doherty's e-mail?
23         He told his bosses that he had been working on
24 trying to get that commission reduced for years and years and
25 years.  And in fact, the commission was reduced as part of the

1  FY08 agreement.  These commissions are significant.  They are

2  the make or break for the airlines as to whether they make

3  money, and they can and do change from year to year.

4          There's something else missing from this agreement,

5  not just the price.  That is, who else is going to be on the

6  team for that year?  Is that significant?  Well, what have we

7  heard?  You bet it is.  The size of the team can determine how

8  much money you have.  And I guess yes, again, in retrospect,

9  you could see that Northwest turned out to be a constant over

10 those years.  But that's hindsight.  No one knew that back in

11 2005 or 2004.

12         So what you would have to believe -- if you believe

13 that this is a contract, here's what you have to believe:  You

14 have to believe that back in 2005 that Bill Doherty, with no

15 evidence that he consulted with a CFO, with the chairman or

16 any evidence that he consulted with anyone, that he locked ATA

17 in for three years with no idea what he's going to pay and no

18 idea what the team is going to look like each year and no exit

19 strategy.

20         What would happen -- and you saw from Mr. Patterson

21 a list of various bankruptcies.  Is ATA seriously saying that

22 had something happened, ATA was locked in, that they had --

23 this letter meant they would have to sit around and go out of

24 business?  Of course not, because this letter is not a

25 contract.

Vol. 7 - 1134

1          It is in item 2 what the law calls -- and it's in
2     jury instruction 27 before you -- a preliminary agreement on a
3     single term.
4          Sometimes -- and this happens both for large
5     commercial parties, big companies; but it also happens in
6     everyday life.  You work out a contract, a deal, term by term.
7     You may get a quote or a mortgage rate from a lender.  Does
8     that mean you have the loan?  "I've got a letter.  It says you
9     gave me a rate."  No.  It's a single term, and that's exactly
10    the way the process worked here as you heard from
11    Mr. Molinari, from Mr. Rachor but also from Mr. Doherty and
12    Mr. Pollard.
13         They worked out one term of an overall contract, the
14    term being the split.  And that term was worked out over a
15    multiple year period because as Mr. Pollard said, he wanted
16    some visibility -- and you heard him -- as to what things
17    might look like.  He used the words "might" or "would" I think
18    in future years.
19         But that one term is not the contract.  You still
20    had to put the rest of the team together and still had to work
21    out the commission.  When those elements are put together and
22    the whole team is assembled for the year, then ATA, Omni,
23    Northwest, Atlas, all those airlines, they go to contract.
24    They say, "Yes.  For this year, we'll be on the team."
25         Robb, if you could call up the Fee Agreement,

Vol. 7 - 1135

1  Plaintiff's 14.  And blow that up a little bit.

2          It's plain from the Fee Agreement that's going to go

3  back to you.

4          Robb, if you'll go to 7471.

5          Both the terms, the price term, what ATA is paying,

6  and the share of the business, what ATA is receiving -- both

7  of these are in the final Fee Agreement.

8          Mr. Broughton had the picture of the umbrella.  I

9  think the more apt description is what this is is a puzzle

10  piece.  It's one piece of the overall puzzle, one part of

11  participating on the team each year.

12          And as you heard from Gary Molinari, as far as Gary

13  Molinari was concerned, ATA, Omni or any other airline were

14  free agents each and every year until they signed these

15  agreements.  And actually, what you also saw from Bill Doherty

16  is that back in 2007, after the signing of the September 7th

17  letter, he was engaged with discussions with the UPS team.  I

18  believe that document is going back to you as part of your

19  deliberations.

20          But what it said was very telling.  Mr. Doherty

21  said, "Well, I just kind of like to check out from year to

22  year what's going on."  But the letter is a little more

23  detailed than that.

24          It says, "Based on our discussions, I think this is

25  where ATA would like to be."  This wasn't just a hey, let's

1  find out what the competition is doing and bring it back.

2  These airlines, they look year to year.  Where could they make

3  the most money?  Where could they get the best deal?

4        And there's nothing wrong with that, but they

5  weren't locked in.  This wasn't a contract that forced ATA or

6  Omni to participate on the FedEx team if they could get a

7  better deal somewhere else.

8        The FedEx team is a year-to-year arrangement based

9  on annual contracts, an annual Fee Agreement, an annual

10 Arrangement Agreement and an annual Operating Agreement.  And

11 each year FedEx puts together the team that will bid that

12 year's contract.  For FY09, there were two reasons for not

13 including ATA:  That Northwest wanted to double its flights.

14 There's been no dispute that Northwest was going to double its

15 flights, and it asked for $120 million of the team's business.

16       You saw the e-mail I think for the first time in

17 closing about Northwest's position.  Well, I think that's an

18 easy position for Northwest to take.  They thought there was

19 enough room because, of course, they get what they want.  But

20 Northwest didn't have to worry about what the other teams had.

21       And ATA's structure, it caused great concern for

22 FedEx.  Really, that evidence is -- has been unrebutted.

23 FedEx was concerned.  You heard from Mr. Pollard talk about

24 his concerns about the structure; and you also saw evidence

25 that these concerns were not unfounded by FedEx.

Vol. 7 - 1137

1          We now know that GAL's chief marketing officer, Rob

2    Binns, was suggesting that the Alliance team, one of the

3    competing teams, make an offer to Continental and Northwest.

4    That's the conflict of interest.  That's the problem.  You've

5    got a parent up there making decisions that certainly for

6    World and North American were probably in their interests and

7    for the Alliance Team but wasn't going to help the FedEx team

8    and their members.

9          In fact, you even saw that making the decision about

10   what to do with ATA, one of the considerations was, "Well, if

11   ATA stops flying, there's going to be extra business out

12   there; and World and North American might pick some of that

13   up."

14         So in sum, these letters, these letters -- excuse

15   me -- are not contracts.  They're not contracts under the law

16   that you'll be applying.  What they are are preliminary

17   agreements to agree, a party agreeing on a single term,

18   knowing that other terms are going to be negotiated later and

19   that everything ultimately will be put in one, single, final

20   integrated agreement.

21         And by the way, that's the reason for the

22   integration clause.  What the integration clause is saying, as

23   Mr. Rachor testified, is we know we're going through this

24   process.  We know that we are -- that there may be initial

25   discussions on a variety of topics.  Split could be a

Vol. 7 – 1138

1  discussion or other things.  But once we go to contract for
2  that year, that's the contract.
3          And what the Entire Agreement clause really shows is
4  that it's the Fee Agreement and the two other agreements
5  incorporated by reference that are the contracts in this case
6  and they are annual.
7          Now, Robb, if you can go back.
8          We've covered 1 and 2.  There's a third reason that
9  this letter, this particular one -- not prior ones but this
10 one is not a contract, and that is it wasn't signed by all the
11 parties to the contract.  It has a blank signature block.
12         FedEx made the offer and as you'll see in your offer
13 instructions, it states the terms of acceptance.  The intent
14 here -- the intent and expectation was to have a fully
15 executed agreement.
16         And how do we know this?  When Mr. Molinari sent the
17 letter out, the e-mail attached said, "Here's a letter for
18 each of you to sign."  The letter itself says, "Please
19 indicate your concurrence by signing as indicated below and
20 returning to the undersigned."
21         Now, what ATA wants to do is they're taking this
22 letter, the Omni letter.  They're putting them side by side
23 and saying, "See, they're the same thing.  There's their 50.
24 There's their 50."  But that's not what's true with the two
25 letters.

1          Omni's letter, as Mr. Pollard testified, secured

2   Omni's 50 percent of the business; and although they didn't

3   show that clip, he went on to say that he didn't know what was

4   going on with ATA or that wasn't his concern.

5          Mr. Pollard through getting his letter had secured

6   50 percent of the business.  He saw it as a floor, not a

7   ceiling.  And you heard him say and you saw testimony that in

8   later years, he asked for more than 50 percent of the

9   business.  But by not executing this letter, it never became

10  effective.  The question is what did ATA believe or how did

11  they view this letter at the time.  Well, what are they saying

12  about the signature?

13         Well, you heard Mr. Yakola say oh, a missing

14  signature isn't a problem because often agreements are signed

15  in counterparts.  I think we walked through the Arrangement

16  Agreement that had that language.

17         But that language isn't here.  It doesn't say it

18  could be signed in counterparts.  In fact, it says exactly the

19  opposite.  "Please indicate your concurrence by signing as

20  below where it says the undersigned.  We would anticipate and

21  expect that everyone would have to sign this letter to make it

22  effective."

23         Then we heard testimony that, well, having the FedEx

24  signature was good enough for us.

25         But the e-mails that you saw show that that wasn't

Vol. 7 - 1140

1 the case at the time, that, in fact, they said they needed the

2 signature.  We had to get the signature.  Get Omni's

3 signature.  There were several e-mails at that point.

4          We also know that Mr. Yakola asked Bill Doherty to

5 call FedEx and find out the status of the signature.

6          As I said in opening -- I said Mr. Molinari would

7 look you in the eyes and tell you, "I called Bill Doherty.  I

8 said Omni wouldn't sign and that even -- even on this one

9 term, this one part of the puzzle piece, we don't have a deal.

10 We're going to go year to year."

11          Well, you're the jury.  But what do we know

12 following that conversation?

13          We know that in 2008, the next year, ATA agreed to

14 something different, 50/50 minus 10 flights a month.  And that

15 10 flights a month is $60 million.  Now, you've heard some

16 explanation that, well, when you take the commission into

17 effect, it's kind of a wash.  Well, if this was such a great

18 deals, ask yourself this question:  Why did they fire Bill

19 Doherty two weeks later?  Was it really that great of a deal?

20          We also know from hearing about the commission and

21 how he told his supervisors about news when he told about the

22 change in the Fee Agreement, that Bill Doherty is someone who

23 from time to time likes to put the good news out there and not

24 necessarily the bad news.  He told the supervisors I did a

25 great job.  I got the commission reduced to 4.5 percent.

1          The supervisor -- the CEO comes back and says, "Huh?

2    Why?"  I'm sure you remember those e-mails.  He says, "Oh,

3    it's something I've been working on for years."

4          "No, I'm serious.  Why did this happen?"  It took

5    three tries to try to get Bill Doherty to say precisely why

6    that commission was cut.

7          But what also is very telling -- oh, I'm sorry.

8    When FedEx came back and said it's going to be 50/50, 10, did

9    ATA ever raise the letter?  Did they ever say, "You can't do

10   this because we have a letter?"  Did they ever say, "We want

11   the letter changed or amended?"  Nothing.  They were

12   absolutely silent.

13         In fact, you saw the impeachment testimony where

14   Mr. Doherty tried to say, "Oh, I did raise it with FedEx."

15   And the tape was played, and he acknowledged he never raised

16   the letter with FedEx.

17         What else is telling?  When it came time for the

18   50/50 minus $60 million of business, what got amended?  Did

19   the letter get amended?  Have you ever seen a letter with

20   50/50 minus $60 million of business?  No.  What did they

21   amend?  They amended the Fee Agreement.  Why did they amend

22   the Fee Agreement?  Because that's the contract.  That's the

23   document that controls.  That's the document that says at the

24   end of the day, with whatever went on before, once that

25   contract year starts, that's what the deal is going to be.

Vol. 7 - 1142

1  Changing the letter wouldn't have changed what was allocated.

2  You had to change the Fee Agreement.

3          Now, in addition to these legal -- or these reasons

4  that this letter is not a contract, there's another thing in

5  the jury instructions you're going to go back and talk about;

6  and that's something called intent of the parties.

7          There's an important phrase in that intent of the

8  parties instruction, and that's what was the intent of the

9  parties at the time?  We've had plenty of ATA witnesses come

10  through this door and say, "It was a contract.  It was a

11  contract.  It was a contract."

12          Frankly, ladies and gentlemen, I wouldn't have

13  expected anything different.  FedEx is being sued for tens of

14  millions of dollars.  Of course, that is what they're going to

15  say.

16          So the question is not what they're saying now was a

17  contract.  It's what were they saying at the time and really,

18  most critically, what were they saying at the time between

19  September 7, 2006, the date of this letter, and January 22nd,

20  2008, when FedEx gave its notice?

21          Well, I think Mr. Yakola gave somewhat of an

22  overview about Securities and Exchange Commissions filings,

23  how important they are, how significant they are.  That's

24  where you put your cards on the table.  That's where you have

25  to disclose anything that's material to an investor.

1          Well, you've heard over and over and over again that

2  this was the bedrock of the business.  This was the only

3  profit center.  This was the very foundation of ATA.  So

4  there's no question that ATA's contract status with FedEx is

5  material.

6          Robb, if you can call up the SEC Form 10.

7          This is the filing and there as we saw -- this is

8  where they're talking about military charter service,

9  describing their military charter business.

10          Robb, if you could go to the next page.

11          This is in April of 2007, middle of FY07.  It says,

12  "For government fiscal year 2007, we have contracted with the

13  FedEx team."  And that's accurate because at that time, they

14  had signed the Arrangement, Operating and Fee Agreements.

15          But then it goes on to say, "and expect to contract

16  for the same percentage for 2008."  Expect to contract.

17  That's different.  You don't have a contract that when you

18  expect a contract -- if they had a three-year contract, it

19  would have said we've contracted with the FedEx team to fly 50

20  percent of the business for fiscal years '07, '08 and '09,

21  exactly what they're saying in this court.  But that's not

22  what they said to the Securities and Exchange Commission in a

23  securities filing where you're supposed to report everything

24  that is material to an investor.

25          What else were they saying at the time?  We actually

1  saw during ATA's closing a clip from Mr. Doherty about the

2  importance of these three-year arrangements for financial and

3  fleet acquisition decisions.  That's what he said from the

4  stand.  But what was he saying at the time, between -- prior

5  to January 22, 2008?

6          Robb, if you can put up Defendant's 64.

7          At the time, Mr. Doherty's pitching for a three-year

8  contract -- for a multiyear contract.  Why is he doing that?

9  Because a longer-term contract gives us some basis for fleet

10  planning, fleet upgrades and investor confidence in our

11  business plans.  "Right now we are guessing year to year

12  because we don't know what Teaming Arrangements or how

13  business opportunities will change."  Again, what were they

14  saying at the time?

15          And how about on the FedEx side?  What was FedEx's

16  understanding, intent and belief of these letters.

17          Robb, if you could put up FedEx 79.

18          This is what Gary Molinari was saying to his vice

19  president, Robert Rachor, talking about ATA.  "They've already

20  signed for FY08."  He goes on to say, "Omni is now the one

21  holding out."  Holding out.  What does holding out mean?  It

22  means they're not signing yet.  They're holding out.  You saw

23  from the e-mails they were holding out because they wanted to

24  change the split.

25          Then he goes on to describe ATA.  "I think the

Vol. 7 - 1145

1   discussion will center on what happens in FY09 and beyond."

2   Gary Molinari never viewed these letters as binding these

3   airlines to the team.  It was their split if they were on the

4   team; but they were holding out, hadn't signed yet.  That was

5   the intent at the time.

6          Here is the thing.  You've heard -- actually, I

7   think Mr. Morriss said it best, something about tons and tons

8   of documents in this case.  Ladies and gentlemen of the jury,

9   let me assure you the notebooks you are going to get back,

10  which are fairly voluminous, don't begin to describe the tons

11  and tons of documents that brought us here this day.

12         Has ATA -- they're looking at e-mails and interpret

13  this.  This could be that.  Has ATA shown you a business plan,

14  a prospectus, a -- you know, they talk about going for

15  financing and all these loans?  Have they shown you something

16  that says, "One of the great things about us is we have a

17  three-year contract for FedEx team membership"?  No.  They

18  talk about the puzzle piece, the split that might be split;

19  and even then, the language is not always clear as to whether

20  they're referring to the letter or what just happens to be in

21  place by the Fee Agreement.

22         One of the things -- and you're being asked to use

23  your common sense and experience.  If this contract was the

24  bedrock of ATA's profitable military charter, wouldn't there

25  have been some official ATA document that says, "We've got

1   this three-year contract.  We have a three-year contract to be

2   on the FedEx team."  And there just isn't one.

3           And here's the reason:  Because at the time, prior

4   to January 22, 2008, ATA viewed this letter and FedEx viewed

5   this letter and everyone else viewed this letter as exactly

6   what it is, an agreement on one term of a contract but not a

7   contract for FedEx team membership.

8           And it's for these reasons that when you go back to

9   the jury room, FedEx is going to ask you to answer "no" on

10  question one of your jury form, that there was not a

11  three-year contract for FedEx team membership.

12          Now, we're asking you to say "no" on question 1 and

13  to return a verdict for FedEx.

14          But if you don't do that, we don't get a second

15  chance to address you.  The bailiff is going to take the form,

16  and you'll be on your way.  So I'm obligated for my client and

17  everyone else to go through the other questions that you'll be

18  asked to answer, even if you do find that there was a contract

19  and a breach.

20          And the first of these is causation.  Was FedEx's

21  decision the cause of ATA's damages?  We heard from ATA that

22  FedEx -- that it was FedEx that put ATA on the spot, that it

23  was FedEx that set this whole thing in motion.  But here's

24  what the facts show.

25          FedEx's decision was that ATA would not be on the

Vol. 7 - 1147

1  FY09 team.  Nothing was changing for FY08.  ATA was still on

2  the FedEx team, still flying, in fact, did continue to fly

3  even after receiving the January 22nd letter.

4           In fact, Mr. Molinari stated that one of the reasons

5  the sentence was in there was that he thought he recalled Gary

6  Ellmer say during the call, "We're not changing anything for

7  '08, right?"  So part of that was specifically in there

8  because ATA wanted that assurance.

9           We also know that ATA went out of business on

10 April 3rd, 2008, six months before the start of FY09.  We also

11 know that ATA was losing money prior to FedEx's decision, and

12 these losses were getting worse and worse going into FY2007.

13 The profits for military charter were dropping, and they had

14 gotten to just $2.1 million for FY07, as we saw from

15 Mr. Morriss.  And the losses from scheduled services were

16 growing.  We heard a lot of testimony about what was going on

17 with fuel at that time.  It was getting worse and worse and

18 worse.

19           And as Mr. Garrett testified, even before this

20 decision on FY09, ATA was having severe cash problems.  Cash

21 was ugly.  There were references to "going to DEFCON 5 in Indy

22 in a shutdown-and-cut-our-losses scenario."

23           The company was already instituting austerity

24 measures.  You saw from some of the board minutes that ATA put

25 out that they were deferring capital projects.  Even some kind

Vol. 7 - 1148

1    of flight system had to be run through the CFO before it could

2    be authorized.  And at that time, it was already getting cash

3    from its parent holding company, GAL, and its subsidiaries.

4           This wasn't cash to buy aircraft or to put in a new

5    computer system.  It was getting cash to stay in operations,

6    to make payroll, to gas up the planes.  So the idea that FedEx

7    set this in motion just isn't supported by the evidence you've

8    heard.

9           But what ATA is saying is basically this:  "If we

10   knew we had just 12 more months of flying on the FedEx team,

11   we could have turned this whole thing around."  And I'm sure

12   you're looking at me and saying, "12 months?  What do you mean

13   by 12 months?"

14          Well, FedEx had said you're on the team all the way

15   through the end of FY09, even in its letter.  And the

16   contract, the contract that they're suing on or they claim to

17   be suing on, ends in FY09.

18          If it's your belief that -- or if it's their belief

19   that this is a contract, then there's nothing after FY09.

20   Now, it's possible they could have found another team,

21   although we've already heard they couldn't go to the Alliance

22   team.  We already heard the UPS team was too small.  With the

23   FedEx team, it's who knows?  We don't know.

24          So the question you've got to ask is:  Would just

25   the promise of 12 additional months of flying, having made

Vol. 7 – 1149

1  only $2.1 million in FY07, would that be enough to justify to

2  do this Project Thatcher, to do what they were planning to do.

3          There's two things you need to know about Project

4  Thatcher.  First, it wasn't free.  We saw the cost estimates.

5  And no one disputes, no one questions these 30 to

6  60 million-dollar shutdown costs; and not just those costs but

7  the cash burn, the continuing cash coming out until they get

8  scheduled service shut down.

9          And second, it's just that:  it's a plan.  It's a

10  project.  Whether it would have worked is totally speculative.

11  ATA had tried a codeshare with Southwest.  I'm sure they had

12  good intentions, but it didn't end up working out.

13          The parent did the merger with World and North

14  American.  I'm sure it was done with good intentions in mind,

15  to view those synergies and make them all profitable.  That

16  didn't work out either.  It's just simply speculative as to

17  whether they could have pulled off this Project Thatcher.  So

18  it's speculative whether anything would have changed.

19          We know that ATA went out of business on April 2nd

20  basically because it ran out of cash.  It ran out of cash

21  while it was still on the FedEx tea m, still entitled to fly

22  and still had money on the table.  The idea that but for this

23  letter there would have been a different result is just that.

24  It's speculation.

25          Because ATA did go out of business before the start

1  of FY09, if there's no company, there's no cause, then FedEx

2  cannot be held responsible for the profits because the company

3  would not have been around to earn the profits.

4          And you'll see in one of your jury instructions, one

5  of the requirements is that if a company is claiming -- is

6  claiming damages, it must prove that it would have been ready

7  and able to perform that contract.  And here the evidence

8  shows the company went out of business six months before FY09

9  and, therefore, would not have been ready and able to perform

10  that contract.

11          Now, in my list of things that I need to and want to

12  address with you before you go back to deliberate -- because I

13  don't get to jump up each time you answer a question -- is the

14  damages question.

15          First -- and I want to split this into two parts.

16  First is the FY08 damages, the damages for fiscal year 2008.

17  ATA is seeking the money that it claims it would have earned

18  for FY2008; but FedEx's decision here was that ATA would not

19  be on the FY09 team.  FedEx wanted ATA to fly in FY08.  ATA

20  had signed its Operating and Arrangement and Fee Agreements

21  for FY08.

22          Mr. Yakola gave you the reasons for the shutdown.

23  ATA was beginning to burn cash.  Some of ATA's problems had

24  spilled into the military service area.  They had gone into

25  the penalty box, reducing the revenue even on that business by

1  2 percent.

2        They were concerned with what might happen to their

3  personnel, and shutting down might allow some of the business

4  to go over to World and North American.

5        We're not really here to quibble with any of those

6  business reasons, and know FedEx has argued otherwise; but

7  that was a business decision that was made by ATA's parent for

8  what it felt was in the best interests of ATA.  And that's

9  fine.

10        But having made the business decision to leave those

11  profits on the table or leave that money on the table because

12  it was overall in the best interests of the company not to

13  operate, FedEx as a matter of law cannot be held responsible

14  for those damages.

15        Having made their choice, having shut down, they

16  can't then come back and say, "Well, FedEx, you still have to

17  pay for us.  "FedEx wanted their participation.  FedEx

18  expected their participation.  And the fact that they had

19  business reasons not to do it doesn't permit them to come to

20  FedEx and say, "Well, we want that money anyway."  That money

21  was there, and it was available to them; and they made the

22  choice not to earn those profits and not to fly, but FedEx did

23  not prevent them from flying.

24        Now, I want to turn to the FY09 profits, which is

25  the 44 million-dollar number that was presented you by

1  Mr. Morriss.  And the key is -- here is what we would be

2  looking at for FY09 are the damages that ATA would have earned

3  in FY09, not what they earned in the past, not what they

4  earned in 1998, not what they earned in 2000, not what they

5  earned in 2005.

6       The goal of lost profits, as the Court has

7  instructed you and I think as Mr. Broughton stated in his

8  closing, is to put the profits that would have been earned had

9  the contract been performed.  So what you need to look at is

10 what would they have earned for 2009 had they performed.

11      Now, we've heard a lot of military flying is

12 profitable, extremely profitable; but we really haven't had

13 that many numbers.

14      Robb, if you could put up 7187.  Delete the text,

15 please.  Thank you.

16      The only hard numbers that we've seen, actual

17 numbers, are these.  The fiscal year September 2007

18 essentially matches what we would be dealing with in '08 and

19 '09.  It is a -- it's -- it was a 50 percent to ATA,

20 50 percent to Omni year.

21      We talked about the DC10s and the DC10 costs.  But

22 as Mr. Morriss explained, those amortization costs were spread

23 out over a number of years.  So those costs would have

24 continued in '08 and '09.  This $2.1 million, that's where ATA

25 was in 2007.  That's the hard number.  That's the reality, not

1  the speculation, not the guess, not looking back to what

2  happened in prior years with a different split, with different

3  team members, with different circumstances, with different

4  cost structures.

5        So given that the number is -- for FY07 was 2.1

6  million, how in the world do you come to a 44 million-dollar

7  spike in just one year?  How does that happen?  Well, we saw

8  how that happens.

9        First of all, Mr. Morriss' revenue number was too

10 high.  Mr. Zandman came up and explained -- Howard Zandman

11 came up and explained he had used the wrong percentages in

12 calculating revenue.  How much was that?  $40 million.  No

13 rebuttal on that, no cross-examination.  The numbers were

14 wrong, and it threw it off by $40 million.

15       What else do we know?  A regression analysis looks

16 at the past, looks at what happened, looks at the past cost

17 structure and says oh, well, if that happened in the past,

18 that might be the future.  How do we know that doesn't work?

19 How do we know that didn't work here?

20       We know from the UPS example that Mr. Zandman gave

21 to the bench.  ATA got an offer from UPS, and ATA had

22 estimated that that number was going to be about $176 million.

23 ATA had looked at it and thought that wasn't enough profit to

24 go forward.

25       And Mr. Zandman acknowledged very carefully that he

Vol. 7 - 1154

1  looked at the UPS offer too and said that wasn't going to make

2  money.

3          What happens when you plug the regression analysis

4  into that 176 -- I'm sorry -- 176 million?  You get an

5  8 million-dollar profit.  That's the proof that it doesn't

6  work.  That's the proof that it overstates revenue.  It's not

7  the right number.

8          The right number is at a minimum what would have

9  happened.  We know what happened.  When the split was 50 with

10  the DC10s, it's right there.  ATA earned $2.1 million, and no

11  evidence was presented of anything that was going to change

12  had they performed -- materially, had they performed in '08 or

13  '09 -- that was going to materially change that result.

14          Finally, the other thing that brings that number to

15  44 million is the EBITDA, EBITDA.  I think after time, I may

16  actually now be pronouncing it right.

17          Mr. Morriss added back the interest and depreciation

18  costs.  But as Mr. Zandman explained to you -- and Mr. Zandman

19  said, "In the normal case, continuing enterprise, I would do

20  the same thing."

21          But here's the thing.  ATA didn't operate after

22  April of 2008.  So it didn't have those costs.  It didn't

23  incur a depreciation expense.  It didn't occur.  Those were

24  saved and avoided costs.  And they can't be part of any award

25  you give because it violates the very rule of lost profits

Vol. 7 - 1155

1    you're being asked to apply.  You cannot put the plaintiff in

2    a position better than it would have been if it had performed.

3              If it had performed, it would have had to pay those

4    costs; and if you award those, it ends up getting costs that

5    it ended up never shelling out because of shutdown.

6              Now, Robb, I actually do want to go back to that --

7    actually, leave that up.

8              Finally, when Mr. Broughton was talking about

9    damages and that 66 million-dollar number, there's another

10   part of the jury instruction that wasn't referred to.  And if

11   you see it, it says, "The plaintiff is entitled to lost

12   profits less any costs that were avoided by not performing."

13   And here, ladies and gentlemen of the jury, that's not an

14   insignificant part of the instruction.

15             ATA, in order to get -- claim lost profits has to

16   say it would still be in business.  Project Thatcher and

17   changing to a military only carrier is their method.  Well, if

18   they're going to say that and they're going to say, "Yes, we

19   would have done Project Thatcher" and "Yes, we could

20   accomplish it," they have to be consistent.

21             If you're going to do Project Thatcher, you've got

22   to pay for Project Thatcher.  Those are all costs, because

23   there would have been no scheduled service -- all costs that

24   would have had to have been borne by the military charter

25   segment.

Vol. 7 - 1156

1          What were those numbers that we saw?  We saw two
2    different estimates.
3          Robb, FedEx slide.  I hope it's the right one.  If
4    not -- am I out?  I'm out.  Okay.
5          We saw two different estimates.  First, we saw the
6    estimates from even before FedEx's decision where they
7    anticipated -- you saw that PowerPoint that's going back with
8    you in the jury room.  51 to $63 million in scheduled service
9    shutdown costs.  That's 51 to $63 million --
10         There we go.  Thank you, Robb.  There are the
11   numbers.
12         If all that's left is military charter, that's all
13   going to have to be paid.  These are costs that were avoided
14   by the shutdown.
15         There was another estimate in Project Thatcher, the
16   one that Mr. Zandman was referring to, that had those numbers
17   on a wider scale, somewhere between 30 and 60 million.  But
18   again, these are avoided costs that if you presume Project
19   Thatcher and you presume it works, then you must also take
20   into account what it would have cost in 2008 and 2009.
21         The other thing you need to take in account when you
22   look at what would have happened in 2009 is the fact that ATA
23   military would have been a very different company.  I think as
24   Mr. Zandman used an example, when a company shuts down part of
25   its service, it doesn't shut down everything.  I don't think

1  Mr. Yakola testified that he was going to take a 50 percent

2  pay cut.  I don't think they were going to run 50 percent of

3  the heat.  Additional expenses, costs that the whole

4  enterprise was bearing, now get moved over to military

5  charter.  There's another headwind that would be based on

6  their profitability if they did operate in FY08 and '09.

7          At the end of the day, Mr. Morriss' regression

8  analysis is a guess.  It's a guess as to what would have

9  happened.

10         But we know what happened in 2007.  We have those

11 numbers, 50 percent of the team's business, putting the DC10s

12 into service, taking the amortization expenses.  And we know

13 that ATA was facing additional headwinds:  Whatever additional

14 business Northwest was going to be flying, the moving to a

15 military only charter and, of course, all these shutdown

16 costs.  It's simply the case that for FY08 and '09, ATA

17 military charter would not have been a profitable enterprise.

18         And for these reasons, we ask that should you reach

19 the question of profits, that you not award any profits in

20 this matter because at the end of the day, the purpose of a

21 lost profits award is to put the plaintiff in the position it

22 would have been had the contract been performed.  And in this

23 instance, those years would not have been profitable years for

24 ATA.

25         You also will be asked if you do award damages a

Vol. 7 – 1158

1  question on mitigation.  Mitigation is ATA's ability to have

2  avoided some of these damages.  Mitigation applies here.

3         First of all, in the FY08 damages, as I said before,

4  they could have mitigated by performing.  They chose not to,

5  and we've heard the reasons why they didn't; but that was

6  their business choice.

7         FedEx didn't say, "You can't take off.  You can't

8  bid.  You can't land.  You can't do this."  ATA had business

9  issues, and they made the decision not to fly.  But having

10 made that decision, that would mitigate any of the FY08

11 damages.

12        The other mitigation is on the FY09 damages.  If you

13 do award any damages there, if a regression analysis is used

14 to calculate damages, then a regression analysis has to be

15 used on the mitigation.  And UPS was on the table.  It was an

16 offer.  It was there, and the regression analysis shows

17 $8 million there.

18        Finally, the last thing I want to address with you

19 is FedEx's counterclaim.

20        On the counterclaim, there really aren't any

21 disputed questions.  ATA had signed its Arrangement, Operating

22 and Fee Agreements for FY08; and ATA made the election not to

23 perform.

24        FedEx incurred the $180,000 in costs in moving the

25 soldiers who were on ATA flights to their destinations.  None

Vol. 7 – 1159

1  of this has really been challenged.  So we would ask for your

2  verdict on the counterclaim and the award that FedEx has asked

3  for of $180,000.

4        I want to thank you for your time and your attention

5  for this whole week.  I want to really conclude where I

6  started.  And it's going back to the very first question with

7  this letter because the law of contracts that you're going to

8  be asked to apply and the evidence that you've heard show that

9  this partially-signed letter is not a multi million dollar

10 contract.  It's simply one term of a contract; and we,

11 therefore, ask that you find in favor of FedEx and return a

12 verdict for Federal Express.  Thank you very much.

13       THE COURT:  Thank you Mr. Blumberg.

14       Mr. Broughton in rebuttal.

15       MR. BROUGHTON:  I know we're getting towards lunch,

16 but I just wanted a chance to respond to some of the arguments

17 you just heard.

18       Mr. Brockwell, if you could play –– I think that's

19 Exhibit –– is it 47?  Put it up there, please.  If you could

20 enlarge just that first page of it.

21       You just heard from FedEx's closing.  They said,

22 "Hey, where are these agreements where ATA was looking at this

23 three-year split and planning its business accordingly?"

24       We discussed this in testimony, August 3rd, 2007.

25 That's almost at the end of FY07, just before FY08.  We heard

Vol. 7 – 1160

1    Andrew Gigax was a financial analyst, and Bill Doherty was

2    sending him —— what was he sending him?  Let's go to the

3    second, third and fourth pages.  He was sending ATA's

4    financial analyst what?

5           Mr. Molinari's August 122005 proposal, which said I,

6    the decider, have made the determination after hearing what

7    Omni says and what ATA says, it's going to be 50/50 for three

8    years.

9           All right.  What's page 4?  Page 4 is the three-year

10   contract we're suing on.  So absolutely ATA was circulating

11   those documents.  Its financial analysts were reviewing those

12   documents during the course of that three-year contract.

13          All right.  You also just heard FedEx say that it

14   wanted a single integrated agreement.  And FedEx admitted

15   there was not just one single integrated agreement in this

16   case.  We repeatedly heard there were three annual agreements,

17   and we repeatedly saw there were multiple —— several multiyear

18   agreements.  So there was no such thing as a single integrated

19   agreement between these parties.

20          And, in fact, if we look at court instruction

21   No. 21 —— we looked at it earlier —— it specifically said a

22   contract may be made up of several different documents if the

23   parties intended that the various documents would be one

24   contract.

25          And indeed, FedEx counsel said the three-year

1  contract is a puzzle piece.  It's one part of the overall

2  agreement.  That's exactly what that Court instruction

3  describes.  It —— in FedEx's own words, it's a puzzle piece.

4  It's one part of the overall agreement.

5         You also heard some claim that FedEx did not receive

6  anything in return from the three-year agreement.  That's

7  absolutely not true.  We heard that FedEx was very focused

8  each year —— in fact, six, eight, nine months before a fiscal

9  year would come to an end, it was planning out who was going

10  to be on its team.  It wanted to know how many planes each of

11  its fliers were going to have because it was making a bid.  It

12  got awarded that $1 billion for FY08, and it wanted to be sure

13  it had fliers to fly that entitlement.

14         So when you look at that three-year agreement,

15  there's promises running two ways.  There's absolutely

16  promises running two ways.  FedEx is promising ATA and Omni,

17  "I'm going to give you 50 percent of this flying for three

18  years."  And those companies were promising FedEx in return,

19  "We're going to be there for you.  We're going to have the

20  planes necessary and the crews necessary to fly off whatever

21  FedEx's entitlement is for those three years."  That's the

22  two-way flow there.

23         All right.  We started off very early in my closing

24  looking at what Mr. Pollard, Mr. Doherty, Mr. Molinari said,

25  why a three-year agreement?  And it was for fleet planning.

Vol. 7 - 1162

1   All right.

2          You just heard FedEx say these three-year

3   agreements, despite their language, were just preliminary,

4   just preliminary.  We looked and saw there was no preliminary

5   language in those contracts.

6          But let's apply some common sense here, and let's

7   look at what ATA and Omni did once they had their three-year

8   agreements.  Both of them went out and spent tens of millions

9   of dollars after they signed those three-year agreements

10  buying DC10s.  Would it be common sense for those two

11  companies to spend all that money and incur all that debt for

12  some preliminary discussion?  No.  Common sense tells you

13  that's not what those two companies would do.

14         You also heard this hypothetical:  What if the teams

15  changed?  Well, we saw the teams didn't change, all right.

16  FY06, FY07, FY08 they were exactly the same people on the

17  team.

18         But FedEx misses the point, okay.  The three-year

19  agreement said whatever the teams are, whatever the teams

20  are -- because the evidence was, oh, everybody was trying to

21  get these big points contributors because the points

22  contributors expand the size of the pie.  The three-year

23  agreement is whatever the size of the team, ATA was going to

24  get 50 percent of that and Omni was going to get 50 percent.

25  That's the agreement.

1          All right.  We've heard more about Omni's signature;

2    and FedEx keeps trying to convince you that Chuck Pollard

3    didn't know what he was talking about, that he didn't mean

4    what he wrote and that he didn't mean what he said on that

5    video.

6          But it's amazing to me that there's no dispute Omni

7    did agree.  There's no dispute Gary Molinari never sent that

8    Omni agreement to ATA.  He put it in his file.  And now

9    they're trying to benefit saying, "Well, because I never

10   shared Omni's signature with you, I can now say Omni didn't

11   agree to this," even though Gary Molinari knew better and

12   Chuck Pollard said they agreed.

13         You also heard this argument about ATA only paid

14   2.1 million profit in '07.  Right here at the end of the

15   closing, FedEx said there was no evidence that FY08 and FY09

16   was going to be any different.  That's absolutely not true.

17         There was very specific evidence and you heard it

18   several times that the reason -- that the reason that profits

19   in '07 were 2.1 million was because that's when ATA was

20   incurring all the one-time start-up costs for those DC10s.

21   The evidence was they were spending millions of dollars paying

22   for those DC10s, training the crews, renovating the planes,

23   reconfiguring the planes, training the mechanics, buying spare

24   parts.  Those were one-time costs that were only going to be

25   incurred in FY07.  And then the payoff would come in FY08 and

Vol. 7 – 1164

1    FY09.

2          You also heard from Mark Patterson, the head of a

3    9 billion-dollar company, that -- whose expertise is getting

4    distressed company out of distress, that he had a long-term

5    commitment to ATA and that but for FedEx's breach of that

6    contract, MatlinPatterson would have continued to support and

7    continued to support and continued to fund ATA.

8          He also told you that since that time, military

9    flying has continued to be a very big part of

10   MatlinPatterson's portfolio and a very profitable part,

11   putting money where his mouth is.  They've continued to

12   support military flying.  Couldn't do it at ATA because of

13   FedEx's breach, but they've done it with other companies.

14         Amazingly, you heard Mr. Zandman testify yesterday.

15   Basically, what he said was because ATA shut down, they don't

16   have the right to recover the benefit of their bargain.  That

17   can't be right.  That can't be -- that's not common sense.

18         FedEx put in motion a chain of events; and the

19   cancellation of FY09, the cancellation of ATA's core business

20   caused MatlinPatterson to stop funding.  And it prevented ATA

21   from being able to hold onto crews and mechanics and flight

22   attendants and other key personnel.  So it couldn't keep the

23   company opening.  He's saying because FedEx set in motion this

24   chain of events, that it also gets to benefit.

25         Yeah.  I made this three-year agreement; but because

Vol. 7 - 1165

1   you shut down, you can't sue me for what you would have made

2   on that contract.

3          You also heard -- this is the first time we've heard

4   about that -- well, what was ATA going to do in FY10?  I tell

5   you, that's a new smoke screen; and that's a new excuse.

6   We're not here talking about FY10.  We're here talking about

7   that FedEx pulled the plug on ATA's core business and

8   cancelled it for FY09.  What it was going to do in the future

9   has nothing to do with this three-year contract.  FedEx needs

10  to be accountable for breaking its word.

11         Also, right there at the end, FedEx was saying, oh,

12  ATA was going to incur all these shutdown costs from shutting

13  down its scheduled service.  That's true.  But, FedEx

14  conveniently left out and when you look at the board minutes

15  which week after week after week -- they're in what you're

16  going to have in the jury room.  You're going to see part of

17  that plan was those shutdown costs were going to go away on

18  the scheduled service because ATA was going to file a

19  Chapter 11 reorganization.  The bankruptcy court was going to

20  zero out those shutdown costs, and ATA would emerge as a

21  military flying company.

22         Now, I'm very, very glad that FedEx brought up the

23  fact that in FY08, Northwest decided it wanted to do some more

24  flying and that as a result of that, ATA ended up agreeing

25  that its 50 percent would come after Northwest had the chance

Vol. 7 - 1166

1   to fly up to 10 flights a month.

2          Why am I glad that was brought up?  One thing,

3   parties are free to modify and amend an existing agreement.

4   All right.  That doesn't prove there was no original 50/50

5   split.  It proves that after the first year, those parties --

6   Mr. Molinari went to ATA and said, "You know what?  Northwest

7   is really important to us.  We want to keep them on the team.

8   They're insisting that they do a little flying.  So let's let

9   them fly, and then you'll get your 50 percent; and we'll lower

10  your commission rate."

11         That's a modification.  That's an amendment.  It

12  doesn't prove there was no original agreement.  In fact, the

13  fact that it says 10 flights and then you get your 50 percent

14  is further corroboration.

15         But I tell you what that really, really shows.

16  Okay.  It was undisputed that Gary Molinari was the decider.

17  We saw plenty of evidence from Mr. Rachor and Mr. Molinari,

18  from Mr. Pollard and Mr. Doherty, FedEx decided who was going

19  to be on the team.  They decided what the split was going to

20  be, and they didn't need anybody's permission.  All right.

21         So if as FedEx says there were only annual

22  agreements, only annual, the three-year agreements were

23  nothing, all right, he would not need to go ask ATA -- he

24  wouldn't need to go bargain with ATA to let Northwest fly.

25         Can you put up that next exhibit, please?

1          All right.  Let's go back and see what was happening

2   there.  This is from Plaintiff's 257, the Omni custodian of

3   the records affidavit.  Omni is talking amongst themselves.

4   "Bill Doherty just called and asked if we had talked to Gary

5   about Northwest's position for FY08.  I danced around the

6   question and told him that there had been an exchange of

7   e-mails requesting time to discuss but that to my knowledge,

8   nothing had been resolved as of yet."

9          Last sentence there then highlighted.  "Sounds like

10  Gary may not have approached them yet."  In other words,

11  Mr. Molinari went to Omni first.  All right.

12         Go to the next slide, and let's see what Omni told

13  him.  This is February 16, Rob Coretz to Gary Molinari, Chuck

14  Pollard.  Look -- "With respect to Northwest operating, we do

15  not object so long as it is clear that any business Northwest

16  performs does not come out of our share of our current

17  three-year agreement of 50 percent of the total passenger

18  business of the FedEx team."

19         That's between Omni and Mr. Molinari.  Mr. Molinari

20  didn't respond, and say, "There's no current three-year

21  agreement.  We only have annual agreements."

22         Okay.  So he goes -- he didn't -- if he's the

23  decider and there's no three-year agreement, he doesn't need

24  to ask Omni's permission to let Northwest fly.  Okay.  He went

25  there because he knew there was a three-year agreement; and he

Vol. 7 - 1168

1  said, "Omni, will you let Northwest fly?"  Mr. Molinari (sic)
2  says, "No way.  They can fly, but it's not coming out of our
3  50 percent from our three-year agreement."

4          So what does he do?  And Mr. Kurth's going to laugh.
5  I've been making fun of Mr. Kurth for years wearing this hat.
6  I thought of this last night.  I said, "Please, bring your hat
7  to court."

8          Why?  If there was no three-year agreement, FedEx as
9  the decider could have just gone to ATA and said, "You know
10 what, Northwest is going to fly.  You don't have a 50 percent
11 agreement."

12         What happened?  It's kind of an old-timey saying.
13 People don't wear hats anymore.  Mr. Molinari went hat in hand
14 and said, "Mr. Doherty, we've got to let Northwest fly.
15 They're the biggest points contributor."  All right.  He
16 didn't need -- but for the three-year agreement with ATA, he
17 didn't need to do that.  He could have sent an e-mail or
18 picked up the phone and said, "You know what, we only have
19 annual contracts.  There are no three-year agreements, so I
20 don't need your permission.  Northwest is going to fly."

21         That didn't happen.  The very fact he went and had
22 to negotiate and said -- Bill Doherty said, "Okay.  They can
23 fly, but you're going to cut our commission from 7 to
24 4.5 percent."  That exchange, that FY08 agreement proves that
25 FedEx knew there was a three-year agreement.

Vol. 7 - 1169

1          Now, if we can go to the questions, please.

2          We're going to quickly go through here.  These are

3   the questions you're going to be asked.

4          Has ATA proven by a preponderance of the evidence

5   that FedEx and ATA had an enforceable contract for long-range

6   international passenger business with the FedEx team for the

7   three-year period '07 through '09?  I think the evidence has

8   been crystal clear that's exactly what we had here.

9          You go to question No. 2:  Has ATA proven that FedEx

10  breached the contract?  That's PX2.  That January 22nd, 2008,

11  letter.  You couldn't be more clear.  You're not going to be

12  on the team for the third year of the three-year contract.

13  That's a breach.

14         Has ATA proven that FedEx's breach was the cause of

15  ATA's damages?  Remember, we're only suing on the profits from

16  that military flying contract, not the whole company.  We

17  haven't tried to blame FedEx for the scheduled service

18  problems.  All right.  We're saying we had this three-year

19  contract.  Regardless of our other problems, the profits from

20  that contract would have been significant.  That's what this

21  case is about.  You're going to answer yes.

22         Question No. 4 -- and this is going to break it into

23  '08 and '09.  You know, you saw Mr. Morriss' testimony; and as

24  I sat there, it seemed to be essentially unrefuted by

25  Mr. Zandman.  He tossed out a few things.  He said, "Well,

Vol. 7 - 1170

1   what about this?  What about that?"  But he didn't give you a

2   dollar amount.  He didn't really quantify any of those things.

3         I think the evidence is really clear that had ATA

4   not been forced to shut down, had it not been prevented by

5   FedEx's anticipatory repudiation of that contract of shutting

6   down, it would have earned 21,999,470 for '08.

7         Similarly, for '09, I think the evidence was strong

8   these were very profitable -- it was a very profitable

9   contract.  It was profitable by design.  I completely disagree

10  with FedEx's characterization of what Bill Garrett said, that

11  it wasn't 11 percent.  Everybody was pretty consistent.  This

12  was an 11 percent margin at least.  You recall that's based on

13  everybody's costs, and there was testimony that it could have

14  even been more than 11 percent.

15        You get to No. 6:  Has FedEx proven by a

16  preponderance of the evidence the affirmative defense of

17  mitigation?  Mitigation means FedEx is saying ATA didn't even

18  try to do anything to fill this gap.  We went through board

19  minute after board minute, week after week with Mr. Yakola on

20  that first day of all the different scenarios that ATA looked

21  at trying to do something here.

22        They tried to get FedEx to reconsider.  They looked

23  at UPS.  They looked at all those other solutions.  So to say

24  they weren't trying their best to stay in business and to say

25  they weren't trying their best to mitigate this harm is

Vol. 7 – 1171

1    absolutely groundless.

2          We look at how much, if any, should ATA's damage

3    award be reduced for its failure to mitigate?  Zero.  They

4    tried really hard.  They tried really hard to keep that

5    company open.

6          All right.  We go to FedEx question No. 1:  Has

7    FedEx proven by a preponderance of the evidence that it had an

8    enforceable contract that required ATA to fly for the FedEx

9    team through the end of FY08?  We know that there was a

10   contract, but here's the problem.  In the midst of that,

11   halfway through it, FedEx sends this notice.  They sent a

12   notice, "You know what, six months, you're not going to be on

13   here.  Your core business is gone."  And they forced ATA to

14   shut down, and now they're trying to benefit by that.  All

15   right.

16         I mean, they what's called anticipatorily repudiated

17   that contract; and that excused ATA from further performance.

18   It excused ATA from further performance.

19         We go to No. 2:  Has FedEx proven by a preponderance

20   that ATA breached the contract?  The answer is no because they

21   breached it first.  When they sent that notice letter in

22   January, they were breaching the three-year agreement.  They

23   breached it first.

24         Has FedEx proven by a preponderance of the evidence

25   that ATA's breach was the cause of FedEx's damages?  No, they

Vol. 7 - 1172

 1  have not.

 2          The answer to No. 4 should be zero.

 3          Indeed, if you look at final instruction No. 29, on

 4  this very point, it says -- 29, he's bringing it up.  Any

 5  party to a contract has a legal right to abandon or refuse to

 6  perform that contract where the other party has unequivocally

 7  renounced the contract.  That's exactly what happened here.

 8  ATA's further performance was excused when FedEx renounced

 9  that contract in January of '08.

10          If we could go to what is good for the goose.

11          Just to come back very quickly to FedEx's Entire

12  Agreement clause, what is good for the goose is good for the

13  gander.  We've heard that a million times.  If the Entire

14  Agreement clause didn't wipe Omni's three-year contract, the

15  same Entire Agreement clause doesn't wipe out ATA's.  FedEx

16  cannot pick and choose when its word is its bond.

17          And if we could go to the very last one, please.

18  I'll close on this one.

19          Mr. Molinari said, "If they," being Omni, "had

20  signed that September '06 Letter Agreement, would you think of

21  that as an agreement?  When you signed it, if the others had

22  signed it, would you consider that to be an agreement?"

23          He said, "Yes."  And we know, in fact, from Chuck

24  Pollard that Omni had agreed to that.  And so Mr. Molinari, he

25  was hiding that ball at that point in time.  He didn't tell us

1  that Omni agreed, but he knew Omni had agreed and Omni had

2  sent him that.

3           So again, can't thank you enough for your time.  In

4  all sincerity, I've been tremendously impressed with

5  Indianapolis.  I haven't gotten to enjoy it, but stayed

6  downtown at the hotel.  I see the people everywhere.

7           And where I live, they unfortunately roll the

8  sidewalks up at about 6 p.m. and there are no restaurants.

9  There's nobody walking around, nobody having a good time in

10 downtown Houston.

11          I want to commend you on having built a beautiful

12 community here and again, on behalf of Cisco Rivero, Alan

13 Wright, Tom Kurth and Doug Yakola, we thank you.

14          THE COURT:  Thank you, Mr. Broughton.

15          I just have a few more instructions to read to you.

16 You can follow along if you wish or just listen.  I'm on 39 on

17 page 44.

18     *(Jury instructions were read to the jury.)*

19          THE COURT:  Members of the jury, those are my final

20 instructions to you.  The verdict form is contained here in

21 this manila folder, and it is self-explanatory.

22          Mr. Bailiff, if you would please come forward.

23 Please raise your right hand.

24     *(Bailiff sworn.)*

25          THE COURT:  Mr. Bailiff, please that the jurors for

Vol. 7 - 1174

1  their deliberations.

2          Ladies and gentlemen, you may now go to deliberate

3  your verdict.  Of course, it is noontime.  If you wish to go

4  out and get some fresh air for lunch, that's fine and begin

5  your deliberations after lunch, that's fine as well.

6          If you wish to begin your deliberations and have

7  lunch brought in, that's fine as well also.  So just let

8  Philip know how you wish to proceed; but in any event, do not

9  begin your deliberations until all of you agree that you wish

10 to begin your deliberations.

11         If you need any of the exhibits, of course, all

12 those exhibits are available to you to examine at your -- to

13 your satisfaction.  Also, again, Philip would have those

14 exhibits made available to you.

15         So, with that, take your instructions with you, go

16 back to the jury room and deliberate your verdict.  Thank you

17 very much.

18         COURT CLERK:  All rise.

19    (Jury out.)

20         THE COURT:  Please be seated.  All right,

21 Mr. Broughton, any further record today?

22         MR. BROUGHTON:  No, Your Honor.

23         THE COURT:  Mr. Blumberg, any further record today?

24         MR. BLUMBERG:  No, Your Honor.

25         THE COURT:  All right.  If you are leaving the

Vol. 7 - 1175

1  courthouse, which I'm --

2        MR. BLUMBERG:  Actually, Your Honor, I do want to

3  raise one thing.  I maybe should have done it before the jury

4  was discharged.

5        I didn't want to interrupt counsel closing, but

6  there was a reference in the closing to the board minutes

7  saying that ATA was going to declare bankruptcy, which is a

8  significant representation, as it might affect the voided

9  damages.

10        I just wanted to assure myself that that's actually

11  true that that's somewhere in the board minutes.  I didn't

12  want to jump up because I'm not sure.  If it isn't true,

13  because they're so voluminous, I would want a corrective

14  instruction.

15        THE COURT:  I don't know quite how to answer that.

16  I'm assuming if it was said by an officer of the Court that

17  it's true?  Mr. Broughton?

18        MR. BROUGHTON:  I believe it's absolutely true.

19        MR. BLUMBERG:  Like I said, I didn't jump up in the

20  middle because it -- I wanted assurance.  We wanted to go

21  through during lunch and make absolutely sure.  It's only

22  because I spent two years with them that I didn't jump up

23  because I'm sure Ken is right, but I did want to let you know.

24        THE COURT:  If you are leaving, please leave your

25  contact information with Philip so in the event we have to

Vol. 7 - 1176

1   call you back to the court for any matters, we can easily get

2   ahold of you.

3           It's been a pleasure working with you on this trial

4   this week.  It's always gratifying to the Court and a pleasure

5   for the Court to work with excellent lawyers, and you

6   certainly are excellent lawyers.  You've represented your

7   clients very well, in the Court's opinion.  Thank you.

8           COURT CLERK:  All rise.

9      (A recess was taken.)

10          COURT CLERK:  All rise.

11     *(Jury in.)*

12          THE COURT:  All right.  Members of the jury, the

13  bailiff has informed me you have reached a unanimous verdict?

14  Is that true?

15          JURY FOREMAN:  Yes, Your Honor.

16          THE COURT:  Will the foreman please hand the verdict

17  form to the bailiff?

18          All right.  In the matter of ATA Airlines, Inc.

19  versus Federal Express Corporation, Cause No. 1-08-CV-785

20  verdict form, regarding ATA's breach of contract claim, has

21  ATA proven by a preponderance of the evidence that FedEx and

22  ATA had an enforceable contract for the long-range

23  international passenger business with the FedEx team for the

24  three-year period from Government fiscal year 2007 through

25  2009?  Answer is, "Yes."

Vol. 7 – 1177

1          Has ATA proven by a preponderance of the evidence
2   that FedEx breached the contract?  Answer is, "Yes."
3          Has ATA proven by a preponderance of the evidence
4   that FedEx's breach was the cause of ATA's damages?  "Yes."
5          What, if any, lost profits do you award ATA for
6   fiscal year 2008?  $21,999,470.
7          What, if any, lost profits do you award to ATA for
8   fiscal year 2009?  $43,998,941.
9          Has FedEx proven by a preponderance of the evidence
10  its affirmative defense of mitigation?  Answer is, "No."
11         How much, if any, should ATA's damage award be
12  reduced for failure to mitigate?  "Zero."
13         Signed by the foreperson, dated today and verdict
14  form 2 on the counterclaim, of course, is answered.
15         All right.  Ms. Harrison, your verdict?
16         JUROR HARRISON:  Yes.
17         THE COURT:  Your verdict, ma'am?
18         JUROR 2:  Yes.
19         THE COURT:  Your verdict?
20         JUROR 3:  Yes.
21         THE COURT:  Your verdict, ma'am?
22         JUROR 4:  Yes.
23         THE COURT:  Sir, your verdict?
24         JUROR 5:  Yes.
25         THE COURT:  Ma'am, your verdict?

Vol. 7 - 1178

1           JUROR 6:  Yes.

2           THE COURT:  Sir, your verdict?

3           JUROR 7:  Yes.

4           THE COURT:  So the jury's polled.  It is indeed a

5    unanimous verdict.

6           Members of the jury, that will conclude our

7    proceedings for this trial.  I want to thank you very much on

8    behalf of the Court staff, myself and all the parties involved

9    for your service.

10          I know we interrupted your personal lives to come in

11   here; but I hope you feel you made your contribution -- made a

12   contribution back to your community, satisfied a role as

13   citizens of our community in serving as jurors and

14   interrupting your personal lives for a few days to be with us.

15          You now see what we do in courts every day.  It's a

16   little different than TV, as I'm sure you can see; but I hope

17   you found it to be an interesting and rewarding experience.

18   And again, we do appreciate your service.

19          If you would go back to the jury room, I will be

20   back in just a few moments to chat with you a little more

21   informally, answer any questions you may have.  And get you

22   back on the road here shortly.  Thank you very much.  You may

23   go back to the jury room.

24          COURT CLERK:  All rise.

25     *(Jury out.)*

Vol. 7 - 1179

1           THE COURT:  All right.  Please be seated.

2           The verdict form is here if anyone wishes to examine

3     it.  Or if you wish to have a copy, we'll make copies of it

4     for you.

5           Any further record?

6           ATA's Rule 50 motion is denied.  I'm assuming,

7     Mr. Blumberg, you wish to renew yours?

8           MR. BLUMBERG:  Yes, I do, Your Honor.

9           THE COURT:  All right.  We'll show that FedEx renews

10    its Rule 50 motion.  I'm assuming you're going to follow that

11    up with a writing?

12          MR. BLUMBERG:  Yes, we will.

13          THE COURT:  Okay.  They will follow it up with a

14    writing.  That will be continued under advisement, of course.

15          As I said earlier, it was a pleasure working with

16    you.  You're excellent lawyers, and this case ran very

17    smoothly; and that's due, of course, to your preparation.  And

18    the Court certainly appreciates that as well.

19          My policy is I go back to the jury and talk to them

20    a little bit.  I always invite the attorneys to come back to

21    chat with the jurors if they wish, ask any questions you might

22    or the jurors may have some questions for you as well, with

23    the only caveat being that anything said in the jury room

24    cannot be used as any kind of collateral attack on the

25    verdict.

Vol. 7 – 1180

1          So if you can follow those rules, when I go back

2   there, I can have you come back in a few minutes if you wish

3   to chat with them.  Okay.  Thank you.

4          COURT CLERK:  All rise.

5          *(The proceedings were adjourned at 2:57 p.m.)*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF COURT REPORTER

2

3      I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6

7

8    /s/ Cathy Jones                    October 29, 2010
    _____
9    CATHY JONES, RPR, FCRR
     Official Court Reporter
10   Southern District of Indiana
     Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25